DENNIS J. HERRERA, State Bar #139669
City Attorney
DANNY CHOU, State Bar # 180240
Chief of Complex and Special Litigation
JAMES M. EMERY, State Bar #153630
ELAINE M. O'NEIL, State Bar #142234
Deputy City Attorneys
Fox Plaza
1390 Market Street, Seventh Floor
San Francisco, California 94102-5408
Telephone:     (415) 554-4261
Facsimile:     (415) 554-3985
E-Mail:        jim.emery@sfgov.org

Attorneys for Defendants
CITY AND COUNTY OF SAN FRANCISCO, ET AL.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IVANA KIROLA and ELIZABETH ELFTMAN, on behalf of themselves and all others similarly situated,<br><br>       Plaintiffs,<br><br>       vs.<br><br>THE CITY AND COUNTY OF SAN FRANCISCO ("the CITY"); GAVIN NEWSOM, in his official capacity as Mayor; AARON PESKIN, in his official capacity as President of the Board of Supervisors; JAKE MCGOLDRICK, MICHELA ALIOTO-PIER, ED JEW, CHRIS DALY, SEAN ELSBERND, BEVAN DUFTY, TOM AMMIANO, SOPHIE MAXWELL, ROSS MIRKARIMI, AND GERARDO SANDOVAL, in their official capacities as members of the Board of Supervisors,<br><br>       Defendants. | Case No. C07-3685 SBA<br><br>CLASS ACTION<br><br>**SAN FRANCISCO'S AMENDED TRIAL BRIEF**<br><br>Trial Date:  September 1, 2010 |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .................................................................................................... 1

STATUTORY FRAMEWORK ................................................................................ 5

    I.      ESSENTIAL ELEMENTS OF PLAINTIFFS' INDIVIDUAL CLAIMS .............. 5

    II.     CLASS CLAIMS ............................................................................................... 7

DISCUSSION ........................................................................................................... 8

    I.      SAN FRANCISCO'S MAYOR'S OFFICE ON DISABILITY, SUPPORTED BY ADA COORDINATORS IN EACH CITY DEPARTMENT, DEMONSTRATES SAN FRANCISCO'S EFFECTIVE COMMITMENT TO PROVIDE FULL ACCESS TO INDIVIDUALS WITH DISABILITIES ............. 8

    II.     SAN FRANCISCO'S POLICIES AND PRACTICES ENSURE THAT IT DESIGNS AND BUILDS ACCESSIBLE FACILITIES ..................................... 10

    III.    SAN FRANCISCO'S POLICIES AND PRACTICES ENSURE THAT EACH PROGRAM, SERVICE AND ACTIVITY, VIEWED IN ITS ENTIRETY, IS READILY ACCESSIBLE TO AND USABLE BY INDIVIDUALS WITH DISABILITIES ................................................................................................... 11

        A.     Controlling Legal Issues ....................................................................... 12

            1.     Program Access Does Not Require Existing Facilities To Comply Strictly With The Latest Access Codes .......................... 12

            2.     Program Access Only Requires An Equitable Distribution Of Services And Does Not Require Each And Every "Neighborhood-Based" Facility To Be Fully Accessible ............. 14

        B.     Swimming Pools ................................................................................... 16

        C.     Libraries ................................................................................................ 16

        D.     Parks ...................................................................................................... 17

        E.     Public Right Of Way ............................................................................. 17

            1.     Curb Ramps ............................................................................... 17

            2.     Sidewalks .................................................................................. 19

        F.     The City's Undue Burden Statement .................................................... 20

    IV.    SAN FRANCISCO POLICIES AND PRACTICES REASONABLY MAINTAIN THE ESSENTIAL ACCESS FEATURES OF ITS FACILITIES ... 23

    V.    STATE REGULATIONS DO NOT IMPOSE ANY MANDATORY DUTY ON SAN FRANCISCO TO DEVELOP A SELF-EVALUATION OR TRANSITION PLAN FOR STATE-FUNDED PROGRAMS ............................ 24

CONCLUSION ........................................................................................................ 26

# TABLE OF AUTHORITIES

**Federal Cases**

*Access Now, Inc. v. S. Fla. Stadium Corp.*
   161 F. Supp. 2d 1357 (S.D. Fla. 2001) .....................................................................................14

*Alexander v. Choate*
   469 U.S. 287 (1985)............................................................................................................7

*Armstrong v. Davis*
   275 F.3d 849 (9th Cir. 2001) .........................................................................................7

*Association of Disabled Americans v. City of Orlando*
   153 F. Supp. 2d 1310 (M.D. Fla. 2001).......................................................................13

*Association of People with Disabilities v. Shelly*
   324 F.Supp. 2d 1120 (C.D. Cal. 2004). .......................................................................15

*Bennett v. Roberts*
   295 F.3d 687 (7th Cir. 2002) .........................................................................................7

*Bird v. Lewis & Clark College*
   303 F.3d 1015 (9th Cir. 2002) ...................................................................................7, 8

*Blackwell v. City and County of San Francisco*
   2008 WL 4500705 at *5 (N.D. Cal. 2008) ....................................................................6

*Californians for Disability Rights, Inc. v. Caltrans*
   249 F.R.D. 334 (N.D. Cal. 2008)..................................................................................24

*Cupolo v. Bay Area Rapid Transit*
   5 F.Supp.2d 1078 (N.D. Cal. 1997) ..............................................................................23

*D'Lil v. Stardust Vacation Club*
   *2001 U.S. Dist. LEXIS 23309, at *15 (E.D. Cal. Dec. 20, 2001)* ...............................14

*Equal Rights Center v. Hilton Hotels Corporation*
   *2009 WL 6067336 at *5 (D.D.C. 2009)*.......................................................................6

*Foley v. City of Lafayette*
   359 F.3d 925 (7th Cir. 2004) .......................................................................................23

*Harris v. Costco Wholesale Corp.*
   389 F. Supp. 2d 1244 (S.D. Cal. 2005)..........................................................................6

*Hubbard v. 7-Eleven, Inc.*
   433 F.Supp. 2d 1134 (S.D. Cal. 2006)..........................................................................13

*Lane v. Tennessee*
   541 U.S. 509 (2004)........................................................................................12

*Liberty Resources, Inc. v. Philadelphia Housing Auth.*
   528 F.Supp.2d 553 (E.D. Pa. 2007) ...............................................................8

*Lonberg v. City of Riverside*
   571 F.3f 846 (9th Cir. 2009).....................................................................24, 26

*Lujan v. Defenders of Wildlife*
   504 U.S. 555 (1992)..........................................................................................6

*Martin v. Metro. Atlanta Rta*
   225 F.Supp.2d 1362 (N.D. Ga. 2002)..............................................................23

*McGary v. City of Portland*
   386 F.3d 1259 (9th Cir. 2004) ..........................................................................6

*Olmstead v. L.C.*
   527 U.S. 581 (1999)........................................................................................21

*Pascuiti v. New York Yankees*
   87 F.Supp.2d 221 (S.D.N.Y. 1999) .......................................................13, 20, 21

*Pierce v. County of Orange*
   519 F.3d 985 (9th Cir. 2008) ...........................................................................15

*Pickern v. Holiday Quality Foods, Inc.*
   293 F.3d 1133 (9th. Cir. 2002) .........................................................................6

*Putnam v. Oakland Unified School Dist.*
   1995 WL 873734, *10 (N.D. Cal. 1995) ..........................................................15

*Thompson v. Davis*
   295 F.3d 890 (9th Cir. 2002) (per curiam)
   *cert. denied*, 538 U.S. 921 (2003)....................................................................6

*Weinreich v. Los Angeles County Metropolitan Transp. Author.*
   114 F.3d 976 (9th Cir. 1997) ............................................................................6

*White v. Cinemark USA, Inc.*
   2005 U.S. Dist. LEXIS 42134 (E.D. Cal. Aug. 3, 2005).................................14

**Federal Statutes**

42 U.S.C.
   § 12131(2).......................................................................................................12
   § 12132..............................................................................................................5
   § 12133..............................................................................................................5
   § 12134..............................................................................................................5

Section 504 of the Rehabilitation Act ........................................................................5

**State Cases**

*Kucera v. Lezza*
   59 Cal.App.4th 1141 ................................................................................25

*People v. Sinohui*
   28 Cal.4th 205 (2002) ............................................................................25

**State Statutes & Codes**

22 C.C.R.
   § 98251 ...........................................................................24, 25, 26
   § 98254 ...................................................................................25
   § 98258 ...........................................................................24, 25, 26

California Government Code
   § 11135 ...............................................................................24, 25
   § 11139 ...............................................................................24, 25

**Federal Regulations**

28 C.F.R.
   §35.105...................................................................................9
   § 35.105(a) ..............................................................................25
   § 35.150 (2010) ...........................................................................13
   § 35.133 .................................................................................23
   § 35.150(a). ..............................................................................20
   § 35.150(a)(1) .........................................................................12, 14
   § 35.150(b)(1) ..................................................................12, 13, 14, 16
   § 35.150(d) ..............................................................................25
   § 35.151 .................................................................................13
   § 35.151(a)(2) ............................................................................13
   § 35.151(a)(3) ...................................................................13, 20, 22
   § 35.151(c). ..............................................................................10
   § 41.57(c) ...............................................................................25
   § 42.505(c) ..............................................................................25

34 C.F.R.
   § 104.6(c) ...............................................................................25

56 Fed. Reg. 35694-01, 1991 WL 304268 (F.R. July 26, 1991). ................................................20

**Other References**

ADA Title II Technical Assistance Manual
   § 5.2000 .............................................................................16, 18

Cal. Sen. Rules Com., Third Reading of Assem. Bill No. 1670
   as amended Sept. 3, 1999, p. 15 (1999) ......................................................26

## INTRODUCTION

This class action bench trial challenges San Francisco's policies and practices for providing physical access for persons with mobility disabilities to the City's swimming pools, libraries, parks and the public right of way. The evidence will show that San Francisco is not only a national model for physical accessibility, it is a national model for serving the holistic needs of the disabled community. San Francisco has maintained this longstanding commitment to the disabled despite the severe economic downturn that has devastated governmental entities throughout California as well as throughout the country. Indeed, municipalities throughout the county look to San Francisco for guidance to enhance their overall services to the disabled community as well as their own disability access programs.

San Francisco's reputation is well deserved. Realizing long ago that the disabled community has a diverse range of needs, San Francisco provides a rich array of programs and services designed to serve the overall needs of that community. These services to individuals with disabilities extend far beyond the architectural issues that plaintiffs complain about in this lawsuit. For example, San Francisco provides in-home support services ("IHSS") and a full range of other services that allow individuals with disabilities to live successfully in their own apartments. San Francisco provides subsidized healthcare and subsidized community-based housing to low income residents, many of whom have physical and/or mental disabilities. Indeed, class representative Ivana Kirola acknowledged at her deposition that she relies on IHSS that San Francisco provides her to dress, bathe and groom herself, and if San Francisco were forced to reduce her IHSS hours, she would be unable to leave her apartment. Indeed, without such services, the physical accessibility of the City's parks, pools, libraries, and public right of way may be irrelevant for many in the disabled community, because they will be unable to leave their homes or will require institutionalization.

In any event, San Francisco is well aware of its physical access obligations and has long had a strong commitment to ensuring access to its services, programs, and activities for those with mobility, vision, and other impairments. In 1999, the City established the Mayor's Office on Disability ("MOD") which serves as San Francisco's city-wide ADA coordinator. MOD employs experts with decades of training and experience in all aspects of disabled access. MOD and other City

Departments work closely with representatives of the disabled community in order to prioritize the needs of that community and to make sure that the City's limited resources are properly utilized to address those needs.  And as part of its commitment to ensuring physical access, San Francisco years ago established effective policies and practices to ensure compliance with its physical access obligations.  As a result, San Francisco constructs new buildings to meet all applicable access requirements, provides program access at existing facilities, and properly maintains access features necessary to ensure continued program access.

San Francisco's rigorous policies, practices, and procedures ensure that City construction projects comply with both federal and state access laws.  San Francisco requires that all projects comply with those laws and hires architects experienced in doing so.  Architectural designs for all projects are reviewed not only by the Department of Building Inspection for access issues, but also by access experts at MOD and at the Department of Public Works ("DPW").  After the City's access experts have approved the architectural plans for a City construction project, then these same trained access experts repeatedly inspect the ongoing construction to make sure the built facility conforms to the plans.  Indeed, access issues are emphasized in all phases of the construction process by all those responsible for the project.  The City does not issue a final Certificate of Occupancy for a City facility unless and until the City's specially trained access experts are satisfied that the facility conforms to all applicable state and federal access requirements.

As Title II of the ADA requires, San Francisco has made each program, service and activity that it offers to the public, when viewed in its entirety, readily accessible to and usable by individuals with disabilities.  Federal regulations implementing the ADA explicitly recognize that "program access" does not require *each* facility offering a program throughout the City to be accessible.  These implementing regulations instruct Title II entities that they may provide program access through various non-structural alternative means, including "delivery of services at alternate accessible sites." It is sufficient to have a geographically equitable distribution of accessible facilities throughout the City that offer a particular program.

The City shares plaintiffs' goals of providing uniform access to all City facilities, and the City has a long term capital plan for accomplishing this ambitious goal.  In the meantime, the City already

1  provides program access for its library programs and the programs offered at its swimming pools and

2  parks.  Fourteen of San Francisco's 27 branch libraries have already been replaced or renovated, and

3  are fully accessible.  Eight branch libraries are currently under construction, and the remaining branch

4  libraries will are scheduled for completion by 2014.[1]  San Francisco's Recreation and Parks

5  Department ("RecPark") manages more than 200 separate facilities throughout San Francisco.

6  Through its capital improvement program, RecPark has renovated a strategic distribution of its

7  diverse facilities.  For example, six of San Francisco's nine municipal pools are already fully

8  accessible, distributed throughout the City.  Likewise, accessible parks are distributed throughout

9  San Francisco.  RecPark's ongoing capital improvement program continues to spend approximately

10  $30 million annually to upgrade RecPark facilities, so that each year RecPark achieves even greater

11  saturation of accessible facilities throughout the City.  RecPark identifies individual facilities for

12  renovation only after extensive community input, to ensure that renovation priorities reflect the

13  preferences of the people who use RecPark facilities, including individuals with disabilities.

14  RecPark's annual capital improvement budget reflects the maximum amount that can be prudently

15  and effectively managed, both as a practical logistical matter and in view of the City's overall debt

16  burden.  As a result of these long-term efforts, San Francisco ensures that its libraries, pools, and

17  parks are distributed equitably throughout the City and are readily accessible to and usable by

18  individuals with disabilities when viewed in their entirety.

19      San Francisco also has an extensive network of existing curb ramps that it started installing in

20  the 1970s.  Plaintiffs' experts agree San Francisco's current curb ramp design standards, formally

21  adopted in 2004, comply with applicable federal and state access requirements.  Even before plaintiffs

22  commenced this action, San Francisco has been spending approximately $7 million annually on its

23  curb ramp improvement program, which translates to about 1000 new curb ramps every year.  These

24  1000 new curb ramps each year represent a combination of new ramps where none existed before and

25  replacements for older existing curb ramps.  San Francisco prioritizes its curb ramp installations

26  _____

[1]  Neighborhood opposition and demands for further environmental review have delayed the renovation project at North Beach branch library.  The branch library improvement program will be substantially complete by June 2012.

consistent with Justice Department regulations, responding to citizen requests, and constructing curb ramps that serve civic buildings, transit stops, places of employment and public accommodations.

San Francisco's ten-year capital plan calls for maintaining the current $7 million annual funding level for its curb ramp improvement program.  San Francisco has managed to preserve this exemplary funding level,[2] notwithstanding the unprecedented financial constraints facing all local governments, including San Francisco.  Beyond the 1000 ramps installed each year through the curb ramp improvement program, San Francisco installs additional curb ramps in connection with street repaving, using street repaving funds.  Even more curb ramps are installed in connection with private commercial construction projects and utility work throughout the City.

Though curb ramp construction is not yet complete at every intersection throughout San Francisco, the City's existing network of curb ramps, along with its continuing program of prioritizing citizen requests, the public transit system and the paratransit program, provides meaningful access to the public right of way.  Further, the City's curb ramp program demonstrates a firm commitment to saturate the City with state-of-the-art curb ramps.  Indeed, San Francisco's curb ramp design standards specify two curb ramps at every intersection, even though the law does not require it do so. San Francisco makes great strides each year on that ambitious undertaking and will complete it as quickly as today's unprecedented financial constraints permit.

San Francisco employs a two-pronged approach to maintaining its sidewalk surfaces.  First, DPW has a system for receiving, prioritizing and responding to citizen requests for sidewalk repairs. Second, the City's proactive Sidewalk Inspection and Repair Program ("SIRP") covers the entire City over a 25-year cycle.  Together, the request system and SIRP provide accessible sidewalk surfaces throughout San Francisco.

The evidence at trial will show that San Francisco has effective policies and practices in place to ensure that new construction projects comply with all applicable access requirements.  The evidence will further show that San Francisco provides program access to its swimming pools,

---

[2]  San Francisco's $7 million annual expenditure on curb ramps, per capita, is 13 times the amount Caltrans now pays on improvements to all aspects of the public right of way under the terms of its recent class action settlement agreement.

libraries, parks and the public right of way.  San Francisco's existing policies and practices, and the exemplary funding levels already in place to ensure continued access improvements, make any injunctive relief in this case inappropriate.  Indeed, given the fiscal crisis facing San Francisco and other cities in California, it can do no more without sacrificing essential services to the disabled community and imposing an undue burden on San Franciscans and the City itself.

## STATUTORY FRAMEWORK

Title II of the ADA governs a government entity's access obligations to the public and establishes a broad anti-discrimination mandate, prohibiting exclusion or denial of benefits because of an individual's disability.[3]

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.  The ADA provides the same "remedies, procedures, and rights" established by Section 504 of the Rehabilitation Act.  *Id.* § 12133.  Congress directed the Justice Department to develop implementing regulations.  *Id.* § 12134.

## I.   ESSENTIAL ELEMENTS OF PLAINTIFFS' INDIVIDUAL CLAIMS

To establish a prima facie case under the ADA, an individual plaintiff must prove four essential elements:

1.  the plaintiff is an individual with a disability;
2.  the plaintiff is otherwise qualified to participate in or receive the benefit of a public entity's services, programs, or activities;
3.  the plaintiff was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and
4.  such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability.

---

[3]  Title I of the ADA governs employment by public and private entities.  Title III governs the obligations of private entities offering public accommodations, such as hotels and restaurants.

1   *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004); *Thompson v. Davis*, 295 F.3d 890,

2   895 (9th Cir. 2002) (per curiam), *cert. denied*, 538 U.S. 921 (2003); *Weinreich v. Los Angeles County*

3   *Metropolitan Transp. Author.*, 114 F.3d 976, 978 (9th Cir. 1997).[4]

4         A plaintiff has standing to sue only for alleged ADA violations in facilities that she personally

5   encountered before filing the suit.  *See Pickern v. Holiday Quality Foods, Inc.*, 293 F.3d 1133, 1138

6   (9th. Cir. 2002); *Blackwell v. City and County of San Francisco (Blackwell)* 2008 WL 4500705 at *5

7   (N.D. Cal. 2008) (Armstrong, J.), partially vacated on other grounds [holding that plaintiff has not

8   suffered an initial injury under the ADA "because he has not alleged, as is required by the Ninth

9   Circuit, that he has 'personally encountered barriers that bar his access' to the public

10  accommodation."]  Plaintiffs carry the burden of proof and persuasion as to the existence of standing.

11  *Lujan v. Defenders of Wildlife (Lujan),* 504 U.S. 555, 561 (1992).  A plaintiff may *not* sue for alleged

12  ADA violations that she did not personally encounter before filing suit unless she otherwise meets the

13  Article III injury in fact requirement.  *Lujan*, 504 U.S. at 569 n. 4.

14        As this Court noted in *Blackwell*, a plaintiff does not suffer a concrete and particularized

15  injury under the ADA where he has not attempted to access the facility prior to filing suit. *Blackwell*,

16  2008 WL 4500705 at *5.  Hence, a plaintiff may not sue for alleged ADA violations at facilities she

17  has not attempted to access before filing suit; nor may she sue for alleged ADA violations at other

18  facilities that she only becomes aware of through a retained expert after filing suit.  *Blackwell*, 2008

19  WL 4500705 at *5-6 ["Whether a plaintiff has standing turns on the facts as they existed at the time

20  the plaintiff filed the complaint, so visits subsequent to his complaint … are irrelevant to establishing

21  an injury in fact."].[5]

---

[4]   The elements of a cause of action under the Rehabilitation Act track the elements of an ADA claim, with the additional requirement that "the program receives federal financial assistance." *Weinreich*, 114 F.3d at 978.

[5]   See also *Harris v. Costco Wholesale Corp.,* 389 F. Supp. 2d 1244, 1249 (S.D. Cal. 2005); see also *Equal Rights Center v. Hilton Hotels Corporation*, 2009 WL 6067336 at *5 (D.D.C. 2009) ["[A] plaintiff who discovers an accessibility barrier at one location is not necessarily deterred from visiting all other related locations, absent allegations that all the locations are identical, or at least similar."]

## II.    CLASS CLAIMS

Rule 23 and controlling case law require plaintiffs to prove the following essential elements to prevail on their class claims under the ADA and the Rehabilitation Act:

1. The class is comprised of individuals with mobility disabilities;

2. Class members are otherwise qualified to participate in or receive the benefit of San Francisco's services, programs, or activities;

3. San Francisco has a policy or practice that has the effect of depriving class members of meaningful access to the services, programs or activities San Francisco offers to the public in its swimming pools, libraries, parks, and the public right of way

4. The deprivation of meaningful access occurs by reason of plaintiff class members' mobility disabilities.

The third element requires plaintiffs to identify the challenged policy or practice and to identify how that policy or practice has denied them meaningful access.

Class claims must satisfy Rule 23's typicality and commonality requirements.  "Commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001).  Typicality requires that "the injuries [of unnamed class members] result from the same, injurious course of conduct" that injures the class representative. *Id.*  Therefore, plaintiffs' class claims in this case must focus on City-wide policies and practices that affect all class members.  Isolated and singular incidents generally are insufficient to constitute or establish a specific policy or practice.  *See Bennett v. Roberts*, 295 F.3d 687, 698 (7th Cir. 2002).  Evidence of individual architectural access barriers will not support plaintiffs' class claims unless the evidence demonstrates that architectural access barriers are systemic and widespread.  Only if architectural access barriers are systemic and widespread will those barriers support a finding that policies or practices discriminate against class members.

In this context, discrimination requires a showing that the plaintiff class has been deprived of "meaningful access" to the services, programs and activities that San Francisco provides to the public in its parks, libraries, swimming pools, and the public right of way.  *See Alexander v. Choate*, 469 U.S. 287, 301 (1985) (interpreting Rehabilitation Act).  Meaningful access requires only "reasonable, but not fundamental or substantial, modifications to [ ] programs." *Bird v. Lewis & Clark College*,

303 F.3d 1015, 1020 (9th Cir. 2002) (Rehabilitation Act and Title III).  "Reasonableness depends on the circumstances of each case, and requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards."  *Id.* (internal quotations omitted).  Meaningful access under the Rehabilitation Act and the ADA "only require a program to provide equal access to its core services."  *Liberty Resources, Inc. v. Philadelphia Housing Auth.*, 528 F.Supp.2d 553, 567 (E.D. Pa. 2007).   Thus, in *Bird*, the Ninth Circuit held that the college's overseas field-based program did not violate the ADA or the Rehabilitation Act even though some of the program's activities, housing and lodging were not wheelchair accessible.  303 F.3d at 1017-19.  The court concluded that plaintiff was not denied meaningful access to the benefits of the program because the college reasonably accommodated her disability and because "she enjoyed many of the benefits offered by the program."  *Id.* at 1021.  "Compliance under the Acts does not depend on the number of locations that are wheelchair accessible."  *Id.*

## DISCUSSION

## I.    SAN FRANCISCO'S MAYOR'S OFFICE ON DISABILITY, SUPPORTED BY ADA COORDINATORS IN EACH CITY DEPARTMENT, DEMONSTRATES SAN FRANCISCO'S EFFECTIVE COMMITMENT TO PROVIDE FULL ACCESS TO INDIVIDUALS WITH DISABILITIES

The Mayor's Office on Disability is responsible for overseeing the implementation and local enforcement of the City's obligations under the ADA as well as other federal, state and local access codes and disability rights laws.  Mayor Willie L. Brown, Jr. created MOD in 1999, after a series of meetings with members of the disability community.  These meetings recognized the need for a coordinated, centralized city-wide analysis of ADA compliance.  MOD's mission is to ensure that every program, service, benefit and activity operated or funded by the City is fully accessible to, and useable by, people with disabilities.

MOD is staffed by strong advocates for the disability community (with 80% of the staff having a disability themselves).  MOD's staff serve as the City's in-house experts on all aspects of accessibility compliance.  Among other responsibilities, MOD staff advise City agencies on policies and procedures related to disabled access, conduct training on matters such as maintenance of

accessible features and the proper response to requests for reasonable modifications, provide specially trained experts in the requirements of federal access laws for purposes of architectural plan review and site inspections, provide necessary and helpful information to the public about disabled access issues, and manage the City's grievance procedure providing for prompt and equitable resolution of ADA complaints.  MOD's Director, Susan Mizner, serves as San Francisco's Citywide ADA coordinator.  In addition, each City department has its own ADA coordinator, who serves as a liaison to the public, and to MOD.

MOD also supports the Mayor's Disability Council ("MDC"), comprised of representatives of the local disabled community.  MDC advises the Mayor's Office on disability issues, works with MOD to ensure ADA compliance, and provides a public forum to discuss disability issues.  Through its Physical Access Committee, the MDC also makes recommendations to MOD and various City agencies regarding planning and prioritization of City resources directed to removal of physical access barriers.

One of MOD's first tasks after its creation in 1999 was to conduct a citywide "Self-Evaluation," consistent with the ADA's requirement that local governments conduct a self-evaluation of programs and services.  28 C.F.R. §35.105.[6]  The Self-Evaluation examined how the City's programs, services, activities and benefits operate, and whether people with disabilities can use them as easily and fully as people without disabilities.  The Self-Evaluation also looked at how the City communicates with members of the public with disabilities, and how the City accommodates the needs of the public with disabilities so that they can have an equal chance of using and benefiting from City programs.

This citywide Self-Evaluation is set forth in a comprehensive report published in 2004 and available for review on the MOD website.  In many cases it reaffirmed information already known to the City and in other cases provided new information recommending changes to City practices.  It is important to note that although the formal citywide Self-Evaluation was concluded in 2004, the City

---

[6]  After the ADA took effect in 1992, the City's initial Self-Evaluation was conducted on an individual department basis.

1    remains continuously vigilant to ensure it continues to provide program access, as programs evolve

2    over time and the City's physical plant changes.

3    **II.    SAN FRANCISCO'S POLICIES AND PRACTICES ENSURE THAT IT DESIGNS
         AND BUILDS ACCESSIBLE FACILITIES**

4

5         State access requirements are found in the California Building Code ("CBC" or "Title 24").

6    The federal ADA allows compliance with either of two alternative codes:  the ADAAG (Americans

7    With Disabilities Act Accessibility Guidelines) or the UFAS (Uniform Federal Access Standards).

8    *See* 28 C.F.R. § 35.151(c).

9         San Francisco, through its rigorous policies and practices, has established multiple safeguards

10   to ensure that municipal construction projects result in fully accessible facilities.  In connection with

11   new construction and alteration projects, the evidence will show the City has five layers of review

12   and enforcement to ensure that construction conforms to all applicable state and federal access

13   requirements: (1) the City hires architects experienced in access issues and contractually requires the

14   architect to design a compliant project; (2) the Department of Building Inspection ("DBI") reviews

15   the architectural plans to ensure they comply with all state codes, including access codes; (3) for

16   municipal projects, specially trained experts in the Mayor's Office on Disability or the Department of

17   Public Works inspects the plans specifically for ADA compliance; (4) during construction, both DBI

18   and the City's ADA access experts inspect the project repeatedly, and (5) the City will not issue a

19   final certificate of occupancy unless and until both DBI and the City's ADA access experts approve

20   the final construction.  Finally, San Francisco responds to requests and complaints from people who

21   actually use its facilities, and the City will remediate individual access barriers that come to its

22   attention through citizen complaints, which may be present notwithstanding the City's rigorous access

23   review of design and construction.  A typical facility has thousands of access dimensions.  A single

24   set of restrooms may have 450 separate dimensional requirements for access.

25        Plaintiffs' four retained architectural experts have inspected over a hundred of San Francisco's

26   facilities.  Plaintiffs' site inspection reports seriously misrepresent the state of the City's accessible

27   facilities.  Plaintiffs' expert reports routinely cite inapplicable code provisions, such as later versions

28   of the CBC that were enacted after a particular construction project was built.  They ignore crucial

1    elements of both the ADAAG and the CBC that explicitly authorize departures from strict

2    dimensional requirements (such as conventional construction industry tolerances, equivalent

3    facilitation, structural impracticality and the historic nature of many City facilities).  They cite

4    conditions in staff-only areas, which are not available to the public and therefore irrelevant to this

5    Title II lawsuit.  They include multiple citations for a single condition, thus bulking up their reports.

6    They include truly trivial items, such as a footstool that a child left in front of a drinking fountain in a

7    library.  Many of plaintiffs' inspection reports focus on nearby sidewalks and the public right of way,

8    when ADAAG explicitly defines a "facility" or "site" to include features only within the property

9    boundary, and explicitly requires an accessible path of travel only from the facility entrance to the

10   property boundary.  The large quantity of erroneous and irrelevant entries in plaintiffs' experts

11   inspection reports is not entirely surprising in light of their instructions from counsel to ignore

12   dimensional tolerances, construction history and the historical status of City buildings.  A proper

13   analysis of plaintiffs' site inspection reports requires a conclusion that the City's construction projects

14   do in fact result in fully accessible facilities that comply with all applicable federal and state access

15   requirements.  Any de minimis departures from ADAAG dimensions do not deprive class members

16   of meaningful access to the facilities or to the programs therein.

17          As for curb ramp construction, plaintiffs' experts have acknowledged that San Francisco's

18   curb ramp design standards, adopted in 2004, comply with applicable state and federal access

19   requirements.  San Francisco's longstanding practices and policies require curb ramp upgrades in

20   connection with street repaving or excavation that encroaches on the crosswalk or street corner.

21   **III.    SAN FRANCISCO'S POLICIES AND PRACTICES ENSURE THAT EACH
             PROGRAM, SERVICE AND ACTIVITY, VIEWED IN ITS ENTIRETY, IS READILY**

22           **ACCESSIBLE TO AND USABLE BY INDIVIDUALS WITH DISABILITIES**

23          To provide "program access," federal regulations require San Francisco to "operate each

24   service, program, or activity so that the service, program, or activity, when viewed in its entirety, is

25   readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150(a).  These ADA

26   regulations, promulgated by the United States Justice Department, explicitly recognize that program

27   access does not "[n]ecessarily require a public entity to make each of its existing facilities accessible."

28

1  *Id.* § 35.150(a)(1).  The ADA regulations further authorize a public entity to enlist a number of

2  alternative methods to satisfy its program access obligations:

> A public entity may comply with the requirements of this section through such
> means as redesign of equipment, **reassignment of services to accessible**
> **buildings**, assignment of aides to beneficiaries, home visits, **delivery of**
> **services at alternate accessible sites**, alteration of existing facilities and
> construction of new facilities, use of accessible rolling stock or other
> conveyances, or any other methods that result in making its services, programs,
> or activities readily accessible to and usable by individuals with disabilities.  **A**
> **public entity is not required to make structural changes in existing**
> **facilities** where other methods are effective in achieving compliance with this
> section. [ ]  In choosing among available methods for meeting the requirements
> of this section, a public entity shall give priority to those methods that offer
> services, programs, and activities to qualified individuals with disabilities in
> the most integrated setting appropriate.

10  *Id.* § 35.150(b)(1) (emphasis supplied).

  **A.**  **Controlling Legal Issues**

    **1.**  **Program Access Does Not Require Existing Facilities To Comply Strictly**
      **With The Latest Access Codes**

  The ADA's program access requirement does not impose any specific access design standards

on existing facilities (*i.e.*, those facilities constructed prior to the ADA's 1992 effective date).  When a

Title II entity relies on structural changes in an existing facility to provide program access, the ADA

requires only "reasonable measures to remove architectural and other barriers" at that facility.  *Lane*

*v. Tennessee*, 541 U.S. 509, 532 (2004) (citing 42 U.S.C. § 12131(2)).  The Justice Department has

expressly authorized a number of diverse non-structural solutions for achieving program access.

These non-structural solutions include "redesign of equipment, reassignment of services to accessible

buildings, assignment of aides to beneficiaries, home visits, delivery of services at alternate

accessible sites, [ ] use of accessible rolling stock or other conveyances, or any other methods that

result in making its services, programs, or activities readily accessible to and usable by individuals

with disabilities."  28 C.F.R. § 35.150(b)(1).  A public entity must rely on structural changes for

program access "[o]nly if these [alternative non-structural] measures are ineffective in achieving

accessibility."  *Lane*, 541 U.S. at 532.

  When a public entity includes structural changes to existing buildings in its overall program

access strategy, the ADA does not require public entities to remove all barriers from existing

1   buildings, nor does it require existing buildings to comply with the specific architectural accessibility

2   standards that apply to new buildings.  Rather, the ADA requires only "reasonable structural changes"

3   in existing buildings, and only when the alternative non-structural measures are ineffective in

4   achieving accessibility.

> As Title II's implementing regulations make clear, the reasonable modification requirement can be satisfied in a number of ways.  In the case of facilities built or altered after 1992, the regulations require compliance with specific architectural accessibility standards.  28 C.F.R. § 35.151.  **But in the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services. 35.150(b)(1).  Only if these measures are ineffective in achieving accessibility is the public entity required to make reasonable structural changes.**  *Id.*  And in no event is the entity required to undertake measures that would impose an undue financial or administrative burden, threaten historic preservation interests, or effect a fundamental alteration in the nature of the service.  §§ 35.151(a)(2), (a)(3).

*Id.*, 541 U.S. at 532 (emphasis supplied).

The federal accessibility standards for new construction and alteration projects (*i.e.*, ADAAG or UFAS) are not the measure for determining whether an existing facility provides program access. Rather, ADAAG provides only "valuable guidance."  "Although the ADAAG guidelines do not apply to facilities existing before the ADA' s effective date, they 'provide valuable guidance for determining whether an existing facility contains architectural barriers.'"  *See, e.g., Hubbard v. 7-Eleven, Inc.*, 433 F.Supp. 2d 1134, 1138 (S.D. Cal. 2006) (*quoting Pascuiti v. New York Yankees*, 87 F.Supp.2d 221, 226 (S.D.N.Y. 1999)).

Technical deviations from ADAAG do not demonstrate discrimination or denial of access. Rather, plaintiffs must show that departures from ADAAG standards cause San Francisco's programs, services, or activities to not be "readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150 (2010).  Assessing program access, the Court "must look at the accessibility of the [facility] as a whole, not at individual elements."  *Pascuiti,* 87 F.Supp.2d at 223.  Similarly, in *Association of Disabled Americans v. City of Orlando*, 153 F. Supp. 2d 1310 (M.D. Fla. 2001), the court found that, though "many elements" of an arena would constitute ADA violations had they been constructed after 1992, because the defendant city showed a "minimum level of accessibility," it met

the "program access" requirement.  *Id.* at 1322.  *See also D'Lil v. Stardust Vacation Club, 2001 U.S. Dist. LEXIS 23309, at \*15 (E.D. Cal. Dec. 20, 2001)* ("[Plaintiff] must still prove that Room 138 contained actual barriers that hindered her access to the room; she cannot rely solely on the Stardust's deviation from ADAAG to establish her Title III claim."); *Access Now, Inc. v. S. Fla. Stadium Corp.*, 161 F. Supp. 2d 1357, 1368 (S.D. Fla. 2001) ("At trial, a defendant may be able to rebut this evidence by showing that despite the technical noncompliance, the challenged accommodation in fact allows disabled persons effective access."); *White v. Cinemark USA, Inc.*, 2005 U.S. Dist. LEXIS 42134, \*13  (E.D. Cal. Aug. 3, 2005) (denying plaintiffs motion for summary judgment where plaintiff demonstrated ADAAG violations but failed to show that defendant theater "contained actual barriers that hindered her access").

### 2. Program Access Only Requires An Equitable Distribution Of Services And Does Not Require Each And Every "Neighborhood-Based" Facility To Be Fully Accessible

Plaintiffs have asserted that program access requires each swimming pool, branch library and park to be accessible.  Plaintiffs contend these facilities offer "neighborhood-based" programs, and it would therefore discriminate against class members and segregate them from neighbors, if they participate in the program at an alternative location.[7]

Plaintiffs' novel interpretation of the ADA's program access requirement contradicts the express language of the Justice Department's implementing regulations.  The governing regulations direct the program access analysis to view each service, program or activity "in its entirety."  28 C.F.R. § 35.150(a).  The regulations explicitly recognize that program access does not "[n]ecessarily require a public entity to make each of its existing facilities accessible."  *Id.* § 35.150(a)(1).  The Justice Department directs Title II entities that they may provide program access through "delivery of services at alternative accessible sites."  *Id.* § 35.150(b)(1).

Even in the context of public schools, where each student is assigned a particular school and required by law to attend that school, program access does not require each and every facility to be

---

[7]  To the extent plaintiffs seek to define each "neighborhood-based" facility as a separate and distinct service, program or activity, then plaintiff and class representative Ivana Kirola lacks standing to pursue claims with respect to facilities she did not visit before she filed this lawsuit.

1    accessible.  In *Putnam v. Oakland Unified School Dist.*, 1995 WL 873734, *10 (N.D. Cal. 1995), the

2    District Court rejected plaintiffs' contention that "certain necessary or unique facilities, such as

3    bathrooms and auditoriums, must be accessible to avoid violating the rights of disabled students."

4    Notwithstanding that it was "essential" that students be able to use school restrooms in privacy, "this

5    does not mean that each restroom in each school need be accessible."  *Id.*  Program access required

6    only that a single restroom in each high school attended by a student with disabilities was accessible.

7    *Id.*

8       Likewise, program access allowed discontinuation of an existing electronic voting system,

9    even though, in the absence of the system, individuals with disabilities would not be able to vote

10    secretly.  "It cannot be disputed that casting a vote independently and secretly would be preferred

11    over casting a vote with the assistance of a family member or other aide. . . .  However, the ADA

12    does not require accommodation that would enable disabled persons to vote in a manner that is

13    comparable in every way with the voting rights enjoyed by persons without disabilities.  Rather, it

14    mandates that voting programs be made accessible, giving a disabled person the opportunity to vote."

15    *Association of People with Disabilities v. Shelly*, 324 F.Supp. 2d 1120, 1126 (C.D. Cal. 2004).

16       The Ninth Circuit in *Pierce v. County of Orange*, 519 F.3d 985 (9th Cir. 2008), confirmed the

17    principle that program access does not require each facility to be accessible.   "While the County need

18    not make all of its existing [prison] facilities accessible to individuals with or without disabilities, it is

19    expected to provide 'program access'."  *Id.* at 1015.  In *Pierce*, the county fell short of its program

20    access obligations in its prison system only because the county housed inmates with disabilities in

21    particular facilities, certain activities were not available in those facilities, and the county did not

22    permit inmates with disabilities to travel to other facilities to participate in these activities.  *Id.* 1014-

23    16.

24       By contrast, class members in this case may visit any of multiple City swimming pools,

25    libraries and parks, choosing which facility best meets his or her needs, taking into consideration the

26    accessibility features available at each facility.  When "viewed in its entirety," as the ADA requires,

27    the programs the City offers at its swimming pools, libraries and parks are "readily accessible to and

28    usable by persons individuals with disabilities."

1    The Justice Department has directed Title II entities, when providing program access, to "give

2    priority to those methods that offer services, programs, and activities to qualified individuals with

3    disabilities in the most integrated setting appropriate."  28 C.F.R. § 35.150(b)(1).  The directive to

4    provide "the most integrated setting appropriate" means simply that Title II entities should, where

5    practical, provide an opportunity for individuals with disabilities to interact with others, rather than

6    separate programs.  The preamble to the Title II regulations defines an "integrated setting" as "a

7    setting that enables individuals with disabilities to interact with nondisabled persons to the fullest

8    extent possible."  28 C.F.R. Part 35 App. A.  The Justice Department has explained that the purpose

9    of the integration requirement is to "encourage interaction among all users, including individuals with

10   disabilities."  ADA Title II Technical Assistance Manual § 5.2000.  Title II entities should give

11   priority to program access solutions that provide services "to individuals with disabilities and others

12   in the same setting."  *Id.*

13   Each of San Francisco's accessible swimming pools, libraries and parks provides an integrated

14   setting where individuals with disabilities can interact with all other users.  Accordingly, the City's

15   network of accessible swimming pools, libraries and parks provides program access, and meets the

16   ADA's priority for "integrated settings."

17   **B.    Swimming Pools**

18   Applying these legal principles to San Francisco's swimming pools, the only conclusion is that

19   the City provides meaningful access to its swimming program.  First, six of San Francisco's nine

20   public swimming pools are fully accessible.  Indeed, class representative Ivana Kirola uses several of

21   the City pools regularly.  The six accessible swimming pools are distributed equitably throughout the

22   City, so that "when viewed in its entirety," the City's swimming program is readily accessible to and

23   usable by individuals with disabilities.

24   **C.    Libraries**

25   Likewise, San Francisco provides program access to its library programs.  The "core program"

26   at City libraries is access to books and multimedia resources.  San Francisco's Main Library opened in

27   a brand new building in 1996, which is fully accessible.  In November 2000, San Francisco passed a

28   bond measure for $106 million to upgrade San Francisco's branch library system.  In November

2007, Proposition D authorized additional funding to improve the branches. San Francisco is nearing the end of its ambitious bond-funded Branch Library Improvement Program, rebuilding or renovating 24 out of the City's 27 branch libraries. Fourteen branches are already completed. Eight branches are currently under construction. The remaining two are fully funded and in the design and bid process. By any measure, San Francisco provides program access to its library programs.

### D.      Parks

San Francisco's RecPark Department manages over 200 separate facilities. RecPark's current capital improvement program began in 1998, when RecPark instituted a comprehensive assessment project. The City approved a ten year capital plan for RecPark in March 2000. This Capital Plan has been financed by two substantial bond measures passed in 2000 ($110 million) and 2008 ($150 million). RecPark has raised a total of $600 million for park improvements since 2000. This capital plan has renovated 89 separate RecPark facilities since 2000, creating a network of accessible RecPark facilities equitably distributed throughout San Francisco. By any measure, San Francisco provides meaningful access to its park programs.

Plaintiffs make much of the City's deposition testimony acknowledging that, in a layman's sense, each City park is unique. Indeed, various city parks are unique in the same sense that every piece of real estate is unique. The relevant question however for program access analysis is whether the programs, services and activities offered in each park are unique. The evidence will show that San Francisco's extensive park system offers the same core programs at multiple locations. A typical park, for example, provides an opportunity to enjoy an outdoor experience. The core program is the same, even if the particular views, landscaping and terrain at individual parks may vary.

### E.      Public Right Of Way
#### 1.      Curb Ramps

San Francisco began installing curb ramps in the early 1970s. City streets have 7,200 intersections. A typical intersection of two perpendicular streets contains 8 curb ramps, 2 on each corner. San Francisco's curb ramp design standards require two curb ramps on a corner where there are two pedestrian pathways unless it is technically infeasible or structurally impracticable to build

them.  Deviation from the standard design requires approval by the necessary DPW personnel.  State and federal law only require one curb ramp on each corner.

The City's Curb Ramp Program was developed as a formal program within the Department of Public Works ("DPW") in 1989.  The first DPW Curb Ramp Transition Plan was developed in fiscal year 1992-1993.  A follow-up five year plan was developed in 1998.  In 2000, DPW undertook a program to survey and collect data regarding the condition and status of all existing curb ramps and potential sites for curb ramps.  This information is contained in the Curb Ramp Information System ("CRIS") database.

DOJ guidance documents make clear that program access does not require a curb ramp at every pedestrian crossing.  While a City may elect to provide a curb ramp at every pedestrian crossing, it is not required to do so.

**II-5.3000 Curb ramps**. Public entities that have responsibility or authority over streets, roads, or walkways must prepare a schedule for providing curb ramps where pedestrian walkways cross curbs. Public entities must give priority to walkways serving State and local government offices and facilities, transportation, places of public accommodation, and employees, followed by walkways serving other areas.  This schedule must be included as part of a transition plan (see II-8.3000).

To promote both efficiency and accessibility, public entities may choose to construct curb ramps at every point where a pedestrian walkway intersects a curb.  However, public entities are not necessarily required to construct a curb ramp at every such intersection.

Alternative routes to buildings that make use of existing curb cuts may be acceptable under the concept of program accessibility in the limited circumstances where individuals with disabilities need only travel a marginally longer route. In addition, the fundamental alteration and undue burdens limitations may limit the number of curb ramps required. To achieve or maintain program accessibility, it may be appropriate to establish an ongoing procedure for installing curb ramps upon request in areas frequented by individuals with disabilities as residents, employees, or visitors.

ADA Title II Technical Assistance Manual (emphasis supplied).  San Francisco's existing network of curb ramps, coupled with its ongoing curb ramp replacement program and the ongoing sidewalk inspection and repair program and transit services, provide program access to the public right of way.

In January 2008, the City issued its Americans with Disabilities Act Transition Plan for Curb Ramps and Sidewalks, Updates and Revisions 2007-2008.  (Copy is provided as Exhibit 7.)  As discussed in the transition plan, the City has prioritized intersections for curb ramp construction and

1   upgrades.  The prioritization takes into account current conditions at each intersection, requests from

2   citizens, proximity to government offices and public facilities, proximity to public transit, proximity

3   to public accommodations, and proximity to places of employment.  San Francisco's ultimate goal is

4   to provide complete saturation of modern curb ramps at every pedestrian crossing throughout the

5   City, exceeding the ADA's program access requirements.

6       The City's 10 Year Capital Plan has allocated $70 million over the ten year period from the

7   General Fund to install and upgrade curb ramps throughout the City.  For FY 2008-2009, the City's

8   curb ramp funding was delayed significantly because of the financial crisis, which froze the financial

9   markets.  For several months, there was literally no market for public bonds.  As the 2009-2010 fiscal

10  year draws to a close, the City will have spent approximately $7,647,500 on curb ramp funding

11  during the current fiscal year.  The City's 10 year Capital Plan calls for consistent curb ramp

12  expenditures from year to year.

13      Beyond the funds specifically allocated by the City to build curb ramps according to transition

14  plan priorities, the City works to ensure that curb ramps are installed by other governmental, public

15  and private entities.  Examples of this are street repaving projects, public or private development

16  projects impacting sidewalks, and work in the public right of way by utilities.

17          **2.      Sidewalks**

18      Plaintiffs also complain that irregularities in sidewalk surfaces create barriers to access.  As

19  explained in the City's transition plan for curb ramps and sidewalks, San Francisco has two programs

20  to address sidewalk repairs:  the first, a proactive survey and repair program; and the second, a

21  response system for complaints.  In 2006, before plaintiffs commenced this action, San Francisco

22  enacted legislation creating a sidewalk improvement fund and requiring abutting property owners to

23  repair sidewalk problems in front of their properties.  San Francisco has a comprehensive plan to

24  survey and repair all the City sidewalks over 25 years, one sector at a time.  In addition, the City

25  continues to respond to sidewalk complaints as it receives them on a citywide basis.  San Francisco

26  contemplates that its sidewalk inspection and repair program will be perpetual.  After all 25 sectors

27  have been surveyed, the City will begin again with the first sector, to identify any surface

28  irregularities that arose since the previous survey and not otherwise come to the City's attention

through City inspections or citizen complaints.  DPW spends more than $2 million each year to

inspect and repair city sidewalks.

### F.   The City's Undue Burden Statement

The federal ADA regulations expressly recognize the program access obligation may impose

a crushing economic burden on the government entity.  These regulations provide a defense when the

entity can demonstrate an undue burden.

> [Title II's program access obligation] does not require a public entity to take
> any action that it can demonstrate would result . . . in undue financial and
> administrative burdens.  In those circumstances where personnel of the public
> entity believe that the proposed action . . . would result in undue financial and
> administrative burdens, a public entity has the burden of proving that
> compliance with § 35.150(a) of this part would result in such . . . burdens.  The
> decision that compliance would result in such . . . burdens must be made by the
> head of a public entity or his or her designee after considering all resources
> available for use in the funding and operation of the service, program, or
> activity, and must be accompanied by a written statement of the reasons for
> reaching that conclusion.

28 C.F.R. § 35.150(a)(3).  The Justice Department explained in commentary accompanying the final

rulemaking that department heads with budgetary authority may properly conduct an undue burden

analysis on behalf of an entity.

> The [Justice] Department recognizes the difficulty of identifying the official
> responsible for this determination, given the variety of organizational forms
> that may be taken by public entities and their components.  The intention of
> [section 35.150(a)(3)] is that the determination must be made by a high level
> official, no lower than a Department head, having budgetary authority and
> responsibility for making spending decisions.

56 Fed. Reg. 35694-01, 1991 WL 304268 (F.R. July 26, 1991).  Accordingly, in this case, San

Francisco's Controller, Mr. Ben Rosenfield, is an appropriate person to conduct the City's undue

burden assessment in this case.

In *Pascuiti v. New York Yankees*, 87 F.Supp.2d 221 (S.D.N.Y. 1999), the plaintiffs

complained of access barriers in New York's Yankee Stadium.  The district court held it should

consider only the budget of New York City's Parks Department in assessing the undue burden

defense, rejecting the plaintiffs' invitation to take into account the entire budget of New York City.

"[T]he relevant budget of the public entity under Title II is the budget for the service, program, or

activity at issue."  *Id.* at 224.  The district court analogized to the Supreme Court's reasoning in

1    *Olmstead v. L.C.*, 527 U.S. 581 (1999), in which the Supreme Court addressed whether the ADA

2    required the state of Georgia to place persons with mental disabilities in community settings (rather

3    than in institutions). Considering the state's cost-based defense, the Supreme Court in *Olmstead*

4    looked at the state's overall mental health budget. On remand, the Supreme Court instructed the

5    lower court to "tak[e] into account the resources available to the State and the needs of others with

6    mental disabilities." *Pascuiti*, 87 F. Supp.2d at 225 (quoting *Olmstead*). Ultimately, the district court

7    in *Pascuiti* adopted the "broad perspective" that the Supreme Court urged in *Olmstead*.

8    > Sensibly construed, the fundamental-alteration component of the reasonable-
9    > modifications regulation would allow the State to show that, in the allocation
     > of available resources, immediate relief for the plaintiffs would be inequitable,
     > given the responsibility the State has undertaken for the care and treatment of a
10   > large and diverse population of persons with mental disabilities.

11   *Pascuiti*, 87 F. Supp.2d at 225 (quoting *Olmstead*). Following *Olmstead*'s guidance, the district court

12   in *Pascuiti* held the relevant budget for assessing New York City's undue burden defense was the

13   Parks Department budget. "By considering the overall Parks Department budget, this Court adopts a

14   similarly broad perspective for the 'undue burden' analysis in this case. The Court can obtain a

15   realistic picture of the resources available to the City for proposed modifications, while balancing the

16   cost of those modifications against potential harms to other Parks Department programs." *Id.*

17         Following the guidance of *Olmstead* and *Pascuiti*, when evaluating San Francisco's undue

18   burden statement in this case, this Court should consider the resources available to San Francisco for

19   providing the full range of services to individuals with mobility disabilities (not the City's overall

20   budget) and the needs of others with disabilities.[8] The Court should determine whether it would be

21   inequitable to require the schedule for physical access improvements plaintiffs demand, given the

22   responsibility San Francisco has undertaken to provide not only physical access, but a full range of

23   essential services to a large and diverse population of persons with disabilities.

24

25         [8] Under any measure the Court may apply – whether the City's entire general fund, individual
     departmental budgets, or resources available to provide services to the disabled community –
26   substantially increased spending on physical access improvements will impose an undue burden on
     the City and on its residents who have disabilities and rely on the full range of services the City
27   offers.

28

---

As the Court is aware, this country endured and continues to endure an unprecedented economic crisis beginning in the fall of 2008.  This economic downturn has reduced the City's tax revenues and reduced state funding, while the need for City services has only increased.  In his 2009 undue burden statement, and in the 2010 update, Mr. Rosenfield, San Francisco's Controller, provides an overview of San Francisco's budget and all available funding sources for the City.  Mr. Rosenfield explains the relatively small proportion of the overall City budget that is available for programs to serve individuals with disabilities (as opposed to Fire, Police, Public Health, Building Inspection and other City functions that serve all residents, including individuals with disabilities).  Mr. Rosenfield identifies the range of services San Francisco provides for individuals with disabilities, including housing, home health care, community services, meals and other essential support services.  Mr. Rosenfield demonstrates that any substantial increase in San Francisco's current spending levels on mobility access would force debilitating cuts in essential services to the same population, imposing an undue burden on San Francisco residents and on the City itself.

Plaintiffs' retained expert Mr. Paul Regan will criticize Mr. Rosenfield's undue burden analysis.  Mr. Regan is a CPA and serves on the City Council of the Town of Hillsborough California.  Before he was retained in this case, Mr. Regan had never heard of the undue burden defense to program access.  Mr. Regan faults the City's undue burden analysis on the grounds that Mr. Rosenfield failed to consider all potential sources of revenue (additional debt and sale of assets) and that Mr. Rosenfield's analysis projects only three years into the future instead of a longer period.  The evidence will show that Mr. Rosenfield's three year projection period is reasonable and prudent; and that Mr. Rosenfield properly considered all resources available for the programs, services and activities at issue, as section 28 C.F.R. 35.150(a)(3) and the case law direct.  The City's existing debt burden already reaches the maximum level the City has determined to be fiscally prudent.  Any additional borrowing would not only require two-thirds voter approval, but would have the direct effect of increasing voters' property taxes to service the increased debt burden.  Voters have rejected past bond measures designed to fund physical access improvements, and plaintiffs' own expert acknowledged that any such bond on the 2009 ballot would likely have failed.  Any increased debt would place the City in an untenable position, threatening its bond rating and compromising its

ability to finance essential health and safety improvements, such as seismic upgrades, to its public buildings.  Financial projections that go beyond three years become increasingly speculative, which is why Mr. Rosenfield elected to conduct his undue burden analysis over a three-year window, contemplating regular updates.

## II.   SAN FRANCISCO POLICIES AND PRACTICES REASONABLY MAINTAIN THE ESSENTIAL ACCESS FEATURES OF ITS FACILITIES

Title II entities must reasonably maintain the access features that are essential for program access.

> (a) A public accommodation shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities by the Act or this part.

> (b) This section does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs.

28 C.F.R. § 35.133.  The Justice Department has explained that the maintenance obligation applies only "to the maximum extent feasible," and that service interruptions are inappropriate only if they "persist beyond a reasonable period of time."  28 C.F.R. Part 35 App. A.

A Title II entity falls short of its maintenance obligations only if plaintiffs prove that maintenance issues are "recurrent" and constitute a "pattern," rather than being "isolated or temporary."  *Cupolo v. Bay Area Rapid Transit*, 5 F.Supp.2d 1078, 1083 (N.D. Cal. 1997).  Case law in other jurisdictions recognizes the same distinction between isolated maintenance interruptions and systemic problems.  *See Foley v. City of Lafayette*, 359 F.3d 925, 930 (7th Cir. 2004) (The court rejected plaintiffs' Title II maintenance claim where an elevator was closed for repairs and snow was not cleared from accessible crosswalk, because plaintiff had not shown "systemic problems of poor maintenance policy or frequent denials of access"); *Martin v. Metro. Atlanta Rta*, 225 F.Supp.2d 1362, 1380 (N.D. Ga. 2002) ("Although Plaintiffs have documented a number of cases where they encountered inoperable elevators in MARTA stations, their evidence is insufficient to demonstrate a systemic problem that would rise to the level of an ADA violation," since "[i]t is simply a fact of life that elevators will break down on occasion.").

Likewise, in this case, the evidence will show that the City has reasonable policies and practices to maintain the access features necessary to provide program access.  MOD's citywide

1   training throughout city departments includes training on maintenance obligations.  Libraries have

2   daily inspections to make sure paths of travel are clear, and quarterly inspections to check other

3   access issues, such as door pressures and operability of bathroom fixtures.  RecPark has a regular

4   inspection program for park facilities, and reasonable maintenance budget, prioritizing requests

5   involving access issues.  DPW has instituted its proactive sidewalk inspection and repair program,

6   and in addition responds to citizen complaints and requests.  And the City has formally included curb

7   ramps that have deteriorated over time in its curb ramp repair and replacement program.  Plaintiffs

8   will be unable to establish any "pattern" of "recurrent" maintenance problems.

9   **III.   STATE REGULATIONS DO NOT IMPOSE ANY MANDATORY DUTY ON SAN FRANCISCO TO DEVELOP A SELF-EVALUATION OR TRANSITION PLAN FOR STATE-FUNDED PROGRAMS**

10

11   Relying on 22 C.C.R. §§ 98251 and 98258 (hereafter "sections 98251 and 98258") – two

12   regulations promulgated under section 11135 of the California Government Code – plaintiffs seek

13   injunctive relief, requiring the City to "[p]repare, adopt and implement a Self-Evaluation Plan and

14   Transition Plan.[9]  Although California Government Code section 11139 permits enforcement of those

15   regulations "by a civil action for equitable relief," the regulations are only directory and impose no

16   affirmative mandatory duties on public entities.  Moreover, even if 98251 and 98258 were mandatory,

17   they only impose a duty on "the responsible State agency" – and not on the "recipient" of state funds.

18   Thus, the only possible remedy available is an injunction or writ of mandamus requiring "the

19   responsible State agency" – which is not a party to this action – to require the City to prepare a Self-

20   Evaluation Plan and Transition Plan.  Finally, even assuming sections 98251 and 98258 could be

21   construed to create a mandatory duty to prepare a Self Evaluation Plan and Transition Plan, they only

22   impose that duty after "the responsible State agency" has required the recipient to do so.  Because no

23   State agency has required the City to prepare such a plan, the City has no legal duty to do so.

24   Section 98258 – which addresses transition plans – provides in relevant part:

25

26   [9]   There is no private right of action under the ADA or Rehabilitation Act to require a public entity to prepare a self-evaluation or transition plan.  *Lonberg v. City of Riverside*, 571 F.3f 846, 851-

27   52 (9th Cir. 2009); *Californians for Disability Rights, Inc. v. Caltrans*, 249 F.R.D. 334, 342 (N.D. Cal. 2008).

28

> In the event that structural changes to facilities are necessary to meet the provisions of Section 98254, a recipient *should be required by the responsible State agency* to develop, within six months of the effective date of implementing regulations, a transition plan setting forth the steps necessary to complete such changes.  (emphasis added).

Section 98251 – which addresses self-evaluation plans – similarly states that "a recipient  with 15 or more employees *should be required by the responsible State agency*, within one year of the effective date of implementing regulations to" have a self-evaluation plan.  (emphasis added).

Because both regulations use the word "should" instead of "shall," they are directory and impose no mandatory duties on either recipients or State agencies.  *See Kucera v. Lezza*, 59 Cal.App.4th 1141, 1152 ("The words 'may' and 'should' are ordinarily permissive").  The differing language of the corresponding federal regulations confirm this.  Unlike the state regulations, the federal regulations addressing self-evaluation and transition plans impose a mandatory duty on the public entity recipient by using the word "shall" instead of "should."  *See* 28 C.F.R. § 41.57(c) ("a recipient shall develop . . . a transition plan"); 28 C.F.R. § 42.505(c) ("A recipient *shall* . . . evaluate and modify its policies and practices that do not meet the requirements of this subpart"); 34 C.F.R. 104.6(c) ("A recipient *shall* . . . (i) Evaluate . . . its current policies and practices and the effects thereof that do not or may not meet the requirements of this part"); 28 C.F.R. § 35.150(d) ("a public entity . . . *shall* develop . . . a transition plan"); 28 C.F.R. § 35.105(a) ("A public entity *shall*, within one year of the effective date of this part, evaluate its current services, policies, and practices, and the effects thereof, that do not or may not meet the requirements of this part").  By declining to use the word "shall" as used in the corresponding federal regulations, the State agency that promulgated sections 98251 and 98258 necessarily intended to make those regulations directory and not mandatory.  *See People v. Sinohui*, 28 Cal.4th 205, 213 (2002) (where legislative body knows how to create a requirement by adopting certain language but declines to do so, it intends to omit that requirement).

The pertinent legislative history also supports such an interpretation.  In amending California Government Code section 11139 in 1999 to permit private enforcement of regulations adopted pursuant to section 11135, the Legislature only intended to "permit private individuals to seek judicial relief to force agencies or entities receiving state funds *to halt their discriminatory practices*."  Cal.

1  Sen. Rules Com., Third Reading of Assem. Bill No. 1670, as amended Sept. 3, 1999, p. 15 (1999)

2  (emphasis added).  But as the Ninth Circuit recently explained, "[t]he existence or non-existence of a

3  transition plan does not, by itself, deny a disabled person access to a public entity's services, nor does

4  it remedy the denial of access."  *Lonberg v. City of Riverside*, 571 F.3d 846, 851 (9th Cir. 2009).

5  Because the failure to have a Self-Evaluation or Transition Plan is not a discriminatory practice,

6  construing sections 98251 and 98258 as permissive – and not mandatory – is wholly consistent with

7  the purpose behind the 1999 amendment to section 11139.

8         In any event, even if sections 98251 and 98258 could be construed as imposing a mandatory

9  duty, those regulations only impose that duty on "the responsible State agency" – and not on the

10  "recipient" of state funds.  Indeed, both regulations expressly state that a self-evaluation or transition

11  plan "should be required *by the responsible State agency*."  22 Cal. Code Regs. §§ 98251 & 98258

12  (emphasis added).  Thus, any injunctive relief ordered pursuant to these regulations may only be

13  directed at a State agency – and not at the City.  And because no State agency is a party to this

14  litigation, plaintiffs are not entitled to such relief.

15         Finally, in light of the italicized language of these regulations, a directive from the State

16  agency, at a minimum, is necessary before the City would even have a duty to prepare a Self-

17  Evaluation or Transition Plan.  No such directive exists.  Accordingly, under sections 98251 and

18  98258, plaintiffs are not entitled to injunctive relief requiring the City to prepare, adopt, or implement

19  such plans.

## CONCLUSION

21         For the foregoing reasons, the Court should enter judgment for San Francisco after trial.

22  DATED:   July 20, 2010

DENNIS J. HERRERA
City Attorney
DANNY CHOU
Chief of Complex and Special Litigation


By _____/s/_____
JAMES M. EMERY
Deputy City Attorney
Attorneys for Defendants City and
County of San Francisco, et al.