UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

IVANA KIROLA, et al.,

Plaintiffs,

vs.

THE CITY AND COUNTY OF SAN FRANCISCO, et al.,

Defendants.

Case No: C 07-03685 SBA

**ORDER GRANTING THE CITY'S MOTION FOR A MODIFICATION OF THE CLASS DEFINITION TO EXCLUDE HOWARD CHABNER AS A CLASS MEMBER**

Dkt. 506

The parties are presently before the Court on Defendant the City and County of San Francisco's ("the City") Motion for a Modification of the Class Definition to Exclude Howard Chabner as a Class Member. Dkt. 506. Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby GRANTS the motion for the reasons set forth below. The Court, in its discretion, finds this matter suitable for resolution without oral argument. See Fed.R.Civ.P. 78(b).

# I. BACKGROUND

## A. PROCEDURAL HISTORY

The parties are familiar with the facts of this case, which will not be repeated in detail. On June 4, 2010, the Court certified the following class of persons in this action:

> All persons with mobility disabilities who are allegedly being denied access under Title II of the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, California Government Code Section 11135, et seq., California Civil Code § 51 et seq., and California Civil Code § 54 et seq. due to disability access barriers to the following programs, services, activities and facilities owned, operated and/or maintained by the City and County of San Francisco: parks, libraries, swimming pools, curb ramps, sidewalks, cross-walks, and any other outdoor designated pedestrian walkways in the City and County of San Francisco.

See 6/4/10 Order, Dkt. 285.

On March 4, 2011, Joanna Fraguli, the Deputy Director for Programmatic Access of the Mayor's Office on Disability ("MOD"), filed a motion for modification of the class definition to exclude her as a class member. Dkt. 495. Ms. Fraguli fell within the class definition because she uses a wheelchair for mobility. In her motion, Ms. Fraguli argued that the Court should modify the class to exclude her in order to avoid an irreconcilable conflict of interest with the class that precludes adequate representation. Specifically, Ms. Fraguli asserted that she has a conflict with the class because, given her position at MOD, she is responsible for developing and implementing the very City programs and policies challenged by Plaintiffs in this action.

On March 18, 2011, the Court granted Ms. Fraguli's motion and modified the class definition to exclude her from the class. See 3/18/11 Order, Dkt. 505. The Court found:

> Like the supervisory employees in the employment discrimination actions cited by Ms. Fraguli, here, Ms. Fraguli is responsible, at least in part, for developing and implementing the very City programs and policies challenged by Plaintiffs. Given her position at MOD, she participated in the very behavior that is being challenged, and is a potential witness against the allegations raised by other class members. Therefore, Ms. Fraguli has a conflict with the class that precludes adequate representation, which can be remedied by excluding her from the class definition.

Id. at 10. The Court also directed further briefing as follows:

> It is unclear whether there are other City officials or employees that are similarly situated to Ms. Fraguli and for whom the same rationale would apply for excluding them from the class definition. Therefore, the City is granted leave to file a memorandum directed to this issue, as set forth below. If a timely memorandum on this issue is not filed, it will be presumed that there are no other such City officials or employees.

Id. at 12 n.4.

In response, the City filed the instant Motion for a Modification of the Class Definition to Exclude Howard Chabner as a Class Member on the ground that "Mr. Chabner, who uses a wheelchair for mobility, is a City official responsible for developing and implementing the policies challenged by plaintiffs in this lawsuit." City's Mtn. at 1-2. The Court subsequently

ordered the City to submit a supplemental memorandum clarifying its assertion that Mr. Chabner is a "City official" responsible for "developing and implementing" the policies at issue in this lawsuit. See Dkt. 536. Plaintiffs oppose the City's motion.

### B. MIZNER DECLARATION

In support of its motion, the City submits the declaration of Susan Mizner, the Director of MOD. Mizner Decl., Dkt. 507. In her declaration, Ms. Mizner describes Mr. Chabner's role as chair of the Physical Access Committee of the Mayor's Disability Council ("MDC"). Id. ¶ 3. Specifically, she explains that the mission of the MDC is to "(1) advise the Mayor on disability issues; (2) work with MOD to ensure ADA compliance throughout the City; and (3) provide a public forum to discuss disability issues." Id. Furthermore, Ms. Mizner explains that, each year, the Physical Access Committee is the first public body to review the status of the ADA UPHAS plan, which is the City's ADA transition plan for buildings and facilities, and MODS's requests for capital budget funding for that fiscal year, after which "the entire Mayor's Disability Council provides review and feedback." Id. ¶ 5.

According to Ms. Mizner, through Mr. Chabner's service on MDC's Physical Access Committee, he "plays a key role in San Francisco's outreach to the disabled community and in developing City policies and priorities for physical access improvements." Id. ¶ 3. Mr. Chabner "assists and guides many of the City's policy decisions regarding physical access." Id. ¶ 4. For example, "the scoring system currently used to evaluate the condition of curb ramps in the City's Curb Ramp Information Systems (CRIS) database arose almost entirely out of the feedback MOD and DPW received from Mr. Chabner and the Physical Access Committee members." Id. Also, Mr. Chabner "has personally submitted requests for installation of curb ramps at more than 100 locations in San Francisco." Id.

Ms. Mizner further states that "Mr. Chabner takes an active role in reviewing the access features in most major public construction projects – not at the level of detailed code compliance, but in terms of broad access approaches." Id. ¶ 6. Specifically, Mr. Chabner "chairs the Physical Access Committee discussion" regarding various access features in

construction projects, and "documents the discussion in a report he publicly presents" to MOD, along with "recommendations for the Council's position." Id.

### C. SCOTT DECLARATION

In response to the Court's briefing order, the City submits the declaration of John Paul Scott, employed by the City as the Deputy Director of Physical Access at MOD. Scott Decl. ¶ 1, Dkt. 539. Mr. Scott explains that Mr. Chabner is considered a "City official" because, as member of the MDC, Mr. Chabner is "appointed by the Mayor and sworn in to office as any other public official is sworn in." Id. ¶ 2. Mr. Scott further explains that, as chair of the Physical Access Committee of the MDC, Mr. Chabner "sets the agenda for the meeting, with staff support, chairs the meeting itself, and develops consensus of the committee for recommendations to the full Mayor's Disability Council." Id. ¶ 3.

According to Mr. Scott, "Mr. Chabner decides what projects will get close review from the Committee, which projects need to return for further discussion, and which projects have issues that need to be elevated beyond the MDC." Id. For example, "Mr. Chabner was part of establishing the City's position on the North Beach Library that the library needed to be rebuilt, rather than renovated, in order to have the best access (and best services) at the site." Id. Also, Mr. Chabner "sits on a 30 person committee for the Transbay Joint Powers Authority to represent the disability interests for the City and County of San Francisco in both the Transbay terminal temporary design and permanent terminal design." Id. "With respect to the Van Ness Bus Rapid Transit project, Mr. Chabner was key in developing the accessibility priorities matrix that [is] included in the Draft Environmental Impact Report; these priorities evaluate the impact on people with disabilities of the different design options." Id. "Finally, Mr. Chabner also routinely helps in establishing priorities for construction of curb ramps in the public right of way and the priorities for the City's UPhAS ADA Transition Plan for Facilities." Id.

Mr. Scott further explains:

> Mr. Chabner played a key role in developing the scoring systems for grading the condition of the City's curb ramps. This involved looking at each measurement on a ramp – the landings, the slope, the wings, the width, the cross-slope, the connection to the crosswalk, and the lip. He and other Committee members

> weighted the degree of importance of each item, and correlated each item to the City's scoring system. … This scoring systems is an integral part of the City's ADA Transition Plan for Curb Ramps and Sidewalks. Each year, Mr. Chabner and the other Physical Access Committee members prioritize the remaining itmes [sic] in the UPhAS ADA Transition Plan for Facilities, and report their findings to the Mayor's Disability Council with MOD staff, for MDS comment and approval.

Id. ¶ 4.

Moreover, Mr. Scott states that "Mr. Chabner communicates with other city officials as chair of the MDC's Physical Access Committee, explaining and advocating for the access policies and approaches that the Committee and the MDS have agreed upon." Id. ¶ 6. For example, "while the applicable state and federal disability requirements do not require two elevators at all underground transit stops, the Physical Access Committee has clearly found that two elevators are necessary for reasonable and consistent access to public transportation." Id. As a result, the new Central Subway project constructed in the City will have two elevators for each stop. Id. Also, "he negotiates consensus among the Committee members, who represent different disability interests and various disability groups, to shape MDC and MOD policies as they relate to the ADA Transition Plan for Curb Ramps and Sidewalks as well as the UPhAS ADA Transition Plan for Facilities." Id.

Finally, Mr. Scott explains that "Mr. Chabner does not have the power to hire or fire city staff, nor does the have the ability to unilaterally stop a project. He, like most people in the Mayor's Office on Disability, operates with persuasive power, referring to both legal requirements and best practices." Id. ¶ 7. Mr. Scott states that "there has been only one instance" in his memory "in which City policy and practice did not follow [Mr. Chabner's] recommendation." Id. Mr. Scott explains "that was a situation in which both staff and the Physical Access Committee members were divided as to the best approach to proceed (this involved where accessible bathrooms would be located at San Francisco General Hospital as part of the design and construction of those facilities under the UPhAS ADA Transition Plan)." Id.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." See also General Telephone Co. of Southwest v. Falcon, 457 U.S. 147, 160 (1982) ("Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation."); Andrews Farms v. Calcot, LTD., 2010 WL 3341963, *3 (E.D. Cal. Aug. 23, 2010) (a court "retains broad authority to modify or withdraw certification at any time where it appears the class definition is inappropriate or inadequate") (citing Armstrong v. Davis, 275 F.3d 849, 871 (9th Cir. 2001), abrogated on other grounds by Johnson v. California, 543 U.S. 499, 504-05 (2005)).

Moreover, Federal Rule of Civil Procedure 23(a)(4) imposes on the trial court "a continuing duty to undertake a stringent examination of the adequacy of representation by the named class representatives and their counsel at all stages of the litigation." In re General Motors Corp. Engine Interchange Litig., 594 F.2d 1106, 1124 (7th Cir. 1979). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998); see also Andrews Farms, 2010 WL 3341963, *4 (citing Amchen Products, Inc. v. Windsor, 521 U.S. 591, 626 (1997)) (to satisfy the adequate representation requirement, a named "class representative must not be antagonistic or have conflicts of interest with other potential class members").

## III. ANALYSIS

In support of its motion, the City argues that Mr. Chabner, like Ms. Fraguli, "is responsible for developing and implementing the very City policies and programs challenged by plaintiffs." City's Mtn. at 2. On that basis, the City moves to exclude Mr. Chabner from the class definition.

In response, Plaintiffs argue Mr. Chabner is not a City employee, official, or director whose decisions and/or actions create liability for the City or are being challenged in this

lawsuit; rather, Mr. Chabner provides input and feedback to the City regarding disability access issues like any other member of the general public. Therefore, according to Plaintiffs, the reasoning underlying the Court's decision to exclude Ms. Fraguli does not apply to Mr. Chabner. The Court disagrees. At the outset, Mr. Chabner, as a City official appointed by the Mayor, has a more significant role in developing and shaping City policy with respect to physical access issues than a general member of the public commenting on such issues. In addition, based on the evidence provided by the City, it is apparent that Mr. Chabner plays a significant role in San Francisco's outreach to the disabled community and in developing City policies and priorities for physical access improvements, including polices challenged by Plaintiffs in this suit. For instance, Mr. Chabner played a role in developing the scoring system currently used to evaluate the condition of curb ramps, which is part of the City's ADA Transition Plan for Curb Ramps and Sidewalks. Scott Decl. ¶ 4. Plaintiffs directly challenge the City's curb ramp program and transition plan in this suit. See Plfs.' Trial Brief at 22-23, Dkt. 306 (Citing the CRIS database, asserting that "[t]he City's own documents show that it has failed to meet its obligations to provide access curb ramps so that persons with mobility disabilities can use the City's right-of-way safely."); First Amended Complaint ("FAC") ¶ 60, Dkt. 294 (the City has "fail[ed] to develop and implement an adequate self-evaluation and transition plan that sets forth the steps necessary to achieve full and equally effective access for persons with mobility disabilities ….").

Moreover, based on the information submitted, Mr. Chabner provides annual feedback on the status of the City's ADA transition plan for buildings and facilities, including commenting on MOD's capital budget requests for the plan and setting priorities for funding of projects. See Mizner Decl., ¶ 5, Ex. B. He also negotiates consensus among the Committee members to shape MDC and MOD policies as they relate to the ADA Transition Plan for Curb Ramps and Sidewalks and the UPhAS ADA Transition Plan for Facilities. Scott Decl. ¶ 6. As indicated, Plaintiffs directly challenge the sufficiency of the City's ADA transition plan. Finally, while Mr. Chabner's actions and recommendations are not binding on the City, it appears from the Scott and Mizner declarations that Mr. Chabner holds significant persuasive

power in shaping and developing City policy with respect to physical access. This is in accordance with the overall role of the Physical Access Committee to "advise the Mayor on disability issues" and "work with MOD to ensure ADA compliance throughout the City." Mizner Decl. ¶ 3.

At bottom, Mr. Chabner, like Ms. Fraguli, is responsible, at least in part, for developing and implementing the very City programs and policies challenged by Plaintiffs. Given his position as chair of the Physical Access Committee, he participated in the very behavior that is being challenged. See e.g. Donaldson v. Microsoft Corp., 205 F.R.D. 558, 568 (W.D. Wash. 2001) (denying certification of a class that included, in an employment discrimination action, both supervisory and non-supervisory employees, finding: "[s]ince plaintiffs['] allegations about disparate treatment and disparate impact arise directly from the evaluation system at Microsoft, the Court is unable to envision a class which would include both those who implemented the ratings system and those who allegedly suffered under it."); Bacon v. Honda of America Mfg., Inc., 205 F.R.D. 466, 481-82 (S.D. Ohio 2001) (denying class certification on the ground that the adequate representation requirement has not been satisfied, in view of the inclusion of both supervisory and non-supervisory employees in the proposed class, finding: "[a]t Honda, exempt level employees and even team leaders participate in employment decisions touching upon production associates in matters of promotion, associate evaluations and discipline which would place them in the conflicting position of having to defend their actions against a discrimination challenge."). Therefore, Mr. Chabner has a conflict with the class that precludes adequate representation, which can be remedied by excluding him from the class definition.[1]

[1] Plaintiffs also oppose the City's motion on the ground that the Court previously granted Plaintiffs' Motion in Limine No. 3 to exclude Mr. Chabner from testifying at trial because he was not timely disclosed. See 3/18/11 Order at 5-6, Dkt. 389. However, Mr. Chabner's inability to testify at trial does not change the fact that he has irreconcilable conflict with the class precluding adequate representation. Moreover, this Order does not change the Court's in limine ruling.

## IV. CONCLUSION

For the reasons stated above,

IT IS HEREBY ORDERED THAT:

1. The City's Motion for a Modification of the Class Definition to Exclude Howard Chabner as a Class Member is GRANTED; the class definition as set forth in the Court's June 4, 2010 Order (Dkt. 285), and as modified in the Court's March 18, 2011 Order (Dkt. 505), is further modified as follows (modification underlined):

> All persons with mobility disabilities who are allegedly being denied access under Title II of the Americans with Disabilities Act of 1990, Section 504 of the Rehabilitation Act of 1973, California Government Code Section 11135, et seq., California Civil Code § 51 et seq., and California Civil Code § 54 et seq. due to disability access barriers to the following programs, services, activities and facilities owned, operated and/or maintained by the City and County of San Francisco: parks, libraries, swimming pools, curb ramps, sidewalks, cross-walks, and any other outdoor designated pedestrian walkways in the City and County of San Francisco. Excluded from the class are Joanna Fraguli, Deputy Director for Programmatic Access of the City and County of San Francisco's Mayor's Office on Disability, and Howard Chabner, Chair of the Physical Access Committee of the City and County of San Francisco's Mayor's Disability Council.

2. This Order terminates Docket 506.

IT IS SO ORDERED.

Dated: April 3, 2011

SAUNDRA BROWN ARMSTRONG
United States District Judge