1
2
3
4
5
6
7                       UNITED STATES DISTRICT COURT

8               FOR THE NORTHERN DISTRICT OF CALIFORNIA

9                            OAKLAND DIVISION

10

11  IVANA KIROLA, et al.,                    Case No:  C 07-3685 SBA

12               Plaintiffs,                 **CLASS ACTION**

13          vs.                              **FINDINGS OF FACT AND
                                             CONCLUSIONS OF LAW**
14  THE CITY AND COUNTY OF SAN
    FRANCISCO, et al.,
15
                 Defendants.
16

17

18  **I.      INTRODUCTION**

19          Plaintiff Ivana Kirola ("Kirola" or "Plaintiff"), a mobility-impaired individual,

20  brings the instant disability access class action on behalf of herself and similarly-situated

21  individuals against Defendants City and County of San Francisco, the Mayor of San

22  Francisco, and members of the Board of Supervisors (collectively "the City").  She alleges

23  that the City discriminates against mobility-impaired persons by failing to eliminate all

24  access barriers from or otherwise ensure accessibility to the City's libraries, swimming

25  pools, parks, and public rights-of-way (i.e., the City's network of sidewalks, curb ramps,

26  crosswalks, and other outdoor pedestrian walkways).  She also complains that the City's

27  policies and practices for ensuring access, removing access barriers, and handling public

28  access complaints are deficient.

1   The operative pleading is the First Amended Complaint ("FAC"), which alleges six

2   claims for relief based on:  (1) Title II of the Americans with Disabilities Act of 1990

3   ("Title II of the ADA" or "Title II"), 42 U.S.C. § 12131-12165; (2) the Rehabilitation Act

4   of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794; (3) the Civil Rights Act of 1871, Rev.

5   Stat. 1979, as amended, 42 U.S.C. § 1983; (4) the California Unruh Civil Rights Act

6   ("Unruh Act"), Cal. Civ. Code §§ 51; (5) the California Disabled Persons Act ("CDPA"),

7   id. § 54.1; and (6) California Government Code §§ 11135.  Dkt. 294.  Plaintiff seeks

8   declaratory and injunctive relief only.  The Court has subject matter jurisdiction over

9   Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4), and supplemental

10   jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367.  Venue is proper in the

11   Northern District of California, as all Defendants reside and the acts or omissions

12   complained of occurred in this District.  28 U.S.C. § 1391(b)(1), (2).

13   The Court previously granted class certification and appointed Kirola as the sole

14   class representative.  Dkt. 285.  Thereafter, the parties presented their respective cases to

15   the Court during a court trial.  Subsequent to trial, the parties submitted post-trial briefing

16   and proposed findings of fact and conclusions of law.  Dkt. 614, 616, 617, 618, 632, 634,

17   635, 636, 646, 662, 681, 683.  Separately, the City filed a Post-Trial Motion for Judgment,

18   focusing primarily on whether Kirola has constitutional standing under Article III to pursue

19   any claims on behalf of herself or the class.  Dkt. 666, 672, 675.  Alternatively, the City

20   contends that even if Kirola has standing, she has failed to demonstrate the substantive

21   merit of any of her claims.

22   As will be set forth below in the findings of fact and conclusions of law, the Court is

23   persuaded by the City's arguments, and, based on the evidence and testimony presented at

24   trial, finds that Kirola lacks constitutional standing to pursue any claims on behalf of the

25   class.  Alternatively, even if Kirola had standing, she has failed to carry her burden of

26   demonstrating, by a preponderance of the evidence, that the City has violated the ADA or

27   any of the other federal and state laws and regulations alleged in the FAC.

28

1  **II.     BACKGROUND**

2      **A.     TITLE II OF THE ADA**

3          "Congress enacted the ADA in 1990 to remedy widespread discrimination against

4  disabled individuals." PGA Tour, Inc. v. Martin, 532 U.S. 661, 674 (2001).  The ADA is

5  comprised of five titles:  Employment (Title I); Public Services (Title II); Public

6  Accommodations and Services Operated by Private Entities (Title III);

7  Telecommunications (Title IV); and Miscellaneous Provisions (Title V).  Zimmerman v.

8  Or. Dep't of Justice, 170 F.3d 1169, 1172 (9th Cir. 1999).  The purpose of the ADA's

9  various provisions is "to provide clear, strong, consistent, enforceable standards addressing

10  discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(2).

11          This action is premised on Title II of the ADA, which became effective on January

12  26, 1992, and applies to public entities.  Norman-Bloodsaw v. Lawrence Berkeley Lab.,

13  135 F.3d 1260, 1273 (9th Cir. 1998) (citing §§ 108, 205, Pub.L. No. 101-336).  To

14  demonstrate a prima facie case under Section 202 of Title II of the ADA, a plaintiff must

15  show that:

16              (1) she is an individual with a disability; (2) she is otherwise
              qualified to participate in or receive the benefit of a public
17              entity's services, programs or activities; (3) she was either
              excluded from participation in or denied the benefits of the
18              public entity's services, programs or activities or was otherwise
              discriminated against by the public entity; and (4) such
19              exclusion, denial of benefits or discrimination was by reason of
              her disability.

20

21  Sheehan v. City & Cnty. of San Francisco, 743 F.3d 1211, 1232 (9th Cir. 2014) (discussing

22  requirements of a claim brought under 42 U.S.C. § 12132).  "This prohibition against

23  discrimination is universally understood as a requirement to provide 'meaningful access.'"

24  Lonberg v. City of Riverside, 571 F.3d 846, 851 (9th Cir. 2009).  "An individual is

25  excluded from participation in or denied the benefits of a public program if 'a public

26  entity's facilities are inaccessible to or unusable by individuals with disabilities.'"  Daubert

27  v. Lindsay Unified School Dist., 760 F.3d 982, 987 (9th Cir. 2014) (quoting 28 C.F.R.

28  § 35.149).

ADA regulations recognize that "in the case of older facilities, for which structural change is likely to be more difficult, a public entity may comply with Title II by adopting a variety of less costly measures, including relocating services to alternative, accessible sites and assigning aides to assist persons with disabilities in accessing services." Tennessee v. Lane, 541 U.S. 509, 532 (2004). Accordingly, the regulations promulgated by the United States Attorney General to implement the requirements of Title II differentiate between structures built before the effective date of the ADA and those built or altered after.

Existing facilities constructed prior to January 26, 1992, are subject to 28 C.F.R. § 35.150, which requires only "***program access***." 760 F.3d at 988. Program access does not require that each and every facility is equally accessible to disabled persons. Cohen v. City of Culver, 754 F.3d 690, 694-95 & n.4 (9th Cir. 2014). Rather, it simply requires a public entity to "operate each service, program, and activity so that the service, program, or activity, when ***viewed in its entirety***, is readily accessible to and usable by individuals with disabilities." 28 C.F.R. § 35.150(a) (emphasis added).[1] "Title II's emphasis on 'program accessibility' rather than 'facilities accessibility' was intended to ensure broad access to public services, while, at the same time, providing public entities with the flexibility to choose how best to make access available." Daubert, 760 F.3d at 986 (internal quotations and citation omitted). Public entities are directed to develop a "transition plan" to "achieve program accessibility" by "setting forth the steps necessary to complete such changes." 28 C.F.R. § 35.150(d)(1); Cohen, 754 F.3d at 696.

"New construction and alterations" commenced after January 26, 1992, are subject to more exacting requirements. Specifically, under 28 C.F.R. § 35.151, "[e]ach facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is ***readily***

---

[1] By way of comparison, Title III, which applies to ***private entities*** operating a "place of public accommodation," imposes more stringent requirements aimed at ensuring that ***every facility*** is equally accessible to disabled persons. See Disabled Rights Action Comm. v. Las Vegas Events, Inc., 375 F.3d 861, 882 (9th Cir. 2004); 1 Americans with Disab.: Pract. & Compliance Manual § 2:44. This means, for example, that each and every store operated by a retailer must be ADA compliant.

1 | *accessible* to and usable by individuals with disabilities, . . ."   28 C.F.R. § 35.151(a)(1)

2 | (emphasis added).   To be "readily accessible," the facility "must be constructed in

3 | conformance with the Americans with Disabilities Act Accessibility Guidelines for

4 | Buildings and Facilities (ADAAG), 28 C.F.R. Pt. 36, App. A, *or* with the Uniform Federal

5 | Accessibility Standards (UFAS), 41 C.F.R. Pt. 101-19.6, App. A." <u>Daubert</u>, 760 F.3d at

6 | 986 (emphasis added, citation omitted).   "The ADAAG is a comprehensive set of structural

7 | guidelines that articulates detailed design requirements to accommodate persons with

8 | disabilities." <u>Id.</u>   "[O]nly facilities that were constructed or altered after January 26, 1992,

9 | are subject to the ADAAG's requirements." <u>Id.</u> at 987.

10 |    **B.    CASE OVERVIEW**

11 |         The original complaint named three plaintiffs:  Kirola; Elizabeth Elftman

12 | ("Elftman"); and Michael Kwok ("Kwok") (collectively, "Plaintiffs").  Dkt. 1.  Three years

13 | later on February 9, 2010, Plaintiffs moved for leave to file an amended complaint,

14 | requesting, inter alia, to dismiss Kwok as a named plaintiff and to substitute Linda Pillay

15 | ("Pillay") in his stead.  Dkt. 121, 3:6-8.  Plaintiffs also sought to refine their class

16 | allegations and claims. <u>Id.</u>, 3:9-16.

17 |         On March 2, 2010—before the Court ruled on their motion for leave to amend—

18 | Plaintiffs filed a motion for class certification under Federal Rule of Civil Procedure 23(a)

19 | and (b)(2), which sought to appoint both Kirola and Pillay as class representatives, even

20 | though Pillay was not a party to the action.  Dkt. 187.  Plaintiffs did not seek to have

21 | Elftman appointed as a class representative. <u>Id.</u>; Dkt. 1; Dkt. 121, Exh. A.

22 |         On April 12, 2010, the Court granted in part and denied in part the motion for leave

23 | to amend.  Dkt. 238.  The Court allowed Plaintiffs to narrow the class definition alleged in

24 | the initial complaint, dismiss Kwok as a named plaintiff, and clarify their allegations

25 | concerning the City's alleged failure to comply with California Government Code § 11135.

26 | The Court, however, denied their request to join Pillay, finding that Plaintiffs had failed to

27 | establish good cause to add her as a party-plaintiff. <u>Id.</u>  Consistent with the Court's ruling,

28 | Plaintiffs filed their FAC on June 24, 2010.  Dkt. 238, 294.

1    During the interim, on June 7, 2010, the Court granted Plaintiffs' motion for class

2  certification, and certified the following class pursuant to Federal Rule of Civil Procedure

3  23(a) and (b)(2):

4        All persons with mobility disabilities who are allegedly being
         denied access under Title II of the Americans with Disabilities
5        Act of 1990, Section 504 of the Rehabilitation Act of 1973,
         California Government Code Section 11135, et seq., California
6        Civil Code § 51 et seq., and California Civil Code § 54 et seq.
         due to disability access barriers to the following programs,
7        services, activities and facilities owned, operated and/or
         maintained by the City and County of San Francisco: *parks,*
8        *libraries, swimming pools, and curb ramps, sidewalks, cross-*
         *walks, and any other outdoor designated pedestrian walkways*
9        in the City and County of San Francisco.

10  Dkt. 285, 7:19-25 (emphasis added).  Having previously denied Plaintiffs' request to join

11  Pillay as an additional party-plaintiff, the Court granted their remaining request to appoint

12  Kirola as the class representative.  Id., 7:26.

13    In the course of its briefing on the class certification motion, the City argued, among

14  other things, that Kirola lacked standing to seek injunctive relief with respect to the alleged

15  disability access claims at issue and therefore was not an adequate class representative.

16  Dkt. 245, 20:7:14-21:2.  At the motion hearing on May 18, 2010, the City withdrew its

17  challenge to Kirola's adequacy as a class representative.  Dkt. 285, 3:18-20.  As such, in its

18  June 7, 2010 Order Granting Plaintiffs' Motion for Class Certification, the Court did not

19  address Kirola's standing, and, importantly, made "no finding as to the type or scope of

20  relief [Kirola could] seek or obtain on behalf of the class[.]"  Id., 4:21-22.  Rather, the

21  Court ruled that "[s]uch determinations [would] be made following trial based upon the

22  evidence presented and the relief requested."  Id., 4:23-24.

23    The parties presented their respective cases over the course of a five-week court

24  trial.  Cumulatively, thirty-six lay and expert witnesses, along with numerous exhibits in

25  support of the parties' respective positions, were presented.  Kirola testified, and presented

26  the testimony of six class members and mothers of class members; several City employees

27  as adverse witnesses; four accessibility experts; and two experts in other areas.  The City

28  presented testimony from members of the Mayor's Office on Disability ("MOD"),

1   employees from various City departments, including the Department of Public Works

2   ("DPW") and Recreation and Parks Department ("RecPark"); two accessibility experts; and

3   several other individual witnesses.

4          Subsequent to trial, the Court directed the parties to meet and confer regarding the

5   course of further proceedings, and to thereafter submit a Joint Statement Re Further

6   Proceedings ("Joint Statement").  Dkt. 659, 1:22-26, 2:5-8.  In the Joint Statement, Plaintiff

7   alleges that she "had encountered, and was continuing to encounter on a daily, regular or

8   ongoing basis, numerous disability access barriers that significantly limited, interfered with,

9   and obstructed her access to the City's pedestrian rights of way, parks, pools and libraries

10  in violation of the meaningful access standard."  Dkt. 662, 10:9-13.  She also claims to have

11  "a real and immediate threat of repeated injury" stemming from eleven policies and

12  procedures, identified as follows:

13             (1) the City's [2007-2008 Fiscal Year ("FY") Americans with
               Disabilities Act Transition Plan for Curb Ramps and Sidewalks
14             ("Curb Ramp and Sidewalk Transition Plan") which does not
               comply with the three-year implementation period and January
15             26, 1995 deadline established by Title II of the ADA (28 C.F.R.
               § 35.150(c)) for the completion of any barrier removal
16             necessary for program access;

17             (2) the Sidewalk Inspection Repair Program, which only
               inspects and repairs access barriers on a 25 year cycle, and
18             which also fails to comply with the January 26, 1995 deadline
               for program access;
19
               (3) the City's curb ramp design standard utilized between 1994
20             and 2004 pursuant to which it constructed curb ramps with a ½
               inch lip at the base in violation of federal disability access
21             design standards;

22             (4) the City's Guidelines for Paving and Accessibility
               Compliance which permits the City to install curb ramps up to
23             two years after re-paving;

24             (5) the City's policy as stated on its website that an "accessible"
               park need provide only an "accessible entrance" and "at last one
25             recreational opportunity," and which does not require the
               provision of accessible routes to the range of recreational
26             opportunities provided within each park;

27             (6) the City's UPhAS [Uniform Physical Access Strategy],
               which adopts a policy of leaving disability access barriers that
28             limit program access in place until major modernizations are
               performed in violation of the legal duty to remove such barriers

                                          - 7 -

by no later than January 26, 1995, which contains no objective definition of "accessible," and permits City officials to rely upon their "common sense" in determining what is "accessible," and which sets no deadline for when the City's parks and or libraries will be readily accessible to persons with mobility disabilities;

(7) the City's written complaint policies and forms that make no requirement that disability access barriers be removed within any particular time period, but instead permit the City to take up to two years to remove barriers;

(8) the City's policies and procedures regarding new construction and alterations, which do not require a close-out inspection for compliance with federal disability access design standards or specific sign-off from the relevant City official that a project is in full compliance with those standards as built;

(9) the City's maintenance policies and procedures which do not set specific and prompt deadlines for the identification and repair of items that are broken, non-operational or in need of repair; . . .

[10] the City's failure to adopt and implement a self-evaluation and transition plan pursuant to California Government Code § 11135 . . . and

[11] the City's ongoing failure to adopt any written policy or procedure regarding the identification and removal of safety hazards to persons with mobility disabilities.

Dkt. 662, 13:15-11.[2]

## III.   **<u>FINDINGS OF FACT</u>**

The Court now makes the following findings of fact pursuant to Federal Rule of Civil Procedure 52(a)(1). These findings are based on the evidence and testimony presented at trial, the Court's assessment of the witnesses' credibility, and the legal arguments presented by counsel. To the extent that any of the findings of fact are more appropriately construed as conclusions of law, or vice-versa, they shall be deemed as such.

In this section, the Court will assess:  (1) the City's infrastructure to ensure accessibility for disabled persons to its programs, services and activities, as they relate to the public right-of-way system and the library, aquatics and RecPark programs; (2) the

---

[2] Aside from a brief reference to the adequacy of the City's transition plan, the FAC does not specifically reference any of the above policies. Dkt. 294, ¶ 44.

1   accessibility of the aforementioned programs, services and activities; (3) the City's

2   grievance procedure for making accessibility complaints; and (4) the credibility of Kirola,

3   class members, and the parties' experts as their testimony relates to the claims alleged in

4   this action.[3]

5       A.   **INFRASTRUCTURE TO ENSURE ACCESSIBILITY**

6           1.   **Mayor's Office On Disability**

7       1.    According to the 2000 census, approximately 20% of the City of San

8   Francisco's population (150,000 people) live with disabilities.  The City's disabled

9   population includes individuals with mobility impairments, cognitive and psychiatric

10  challenges, sensory impairments and self-care challenges.  Reporter's Transcript ("RT")

11  1596:6-22, 2489:12-20; DTX H27 [11, 14-15].

12      2.    To ensure that disabled persons have meaningful access to its services and

13  programs consistent with the ADA and state law, the City has created a sophisticated and

14  robust infrastructure, which includes the establishment of various departments, positions,

15  policies, and programs, which are overseen by MOD.

16      3.    The City created MOD to ensure that every program, service, benefit, activity

17  and facility operated or funded by the City is fully accessible to, and usable by, people with

18  disabilities.  RT 1561:16-18; 1566:8-1567:9; DTX A35.

19      4.    MOD is charged with representing the needs of the disabled community.  RT

20  1592:6-22.  MOD staff regularly work with and receive input from a variety of

21  organizations devoted to disabled access.  RT 1596:24-1597:16.

22      5.    Susan Mizner ("Mizner") has been Director of MOD since 2003.  RT 561:14-

23  21.  Mizner oversees a staff of seven full-time employees, all of whom have disabilities and

24  many years of experience advocating for the disabled.

25

26

27      [3] Kirola filed two post-trial requests for judicial notice, see Dkt. 587, 621, which are denied on the ground that none of the documents submitted with those requests is germane

28  to the Court's decision.

6.     Joanna Fraguli ("Fraguli") is MOD's Deputy Director for Programmatic Access.

7.     John Paul Scott ("Scott") is MOD's Deputy Director for Physical Access.

8.     Jim Whipple ("Whipple") and Carla Johnson serve as MOD access compliance officers who conduct plan and site reviews, and Ken Stein is MOD's Program Administrator.  RT 1588:13-1592:5.

9.     As part of its efforts to promote access for disabled persons, MOD maintains a public website that provides extensive information on various topics, including:  (1) new developments; (2) architectural access; (3) the City's review process for ensuring that publicly-funded facilities comply with access laws; (4) the City's ADA transition plans; (5) the rights of persons with disabilities under the ADA; and (6) the City's grievance procedure.  RT 1565:14-19, 1567:16-1588:4, 1571:24-1574:6; DTX A35.

10.    MOD has also prepared brochures and other materials to publicize its services and to inform the disabled population of their access rights.  RT 1575:20-1576:17; 1578:24-1579:21; see, e.g., DTX A31; DTX E27 [000017].

## 2.     Mayor's Disability Council

11.    Since 1998, the Mayor's Disability Council ("MDC") has advised the Mayor on disability issues and worked with MOD on access compliance.

12.    MDC consists of between nine to eleven appointed members from the disabled community and serves as an advisory body to the Mayor and MOD.

13.    The purpose of the council is to ensure ADA compliance and to provide a public forum to discuss disability issues.  RT 1593:10-2; DTX A35 [000003].

14.    MDC is MOD's primary liaison to the City's disabled community and provides guidance on a variety of disability issues, including website guidelines, transportation, housing, and priorities for ADA transition plan projects.  RT 1593:10-17, 1595:14-1596:13.

### 3.   ADA Coordinators

15.   Mizner serves as the Citywide ADA Coordinator.

16.   Every City department with over fifty employees has a designated ADA Coordinator responsible for investigating disability access complaints and serving as a resource for the department on disability access issues.  RT 1583:7-1584:9, 1854:24-1856:21; see also DTX A35 [000110-113].

17.   MOD works closely with the ADA Coordinators for the departments involved in this action; namely, DPW and RecPark, and the San Francisco Public Library ("Library").  RT 1857:21-1859:6, 1861:2-1863:6.

18.   MOD provides technical assistance and support to all City departments and employees regarding accommodations necessary to ensure access to City services, programs, and activities.

19.   In addition, MOD regularly conducts training for virtually all City departments on matters such as disability rights and access requirements.  RT 1852:1-1854:7, 1584:22-1586:7, 1839:20-1840:19; DTX A31 [000003]; see, e.g., DTX E45.  The trainings emphasize, among other things, the importance of maintaining accessible features.  RT 1863:9-1865:3; DTX E45 [000022-023].  RT 1849:4-1850:23.  MOD also provides specific training for ADA Coordinators.  RT 1854:16-1856:3; DTX E27; DTX E47.

### 4.   Grievance Procedure

20.   MOD oversees a citywide grievance procedure for handling public complaints regarding disabled access to its facilities, programs and services.  Instructions regarding this procedure are contained on a website operated by MOD which explains how to submit a complaint, inter alia, by using the "ADA Complaint and Assistance Form."  RT 1579:23-1580:12-1581:22; DTX A35 [000105-109].  MOD chose this title, believing that it would encourage people to submit requests, including persons who did not characterize their requests as "complaints."  RT 1581:11-22.

21.   Upon receipt, MOD transmits a copy of the complaint to the appropriate ADA Coordinator.  The assigned ADA Coordinator, in turn, conducts an investigation, and,

1    in the course of investigating and responding to the complaint, may seek assistance from

2    MOD or the City Attorney.  DTX A35 [000105]; RT 1866:19-25.

3          22.    Within thirty days of receiving a complaint, a written response, approved by

4    MOD and signed by both the ADA Coordinator and the department head, is sent to the

5    complainant.  DTX A35 [000105].  The City responds to complaints received "fairly

6    consistently" within thirty days and handles a significant number of complaints through its

7    grievance procedure.  RT 1711:18-20-1712:8.  However, depending on the complexity of

8    the issue, some complaints take longer to resolve.  RT 2001:2-7.  MOD monitors the

9    grievances received to identify trends and develop programs to improve access.  RT

10   1869:6-21.

11         23.    During the three year period prior to trial, 40 percent of the grievances

12   received by MOD were related to housing issues, 25 to 30 percent were related to public

13   transportation and paratransit, and 20 percent were related to physical access (the majority

14   of which were curb ramp requests).  RT 1868:9-1869:5.

15         24.    Fraguli oversees the City's grievance procedure.  RT 1866:11-14.  Between

16   the time she joined MOD in 2006 and trial, Fraguli received only one complaint related to a

17   library (pertaining to assistive technology) and a "few" complaints related to physical

18   access in RecPark facilities, which were resolved "fairly quickly."  RT 1869:22-1870:13.

19   She has never received a complaint from Kirola or any testifying class member.  RT

20   1870:14-1871:9.

21         25.    Aside from Fraguli, ADA Coordinators at the City's various departments also

22   receive and address access complaints and/or requests regarding their respective

23   departments.  See, e.g., RT 2253:22-2254:24 (complaints regarding access to libraries),

24   2306:3-2309:14, 2336:16-18 (complaints regarding access to RecPark activities, facilities,

25   or programs), 1999:12-2001:1 (complaints regarding access to the City's public right-of-

26   way).  MOD receives a monthly report indicating the types of complaints received by the

27   various City departments and whether any departments have been dilatory in issuing

28   responses.  RT 1869:6-17.

26.     Curb ramp requests or complaints may be submitted through the complaint form on MOD's website, by telephone, written correspondence, or e-mail, either to MOD or DPW, or through the City's 3-1-1 system (which is used to request City services).  RT 1619:15-23, 2416:23-2417:2, 2727:13-17.

27.     Curb ramp requests submitted through the City's grievance procedure trigger an investigation by DPW.  If appropriate, DPW coordinates with other City departments or offices as needed, assigns an engineer to design the individual curb ramp, and works with MOD to prioritize the inquiry list based on the date each request was received and the priorities set forth in the City's Curb Ramp and Sidewalk Transition Plan, i.e., the ADA transition plan specific to its public right-of-way system at issue in this action.  RT 2000:7-18, 2385:14-2386:22; DTX A15.

28.     The City also proactively solicits curb ramp requests.  For instance, the City became concerned that it had received a disproportionally low number of curb ramp requests from certain low-income neighborhoods, despite the fact that those neighborhoods had fairly high rates of disability.  The City thus instituted a public outreach program to solicit curb ramp requests from those neighborhoods.  RT 1634:5-10, 2417:12-2419:1.  The City funded a bus advertisement campaign and sent postcards to paratransit riders explaining the process for making curb ramp requests.  RT 1634:11-14;  DTX L4.  The City also trained its staff to go door-to-door in the poorest neighborhoods to speak with community members about their disability access needs.  RT 1634:15-17.

29.     At the time of trial, the City's curb ramp request log contained outstanding curb ramp requests for 124 intersections across the City.  RT 2440:3-4.  Of those 124 intersections, 44 corresponded to requests from individuals with disabilities and were therefore categorized as "higher priority" requests.  RT 2440:4-6.  At the time of trial, the City was in either the design or construction phase on fully-funded curb ramp projects at 132 intersections.  RT 2440:7-10.

30.     William Hecker ("Hecker"), one of the City's program access experts, opined that the City's grievance procedure is consistent with the requirements and provisions of the ADA and its regulations.  RT 2727:5-19.

### 5.     Funding for Access Improvements

31.     Funding for access improvements is governed by the City's Capital Plan. The Capital Plan for Fiscal Years 2012 to 2021 allocates a total of $177 million in fully-funded capital spending over the 10-year period to disability access improvements, which includes $24 million for facility improvements and $153 million for public right-of-way improvements.  RT 1543:2-6; PTX 4057 [7].  Considering other categories of spending that would include disability access improvements (such as street repaving projects, earthquake and public safety improvements, facility renewals, and critical deferred maintenance), the City's Capital Planning department estimated the total amount of planned ADA spending from 2012 to 2021 to be approximately $670 million.  RT 1544:6-14, 1543:7-1544:4, 1539:19-1540:19.

### B.     PUBLIC RIGHT-OF-WAY

32.     DPW oversees the City's public right-of-way network, which consists of approximately 2,000 miles of sidewalks, 27,585 street corners, and roughly 7,200 intersections.  RT 2391:23-25, 2447:6-18.

33.     DPW's Disability Access Coordinator is responsible for monitoring access issues related to the public right-of-way; reviewing publicly-funded construction projects designed by or contracted through DPW; training staff on access issues; and serving as the key DPW contact for individuals who seek information regarding accessibility or who submit access complaints or curb ramps requests.  RT 1910:18-1911:16, 2443:25-2444:10.

34.     Separate from DPW, the City's Municipal Transportation Agency, provides paratransit services and public transportation as important components of an accessible public right-of-way.  RT 1636:4-12.  The City operates and subsidizes a paratransit system that offers van and taxi service for persons with disabilities who are unable to use public transportation.  RT 1634:18-1635:1, 1635:21-1636:3.

35.     The City has enacted procedures and policies setting standards for new construction and alterations, as well as ensuring program access with respect to existing pathways, both of which are discussed below.

### 1.     New Curb Ramp Construction and Alterations

36.     The City began installing curb ramps in the 1970s, and created formal design standards for curb ramp construction in the 1980s, prior to the enactment of the ADA. RT 1996:6-1997:6; 2467:21-2468:13; DTX H06 [000959].

37.     In 1989, DPW established its Curb Ramp Program and developed priorities for the design and installation of curb ramps based on input from the disabled community. DTX H06 [000959].

38.     In 1994, the City revised its curb ramp design standards to provide more detailed specifications.  RT 2467:21-2471:20.  In particular, new curb ramp standards were developed in order to address conflicting federal and state requirements regarding use of a half-inch curb lip at the point where the ramp meets the street.  RT 1994:18-1995:4.  At that time, state accessibility standards required a half-inch lip at the base of the curb ramp which could be detected by a visually-impaired person using a cane.  Federal law, however, specified flush or smooth transitions.  Accordingly, non-federally-funded curb ramps were built with a lip, while federally-funded curb ramps were not.  RT 1993:21-1995:22, 1608:13-1609:4; DTX H05.  In 2004, the City updated its curb ramp design standards, which eliminated use of the half-inch lip.[4]

39.     In 1995, DPW issued Order No. 169,270, which memorialized the City's plan to install curb ramps in compliance with disability access laws, while recognizing that funding constraints might delay full implementation of this policy.  DTX G18.  DPW prioritizes curb ramp installation as follows:  (1) replace existing curb ramps in poor

---

[4] The California Building Code previously required a half-inch lip at the base of curb ramps "as a detectable way-finding edge for persons with visual impairment."  See, e.g., 2001 Cal. Bldg. Code, § 1127B.5.  In 2006, the half-inch lip requirement was removed from the California Building Code.  Although some legacy curb ramp lips still exist, the City endeavors to remove them where possible, in accordance with its current Curb Ramp and Sidewalk Transition Plan.  RT 1978:12-1980:1, 1981:16-1990:19; DTX H04.

condition; (2) install curb ramps where none exist; (3) provide for a second curb ramp, where feasible, on corners with a single curb ramp; (4) construct or reconstruct curb ramps in locations with physical or other constraints; and (5) reconstruct curb ramps that are safe but that do not meet the City's construction standards. RT 1951:8-1952:15; DTX G18.

40.     In or about May 2004, DPW issued Order No. 175,387, which adopted the City's design standards requiring the use of bi-directional curb ramps (i.e., a ramp aligned in parallel to the cross-walk) or at least one curb ramp per corner.  RT 1978:12-1980:1, 1981:16-1990:19; DTX G07, DTX H04 [000002, 000004].  Although bi-directional curb ramps are not required by the ADA, the City installs them to enhance access for disabled individuals.  Bi-directional curb ramps are preferred by the disabled community, including Kirola and testifying class members.  RT 552:12-553:20, 542:8-543:13, 875:14-876:9, 1005:4-14, 1007:7-16, 1025:9-18, 1384:13-21, 2066:24-2067:22.

41.     City Procedure No. 10.6.2 requires that: (1) curb ramps shall be designed in accordance with DPW Order No. 175,387; (2) any deviations must be approved; and (3) curb ramp designers must coordinate with other City departments and third parties.  RT 2381:4-2385:4; DTX A41.

42.     When installing curb ramps, the City evaluates the entire intersection to ensure accessibility.  Curb ramps will be constructed to current standards, if necessary, at all corners of the intersection.  RT 2376:6-17.  The City's design standards ensure an accessible path of travel in traffic islands, medians, and trackways within the street.  RT 1992:11-1993:9; DTX H07.

43.     The City has established Quality Assurance ("QA") Checklists for the design and construction of curb ramps and sidewalks to ensure they meet the applicable requirements and established quality standards.  RT 2377:24-2380:20; DTX A13 [QA Checklist 5.2 [A-13-000050-52]; RT 2376:18-2377:14; DTX H14.

44.     Since 1989, the City has required that when roads are paved and the paving extends into an intersection (including the cross-walk), curb ramps are constructed or

1  reconstructed if they do not meet the City's current curb ramp design standards.  RT

2  2471:22-2472:10; 2473:4-12; 2426:2-2427:4.  This practice is memorialized in the DPW's

3  Guidelines for Paving and Accessibility Compliance ("Paving Guidelines").  DTX N23

4  [000003]; RT 2426:9-2429:16, 2471:22-2481:8.

5      45.    The Paving Guidelines allow the City to defer curb ramp installation in

6  connection with a street paving project for up to twenty-four months when a pre-planned

7  project would demolish the newly constructed curb ramp within that time period.  DTX

8  N23 [000003].  If the subsequent project is delayed or discontinued, the curb ramps at issue

9  are to be installed immediately.  RT 2428:19-2429:16, 2445:11-15; DTX N23 [000003].

10     46.    The City's Bureau of Sewer and Street Repair ("Bureau") typically repaves

11  City blocks one block at a time, without affecting the crosswalk.  In these cases, the

12  Bureau's obligation to install curb ramps is not triggered.  RT 2480:4-2481:8.  No evidence

13  was presented showing that the City has a policy and/or practice of intentionally avoiding

14  crosswalks in order to evade an obligation to construct curb ramps.

15              **2.    Transition Plan**

16     47.    The City's first curb ramp transition plan in Fiscal Year ("FY") 1992/1993

17  estimated 52,000 curb ramps were needed citywide.  RT 1950:3-24; DTX H20 [000959].

18  The City updated its transition plan in 1998 and again in FY 2007/2008.  RT 1951:8-

19  1952:15; DTX H20; PTX 22.  The FY 2007/2008 amendments, which are at issue in this

20  action, are set forth in the Curb Ramp and Sidewalk Transition Plan.  PTX 22.

21              *a)    Curb Ramps*

22     48.    One of the goals of the Curb Ramp and Sidewalk Transition Plan is "curb

23  ramp saturation"—that is, to construct a curb ramp compliant with its current design

24  standards at the end of every pedestrian crossing or least one curb ramp per corner.  This

25  approach often involves installing bi-directional curb ramps at every corner.  RT 2390:10-

26  18.

27     49.    The 2008 revisions organized the priorities outlined in DPW Order No.

28  169,270 into a "priority matrix."  DTX A35 [000023].  The priority matrix prioritizes

1    installations/upgrades based on:  (1) locations requested by citizens; (2) locations serving

2    government offices and public facilities; (3) locations serving public transportation;

3    (4) locations serving public accommodations, employers, and commercial districts; and

4    (5) warehouse districts and residential areas.  RT 1441:11-1442:15, 1617:2-1619:13,

5    1618:4-1619:13, 1956:6-1958:16, 2416:19-22; DTX A35 [000023].

6        50.    DPW employs a curb ramp grading or evaluation system to prioritize curb

7    ramp repair and replacement.  RT 1606:23-1607:22, 1615:10-24.  In establishing the curb

8    ramp grading system, the City solicited and incorporated recommendations from the

9    MDC's Physical Access Committee and the City's disabled community to establish the

10   grading system.  RT 1607:18-22, 1608:8-1614:12.

11       51.    Under the curb ramp grading system, each existing curb ramp is assigned a

12   "condition score" based on a 100-point scale.  RT 1607:2-13.  Each curb ramp begins with

13   a 100 point score, from which a specific number of points is then deducted, depending on

14   the type of disability access barrier presented.  For example, 5 points are deducted for lips

15   greater than a half-inch; 12 points for a running slope between 8.33 percent and 10 percent;

16   25 points for a running slope greater than 10 percent; and 13 points for lack of a level

17   bottom landing.  RT 1607:23-1608:7, 1611:10-13; PTX 0023.[5]

18       52.    The City presumes that curb ramps with a score greater than 75 are good and

19   usable; curb ramps with a score of between 70 and 75 are low priorities for replacement;

20   and curb ramps with a score of 69 or below are high priorities for replacement.  RT

21   1615:14-24.

22       53.    The City tracks citizen requests, curb ramp attributes, and curb ramp

23   condition scores through a Curb Ramp Information System ("CRIS") database.

24

25       [5] The blind and low-vision community expressed concern that the City would
     eliminate the half-inch lip present on some of the City's curb ramps.  As indicated
26   previously, detectable lips provide a means for blind or low-vision individuals to locate the
     edge of the ramp.  Such discussions were factored into the City's decision to deduct only
27   five points for curb ramps with a half-inch lip.  RT 1611:10-13.  In lieu of a detectable half-
     inch lip, the City now uses a detectable warning surface (i.e., tiles with "bumps" or tactile
28   domes) on all new curb ramps it constructs.  RT 1608:13-1609:4.

54.     The City also uses a geographic information service ("GIS") to map citywide curb ramp locations by grade based on the data contained within the CRIS database.  RT 1621:2-25; DTX F11.  These maps include public transit stops, civic buildings, health facilities, libraries, police stations, cultural centers, and public schools.  RT 1621:2-1622:10; DTX F11.

55.     At the time the current Curb Ramp and Sidewalk Transition Plan was drafted, the City had yet to identify every location where a new or upgraded curb ramp was required to achieve curb ramp saturation.  RT 2390:19-2391:11.  By January 2011, however, the City had surveyed all potential curb ramp locations and uploaded information about each location into the CRIS database.  More specifically, the survey confirmed whether there was an existing curb ramp at the location, the condition of any existing curb ramp, and whether the location actually served a pedestrian crossing and thus warranted installation of a curb ramp.  RT 2395:22-2396:23.

56.     Based on information in its CRIS database, the City has determined that 23,401 curb ramps are needed to meet the City's goal of curb ramp saturation.  RT 2410:19-2411:21.

57.     Consistent with its Curb Ramp and Sidewalk Transition Plan, the City installs approximately 1,200 new curb ramps each year.  RT 2785:17-2787:13, 2789:3-2790:18; PTX 0022 [003798].

58.     The Curb Ramp and Sidewalk Transition Plan does not include a specific deadline for achieving curb ramp saturation.  RT 2015:16-29, 2413:17-2414:1.  However, at the time of trial, the City estimated that it would complete construction of the 23,401 curb ramps by Fiscal Year 2028/2029.  RT 2410:19-2414:1.  That projection, however, was based on an overestimation of the number of curb ramps needed for curb ramp saturation.  RT 2396:19-2397:7, 2401:14-16, 2403:12-2404:9.  The City now projects that, taking into account accelerated curb ramp installation, curb ramp saturation can be achieved by Fiscal Year 2026/2027.  Dkt. 657, 4:12-13.

59.     The determination of the particular curb ramps to be constructed in the upcoming fiscal year is based on available and procured funds.  RT 1637:4-1638:6, 2027:10-12.  The City prioritizes construction consistent with the priorities set forth in the Curb Ramp and Sidewalk Transition Plan.  RT 1958:18-1959:2, 2027:4-19.  In the process of prioritizing future curb ramp construction, the City also evaluates the information contained within the CRIS database along with information regarding any planned paving projects and outstanding curb ramp requests.  RT 1627:16-1633:24.

60.     At the time of trial, the Curb Ramp and Sidewalk Transition Plan did not explicitly include the City's crosswalks.  RT 2013:13-22.  The City nevertheless has initiated a pilot project pursuant to which City engineers are to evaluate the accessibility of crosswalks when constructing corresponding curb ramps in order to determine whether the crosswalk contains cracks, potholes, or other barriers that adversely impact the crosswalk's accessibility.  RT 2430:13-22.  The City plans to incorporate the results of the pilot project into its Curb Ramp and Sidewalk Transition Plan.  RT 2430:9-2431:19.  The City also has developed a crosswalk assessment checklist for use in the pilot study and implementation into the Curb Ramp and Sidewalk Transition Plan.  RT 2431:2-3; DTX Z58.

### *b)     Sidewalks*

61.     The Curb Ramp and Sidewalk Transition Plan includes a Sidewalk Inspection and Repair Program ("SIRP"), first implemented in FY 2006/2007, which governs the maintenance of the City's 2,000 miles of sidewalks.  RT1974:7-21, 2447:6-18; PTX 22.

62.     Under SIRP, the City proactively inspects every city block on a twenty-five year cycle, notifies the responsible parties of any access barriers identified, and ensures the remediation of these barriers.  RT 1974:7-21, 2447:12-18; PTX 0022 [18-20].  DPW determined that a twenty-five year inspection cycle is reasonable, given the size of San Francisco, the fact that the inspection program operates in tandem with a grievance procedure, fiscal and staffing constraints, and the prioritization of repairs where pedestrian volume is the greatest.  RT 1974:3-21, 2453:9-17.

63.     Under SIRP, the City prioritizes sidewalk inspection and repair along city blocks with high pedestrian usage as characterized by or based on:  (1) commercial districts; (2) public transportation routes; (3) proximity to schools, public facilities, hospitals, or senior centers; and (4) population density.  RT 1974:22-1977:9, 2448:11-22; PXT 0022 [18-20]; DTX AA23.  Consistent with guidance from the Department of Justice ("DOJ"), the City also prioritizes locations based on citizen requests, requiring that requests from the disabled community be given top priority.  RT 1974:22-1976:2, 2450:12-24.

64.     City policy specifies that private property owners are responsible for the repair and maintenance of sidewalk areas in front of their property.  RT 1101:1-4.  Once the City identifies a defective sidewalk and sends the property owner a notice to repair, the owner has thirty days to commence repairs.  RT 1101:14-17.  The City has endeavored to streamline the process by incenting property owners to use a City contractor in exchange for a waiver of permit fees.  RT 2451:3-2452:4.  If the owner fails to repair the sidewalk after having been duly notified, the City is entitled to perform the repair and invoice the property owner for the cost of inspection and abatement.  RT 2451:11-15.  The City's practice at the time of trial was to bill property owners through property liens.  RT 2451:15-16.

65.     The SIRP, which is considered a "proactive" program, operates in conjunction with a "reactive" program known as the Accelerated Sidewalk Abatement Program ("ASAP"), whereby the City responds directly to complaints or requests submitted by the public.  RT 2453:18-2454:12.  Under ASAP, issues or problems with sidewalks that impact accessibility are given "high priority" for remediation.  RT 2454:1-12.  If a high priority complaint is received for a sidewalk that is scheduled for repair within a few months, the City dispatches an inspector typically within one business day to investigate the matter.  If the inspector finds a defect, he or she will immediately issue a notice of repair and an abatement order to the property owner.  Repairs are generally completed within ninety days.  RT 2454:13-2455:22.

66.     In addition to the foregoing, the City has adopted various other policies to ensure accessibility of the City's sidewalks.  RT 1959:13-1960:2, 2443:25-2444:10.  These policies include:  guidelines regarding the placement of barriers at construction sites; guidelines regarding the placement of scaffolding; permit requirements regarding the use of tables and chairs on the sidewalk; requirements regarding temporary occupancy of the public right-of-way; guidelines regarding displaying merchandise on the sidewalk; regulations regarding tree planting and maintenance; and requirements regarding slip-resistant metal covers and grates.  RT 1960:7-1971:9; DTX A9; DTX A21; DTX G19; DTX F43; DTX F44; DTX F45; DTX G17; DTX F48; DTX G10.

## C.     FACILITIES AND PROGRAMS

67.     Separate and apart from its public right-of-way system, the City operates a number of programs, i.e., aquatic, library and RecPark programs, which are offered through various facilities located throughout San Francisco.

68.     The library program is provided through the Main Library and twenty-seven branch libraries located throughout San Francisco.  RT 2222:13-15.

69.     The aquatic program is provided through nine swimming pools, RT 2763:21-2765:5.

70.     The RecPark program is provided through approximately 220 parks spanning 4,200 acres of park space and 400 structures (i.e., clubhouses, recreation centers, etc.) thereon.  RT 2264:13-17, 2302:12-16.

71.     The City has enacted procedures and policies to ensure meaningful access, including program access, to its aquatic, library and RecPark programs, as summarized below.

### 1.     Facilities Transition Plan

#### a)     History and Objectives

72.     In 2003, MOD hired Logan Hopper ("Hopper") as a facilities transition plan consultant.  RT 1603:12-18.  Hopper surveyed approximately 700 facilities across the City and prepared a draft transition plan.  The draft transition plan identified the "essential

1   services" offered by various city departments, including Library and RecPark, and
2   estimated costs and timelines for removing the identified access barriers. RT 1603:22-
3   1604:3, 1603:22-1604:3; PTX 0034 [000470, 000476, 000522-523, 000528-538].

4          73.    Mizner, the Director of MOD, testified that because Hopper was not familiar
5   with construction practices in San Francisco, she felt that he had significantly
6   underestimated both the projected cost and the amount of time necessary to complete a
7   particular project. RT 1603:12-1604:18. Accordingly, Mizner recruited Scott to lead the
8   development of the City's facilities transition plan. RT 1604:14-18, 1770:10-12, 1777:21-
9   1779:11. Scott, who had been the ADA Coordinator for the Port of San Francisco, is a
10  licensed architect with more than twenty years of experience working on architectural
11  access issues and is a former member of the U.S. Access Board's Recreation Access
12  Advisory Committee and Places of Amusement Committee. RT 1771:21-1773:22, 1775:9-
13  11.

14                   b)    *Uniform Physical Access Strategy or UPhAS*

15         74.    In 2007, under Scott's leadership, the City developed its facilities transition
16  plan known as the Uniform Physical Access Strategy ("UPhAS"). Scott's plan is based on
17  the extensive work performed by Hopper and Gilda Puente Peters, another access
18  consultant retained by the City, the capital plans of various City departments such as
19  Library and Rec Park, and outreach to the disabled community to understand their
20  priorities. RT 1452:20-23, 1779:12-1780:9; 1784:7-22; DTX B07, PTX 0035.

21         75.    UPhAS governs the City's libraries and Rec Park facilities. RT 1791:15-
22  1792:15; 1797:20-1798:5. The plan seeks to provide maximum access for the disabled to
23  each City building and facility, RT 1785:14-1786:22; prioritize physical access solutions
24  and limit the use of a program access approach (which allows a city to move programs to
25  other sites rather than make access improvements), RT 1789:6-19; and offer programs and
26  services in the most integrated setting possible, RT 1789:20-1790:10; DTX B07 [005317]).
27  UPhAS calls for input from the public and MOD, as well as an annual assessment of access
28  priorities. RT 1786:23-17878:4; PTX 0040.

76.    UPhAS has no schedule or deadline for the removal of access barriers, but instead, sets funding targets to facilitate their removal.  RT 1456:18-1457:15, 123:11-12, 612:2-9;  PTX 0040.  As such, the City's plan for implementing UPhAS changes annually, depending on funding.  RT 612:2-4.

77.    The City constantly re-evaluates UPhAS by tracking projects as they are created, built and completed.  RT 1791:2-1791:14.  Scott uses complex, color-coded spreadsheets and maps to track the status of each facility evaluated as part of the Hopper surveys and to graphically represent the accessibility of City facilities.  RT 1798:6-1799:25; 1801:24-1802:2; 1810:6-25; PTX B39.  Each color signifies a different status.  RT 1799:4-25.  Blue dots "signify a building that had undergone new construction or alterations," based on a post-2000 capital improvement project.  RT 1463:8-1464:12; see, e.g., PTX 0148A.  For instance, one of the maps shows all of the City's swimming pools located in San Francisco.  DTX F16.  Some pools are identified by a blue dot, while others are denoted with a red dot, which signifies "limited access."  Id.

78.    Trial testimony established that a blue dot was not intended to suggest that every element of the facility was 100 percent compliant with all applicable facilities access regulations; rather, it signifies that the facility was fulfilling the City's program access intent under UPhAS.  RT 1464:14-23.  In other words, a blue dot indicates only that the facility offers some accessible program or programs, and not necessarily that every physical element of the facility is compliant with disability access regulations.

79.    Through UPhAS, the City seeks to attain a level of access **_greater than_** required under law (i.e., more than the legally-mandated program access) with respect to almost all of its various programs, services, and activities.  RT 1785:23-1788:21.  For example, the City strives to ensure that all libraries are accessible to disabled individuals, even though Title II does not require that the City make each library facility accessible.  RT 1797:5-19.  However, due to the broad, varying and diverse scope of RecPark facilities, the City aims for program access (as opposed to access greater than legally required) as to RecPark programs, services, and activities.  RT 1797:20-1798:5.

## 2.   New Construction and Alterations

80.   Federal regulations promulgated to enforce the ADA require that each new facility or part of a facility constructed or altered after January 26, 1992, conform to either (1) the ADAAG (i.e., ADA Accessibility Guidelines for Buildings and Facilities) or (2) the UFAS, thereby allowing public entities to choose between the two accessibility standards. See 28 C.F.R. § 35.151.

81.   The City has elected to use ADAAG as its standard for ensuring that newly constructed or altered facilities comply with federal access laws.  RT 1919:20-24.

82.   Since June 22, 1998, the City has required that all projects involving new construction or alterations of a building funded, in whole or in part, by the City, undergo review by City staff to ensure compliance with disability access laws.  RT 1568:11-1569:24; 1914:17-1917:5; 1918:12-22; 1919:6-19; DTX P11; DTX A35 [000126-141].  To that end, City staff members regularly meet with architectural teams during the planning and design stage, review construction plans before permits are issued, visit sites during the construction process, and conduct post-construction field inspections to ensure access compliance.  RT 1744:19-1748:15, 1901:15-1903:22, 1914:17-1917:5, 1918:12-22, 1919:6-19, 1568:11-1569:24; DTX P11; DTX A35 [000126-141].

83.   The City also requires that sidewalks and curb ramps adjacent to newly constructed or altered City buildings be accessible to persons with disabilities.  As a result, whenever a City facility is constructed or altered, the City evaluates the condition of the sidewalk and curb ramps bounding the perimeter of the project site, evaluates the path of travel from the facility to the public right-of-way, nearby parking and public transportation, and corrects any access problems identified.  RT 1936:4-1938:11.

84.   In January 2010, DPW adopted and implemented Procedure 9.8.24, which is a written accessibility compliance procedure that sets forth the review process for all projects designed by or contracted through DPW to ensure that all construction plans and completed facilities meet applicable access regulations and City standards.  RT 1920:24-1921:24; DTX A14.

85.     Procedure 9.8.24 requires DPW Disability Access Coordinator to conduct: (1) accessibility reviews during the planning and design of DPW-managed City projects, which includes the review of construction drawings and plans prior to submission to the Department of Building Inspection; (2) accessibility reviews during construction; and (3) post-construction inspections for disability access compliance before the building is certified for occupancy.  DTX A14; RT 1921:25-1935:19; DTX J21; DTX K10.  Publicly-funded projects reviewed by MOD undergo similar access reviews.  RT 1742:23-1743:6, 1743:16-1748:15, 1901:15-1904:8.  The Department of Building Inspection will not issue a building permit, or certify a project as complete, without written approval from MOD's compliance officers for each stage of design and construction.  RT 1747:1-1748:15, 1901:15-1904:8.

86.     Hecker opined that the City staff members responsible for design and construction review of publicly-funded projects are "well qualified, competent, detail-oriented professionals that really understand the accessibility requirements of the ADA."  RT 2729:17-2730:3.  The Court finds Hecker, who serves as a consultant to the DOJ in ADA enforcement actions, to be a credible witness and credits his testimony accordingly.  RT 2720:6-2721:15.

### 3.     Specific Programs

87.     In addition to the City's public right-of-way system, Kirola challenges the City's compliance with Title II of the ADA with respect to its swimming pools, libraries and parks.  These facilities are the means through which the City provides its aquatic program, library program and RecPark program, respectively.

#### a)     *Aquatic Program*

88.     The City's aquatic program is provided through nine public swimming pools.  Six of the nine pools have been renovated and made accessible.  RT 2767:8-2769:17; DTX F16.

89.     Wood credibly opined that renovated pools have the features necessary to provide program access, namely:  (1) an accessible route from the property line to the

building; (2) an accessible entry; (3) an accessible check-in counter; (4) accessible signage; (5) accessible ramps or curb ramps, wherever necessary; (6) accessible toilets; (7) accessible showers; (8) accessible locker rooms; and (9) transfer lifts to assist individuals with mobility impairments to get into and out of the pool.  RT 2136:7-2137:5.

90.     Balboa Pool, Garfield Pool and Rossi Pool are coded with red dots, meaning that they are "limited access" pools.  DTX F16.  However, at the time of trial, a barrier removal project was underway at Garfield Pool, RT 1813:13-1814:4, and Rossi Pool and Balboa Pool have since been scheduled for barrier removal, Dkt. 658-1.

91.     Hecker credibly opined that the number and distribution of accessible pools (six out of nine) is sufficient to provide program access for the City's aquatic program.  RT 2767:8-2769:17; DTX F16.

### b)     *Library Program*

92.     The City's library program is provided through its Main Library and twenty-seven branch libraries.  RT 2222:13-15; DTX 132.

93.     In 2000, the City embarked on a $153 million Branch Library Improvement Program ("BLIP"), a program largely funded by a voter-approved $106 million bond measure.  RT 2222:16-2223:3; DTX C37; PTX 4057 [000113-114].

94.     BLIP's express priorities are to ensure that twenty-four of the City's branch libraries are ADA compliant and seismically retrofitted.  RT 2222:16-2223:3, 2228:25-2229:9; DTX C37; DTX D1; DTX F22; PTX 4057 [00118]; PTX 0045 [72].[6]  Although MOD had previously determined that the City was sufficiently providing program access to its library system through its four ADA-compliant libraries, it nevertheless approved BLIP after determining that the project met UPhAS's goal of providing a higher level of accessibility than the legally-mandated minimum program access.  RT 1797:5-19.

---

[6] Prior to the passage of the BLIP bond in 2000, the Main Library and three branch libraries (i.e., Chinatown, Ocean View, and Mission Branch) were seismically-upgraded and rendered ADA-compliant.  As such, BLIP focused on the remaining twenty-four branch libraries.  Id.

95.     As of April 29, 2011, the City had completed construction and/or renovation of seventeen of the twenty-four branch libraries covered under BLIP. The City anticipated completing work at five additional branch libraries between May and September of 2011. As to the two remaining projects, one was under construction at the time of trial and the other was anticipated to conclude in 2014. RT 2227:7-21; DTX I32.

96.     Kevin Wesley Jensen ("Jensen"), DPW's Disability Access Coordinator, conducted disability access reviews pursuant to Procedure 9.8.24 for all BLIP projects, other than the Mission Bay Branch Library (which was reviewed by Whipple). RT 1900:24-1904:8, 1938:20-1939:24, 1939:25-1940:8. Jensen reviewed the projects at various points, including during design, planning, and construction. RT 2230:6-2233:13. Following the completion of the project, Jensen decided whether the building should be certified for occupancy. Id.

97.     On a number of occasions, including one involving the Glen Park Branch Library, Jensen found that the construction work did not meet access requirements. In those instances, he withheld occupancy approval and required the library to correct the deficiencies before opening the branch location in question to the public. RT 2232:8-2233:13.

98.     Jensen also evaluated the path of travel from each branch library to the public right-of-way, nearby parking and public transportation. Where necessary, he implemented access improvements, including the repair or replacement of sidewalks. RT 1943:8-1945:17.

99.     In addition to the above, the City has undertaken additional efforts to ensure accessibility of its libraries. For example, the Library employs two dedicated accessibility coordinators—one who specializes in programmatic access and who trains staff on a variety of issues related to accessibility, and another who specializes in ensuring that library facilities are physically accessible. RT 2224:8-23.

100.    Library staff use a Daily Facility Checklist to maintain the accessibility of each library facility. Each morning, trained library staff inspect their respective facilities,

move furniture (including misplaced/errant step stools and chairs) or other objects that may impede the path of travel, and report any access issues that cannot safely or readily be corrected.  Library staff members have various tools, such as door pressure monitors, to conduct these daily inspections.  RT 2235:22- 2237:13, 2252:10-2253:21; DTX A45. Pursuant to the Library's policy of conducting daily inspections, misplaced furniture impeding an accessible path of travel remains out of place for, at most, twenty-four hours. See DTX A45.

101.   The Library also offers a range of non-structural solutions to ensure access to its programs and events, including assistive technologies, books by mail, a Library on Wheels, a Library for the Blind and Print Disabled, a Deaf Services Center, and Accessibility Tool Kits, which include simple tools such as magnifying glasses, magnification sheets, book holders, pencil grips, and special rulers.  DTX A43; RT 2248:7-2252:9.

102.   At the time of trial, the City had instituted a policy requiring the installation of automatic door openers to increase accessibility in all buildings, even when not required under applicable access regulations.  RT 2238:16-2239:6.  The City also implemented custom access standards for use when purchasing furniture and equipment for its facilities. RT 1940:9-1942:24, 2233:14-2235:3; DTX V26; DTX V27; DTX V28.

103.   Any public complaints regarding accessibility are handled by the Library's ADA Coordinator for Programmatic Access.  Whenever possible, complaints are handled immediately.  Some complaints, however, require investigation and assistance from other City departments, and others require funding and must be budgeted.  RT 2253:22-2254:24.

### c)   RecPark Program

104.   RecPark manages approximately 4,200 acres of park land, which includes more than 220 parks and 400 built structures, including pools, recreation centers, clubhouses, and playgrounds.  RT 2302:10-23, 2264:13-17.

105.   Due to the scale and geographic distribution of its facilities, the City relies on a program access approach to provide disability access to RecPark programs, services, and

1  activities (as opposed to making each and every RecPark facility individually and fully

2  accessible).  RT 1797:20-1798:5.

3      106.    RecPark evaluates all of its recreation programs to ensure that they are

4  accessible to individuals with disabilities, provide a range of accommodations, and

5  maintain an inclusion services department that works with disabled individuals to meet

6  their individualized needs.  RT 2304:7-2305:6.

7      107.    RecPark has three employees dedicated to accessibility:  an ADA

8  Programmatic Access Coordinator; an ADA Facilities Coordinator; and an Inclusion

9  Services Director.  RT 2305:8-2306:2.

10      108.    The ADA Programmatic Access Coordinator serves as a liaison between the

11  public, RecPark and MOD, provides staff training, and works to resolve access complaints.

12  RT 2336:3-18.

13      109.    The ADA Facilities Coordinator focuses on ensuring physical access to

14  RecPark facilities via barrier removal and works closely with the City's Capital Division.

15  RT 2305:22-2306:2.

16      110.    The Inclusion Services Coordinator works with individuals who request

17  custom accommodations, such as aides, wheelchair transportation, and assistive listening

18  devices.  RT 2336:24-2340:13.

19      111.    RecPark requires daily inspection of its buildings and facilities for safety

20  hazards or other issues that might impact access before they are opened to the public.  RT

21  2315:15-2317:18; DTX Z60 (Employee Daily Facility Preparation Quick-Sheet).

22      112.    RecPark also undertakes a semi-annual accessibility survey whereby it

23  inspects its facilities using a more detailed accessibility checklist and corrects items that

24  may affect physical access.  RT 2318:2-2319:18; DTX Z61 (Semi-Annual Facility

25  Accessibility Survey).

26      113.    As mandated by Proposition C, a 2003 voter referendum, RecPark regularly

27  inspects features such as pathways, playgrounds, athletic courts, and trees.  These

28  inspections promote accessibility by focusing on path of travel issues, such as surface

- 30 -

1  quality of pathways, the operability of gates and latches, and removal of barriers such as

2  low hanging tree limbs.  RT 2320:2-2321:6.

3       114.   RecPark has a written policy that categorizes and prioritizes maintenance

4  requests and complaints as follows:  emergencies, which are to be addressed immediately;

5  health, safety and accessibility issues, which are to be addressed within forty-eight hours;

6  and routine issues.[7]  RT 2306:3-2309:14; DTX A10.

7       115.   The public may obtain information relating to the department's programs,

8  services, and activities—including accessibility information—through RecPark's website.

9  RT 2344:25-2348:19; PTX 3875.

10      116.   The website contains a webpage specifically dedicated to disability access

11 issues, which provides information regarding facility accessibility and programmatic

12 accessibility, as well as contact information for further access inquiries.  RT 2347:24-

13 2348:19; PTX 3875 [075767].  It also provides instructions for submitting individualized

14 requests for inclusion services or accommodations, as well as a list of available adaptive

15 recreation classes and activities.  RT 2347:24-2348:19, 2354:10-24; PTX 3875 [075768].

16 The website includes a map function that identifies parks and recreation facilities as either

17 "accessible" or "limited wheelchair accessibility."  PTX 3875 [075769].

18      117.   The purpose of the website is to provide the public with "shorthand

19 information" regarding City facilities that contain programs accessible to wheelchair users.

20 RT 1502:13-16.  As such, the website defines an "accessible" park or outdoor area as one

21 that has a wheelchair accessible entry and "at least one accessible recreational opportunity."

22 RT 1476:24-1477:14, 2329:11-16; PTX 3875 [075767].  The website advises the public

23 that due to the terrain, age, and natural features of the City's outdoor areas, "there will be

24 sites labeled 'accessible' in which some areas of the site are not accessible to wheelchair

25 users."  PTX 3875 [075767].

26

27      _____

28      [7] The trial record does not indicate RecPark's timeframe for addressing routine issues.

118.   RecPark makes reasonable efforts to fulfill special accommodation requests made by persons with disabilities.  RT 2348:20-2354:3.  Although RecPark requests seventy-two hours' notice for such requests, it nonetheless strives to accommodate requests received less than seventy-two hours in advance, as well.  RT 2310:12-2312:24, 2348:20-2350:1.

119.   At trial, RecPark's ADA Coordinator for Programmatic Access testified that he was unaware of any situation in which RecPark had been unable to fulfill a request for accommodation, and there has been no showing to the contrary.  RT 2352:16-19.[8]

120.   Since 2000, RecPark has spent over $500 million on capital projects to improve the City's RecPark facilities through its Capital Improvement Program.  RT 2265:2-2266:2; DTX C32 [000003].

121.   As RecPark renovates each park and facility under its Capital Improvement Program, it makes access improvements as necessary to ensure compliance with access regulations.  RT 2274:3-2275:7.

122.   In 2008, RecPark estimated its capital need for its entire system to be roughly $1.7 billion.  RT 2267:2-12.

123.   The majority of funding for RecPark improvements derives from voter approved measures, including the 2008 Clean and Safe Neighborhood Parks General Obligation Bond ("2008 Bond"), while the remainder came from other sources, such as the City's General Fund.  RT 2266:11-2267:2.

124.   In connection with the 2008 Bond, RecPark conducted a year-long community outreach campaign to select the parks to be included in the bond measure. Based on the feedback it received, RecPark selected fourteen neighborhood parks or park facilities for inclusion based on the following four criteria:  (1) earthquake safety hazards;

---

[8] RecPark also works with the community to accommodate requests from gardeners with disabilities.  RT 2282:18-2283:15.  Trial testimony, however, does not establish that Kirola or any of the other class members ever attempted to visit any of San Francisco's community gardens.  As such, the Court does not discuss the City's community garden program in detail.

1  (2) physical condition; (3) location in dense urban areas; and (4) the provision of "core park

2  amenities," such as a play area, green space, recreation facility, athletic field, or athletic

3  court.  RT 2267:13-2272:24, DTX O37 [00029-35].  All of the 2008 Bond projects include

4  expenditures for access improvements.  Id.

5      125.    At the time of trial, RecPark and MOD were planning a $150 million general

6  obligation bond for further park improvements for inclusion on the November 2012 ballot.

7  RT 2277:3-12, 1808:18-1809:23.

8      126.    Pursuant to UPhAS, MOD studies and tracks RecPark's capital projects.  RT

9  1802:25-1803:3, 1805:1-22.  MOD works closely with RecPark staff and provides guidance

10  on accessibility issues, such as the priorities selected for the 2008 Bond and the

11  accessibility standards to apply.  RT 1806:3-18, 1808:11-17.

12      127.    DPW's Disability Access Coordinator and MOD's Access Compliance

13  Officers perform disability access reviews for RecPark's capital improvement projects.  RT

14  1945:18-1946:14, 1901:3-14.

15      128.    Jensen, DPW's Disability Access Coordinator, followed Procedure 9.8.24,

16  which sets forth the review process for compliance with accessibility standards, for all

17  RecPark projects he reviewed.  RT 1946:15-1947:1.  He also evaluated the path of travel

18  from each site evaluated to the corresponding public right-of-way, nearby accessible

19  parking, and public transportation, and he required access improvements where necessary.

20  RT 1948:7-1949:4.  In addition, Jensen used the playground and recreation accessibility

21  standards developed by the U.S. Access Board when reviewing RecPark projects, even

22  though they had not yet been adopted by the DOJ.  RT 1947:7-1948:6.

23      **D.    LAY WITNESS TESTIMONY**

24      129.    Kirola has been a resident of the City since 1993.  RT 1389:8-9.  She suffers

25  from cerebral palsy and uses a motorized wheel chair for mobility and to travel around San

26  Francisco.  RT 1380:12-1381:3.

27      130.    Aside from her own testimony, Kirola presented the testimony of three class

28  members and three mothers of class members.

131.    Timothy Grant ("Grant") is a class member with multiple sclerosis who uses a wheelchair for mobility.  He resides in Albany, California, and travels to San Francisco four to five times a week.  RT 873:8-15, 881:18-23.

132.    Margie Cherry ("Cherry") is a class member with chronic arthritis.  She resides in San Francisco.  RT 1028:22-23, 1029:18.

133.    Elizabeth O'Neil ("O'Neil") is a class member with cerebral palsy who often uses crutches or a wheelchair for mobility.  She resides in San Francisco.  RT 537:13-24, 539:18-540:20.

134.    Jill Kimbrough ("Kimbrough") is the mother of a nine-year-old class member with Rett syndrome who requires assistance to walk.  RT 822:1:823:4.  Kimbrough and her family reside in San Francisco.  RT 821:6-8.

135.    Audrey DeChadenedes ("DeChadenedes") is the mother of a twenty-five year-old class member with Rett syndrome who requires a wheelchair for mobility.  RT 1001:14-19.  DeChadenedes and her daughter reside in San Francisco.  RT 997:24-998:10.

136.    Erica Monasterio ("Monasterio") is the mother of a thirteen year-old class member with cerebral palsy who uses a wheelchair for mobility.  Both reside in San Francisco.  RT 1226:3-4, 23-24.

### 1.    Public Right-of-Way

137.    Upon questioning from Class Counsel at trial, Kirola testified only to a very limited number of specific barriers she encountered while utilizing the City's public right-of-way.  In particular, Kirola noted that while travelling around San Francisco, she encountered bumps and/or uneven surfaces along:  (1) the east side of Fulton Street ("Fulton") between Fillmore Street ("Fillmore") and Steiner Street ("Steiner"); (2) Steiner between Grove Street ("Grove") and Fulton; and (3) the east side of 19th Street one block north of Wawona Street.  RT 1381:14-21, 1382:4-16, 1382:16-18, 1386:-1387:18.

138.    Kirola claims that the bumps on the east side of Fulton caused her wheelchair to "hesitate," and that she "got to spend extra time deciding where [she is] going to go."  RT 1382:8-18.  No further information was elicited regarding the nature or extent of the

alleged bumps and uneven surfaces.  In addition, it is unclear from Kirola's testimony whether the bumps prevented her from accessing the sidewalk.  Indeed, Kirola testified that she is able to travel on the "west" side of Fulton along the sidewalk segment in question. RT 1382:5-9.

139.    With respect to the bumps along Steiner, Kirola testified that her wheelchair "refuses to go down that way."  RT 1382:16-18.  With respect to the bumps along the east side of 19th Street, Kirola alleges that she "didn't know where to go to avoid the bumps" and "had to take the bus."  RT 1387:12-13.  Again, however, Kirola offered no further details regarding the severity of the alleged bumps and uneven surfaces she encountered, or any alleged burden imposed by having to take an alternative route, if any.

140.    Kirola also testified that on one occasion she ran her wheelchair into an uncovered tree well on McAllister Street ("McAllister").  RT 1383:3-12.  The record shows, however, that there was a 48" wide unobstructed path around the tree well.  RT 1383:3-12, 431:3-10; PTX 4140Y.

141.    Kirola further testified that she encountered a corner with only one curb ramp (as opposed to bi-directional ramps) at the intersection of McAllister and Fillmore, but did not submit a complaint.  RT 1384:13-21.  She also found no curb ramps at the corner of Hayes Street ("Hayes") and Fillmore.  As a result, Kirola had to make a conscious effort to take a "different route" to her friend's house.  RT 1384:8-10.  No testimony was elicited regarding the details of the different or alternate route, such as the additional distance and/or travel time involved, if any.  Kirola submitted a curb ramp request for the corner of Hayes and Fillmore, and the City installed the requested curb ramps within twenty months. RT 1383:19-1884:8, 1391:18-1392:2.

142.    Kirola identified no other specific barriers regarding the City's sidewalks, and she did not testify regarding any alleged access barriers within the City's crosswalks.  In addition, Kirola testified that she routinely and independently travels across the City, using the City's public right-of-way, public transportation systems, and paratransit service.  RT 1380:12-22, 1392:17-23, 1393:12-23.

143.    O'Neil, Grant, Cherry, Kimbrough and DeChadenedes each testified to having encountered uneven and cracked sidewalks, exposed tree roots and missing curb ramps, all of which impeded their access.   E.g., RT 541:14-19, 566:3-8, 541:24-542:5, 546:4-25, 553:21-24, 563:24-564:10, 542:8-543:13, 553:9-20, 867:1-13, 824:13-825:11, 821:17-18, 1031:22-1032:17, 1039:14-16.

### 2.    Libraries

144.    Kirola testified to having used three of the City's twenty-eight libraries:  the Main Library, the Western Addition Branch Library, and the Parkside Branch Library.  RT 1385:22-1386:5.  At each of those libraries, Kirola encountered misplaced or errant step stools left in the stacks which blocked her access to the particular aisle.  RT 1385:22-1386:5.

145.    The Western Edition Branch Library is located in Kirola's neighborhood. She visits that particular branch about once every two months.  She found misplaced stools—apparently left by inconsiderate library patrons—on about 40 percent of those visits, which amounts to about 2.4 times per year.  RT 1385:17-1386:8.

146.    With respect to the Main Library and Parkside Branch Library, no testimony was offered regarding the frequency of her encounters with misplaced stools.

147.    No testimony was presented showing that the misplaced stools prevented Kirola from utilizing the library or the library program in general.

148.    Kirola also did not testify to encountering any other access barriers in the City's libraries.

149.    No class member testified to any access barriers at any of the City's libraries.

### 3.    Swimming Pools

150.    Kirola routinely swims at Hamilton Pool and Martin Luther King Jr ("MLK") Pool, which were previously renovated and made accessible.  RT 1392:17-1393:23.

151.    Hamilton Pool is the closest pool to her home.  RT 1393:2-3.  Kirola's only complaint regarding that pool is that she cannot use the children's slide because it lacks a lift.  RT 1392:17-1393:23.  She acknowledged, however, that the slide at Hamilton Pool is

1   intended for children and was unaware whether adults are allowed to use it.  RT 1387:16-

2   18.

3       152.    MLK Pool is her "favorite pool."  RT 1393:1-3, 1392:17-19.  Travelling to

4   MLK Pool takes a "long time" on public transit, but is "not hard to get to."  RT 1392:19-21.

5       153.    Kirola found Sava Pool to be accessible, but encountered a cracked sidewalk

6   near the facility on 19th Street.  RT 1386:22-1387:13.

7       154.    Kirola testified to experiencing accessibility issues at Balboa Pool, Garfield

8   Pool and Rossi Pool.  These pools are classified as "limited access," as opposed to

9   accessible.  DTX F16.

10       155.    At Balboa Pool, Kirola encountered a steep entrance ramp and an inadequate

11   locker room.  RT 1388:5-6.  She likewise found insufficient clearances in the locker room

12   and restrooms at Garfield Pool.  RT 1388:7-17.  As for Rossi Pool, Kirola claims that she

13   was deterred from visiting that facility after being informed that it was inaccessible.  RT

14   1386:15-19.

15       156.    Kimbrough testified that the ramp at Balboa Pool is too steep for her daughter

16   to use, and as a result, she cannot watch her sister take swimming lessons or access the

17   pool.  RT 838:12-839:19.  Although Coffman Pool is only a mile further away than Balboa

18   Pool, Kimbrough prefers not to go there because her eldest daughter's swimming instructor

19   teaches at Balboa Pool, and she feels that Coffman Pool is not located in a safe

20   neighborhood.  RT 849:10-17, 852:19-853:2

21       157.    Monasterio testified that the closest pool to her is Garfield Pool but that

22   "there's not a safe space for her to sit and shower."  RT 1233:18-24.  Although she believed

23   that Garfield is designated as accessible, it is not.  See RT 1234:10-12; DTX F16.

24       158.    Cherry testified that she attempted to take a swimming class at MLK Pool but

25   that she had been forced to discontinue the class as a result of the lift being consistently

26   broken for an entire month.  RT 1043:15-1045:19.

27

28

1

### 4.    Parks

2    159.    At trial, Kirola testified regarding accessibility issues only with respect to

3 Alamo Square Park.  More specifically, Kirola stated that "the accessible entrance is steep

4 to use," RT 1385:5; that she was "not able to get in the children's play area," RT 1385:14-

5 15; and that there were "some places where the slope of the paths are steep so it is hard to

6 use those areas of the park," RT 1385:7-169.

7    160.    Kirola did not offer any testimony or evidence as to **when** the features of

8 Alamo Square Park about which she complained were constructed.  She also acknowledged

9 that the park is located on a steep hill.  RT 1394:2.

10    161.    Aside from Alamo Square Park, Kirola did not testify or complain about any

11 accessibility issues at any other City park or park facility.[9]

12    162.    Cherry stated, without elaboration, that all of the parks in her area "need

13 help" and "haven't been maintained the way they should."  RT 1041:1-5.  She commented

14 that her daughter had difficulty with a bathroom at Golden Gate Park and felt that the

15 disabled stall should be located in the front.  RT 1041:19-21.

16    163.    Kimbrough complained that her daughter:  (1) could not enter the Tea House

17 at the Japanese Tea Garden (Golden Gate Park) because of the "stepping stones that go

18 over the water," RT 831:16-20; (2) could not enter the children's playground at Golden

19 Gate Park, RT 832:3-833:4; (3) had difficulty going to the duck pond at McLaren Park, RT

20 834:16-835:11; (4) found the pathway to the play area at the St. Mary's playground too

21 steep, RT 835:16-8; (5) was unable to access one part of the play area at Balboa Park,

22 though was otherwise able to use almost all of the play structures there, RT 836:17-837:9;

23 and (6) encountered steep paths at Holly Park, which "is on the top of a hill," RT 837:19-

24 838:5.

25

26

27    [9] At trial, some of Kirola's lay and expert witnesses offered testimony regarding access barriers at Golden Gate Park and various RecPark facilities contained within the Park.  Kirola, however, made no mention during her examination of any access barriers she

28 encountered at Golden Gate Park or any Golden Gate Park facility.

164.   Monasterio testified that her daughter: (1) had difficulty accessing parts of Glen Canyon Park, which is located in a "Eucalyptus forest" that is "very wild," RT 1234:16-1237:2; (2) could not enter certain parts of the exhibit at the Conservatory of Flowers (Golden Gate Park) because plants were in her way, RT 1237:3-20; and (3) could not enter the Japanese Tea Garden for unspecified reasons, RT 1237:23-1238:1.

### 5.   Grievance Procedure

165.   Fraguli, who is in charge of the grievance procedure operated by MOD, never received any complaints from Kirola or any testifying class member or parent of a class member.  RT 1866:11-14, RT 1870:14-1871:9.  She was surprised to have not received any complaints from Kirola, whom she knows socially, or O'Neill, who had previously worked at MOD.  RT 1870:14-22.

166.   Though Kirola did not utilize the City's grievance procedure, she did contact her district supervisor in July 2006 to complain about the lack of curb ramps at the corner of Hayes and Fillmore.  In April 2008, the City installed the curb ramps per Kirola's request.  RT 1383:19-1884:8, 1391:18-1392:2.  The City also installed curb ramps at all the locations alleged in the pleadings.  RT 1392:3-16.  Kirola did not make any other formal access complaints to the City prior to the filing of this lawsuit.

167.   In 2006 or 2007, Monasterio ran into her then supervisor, Tom Ammiano, at the video store and complained to him about having "curb cuts" installed along Cortland Avenue.  RT 1228:18-1229:9.  In response, DPW consulted with Monasterio to understand her daughter's needs.  RT 2001:8-2002:5. The City constructed all curb ramps requested by Monasterio within a year after the requests were made.  RT 2419:13-2420:4; 2001:8-2002:5; 1228:18-1229:6.[10]

168.   O'Neil testified about three curb requests.  First, O'Neil claims that in 1991 she left a message with DPW regarding the curb ramps at Fillmore Street ("Fillmore") and

_____

[10] Based on a declaration she filed in this action, Monasterio apparently made other requests, which the City has prioritized for construction the next fiscal year following trial. RT 2420:5-2420:17.

Beach Street ("Beach"), and thereafter followed up many times, without success.  RT 568:6-11, 569:1-572:11.  A curb ramp at that location was installed in April 2011, based on the request of a person other than O'Neil.  RT 2423:15-2424:5, 573:22-574:1.

169.    Second, she called DPW to complain about a curb ramp at the corner of Van Ness Avenue ("Van Ness") and Olive Street ("Olive").  RT 589:2-18.  She indicated that she made the complaint sometime between 2006 and 2009, and that the curb ramp was fixed in about one year.  RT 571:7-8, 589:6-7, 589:21-590:4.

170.    Third, O'Neil claims that on March 17, 2011, she submitted a complaint regarding steep curb ramps at the corner of Van Ness and Hickory Street ("Hickory"), a location where the City had received a prior curb ramp request.  RT 578:4-24, 2420:18-2421:2.  Initially, the City determined that curb ramps could not be constructed at this location because of a sub-sidewalk basement.  RT 2005:2-2006:4; 2421:3-8.  The City later identified a significantly more expensive design "bulb-out" solution that extends the sidewalk out into the street, thereby avoiding the sub-sidewalk basement.  RT 2006:5-18; 2421:9-22, 2421:20-25.  At the time of trial, curb ramps for this location were in the design phase. RT 2006:19-25; 2422:1-6.  Approximately twenty new bi-directional curb ramps have been installed in O'Neil's neighborhood, some at her request.  RT 594:15-18.

### E.    EXPERT TESTIMONY

171.    Kirola offered expert testimony from Peter Margen ("Margen"), Dr. Edward Steinfeld ("Steinfeld"), Jeffrey Scott Mastin ("Mastin"), Gary Waters ("Waters") and David Seaman ("Seaman").

172.    Mastin is a licensed architect and was received by the Court as an expert in architecture, construction, disability access, program access for mobility disabled persons, ADA transition plans, and barrier removal.  RT 927:6-931:23.

173.    Steinfeld is a professor of architecture, the Director of the Center for Inclusive Design and Environmental Access ("IDEA Center"), and an advocate for improved disability access standards, and was received by the Court as an expert in

architecture, accessibility design, universal design, program access, and transition planning for public entities.  RT 606:7-607:9, 767:6-13.

174.    Margen, a disability access specialist, was received as an expert on disability access.  RT 100:17-101:3.

175.    Waters, a licensed architect, certified access specialist, and disability access consultant, was received by the Court as an expert in disability access, program access for persons with mobility disabilities, the preparation and implementation of self-evaluation and transition plans, and policies, procedures and practices regarding disability access barrier removal.  RT 1306:23-1310:6.

176.    Seaman was qualified as an expert in GIS.  RT 489:19-490:5.

177.    The City offered expert testimony from Hecker and Larry Wood ("Wood").

178.    Hecker, a licensed architect, was received by the Court as an expert in architecture and disability access.  RT 2037:7-2038:3.

179.    Wood, an architect and accessibility consultant with a nation-wide practice, was received by the Court as an expert in architecture, disability access, self-evaluation plans, transition plans, and Title II program access requirements.  RT 2722:25-2723:6.

### 1.    Public Right-of-Way

180.    Kirola's experts offered a variety of testimony regarding their evaluation of the City's curb ramps and sidewalks.

181.    Mastin opined that 1,358 of the 1,432 curb ramps he inspected were inaccessible or non-compliant.  RT 1215:12-1218:7; PTX 4148.

182.    Steinfeld found barriers relating to curb ramp accessibility at thirteen of the fourteen site inspections conducted by his team that involved inspection of the public right-of-way.  RT 704:9-12.

183.    Margen inspected sidewalks and curb-ramps at ten street intersections and/or street segments, and asserted that there were "major barriers to accessibility" which rendered "the system as a whole not accessible."  RT 330:21-331:1.

184.   The Court finds that the opinions offered by Kirola's experts are unreliable and unpersuasive.

185.   As an initial matter, the Court has serious concerns regarding their methodology.  For instance, Kirola's experts failed to consider the height of the curbs or widths of the sidewalks they examined, even though both are critical measurements that may impact the design, construction, and accessibility conclusions of the curb ramps at issue.  RT 2073:11-16.  The record also shows that they failed to take steps to apply a consistent method of measuring slopes, sidewalks, and curb ramps, and improperly applied ADAAG to the public right-of-way.  RT 398:12-399:5, 2055:24-2056:7, 2058:20-2061:6, 800:24-802:21, 2048:9-15.

186.   The Court also has concerns regarding the qualifications of the persons conducting the evaluations.  Steinfeld conducted his surveys mostly with the help of student interns who were not trained on California accessibility standards and whose work was shown by the City to be unreliable.  RT 738:2-739:22, 800:14-801:25, 817:12-819:2, 2065:1-20.  Margen is not an architect.  According to fellow expert Mastin, only licensed architects are qualified to be experts in disability access standards.  RT 1250:19-1251:22.

187.   Wood, the City's accessibility expert, whom the Court finds to be credible, was particularly critical of the methodology utilized by Kirola's experts, opining that "there was no common way of measuring anything, such as slopes, sidewalks, [and] curb ramps" and that "they all seemed to have a different approach that was somewhat haphazard."  RT 2056:3-7.  Notably, the inconsistencies in such measurements led to internal disagreements between Kirola's experts.  Steinfeld's colleague, Denise Levine, who supervised the site inspections conducted by Steinfeld's IDEA Center team, viewed her methodology as superior to the methodology employed by Kirola's other access experts and rejected their inspection protocols in favor of her own.  RT 800:24-802:21.

188.   Also problematic is Kirola's experts' failure to account for dimensional tolerances.  Due to variations in workmanship and real-world construction practices, minor variations in the curb ramp or sidewalk construction may occur.  28 C.F.R. part 36, App. D,

§ 3.2 ("[a]ll dimensions are subject to conventional building industry tolerances for field conditions"). For instance, there may be slight imperfections in a curb ramp surface, or, at different points along the ramp, the slope or grade may not necessarily be uniform. RT 2061:2-2062:62:13. These variations may be the result of using a hand-trowel during the construction process and the natural settlement of concrete. RT 2061:22-2062:2. According to Wood, a dimensional tolerance is a permissible deviation from standards commonly accepted in the construction industry and does not impact accessibility under ADA guidelines. RT 2057:2-20, 2062:10-2063:2. Mastin, who conducted the majority of the curb ramp assessments, failed to account for such tolerances. In failing to do so, he inappropriately found trivial and insignificant deviations as access barriers, despite the fact that such deviations are permissible under industry standards. RT 955:5-10, 1272:1-12, 1282:4-18, 2055:24-2057:20.

189. In addition, Kirola's experts measured curb ramp slopes without considering the ramp's overall "rise in run" and flatness. RT 2056:10-2057:1. Instead, they recorded the maximum localized variation (i.e., the steepest individual point along the slope of the curb ramp), which skewed their results. RT 2056:10-2057:1, 2058:20-2061:6, 771:11-772:8. Steinfeld, for instance, acknowledged that the measurements he made regarding the overall slope of each curb ramp were based on the most extreme variation in the ramp's grade, misleadingly characterizing that measurement as applying to the ramp as a whole. RT 771:23 ("we use the steepest slope as what we record"). In other cases, the measurements taken were erroneous. Mastin admittedly cited dozens of curb ramps with a slope of less than 8.3 percent as non-compliant—when, in actuality, a slope of 8.3 percent or less comports with the ADAAG. RT 1275:5-21. Wood noted this discrepancy in his testimony. RT 2081:5-10. Wood also pointed out that Kirola's experts routinely cited items such as pot holes or utility grates as access barriers, notwithstanding the fact that there was an ADA compliant (i.e., 48-inch wide) path around the item. RT 2079:10-2081:10.

190.    The Court further discounts the probative value of Kirola's experts' opinions and reports based on their misapplication of ADAAG, which applies specifically to post-January 26, 1992, construction.  RT 2172:11-14.  The ADAAG's current regulations focus on buildings and facilities, and do not explicitly encompass the public right-of-way (though a public right-of-way section has been reserved).  Indeed, on July 26, 2011, the U.S. Access Board published Proposed Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way, thus implying that the Board intended the current guidelines to be limited to newly constructed buildings and facilities (and the curb ramps, sidewalks, and loading zones associated with such buildings and facilities).  Dkt. 636, Exh. A.

191.    Even if the ADAAG were applicable to a public right-of-way, its provisions would apply only to newly constructed or altered elements of the public right-of-way.  See 28 C.F.R. § 35.151.  Despite this distinction, Kirola's experts indiscriminately applied the ADAAG to each curb ramp assessed without taking in account **when** the curb ramps were constructed or altered.  The fact that Kirola's experts inappropriately applied the ADAAG to every curb ramp assessed without first ascertaining when the curb ramp was constructed or altered and whether the ADAAG therefore applied undermines both their credibility and the probative value of their testimony.

192.    As for Margen's claim that the "the [City's] system [of curb ramps and sidewalks] as a whole is not accessible," the Court finds his opinion unpersuasive.  RT 330:21-331:1.  Margen was not certified as an expert on program access under Title II of the ADA nor is he an architect.  RT 100:17-101:3.  According to Mastin, only licensed architects are qualified to be experts in disability access standards.  RT 1250:19-1251:22.  Further, Margen's lack of knowledge was apparent from his inconsistent testimony regarding his understanding of Title II's program access requirements.  RT 100:17:101:3, 105:20-25, 333:9-11.  The Court therefore affords Margen's conclusions regarding program access little weight.

193.    The Court also ascribes little weight to the testimony of Kirola's GIS expert, Seaman, who performed an analysis of the data contained within the CRIS database as of

January 21, 2011, and prepared maps, which depict corners lacking curb ramps and curb ramps with low condition scores. RT 494:14-500:13. Seaman's geographic representations of the CRIS data are misleading in that he failed to show data for accessible curb ramps near the purportedly non-accessible curb ramps, despite the fact that such data was available to him. RT 530:3-5. In addition, testimony presented at trial demonstrates that the CRIS database was not up to date and lacked data for curb ramps installed through departments other than DPW. RT 2396:19-2397:7, 2401:14-16, 2403:12-2404:9.

194.    In contrast, the Court finds the opinions of Hecker, the City's accessibility expert, to be more credible. The DOJ's "Tool Kit for Title II Entities" advises public entities to create long-range plans to provide curb ramps where needed and to employ a request-based system for installing curb ramps. RT 2811:7-2812:15. Hecker opined that the City's priorities for curb ramp installation, as set forth in the Curb Ramp and Sidewalk Transition Plan, are consistent with the priorities and recommendations established by the DOJ. RT 2785:17-2787:13, 2789:3-2790:18, 2811:7-2812:15.

195.    On cross-examination, Kirola asked Hecker about a December 2009 expert report in which he had stated that the City had not yet installed every curb ramp necessary for program access when the network of City sidewalks was viewed in its entirety, but that the City was making progress toward program access. RT 2795:19-2796:8. However, Hecker acknowledged that at the time he issued the 2009 report, he had not actually determined the total number of curb ramps needed to achieve program access for the purposes of that report. RT 2797:15-2798:6. Hecker provided no updated program access conclusions regarding the City's public right-of-way. In any event, Hecker's observations in the 2009 report do not undermine his opinion that the City's policies and programs for curb ramp installation comport with the ADA. RT 2785:17-2787:13, 2789:3-2790:18, 2795:19-2796:8; PTX 0022 [003798].

196.    To summarize, the Court finds that the opinions of Kirola's experts regarding whether the City provides meaningful access to its public-right-of-way are uncompelling, particularly in light of the persuasive testimony provided by Wood, and affords them little

1   weight.  The Court finds Hecker, the City's access expert, to be credible, and finds the

2   City's priorities for curb ramp installation, as set forth in the Curb Ramp and Sidewalk

3   Transition Plan, to be consistent with the priorities and recommendations established by the

4   DOJ.

5               **2.      Library and RecPark Facilities**

6       197.    The Court now addresses the expert testimony regarding whether mobility-

7   impaired individuals have been provided with meaningful access to the City's Library and

8   RecPark facilities.  The following section is divided into two parts.  The Court first

9   addresses the opinions offered to support Kirola's contention that, to comply with its access

10  obligations, the City must make each of its individual libraries, parks, pools, and recreation

11  centers fully accessible because the City has a program of providing "unique"

12  neighborhood facilities.  See, e.g., RT 103:6-104:19.  Following those findings, the Court

13  will address the opinions and findings of Kirola's experts that there are significant

14  accessibility barriers that preclude program access with respect to the aforementioned

15  facilities.

16              *a)      "Neighborhood" Access Theory*

17      198.    According to Margen, each individual park or library constitutes a "unique"

18  program because of its status as a "neighborhood" site.  RT 104:1-19, 406:25-407:22.

19  Margen opined that program access, "as it relates to San Francisco," means that all services

20  and activities available at one facility must be made available at every facility.  RT 105:20-

21  25.  He admitted, however, that his opinion was not based on any authoritative publication

22  in his field, but was simply his personal opinion.  RT 407:8-22.  In addition, Margen, who

23  was not received as a program access expert, later contradicted himself, stating that the

24  services offered at one park need not be duplicated at every park, "but where services are

25  provided, those services need to be accessible."  RT 333:9-11.  The inconsistencies in and

26  apparent arbitrariness of Margen's opinions raise concerns regarding his actual

27  understanding of the program access requirements.  RT 100:17:101:3, 105:20-25, 333:9-11.

28  The Court therefore gives little weight to Margen's opinion.

199.   Like Margen, Steinfeld opined that each City park is "unique," and therefore, the City's efforts to offer program access to its park system was not "workable" in light of the length of time it would take to walk from one park to another.  RT 615:17-616:4, 619:18-621:8, 629:12-15.  Though admitting that every park need not be made accessible, he opined that the City must provide an "equivalent park" within a "reasonable" distance from every non-accessible park, which he posited to be one-half of a mile.  RT 624:11-13, 625:8-626:8.  He reasoned that certain "very special parks," such as Mission Dolores Park or Golden Gate Park, have no equivalent, and as such, each of those parks must be fully accessible.  RT 629:3-15.  Steinfeld also asserted that parks are unique to the particular neighborhood in which they are located and potentially have "neighborhood meaning."  RT 618:21-25.

200.   Steinfeld presented no foundation for his opinions, and conceded that he had never visited Mission Dolores Park and knew little about it.  RT 797:19-23.  He also contradicted himself, testifying that only "a small part" of a particular park must be accessible in order to provide the requisite program access.  RT 717:10-21.  In addition, the suggestion that the name of a park connotes its unique, neighborhood meaning, is both unfounded and illogical.  The mere fact that a park is named after the area in which it is located does not establish that the park has "neighborhood meaning" or that the City is obligated to ensure that each and every "neighborhood" park is accessible.  Given the lack of any identifiable bases for Steinfeld's opinions, it is readily apparent that his testimony was based on his personal views, rather than a professional understanding of a public entity's Title II obligations.  For the reasons discussed, the Court finds Steinfeld's opinions to be unpersuasive and gives them little weight.

201.   The Court also affords little weight to Steinfeld's opinions that Coffman Pool and MLK Pool (which are designated as accessible pools) are not meaningful alternatives to Balboa Pool for persons with mobility disabilities due to their distance from Balboa Pool.  RT 673:4-23.  Kimbrough, a mother of a class member, testified that Coffman Pool was only two miles from her home while Balboa Pool was one mile from her home.  RT

852:18-853:2, 848:18-24.  Given the proximity of Coffman Pool to Balboa Pool, the Court is unpersuaded by Steinfeld's suggestion that the Coffman Pool is not a meaningful alternative.  Steinfeld's conclusion in this regard detracts further from his credibility and program access conclusions.

202.   Mastin opined that the City must make "each and every" one of its "unique" facilities accessible to satisfy its program access requirements under the ADA.  RT 1223:22-1224:4.  Mastin testified specifically regarding recreation centers, stating that, in his opinion, the City's recreational centers are "localized" and that it is "not equivalent to go to someone else's neighborhood and socialize with people you don't know."  RT 1172:22-1174:10.  Mastin failed to cite any authority or identify a factual basis in the record for his opinions, and the Court concludes that, like Steinfeld, his opinions are based on his personal, subjective views as a disability access advocate, rather than a professional understanding of a public entity's Title II obligations.  The Court therefore finds Mastin's opinions to be unpersuasive and gives them little weight.

203.   Waters opined that the "uniqueness of a particular facility" is a factor to be taken into account when determining whether or not program access has been afforded.  RT 1349:4-15.  Again, Waters failed to cite any authority or identify any factual basis in the record for his opinions, which are based on his personal opinions as a disability access advocate rather than on a professional understanding of a public entity's Title II obligations.  The Court therefore finds Waters' opinions to be unpersuasive and affords them little weight.

204.   In sum, although each library, park, pool, and recreational center arguably may have some "unique" features, that does not, in turn, support the conclusion that each individual library, park, pool, and recreational center must be fully accessible in each neighborhood.  The opinions of Kirola's experts are not grounded on any industry standards or understanding.  Instead, they are based on their personal beliefs as disability access advocates.  For these reasons and those discussed above, the Court finds the conclusions of

Kirola's experts regarding the neighborhood theory of access to be suspect and lacking in credibility.

### b)   *Accessibility*

205.   Aside from offering opinions regarding Kirola's neighborhood theory of accessibility, her experts also discussed purported accessibility barriers in relation to the City's Library and RecPark facilities.  These experts testified, to varying degrees, that they encountered multiple access barriers at the libraries, pools, parks, and recreation centers which they inspected.

206.   Kirola's experts inspected eighteen of the City's twenty-eight libraries, including the Main Library.  RT 164:5-165:21, 384:14-385:13, 651:14-653:1; PTX 4148. Margen, Steinfeld and Mastin opined that those libraries had narrow aisles, inadequate turnaround space at the end of aisles, inaccessible restrooms, inaccessible seating, and excessive door pressure.  RT 293:5-295:3, 296:6-298:5, 334:8-16, 378:23-379:5, 741:20-743:18 1213:12-22.  Margen opined that the City's libraries suffered from accessibility issues that must be addressed in order to make the library system, on the whole, accessible. RT 334:8-16.

207.   Kirola's experts inspected seven of the City's nine pools.  Three of the pools they inspected, i.e., Garfield, Balboa, and Rossi Pools, are designated as "limited access"— meaning that they are not intended to provide program access.  RT 164:4-165:11, 408:11-14, 651:14-652:6, 1312:1-1313:2, 1813:10-23; PTX 4147; PTX 4149; DTX F16.  Steinfeld, in particular, claimed to have found numerous access barriers at the pools, including inaccessible paths of travel, inaccessible parking, inadequate signage, missing handrails, inaccessible handrails, heavy doors, drinking fountains lacking inadequate knee clearance, and non-detachable shower heads.  RT 657:15-657:24, 664:5-664:24, 670:10-670:19, 672:7-19, 748:22-749:8, 812:19-813:14, 728:20-729:13, 736:8-22, 743:25-744:14, 755:19-756:19, 813:20-814:24, 694:12-19, 728:20- 729:13.

208.   With respect to the City's park program, Kirola's experts inspected 13 parks, 7 mini-parks, and 16 playgrounds of the City's network of approximately 220 parks.  They

also visited multiple sites within Golden Gate Park.  RT 164:4-165:21, 651:23-652:6, 1312:17-19; PTX 4149; PTX 4147.  Based on their inspections, Kirola's experts identified various access barriers, including an inaccessible entrance ramp at Balboa Park, a cracked sidewalk at Jefferson Square Park, limited accessible paths of travel at Golden Gate Park's Japanese Tea Garden and Rose Garden, inaccessible paths connecting the main facilities at Glen Canyon Park, and placement of flora and fauna signage at Glen Canyon Park too far from accessible trails.  RT 670:10-671:12, 712:12-17, 757:5-6, 1316:22-1313:9, 1317:22-1318:8, 1327:5-1330:15-17, 1331:13-23, 1333:8-21.

209.    Finally, the experts conducted site inspections of thirteen of the City's seventy-three recreation centers and clubhouses.  PTX 4147; PTX 4149.  Mastin cited access barriers at the recreation centers he inspected, such as inadequate signage, an excessive cross-slope leading to accessible features in a restroom, a broken elevator, and an inaccessible tennis court.  RT 1121:8-1124:5, 1141:5-1142:5, 1150:21-1152:4, 1155:20-1158:6, 1158:19-1160:22, 1162:12-1164:15.  Mastin concluded that, based on the barriers he observed, four of the eleven recreation centers he inspected were not accessible.  RT 1121:11-15, 1141:5-9, 1162:6-10.

210.    The Court is unpersuaded by the opinions of Kirola's experts regarding the purported access barriers they encountered at the City's libraries and RecPark facilities.

211.    As an initial matter, Kirola's experts routinely applied inconsistent methodologies and inspection protocols.  RT 398:12-399:5, 800:17-801:25, 2055:24-2056:7.  Two experts, in particular, inappropriately focused on minor construction variations and ignored dimensional tolerances, which resulted in otherwise trivial and insignificant deviations being characterized as access barriers—despite the fact that such deviations were permissible under industry accessibility standards.  RT 955:5-10, 1273:4-10, 1342:6-13, 1358:19-1359:3, 2055:24-2057:20, 2065:8-20.  For example, at the Kimball Playground, Margen's team used a very short level to measure slopes, notwithstanding Margen's assurance that his team always used a two-foot level.  RT 2058:20-25.  Use of a short level is problematic because it "gives exaggerated readings because it's so short [that]

it picks up minor fluctuations." RT 2059:1-4.  Similarly, at St. Mary's Playground, Kirola's inspection team recorded the maximum localized variation as the overall slope of the curb ramp rather than the curb ramp's overall "rise in run" and flatness, which is the appropriate measure of accessibility compliance.  RT 2059:9-2061:6.

212.    Kirola's experts also repeatedly applied erroneous access requirements.  At the time of trial, there were no set standards for parks and playground facilities, though federal guidelines for outdoor facilities had been proposed.  RT 2063:19-2064:25.  The proposed guidelines recognize that such facilities are located in topographies that vary, and as such, set different and more forgiving slope requirements than compared to those applicable to a building.  Id.  Yet, Kirola's experts applied the more stringent but inapplicable ADAAG standard to park and playground facilities.  Id.

213.    With regard to buildings, they inappropriately failed to differentiate between new construction and alteration standards, applying the latest version of the California Building Code as opposed to the version in effect when the structure was built.  RT 2046:15-2047:5, 2052:7-2053:20.[11]  Kirola's experts similarly failed to take into account the existence of conflicts between state and federal law relating to the placement of items such as the location of toilet paper and grab bars and door pressure, requiring the City to decide which standard is more restrictive.  RT 2048:16-2049:8.  Moreover, no showing was made that these minor variations fell outside accepted construction variances or otherwise rendered the particular facility inaccessible or unusable.  RT 2045:6-19.

214.    With regard to libraries, Kirola's experts opined that they had narrow aisles and inadequate turnaround space at the end of aisles.  RT 293:5-295:3, 296:6-298:5, 334:8-16, 378:23-379:5, 741:20-743:18 1213:12-22.  Under both state and federal law, end aisles at library stacks may be 36" wide.  RT 2091:15-18.  The 48" width requirement cited by Kirola's experts applies only to restricted U-turn areas.  RT 2091:13-2093:8, 2094:10-17,

---

[11] The City is subject to both federal ADA requirements and California requirements, which generally are set forth in the California Building Code.  Though the parties' experts discussed both standards, the parties primarily devote their argument to the City's compliance with ADA.

1  2194:14-2197:11, 2202:7-08; Cal. Bldg. Code § 1133B.6.2; ADAAG 4.3.3; PTX 4153, 20-

2  4.  Margen and Mastin also cited excessive door pressures at some of the libraries they

3  inspected.  RT 373:5-12, 377:15-378:14, 1272:14-16.  However, for safety reasons, many

4  of those doors had a greater opening pressure because fire doors are permitted to have a

5  greater amount of pressure.  RT 2098:11-16.  Mastin also admitted that door pressures may

6  vary daily due to wind or other factors.  RT 1272:14-16.

7       215.   Another flaw in Kirola's experts' analyses is their citation to barriers that, in

8  fact, did not impede meaningful access.  RT 2057:21-2058:9, 2081:8-10.  The survey

9  prepared by Kirola's experts frequently cited issues such as a door being difficult to open

10  when there was an automatic door opener, thereby obviating the need to manually open the

11  door.  RT 2057:24-2058:12.  In another instance, the report cited the lack of handrails for

12  stairs when a new elevator system providing full access had been installed.  Id.  The experts

13  criticized the lack of an ambulatory stall (which can be used by persons with crutches or a

14  walker) in a library bathroom, when, in fact, the City had provided two accessible stalls,

15  providing greater access than required by law.  RT 2098:18-2099:13.  Steinfeld criticized

16  the Richmond Branch Library as having an inaccessible ramp, despite the fact that there

17  was a second accessible ramp leading to the same front entrance which complies with

18  ADAAG.  RT 738:16-18, 755:7-10.  Instead of focusing on overall accessibility, Kirola's

19  experts dwelled on minor variations that were no longer required, while overlooking

20  "obvious features of a significant expense" undertaken to make the facility accessible.  RT

21  2058:6-12.  These are but a few examples of the flaws that permeate Kirola's experts'

22  testimony.

23       216.   In contrast to the unreliable testimony offered by Plaintiff, the Court is

24  persuaded by Wood's independent findings regarding the City's libraries, pools, and

25  recreation centers that he inspected as part of his work on this case.  Wood and his staff

26  reviewed a total of sixty-nine facilities comprised of libraries, pools, recreation centers, and

27  playgrounds.  RT 2041:20-25.  Wood's team reviewed each alleged barrier listed in the

28  reports prepared by Kirola's experts, inspected each of the sites visited, and categorized

Kirola's experts' findings into four categories:  (1) "technically correct" and "affects

usability"; (2) "technically correct" but with "little or no effect on usability";

(3) "maintenance of accessible feature"; and (4) "misinterpretation or error in use of

ADAAG or Code."  RT 2038:15-2039:22, 2159:3-22.  To ensure the veracity of his team's

findings, Wood held daily meetings to discuss methodology and equipment.  RT 2039:19-

22.

217.    With respect to the City's libraries, Wood and his team reviewed each of the

libraries evaluated by Kirola's access experts, with the exception of the Visitation Valley

Branch Library (which was under construction for accessibility improvements at the time of

his evaluations) and the Ocean View Branch Library.  RT 2132:23-2134:10.  Wood opined

that each of the sixteen "blue dot" libraries he visited has the features necessary to facilitate

accessibility, including:  (1) an accessible route from the entrance to the public sidewalk;

(2) an accessible entrance; (3) automatic door openers; (4) elevators within multi-story

buildings; (5) access to all library levels; (6) accessible checkout counters; (7) accessible

tables; (8) accessible doors along all accessible routes; (9) accessible copy machines;

(10) accessible toilet rooms for men and women; (11) accessible drinking fountains; and

(12) accessible book stacks.  RT 2132:23-2135:19.

218.    Wood and his team also visited the three "blue dot" pools evaluated by

Kirola's access experts, along with the two additional "blue dot" pools not visited by

Kirola's experts (i.e., Sava Pool and North Beach Pool).  Of the five pools he evaluated,

Wood opined that each has the features necessary to facilitate accessibility, including:

(1) an accessible route from the property line to the building; (2) an accessible entry; (3) an

accessible check-in counter; (4) accessible signage; (5) accessible ramps or curb ramps

where necessary; (6) accessible toilets; (7) accessible showers; (8) accessible locker rooms;

and (9) transfer lifts to assist individuals with mobility impairments in getting into and out

of the pool.  RT 2136:7-2137:5.

219.    Wood and his team also reviewed the recreation centers evaluated by Kirola's

access experts.  Wood opined that each of the newly renovated recreation centers evaluated

has all the features necessary to facilitate accessibility, including:  (1) an accessible route from the property line to the building; (2) an accessible entry; (3) accessible community rooms; (4) accessible ramps or curb ramps where necessary; (5) accessible elevators within multi-story buildings; (6) an accessible gym with accessible bleacher facilities (with the exception of the Golden Gate Senior Center, which lacked a gym); (7) an accessible weight room in facilities where a weight room was provided; (8) accessible doors; (9) an attendant for special requests; (10) accessible bathrooms for men and women; and (11) accessible drinking fountains.  RT 2138:4-2140:12.

220.     Based on Wood's thorough analysis of Kirola's experts' findings, combined with his own independent analysis, MOD advised the Library of approximately three or four access barriers that it believed should be addressed, along with a few maintenance issues that it concluded should be attended to as part of its regular facility maintenance.  RT 1652:16-1653:4.  At the time of trial, the City had made or was in the process of completing the requested repairs.  RT 2255:8-2256:6, 2257:17-2258:10.

221.     MOD also recommended that RecPark remediate roughly 400 access barriers identified, some of which were minor and could therefore be handled by operations staff, and others of which required funding from the department's capital division.  RT 2321:11-2322:22, 1652:16-1653:20.  At the time of trial, RecPark had no deadline or schedule for completing the list of barriers received from MOD.  RT 2333:23-25, 2334:5-16.  RecPark had, however, worked with MOD to prioritize the listed recommendations and was in the process of addressing them.  RT 2321:16-2322:22.

222.     Wood found that only 1.6 percent of the access barriers cited by Kirola's experts at City libraries and recreation facilities actually needed modification.  RT 2038:15-2039:22, 2044:9-2046:12, 1649:10-25, 1625:7-10.

223.     The Court finds Wood to be well-qualified and credible, and credits his opinions regarding the existence of the alleged accessibility problems with the City's libraries and RecPark facilities over those of Kirola's experts.

224.   The Court is likewise persuaded by Hecker, who provided testimony regarding program access to the City's library program and RecPark programs.  As of December 2009, nineteen of the City's libraries were designated as "blue dot" accessible. Hecker opined that the number and distribution of accessible libraries across San Francisco was sufficient to provide program access to the City's library system, considering the City's "compact" size (forty-nine square miles) and effective public transportation and paratransit systems.  RT 2763:21-2765:5; DTX I32.

225.   Hecker credibly opined that:  (1) six of the City's nine swimming pools were designated as "blue dot" accessible, and the number and distribution of accessible pools across San Francisco was sufficient to provide program access to the City's aquatic program, RT 2767:8-2769:17; DTX F16; (2) forty-three of the City's seventy-three recreation centers and clubhouses were designated as "blue dot" accessible, and the number and distribution of accessible recreation centers and clubhouses across San Francisco was sufficient to provide program access to the RecPark programs offered at those locations, RT 2771:3-2772:12; DTX F40; and (3) twenty of the City's forty-five athletic fields were designated as "blue dot" accessible, and the number and distribution of accessible athletic fields across San Francisco was sufficient to provide program access to the City's athletic field program.  RT 2769:18-2771:2; DTX F34.

226.   In forming his program access opinions, Hecker relied exclusively on the determinations of Scott (i.e., MOD's Deputy Director of Physical Access) as to which facilities offered accessible programs and services, i.e., the "blue dot" designations.  RT 2768:4-23.  Scott is a licensed architect with more than twenty years of experience working on architectural access issues and a former member of the U.S. Access Board's Recreation Access Advisory Committee and Places of Amusement Committee.  RT 1771:21-1773:22, 1775:9-11.  Hecker stated that he had a high degree of confidence in the reliability of Scott's designations as a result of Scott's knowledge of accessibility issues and the process employed by the City to ensure the design and construction of accessible City facilities.  RT 2762:17-2763:12, 2769:2-15.

227.    Furthermore, as of December 2009, 77 of the City's 133 children's playgrounds (58 percent) were designated as "blue dot" accessible, and an additional 15 playgrounds were slated for renovation pursuant to funded RecPark capital projects.  RT 1815:9-20; PTX 0148A.  As Kirola has made no showing to the contrary, the Court finds the number and distribution of accessible playgrounds to be sufficient to provide program access to the City's network of children's playgrounds.  PTX 0148A.

228.    Notably, Kirola failed to provide a program access analysis that refutes the conclusion that the City offers program access through its "blue dot" libraries, pools, recreation centers, clubhouses, athletic fields, and playgrounds.  Specifically, Kirola has not shown that each of the designated "blue dot" facilities (designations on which Hecker's program access conclusions rely) fails to fulfill the City's program access intent.  See, e.g., RT 726:5-727:11, 1344:7-1345:13, 1357:15-15.  Kirola's experts instead emphasized that not all of the "blue dot" facilities were 100 percent compliant with disability access regulations.  The flaw in that conclusion is that it misapprehends the significance of the "blue dot" designations.  Trial testimony establishes that such designation is intended to represent that the site is fulfilling the City's obligations under UPhAS, not that every element of the facility was "completely accessible" pursuant to applicable access regulations.  RT 1463:8-1464:23.

### 3.    Grievance Procedure

229.    On behalf of the City, Hecker credibly opined that the City's grievance procedure is consistent with the requirements of ADA regulations.  RT 2727:5-19.  In particular, he found significant that the grievance procedure allows members of the public to submit complaints in any manner they wished to communicate and requires the City to issue a response within thirty days.  RT 2727:5-19.  The Court affords significant weight to his opinion regarding the sufficiency of the City's grievance procedure.

230.    The Court is unpersuaded by Margen's opinion that the City's grievance procedure is flawed due to its failure to specify a definitive timeline for resolution of each access complaint received.  RT 219:23-220:18.  The DOJ's model grievance policy does

not mandate a specific deadline for resolving each access complaint.  <u>See</u> ADA Best
Practices Tool Kit for State and Local Gov'ts, Ch. 2, p. 10-11. The Court therefore affords
little weight to Margen's opinion regarding the adequacy of the City's grievance procedure.

## IV.   CONCLUSIONS OF LAW

### A.   LEGAL OVERVIEW

#### 1.   Claims

1.     Title II of the ADA provides that "no qualified individual with a disability
shall, by reason of such disability, be excluded from participation in or be denied the
benefits of the services, programs, or activities of a public entity, or be subjected to
discrimination by such entity."  42 U.S.C. § 12132.  Under the ADA's implementing
regulations, "no qualified individual with a disability shall, because a public entity's
facilities are inaccessible to or unusable by individuals with disabilities, be excluded from
participation in, or be denied the benefits of the services, programs, or activities of a public
entity, or be subjected to discrimination by any public entity."  28 C.F.R. § 35.149.

2.     Section 504 of the Rehabilitation Act prohibits discrimination on the basis of
handicap in any program or activity receiving Federal financial assistance.  29 U.S.C.
§ 794.  A "program" or "activity" means, in part, "all of the operations" of a state or local
agency.  <u>Id.</u> § 794(b).  "There is no significant difference in the analysis of the rights and
obligations created by the ADA and Rehabilitation Act."  <u>Zukle v. Regents of the Univ. of
Cal.</u>, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999); <u>accord</u> <u>Armstrong v. Davis</u>, 275 F.3d 849,
862 (9th Cir. 2001), <u>abrogated on other grounds by</u> <u>Johnson v. Cal.</u>, 543 U.S. 499, 504-505
(2005).

3.     Title 42, United States Code, section 1983, "provides a cause of action for the
deprivation of any rights, privileges, or immunities secured by the Constitution and laws of
the United States."  <u>Wilder v. Virginia Hosp. Ass'n</u>, 496 U.S. 498, 508 (1990) (quoting 42
U.S.C. § 1983).  Section 1983 is not itself a source of substantive rights, but merely
provides a method for vindicating federal rights conferred elsewhere.  <u>Graham v. Connor</u>,
490 U.S. 386, 393-94 (1989).

4.      The Unruh Act provides that persons with disabilities have equal access to streets, highways, public places, public conveyances, places of public accommodation, and housing.  Cal. Civ. Code §§  51, 54(a).  A violation of the ADA constitutes a violation of the Unruh Act.  Id. § 51(f).

5.      The CDPA provides that "individuals with disabilities shall be entitled to full and equal access . . . to . . . places of public accommodation."  Cal. Civ. Code § 54.1.  "A violation of the right of an individual under the [ADA] also constitutes a violation [of the CDPA]."  Id. § 54.1(d).

6.      California Government Code § 11135 provides that no person in the State of California shall, on the basis of disability, "be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state."  Cal. Gov't Code § 11135.

7.      Aside from the ADA and Section 11135 claims, the parties do not specifically discuss or analyze any of the other claims, all of which rely on the City's alleged violation of the ADA.  Accordingly, the Court's analysis of Kirola's ADA claim applies with equal force to the Rehabilitation Act, Unruh Act and CDPA claims.

8.      The decision of whether to grant or deny permanent injunctive relief under Title II of the ADA is a matter of the district court's discretion.  Midget v. Tri-Cnty. Metro. Transp. Dist. of Or., 254 F.3d 846, 851 (9th Cir. 2001) (affirming denial of permanent injunction where the plaintiff failed to "present facts showing a threat of immediate, irreparable harm").

### 2.      Standing

9.      The City contends that Kirola, the sole class representative, lacks standing to sue for the alleged denial of meaningful access with respect to the City's programs, services and activities, or to challenge any of the various policies which allegedly show that her injury is likely to recur.  Dkt. 666.  The defense of lack of subject matter jurisdiction may

1   be raised at any time, and the court is under a continuing duty to examine its jurisdiction.

2   Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983).

3          10.     "[T]hose who seek to invoke the jurisdiction of the federal courts must satisfy

4   the threshold requirement imposed by Article III of the Constitution by alleging an actual

5   case or controversy." City of Los Angeles v. Lyons, 461 U.S. 95, 101 (1983).  To satisfy

6   the "case or controversy" requirement, a plaintiff must establish standing under Article III.

7   Human Life of Wash., Inc. v. Brumsickle, 624 F.3d 990, 1000 (9th Cir. 2010).

8          11.     "[I]n order to have Article III standing, a plaintiff must adequately establish:

9   (1) an *injury in fact* (i.e., a concrete and particularized invasion of a legally protected

10  interest); (2) *causation* (i.e., a fairly traceable connection between the alleged injury in fact

11  and the alleged conduct of the defendant); and (3) *redressability* (i.e., it is likely and not

12  merely speculative that the plaintiff's injury will be remedied by the relief plaintiff seeks in

13  bringing suit)." Sprint Commc'n Co., L.P. v. APCC Servs., Inc., 554 U.S. 269, 273-74

14  (2008) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)) (emphasis

15  added).  "This triad of injury in fact, causation, and redressability constitutes the core of

16  Article III's case-or-controversy requirement, and the party invoking federal jurisdiction

17  bears the burden of establishing its existence." Steel Co. v. Citizens for a Better Env't, 523

18  U.S. 83, 103-104 (1998).

19         12.     Where, as here, a plaintiff seeks only declaratory and injunctive relief, she

20  must additionally show "a very significant possibility of future harm." Montana Shooting

21  Sports Ass'n v. Holder, 727 F.3d 975, 979 (9th Cir. 2013); Clapper v. Amnesty Int'l USA,

22  — U.S. —, —, 133 S.Ct. 1138, 1147 (2013) (noting that standing may be based on

23  threatened injury only if it is "certainly impending to constitute injury in fact, and that

24  allegations of possible future injury are not sufficient.") (citations, internal quotation marks,

25  and brackets omitted).  "To have standing to assert a claim for prospective injunctive relief,

26  a plaintiff must demonstrate 'that he is realistically threatened by a repetition of [the

27  injury].'" Melendres v. Arpaio, 695 F.3d 990, 997 (9th Cir. 2012) (quoting City of L.A. v.

28  Lyons, 461 U.S. 95, 109 (1983)).

13.     The standing requirement applies to class representatives, who must, in addition to being a member of the class they purport to represent, establish the existence of a case or controversy.  O'Shea v. Littleton, 414 U.S. 488, 494 (1974).  "A plaintiff must demonstrate standing for each claim he or she seeks to press and for each form of relief sought."  Wash. Envtl. Council v. Bellon, 732 F.3d 1131, 1139 (9th Cir. 2013) (citing DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006)).

### B.   PRELIMINARY ISSUES

14.     Before reaching the question of whether Kirola has Article III standing, the Court addresses four preliminary contentions concerning the constellation of evidence which may be considered in analyzing her standing:  (1) whether standing may be established by evidence that was not presented at trial; (2) whether Kirola's experience with barriers in her neighborhood is sufficient to confer standing to sue for barriers she did not encounter; (3) whether standing may be established based on the experiences of class members; and (4) whether Kirola has standing to challenge the City's alleged "overarching policy" of discrimination.

### 1.   Scope of the Evidence

15.     The City contends that Kirola's standing is to be evaluated based solely on the evidence presented at trial; namely, her in-court testimony.  In contrast, Kirola argues that the Court is not limited to the trial record, and that the Court should consider evidence obtained or produced during discovery—irrespective of whether such evidence was previously presented to the Court.  For the reasons that follow, the Court finds that Kirola's standing is to be determined based on the trial record.

16.     Standing is a core component of Article III's case or controversy requirement, and as such, it must be established "through all stages of federal proceedings."  Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477 (1990).  "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the

1   successive stages of the litigation." Lujan, 504 U.S. at 561.  For instance, general factual

2   allegations of injury resulting from a defendant's conduct may suffice at the pleading stage;

3   but in response to a motion for summary judgment, a plaintiff cannot rely on "'mere

4   allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' . . . which

5   for purposes of the summary judgment motion will be taken to be true." Id. (citing Fed. R.

6   Civ. P. 56(e)).  "At the final stage, those facts (if controverted) must be 'supported

7   adequately by the evidence adduced at trial.'" Id. (citing Gladstone, Realtors v. Village of

8   Bellwood, 441 U.S. 91, 115 n.31 (1979)).

9        17.    An assessment of standing based on the trial record is both permissible and

10  appropriate, particularly where, as here, the plaintiff's standing is disputed.  See Maine

11  People's Alliance And Natural Res. Def. Council v. Mallinckrodt, Inc., 471 F.3d 277, 283

12  (1st Cir. 2006) ("When, as now, standing is reviewed after trial, the facts establishing

13  standing 'must be supported adequately by the evidence adduced at trial.'") (citing Lujan,

14  504 U.S. at 561); Perry v. Vill. of Arlington Heights, 186 F.3d 826, 829 (7th Cir. 1999)

15  ("'[W]here standing is challenged as a factual matter, the plaintiff bears the burden of

16  supporting the allegations necessary for standing with "competent proof." . . . "Competent

17  proof" requires a showing by a preponderance of the evidence that standing exists.'")

18  (citations omitted); Biopolymer Eng'g, Inc. v. Immudyne, Inc., No. 05-2972 (JNE/JJG),

19  2009 WL 2916847, *3 (D. Minn. Sept. 4, 2009) ("Plaintiffs bear the burden of establishing

20  their standing.  The Court will determine whether they have satisfied that burden based on

21  the evidence received at trial."); see also Augustine v. United States, 704 F.2d 1074, 1077

22  (9th Cir. 1983) ("The defense of lack of subject matter jurisdiction cannot be waived, and

23  the court is under a continuing duty to dismiss an action whenever it appears that the court

24  lacks jurisdiction.").

25       18.    Here, Kirola has long been on notice that the City disputes whether she has

26  standing and that such determination would be adjudicated at trial.  Although the City

27  chose not to pursue the standing issue in connection with Plaintiff's class certification

28  motion, the Court's order on that motion expressly stated that Kirola's standing "[would] be

1   made following trial based upon the evidence presented and the relief requested."  Dkt.

2   285, 3:23-24.  Despite this awareness, Kirola offered only minimal testimony at trial to

3   establish that *she* suffered an injury in fact.  Specifically, Class Counsel only elicited

4   testimony from Kirola regarding:  (1) three stretches of sidewalk containing "bumps";

5   (2) one corner that lacked curb ramps; (3) one corner that provided only a single curb ramp;

6   (4) errant step stools at three of the City's libraries; (5) three inaccessible pools; and

7   (6) steep paths at one park.  RT 1384:13-21, 1382:4-18, 1387:2-4, 1385:3-1386:8, 1386:15-

8   19, 1388:5-7.

9        19.   Apparently recognizing the insufficiency of her trial testimony, Kirola now

10  argues in her post-trial briefing that the Court must also consider evidence that was not

11  presented at trial.  Dkt. 672, 13:22-14:3, 17:16-18:4, 18:15-26, 19:12-25.  More

12  specifically, Kirola points to certain portions of her deposition testimony and the

13  declaration she submitted in support of her motion for class certification to establish that

14  she encountered barriers in addition to those to which she testified at trial.  Kirola's post

15  hoc effort to supplement the trial record is unavailing.  The Supreme Court has made it

16  clear that when standing is disputed at "the final stage" of a case, standing must be

17  established by "evidence adduced *at trial*."  See Lujan, 504 U.S. at 561; Maine People's

18  Alliance, 471 F.3d at 283; Perry, 186 F.3d at 829.

19       20.   Limiting the evidence of Kirola's standing to the trial record is necessary and

20  appropriate as a matter of due process.  Both Kirola's deposition testimony and her

21  declaration constitute inadmissible hearsay.  Fed. R. Evid. 801(c); Orr v. Bank of Am., NT

22  & SA, 285 F.3d 764, 779 (9th Cir. 2002) ("Deposition testimony, irrespective of its

23  contents, is ordinarily hearsay when submitted at trial"); but see Fed. R. Civ. P. 32(a)(4)

24  (providing an exception to the hearsay rule for deposition testimony where the witness is

25  unavailable).  Namely, both documents consist of out-of-court statements offered to

26  establish the truth of the matter asserted—to wit, that Kirola did, in fact, encounter access

27  barriers as described and consequently suffered an injury in fact.  Kirola has not shown that

28  these statements are subject to any hearsay exception, and otherwise provides no authority

1  suggesting that it would be fair or appropriate for the Court to consider her out-of-court

2  statements, which were not subject to cross-examination by the City at trial.[12]

3      21.    In sum, the Court finds that Kirola's standing must be evaluated based on the

4  trial record.  Consequently, Kirola cannot rely on her deposition testimony or statements

5  presented in a declaration previously filed in support of her class certification motion to

6  bolster the trial record for the purpose of establishing her standing.  See Lujan, 504 U.S. at

7  561; cf. Simon v. Shearson Lehman Bros., 895 F.2d 1304, 1323 (11th Cir. 1990) (when a

8  party chooses not to present evidence at trial for strategic or tactical reasons, it is not an

9  abuse of discretion to deny the party's request to re-open the record before entry of

10  judgment).

11              **2.    Neighborhood Access**

12      22.    Kirola avers that she suffered an actual injury as a result of encountering

13  access barriers in and around her neighborhood.  While recognizing that accessible

14  programs, services and facilities may be available elsewhere in the City, Kirola contends

15  that the City is obligated to ensure that its programs and services are accessible on a

16  neighborhood basis.  E.g., Dkt. 604, 20:8-9, 25:2-4.  By extension, Kirola contends that she

17  has standing to sue for access barriers in other areas of San Francisco that she did not

18  actually encounter.

19      23.    As support for her position, Kirola relies principally on Chapman v. Pier 1

20  Imports (U.S.) Inc., 631 F.3d 939, 943 (9th Cir. 2011) (en banc) ("Chapman I").  In that

21  case, a mobility-impaired individual brought an individual Title III public accommodations

22  action against a retailer, Pier 1, claiming that he encountered barriers at a particular location

23  of a national retailer that impeded his access.  The court held that when a plaintiff "has

24

25  _____
   [12] The vast majority of the deposition testimony Kirola now wishes the Court to
26  consider was never previously presented to the Court.  Although the first volume of
   Kirola's deposition was submitted to the Court in connection with the motion for class
27  certification, the second volume of her deposition, as Class Counsel now admits, was never
   previously provided to the Court.  Dkt. 673, 1:13-17; see also Dkt. 189-2, Exh. 15.  All but
28  one alleged access barrier which Kirola now wishes the Court to consider was discussed in
   the second volume.  Dkt. 673.

suffered an injury in fact by encountering a barrier that deprives him of full and equal enjoyment of the facility due to his particular disability," he has standing to sue for injunctive relief, "either by demonstrating deterrence, or by demonstrating injury-in-fact coupled with an intent to return to a noncompliant facility."  Chapman I, 631 F.3d at 944. Additionally, the court held that "an ADA plaintiff who establishes standing as to encountered barriers may also sue for injunctive relief as to unencountered barriers related to his disability."  Id.

24.     Kirola argues that like the plaintiff in Chapman I, it is unnecessary for purposes of standing that she actually encountered the barriers which she seeks to address, and that standing may be established based solely on her experience with facilities in her neighborhood.  Chapman I, however, is distinguishable in at least two critical respects. First, Chapman I was an individual lawsuit and thus did not address the standards for evaluating standing in a class action.  Second, the claims in Chapman I were premised on Title III of the ADA, as opposed to Title II, which does not require that each individual site at which a public service is offered be accessible, so long as the program, activity or service, "when viewed in its entirety," is readily accessible.  See 28 C.F.R. § 35.150(a) & (a)(1) ("This paragraph does not . . . [n]ecessarily require a public entity to make each of its existing facilities accessible to and usable by individuals with disabilities.").  "In contrast, Title III of the ADA, which governs places of public accommodation, imposes *more stringent requirements* aimed at ensuring that *every facility is equally accessible* to disabled persons."  Cohen, 754 F.3d at 695 n.4 (citing Disabled Rights Action Comm. v. Las Vegas Events, Inc., 375 F.3d 861, 882 (9th Cir. 2004)) (emphasis added); see also Cary LaCheen, Using Title II of the Americans with Disability Act on Behalf of Clients in TANF Programs, 8 GEO. J. ON POVERTY L. & POL'Y 1, 119-20 (2001) ("Given . . . the fact that the

1    unit of analysis for determining accessibility is different under Title II and Title III, Title III

2    will often be a more stringent access standard for a particular program site than Title II.").[13]

3         25.    Because the proper unit of analysis under Title II of the ADA is *programs*

4    *and services*—not the *individual sites* at which they are offered—it is possible for a

5    program, when viewed in its entirety, to be in compliance with the ADA, even if some

6    aspects of facilities where the programs are offered are inaccessible.  E.g., Daubert, 760

7    F.3d at 987-988 (holding that the mere fact that some of the bleachers in the football

8    stadium were not accessible did not result in the denial of program access to the school

9    district's football program); Bird v. Lewis & Clark College, 303 F.3d 1015, 1022 (9th Cir.

10   2002) ("Accessibility is not location-dependent; rather, as we have explained, the essential

11   inquiry is whether the program overall is accessible").  Accordingly, a Title II plaintiff

12   cannot establish standing by merely pointing to a few isolated access barriers in her

13   neighborhood.  Rather, to establish standing, a Title II plaintiff must show that the barriers

14   she encountered amounted to a wholesale denial of "meaningful access" to the challenged

15   program, service, or activity, when viewed in its entirety.  See Armstrong, 275 F.3d at 861

16   (citing Alexander v. Choate, 469 U.S. 287, 295 (1985)).

17        26.    The two out-of-circuit district court cases cited by Kirola are likewise

18   unavailing.  See Kerrigan v. Philadelphia Bd. of Elections, No. 07-687, 2008 WL 3562521,

19   *17-18 (E.D. Pa. 2008); Westchester Disabled on the Move, Inc. v. Cnty. of Westchester,

20   346 F. Supp. 2d 473, 478 (S.D.N.Y. 2004).  Both of those cases involved the provision of

21   accessible polling places on a neighborhood basis, and presented issues including the threat

22   of voter disenfranchisement and the fact that registered voters are specifically assigned to

23

24        [13] In addition, unlike Title III, ADA Title II regulations also allow public entities to
     utilize a variety of methods to render existing facilities "readily accessible," including the
25   "reassignment of services to accessible buildings" and the "delivery of services at alternate
     accessible sites," among others.  28 C.F.R. § 35.150(b); see also Tenn. v. Lane, 541 U.S.
26   509, 511 (2004) ("Title II does not require States to employ any and all means to make . . .
     services accessible or to compromise essential eligibility criteria for public programs.  It
27   requires only 'reasonable modifications' that would not fundamentally alter the nature of
     the service provided, and only when the individual seeking modifications is otherwise
28   eligible for the service.").

polling places near their registered addresses so as to encourage and facilitate voting.  See, e.g., Kerrigan, 2008 WL 3562521, *1 (noting that the Philadelphia Board of Elections and the Commissioners of the City of Philadelphia "assign each registered voter to a specific division near his or her home" and estimating there to be between 1,000 and 1,200 polling places in the City of Philadelphia).  The issues relating to the location of polling places and whether voters have access to a public entity's "program of voting" are separate and distinct from whether disabled persons have program access to the City's facilities and public right-of-way.  Accordingly, the Court finds these cases to be inapposite.

27.     In sum, the Court finds no merit to Kirola's contention that she need only establish that she encountered barriers within her neighborhood in order to have standing to seek injunctive relief with respect to the City's programs, services and activities at issue. She must instead prove that she was denied access to the foregoing in their entirety.[14]

### 3.     Testimony of Class Members

28.     Kirola argues that she may satisfy her burden of demonstrating standing based on the experiences of persons other than herself; to wit, class members.  Dkt. 672, 13:22-14:3.  This contention also lacks merit.  "[I]n class actions, the named representatives must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  Pence v. Andrus, 586 F.2d 733, 736-37 (9th Cir. 1978) (internal citations omitted); see also Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972) (holding that "the 'injury in fact' test requires more than an injury to a cognizable interest.  It requires that the party seeking review be himself among the injured.").  As such, "if none of the named plaintiffs purporting to represent a class establishes the requisite of a case or controversy with the defendants, none may seek relief on behalf of himself or any other member of the class."  O'Shea, 414 U.S. at 494; Cornett v. Donovan, 51 F.3d 894, 897 n.2

---

[14] Furthermore, as set forth above, the Court finds that the testimony proffered by Kirola's experts in support of Kirola's neighborhood theory lacks credibility.  Not only do such experts' conclusions conflict with the law, they are unsupported by any discussion of professional or industry understandings of Title II's program access requirements.

1    (9th Cir. 1995) ("if the representative parties do not have standing, the class does not have

2    standing.").

3        29.    Kirola cites <u>Armstrong</u> for the proposition that the experiences of other class

4    members may be considered in assessing whether she has standing. Dkt. 672, 13:28.  In

5    <u>Armstrong</u>, a class of disabled prisoners and parolees brought a class action alleging that

6    policies and practices related to parole and parole revocation hearings violated the ADA.

7    275 F.3d at 854-55.  The Ninth Circuit held that when prospective injunctive relief is

8    sought, the plaintiff must show not only that he suffered an actual injury, but also that he is

9    "realistically threatened" with a repetition of the violation which led to that injury.  <u>Id.</u> at

10   861-62.  A likelihood of recurrence may be shown where the injury stems from a written

11   policy or the harm is part of a pattern of officially sanctioned conduct.  <u>Id.</u> at 861.  In

12   discussing the latter theory of recurrence, the court explained that "[w]hen a named plaintiff

13   asserts injuries that have been inflicted upon a class of plaintiffs, [the court] may consider

14   those injuries in the context of the harm asserted by the class as a whole, to determine

15   whether a credible threat that the named plaintiff's injury will recur has been established."

16   <u>Id.</u>

17       30.    Kirola's analysis of <u>Armstrong</u> mixes apples with oranges.  <u>Armstrong</u>

18   discusses two separate components to standing:  First, the named plaintiff's ***actual injury***;

19   and second, the realistic ***threat of repetition***, i.e., whether the plaintiff's injury is likely to

20   recur, which applies where injunctive relief is sought.  <u>Id.</u> at 860-61.  The court found that

21   in connection with the latter, injuries suffered by class members may be pertinent.  <u>Id.</u> at

22   861.  Significantly, nowhere in its opinion did the <u>Armstrong</u> court state that the threshold

23   inquiry of whether the named plaintiff suffered an injury in fact may be analyzed based on

24   evidence of harm sustained by the class.  <u>Armstrong</u> thus provides no support for Kirola's

25   claim that the Court must consider the experiences of class members in determining

26   whether the named plaintiff suffered an actual injury.  The Court therefore declines to

27   consider the testimony of other class members in assessing whether Kirola satisfied her

28   burden of establishing that she "personally" has been injured as a result of the policies and

practices at issue in this case. See Pence, 586 F.2d at 736-37 (holding that a named class representative's standing must be based on the injury he sustained, as opposed to those suffered by class members).

### 4. "Overarching Policy"

38. Finally, Kirola argues that she need not demonstrate her standing to challenge each of the eleven policies and procedures she identified in post-trial briefing. Rather, Kirola now asserts that the City has an "overarching policy of leaving disability access barriers in place," and that she has standing to challenge this "official" policy. Dkt. 672, 1:16-28, 5:6-20:4, 25:18-19. She denies that this is a newly-asserted theory of liability, and claims that the Court characterized the case in this manner in its order granting her motion for class certification. Dkt. 681, 2:24-3:4.

39. As an initial matter, Kirola's contention directly contradicts her prior representation to the Court that she is specifically challenging the eleven policies and practices identified in her prior post-trial briefing. Dkt. 662, 13:12-14:17. That aside, Kirola's "overarching policy" argument makes no sense. The mere fact that an access barrier is left "in place" does not automatically demonstrate a violation of Title II of the ADA. Title II emphasizes "program access," which entails reviewing the program or service in its entirety, as opposed to whether every element of a facility through which a program or service is presented is fully accessible. See Daubert, 760 F.3d at 986. Consequently, a barrier may be left in place without necessarily violating Title II.

40. Kirola cites Arreola v. Godinez, 546 F.3d 788, 795 (7th Cir. 2008), for the proposition that this Court, in determining standing, must look at the "case as a whole, rather than picking apart its various components to separate the claims for which the plaintiff will be entitled to relief from those for which he will not." Dkt. 672, 3:9-12. Arreola involved an interlocutory review of a class certification order, and as such, the court focused on the allegations in the plaintiff's complaint to determine if he had satisfied his burden to establish standing at the pleading stage. 546 F.3d at 795. Arreola is

inapposite, where, as here, the issue of standing is being evaluated based on evidence presented at trial.  See Lujan, 504 U.S. at 561.

41.     Irrespective of whether Kirola frames her challenge as one to an "overarching" policy or to eleven specific policies and practices, Kirola lacks standing in either instance.  As will be established in the sections that follow, Kirola has not shown that she has suffered an injury in fact resulting from any access barrier she testified to having encountered.  Having failed to make this showing, she cannot, by extension, demonstrate any injury resulting from any allegedly impermissible policy or practice.

### 5.     Summary

42.     Kirola must demonstrate that she has standing based upon *her* personal experience as set forth in her trial testimony, and not upon the experiences of class members or any extra record evidence.  In addition, Kirola must establish that she was personally denied meaningful access to the challenged programs, services and activities in their entirety, as opposed to specific facilities.  The Court now addresses whether Kirola has met her burden of establish standing within the meaning of Article III.

### C.     ARTICLE III STANDING

43.     The City challenges Kirola's standing, arguing that she has failed to demonstrate that she suffered an injury in fact or demonstrated that her injuries will be redressed by a favorable decision in this action.[15]  In addition, the City argues that Kirola has not established a likelihood of recurrence—an additional standing requirement in cases where prospective injunctive relief is sought.

---

[15] Though the City mentions causation, it does not specifically address that element. Nonetheless, the Court notes that the "'fairly traceable' and 'redressability'' components for standing overlap and are 'two facets of a single causation requirement.'" Wolfson v. Brammer, 616 F.3d 1045, 1056 (9th Cir. 2010) (citing Allen v. Wright, 468 U.S. 737, 753 n.19 (1984)).  The fairly traceable or causation requirement examines the connection between the alleged misconduct and injury, whereas redressability analyzes the connection between the alleged injury and the requested relief.  Id.

44.     The Court agrees that Kirola has failed to carry her burden of establishing standing by a preponderance of evidence with respect to the challenged programs, services and activities.  See Lujan, 504 U.S. at 561; Perry, 186 F.3d at 829.

### 1.     Injury in Fact

45.     To establish injury in fact under the ADA, a plaintiff must show that she has been deprived of "meaningful access" to a challenged service, program, or activity in its entirety.  Armstrong, 275 F.3d at 861 (citing Choate, 469 U.S. at 295); Fortyune v. City of Lomita, 766 F.3d 1098, 1102 (9th Cir. 2014) (holding that program access requires that "the city's system of sidewalks and pedestrian walkways," when viewed in their entirety, "be 'readily accessible to and useable by individuals with disabilities.'"); 28 C.F.R. § 150(a).  Whether program access is being provided "is necessarily fact specific."  Pierce v. Orange Cnty., 526 F.3d 1190, 1222 (9th Cir. 2008).

46.     Kirola alleges that she encountered "numerous access barriers that denied, limited or interfered with her ability to access the City's pedestrian right of way."  Dkt. 672, 17:4-5.  However, Kirola, who testified only briefly, offered minimal testimony at trial to establish that she suffered an injury in fact.  Specifically, Kirola only briefly discussed: (1) three stretches of sidewalk containing "bumps," (2) a sidewalk where her wheelchair became stuck in a tree well; (3) one street corner that lacked curb ramps, (4) one street corner that provided only a single curb ramp, (5) errant step stools at three of the City's libraries, (6) three inaccessible pools, and (7) steep paths at one park.  See RT 1384:13-21, 1382:4-18, 1387:2-4, 1385:3-1386:8, 1386:15-19, 1388:5-7.

47.     Starting first with the City's system of sidewalks and pedestrian walkways, the Court finds that Kirola has failed to show that it is inaccessible and unusable in its entirety.  The City's public right-of-way consists of approximately 2,000 miles of sidewalks, 27,585 street corners, and 7,200 intersections.  RT 2391:23-25, 2447:6-18.  Yet, Kirola only testified regarding accessibility issues she experienced with three sidewalks, a tree well, and a single street corner lacking curb ramps.  RT 1381:14-21, 1384:13, 1386:22-1387:18.  Even then, little, if any, testimony was offered or elicited as to the nature and

extent of the uneven sidewalks from which the Court could ascertain whether the purported

defect constitutes an access barrier within the purview of the ADA.[16]

48.     Although Kirola testified that, on occasion, she "had to make a conscious

effort to take a different route" due to uneven sidewalks or missing curb ramps, RT 1384:8-

10, 1382:8-9, the probative value of such testimony is undermined by the complete lack of

any facts or details regarding any alternate route that she was required to take.  See Cohen,

754 F.3d at 697 ("The ADA allowed [the city of] Carlsbad to compel disabled persons to

travel a 'marginally longer route' under some 'limited circumstances,' as long as its

programs were still accessible as a whole.  The mere fact that some city sidewalks did not

have curb ramps was therefore insufficient to create a triable issue as to whether Carlsbad

violated Title II.") (citing Schonfeld v. City of Carlsbad, 978 F. Supp. 1329, 1341 (S.D.

Cal. 1997)); ADA Title II Technical Assistance Manual, II-5.3000 Curb Ramps

("Alternative routes . . . may be acceptable under the concept of program accessibility in

the limited circumstances where individuals with disabilities need only travel a marginally

longer route."); c.f. Frame v. City of Arlington, 657 F.3d 215, 236 (5th Cir. 2011) (noting

that standing was shown at the pleading stage where "the plaintiffs have alleged *in detail*

how specific inaccessible sidewalks negatively affect their day-to-day lives by forcing them

to take longer and more dangerous routes to their destinations.") (emphasis added).

49.     With regard to the City's RecPark program, which consists of approximately

220 parks spanning 4,200 acres of park space and 400 structures (i.e., clubhouses,

recreation centers, etc.), Kirola complained of accessibility issues at only one park:  Alamo

Square Park.  RT 2264:13-17, 2302:12-16, 1385:3-16, 1394:2-4.  Kirola testified only that

the entrance "is steep to use" and that she was unable to enter the children's play area,

---

[16] As an ancillary matter, Kirola complains that the City's historic curb ramp design standards in effect from 1994 to 2004 resulted in the design and installation of curb ramps that included a half-inch lip in violation of ADA regulations.  Dkt. 662, 13:20-22. Although the City's current curb ramp design standards have since eliminated use of the half-inch lip, Kirola apparently takes issue with the fact that not all of the lips have been removed.  Nonetheless, no evidence was adduced at trial that Kirola encountered a curb ramp having a half-inch lip, let alone experienced any difficulty navigating a half-inch lip while using a motorized wheelchair.

ostensibly attributable to steep paths.  RT 1385:3-16, 1394:2-4.  The fact that Kirola was unable to access one area of the park does not establish an ADA injury.  Indeed, one of her experts (Steiner) testified that "even just [access to] a small part of the park would be sufficient to provide program access."  RT 717:10-21.  In any event, Kirola offered no specific information regarding measurements, dimensions, or slopes of the paths at Alamo Square Park, which she admits is located on a steep hill.  RT 1394:2-3.  Although Kirola is not expected or permitted to offer expert testimony regarding whether the entrance and paths at Alamo Square Park are ADA-compliant, her testimony is too general to persuade the Court that she was denied meaningful access to the park, let alone meaningful access to the City's RecPark program in its entirety.

50.     Equally uncompelling is Kirola's testimony regarding her experiences at Balboa Pool, Garfield Pool and Rossi Pool.  She alleges that Balboa Pool is inaccessible due to its steep entrance ramp and inadequate locker rooms, and that Garfield Pool lacks sufficient clearance in the locker room and restrooms.  Though Kirola has not used Rossi Pool, she was deterred from going there based on the comments of others.  RT 1388:5-6, 388:7-17, 1386:12-19.  The fact that Kirola may have experienced accessibility issues with these three pools is insufficient to demonstrate that she suffered an actual injury resulting from the denial of meaningful access to the City's aquatic program.  None of these three pools has been designated as a fully-accessible pool, and the City does not rely on them to provide program access.  DTX F16.[17]  In contrast, the Court is persuaded that the City's aquatic program, when viewed in its entirety, provides program access.  Kirola's ability to meaningfully access the City's aquatic program is underscored by the fact that she regularly uses Hamilton and MLK Pools, which were previously renovated and designated by the City as accessible.  RT 1392:17-1393:23.

51.     Finally, Kirola has not shown an injury in fact resulting from the lack of program access to the City's library program.  The only "barriers" she encountered were

---

[17] With regard to Sava Pool, Kirola noted that the sidewalk is cracked near the facility but that the pool itself is accessible.  RT 1386:22-1387:13

1   the occasionally misplaced step stools at three libraries (the Main Library and the Western

2   Addition and Parkside Branch Libraries) which impeded her aisle access. RT 1386:1-2.

3   However, the ADA applies to architectural barriers, not temporary or removable

4   obstructions. See Sharp v. Island Restaurant-Carlsbad, 900 F. Supp. 2d 1114, 1126-27

5   (S.D. Cal. 2012) (misplaced chairs blocking the path of travel to a restroom were not

6   architectural barriers under the ADA); see also Cal. Council of the Blind v. Cnty. of

7   Alameda, 985 F. Supp. 2d 1229, 1240 (N.D. Cal. 2013) (noting that 28 C.F.R. § 35.133

8   does not prohibit isolated or temporary interruptions in service or access due to

9   maintenance or repairs). Whether a barrier is temporary or removable presents a question

10  of fact. See Cal. Council of the Blind, 985 F. Supp. 2d at 1240 (noting that "the duration

11  of, frequency of, and reason for the failure of accessible voting machines to operate

12  properly is a question of fact.").

13          52.     Based on the record developed at trial, the Court is persuaded that the

14  misplaced step stools encountered by Kirola are not architectural barriers. On a daily basis,

15  the City requires its library staff to use a Daily Facility Checklist to inspect for any

16  obstructions and to maintain the accessibility of each library facility. RT 2235:22-

17  2237:13, 2252:10-2253:21; DTX A45. Thus, even if library staff only checked for

18  misplaced stools once a day—which Kirola has not shown—such "barrier" would

19  temporarily exist for no more than twenty four hours. Moreover, Kirola testified that she

20  did not encounter misplaced stools the majority of times she used these three libraries, RT

21  1386:6-12, and there is no evidence that she experienced any inability or difficulty in

22  utilizing the services at these particular libraries, or with respect to the City's library

23  program in its entirety.

24          53.     Citing Chapman v. Pier 1 Imports, 870 F. Supp. 2d 995 (E.D. Cal. 2012)

25  ("Chapman II"), Kirola argues that misplaced stools, in fact, may qualify as an accessibility

26  barrier under the ADA. In Chapman II, the plaintiff brought an action against a retail store

27  known as Pier 1 Imports ("Pier 1"), claiming, inter alia, that the store aisles were blocked

28  by merchandise, which, in turn, impeded his access in violation of Title III of the ADA. In

its summary judgment motion, Pier 1 argued that the obstructions were "only temporary," and that regulations promulgated under the Title III of ADA do not impose liability for "isolated or temporary" interruptions to accessibility. Id. (citing 28 C.F.R. § 36.211(b)).[18] In addressing this argument, the court explained that a "temporary" maintenance barrier is "an object that is unavoidably placed in the aisle, but with the intention of removing it as soon as possible." Id. The court denied defendant's motion for summary judgment, finding that there was a factual dispute regarding whether the blockages were isolated or temporary, and that the plaintiff had presented evidence that the barriers were recurring and prevented him from accessing store merchandise. Id. at 1009.

54.     Kirola argues that, like the merchandise in Chapman II, the stools are not merely "temporary" barriers because library staff only conduct a full inspection of facilities once per day, and therefore, the stools are not removed "as soon as possible." Chapman II is distinguishable. Whereas the merchandise in the Pier 1 store aisles was intentionally placed there by store employees, there is no evidence that the step stools were placed in the stacks as a routine matter by library staff. To the contrary, the limited testimony presented by Kirola on this issue suggests that the stools were placed in the aisle by other library patrons. In addition, unlike the plaintiff in Chapman II, Kirola has made no showing that the occasional misplaced stools interfered with her ability to access library services at a particular library, let alone precluded her access to the City's network of libraries in its entirety. 28 C.F.R. § 35.150(a).

55.     In sum, the Court finds that Kirola has failed to show, by a preponderance of the evidence, that she has constitutional standing to bring any of the claims alleged in her FAC. Accordingly, she lacks standing to pursue this action individually or on behalf of the class she was appointed to represent.

---

[18] Section 36.211 is the Title III analogue to 28 C.F.R. § 35.133, which applies in Title II cases.

1

## 2. Redressability

2      56.     Even if Kirola had suffered an actual ADA injury, she has not shown

3   redressability, as required under <u>Lujan</u>.  In order to demonstrate redressability, a plaintiff

4   must show that plaintiff "personally would benefit in a tangible way from the court's

5   intervention."  <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 103 n.5 (1998) (citing

6   <u>Warth v. Seldin</u>, 422 U.S. 490, 508 (1975)).  Furthermore, any "remedy must of course be

7   limited to the inadequacy that produced the injury in fact that the plaintiff has established."

8   <u>Lewis v. Casey</u>, 518 U.S. 343, 357 (1996).

9      57.     Kirola seeks a broad permanent injunction relating to virtually every aspect of

10  the City's operation and management of its facilities, programs and services.  Dkt. 635.

11  However, the nexus between Kirola's injury and the relief sought is lacking.

12     58.     With regard to curb ramps, Kirola seeks an injunction requiring the City to,

13  within ten years of judgment, construct an accessible curb ramp at every existing or

14  potential curb ramp location, except for those locations where the City is able to document

15  that a curb ramp is not required.  Dkt. 632, 2:24-3:10.[19]  But curb ramp saturation—which

16  is not required under the ADA—is already part of the Curb Ramp and Sidewalk Transition

17  Plan.  Although the City's curb ramp transition plan does not contain a specific deadline for

18  completion, the City anticipates achieving curb ramp saturation within approximately

19  twelve years.  Dkt. 657, 4:12-13.  There is no evidence that the marginally expedited

20  deadline (ten vs. twelve years) proposed by Kirola would redress any supposed injury she

21  suffered due to missing curb ramps.  In fact, Kirola's sole curb ramp request (for the corner

22  of McAllister and Fillmore) was fulfilled in less than two years and would not have been

23  constructed any sooner under her proposed injunction.  RT 1383:19-1884:8, 1391:18-

24

25

26      [19] Kirola asserts that she selected the ten-year time frame to allow the City to plan
    barrier removal in harmony with its existing ten-year capital planning process.  Dkt. 672,
27  14:28-15:3.  Trial testimony shows, however, that the City's ten-year capital plan is a mere
    planning tool, not a set schedule or budget, and that the City prepares a new ten-year plan
28  each year.  RT 1511:4-14, 1534:19-25.

1392:2.  As such, Kirola's proposed remedy would not have resulted in a more expeditious response to her request.[20]

59.     Redressability also is absent with respect to Kirola's accessibility complaints pertaining to the City's sidewalks.  Kirola proposes an injunction requiring the City to inspect and repair all sidewalk-related barriers along its 2,000 miles of sidewalk in 10 years, and thereafter implement a 15-year inspection cycle—rather than the current 25-year cycle under SIRP (the City's current sidewalk inspection plan).  Dkt. 635, 5:1-5.  She also insists that, within ninety days of judgment, the City identify alternative, accessible routes wherever the City contends that removal of a sidewalk barrier is unnecessary for program access.  Dkt. 635, 4:6-27.

60.     Underlying Kirola's proposal for a shorter inspection cycle is her failure to recognize that SIRP operates in tandem with ASAP (i.e., Accelerated Sidewalk Abatement Program).  Whereas the SIRP is a "proactive" program in which the City seeks out sidewalks in need of repair, the ASAP is a "reactive" program in which the City repairs sidewalks in response to public complaints.  RT 2453:18-2454:12.  Accessibility complaints regarding sidewalks are given high priority and responded to immediately, and are typically resolved in ninety days.  RT 2454:1-12.  Here, Kirola never complained to the City about the three stretches of sidewalk she testified about.  Had she done so, the trial record establishes that her complaints would likely have been addressed within a matter of months.  The Court is thus unpersuaded that the remedy of requiring the repair of all sidewalks within ten years is necessary or would redress the harm allegedly caused by the three sidewalks about which Kirola testified.

---

[20] Kirola also complains that the City's Paving Guidelines inappropriately allow the City to defer curb ramp installation in connection with a street paving project for up to twenty-four months when a pre-planned project would require demolition of a newly constructed curb ramp.  DTX N23 [000003].  She proposes an injunction eliminating this deferment.  Dkt. 635, 5:5-20.  However, Kirola acknowledges that, despite having lived in San Francisco for almost twenty years, she has "not yet encountered an inaccessible corner or curb ramp" as a result of the Paving Guidelines or shown that she is likely to do so in the future.  Dkt. 672, 18:17-18.  Further, no evidence was presented at trial showing that the City has actually deferred installation of a curb ramp under this policy.

61.     With regard to the City's RecPark facilities and pools, Kirola seeks an injunction directing the City to:  (1) conduct a survey of every pool, park and recreational facility in the City within nine months of judgment, identifying every facility containing a barrier under ADAAG; (2) prepare a program access plan within eighteen months; and (3) remove all barriers necessary to ensure program access in ten years.  Dkt. 632, 7:12-28. Kirola has not established how this proposed remedy would redress any alleged injury.

62.     Kirola complained about barriers at Balboa Pool, Garfield Pool and Rossi Pool.  The law is clear that the City has no obligation under Title II of the ADA to ensure that each facility through which it offers its aquatics program is fully accessible. Nevertheless, at the time of trial, the City had already embarked on a barrier removal project at Garfield Pool, RT 1813:13-1814:4, and Rossi Pool and Balboa Pool have since been scheduled for barrier removal, Dkt. 658-1.  As such, Kirola would not personally benefit in a tangible way from the Court's intervention, since the few barriers she encountered are already being addressed by the City on a more expeditious schedule as compared to her proposed remedy.

63.     The same lack of redressability is evident in terms of Kirola's experience using City parks.  The only park at which Kirola claimed to have encountered accessibility barriers was Alamo Square Park.  RT 1385:5-15.  Even if Kirola's vague testimony was sufficient to demonstrate that she was denied meaningful access to Alamo Square Park— which it is not—no showing has been made that her proposed remedy would correct those purported defects.  In addition, a survey of Alamo Square Park to ascertain its compliance with ADAAG would not benefit Kirola because ADAAG's dimensional requirements do not apply to outdoor recreational facilities or open spaces.  RT 2048:9-15; 2064:21-25.

64.     Finally, with regard to the City's libraries, Kirola seeks an injunction requiring the City to:  (1) complete work on both the Bayview Branch Library and the North Beach Branch Library within 2 years; and (2) rectify all alleged barriers identified by Kirola's experts within 120 days.  Dkt. 632, 8:27-9:3.  However, Kirola presented no evidence that she encountered any accessibility barriers at either of these libraries, or that

she has ever attempted, let alone desires, to use either facility. Nor does her proposed injunction bear any relation to the injury she allegedly sustained as a result of having encountered misplaced step stools at three other libraries. As for the second aspect of the proposed remedy, i.e., to rectify barriers identified by her experts, none of them cited the presence of step stools in library aisles. As such, Kirola's proposed remedy regarding the library system would not address her alleged injury, i.e., encountering stools in the stacks at three other libraries.

65. The Court concludes that Kirola has failed to satisfy her burden of demonstrating that any of her injuries resulting from the alleged denial of meaningful access will be remedied by the relief she seeks in this action. Sprint Commc'n Co., 554 U.S. at 274-75. Thus, independent of her failure to demonstrate that she suffered an injury in fact, Kirola lacks standing based on her failure to prove redressability.

### 3.   Likelihood of Recurrence

66. Even if Kirola had satisfied the Lujan test for constitutional standing, she has failed to meet the further requirement applicable in cases where prospective injunctive relief is being sought; that is, that injury is likely to recur. "Likelihood of recurrence is established when the plaintiff shows that 'the defendant had, at the time of the injury, a written policy, and that the injury '***stems from***' that policy.'" Taylor v. Westly, 488 F.3d 1197, 1199 (9th Cir. 2007) (emphasis added, citation omitted).

67. There must be "a very significant possibility" that future harm will ensue. Nelsen v. King Cnty., 895 F.2d 1248, 1250 (9th Cir. 1990). In the absence of an immediate threat, federal courts must exercise restraint in interfering with government operations. Midgett v. Tri-Cnty. Metro. Transp. Dist. of Or., 254 F.3d 846, 850 (9th Cir. 2001) ("This 'well-established rule' bars federal courts from interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury." (quoting Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1042-43 (9th Cir. 1999)).

68. Here, Kirola contends that her injuries are likely to recur because they arise from eleven City policies which allegedly violate the ADA. Dkt. 662, 13:15-11. Thus, to

show a likelihood of recurrence, Kirola must demonstrate an injury that "stems from" each

policy.  See Taylor, 488 F.3d at 1199.  Each policy is discussed below.

### a) *Curb Ramp and Sidewalk Transition Plan*

70.     The Curb Ramp and Sidewalk Transition Plan affirms the City's previously

existing policy of achieving curb ramp saturation; that is, the practice of installing a curb

ramp at every pedestrian crossing in the City.  DTX G18.  According to Kirola, the City's

transition plan "does not comply with the three-year implementation period and the January

26, 1995 deadline established by Title II of the ADA (28 C.F.R. § 35.150(c)) for the

completion of any barrier removal necessary for program access."  Dkt. 662, 13:15-18.

71.     Kirola has failed to demonstrate that she suffered any injury that stems from

the Curb Ramp and Sidewalk Transition Plan.  Program access does not require curb ramp

saturation.  See Cohen, 754 F.3d at 696 (holding that Title II regulations do "not require the

City to build curb ramps at every corner during its transition to compliance with the

ADA.").  As such, the fact that Kirola encountered a missing curb ramp at one corner and

bi-directional curb ramps at another is not attributable to any deficiency in the Curb Ramp

and Sidewalk Transition Plan, which actually provides more access than is required by Title

II.  In addition, the evidence presented at trial shows that Kirola routinely and

independently travels across the City, using the City's public right-of-way, public

transportation systems, and paratransit service, which undermines her claim that she has

been injured by the denial of program access resulting from the occasional missing curb

ramp.  RT 1380:12-22, 1392:17-23, 1393:12-23; see also Findings of Fact ¶ 142.

### b) *Historic Curb Ramp Design Standards*

72.     Next, Kirola complains that the City's historic curb ramp design standards in

effect from 1994 to 2004 resulted in the design and installation of curb ramps that included

a half-inch lip in violation of ADA regulations.  Dkt. 662, 13:20-22.  However, no evidence

was presented at trial demonstrating that Kirola encountered a curb ramp with a half-inch

lip.  Accordingly, she cannot legitimately claim that she suffered an injury that stems from

the City's historic curb ramp standards or any curb ramp lip that has not yet been removed

1   under the City's current curb ramp design standards.  DTX H04; RT 1981:9-1985:6,

2   1986:23-1991:24.

3                           *c)*      ***Sidewalk Inspection Repair Plan***

4          73.     Kirola next complains that the SIRP "only inspects and repairs access barriers

5   on a 25 year cycle, and . . . fails to comply with the January 26, 1995 deadline for program

6   access."  Dkt. 662, 13:18-20.  That argument ignores that SIRP operates in tandem with

7   ASAP, a program which ensures that accessibility complaints regarding sidewalks are

8   addressed and rectified, typically within ninety days.  Given that there are 2,000 miles of

9   sidewalks in the City, it is inevitable that Kirola will occasionally experience challenges

10  resulting from cracked or uneven pavement.  The fact that defects can and do arise—

11  attributable, for example, to expanding tree roots or occasional ground movement—does

12  not ipso facto demonstrate that there is a defect in any written policy that caused injury to

13  Kirola.

14                          *d)*      ***Paving Guidelines***

15         74.     The City's Paving Guidelines permit the City to defer curb ramp installation

16  for a period of up to twenty-four months in cases where there is a pre-planned project that

17  would require demolition of the newly constructed curb ramp.  DTX N23.  While

18  acknowledging that she has not been negatively impacted by this policy, Kirola nonetheless

19  contends that she faces a "real threat of injury" given her daily use of sidewalks throughout

20  the City.  Id. at 19:1-8.  However, no evidence was presented at trial showing that the City

21  has actually deferred installation of a curb ramp under the Paving Guidelines.  The mere

22  possibility that the City will delay construction of a curb ramp and that Kirola may be

23  injured as a result is simply "'too speculative to support standing.'"  Ervine v. Desert View

24  Reg'l Med. Ctr. Holdings, LLC, 753 F.3d 862, 868 (9th Cir. 2014) (quoting Friends of the

25  Earth, 528 U.S. at 190).  As the Ninth Circuit has explained, a plaintiff "cannot

26  manufacture standing through bald assertion, contradicted by the record."  Id. (finding that

27  the plaintiff had not shown a real or immediate threat of future injury in regard to the

28  claims asserted).  The Court thus finds that Kirola has not established that there is a

substantial probability that she will be harmed in the future as a result of the City's Paving
Guidelines.

### e)   UPhAS

76.    Kirola complains that the City's facilities transition plan, i.e., UPhAS, fails to
require the removal of barriers that deny program access until the particular facility is
scheduled for renovation.  Dkt. 662, 13:27-14:4.  Yet, no evidence has been presented that
Kirola has been deprived of meaningful access to any program, service or activity because
of the lack of access improvements at an existing facility.  Though Kirola complained of
purported barriers at a few libraries and pools, there is no evidence that she was denied
meaningful access to other facilities within San Francisco or the City's programs and
services in their entirety.  Moreover, every library Kirola uses regularly was completely
renovated prior to trial, and the three pools about which she complained have since been
renovated or are scheduled for renovation.  The Court thus finds that Kirola's has not
shown that she suffered any injury that stems from UPhAS.

### f)   The RecPark Website

77.    Kirola challenges "the City's policy as stated on its [RecPark] website that an
'accessible' park need only provide an 'accessible entrance' and 'at least one recreational
opportunity[.]'"  Dkt. 662, 13:4-27.  Kirola asserts that the RecPark website's definition of
"accessible" constitutes a City policy "of general application" relating to program access
and argues that the policy is discriminatory because it does not require the City to provide
mobility disabled individuals with meaningful and equal access to recreation opportunities.
Dkt. 672, 16:6-12.

78.    The flaw in Kirola's claim is that it fundamentally mischaracterizes the nature
of the information provided on the RecPark website.  Despite Kirola's claim to the
contrary, the website does ***not*** purport to articulate a general policy of what the City
considers to qualify as program access.  Rather, the information is posted on the website
simply to provide the public with information about sites they may wish to visit, and the
website invites further inquiry for more detailed information.  PTX 3875 [075767].

79.     Even if the website defined the meaning of "accessible" as a matter of general policy, Kirola has failed to establish that she suffered any injury as a result of the policy. Of the City's 220 parks, Kirola complained only that the accessible entrance at Alamo Square Park was steep—not that it was inaccessible.  RT 1385:5-8.  Perhaps more fundamentally, Kirola cannot legitimately allege that she suffered any harm stemming from a website which she never used.

### g)     New Construction and Alterations

80.     Kirola contends that "the City's policies and procedures regarding new construction and alterations . . . do not require a close-out inspection for compliance with federal disability access design standards or specific sign-off from the relevant City official that a project is in full compliance with those standards as built."  Dkt. 662, 9:3-10.

81.     At trial, Kirola offered no testimony regarding any architectural barriers at any newly-constructed or renovated library, swimming pool or other RecPark facility.  In the absence of such evidence, Kirola cannot show that she suffered an injury in fact or that such injury stems from any City policy governing new construction and alterations.

### h)     Maintenance Policies

82.     Kirola complains that the City's maintenance policies and procedures "do not set specific and prompt deadlines for the identification and repair of items that are broken, non-operational, or in need of repair."  Dkt. 662, 14:9-11.

83.     Under 28 C.F.R. § 35.133, public entities "shall maintain in operable working condition those features of facilities and equipment that are required to be readily accessible to and usable by persons with disabilities[.]"  28 C.F.R. § 35.133(a).  The section, however, "does not prohibit isolated or temporary interruptions in service or access due to maintenance or repairs."  28 C.F.R. § 35.133(b); see also U.S. Dep't of Justice Technical Assistance Manual, II-3.10000 Maintenance of Accessible Features ("Where a public entity must provide an accessible route, the route must remain accessible and not blocked by obstacles such as furniture, filing cabinets, or potted plants.  An isolated

1   instance of placement of an object on an accessible route, however, would not be a

2   violation, if the object is promptly removed.").

3        84.    At trial, Kirola failed to identify a single barrier that she encountered as a

4   result of something being "broken, non-operational, or in need of repair," much less an

5   ADA barrier that existed because of any maintenance policy.  Dkt. 662, 14:9-11.  The

6   errant stools Kirola encountered on occasion at three libraries have not been shown to be

7   broken, non-operational or in need of repair, nor did they render the particular library—or

8   the library system in general—inaccessible.  She also failed to identify any maintenance

9   issue as to any RecPark facility.[21]  Accordingly, the Court finds that because Kirola has not

10  shown that she suffered any injury stemming from the City's maintenance policies, she

11  cannot show any injury resulting from those policies.

12                         *i)    Grievance Procedures*

13       85.    Kirola alleges that the City's ADA grievance procedures violate Title II's

14  program access requirements on the ground that the City's "written complaint policies and

15  forms make no requirement that disability access barriers be removed within any particular

16  time period, but instead permit the City to take up to two years to remove barriers[.]"  Dkt.

17  662, 14:4-6; Dkt. 672, 25:6-9.

18       86.    Kirola lacks standing to challenge the City's grievance procedure.[22]  At trial,

19  Kirola testified to having made a single request for the removal of an access barrier;

20  namely, her July 2006 request that the City install curb ramps at the corner of Hayes and

21  Fillmore.  RT 1383:19-1384:8, 1391:18-1392:2.  The requested curb ramps were installed

22  in April 2008, less than two years after the requests were made.  RT 1384:7-8.  There also

23  is no evidence in the trial record that Kirola was unable to traverse the intersection or that

24  she was compelled to take a substantially longer alternative route.  To the extent that Kirola

25

26       [21] The uneven sidewalk surfaces identified by Kirola could be considered a
     maintenance issue, and are addressed in the section discussing the SIRP and ASAP.

27       [22] As will be discussed below, even if Kirola had standing, there is no private right
28  of action to challenge an ADA grievance procedure.

1   is complaining about the length of time it took for the City to install the curb ramps, she has

2   presented no evidence to substantiate any injury resulting from such delay or that such

3   delay is attributable to an ineffective grievance procedure.

4                    *j)*      **Safety Hazards Policy**

5        87.    Kirola complains that the City has failed to adopt an overarching "written

6   policy or procedure regarding the identification and removal of safety hazards to persons

7   with mobility disabilities."  Dkt. 662, 14:15-17.

8        88.    At trial, Kirola failed to offer any testimony demonstrating that she

9   encountered any "safety hazards" at any library or RecPark facility.  Though Kirola

10  complained of steep paths at Alamo Square Park, the probative value of such testimony is

11  undermined by the lack of any objective data (such as actual measurements of those paths)

12  to quantify her claim.  Additionally, there is no evidence that those conditions denied her

13  program access.

14       89.    The Court is likewise unpersuaded by Kirola's testimony regarding her one-

15  time experience in which her wheelchair was caught in an exposed tree well.  The record

16  presented at trial shows that, in fact, there was an unobstructed 48-inch-wide accessible

17  path of travel around the tree well.  RT 1383:3-12, 431:3-10; PTX 4140Y.  The Court

18  therefore finds that Kirola has failed to establish any actual and concrete injury in fact in

19  regard to the City's policies related to removal of safety hazards.  See Lujan, 504 U.S. at

20  560-61.

21                    *k)*      **Self-Evaluation/Transition Plan**

22       90.    Kirola asserts that the City has not adopted or implemented a self-evaluation

23  or transition plan in violation of California Government Code § 11135.  Dkt. 662, 14:13-25.

24       91.    Section 11135 provides, in pertinent part, that:

25            No person in the State of California shall, on the basis of . . .
             disability, be unlawfully denied full and equal access to the
26           benefits of, or be unlawfully subjected to discrimination under,
             any program or activity that is conducted, operated, or
27           administered by the state or by any state agency, is funded
             directly by the state, or receives any financial assistance from
28           the state.

1   Cal. Gov. Code § 11135(a).  Regulations promulgated to implement Section 11135 insofar

2   as discrimination based on physical or mental disabilities is concerned, state that a

3   transition and self-evaluation plan "should be required" by the "responsible State agency."

4   Cal. Code Regs., tit. 22, §§ 98251(a), 98258.

5          92.    The City argues that Kirola lacks standing to challenge any alleged non-

6   compliance with California Government Code § 11135 or its regulations based on her

7   failure to demonstrate that she (1) was deprived program access to any state-funded

8   program or activity or (2) encountered any access barriers to a state-funded program or

9   activity because of the alleged absence of a self-evaluation or transition plan.  Dkt. 666,

10  20:20-24.  The Court agrees.  At best, Kirola has presented only bare and conclusory

11  allegations of injury resulting from the City's failure to develop and implement a self-

12  evaluation or transition plan.  Moreover, there is no evidence that each of the specific

13  programs to which she was allegedly denied access is state-funded or otherwise receives

14  financial assistance from the state.  See Cal. Gov't Code § 11135.  As such, Kirola has not

15  shown that she suffered any injury that stems from the City's alleged failure to comply with

16  Section 11135 or its regulations.

17                          *l)      Conclusion*

18         93.    Kirola has failed to establish that she sustained any injury which stems from

19  any written policy.  A fortiori, she has not shown a likelihood of recurrence, which is

20  necessary for standing where prospective, injunctive relief is sought.  Taylor, 488 F.3d at

21  1199.  Thus, separate and apart from the Lujan requirements for Article III standing, the

22  Court finds that Kirola lacks standing to seek the relief she seeks in this action.

23                  **4.      Substitution of Class Representative**

24         94.    Kirola argues that any deficiencies in her standing as a class representative

25  can be rectified by allowing class members who testified at trial to be substituted in her

26  stead.  Dkt. 662, 15:4-16:12.  As support, Kirola cites several cases where courts permitted

27  such a substitution where the class representative's claims became moot.  E.g., United

28  States Parole Comm'n v. Geraghty, 445 U.S. 388, 415 n.8 (1980) ("If the named plaintiff's

1    own claim becomes moot after certification, the court can re-examine his ability to

2    represent the interests of class members.  Should it be found wanting, the court may seek a

3    substitute representative or even decertify the class."); Wade v. Kirkland, 118 F.3d 667,

4    669 (9th Cir. 1977) ("We reverse and remand for a ruling on the outstanding class

5    certification motion, including a determination [of] whether Wade may remain as the class

6    representative despite the mootness of his individual claim or whether putative class

7    members with live claims should be allowed to intervene.").

8         95.    The issue here is not mootness, however, but the lack of standing.  As a

9    result, substitution is not an appropriate solution to Kirola's lack of standing.  See Lierboe

10   v. State Farm Mut. Auto. Ins. Co., 350 F.3d 1018, 1022 (9th Cir. 2003) (finding that the

11   class representative's lack of standing could not be cured by substituting in another class

12   member as the named party, vacating the class certification, and remanding the case to the

13   district court with instructions to dismiss).  "[I]f a case has only one class representative

14   and that party does not have standing, then the court lacks jurisdiction over the case and it

15   must be dismissed; if the case only had this one class representative from the outset, then

16   there is no opportunity for a substitute class representative to take the named plaintiff's

17   place because this means that the court never had jurisdiction over the matter."  Newberg

18   on Class Actions § 2:8 (5th ed. 2013).

19        96.    In view of the above, the Court concludes that Kirola cannot rectify her lack

20   of standing by substituting additional class members as class representatives.  In addition,

21   permitting a substitution at this late stage of the proceeding would be prejudicial to the City

22   and otherwise futile for the reasons discussed below.

23        D.    FINDINGS ON THE MERITS

24        97.    The City contends, in the alternative, that even if Kirola had satisfied her

25   burden of demonstrating Article III standing, she would not prevail on the merits.  The

26

27

28

Court agrees, and finds that Kirola has failed to establish that she is entitled to relief on any of the claims alleged in the FAC.[23]

98.     Plaintiff bears the burden of proving, by a preponderance of the evidence, that the City has violated the ADA.  See In re Exxon Valdez, 270 F.3d 1215, 1232 (9th Cir. 2001) ("The standard of proof generally applied in federal civil cases is preponderance of evidence.").

99.     The City's programs and services at issue consist of its public-right-of-way system along with its library, aquatic and RecPark programs.  See, e.g., Cohen, 754 F.3d at 695.  The Court therefore considers whether Kirola has shown that each of these services or programs is inaccessible in its entirety.  In addition, the Court considers her challenges to certain of the City's policies and procedures, where pertinent.

### 1.     Program Access

100.     "Under Title II of the ADA, the standard for compliance is 'program access,' that is, when viewed in its entirety, the city's [programs, services and activities] must be 'readily accessible to and useable by individuals with disabilities.'"  Carter v. City of Los Angeles, 224 Cal. App. 4th 808, 821 (2014) (citing 28 C.F.R. § 35.159(a), 45 C.F.R. § 84.22(a), and Cal. Gov. Code § 11135(b)).  ADA regulations authorize a public entity to enlist a number of alternative methods to satisfy its program access obligations:

> A public entity may comply with the requirements of this section through such means as redesign of equipment, reassignment of services to accessible buildings, assignment of aides to beneficiaries, home visits, *delivery of services at alternate accessible sites*, alteration of existing facilities and construction of new facilities, use of accessible rolling stock or other conveyances, or any other methods that result in making

---

[23] Kirola claims that she was not able to address the merit-based arguments in the City's Motion for Judgment given the applicable page limitations.  Dkt. 672, 2:1-2.  The Court, however, did not impose page limitations beyond those proscribed by Civil Local Rule 7-2(b) and, in fact, specifically invited the parties to file a request for enlarged page limitations via either a joint stipulation or an individual motion.  Dkt. 663, 8:5-9.  It is also noteworthy that both parties have submitted *substantial* post-trial briefing addressing the merits of this case, which the Court has considered in drafting this Order.  E.g., Dkt. 614, 616, 617, 618, 632, 634, 635, 636, 646, 662, 666, 672, 675, 681, 683.  Therefore, the Court finds no merit to Kirola's contention that she lacked an adequate opportunity to address the issues in this case.

its services, programs, or activities readily accessible to and usable by individuals with disabilities. ***A public entity is not required to make structural changes in existing facilities where other methods are effective in achieving compliance*** with this section.

Id. § 35.150(b)(1) (emphasis supplied).  Program access does not require that each particular facility through which a program is offered be fully accessible.  See Daubert, 760 F.3d at 987.  Rather, the Court must construe the particular program or service "in its entirety" to determine whether it is accessible.  Id.

### a) *Public Right-of-Way*

101.    Based on the record presented at trial, the Court finds that Plaintiff has failed to establish a lack of program access with regard to the City's public right-of-way, i.e., its system of sidewalks, curb ramps and crosswalks.

102.    As an initial matter, Kirola offered no evidence or testimony regarding any accessibility issues with the City's crosswalks.  She did, however, identify three sidewalks which she claims were problematic due to cracks or bumps in the concrete, one instance where her wheelchair became stuck in a tree well (the area around the base of the tree), and one corner lacking curb ramps.  As discussed above, however, the Court finds that Kirola's minimal testimony regarding accessibility issues with the City's right-of-way in its entirety, coupled with her vague testimony, is insufficient to demonstrate that she was denied meaningful access to the City's right-of-way or that the barriers she encountered violated either federal or state accessibility laws.

103.    The testimony of class members and Plaintiff's experts fares no better.  Like Kirola, various class members and mothers of class members testified to having encountered cracked pavement, potholes, uneven sidewalks, and missing or difficult-to-use curb ramps.  RT 541:9-543:21, 1002:11-22, 1031:20-1033:17, 1232:10-1233:4.  The probative value of such testimony is undermined by the non-specific, generalized nature of the testimony offered.

104.    Kimbrough, the mother of a minor class member, claimed that street corners lacking curb ramps were prevalent in her neighborhood.  823:16-829:22.  When asked by

- 88 -

Class Counsel which locations she encountered problems, Kimbrough answered, "All of them really," RT 823:19-20, and later adding that, "They are quite prevalent," RT 825:9-11. Yet, the only specific example discussed was the intersection at Paris Street and Avalon Avenue.  RT 826:8-24, 829:1-2.  Upon cross-examination, Kimbrough conceded that some of the street corners at this intersection, in fact, had curb ramps, and she had difficulty ascertaining which corners did and which ones did not.  RT 824:13-825:11, 844:11-847:4.

105.    Similarly, Grant had difficulty providing specific locations near the Embarcadero BART station where he encountered problems.  RT 878:16-888:13.  O'Neil complained about "many bad curb ramps," yet provided few specifics.  RT 541:9-543:21. Cherry complained about cracked and uneven sidewalks in her neighborhood, but did not specify where she experienced these problems.  RT 1031:20-1033:17.

106.    Notably, none of the problem areas cited by class members or their parents were confirmed by Plaintiff's experts as failing to comply with federal or state access laws. Although Kirola's experts identified alleged access issues at *other* locations, the Court finds their opinions unpersuasive for the reasons set forth above.  See Findings of Fact ¶¶ 180-196.  The above notwithstanding, the fact that Kirola and some class members may have experienced difficulty accessing the City's public-right-of-way, while understandably frustrating, does not prove that the City has failed provide program access as required by the ADA.

107.    Based on the record presented at trial, the Court is satisfied that the City's public right of way system, when viewed in its entirety, affords program access to mobility-impaired individuals.  The lack of curb ramps at some street corners does not amount to a lack of program access.  See Bird, 303 F.3d at 1021 ("Compliance under the [ADA and Rehabilitation Act] does not depend on the number of locations that are wheelchair-accessible; the central inquiry is whether the program, 'when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.'") (citations omitted). Indeed, Title II of the ADA does not require the installation of curb ramps at each and every street corner.  See Cohen, 754 F.3d at 696; accord Carter, 224 Cal. App. 4th at 821;

see also ADA Title II Technical Assistance Manual, II-5.3000 Curb Ramps ("To promote both efficiency and accessibility, public entities may choose to construct curb ramps at every point where a pedestrian walkway intersects a curb.  However, public entities are not necessarily required to construct a curb ramp at every such intersection.").  Despite this, the City endeavors to achieve curb ramp saturation; that is, a curb ramp at every corner.  To that end, the City installs approximately 1,200 new curb ramps each year.  RT 2785:17-2787:13, 2789:3-2790:18; PTX 0022 [003798].  Consistent with DOJ guidelines, the City prioritizes installation of these curb ramps by taking into account citizen requests and whether the proposed ramps are in high utilization areas, including governmental offices, public facilities, public transportation, public accommodations, and commercial districts.  RT 1441:11-1442:15, 1617:2-1619:13, 1956:6-1958:16, 2416:19-22; PTX 0022; DTX G18; see also 28 C.F.R. § 35.150(d)(2) (providing that public entities should give "priority to walkways serving entities covered by the Act, including State and local government offices and facilities, transportation, places of public accommodation, and employers, followed by walkways serving other areas").

108.    Moreover, the City's curb ramp design standards in effect since 2004 require bi-directional curb ramps and the use of smooth transitions.  Each curb ramp is uniquely designed for its designated location, and each design is cross-checked for ADA compliance pursuant to the Quality Assurance Checklist.  The City utilizes a curb ramp grading system, paving guidelines, an inspection program and a priority matrix (part of the Curb Ramp and Sidewalk Transition Plan) to ensure that sidewalks remain accessible and curb ramps are installed and/or repaired where they are needed the most.  Critical data regarding the City's progress is stored in the CRIS database, from which the City is able to ascertain where curb ramps are to be installed.  The transition plan sets a timeframe for completing curb ramp saturation and identifies funding sources.  These measures support the conclusion that the City is in compliance with its Title II obligations.  E.g., Schonfeld, 978 F. Supp. at 1341 (finding that where a city "has constructed curb ramps where necessary to provide access along highly-trafficked routes, has allocated funding and established a schedule for future

1   curb ramp construction, and is addressing the particular intersections identified by plaintiffs

2   as well as other intersections in accordance with ADA priorities," it is in compliance with

3   its Title II obligations).[24]

4        109.   In passing, Kirola attempts to make much of Hecker's 2009 expert report in

5   which he found that the City had not yet installed every curb ramp necessary for program

6   access.  Dkt. 604, 6:20-22; see also RT 2795:19-2796:2.  The trial record, however, does

7   not establish the basis for his opinion or whether the opinion was still valid based on the

8   conditions existing at the time of trial.  In view of the evidence presented at trial showing

9   the City's continuing progress toward program access, the Court finds that Hecker's 2009

10  program access conclusions, without more, fail to satisfy Kirola's burden of ***demonstrating***

11  that the City failed to provide program access to its public right-of-way.

12       110.   With regard to sidewalks, Kirola's complaints present an issue of

13  maintenance, as opposed to construction.  In particular, she complains that the City only

14  proactively inspects its 2,000 miles of sidewalks on a 25-year cycle, which she claims is too

15  long.  This contention lacks merit.  The City inspects approximately 200 blocks per year,

16  with the areas of the greatest pedestrian traffic given the highest priority.  RT 2453:6-17.  In

17  view of the City's financial and staffing constraints, the Court finds nothing objectively

18  unreasonable with this approach.  It is also important to note that the City's inspection

19  policy operates in conjunction with the SIRP, which as discussed more fully above, ensures

20  that complaints regarding sidewalk accessibility are given high priority and remediated,

21  whenever possible, within ninety days.  RT 2454:13-2455:22.  The City's proactive and

22  reactive approach to ensuring sidewalk accessibility is reasonable, appropriate and supports

23  a finding that the City affords program access to its sidewalks.  See Schonfeld, 978 F. Supp.

24  at 1341.

25

---

26       [24] As indicated above, the City installed curb ramps at all the locations identified in
    the pleadings, RT 1392:3-16, effectively rendering Plaintiff's complaints regarding the curb
27  ramps moot.  See Oliver v. Ralphs Grocery Co., 654 F.3d 903, 905 (9th Cir. 2011) ("a
    defendant's voluntary removal of alleged barriers prior to trial can have the effect of
28  mooting a plaintiff's ADA claim.").

111.    Program access to the City's public right-of-way also is enhanced by paratransit services and public transportation.  RT 1636:4-12.  The City operates and subsidizes a paratransit system that offers van and taxi service for persons with disabilities who are unable to use public transportation.  RT 1634:18-1635:1, 1635:21-1636:3.  Kirola testified that she regularly uses public transportation and paratransit, sometimes up to five or six times per week.  RT 1391:9-17.  However, she argues that paratransit is not an effective substitute because not all mobility-impaired persons are able to use its services, and it is not always reliable.  Dkt. 618, 13:1-5.  But the City does not rely exclusively on paratransit or its public transportation system to provide access for mobility-impaired persons.  Those services are simply additional means utilized by the City to enhance access for mobility-impaired and other disabled persons.  See 28 C.F.R. § 35.150 (b)(1).  That the system may not operate perfectly at all times does not show that the City has failed to provide program access to its public-right-of-way system.

112.    Kirola also complains that the City has failed to establish a definition of "program access" with respect to the public right-of-way, and that the City has failed to show that each allegedly non-complaint curb ramp identified at trial is the result of site constraints.  Dkt. 604, 9:22-23; Dkt. 618, 5:7-10.  The flaw in this argument is that it impermissibly attempts to shift the burden to the City, when the burden rests with Kirola.  See Pierce, 526 F.3d at 1217; see also McGary v. City of Portland, 386 F.3d 1259, 1265 (9th Cir. 2004) (noting the elements necessary to state a claim of disability discrimination under Title II).

113.    In sum, the Court finds no merit to Kirola's claim that she or any class member has been deprived of program access to the City's public right-of-way.

### b)    *Library Program*

114.    The City's library program is presented through its network of libraries, which consists of a Main Library and twenty-seven branch libraries.  RT 2222:13-15.  At the time of trial, the City's Main Library and seventeen branch libraries had been made fully accessible, pursuant to the BLIP (Branch Library Improvement Program).

1    Renovations of the three remaining libraries will be completed by 2014.  RT 2227:7-21;

2    2132:23-2135:19; 1797:5-19.  The three branch libraries that were not renovated under the

3    BLIP program had access barriers removed in the 1990's, and since 2004, were the subject

4    of additional access improvements, including automatic door openers.  RT 1796:25-1797:4.

5    Hecker, the City's expert, credibly testified that the number, distribution and features of the

6    City's accessible libraries are sufficient to provide meaningful access to its library program.

7    RT 2763:25-2764:9.

8         115.   Kirola has failed to carry her burden of proving that the City's library

9    program, when considered in its entirety, fails to provide program access for mobility-

10   impaired persons.  Neither Kirola nor any class member testified to having encountered any

11   architectural barriers at any of the City's twenty-eight libraries.  Although Kirola

12   occasionally encountered misplaced stools at three libraries, no evidence was presented that

13   the stools were anything other than a temporary obstruction, or that they impeded her or

14   any class members' ability to utilize any service at those individual libraries or the City's

15   library program in its entirety.  Likewise, none of Kirola's experts offered any opinions or

16   findings specifically regarding the errant library stools or any testimony to support her

17   claim that the City's library program fails to afford program access.

18        116.   In sum, the Court finds no merit to Kirola's claim that she or any class

19   member has been deprived of program access to the City's library program.

20                        *c)*    ***Aquatic Program***

21        117.   The City operates nine public swimming pools as part of its aquatic program.

22   RT 2763:21-2765:5.  As of 2009, six of the nine pools were made accessible.  RT 2767:8-

23   2769:17.  At trial, Hecker credibly testified that the number and distribution of accessible

24   pools located throughout San Francisco is sufficient to provide meaningful access to the

25   City's aquatic program.  RT 2768:4-11.

26        118.   Neither Kirola nor class members presented any compelling evidence to

27   establish a denial of program access to the City's aquatics program.  The three pools Kirola

28   complained about were not designated as accessible at the time of trial.  However, program

access does not require the City to make *every* pool accessible.  Rather, the City ensures program access to it aquatics program through its other pools.  Notably, Kirola acknowledged that she regularly uses Hamilton and MLK Pools—the latter of which is her "favorite"—without difficulty.  RT 1392:17-1393:23.

119.    The testimony of class members likewise fails to demonstrate a lack of program access.  Kimbrough complained that the ramp at Balboa Pool is too steep for her younger disabled daughter to access the pool area and watch her sister take swim lessons.  RT 848:18-24, 838:12-839:19.  Although Coffman Pool is only one mile further away and fully accessible, Kimbrough stated that she does not want to take her family there because her eldest daughter's swimming instructor teaches at Balboa Pool, and she feels that Coffman Pool is not located in a safe neighborhood.  RT 849:10-17, 852:19-853:2.

120.    The Court finds that Kimbrough's testimony fails to demonstrate a denial of program access.  Watching a sibling take swim lessons is not a program, activity, or service provided by the City.  See Daubert, 760 F.3d at 987 ("experiences that are merely incidental to normal government functions are not fairly characterized as government programs under 28 C.F.R. § 35.150.").  But even if Balboa Pool were inaccessible, the fact remains that there are a variety of other pools which are fully accessible and available to her, including Coffman pool, which is only a mile further away.[25]  That Kimbrough may personally dislike Coffman Pool, without more, has no bearing on whether the City is in compliance with its obligation to render its aquatic program accessible to mobility-impaired persons on a program access basis.  See Daubert, 760 F.3d at 988.

121.    Monasterio, also a mother of a class member, testified that the closest swimming pool to her is Garfield Pool, which lacks "a safe space for her to sit and shower."  RT 1233:21-24.  Although Monasterio thought Garfield Pool was designated as accessible, it is, in fact, designated as having only limited accessibility.  RT 1234:10-12; DTX F16.  In

[25] Plaintiff's expert Steinfeld opined that Coffman Pool and Martin Luther King Jr. Pool (two accessible pools) are too far from Balboa Pool to be considered meaningful alternatives.  RT 673:4-23.  Kimbrough, however, testified that Coffman Pool is only two miles from her home.  RT 852:18-853:2, 848:18-24.

1   any event, Monasterio's negative experience with one of the City's nine pools does not

2   demonstrate a denial of program access to the City's aquatic program.

3          122.    Cherry testified that she once attempted to take a swimming class at MLK

4   Pool but that she had been forced to discontinue the class as a result of the pool's lift being

5   consistently broken over a one-month period.  RT 1043:15-1045:19.  The inoperability of

6   the lift presents a maintenance, as opposed to a barrier, issue.  Nonetheless, the temporary

7   inaccessibility to a swim class at a particular pool does not demonstrate a lack of program

8   access, since the City is not required to provide identical services at each pool.  See Pierce,

9   526 F.3d at 1222 ("We also emphasize that the district court should look at the offerings as

10  a whole and in their entirety and thus the court is not required to ensure that each individual

11  program or service offered at Theo Lacy and Musick is offered in complete parity with an

12  offering at the Central Jail.").[26]

13         123.    In sum, the Court finds no merit to Kirola's claim that she or any class

14  member has been deprived of program access to the City's aquatic program.

### d)    RecPark Program

16         124.    Kirola's evidence regarding the City's RecPark program similarly fails to

17  show a denial of program access.  Of the City's 220 parks, Kirola only complained about

18  the steep entrance and paths at Alamo Square Park, which she acknowledged is located on a

19  steep hill.  RT 1385:3-16, 1394:2-4.  Although Kirola testified that she could not access the

20  playground there, she did not claim that the park was otherwise inaccessible to her.  RT

21  717:10-21.  Nor did she offer any testimony regarding any inability to access the multitude

22  of other parks operated by the City.

23

24

_____

25         [26] As an ancillary matter, Kirola complains that, in violation to 35 C.F.R.
    § 35.163(b) the City fails to provide signage at parks and swimming pools directing
26  disabled persons to other accessible areas of a park or other accessible pools.  Dkt. 604, 18,
    21.  Section 35.163(b), provides, in pertinent part, that "[a] public entity shall provide
27  signage at all inaccessible entrances to each of its facilities, directing users to an accessible
    entrance or to a location at which they can obtain information about accessible facilities."
28  There is no mention of providing signage regarding other accessible facilities.

125.   Cherry, Kimbrough and Monasterio testified regarding accessibility issues at a handful of the City's 220 parks.  Much of the testimony was sparse and non-specific.  For example, Cherry claimed that all of the parks in her area "need help" and "haven't been maintained the way they should," but she did not elaborate further.  RT 1041:1-5.  Monasterio stated that her daughter could not enter the Tea Garden, but did not explain why.  RT 1237:23-1238:1.  Other accessibility complaints pertained to issues inherent in the terrain.  Monasterio stated that the paths at Glen Canyon Park are uneven or unpaved.  RT 1234:16-1237:2.  Yet, she acknowledged that the park is located in a "Eucalyptus forest" that is "very wild."  RT 1234:16-1237:2.  Similarly, Kimbrough complained about steep pathways leading to the playground at Holly Park, which is located at the "top of a hill."  RT 837:19-838:5.  The testimony of class members, at best, shows that they occasionally encountered barriers at certain parks; however, it does not establish that they were denied access to RecPark programs, services and activities in their entirety.  Title II of the ADA mandates meaningful access on a program access level, not on a neighborhood or facility-specific basis.

126.   In contrast, the City presented compelling evidence to demonstrate its compliance with Title II of the ADA.  The athletic fields, play areas and recreation centers (along with open space that is provided at virtually every park), represent core features that together provide the range of services, programs and activities available at the City's parks.  Across San Francisco, the City provides twenty accessible athletic fields, and eight additional athletic field facilities that were, at the time of trial, in the planning phase and either fully funded or in design or construction.  RT 1818:3-18; DTX F34.  Notably, Hecker credibly opined, based on his review of the "blue dot" designations determined Scott, as well as his training, knowledge and experience, that the number and distribution of these twenty accessible athletic fields is sufficient to provide program access to the City's athletic programs.  RT 2769:18-2771:2.

127.   The City provides forty-three accessible Recreation Centers and Clubhouses, which have either been renovated since 2000, or received a specific barrier removal since

1992.  Additional facilities are "in the pipeline" for renovation.  RT 1816:5-1817:1; DTX F40.  Focusing solely on Recreation Centers, which are larger than Cluhouses and include a gymnasium, fifteen out of twenty-three facilities are accessible, and five additional Recreation Centers have received funding for access renovations, or are already in design or construction.  DTX 40.  The number and distribution of accessible Recreation Centers and Clubhouses are sufficient to provide program access to the programs housed in these facilities.  RT 2771:3-2772:12.  Likewise, the City provides an equitable distribution of accessible children's play areas throughout San Francisco.  RT 1815:9-20; PTX 148A.

128.    Kirola contends that the Community Garden Program is not accessible.  The Community Garden is a program intended for people who do not have backyards, and serves organized community clubs that operate each community garden.  RT 2281:10-2283:15.  Only group members are eligible to participate in the "program" offered at the community garden sites.  Id.  RecPark makes access improvements each time it performs construction work at a community garden.  Id.  In addition, it accommodates each individual access request it receives from club members who actually use the garden.  Id.  Neither Kirola, nor any class member who testified at trial, belongs to any community club that operates a community garden, nor has Kirola ever attempted to visit a community garden as a member of the public.  Kirola's claims based on the community gardens fail for lack of standing, and for lack of proof.

129.    Kirola, through her experts, also asserts that the City fails to provide program access in its parks, because some "unique" park facilities are not "fully accessible" and "ADAAG-compliant."  This assertion is uncompelling for a number of reasons.  First, this contention erroneously focuses on a "unique facility," without identifying any unique program that is only offered at that facility.  Second, because ADAAG does not apply to playgrounds or to outdoor developed recreational areas, Kirola has applied an inapplicable standard.  In any event, as Kirola's experts readily acknowledged, program access is a much more subjective standard than ADAAG-compliance, RT 1366:3-13, and only a small

1   portion of a particular park must be accessible in order to provide the requisite program

2   access, RT 717:10-21.

3       130.    Kirola argues that Golden Gate Park is unique and therefore must be fully

4   accessible.  Assuming arguendo that Golden Gate Park should be analyzed in isolation, the

5   Court finds that the City provides meaningful access thereto.  Golden Gate Park has an

6   extensive network of accessible paths, with accessible parking and accessible restrooms

7   disbursed throughout the park, providing ample opportunity for class members with

8   mobility disabilities to enjoy Golden Gate Park's varied landscapes.  RT 1819:2-1821:20,

9   1824:14-1825:6; DTX F37.  The popular destinations in Golden Gate Park—namely, the

10  Conservatory of Flowers, the Arboretum and the Japanese Tea Garden, are also accessible.

11      131.    Even if the Court accepted Kirola's premise that the path of travel through the

12  formal gardens in front of the Conservatory of Flowers interferes with program access, her

13  analysis ignores additional accessible parking on JFK Drive, which offers a shorter route to

14  the Conservatory entrance.  RT 2112:24-2114:6; DTX F37.  The Arboretum offers an

15  extensive network of accessible trails (evaluated according to the proposed federal

16  standards for outdoor areas), and two sets of accessible restrooms.  RT 2114:7-2116:23;

17  DTX F37.5.  The Japanese Tea Garden has accessible paths, to the extent practical, without

18  necessitating fundamental alterations to the facility.  RT 1360:20-1362:1.  In any event,

19  additional improvements for the Japanese Tea Garden were scheduled to be completed

20  shortly after trial, and will further enhance access to the Tea House.  RT 2325:4-20.

21      132.    Similarly, Kirola has made an insufficient showing of inaccessibility as to

22  Dolores Park.  At the time of trial, RecPark was commencing a complete $16 million

23  renovation of Dolores Park that will render the park completely accessible.  RT 2278:3-

24  2279:12.  RecPark is also planning renovations at Glen Canyon Park and estimates the cost

25  at $20-$40 million.  The 2008 Bond provides $5.8 million for Glen Canyon Park, and

26  RecPark will prioritize work there based on community input.  RT 2279:13-2280:14.

27      133.    Next, Kirola argues that all elements of the "blue dot" facilities are not

28  entirely compliant with facility access regulations.  As discussed earlier, MOD uses color-

1   coded spreadsheets and maps to track the status of each of the approximately 700 facilities

2   surveyed by Hopper and illustrate the distribution of accessible facilities across the City.

3   Blue dots are placed on those maps to indicate where a capital improvement project has

4   taken place since 2000.  See Findings of Fact ¶ 77.

5       134.   Not every aspect of a facility where a program is offered must necessarily be

6   fully accessible.  See Daubert, 760 F.3d at 987.  Nor does Title II of the ADA require

7   complete parity of services at each of the facilities through which the City offers its

8   programs.  See Pierce, 526 F.3d at 1222; see also RT 717:10-21 (testimony by Plaintiff's

9   expert that only a "small part of a park" must be accessible to provide program access).

10  That aside, Kirola overlooks the fact that the City's "blue dot" designation is not intended

11  to signify that every element of the facility was 100 percent compliant with all applicable

12  facilities access regulations; rather, it signifies that the facility was fulfilling the City's

13  program access intent under UPhAS.  RT 1464:14-23.  In other words, a blue dot indicates

14  only that the facility offers some accessible program, not that every physical element of the

15  facility is compliant with disability access regulations.  In addition, Kirola's arguments

16  regarding the "blue dot" facilities are unpersuasive given that her experts admittedly did not

17  inspect each of the City's "blue dot" libraries, pools, and parks; as to those "blue dot"

18  facilities which they did visit, their site assessments were shown by the City to be

19  unreliable.

20      135.   In sum, the Court finds no merit to Kirola's claim that she or any class

21  member has been deprived of program access to the City's RecPark program.

22              **2.     New Construction and Alterations**

23      136.   Pursuant to 35 C.F.R. § 35.151, the City has elected to use ADAAG as its

24  standard for newly constructed or altered facilities.  RT 1919:20-24.  According to Kirola,

25  the City's policies and practice are insufficient to ensure "strict compliance" with ADAAG

26  as to City facilities newly constructed or altered after January 26, 1992.  Dkt. 604, 22:11-

27  24:5.  In particular, Kirola contends that her experts' inspections of the City's libraries and

28

parks revealed disability access barriers in violation of ADAAG or the California Building
Code. Id.

137.    The Court has found the opinions of Kirola's experts, including those relating
to the City's compliance with ADAAG and the California Building Code, to be unreliable.
E.g., Findings of Fact ¶ 205-228.  Among other things, Kirola's experts relied on
unqualified individuals to conduct their inspections, and applied faulty and inconsistent
methodologies and inapplicable access requirements.  They also failed to properly take into
account dimensional tolerances and their impact on the variation.  Cherry v. City Coll. of
San Francisco, C 04-04981 WHA, 2006 WL 6602454, *6 (N.D. Cal. Jan.12, 2006) ("[T]he
burden is on plaintiffs to prove that the variance exceeds the allowed tolerance. It is not
enough to simply show that a particular bathroom stall, for example, is less than the
required width. The approximate extent of any shortfall must be proven. And, the
dimensional tolerance at the time of construction must be proven.").

138.    In any event, the few isolated departures from ADAAG's dimensional
requirements in newly constructed or renovated facilities identified by Kirola's experts do
not establish any systemic deficiency in the City's policies or practices for the design and
construction of publicly funded construction projects. RT 2040:1-2046:12 (noting that only
1.6% of the items identified by Kirola's experts' "needed to be changed").  No facility or
building is perfect.  RT 2044:9-2046:12; 2733:14-2734:6.  A typical building has thousands
of access measurements; a single set of restrooms has hundreds of access measurements.
RT 1357:2-9.  Indeed, Plaintiff's expert Gary Waters confirmed that an architect's
professional standard of care is to deliver a building that "generally conforms" to access
requirements, and that is the standard he used as court appointed expert monitoring
settlement compliance in another ADA action previously pending in this District.  RT
1353:19-1357:1.

139.    In sum, the Court finds that the few variations from ADAAG or the California Building Code with respect to new construction or alterations are insufficient to show that Plaintiff or class members were denied meaningful access to the City's programs, services or activities or that they are entitled to relief on a class-wide basis.

### 3.    Grievance Procedure

140.    Title 28, Code of Federal Regulations, section 35.107(b), provides that: "A public entity that employs 50 or more persons shall adopt and publish grievance procedures providing for prompt and equitable resolution of complaints alleging any action that would be prohibited by this part." 28 C.F.R. § 35.107(b).  Kirola argues that the City's complaint process is deficient because it fails to provide for "prompt and equitable" resolution, as specified in § 35.107(b). Dkt. 604, 15:22-16:8.

141.    The City argues that there is no private right of action to enforce 28 C.F.R. § 35.107(b). Dkt. 666, 17:27-18:6.  Although there is no controlling authority on this specific issue, the Ninth Circuit's reasoning in <u>Lonberg</u> supports that conclusion.[27] <u>Lonberg</u> held that there is no private right of action to enforce federal regulations requiring public entities to develop transition plans under 28 C.F.R. § 35.150(d).  571 F.3d at 852.  In reaching its decision, the court reasoned that "a public entity may be fully compliant with [Title II of the ADA] without ever having drafted a transition plan, in which case, a lawsuit forcing the public entity to draft such a plan would afford the plaintiff no meaningful remedy." <u>Id.</u> at 851; <u>see also</u> <u>Ability Ctr. of Toledo v. City of Sandusky</u>, 385 F.3d 901, 914 (6th Cir. 2004) (same); <u>Cherry v. City Coll. of San Francisco</u>, No. C 04-4981 WHA, 2005 WL 2620560, *4 (N.D. Cal., Oct. 14, 2005) ("there is no indication that a public entity's failure to develop a transition plan harms disabled individuals, let alone in a way that Title II aims to prevent or redress.  Indeed, it is conceivable that a public entity could fully

---

[27] While both <u>Armstrong</u>, 275 F.3d at 859, 862, and <u>Pierce</u>, 761 F. Supp. 2d at 953-54, 957, discussed the ADA's grievance procedure requirement, neither court specifically addressed the question of whether there is a private right of action to enforce 28 C.F.R. § 35.107.

satisfy its obligations to accommodate the disabled while at the same time fail to put forth a suitable transition plan.").

142.    The rationale underlying <u>Lonberg</u> applies equally to the question of whether the grievance procedure regulation is subject to private enforcement.  Like ADA transition plans, the existence or non-existence of a grievance policy does not, in itself, deny a disabled person access to a city's services.  A public entity may be fully compliant with Title II without having drafted a grievance policy, let alone a grievance policy that mandates specific deadlines for reaching a resolution on all complaints.  <u>See</u> <u>Lonberg</u>, 571 F.3d at 851; <u>see also</u> <u>Duffy v. Freed</u>, No. 09-2978 (JBS/JS), 2010 WL 3740659, *4 (D.N.J. Sept. 17, 2010), <u>aff'd</u>, 452 F. App'x 200 (3rd Cir. 2011) ("Although Plaintiff asserts that public entities have a legal obligation under the ADA to launch an investigation into any complaint of a violation of Title II, Plaintiff cites no language of the ADA and the Court finds no support for this proposition in the statute.  The public entity's obligation is to not discriminate.  Such entities make additional efforts to resolve any potential discrimination by implementing proactive internal procedures according to the DOJ regulations, but the adequacy of these procedures is not itself an ADA concern.").

143.    Other circuit and district courts have uniformly concluded that no private right of action exists to enforce 35 C.F.R. § 35.107(b).  <u>See</u> <u>Duffy</u>, 452 F. App'x 200, 202 ("[T]here is no private right of action to enforce regulations regarding public entities' ADA grievance procedures[.]"); <u>Giustiniani v. Fla. Dep't of Fin. Servs.</u>, No. 3:11-cv-792-J-37 MCR, 2012 WL 2127733, *2 (M.D. Fla. June 12, 2012) (holding that 28 C.F.R. § 35.107(b) does not create a private right of action); <u>DeLeon v. City of Alvin Police Dep't</u>, No. H-09-10222010 WL 4942648, *4 n.10 (S.D. Tex. Nov. 30, 2010) (quoting <u>Duffy v. Freed</u>, No. 09-2978 (JBS/JS), 2010 WL 3740659 (D.N.J. Sept. 17, 2010)) ("'The failure of a Title II public entity to adequately implement or abide by internal complaint procedures does not itself state an ADA claim, because the statute does not require these procedures.'"); <u>see also</u> <u>Brennan v. Reg'l Sch. Dist. No. 1 Bd. of Educ.</u>, 531 F. Supp. 2d 245, 278 (D. Conn. 2007) (regulation implementing section 504 of the Rehabilitation Act,

1  which required establishment of grievance procedures, was not privately enforceable);

2  Abrahams v. MTA Long Island Bus, 644 F.3d 110, 119-20 (2d Cir. 2011) (regulation

3  requiring creation of mechanism for ongoing public participation in development and

4  assessment of services for disabled individuals not privately enforceable).

5       144.   Attempting to sidestep the issue of whether there is a private right of action to

6  enforce 28 C.F.R. § 35.107(b), Kirola argues that she does "not challenge the City's

7  grievance procedure standing on its own" but rather "challenge[s] the sufficiency of the

8  grievance procedure as a means of providing program access."  Dkt. 618, 12:2-3; see also

9  Dkt. 672, 24:28-25:1 (arguing that the City's "access upon request" policy of addressing

10 access barriers is not a lawful method for providing program access).  The evidence does

11 not support Kirola's position.  While the record establishes that the grievance procedure is

12 an important aspect of the City's efforts to ensure accessibility for disabled persons, it also

13 firmly establishes that the grievance procedure merely supplements the City's proactive

14 efforts to provide accessibility.  See, e.g., RT 64:1-17, 1617:2-1618:3, 2863:14-2867:25.  In

15 other words, the City endeavors to provide program access through both proactive and

16 reactive measures—i.e., undertaking significant accessibility planning across numerous

17 City departments and proactively seeking input from the disabled community in the course

18 of such planning, while also responding to requests and complaints from the public.  The

19 City's efforts therefore do not constitute an "access upon request" approach to accessibility.

20 C.f. Putnam v. Oakland Unified Sch. Dist., 1995 WL 873734, *10 (N.D. Cal. 1995) ("The

21 approach of taking no action to render programs accessible until a student or parent

22 identifies an accessibility problem does not make a program 'readily' accessible."); Huezo,

23 672 F. Supp. 2d at 1063 ("The District concedes that to receive an accommodation of any

24 kind—including basic services such as accessible furniture and transportation to otherwise

25 inaccessible parts of campus—each disabled student must fill out certain forms prior to the

26 beginning of each semester.").

27

28

145.    Even if the Court were to find a private right of action exists to challenge the City's grievance procedure's compliance with 28 C.F.R. § 35.107(b), the evidence does not support the conclusion that any violation of this regulation has transpired.

146.    MOD oversees the City's grievance procedure for handling public complaints regarding disabled access to its facilities, programs and services.  A complaint form is posted on MOD's website.  RT 1579:23-1580:12-1581:22; DTX A35 [000105-109].  Upon receipt of a complaint, MOD sends the complaint to the ADA Coordinator for the appropriate department, which, in turn, investigates the matter.  Upon review and approval by MOD, the ADA Coordinator and department head respond to the complaint within thirty days.  DTX A35 [000105]; RT 1866:19-25.  Because each complaint is unique, resolution of the grievance may, in some instances, require more than thirty days to finally resolve.  RT 2001:2-7; 2385:14-2386:22; DTX A15.

147.    Fraguli is in charge of the grievance procedure.  Only 20 percent of the grievances she received related to physical access—the majority of which were curb ramp requests.  RT 1868:9-1869:5.  Fraguli has never received a complaint from Kirola, O'Neil, Kimbrough, Grant, DeChadenedes or Monasterio.  RT 1870:14-1871:9.  Nevertheless, the City learned, through other channels, that Kirola submitted a single curb ramp request, and that Monasterio and O'Neil submitted multiple requests.  RT 1383:21-1392:16, 568:6-583:22, 1226:23-24, 1128:23-1230:6, 1246:2-1249:16.  The trial record shows that upon becoming aware of these requests, the City installed almost all of the requested ramps within one to two years, while the remaining curb ramps were slated for installation within a year of trial.  RT 1228:18-1229:6,1384:6-10, 1391:18-1392:16, 2001:8-2002:5, 2419:13-2420:4, 2422:22-2424:5.  Moreover, upon reviewing the evidence presented and relevant legal authorities, the Court concurs with Hecker's opinion that the City's grievance procedure is consistent with the requirements and provisions of the ADA regulations.  RT 2727:5-19

148.    For the reasons stated above, the Court finds that Kirola's challenge to the City's grievance procedure is legally without merit.

1

### 4. Maintenance Policies

2      149.    Kirola alleges that the City's policies and practices for the maintenance of

3  accessible features are inadequate because they "do not set specific and prompt deadlines

4  for the identification and repair of items that are broken, non-operational, or in need of

5  repair." Dkt. 662, 14:9-11.  A public entity's maintenance obligation is set forth in 28

6  C.F.R. § 35.133, which provides that public entities "shall maintain in operable working

7  condition those features of facilities and equipment that are required to be readily

8  accessible to and usable by persons with disabilities[.]"  28 C.F.R. § 35.133(a).

9      150.    Under Title II, a public entity's maintenance obligation applies only "to the

10  maximum extent feasible," and service interruptions are inappropriate only if they "persist

11  beyond a reasonable period of time."  28 C.F.R. Part 35 App. A; e.g., Cupolo v. Bay Area

12  Rapid Transit, 5 F. Supp. 2d 1078, 1083-84 (N.D. Cal. 1997) (finding that a plaintiff can

13  succeed on a challenge regarding a public entity's maintenance obligations only if she

14  establishes that the maintenance issues are "recurrent" and constitute a "pattern," as

15  opposed to being "isolated or temporary"); Cherry, 2006 WL 6602454, *7, *10 (noting that

16  while obstructions "due to chairs, trash cans, potted plants, filing cabinets and other

17  furniture intruding upon the required clearance" may constitute accessibility violations

18  "unless the obstruction is temporary or isolated," the plaintiffs failed to meet their burden

19  of demonstrating that the blockages were "persistent"); Martin v. Metro. Atlanta Rapid

20  Transit Auth., 225 F. Supp. 2d 1362, 1380 (N.D. Ga. 2002) ("Although Plaintiffs have

21  documented a number of cases where they encountered inoperable elevators in MARTA

22  stations, their evidence is insufficient to demonstrate a systemic problem that would rise to

23  the level of an ADA violation.  It is simply a fact of life that elevators will break down on

24  occasion.").

25      151.    Both libraries and RecPark facilities are subject to rigorous inspection and

26  maintenance policies.  At the City's libraries, staff utilize a Daily Facility checklist in

27  connection with their facilities inspections each morning.  To ensure access, staff move

28  furniture or other objects that may impede the path of travel, and report any access

1   problems that cannot be safely or readily corrected.  RT 2235:22-2237:13, 2252:10-

2   2253:21; DTX A45.  Kirola does not challenge the efficacy of the checklist per se, but

3   complains that other patrons occasionally leave a step stool in the aisles of the library,

4   obstructing her path.  RT 1385:22-1386:11.  She contends that the current Library policy,

5   which requires staff to conduct a single daily inspection of library facilities, should be

6   replaced by one requiring full inspections throughout the day.  Dkt. 672, 24:20-23.  But

7   even multiple daily inspections would not guarantee that a mobility-impaired library patron

8   would never encounter misplaced step stools left by other library patrons.  Ultimately,

9   however, Kirola has not persuasively demonstrated that misplaced step stools are

10  architectural barriers or that they denied her program access to the City's library program in

11  its entirety.

12         152.   Kirola has likewise failed to show that RecPark's maintenance policies are

13  inadequate under the ADA.  RecPark has implemented written policies that prioritize

14  maintenance requests relating to disabled access to parks and facilities, and strives to

15  resolve these requests within forty-eight hours whenever possible.  RT 2306:3-2309:14;

16  DTX A10.  RecPark also uses an Employee Daily Facility Preparation Quick-Sheet that

17  requires daily inspections of its buildings and facilities for safety hazards or other issues

18  that might impact disabled access before they are opened to the public, RT 2315:15-

19  2317:18; DTX Z60, and a Semi-Annual Facility Accessibility Survey, which includes a

20  detailed inspection checklist and correction of items that may affect physical access to the

21  facility, RT 2318:2-2319:18; DTX Z61.  Further, RecPark staff conduct regular inspections

22  of outdoor facilities which focus on the path of travel, including pathways' surface quality,

23  gates and latches, and barriers such as low hanging tree limbs.  RT 2320:2-2321:6.

24         153.   Lastly, the Court rejects Kirola's claim that the City's policies governing

25  sidewalk repair are not in compliance with the ADA.  As discussed more extensively

26  above, the City's sidewalk maintenance policies, which are embodied in the SIRP and

27  ASAP, adequately address sidewalk access issues.  See Findings of Fact ¶¶ 62-65.

28

1  Similarly, for reasons already discussed, the Court discounts the opinions from Kirola's

2  experts regarding sidewalk maintenance issues.  See id.

3      154.   In sum, the Court finds that Kirola has failed to demonstrate that the City has

4  violated its maintenance obligations, as set forth in 28 C.F.R. § 35.133(a).

5          **5.    Safety Hazards**

6      155.   Kirola alleges that the City is in violation of the ADA due to the lack of a

7  general policy for addressing safety hazards.  She alleges that "it is well-settled that public

8  entities have a duty to remove disability access barriers that constitute safety hazards to

9  persons with mobility disabilities" and that "the City has no written policies or practices in

10 place to either identify safety hazards, or ensure their prompt removal from the City's

11 pedestrian right of way and the other facilities at issue herein."  Dkt. 604; 20:19-21:7.

12 There is no authority holding that a public entity must adopt a written policy or procedure

13 relating specifically to safety hazards.  But even if there were, Kirola has failed to present

14 any evidence establishing that the lack of such a policy resulted in the denial of program

15 access to any particular program, service or activity.

16     156.   Kirola argues that if the City had adopted and implemented "effective

17 policies for the identification and prompt removal of safety hazards, it is likely that [she]

18 would not have encountered steep paths of travel and entrances, sidewalks with excessive

19 cross slopes and broken pavement, and uncovered tree wells[.]"  Dkt. 673, 17:1-4.  This

20 contention is entirely speculative and unsupported by the record established at trial.

21 Further, irrespective of whether the City has a written policy specific to the removal of

22 safety hazards, the trial record shows that the City's existing policies and procedures

23 adequately address these types of concerns.  Both the library and RecPark programs use

24 daily inspection protocols that address issues deemed to constitute safety hazards, such as

25 wet spots or broken equipment.  DTX A45; DTX Z60; DTX Z61.  RecPark further

26 prioritizes the resolution of potential safety hazards by categorizing each complaint

27 received into one of three categories:  emergencies (which are to be addressed

28

1    immediately); health, safety, and accessibility issues (which are to be addressed within 48

2    hours); and routine issues.  RT 2306:3-2308:21.

3         157.   The trial record also establishes that DPW prioritizes resolution of potential

4    safety hazards in the City's public right-of-way via its curb ramp grading system, which

5    grades curb ramps with excessive running slopes—along with curb ramps with both

6    excessive running slopes and excessive gutter slopes—lower than other curb ramps, thereby

7    prioritizing them for replacement.  RT 2453:18-2454:12.  The City worked with members

8    of the City's disabled community in creating the curb ramp grading system, ensuring that

9    the system assigned the lowest scores to curb ramp conditions which the disabled

10   community felt to be the most problematic or dangerous.  RT 1607:17-22.

11        158.   In sum, the Court finds that Kirola has failed to demonstrate that the City's

12   lack of a specific policy for hazard removal violates Title II of the ADA.

13                        **6.    RecPark Website**

14        159.   Kirola complains that the RecPark website improperly defines an "accessible

15   park" as one that has an "accessible entrance" and "at least one recreational opportunity."

16   Dkt. 662, 13:4-27.  As explained above, the City does not rely on this statement as its

17   standard for establishing program access to it programs, services and activities.  The

18   information on the website is intended simply to inform the public about sites they may

19   wish to visit, and visitors are expressly invited to inquire further for more detailed

20   information.  RT 1502:13-16; PTX 3875 [075767].  There is no evidence that the City's

21   definition of "accessible" for the purpose of its RecPark website is in any way connected to

22   City policy regarding its program access obligations.

23        160.   In sum, the Court finds that Kirola has failed to demonstrate that the City's

24   RecPark website demonstrates the City's failure to provide program access to its park

25   system.

26                   **7.    Self-Evaluation and Transition Plans**

27        161.   Kirola alleges that the City has failed to formulate and implement "an

28   adequate self-evaluation plan" or transition plan, and seeks to compel the City to do so

1   under the ADA, California Government Code section 11135, and their respective

2   regulations. Dkt. 294, 14:6-7, 19:21-24.[28]   The record shows that the City has, in fact,

3   drafted the transition plans for both its public right-of-way and facilities.  While it is

4   unclear whether the City has drafted a self-evaluation plan, the authorities are clear that

5   Plaintiff has no legal basis to sue based on the lack of such a plan.

6                             *a)      ADA*

7          162.   ADA regulations direct public entities to adopt transition and self-evaluation

8   plans. See 28 C.F.R. § 35.150(d)(1) ("a public entity . . . shall develop, within six months

9   of January 26, 1992, a transition plan setting forth the steps necessary to complete

10  [structural changes to facilities to achieve program access]"); 35.105(a) ("A public entity

11  shall . . . evaluate its current services, policies, and practices, and the effects thereof ").

12  Neither regulation expressly creates a private right of action to enforce its provisions.

13         163.   "In determining whether a particular regulation is enforceable through a

14  statute's private right of action, [courts] must look to the statute itself and determine

15  whether it displays Congress's intent to create the private right purportedly contained in the

16  regulation." Lonberg, 571 F.3d at 850.  "Only those regulations effectuating the statute's

17  clear prohibitions or requirements are enforceable through the statute's private right of

18  action; regulations that do not encapsulate the statutory right and corresponding remedy are

19  not privately enforceable." Id. at 851.

20         164.   Section 202 of the ADA, 42 U.S.C. § 12132, prohibits public entities from

21  denying qualified disabled individuals from "meaningful access" to their services and

22  programs. Lonberg, 571 F.3d at 851.  In view of this prohibition, the Ninth Circuit held in

23  Lonberg that the failure to prepare a transition plan is not subject to private enforcement.

24  Id.  The court explained that the statute "says nothing about a public entity's obligation to

25  draft a detailed plan and schedule for achieving such meaningful access."  Id.  More

26  fundamentally, "[t]he existence or non-existence of a transition plan does not, by itself,

27  _____

28        [28] Curiously, the proposed permanent injunction submitted by Kirola post-trial seeks
    no such remedy.  Dkt. 635.

deny a disabled person access to a public entity's services, nor does it remedy the denial of access."  Id.  Citing Lonberg, this Court has likewise ruled that there is no private of action to enforce ADA regulations requiring the creation and implementation of a self-evaluation plan.  Skaff v. City of Corte Madera, No. C 08-5407 SBA, 2009 WL 2058242, *3 (N.D. Cal. Jul. 13, 2009).  Given these authorities, the Court finds that Kirola cannot seek to compel the City to prepare and implement a transition or self-evaluation plan under ADA regulations.

### b) *California Law*

165.    For much the same reasons, the Court rejects Kirola's companion claim predicated upon California Government Code section 11135 and two of its implementing regulations, Cal. Code Regs., title 22, sections 98251 (Self-Evaluation) and 98258 (Transition Plan).  The state regulations governing the creation and implementation of transition and self-evaluation plans are patterned after the aforementioned federal regulations and are worded largely the same, except that the state regulations are stated in permissive (i.e., "should"), as opposed to mandatory (i.e., "shall") terms.  As such, it would be anomalous to conclude, as Kirola suggests, that California regulations impose a mandatory duty upon public entities to develop transition and self-evaluation plans when no such obligation exists in the federal regulations upon which they are patterned.  See Darensburg v. Metropolitan Transp. Com'n, 636 F.3d 511, 519 (9th Cir. 2011) (applying federal law to claim brought under California Government Code section 11135); Kamen v. Lindly, 94 Cal. App. 4th 197, 203 (2001) ("Where, as here, California law is modeled on federal laws, federal decisions interpreting substantially identical statutes are unusually strong persuasive precedent on construction of our own laws.").

166.    The Court is aware that it previously intimated that Kirola could pursue claims predicated on California's self-evaluation and transition plan regulations.  See Kirola v. City and Cnty. of San Francisco, No. C 07-3685 SBA, 2010 WL 1459725, *1 (N.D. Cal. Apr. 12, 2010).  In opposing Plaintiff's motion for leave to file an amended complaint, the City argued, inter alia, that permitting the proposed amendment was futile

1  because the regulations did not impose any mandatory duty to develop or implement either

2  a transition or self-evaluation plan.  Dkt. 205, 12:21-15:2.  The Court rejected the City's

3  argument, concluding that it could not be logically reconciled with California Government

4  Code § 11139, which expressly provides a private right of action to enforce rights conferred

5  under Section 11135 and its implementing regulations.  Kirola, 2010 WL 1459725, *1.

6  After further consideration of this matter, however, the Court reconsiders that conclusion.

7  See United States v. Smith, 389 F.3d 944, 949 (9th Cir. 2004) (holding that a district court

8  may sua sponte reconsider a prior, interlocutory ruling over which it has continuing

9  jurisdiction).

10  167.  When Section 11135 was originally enacted in 1977, it did not include an

11  express private right of action.  Donovan v. Poway Unified Sch. Dist., 167 Cal. App. 4th

12  567, 594 (2008).  In Arriaga v. Loma Linda University, 10 Cal. App. 4th 1556 (1992), the

13  California Court of Appeal subsequently declined to find an implied right of action.  "In

14  response to Arriaga, the Legislature, in Assembly Bill No. 1670 amended Government

15  Code section 11139 to expressly provide for a private right of action, but expressly limited

16  enforcement to a 'civil action for equitable relief.'"  Donavan, 167 Cal. App. 4th at 594.

17  Section 11139 provides, in relevant part, as follows:  "This article and regulations adopted

18  pursuant to this article may be enforced by a civil action for equitable relief, which shall be

19  independent of any other rights and remedies."  Cal. Gov. Code § 11139.

20  168.  Although Section 11139 created a private right of action to enforce rights

21  conferred under Section 11135 and its regulations, it does not automatically follow that all

22  regulations promulgated under Section 11135 necessarily create a mandatory duty, and

23  hence, a private right of action based on the failure to prepare and implement either a

24  transition plan or self-evaluation plan.  Section 11135 is a general anti-discrimination

25  statute, pursuant to which a broad range of regulations have been adopted to implement its

26  provisions.  Cal. Code Regs. tit. 22, §§ 98000-98413.  Regulatory language is to be

27  construed in "its plain, commonsense meaning," giving meaning, where possible, "to every

28  word and phrase in the regulation . . . as a whole so that all of the parts are given effect."

1  Butts v. Bd. of Trs. of the Cal. State Univ., 225 Cal. App. 4th 825, 835, (2014).

2  Regulations are to be harmonized together, see Hoitt v. Dept. of Rehabilitation, 207 Cal.

3  App. 4th 513, 524 (2012), and construed in the context with the statutes which they

4  implement, see Wollmer v. City of Berkeley, 193 Cal. App. 4th 1329, 1349 (2011).

5      169.    The regulations implementing Section 11135 expressly differentiate between

6  those regulations that are mandatory and those that are advisory.  Cal. Code Regs. tit. 22,

7  § 98010.  Specifically, the regulations provide that: "'Should' means ***advisory***" while

8  "'Shall' means ***mandatory***."  Id. (emphasis added); Comunidad En Accion v. Los Angeles

9  City Council, 219 Cal. App. 4th 1116, 1125 (2013) (holding that the definitions section

10  forth in the California Code of Regulations, title 22, section 98010, apply to California

11  Government Code section 11135).  Here, the transition and self-evaluation plan regulations

12  at issue use the term "should," as opposed to "shall."  Id. §§ 98251(b), 98258.  In view of

13  the fact that the promulgating agency expressly differentiated between "should" and "shall"

14  and ascribed different significance to each term, it would be incongruous to construe

15  Section 11139 as creating a mandatory duty or conferring a private right of action to

16  enforce the transition and self-evaluation plan regulations, which are merely advisory in

17  nature.  See Wollmer, 193 Cal. App. 4th at 1349.  Thus, the Court finds that although

18  Section 11139 created a private right of action to enforce rights conferred under Section

19  11135 and its regulations, it does not transmute the advisory nature of the self-evaluation

20  and transition plan into a mandatory duty.

21      170.    Even if the regulations at issue imposed a mandatory duty, Kirola has failed

22  to show that Section 11135 is applicable here.  Section 11135 applies only to a program or

23  activity operated by the state or "[is] funded directly by the state, or receives any financial

24  assistance from the state."  Cal. Gov. Code § 11135(a).  No such showing has been made.

25  That notwithstanding, any obligation created by the state's transition and self-evaluation

26  plan regulations runs to the applicable state agency, as opposed to the City.  Both of the

27  applicable regulations include the language "should be required ***by the responsible State***

28  ***agency***," suggesting that any alleged duty under each regulation falls on state agencies

1   rather than on the recipient of state funds.  <u>See</u> 22 Cal. Code Reg's §§ 98251(a)(1), 98258

2   (emphasis added).  Finally, Kirola has failed to demonstrate that she or class members were

3   denied meaningful access to the City's programs, services and activities, but for its failure

4   to adopt and implement "a transition plan for the removal of access barriers as required by

5   California Government Code § 11135."  Dkt. 672, 25:26-28.

6        171.   For the reasons discussed above, the Court finds that Kirola's claim based on

7   the City's alleged failure to develop, adopt and implement a transition plan or self-

8   evaluation plan fails both procedurally and substantively.

9   **V.     CONCLUSION**

10        The Court is sensitive to the plight of mobility-impaired and other disabled

11  individuals.  The testimony of Kirola, class members, and mothers of class members

12  effectively established the daily challenges confronting disabled individuals.  Both federal

13  and state law afford disabled individuals, including Kirola and members of the class, the

14  right to meaningfully access the programs, activities and services provided by a public

15  entity.  At the same time, Article III of the United States Constitution requires that Kirola

16  prove that she has standing to pursue claims on behalf of the class—which she has failed to

17  do.  Nevertheless, even if Kirola had satisfied that threshold burden, the record does not

18  support her contention that the City has failed to comply with its obligations under Title II

19  of the ADA and related federal and state statutes.  To the contrary, the trial record

20  establishes that the City is complying with its obligation to provide meaningful access,

21  including program access, to its public right-of-way, libraries, swimming pools, and parks

22  and recreational facilities.  Accordingly,

23        IT IS HEREBY ORDERED THAT in accordance with this Order, final judgment

24  shall be entered in favor of the City.  The Clerk shall close the file and terminate any

25  pending matters.

26        IT IS SO ORDERED.

27  Dated:  November 26, 2014

28                                                    SAUNDRA BROWN ARMSTRONG
                                                      United States District Judge

- 113 -