# EXHIBIT B

**ORIGINAL**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SAUNDRA BROWN ARMSTRONG, JUDGE

| | | |
|---|---|---|
| IVANA KIROLA, ET AL., | ) | COURT TRIAL |
| | ) | |
| PLAINTIFFS, | ) | VOLUME 9 |
| | ) | |
| VS. | ) | NO. C 07-03685 SBA |
| | ) | |
| CITY AND COUNTY OF | ) | |
| SAN FRANCISCO, ET AL., | ) | PAGES 1661 - 1887 |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | FRIDAY, APRIL 22, 2011 |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

| | |
|---|---|
| FOR PLAINTIFFS: | SCHNEIDER WALLACE COTTRELL BRAYTON & KONECKY |
| | 180 MONTGOMERY STREET, SUITE 2000 |
| | SAN FRANCISCO, CALIFORNIA  94109 |
| BY: | MARK T. JOHNSON, |
| | ANDREW P. LEE, |
| | KIRAN PRASAD, |
| | GUY B. WALLACE, ATTORNEYS AT LAW |
| | BROWN POORE LLP |
| | THE WATERGATE TOWERS |
| | 2200 POWELL STREET, SUITE 745 |
| | EMERYVILLE, CALIFORNIA  94608 |
| BY: | SCOTT A. BROWN, ATTORNEY AT LAW |
| FOR DEFENDANT: | OFFICE OF THE CITY ATTORNEY |
| | SIXTH FLOOR - FOX PLAZA |
| | 1390 MARKET STREET |
| | SAN FRANCISCO, CALIFORNIA  94102 |
| BY: | ERIN BERNSTEIN, |
| | JAMES M. EMERY, |
| | ELAINE M. O'NEIL, |
| | KRISTINE A. POPLAWSKI, ATTORNEYS AT LAW |

REPORTED BY:        RAYNEE H. MERCADO, CSR NO. 8258
                    DIANE E. SKILLMAN, CSR NO. 4909
     RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

I N D E X

| DEFENDANTS' WITNESSES | PAGE | VOL. |
|---|---|---|
| MIZNER, SUSAN | | |
| CROSS-EXAMINATION (RESUMED) BY MR. JOHNSON | 1665 | 9 |
| CROSS-EXAMINATION (RESUMED) BY MR. JOHNSON | 1756 | 9 |
| REDIRECT EXAMINATION BY MS. O'NEIL | 1766 | 9 |
| RECROSS-EXAMINATION BY MR. JOHNSON | 1768 | 9 |
| | | |
| JOHNSON, CARLA J. | | |
| DIRECT EXAMINATION BY MR. EMERY | 1740 | 9 |
| CROSS-EXAMINATION BY MR. BROWN | 1752 | 9 |
| | | |
| SCOTT, JOHN PAUL | | |
| DIRECT EXAMINATION BY MR. EMERY | 1770 | 9 |
| CROSS-EXAMINATION BY MR. WALLACE | 1828 | 9 |
| | | |
| FRAGULI, JOANNA | | |
| DIRECT EXAMINATION BY MS. O'NEIL | 1839 | 9 |
| CROSS-EXAMINATION BY MR. BROWN | 1871 | 9 |
| REDIRECT EXAMINATION BY MS. O'NEIL | 1884 | 9 |

--OOO--

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL |
|---|---|---|---|---|
| 2785 | | | 1877 | 9 |
| 3911 | | | 1886 | 9 |
| 4150 | | 1712 | 1756 | 9 |

| DEFENDANTS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL |
|---|---|---|---|---|
| B07 | | | 1785 | 9 |
| B39 | | | 1804 | 9 |
| E27 | | | 1866 | 9 |
| E45 | | | 1854 | 9 |
| F16 | | | 1815 | 9 |
| F17 | | | 1832 | 9 |
| F26 | | | 1830 | 9 |
| F27 | | | 1833 | 9 |
| F34 | | | 1818 | 9 |
| F37 | | | 1825 | 9 |
| F38 | | | 1835 | 9 |
| F39 | | | 1836 | 9 |
| F40 | | | 1817 | 9 |
| I32 | | | 1813 | 9 |

--O0O--

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

1808

1    GOING TO ASK YOU.

2         IN MANY OF THESE CONDITIONS THERE ARE NO STANDARDS

3    UNDER ADAAG, THE ACCESSIBILITY GUIDELINES FROM 1991?

4         MR. WALLACE:  THAT IS THE PART THAT WE OBJECT TO,

5    YOUR HONOR.

6         THE COURT:  OKAY.  MR. EMERY, ANYTHING FURTHER?

7         MR. EMERY:  NOTHING FURTHER.

8         THE COURT:  THE OBJECTION IS SUSTAINED AND THE, THAT

9    PART OF THE SENTENCE WILL BE STRICKEN.

10   BY MR. EMERY:

11   Q.   HAVE YOU GIVEN AN OVERVIEW OF YOUR INVOLVEMENT WITH

12   RECREATION AND PARKS DEPARTMENT WITH RESPECT TO THEIR

13   IMPLEMENTATION OF THE 2008 CAPITAL BOND?

14   A.   YES.  THE ONLY THING I WOULD ADD IS THAT THEY ARE

15   INCLUDING ME IN THEIR PUBLIC MEETINGS AND THEIR INTERNAL

16   PROJECT MEETINGS AND ASKING MY ADVICE.  THEY PROVIDE ME A SEAT

17   AT THE TABLE.

18   Q.   ARE YOU AWARE THAT RECREATION AND PARK DEPARTMENT IS IN

19   THE PLANNING STAGES OF A FURTHER BOND THAT THEY INTEND TO

20   PRESENT TO THE PUBLIC IN 2012?

21   A.   YES.

22   Q.   WHAT INVOLVEMENT, IF ANY, HAVE YOU HAD WITH REC PARK IN

23   CONNECTION WITH THE ANTICIPATED 2012 CAPITAL BOND?

24   A.   I HAVE HAD SEVERAL MEETINGS WITH THEM TO TALK ABOUT WHAT

25   PROJECTS THEY ARE GOING TO INCLUDE AND ALSO TO GIVE THEM AN

1809

1   ORIENTATION ABOUT THE 2010 NEW ADA STANDARDS THAT INCLUDE

2   GUIDELINES FOR RECREATION AS WELL AS THEY ASKED ME TO PROVIDE

3   THEM WHAT MY PRIORITIES WOULD BE FOR PROJECTS WITHIN THIS BOND

4   PROGRAM.

5   Q.    UH-HUM.

6              HAVE YOU DEVELOPED PRIORITIES FOR REC PARKS

7   ANTICIPATED 2012 CAPITAL BOND?

8   A.    YES.

9   Q.    HOW DID YOU GO ABOUT IDENTIFYING YOUR PRIORITY PROJECTS

10  RECOMMENDATIONS TO REC PARK FOR THEIR 2012 ANTICIPATED CAPITAL

11  BOND?

12  A.    I WENT THROUGH THE ANALYSIS THAT I HAVE DONE THROUGH THESE

13  SPREADSHEETS THAT WE TALKED ABOUT, THE MAPS, THE OTHER

14  INFORMATION THAT I HAVE -- PROJECTS I KNOW THAT THEY ARE DOING

15  THAT ARE NOT BOND RELATED THAT ARE FUNDED BY OTHER SOURCES, AND

16  LOOKED AT THE GEOGRAPHICAL SPREAD OF THESE PROGRAMS AND THESE

17  SITES, AND THEN PICKED EITHER VERY SPECIFIC SITES THAT I WOULD

18  RECOMMEND, THEY FOCUS ON, OR VALIDATE SOME OF THE SELECTIONS

19  THAT THEY HAVE ALREADY MADE, OR -- AND ALSO I HAVE MADE SOME

20  RECOMMENDATIONS FOR INCREMENTAL IMPROVEMENTS AT CERTAIN SITES

21  THAT HAVE ALREADY HAD OTHER THINGS ADDED, LIKE PLAYGROUNDS OR

22  WHATEVER, TO RECOMMEND THAT THEY MAYBE DO -- REDO THE CLUB

23  HOUSE THAT WAS PREVIOUSLY ALTERED UNDER OLD STANDARDS.

24  Q.    DURING YOUR TIME AS DEPUTY DIRECTOR FOR PHYSICAL ACCESS AT

25  THE MAYOR'S OFFICE ON DISABILITY, HAVE YOU BEEN INVOLVED WITH

1810

1  REC PARK IN DECISIONS AS TO WHICH ACCESS STANDARD THEY WOULD

2  APPLY TO PLAYGROUND WHEN -- THAT THEY INSTALLED?

3  A.   NO.   THAT WOULD HAVE BEEN KEVIN JENSEN, BUT I'VE DONE SOME

4  TRAININGS WITH THEIR STAFF TO TALK ABOUT THE 2010 NEW ADA

5  STANDARD AND HOW THOSE GUIDELINES COME INTO PLAY.

6  Q.   WE HAVE BEEN TALKING A LITTLE BIT ABOUT THE MAPS THAT YOU

7  PRODUCED, AND I THINK WHEN YOU WERE ON THE STAND EARLIER IN THE

8  WEEK, MR. WALLACE ASKED YOU SOME QUESTIONS ABOUT SOME BLUE DOT

9  MAPS.   WHAT ARE THE BLUE DOT MAPS?

10  A.   THOSE ARE SOME GRAPHICAL REPRESENTATIONS OF THE ANALYSIS

11  THAT I HAVE DONE UNDER THE ADA TRANSITION PLAN WORK THAT I DO.

12          BUT AT THE SAME TIME I'M USING THOSE AS ANALYSIS

13  TOOLS TO LOOK AT GEOGRAPHICAL SPREAD OF THESE BUILDINGS THAT

14  ARE BLUE DOTS AND ORANGE DOTS AND PURPLE DOTS, AS WELL AS THEIR

15  DISTRIBUTION BY NEIGHBORHOOD IN SUPERVISORY DISTRICT TO LOOK AT

16  THE OVERALL SPREAD OF PROGRAMS UNDER THE VARIOUS SEGMENTS OF

17  THE RECREATION AND PARKS PROGRAM, UMBRELLA OF PROGRAMS.

18  Q.   DO I UNDERSTAND YOU CORRECTLY THAT THE BLUE DOT MAPS

19  REFLECT THE INFORMATION THAT YOU HAVE IN THAT BIG SPREADSHEET

20  THAT WE LOOKED AT BEFORE LUNCH?

21  A.   THAT'S CORRECT.   THE MAPS DO NOT DRIVE THE SPREADSHEET;

22  THE SPREADSHEET IS DRIVING THE MAPS.

23  Q.   WHEN DID YOU START USING BLUE DOT MAPS AS PART OF YOUR

24  WORK AS DEPUTY DIRECTOR IN THE MAYOR'S OFFICE?

25  A.   ABOUT 2004 AND 2005.

1811

1  Q.   AND HOW DID YOU MAKE THEM AT THE BEGINNING?

2  A.   I GOT SOME MAPS FROM MUNI IN THE DEPARTMENT OF PUBLIC

3  WORKS, WENT TO FRY'S ART SUPPLY, AND THEY HAVE THESE STICK-UM

4  DOTS, THEY ARE LIKE POST-IT DOTS.

5          AND I WOULD MARK AND CODE A DOT AND ACTUALLY PUT A

6  DOT ON THE MAP SO I WOULD KNOW THE EXACT LOCATION GEOGRAPHICAL

7  SITE OF THAT PARTICULAR POOL OR CLUBHOUSE OR PLAYGROUND.  AND

8  THEN I WOULD HAVE MULTIPLE MAPS AS PART OF MY ANALYSIS.

9          THEN I WOULD ALSO BE LOOKING AT WHAT IS HAPPENING

10 WITH ALL THEIR FUTURE PROJECTS AND LOOKING HOW THOSE SPREAD

11 OUT.  SO THAT GAVE ME A GOOD GEOGRAPHICAL REPRESENTATION AS TO

12 WHAT WAS GOING ON IN THE TOTAL OF ALL THE PROGRAMS.

13 Q.   HOW DO YOU MAKE THE BLUE DOT MAPS TODAY?

14 A.   WE HAVE EITHER INTERNS OR STAFF AT RECREATION AND PARKS

15 DEPARTMENT OR DEPARTMENT OF PUBLIC WORKS ACTUALLY DO THESE GIS

16 MAPS, THE GEOGRAPHICAL MAPS, THEY ARE MATHEMATICAL

17 EXTRAPOLATIONS THAT PRINT OUT.

18 Q.   SO YOU'VE DONE A TECHNOLOGICAL UPGRADE FROM YOUR DAY OF

19 THE BLUE STICKIES FROM THE ART STORE?

20 A.   YES.

21 Q.   I WOULD LIKE YOU NEXT TO LOOK AT THE DOCUMENT THAT'S BEEN

22 MARKED AS EXHIBIT 130 -- EXCUSE ME, LETTER I32.

23          THAT IS THE LAST TAB IN THE NOTEBOOK.

24          (PAUSE IN THE PROCEEDINGS.)

25          (EXHIBIT DISPLAYED ON SCREEN.)

1812

1 BY MR. EMERY:

2 Q.   WHAT IS THIS DOCUMENT EXHIBIT I 32?

3 A.   THIS IS A GRAPHICAL REPRESENTATION OF THE SPREAD OF BLUE

4 DOT LIBRARIES OR ORANGE DOT LIBRARIES.  THE BLUE DOT ONES ARE

5 PROJECTS THAT HAVE BEEN COMPLETED EITHER IN NEW CONSTRUCTION OR

6 ALTERATIONS.  AND THE ORANGE DOTS ARE THOSE THAT ARE UNDER

7 DESIGN AND CONSTRUCTION.  THEY ARE FULLY FUNDED PROJECTS OF THE

8 LIBRARY'S PORTFOLIO OF PUBLIC PROGRAM SITES.

9 Q.   WHAT IS THE DATE OF THIS MAP?

10 A.   DECEMBER 8TH, 2010.

11 Q.   SO HOW DO YOU KNOW THAT?

12 A.   THE DATE IS DOWN AT THE BOTTOM RIGHT-HAND CORNER.

13 Q.   DO YOU PUT THE DATE AT THE BOTTOM RIGHT-HAND CORNER OF ALL

14 OF YOUR BLUE DOT MAPS?

15 A.   WE'VE ASKED THE INTERNS AND THE STAFF THAT ARE DOING THE

16 MAPS IN RECREATION AND PARKS DEPARTMENT OR PUBLIC WORKS TO ADD

17 REVISION DATES AND REVISION NUMBERS SO THAT WE CAN KEEP TRACK

18 OF THE CHANGES.

19          BECAUSE THESE CAN CHANGE FAIRLY FREQUENTLY.

20 VIRTUALLY EVERY TIME I PRINT, THERE'S ANOTHER PROJECT THAT'S

21 BEEN DELIVERED.

22 Q.   SO DOES THIS EXHIBIT, I32, REFLECT THE STATUS OF YOUR

23 EXCEL SPREADSHEET FOR THE LIBRARIES AS OF DECEMBER 8TH, 2010?

24 A.   YES.  IT WOULD BE THE STATUS JUST RIGHT BEFORE THIS MAP

25 WAS PRODUCED.

1   Q.   UH-HUM.

2          NEXT I WOULD LIKE YOU TO LOOK AT EXHIBIT -- NO.

3          MR. EMERY:  I WOULD LIKE TO MOVE EXHIBIT I32 INTO

4   EVIDENCE.

5          THE COURT:  ANY OBJECTION?

6          MR. WALLACE:  NO OBJECTION.

7          THE COURT:  REQUEST IS GRANTED.

8              (DEFENDANTS' EXHIBIT I32 RECEIVED IN

9              EVIDENCE)

10  BY MR. EMERY:

11  Q.   NOW, I WOULD LIKE TO LOOK AT EXHIBIT F16.

12         (EXHIBIT DISPLAYED ON SCREEN.)

13         CAN YOU TELL ME WHAT EXHIBIT F16 IS, MR. SCOTT?

14  A.   THIS PARTICULAR MAP IS A MAP OF REC AND PARKS DEPARTMENT

15  SWIMMING POOLS AND THEIR STATUS ACCORDING TO THE BLUE DOT

16  THEORY.

17  Q.   AGAIN, WHAT DOES THE BLUE DOT MEAN?

18  A.   BLUE DOT MEANS THAT THAT PARTICULAR SITE HAS UNDERGONE NEW

19  CONSTRUCTION OR ALTERATIONS SINCE 2000.

20         AND ALTHOUGH THE -- IN THE RED DOTS IN THIS

21  PARTICULAR MAP ARE FACILITIES THAT HAVE LIMITED ACCESS, THAT

22  HAVE NOT YET UNDERGONE NEW CONSTRUCTION OR ALTERATIONS SINCE

23  THE YEAR 2000.

24  Q.   THIS SWIMMING POOL MAP DOESN'T HAVE ANY ORANGE OR YELLOWS;

25  WHY'S THAT?

1814

1   A.   THIS IS THE -- THIS MAP REFLECTS THE CURRENT PORTFOLIO

2   PROJECTS THAT WERE CONDUCTED UNDER THE 2000 AND THE 2008 BONDS,

3   BUT IT DOES NOT REFLECT THE BARRIER REMOVAL PROJECT THAT I AM

4   DOING AT GARFIELD POOL.

5            AND, OF COURSE, IT WOULDN'T REFLECT THE 2012

6   PROPOSED BOND PROJECTS BECAUSE THAT BOND IS NOT APPROVED BY THE

7   VOTERS YET.

8            SO THAT'S WHY THERE WOULD BE NO YELLOW OR ORANGE

9   DOTS.

10  Q.   GENERALLY SPEAKING, IF REC PARK HAS A PROJECT IDENTIFIED

11  IN THE 2012 BOND, AFTER THAT 2012 BOND IS HOPEFULLY APPROVED BY

12  THE VOTERS, WHAT WILL THAT DO TO EITHER COLOR DESIGNATION OF

13  THOSE DESIGNATED FACILITIES IN THE UPCOMING 2012 BOND?

14  A.   GARFIELD WILL BECOME A PURPLE DOT BECAUSE OUR OFFICE IS

15  DOING THAT PROJECT.  THEY WILL ADD -- WELL, HOPEFULLY THE BOND

16  WILL ADD ANGELO ROSSI POOL BECAUSE THAT'S A VERY

17  STRAIGHTFORWARD PROJECT.

18  Q.   I AM ASKING A MORE GENERAL QUESTION ABOUT REC PARK

19  FACILITIES.

20           IF A FACILITY IS INCLUDED IN THE 2012 BOND --

21  A.   THEN --

22  Q.   -- AND THE VOTERS APPROVE THAT BOND, WHAT WILL HAPPEN TO

23  THE COLOR DESIGNATION FOR THAT FACILITY ON YOUR MAPS?

24  A.   IT MOVES TO YELLOW WHEN IT'S FUNDED AND IT MOVES TO ORANGE

25  WHEN IT'S IN DESIGN AND CONSTRUCTION.

1815

1          MR. EMERY:  THE CITY MOVES DOCUMENT F16 INTO

2    EVIDENCE.

3          THE COURT:  ANY OBJECTION?

4          MR. WALLACE:  NO.

5          THE COURT:  THE REQUEST IS GRANTED.

6                (DEFENDANTS' EXHIBIT F16 RECEIVED IN

7                EVIDENCE)

8    BY MR. EMERY:

9    Q.   I WOULD LIKE YOU NEXT TO LOOK AT EXHIBIT F35.

10   A.   OKAY.

11   Q.   AND I WILL REPRESENT THAT THIS IS IDENTICAL TO EXHIBIT PTX

12   148A, WHICH IS ALREADY IN EVIDENCE, SO I WILL NOT MOVE IT INTO

13   EVIDENCE.

14          (EXHIBIT DISPLAYED ON SCREEN.)

15          WHAT DOES DOCUMENT F35 SHOW?

16   A.   THIS REPRESENTS THE SAME SORT OF BLUE DOT ANALYSIS OF

17   CHILDREN'S PLAY AREAS, CHILDREN'S PLAYGROUNDS AND EQUIPMENT.

18   Q.   DOES THIS DOCUMENT, F35, REFLECT THE INFORMATION IN YOUR

19   MANAGEMENT EXCEL SPREADSHEET AS OF DECEMBER 7TH, 2009?

20   A.   YES.

21          MR. EMERY:  THE CITY MOVES DOCUMENT F35 INTO

22   EVIDENCE.

23          THE COURT:  I THOUGHT YOU SAID YOU WEREN'T GOING TO

24   MOVE IT INTO EVIDENCE --

25          MR. EMERY:  I AM SORRY.  I WITHDRAW THAT REQUEST,

1816

1    YOUR HONOR.

2            THE COURT:  OKAY.  OKAY.

3    BY MR. EMERY:

4    Q.   I WOULD LIKE TO MOVE NEXT TO EXHIBIT F40.

5            WHAT DOES EXHIBIT F40 REPRESENT?

6            (EXHIBIT DISPLAYED ON SCREEN.)

7    A.   AGAIN, THIS REPRESENTS THE BLUE DOT ANALYSIS OF RECREATION

8    CENTERS AND CLUB HOUSES.  IT COMBINES THE TWO TYPE OF

9    FACILITIES INTO ONE MAP.

10   Q.   WHY DID YOU MAKE A MAP COMBINING RECREATION CENTERS AND

11   CLUB HOUSES INTO A SINGLE MAP?

12   A.   THERE ARE SOME PROGRAMS IN CLUB HOUSES THAT ALSO OCCUR IN

13   RECREATION AND PARK -- RECREATION CENTERS.  AND -- BUT

14   RECREATION CENTERS MAY HAVE ADDITIONAL PROGRAMS THEN CAN FIT

15   INTO A CLUB HOUSE.

16   Q.   WHY WAS IT USEFUL TO YOU IN YOUR WORK TO CREATE THIS MAP

17   THAT INCLUDES BOTH RECREATION CENTERS AND CLUB HOUSES?

18   A.   I FELT THAT FOR MY ANALYSIS IT SHOVED AN ENRICHMENT OF THE

19   SPREAD OF ACCESSIBLE AND USABLE BUILDINGS THAT REFLECTS THE

20   SPREAD OF PROGRAMS THROUGHOUT NEIGHBORHOODS, THE SUPERVISORY

21   DISTRICTS AND JUST GEOGRAPHICAL SPREAD.

22   Q.   DOES EXHIBIT F40 REFLECT THE STATUS OF RECREATION CENTERS

23   AND CLUB HOUSES THAT YOU HAVE IN YOUR EXCEL SPREADSHEET THAT

24   YOU USED TO MANAGE THE UNIFORM PHYSICAL ACCESS STRATEGY AS OF

25   DECEMBER 7TH, 2009?

1817

1  A.   YES.

2           THIS SAYS 2007 ON THE PLAN.

3           OH, I'M SORRY, DECEMBER 7, 2009.

4           THAT WOULD -- THIS MAP IS OLDER, ISN'T IT, THAN THE

5  SPREADSHEET?

6           BUT IT WOULD REFLECT THE STATUS AT THAT PARTICULAR

7  TIME.  I WOULD DO THESE MAPS AFTER I UPDATED MY SPREADSHEETS ON

8  MY OTHER DATABASES.

9  Q.   GOING BACK TO THAT SPREADSHEET, EXHIBIT B39 IS A SNAPSHOT,

10  CORRECT, OF ONE DAY IN TIME OF YOUR SPREADSHEET, CORRECT?

11  A.   THAT'S CORRECT.

12  Q.   AND THAT'S A LIVING DOCUMENT THAT YOU USE ON A CONTINUING

13  BASIS TO MANAGE THE UNIFORM PHYSICAL ACCESS STRATEGY, CORRECT?

14  A.    THAT'S CORRECT.  I AM UPDATING THIS WEEKLY, BIWEEKLY,

15  DEPENDING ON HOW PROJECTS OCCUR.

16           MR. EMERY:  THE CITY MOVES EXHIBIT F40 INTO

17  EVIDENCE.

18           THE COURT:  ANY OBJECTION?

19           MR. WALLACE:  NO OBJECTION.

20           THE COURT:  REQUEST IS GRANTED.

21                (DEFENDANTS' EXHIBIT F40 RECEIVED IN

22                EVIDENCE)

23  BY MR. EMERY:

24  Q.   I WOULD LIKE YOU NOW TO LOOK AT EXHIBIT F34.

25           (EXHIBIT DISPLAYED ON SCREEN.)

1818

1    LET ME KNOW WHEN YOU HAVE IT.

2  A.   I HAVE IT.

3  Q.   TELL ME WHAT EXHIBIT F34 SHOWS?

4  A.   F34, AGAIN, IS ONE OF THESE BLUE DOT ANALYSIS MAPS.  BUT

5  THIS ONE IS DATED JULY 31ST, 2008, SO IT IS REALLY OUT OF DATE.

6    BUT IT IS SHOWING, AGAIN, THE GEOGRAPHICAL SPREAD OF

7  ATHLETIC FIELDS THROUGH NEIGHBORHOODS, SUPERVISORY DISTRICTS,

8  AND REC CENTERS AND PLAYGROUNDS.

9  Q.   THE LEGEND HERE FOR BLUE DOT SAYS "ACCESSIBLE PROJECT".

10  WHAT DOES THAT MEAN?

11  A.   THOSE ARE SPECIFIC SITES WHERE THERE HAS BEEN NEW

12  CONSTRUCTION OR ALTERATION THAT IT IMPROVED FIELDS OF PLAY OR

13  SPORTS COURTS, OUTDOOR RECREATION, SPORT FACILITIES.

14  Q.   DOES EXHIBIT F34 REFLECT THE STATUS OF THESE ATHLETIC

15  FIELD FACILITIES ON YOUR MANAGEMENT SPREADSHEET AS OF JULY 31,

16  2008?

17  A.   YEAH.  AGAIN, AS I SAID, THESE MAPS WOULD BE PRODUCED

18  AFTER I UPDATED THAT SPREADSHEET.

19    MR. EMERY:  THE CITY MOVES EXHIBIT F34 INTO

20  EVIDENCE.

21    THE COURT:  ANY OBJECTION?

22    MR. WALLACE:  NO OBJECTION.

23    THE COURT:  REQUEST IS GRANTED.

24    (DEFENDANTS' EXHIBIT F34 RECEIVED IN

25    EVIDENCE)

BY MR. EMERY:

Q.   NEXT, MR. SCOTT, I WOULD LIKE YOU TO LOOK AT EXHIBIT F37.

IT LOOKS A LITTLE DIFFERENT.  CAN YOU EXPLAIN WHAT EXHIBIT F37 IS?

A.   THIS WAS A PRELIMINARY ANALYSIS I WAS WORKING ON WITH RECREATION AND PARKS DEPARTMENT AS TO WHAT SORT OF CHANGES WERE HAPPENING TO GOLDEN GATE PARK WITH OUTDOOR RECREATION TRAILS, PARKING AND TOILET FACILITIES.  AND WE WERE MULLING OVER HOW WERE WE GOING TO CONVEY THIS INFORMATION TO THE PUBLIC.

SO THIS WAS SORT OF A FIRST ITERATION OF THAT GRAPHIC THAT WE MIGHT PUT UP ON THEIR WEBSITE.

Q.   DO YOU KNOW IF A VERSION OF THIS GRAPHIC HAS BEEN PUT UP ON THE REC PARK WEBSITE?

A.   NOT AS YET.  I DON'T BELIEVE IT HAS.

Q.   YOU ARE STILL WORKING ON IT WITH THEM?

A.   YEAH, WE ARE STILL TRYING TO GET THE ARTWORK THAT WAS RECENTLY PRODUCED FOR GOLDEN GATE PARK SITE PLAN.

Q.   WHAT DO THE BLUE LINES SIGNIFY IN THIS MAP GOING THROUGH GOLDEN GATE PARK?

A.   OKAY.

THERE IS ACTUALLY THREE DIFFERENT TYPES OF BLUE LINES, ALTHOUGH THE LEGEND IS ONLY DISCUSSING TWO.

ONE OF THEM THERE'S AN ACCESSIBLE WEEKEND TRAM THAT HAPPENS IN THE LATE SPRING SUMMERTIME, A BUS THAT HAS WHEELCHAIR ACCESSIBILITY THAT ONE CAN TAKE AROUND TO THE

1820

1  VARIOUS SITES.

2  THE OTHER TWO, THERE WAS A 1994 GOLDEN GATE PARK ADA

3  TRANSITION PLAN THAT DESIGNATED THE ACCESSIBLE ROUTES,

4  RECREATION ROUTES THROUGH THE PARK, AND THERE'S MEDALLIONS IN

5  THESE PATHS THAT EXPLAIN THAT THEY HAVE WHEELCHAIR SYMBOLS AND

6  ARROWS.

7  AND THEN THERE'S ANOTHER SERIES OF LINES WHERE I'VE

8  GONE OUT TO THAT PARTICULAR TRAIL OR RECREATION ROUTE AND FOUND

9  THEM THAT THEY SHOULD BE ADDED TO THIS PLAN TO SHOW

10  RECREATIONAL OPPORTUNITIES THAT HAVE EITHER BEEN IMPROVED

11  THROUGH CAPITAL PROGRAMS SINCE 1994 OR THAT ACTUALLY ARE VERY

12  USABLE, DEPENDING ON WHAT A PERSON WOULD LIKE TO DO OUT IN

13  GOLDEN GATE PARK.

14  Q.   SO, IS THERE A DIFFERENCE IN THE VISUAL REPRESENTATION OF

15  THE TRAILS THAT YOU PERSONALLY IDENTIFIED AS BEING ACCESSIBLE

16  AND USABLE VERSUS THE ONES THAT THE TRAILS THAT YOU KNEW FROM

17  RECORDS WERE THE SUBJECT OF PRIOR IMPROVEMENTS?

18  A.   THERE IS.  THERE'S KIND OF A DOTTED LINE IN THE MIDDLE OF

19  THE MAP, AND THAT SHOWS WHAT IS A RUSTIC TRAIL.  IT IS ACTUALLY

20  AN ASPHALT ROAD THAT ARKS THROUGH THE PROPERTY WHERE TRAFFIC

21  HAS BEEN REDUCED OR ELIMINATED, AND IT REALLY IS A VERY NICE

22  OUTDOOR TRAIL EXPERIENCE.

23  Q.   UH-HUM.

24  SO HOW DID YOU VERIFY THAT THE TRAILS IN GOLDEN GATE

25  PARK MAP HERE THAT ARE DESIGNATED BLUE, HOW DID YOU PERSONALLY

1  VERIFY THAT THEY WERE ACCESSIBLE?

2  A.   WELL, THERE AREN'T ANY ACCESSIBILITY GUIDELINES

3  ENFORCEABLE FOR TRAILS AT THIS POINT.

4  Q.   THE QUESTION IS WHAT DID YOU DO?

5  A.   WHAT DID I DO?  I WALKED EVERY ROUTE.

6           I DROVE OUT THERE AND WALKED ALL THESE ROUTES.  AND

7  IN SOME CASES I USED AN ELECTRONIC LEVEL, BUT I DID NOT SURVEY

8  THIS THING AS A CIVIL ENGINEER.  BUT I WENT AND WALKED EVERY

9  ROUTE.

10 Q.   AND DID YOU APPLY A PARTICULAR STANDARD WHEN YOU WERE

11 DECIDING WHETHER OR NOT TO DESIGNATE A PARTICULAR TRAIL AS BLUE

12 ON THIS MAP?

13 A.   NO.  I APPLIED COMMON SENSE.

14 Q.   WHAT COMMON SENSE QUESTIONS WERE YOU ASKING YOURSELF?

15 A.   WHETHER A PERSON IN A WHEELCHAIR OR SOMEBODY WHO IS

16 AMBULATORY OR VISION IMPAIRMENT OR HAS ANY OTHER SENSORY

17 IMPAIRMENT DISABILITY WOULD FIND THIS EXPERIENCE THROUGH THESE

18 TRAILS OR RECREATION ROUTES A GOOD RECREATIONAL OPPORTUNITY.

19           OUR INTENT WAS, ONCE WE HAD THIS MAPPED, THEN WE

20 WOULD EXPLAIN THE EXPERIENCE.

21 Q.   WAIT FOR THE NEXT QUESTION.

22           I AM WAITING FOR THE OBJECTION.

23           THE COURT:  DON'T ENCOURAGE HIM.  HE'S GIVING YOU

24 LEEWAY.

25 ///

1822

1    BY MR. EMERY:

2    Q.    WHY DID YOU USE COMMON SENSE INSTEAD OF APPLYING A

3    PARTICULAR ACCESSIBILITY STANDARD WHEN YOU WERE MAPPING OUT

4    THIS EXHIBIT F40?

5    A.    BECAUSE YOUR PREVIOUS QUESTION WAS WERE THERE -- DID I

6    APPLY ANY PARTICULAR ACCESSIBILITY STANDARD.

7              AND UNDER THE CURRENT ADAAG, THERE IS NO ENFORCEABLE

8    STANDARD FOR RECREATION ROUTES AND TRAILS.  THIS IS A PROPOSED

9    STANDARD BY THE U.S. ACCESS BOARD.

10             AND ONE OF THE THINGS THAT WE WANTED TO ENCOURAGE

11   INDIVIDUALS WAS COME OUT TO USE GOLDEN GATE PARK WITH THIS MAP

12   AND NOT TO DISCOURAGE PEOPLE TO STAY AWAY FROM CERTAIN AREAS OR

13   SITES.

14   Q.    OKAY.

15   A.    THAT WE WANTED TO BE ABLE TO ENCOURAGE PEOPLE THAT THESE

16   ARE RECREATIONAL OPPORTUNITIES.

17             MR. WALLACE:  PLAINTIFFS MOVE TO STRIKE THE PORTION

18   OF THE RESPONSE IN WHICH THE WITNESS DESCRIBES SUPPOSEDLY

19   UNENFORCEABLE ACCESS STANDARDS FOR TRAILS AND PARKS.

20             THE COURT:  COUNSEL?

21             MR. WALLACE:  SAME BASIS AS PREVIOUSLY, YOUR HONOR.

22             MR. EMERY:  I HAVE A SIMILAR RESPONSE TO PREVIOUSLY

23   YOUR HONOR.  HE WAS EXPLAINING THE REASONS HE MADE A PARTICULAR

24   DECISION IN -- IN THE COURSE OF HIS DUTIES.  THE FACT THAT HIS

25   DECISIONS REQUIRE AN AREA OF EXPERTISE, DOES NOT MAKE THOSE

1823

1   DECISIONS OR EXPLANATIONS OF THEM RULE 26 DISCLOSURE.

2          THE COURT:  YOUR QUESTION WAS:  WHY DID YOU USE

3   COMMON SENSE INSTEAD OF APPLYING A PARTICULAR ACCESSIBILITY

4   STANDARD WHEN YOU WERE MAPPING OUT THIS EXHIBIT?

5          AND THE ANSWER:  BECAUSE YOUR PREVIOUS QUESTION WAS

6   WERE THERE -- DID I APPLY ANY PARTICULAR ACCESSIBILITY

7   STANDARD.  AND UNDER THE CURRENT ADAAG, THERE IS NO ENFORCEABLE

8   STANDARD FOR RECREATIONAL ROUTES AND TRAIL.

9          WELL, WITH RESPECT TO THAT, THAT'S NOT EVEN

10  RESPONSIVE TO THE QUESTION.  IS THAT WHAT YOU'RE OBJECTING --

11  THAT OBJECTION IS SUSTAINED AND THE REQUEST TO STRIKE IS

12  GRANTED WITH RESPECT TO THAT PORTION OF THE ANSWER.

13         SO NOW WE WILL SEE IF WE CAN GET TO THE ANSWER TO

14  THE QUESTION.

15             (PAUSE IN THE PROCEEDINGS.)

16         THIS IS A PROPOSED STANDARD BY THE U.S. ACCESS

17  BOARD.  AND ONE OF THE THINGS -- OKAY, OKAY.

18         SO EVERYTHING BEFORE THIS SENTENCE, THIS SENTENCE --

19  AND ONE OF THE THINGS THAT WE WANTED TO ENCOURAGE INDIVIDUALS

20  WAS TO COME OUT TO USE GOLDEN GATE WITH THIS MAP AND NOT TO

21  DISCOURAGE PEOPLE TO STAY AWAY FROM CERTAIN AREAS OR SITES.

22         THAT PART IS RESPONSIVE.  THAT PART WILL STAY IN AND

23  THE REST OF IT WILL GO OUT.

24  BY MR. EMERY:

25  Q.   I AM GOING TO ASK YOU A QUESTION.  I WANT YOU TO STICK

1824

1   VERY CLOSE TO IT, MR. SCOTT.

2   A.    ALL RIGHT.

3   Q.    WHY DID YOU USE COMMON SENSE INSTEAD OF A PARTICULAR

4   ACCESSIBILITY STANDARD WHEN YOU WERE MAKING YOUR DECISIONS

5   MAPPING OUT THIS -- MAPPING OUT THE TRAILS IN THIS PARK?

6   A.    BECAUSE I A USER OF GOLDEN GATE PARK AND I HAVE 30 YEARS

7   OF PROFESSIONAL EXPERIENCE AS AN ARCHITECT AND 20 YEARS OF

8   EXPERIENCE AS AN ACCESSIBILITY SPECIALIST.

9           AND HAVING WORKED ON MANY OF THESE ACCESSIBILITY

10  GUIDELINES THAT ARE BEING PROPOSED, I FELT THAT THESE ROUTES

11  WERE IN THE SPIRIT AND INTENT OF WHAT IS BEING PROPOSED FOR

12  OUTDOOR RECREATION AND TRAILS AND PATHS.

13  Q.    THANK YOU.

14          WE TALKED ABOUT THE TRAILS THAT ARE DESIGNATED WITH

15  BLUE LINES ON EXHIBIT F37.  I WANT TO ASK YOU NOW ABOUT THE

16  LITTLE SQUARE BOXES WITH THE INTERNATIONAL SYMBOL OF

17  ACCESSIBILITY.

18          WHAT DO THOSE DESIGNATE ON THIS MAP?

19  A.    THOSE DESIGNATE ACCESSIBLE PARKING SPACES THAT ARE

20  ACTUALLY STRIPED AND HAVE SIGNS.

21  Q.    WHAT DO THE NUMBERS THAT ARE ASSOCIATED WITH EACH OF THOSE

22  BOXES HAVING THE ISA SYMBOL DESIGNATE?

23  A.    THAT IS THE NUMBER OF ACCESSIBLE PARKING SPACES THAT ARE

24  AT THAT LOCATION.

25  Q.    WHAT DO THE BOXES WITH THE LITTLE SYMBOL OF A MAN AND A

1    WOMAN INDICATE ON THIS MAP?

2    A.   THOSE ARE FREE-STANDING TOILETS THAT WERE -- OR TOILETS

3    INSIDE BUILDINGS THAT WERE RENOVATED AS PART OF THE 1994 ADA

4    TRANSITION PLAN FOR GOLDEN GATE PARK OR OTHERS THAT WERE

5    RENOVATED OR BUILT AFTERWARDS.  SO THOSE ARE ACCESSIBLE AND

6    USABLE TOILET ROOMS.

7              MR. EMERY:  THE CITY MOVES EXHIBIT F37 INTO

8    EVIDENCE.

9              THE COURT:  37.  ANY OBJECTION?

10             MR. WALLACE:  NO OBJECTION, YOUR HONOR.

11             THE COURT:  REQUEST IS GRANTED.

12                  (DEFENDANTS' EXHIBITF37 RECEIVED IN

13                   EVIDENCE)

14   BY MR. EMERY:

15   Q.   AND YOU CAN PUT THAT BINDER AWAY, MR. SCOTT.

16             IN JANUARY AND FEBRUARY OF 2010, WERE YOU INVOLVED

17   IN THE TASK OF REVIEWING PLAINTIFFS' SITE INSPECTION REPORTS IN

18   THIS CASE?

19   A.   YES.

20   Q.   CAN YOU PLEASE DESCRIBE THAT PROJECT BRIEFLY?

21   A.   PER THE REQUEST OF THE CITY ATTORNEY'S OFFICE, WE WERE

22   SENT THESE REPORTS AND ASKED TO COMMENT ON THEM.

23             AND THEN WHEN WE DISCUSSED HOW WE WERE GOING TO DO

24   THIS INTERNALLY AT MAYOR'S OFFICE ON DISABILITY, I CHOSE OR WAS

25   ASSIGNED CERTAIN FACILITIES TO GO OUT AND TAKE A LOOK AT AND

1855

1    COORDINATOR.  THAT IS THE PERSON WHO'S PRIMARILY RESPONSIBLE

2    FOR INVESTIGATING DISABILITY ACCESS COMPLAINTS AS WELL AS BEING

3    THE RESOURCE PERSON FOR THE DEPARTMENT ON ADA ISSUES.

4            UNFORTUNATELY, THIS POSITION IS NOT THE ONLY JOB

5    THAT A PARTICULAR ADA COORDINATOR DOES.  SO DEPENDING ON WHO IS

6    ASSIGNED TO A PARTICULAR DEPARTMENT, AND WHETHER EXPERIENCE

7    LEVEL WITH ADA OR DISABILITY RIGHTS LAWS IS, THEY MAY HAVE NOT

8    HAD GREAT BACKGROUND.  SO A LOT OF MY WORK IS DOING ONE-ON-ONE

9    TRAINING AND TECHNICAL ASSISTANCE WITH THESE INDIVIDUALS.

10           AND THERE ARE ABOUT 60 IN THE CITY, ONE FOR EACH

11   DEPARTMENT, PRETTY MUCH.  AND WORKING WITH THEM VERY CLOSELY

12   WHEN THERE ARE COMPLAINTS AND THERE NEEDS TO BE AN

13   INVESTIGATION.

14   Q.   SO HAVE YOU CONDUCTED TRAINING SESSIONS FOR THE ADA

15   COORDINATORS SIMILAR TO THE TRAINING SESSIONS THAT YOU LED FOR

16   DEPARTMENT HEADS AND MANAGERS?

17   A.   YES, I HAVE.  IN APRIL OR MAY OF LAST YEAR, 2010, I

18   CONDUCTED A HALF-DAY TRAINING -- ACTUALLY IN SO MANY -- SO MUCH

19   MORE IN DEPTH OF WHAT I USUALLY DO FOR CITY DEPARTMENTS.  AND

20   IT WAS A TRAINING THAT WAS PRIMARILY COORDINATED AND

21   IMPLEMENTED BY ME, BUT ALSO WITH THE ASSISTANCE OF SOME OF OUR

22   MORE EXPERIENCED ADA COORDINATORS AND WITH JOHN PAUL SCOTT.

23   BECAUSE WE WANTED TO PROVIDE A PRIMER, A COMMON BASE FOR ALL OF

24   OUR ADA COORDINATOR STAFF.

25           THE CITY HAS UNDERGONE THROUGH HUGE BUDGETARY

1   DIFFICULTIES, SO A LOT OF PEOPLE HAVE MOVED IN AND OUT OF THAT

2   POSITION.  SO LAST YEAR IT WAS AN OPPORTUNITY TO GET EVERYBODY

3   ON THE SAME PAGE.

4   Q.   AND I WOULD LIKE TO DIRECT YOUR ATTENTION TO THE CITY'S

5   TRIAL EXHIBIT E27, WHICH IS A POWER POINT SLIDE ENTITLED

6   "DISABILITY ACCESS TO CITY'S PROGRAMS, SERVICES AND ACTIVITIES

7   A PRIMER FOR CITY DEPARTMENTS' ADA COORDINATORS".

8              ARE YOU FAMILIAR WITH THIS DOCUMENT, MS. FRAGULI?

9              (EXHIBIT DISPLAYED ON SCREEN.)

10  A.   YES.  I WROTE THIS DOCUMENT.

11  Q.   WHEN DID YOU PREPARE THIS DOCUMENT?

12  A.   AS I SAID, THE TRAINING OCCURRED IN EITHER MAY OR MARCH OF

13  LAST YEAR.  I AM SORRY I CAN'T REMEMBER EXACTLY.  AND SO I

14  PREPARED IT DURING THAT TIME.

15  Q.   IS THIS A POWER POINT TRAINING PACKET THAT YOU PREPARED

16  FOR PURPOSES OF THAT TRAINING SESSION FOR THE ADA COORDINATORS

17  LAST YEAR?

18  A.   YES, IT IS.

19  Q.   AND ROUGHLY HOW MANY PEOPLE ATTENDED THIS TRAINING?

20  A.   ABOUT 45 PEOPLE.  AND THAT REPRESENTED OVER 80 PERCENT OF

21  ALL THE DEPARTMENTS IN THE CITY.

22  Q.   AND I WOULD LIKE TO DIRECT YOUR ATTENTION TO PAGE 10 OF

23  THE CITY'S TRIAL EXHIBIT E27.

24              MS. FRAGULI, DID YOU PREPARE THAT SLIDE?

25  A.   YES, I DID.  IT'S ESSENTIALLY THE JOB DESCRIPTION FOR OUR

1  ADA COORDINATORS.  IT PROVIDES AN OUTLINE OF WHAT THEY ARE

2  EXPECTED TO DO.

3  Q.    NOW, TURNING TO THE NEXT PAGE OF THIS POWER POINT, THERE

4  IS A GRAPHIC IMAGE.

5         DID YOU PREPARE THAT GRAPHIC?

6  A.    I DID.  IT WAS MY VERY QUICK AND POIGNANT WAY OF TELLING

7  FOLKS THAT MOD, MAYOR'S OFFICE ON DISABILITY IS A TINY LITTLE

8  CENTER.  WE HOLD ALL OF THE INFORMATION.  WE ARE THE

9  CLEARINGHOUSE FOR INFORMATION FOR POLICIES, FOR THE CONNECTIONS

10  TO DISABILITY ACCESS, BUT THESE GUYS, THOSE ADA -- THE

11  DEPARTMENT ADA COORDINATORS ARE ACTUALLY OUR LIAISONS.  WE ALL

12  WORK TOGETHER TO SORT OF GET THE DISABILITY WHEEL OF ACCESS

13  GOING.

14         AND I KNOW IT'S KIND OF A CORNY GRAPHIC, BUT IT

15  REALLY -- IT REALLY BRINGS TO HEART, I THINK, THE FACT THAT

16  COLLABORATIVE STYLE THAT OUR OFFICE HAS BEEN SO GOOD AT WORKING

17  WITH FOLKS WITHIN THEIR DEPARTMENTS TO CREATE CULTURE, TO GO

18  BEYOND WHAT IS REQUIRED TO GO TO WHAT IS REALLY NECESSARY TO

19  NOT JUST GET US IN THE DOOR, BUT ACTUALLY GETTING PEOPLE ACCESS

20  TO THE PROGRAM.

21  Q.    WHO IS THE ADA COORDINATOR FOR THE DEPARTMENT OF PUBLIC

22  WORKS?

23  A.    KEVIN JENSEN.

24  Q.    DO YOU COLLABORATE WITH MR. JENSEN ON PROJECTS RELATING TO

25  DISABLED ACCESS?

1858

A.   QUITE FREQUENTLY.  BOTH IN TERMS OF COMPLAINTS AND CURB

RAMP REQUESTS BECAUSE AS I SAID, I OVERSEE AND I CONDUCT A BIG

PORTION OF THE ADA GRIEVANCE PROCEDURE.  I COMMUNICATE WITH

MR. JENSEN QUITE FREQUENTLY IN REGARD TO THOSE COMPLAINTS.

        I OFTEN HAVE THE OPTION OF SINCE I'M A WHEELCHAIR

USER MYSELF, TO KIND OF CALL HIM UP OR SEND HIM A QUICK E-MAIL

AND SAY, HEY, YOU KNOW, I NOTICED THIS.  AND SO THAT COULD LEAD

TO INTERACTION.

        I ALSO WORK WITH MR. JENSEN OR I HAVE BEEN IN GROUPS

AND ADVISORY COMMITTEES, TECHNICAL ADVISORY GROUPS ABOUT

POLICIES THAT PERTAIN TO ACCESSIBILITY IN THE PUBLIC

RIGHT-OF-WAY.

Q.   AND WHO IS THE ADA COORDINATOR FOR THE DEPARTMENT OF

RECREATION AND PARKS?

A.   THERE'S ACTUALLY TWO PEOPLE WITH DIFFERENT

RESPONSIBILITIES.  PAULINA ARAICA IS THE PHYSICAL ACCESS

COORDINATOR, ADA COORDINATOR AND LUCAS TOBIN IS PRIMARILY THE

INDIVIDUAL RESPONSIBLE FOR PROGRAMMATIC ACCESS ISSUES, SUCH AS

REASONABLE ACCOMMODATIONS IN RECREATIONAL PROGRAMS FOR PEOPLE

WITH DISABILITIES AND ALSO PROJECT INSIGHT, WHICH IS AN

ADAPTIVE RECREATION PROGRAM.

Q.   HAVE YOU PROVIDED TRAINING OR OTHER ASSISTANCE TO EITHER

MS. ARAICA OR MR. TOBIN?

A.   I HAVE WORKED WITH MS. ARAICA PERTAINING TO A FEW PHYSICAL

ACCESS COMPLAINTS IN THE RECREATION AND PARK FACILITIES, BUT I

1859

1    MOSTLY HAVE BEEN WORKING WITH MR. TOBIN RELATED TO PROGRAMMATIC

2    ACCESS ISSUES.

3           ONE OF THE MOST -- ONE OF THE MOST IMPORTANT ONE WAS

4    ACCESSIBILITY TO CITIES -- TO TEMPORARY EVENTS TAKING PLACE IN

5    REC AND PARK OPEN SPACES, LIKE FESTIVALS AND PARADES AND THOSE

6    KINDS OF THINGS THAT HAPPEN IN CITY PARKS.

7           THE COURT:  COUNSEL, JUST A SECOND.

8           (PAUSE IN THE PROCEEDINGS.)

9           THE COURT:  IT'S TIME TO RECESS.  DID YOU -- WERE

10   ALL TRYING TO SEE IF YOU COULD COMPLETE THE WITNESS TODAY?

11          MS. O'NEIL:  I PROBABLY HAVE ABOUT MAYBE TEN MINUTES

12   OF QUESTIONS FOR MS. FRAGULI.  IF WE COULD COMPLETE HER TODAY,

13   I THINK SHE WOULD APPRECIATE THAT.  SHE'S BEEN HERE ALL DAY.

14          THE COURT:  MY COURTROOM DEPUTY AND STAFF ARE

15   BEING -- THEY ARE HAVING AN AWARD CEREMONY FOR THE COURT TO

16   START AT 2:30, SO I AM GOING TO LET HER GO.  AND THEN WE CAN

17   JUST -- WE CAN CONTINUE IF THAT'S WHAT YOU ALL WANT TO DO.

18          MAYBE WE CAN JUST -- ASK KEITH TO COME IN UNLESS --

19   IF HE'S GOING TO GO TO THE AWARD CEREMONY, THAT'S OKAY.  WE

20   WILL JUST GO ON WITHOUT IT.

21          WAS HE GOING?  DO YOU KNOW?

22          MR. JOHNSON:  YOUR HONOR, IF I MAY, BEFORE WE BREAK

23   FOR THE DAY AND BEFORE MS. CLARK LEAVES, AND I APOLOGIZE FOR

24   THE INTERRUPTION, BUT I REALIZE WE DIDN'T INTRODUCE OR MOVE

25   INTO EVIDENCE EXHIBIT 3911, WHICH IS THE 12 MAPS.

1860

1        CAN WE MOVE THOSE IN?

2        THE COURT:  3911?

3        MR. JOHNSON:  3911.

4        THE COURT:  WHO IS YOUR COUNTERPART?

5        MS. O'NEIL:  I APOLOGIZE, YOUR HONOR.  I WAS

6   DISCUSSING WITH MR. BROWN ABOUT HIS EXPECTED CROSS-EXAMINATION

7   OF MS. FRAGULI.

8        THE COURT:  I AM GOING TO ACCOMMODATE HER.  I JUST

9   DON'T WANT TO -- BECAUSE THIS AWARD CEREMONY -- SHE'S BEEN HERE

10  15 YEARS.  MY SECRETARY HAS BEEN HERE FOR 20.

11       YOU HAVE BEEN HERE 20 ALSO.

12       EXCUSE ME.  I AM SORRY.  I AM SORRY.  THEY ARE

13  HAVING A BIG CEREMONY, SO I'M GOING TO LET HER GO.  WE CAN STAY

14  AS LONG AS YOU ALL NEED TO SO WE CAN FINISH THE WITNESS SO SHE

15  WON'T HAVE TO COME BACK ON MONDAY.

16       THE WITNESS:  I AM PLANNING FOR ANOTHER TRAINING

17  NEXT WEEK.

18       THE COURT:  WE CAN STAY.

19       LISA, TELL THEM WHY I AM NOT THERE, OKAY?  YOU CAN

20  GO.

21       THE COURT:  HE ASKED THAT --

22       MS. O'NEIL:  WE THOUGHT WE COULD TALK ABOUT IT AFTER

23  WE WERE DONE WITH MS. FRAGULI.

24       THE COURT:  THAT'S FINE.

25       MR. JOHNSON:  THAT'S FINE.

BY MS. O'NEIL:

Q.   WHAT IS THE NATURE OF THE PROJECT THAT YOU WERE WORKING ON
WITH MR. TOBIN RELATED TO TEMPORARY EVENTS AT RECREATION AND
PARK FACILITIES?

A.   SO ONE OF OUR CITYWIDE POLICIES, AND, AGAIN, ONE OF THE
LESSER KNOWN THINGS ABOUT -- THAT I TRIED TO OUTLINE OR
HIGHLIGHT IN MY TRAINING SESSIONS WAS THE ACCESSIBLE EVENTS
CHECKLIST, WHICH IS A DOCUMENT PREPARED BY OUR OFFICE LONG
BEFORE I CAME INTO THE PICTURE, BUT IT PROVIDES STEP-BY-STEP
GUIDANCE ON HOW PUBLIC EVENTS SHOULD BE CREATED TO BE
ACCESSIBLE, BOTH PROGRAMMATICALLY AND PHYSICALLY TO PEOPLE WITH
DISABILITIES.  ANYTHING FROM A PARADE TO A FESTIVAL, THE WHOLE
COMMUNITY PARTICIPATES.  SO THAT PEOPLE WITH DISABILITIES GET
TO PARTICIPATE.

          ONE OF THE THINGS THAT WAS NOT QUITE AS CLEAR WAS
THE FACT THAT FOR EVENTS THAT WERE PUT ON BY PRIVATE ENTITIES,
SUCH AS THE AIDES FOUNDATION, OR OPERA IN THE PARK, WHERE THOSE
EVENTS ARE BEING CONDUCTED IN CITY PARKS, WE FELT THAT IT WAS
OUR RESPONSIBILITY TO ALSO TRAIN THOSE ENTITIES ON HOW TO DO
BUSINESS IN OUR HOUSE IN A VERY COMPLIANT WAY, AN INCLUSIVE
WAY.

          SO, PART OF WHAT I DID WITH MR. TOBIN WAS TO REALLY
GET ON MAKING THAT PROGRAM ACCESSIBLE, AND REVAMP THE CHECKLIST
IN A WAY THAT MADE SENSE FOR THE PERMITS DEPARTMENT AT REC AND
PARK TO WORK WITH THEIR ESSENTIALLY THEIR LESSEES.

1862

1   Q.    WHO IS THE LIBRARY'S ADA COORDINATOR?

2   A.    MARTI GODDARD.

3   Q.    HAVE YOU PROVIDED TRAINING OR OTHER ASSISTANCE TO MS.

4   GODDARD?

5   A.    IT IS MORE THE OTHER WAY AROUND.  MARTI GODDARD IS ONE OF

6   OUR, WHAT I CALL, STAR ADA COORDINATORS.  SHE HAS DONE AN

7   INCREDIBLE JOB IN BRINGING THE PUBLIC LIBRARY INTO A NATION --

8   NATIONAL MODEL OF ACCESSIBILITY BY INCLUDING HIGH-TECH

9   ASSISTIVE TECHNOLOGY, FREE ASSISTIVE TECHNOLOGY ACCESS TO THE

10  PUBLIC LIBRARIES FOR PEOPLE WITH DISABILITIES, PEOPLE WITH BOTH

11  MOBILITY --

12          THE COURT:  SLOW DOWN.  SLOW DOWN.  I HAVE THE SAME

13  PROBLEM.  SO JUST BE CONSCIOUS --

14          THE WITNESS:  I'M ITALIAN --

15          THE COURT:  JUST BE CONSCIOUS.  IF YOU SEE HER

16  GRIMACING THAT MEANS THAT SHE'S HAVING A HARD TIME.

17          THE WITNESS:  I'M SORRY.

18          THE COURT:  SLOW DOWN.

19          MS. O'NEIL:  IT'S NOTHING TO DO WITH THE CONTENT OF

20  WHAT SHE SAYS.

21          THE COURT:  NO, NO.  IT'S JUST THAT SHE'S TRYING HER

22  BEST TO DISCERN WHAT YOU'RE SAYING, SO THAT SHE CAN WRITE IT

23  DOWN ACCURATELY.  JUST SLOW IT DOWN.

24          THE WITNESS:  SO SHE HAS ARE CREATED OR BROUGHT INTO

25  THE PUBLIC LIBRARY A LOT OF FREE ASSISTIVE TECHNOLOGY FOR

1  PEOPLE WITH MOBILITY DISABILITIES, LEARNING DISABILITIES AND

2  VISUAL DISABILITIES, PEOPLE WHO ARE BLIND.

3          AND IN ADDITION TO THAT, SHE HAS CREATED AN

4  EXEMPLARY DEAF AND HARD OF HEARING SECTION IN THE PUBLIC

5  LIBRARY THAT INCLUDES ALSO WAYS OF CREATING COMMUNICATION

6  ACCESS.

7  BY MS. O'NEIL:

8  Q.   THANK YOU.

9          NOW I WOULD LIKE TO DIRECT YOUR ATTENTION TO PAGE 33

10 OF YOUR POWER POINT TRAINING MARKED AS EXHIBIT E27.

11          DID YOUR TRAINING TO THE ADA COORDINATORS INCLUDE

12 TRAINING ON ARCHITECTURAL ACCESS ISSUES?

13          (PAGE DISPLAYED ON SCREEN.)

14 A.   SORRY.  WE ARE DOING A WHEELCHAIR DANCE HERE.

15          YES, I DID.  AND THAT WAS -- THAT WAS A TRAINING

16 THAT WAS ASSISTED BY BOTH OF OUR ARCHITECTURAL ACCESS FOLKS,

17 JOHN PAUL SCOTT, DEPUTY DIRECTOR OF PHYSICAL ACCESS, AND KEVIN

18 JENSEN, WHO IS THE ADA COORDINATOR FOR THE DEPARTMENT OF PUBLIC

19 WORKS.

20 Q.   AND THEN TURNING YOUR ATTENTION TO PAGE 47 OF YOUR

21 TRAINING MATERIALS.

22          (PAGE DISPLAYED ON SCREEN.)

23          THERE IS A SLIDE ON THE SUBJECT OF MAINTENANCE OF

24 ACCESSIBLE FEATURES; IS THAT CORRECT?

25 A.   YES.  YOU WILL SEE A RECURRING THEME HERE.

1           AS A MATTER OF FACT, FOR THE -- OUR ADA

2  COORDINATORS, THE CONCEPT OF MAINTENANCE OF ACCESSIBLE FEATURES

3  WAS AN ENTIRE SECTION.  SO IF YOU WERE TO FLIP ON SOME OF THE

4  SUBSEQUENT SLIDES, YOU WOULD SEE WHAT I MEAN.

5           MS. O'NEIL:  WOULD YOU LIKE TO PUT UP THE NEXT

6  COUPLE OF SLIDES, COLLEEN.

7           (PAGES DISPLAYED ON SCREEN.)

8           AND THE NEXT ONE?

9           (PAGE DISPLAYED ON SCREEN.)

10  BY MS. O'NEIL:

11  Q.  DID YOU, IN THIS TRAINING, DID YOU PROVIDE EXAMPLES TO THE

12  ADA COORDINATORS OF ITEMS THAT NEED TO BE MAINTAINED TO

13  PRESERVE THE ACCESSIBILITY OF MAINTENANCE FEATURES -- EXCUSE

14  ME -- TO PRESERVE THE ACCESSIBILITY OF FEATURES IN THE CITY'S

15  BUILDINGS?

16           THAT'S NOT VERY ARTFULLY STATED.

17  A.  I THINK THAT SLIDE IS EXACTLY WHAT THIS IS ABOUT.  THERE

18  THE SLIDE IS AN EXAMPLE.  I THINK THE ITEMS ON THE SLIDES ARE

19  AN EXAMPLE OF WHAT THIS IS ABOUT.

20           I AM TRYING TO REMEMBER WHAT I SAID.  YOU WOULD SEE

21  THERE SORT OF A DEPICTION OF SEVERAL ITEMS THAT CAN GO OUT OF

22  MAINTENANCE.

23  Q.  AND DOES MOD EXPECT THE CITY'S ADA COORDINATORS TO ASSIST

24  WITH MAINTAINING THE CITY'S ACCESSIBLE FEATURES?

25  A.  AGAIN, THIS IS SOMETHING THAT WE ARE TRYING TO DRILL INTO

 1   EVERYBODY'S HEAD.  IT'S ABOUT IF YOU SEE SOMETHING IS BROKEN,

 2   YOU NEED TO THINK OF IT AS A DISABILITY RIGHTS ISSUE AND AS A

 3   DISABILITY ACCESS VIOLATION.

 4              SO IF YOU FLIP TO THE NEXT SLIDE AGAIN....

 5              (PAGE DISPLAYED ON SCREEN.)

 6   Q.   THAT, FOR THE RECORD, IS SLIDE MARKED AS NUMBER 50.

 7   A.   SO AS YOU WILL SEE ON THAT SLIDE, ONE OF THE ITEMS THAT WE

 8   TRIED TO EMPHASIZE TO THE ADA COORDINATORS IS THAT REGARDLESS

 9   OF THEIR TRAINING AS A PHYSICAL ACCESS EXPERT, RIGHT,

10   REGARDLESS OF THEIR TRAINING ON THAT, EVERYBODY CAN SEE THAT

11   ACCESSIBILITY IS A PRIORITY THAT THE MOD OR THE DPW DISABILITY

12   ACCESS COORDINATOR HAVE HAD A FULL ACCESSIBILITY REVIEW --

13              THE REPORTER:  I'M SORRY.

14              THE COURT:  SHE CAN'T UNDERSTAND WHAT YOU'RE SAYING

15   BECAUSE YOU ARE SPEAKING TOO QUICKLY.

16              TELL HER WHERE YOU STOPPED.

17              THE REPORTER:

18              (RECORD READ AS FOLLOWS:

19              "...ACCESS COORDINATOR HAVE HAD A FULL

20              ACCESSIBILITY REVIEW.")

21              THE WITNESS:  HAVE HAD AN OPPORTUNITY TO FULLY

22   REVIEW THE PLANS.

23              AND -- I AM SORRY, I LOST MY TRAIN OF THOUGHT.

24   BY MS. O'NEIL:

25   Q.   WELL, IS THE INFORMATION STATED ON THE SLIDE SIMILAR TO

1866

1  WHAT YOU TELL AND HAVE TOLD THE ADA COORDINATORS?

2  A.    EXACTLY.

3           MS. O'NEIL:  THE CITY MOVES EXHIBIT E27 INTO

4  EVIDENCE AT THIS TIME.

5           THE COURT:  ANY OBJECTION?

6           MR. BROWN:  NO OBJECTION, YOUR HONOR.

7           THE COURT:  THE REQUEST IS GRANTED.

8                  (DEFENDANTS' EXHIBIT E27 RECEIVED IN

9                  EVIDENCE)

10 BY MS. O'NEIL:

11 Q.    MS. FRAGULI, YOU TESTIFIED THAT YOU ALSO HAVE

12 RESPONSIBILITIES RELATED TO THE CITY'S GRIEVANCE PROCEDURE; IS

13 THAT CORRECT?

14 A.    YES, I DO.  NOT ONLY I HAVE THE OVERSIGHT RESPONSIBILITY,

15 BUT, AGAIN, DUE TO THE OVERALL CITY'S BUDGETARY SITUATION AND

16 THE STAFFING REDUCTIONS, I ACTUALLY END UP CONDUCTING A BIG

17 PORTION OF THE ACTUAL INTERVIEWING AND RELATING TO THE

18 COMPLAINTS.

19 Q.    AND ARE THE DEPARTMENT ADA COORDINATORS RESPONSIBLE FOR

20 ACTUALLY INVESTIGATING THE COMPLAINT?

21 A.    YES, WITH HELP.  I, AS I SAID, AGAIN, DEPENDING ON THE

22 LEVEL OF EXPERTISE AND EXPERIENCE THAT OUR ADA COORDINATORS

23 HAVE IN VARIOUS DEPARTMENTS, I GET TO BE, IN SOME CASES, MUCH

24 MORE INTIMATELY INVOLVED WITH THE ACTUAL RESOLUTION OF THE

25 COMPLAINT THAN OTHERS.

1  Q.   DOES THE CITY HAVE A TIME LINE FOR RESPONDING TO

2  GRIEVANCES?

3  A.   YES.   THE COMPLAINANT IS ENTITLED TO A RESPONSE FROM THE

4  DEPARTMENT WITHIN 30 CALENDAR DAYS.   AND IF A SOLUTION OR A

5  RESOLUTION, OR THE INVESTIGATION EVEN, TAKES LONGER THAN THAT,

6  THE COMPLAINANT STILL RECEIVES A RESPONSE WITHIN 30 DAYS

7  INFORMING THEM OF THE STEPS TAKEN AND WHAT THE TIME LINE -- THE

8  EXPECTED TIME LINE TO BE.

9  Q.   AND DO YOU PROVIDE TRAINING TO THE CITY'S ADA COORDINATORS

10 ON THEIR RESPONSIBILITIES HELPING TO IMPLEMENT THE CITY'S

11 GRIEVANCE PROCEDURE?

12 A.   WELL, THIS IS ONE OF THE TOP REASONS THAT WE WANTED TO

13 TRAIN THE ADA COORDINATORS.   WE TAKE THE ADA GRIEVANCE

14 PROCEDURE VERY, VERY SERIOUSLY.   AND WE SEE OUR ADA

15 COORDINATORS AS VERY KEY PEOPLE IN BEING ABLE TO IMPLEMENT THAT

16 POLICY AND GET BACK TO OUR CITIZENS AS SOON AS POSSIBLE.

17          SO, YES.   IF YOU, AGAIN, FLIP THROUGH SEVERAL

18 SLIDES, WE HAD AN ENTIRE SECTION ON THE ADA GRIEVANCE PROCEDURE

19 AND INVESTIGATION.

20          (PAGE DISPLAYED ON SCREEN.)

21 Q.   DOES THAT BEGIN ON THE SLIDE THAT'S SHOWN HERE AS

22 SLIDE 58?

23 A.   THAT'S CORRECT.

24 Q.   ARE THERE ADDITIONAL SLIDES AFTER THIS RELATED TO YOUR

25 TRAINING ON THE SUBJECT?

1

2

3                    CERTIFICATE OF REPORTER

4          WE, RAYNEE H. MERCADO, AND DIANE E. SKILLMAN, OFFICIAL

5    REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

6    CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN

7    C07-03685SBA, KIROLA, ET AL. V. CITY AND COUNTY OF SAN

8    FRANCISCO, ET AL., WERE REPORTED BY US, CERTIFIED SHORTHAND

9    REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION

10   INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

11   TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF

12   FILING.

13          THE VALIDITY OF THE REPORTERS' CERTIFICATION OF

14   SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL

15   FROM THE COURT FILE.

16

17   _____

18        RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

19

20

21   _____

22        DIANE E. SKILLMAN, CSR, RPR, FCRR

23

24              SATURDAY, APRIL 23, 2011

25