# EXHIBIT C

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA          **ORIGINAL**

BEFORE THE HONORABLE SAUNDRA BROWN ARMSTRONG, JUDGE

| | | |
|---|---|---|
| IVANA KIROLA, ET AL., | ) | **COURT TRIAL** |
| | ) | |
| PLAINTIFFS, | ) | **VOLUME 10** |
| | ) | |
| VS. | ) | NO. C 07-03685 SBA |
| | ) | |
| CITY AND COUNTY OF | ) | |
| SAN FRANCISCO, ET AL., | ) | **PAGES 1888 — 2084** |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | THURSDAY, APRIL 28, 2011 |

**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

FOR PLAINTIFFS:          SCHNEIDER WALLACE COTTRELL BRAYTON &
                              KONECKY
                         180 MONTGOMERY STREET, SUITE 2000
                         SAN FRANCISCO, CALIFORNIA  94109
                    BY:  MARK T. JOHNSON,
                         ANDREW P. LEE,
                         GUY B. WALLACE, ATTORNEYS AT LAW


                         BROWN POORE LLP
                         THE WATERGATE TOWERS
                         2200 POWELL STREET, SUITE 745
                         EMERYVILLE, CALIFORNIA  94608
                    BY:  SCOTT A. BROWN, ATTORNEY AT LAW


FOR DEFENDANT:           OFFICE OF THE CITY ATTORNEY
                         SIXTH FLOOR — FOX PLAZA
                         1390 MARKET STREET
                         SAN FRANCISCO, CALIFORNIA  94102
                    BY:  ERIN BERNSTEIN,
                         JAMES M. EMERY,
                         ELAINE M. O'NEIL, ATTORNEYS AT LAW


REPORTED BY:             RAYNEE H. MERCADO, CSR NO. 8258
                         DIANE E. SKILLMAN, CSR NO. 4909


**_RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530_**

**I N D E X**

| DEFENDANT'S WITNESSES | PAGE | VOL. |
|---|---|---|
| WHIPPLE, JAMES | | |
| DIRECT EXAMINATION BY MR. EMERY | 1898 | 10 |
| CROSS-EXAMINATION BY MR. BROWN | 1906 | 10 |
| | | |
| JENSEN, KEVIN WESLEY | | |
| DIRECT EXAMINATION BY MS. O'NEIL | 1910 | 10 |
| CROSS-EXAMINATION BY MR. JOHNSON | 2009 | 10 |
| REDIRECT EXAMINATION BY MS. O'NEIL | 2027 | 10 |
| RECROSS-EXAMINATION BY MR. JOHNSON | 2029 | 10 |
| FURTHER REDIRECT EXAMINATION BY MS. O'NEIL | 2031 | 10 |
| | | |
| WOOD, LARRY | | |
| DIRECT EXAMINATION BY MR. EMERY | 2034 | 10 |

**E X H I B I T S**

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL |
|---|---|---|---|---|
| 417-07 | | | 2032 | 10 |

--oOo--

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

### E X H I B I T S

| DEFENDANTS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL |
|---|---|---|---|---|
| A14 | | | 1965 | 10 |
| A21 | | | 1962 | 10 |
| A9 | | | 1961 | 10 |
| F43 | | | 1966 | 10 |
| F44 | | | 1967 | 10 |
| F45 | | | 1968 | 10 |
| F48 | | | 1970 | 10 |
| G07, H04 | | | 1992 | 10 |
| G10 | | | 1971 | 10 |
| G17 | | | 1972 | 10 |
| G18 | | | 1958 | 10 |
| G19 | | | 1963 | 10 |
| H05 | | | 1996 | 10 |
| H06 | | | 1997 | 10 |
| H07 | | | 1993 | 10 |
| H20 | | | 1951 | 10 |
| I41 | | | 1928 | 10 |
| I42 | | | 1938 | 10 |
| J21 | | | 1931 | 10 |
| K10 | | | 1936 | 10 |
| P11 | | | 1919 | 10 |
| V26, V27, V28 | | | 1943 | 10 |
| AA13 | | | 2035 | 10 |

BY MS. O'NEIL:

Q.    MR. JENSEN, IS IT CORRECT THAT YOU BEGAN YOUR EMPLOYMENT

WITH THE CITY AT THE PORT OF SAN FRANCISCO IN 1995?

A.    THAT IS CORRECT.

Q.    AND IN THE COURSE OF YOUR WORK FOR THE PORT OF

SAN FRANCISCO, AS THE A.D.A. COORDINATOR FOR THE PORT, DID YOU

RECEIVE A COPY OF THIS DOCUMENT?

A.    I DID.

        MS. O'NEIL:  YOUR HONOR, MAY I PROCEED?

        THE COURT:  YOU MAY.

BY MS. O'NEIL:

Q.    AND I -- I BELIEVE YOU'RE IN THE MIDDLE OF EXPLAINING

WHAT THIS DOCUMENT IS.  COULD YOU FINISH YOUR RESPONSE, SIR.

A.    YES.  IT IS DATED JUNE 22ND, 1998.  AND IT WAS A LETTER

THAT WAS ESTABLISHING THE REQUIREMENT THAT CITY PROJECTS ALL

RECEIVE ACCESSIBILITY REVIEWS AND GETTING INTO SOME DETAIL

ABOUT WHAT THAT MEANS.

Q.    AND IN YOUR EXPERIENCE AS THE A.D.A. COORDINATOR FOR THE

PORT OF SAN FRANCISCO AND AS THE DISABILITY ACCESS COORDINATOR

FOR THE DEPARTMENT OF PUBLIC WORKS, HAS THIS POLICY ESTABLISHED

BY MAYOR BROWN IN 1998 REMAINED IN EFFECT UP TO THE PRESENT?

A.    IT HAS.

        MS. O'NEIL:  YOUR HONOR, THE CITY MOVES TRIAL

EXHIBIT P11 INTO EVIDENCE.

        THE COURT:  ANY OBJECTION?

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1    **MR. JOHNSON:**  NO OBJECTION, YOUR HONOR.

2    **THE COURT:**  P11 WILL BE RECEIVED INTO EVIDENCE.

3                    (DEFENDANTS' EXHIBIT P11

4                    RECEIVED IN EVIDENCE)

5    **BY MS. O'NEIL:**

6    **Q.**    MR. JENSEN, FOR THE CITY PROJECTS THAT ARE UNDER THE

7    RESPONSIBILITY OF THE DPW, IS IT CORRECT THAT YOU ARE THE

8    PERSON WHO APPROVES THOSE PROJECTS AS COMPLIANT WITH TITLE II

9    OF THE A.D.A.?

10   **A.**    I AM.

11   **Q.**    AND DOES YOUR JOB ALSO REQUIRE THAT YOU REVIEW CITY

12   CONSTRUCTION PROJECTS FOR COMPLIANCE WITH THE CALIFORNIA

13   BUILDING CODE?

14   **A.**    IT DOES.

15   **Q.**    AND DO YOU REVIEW CITY PROJECTS UNDER DPW'S JURISDICTION

16   FOR ANY OTHER CODES OR REGULATIONS WITH RESPECT TO DISABILITY

17   ACCESS?

18   **A.**    YES.  I'M CHARGED WITH REVIEWING THEM WITH THE GAMUT OF

19   ACCESSIBILITY REGULATIONS, BOTH FEDERAL, STATE, AND LOCAL.

20   **Q.**    DOES THE CITY USE ANY PARTICULAR DESIGN STANDARD FOR

21   ENSURING THAT CITY'S PROJECTS ARE CONSTRUCTED IN ACCORDANCE

22   WITH FEDERAL ACCESSIBILITY LAWS?

23   **A.**    YES, THE AMERICANS WITH DISABILITY ACT ACCESSIBILITY

24   GUIDELINES OR OTHERWISE CALLED ADAAG.

25   **Q.**    ADAAG; IS THAT RIGHT?

1    A.    YES.

2    Q.    AND DOES DPW HAVE OTHER EMPLOYEES ON ITS STAFF THAT ARE

3    TRAINED IN FEDERAL, STATE, AND LOCAL ACCESS STANDARDS?

4    A.    YES, MANY OF OUR STAFF HAVE RECEIVED TRAINING IN THAT

5    REGARD, ARCHITECTS, LANDSCAPE ARCHITECTS, ENGINEERS,

6    INSPECTORS.

7    Q.    DOES THE DEPARTMENT OF PUBLIC WORKS HAVE A SECTION THAT

8    IS RELATED TO ARCHITECTURE?

9    A.    THE BUREAU OF ARCHITECTURE.

10    Q.    AND WHAT IS THE FUNCTION OF THE BUREAU OF ARCHITECTURE?

11    A.    TO PROVIDE ARCHITECTURAL DESIGN SERVICES AND CONSTRUCTION

12    ADMINISTRATION SERVICES.

13    Q.    AND DO THEY PREPARE TYPICALLY -- STRIKE THAT.

14          DOES THE BUREAU OF ARCHITECTURE TYPICALLY PREPARE

15    THE CONSTRUCTION DRAWINGS AND THE ARCHITECTURAL PLANS FOR

16    CITY-FUNDED PROJECTS?

17    A.    SOME OF THEM, YES.

18    Q.    I WOULD LIKE YOU, MR. JENSEN, IF YOU COULD, TURN TO

19    ANOTHER DOCUMENT IN THE BINDER IN FRONT OF YOU, AND THIS IS

20    DOCUMENT -- TRIAL EXHIBIT A14.

21    A.    OKAY.

22                    (EXHIBIT PUBLISHED.)

23    BY MS. O'NEIL:

24    Q.    MR. JENSEN, DO YOU RECOGNIZE THE CITY'S TRIAL EXHIBIT

25    NO. A14?

1   A.    I DO.

2   Q.    AND WHAT IS THIS DOCUMENT?

3   A.    THIS IS OUR CURRENT PROCEDURE 9.8.24, A.D.A. AND

4   ACCESSIBILITY COMPLIANCE PROCEDURE.

5   Q.    DID YOU PREPARE THIS DOCUMENT?

6   A.    I DID.

7   Q.    DID YOU HAVE ASSISTANCE OF OTHERS IN PREPARING IT?

8   A.    YES.

9   Q.    WHY DID YOU PREPARE THIS PROCEDURE NO. 9.8.24?

10  A.    IT WAS PART OF A DEPARTMENT-WIDE REWORKING OF ALL OF OUR

11  PROCEDURES IN ORDER TO ATTAIN APWA ACCREDITATION, AMERICAN

12  PUBLIC WORKS ASSOCIATION.  AND A KEY PART OF THAT CERTIFICATION

13  IS TO CONFORM TO THEIR FILE NUMBERING SYSTEM AND HAVING A

14  CERTAIN NUMBER OF PROCEDURES IN PLACE IN ACCORDANCE WITH THEIR

15  OUTLINES.

16  Q.    AND WHEN WAS PROCEDURE 9.8.24 CREATED?

17  A.    (REVIEWING DOCUMENT.)

18        THIS WAS ADOPTED IN JANUARY 2010.  IT WAS CREATED IN

19  2009.

20  Q.    AND DOES PROCEDURE NO. 9.8.24 CREATE ANY NEW PROCEDURES

21  FOR THE DEPARTMENT OF PUBLIC WORKS AS OF THAT DATE?

22  A.    NOT SUBSTANTIALLY, NO.  IT JUST PUTS INTO THIS NEW APWA

23  FORMAT THE PROCEDURES AND -- AND POLICIES THAT WERE EXISTENCE

24  ALREADY AT THAT POINT.

25  Q.    MR. JENSEN, I'D LIKE TO DIRECT YOUR ATTENTION TO PAGE 3

 1  OF THIS DOCUMENT.

 2           ACTUALLY, IT'S THE -- IT'S PAGE 3, WHICH IS THE

 3  NUMBERING AT THE VERY BOTTOM.  YOU SEE, THERE'S TWO SETS OF

 4  NUMBERS, MR. JENSEN.  AND IT'S -- IT'S THE NUMBER AT THE BOTTOM

 5  THAT SAYS "EXHIBIT A14-" AND THEN IT HAS MANY ZEROS AND A 3.

 6           DO YOU SEE THAT?  IT'S ACTUALLY PAGE 2 OF YOUR

 7  PROCEDURE --

 8  **A.**    YES.

 9  **Q.**    -- DOCUMENT.

10  **A.**    I HAVE IT, YES.

11  **Q.**    OKAY.  AND THEN DIRECTING YOUR ATTENTION TO SECTION D

12  WHICH IS ENTITLED "PROCEDURE," AND SUB 1, WHICH IS

13  "RESPONSIBILITY," DO YOU SEE THAT, SIR?

14  **A.**    YES.

15  **Q.**    COULD YOU READ THE FIRST PARAGRAPH OF THAT SECTION?

16  **A.**    YES.  THE PROJECT MANAGER, PM, OR THE PROJECT LEAD, PL,

17  WHEN NO PM HAS BEEN ASSIGNED TO MANAGE A PROJECT, IS

18  RESPONSIBLE FOR SCHEDULING A.D.A. REVIEWS IN A TIMELY MANNER

19  AND ENSURING THAT PROJECT TEAM FOLLOWS THROUGH WITH THE

20  IMPLEMENTATION OF REVIEW COMMENTS OR PROVIDES ADEQUATE

21  EXPLANATION AS TO WHY THE COMMENTS ARE NOT BEING IMPLEMENTED.

22  **Q.**    AND THEN THERE'S A SECOND PARAGRAPH IN THAT SECTION.

23  COULD YOU READ THAT, TOO?

24  **A.**    BECAUSE CAPITAL PROJECTS VARY WIDELY IN SIZE AND

25  COMPLEXITY, PROJECT LEADS ARE ENCOURAGED TO MEET WITH THE DPW

1   DAC, DISABILITY ACCESS COORDINATOR, TO ESTABLISH THE NUMBER AND

2   SCHEDULE OF REVIEWS AND SET EXPECTATIONS ON HOW LONG EACH

3   REVIEW WILL TAKE.  EACH REVIEW PERIOD IS USUALLY ONE TO TWO

4   HOURS EACH.

5   **Q.**    AND DID YOU DRAFT THAT LANGUAGE, SIR?

6   **A.**    YES.

7   **Q.**    AND WHAT'S THE SIGNIFICANCE OF THAT LANGUAGE?

8   **A.**    IT MEMORIALIZES THE PROCEDURE THAT I HAD BEEN USING

9   SINCE -- WELL, EVEN BACK WHEN I WAS AT THE PORT OF

10  SAN FRANCISCO WHERE, YOU KNOW, EACH -- EACH PROJECTS' NEEDS

11  WILL VARY AND VARY WITH THE TYPE OF PROJECT, THE COMPLEXITY OF

12  THE PROJECT, AND WHO'S WORKING ON IT.

13          AND SO WE MEET AT THE OUTSET TO DETERMINE WHAT WOULD

14  BE THE APPROPRIATE SCHEDULE OF REVIEWS AND HOW MUCH OVERSIGHT

15  OR ASSISTANCE THE PROJECT STAFF WILL NEED FROM ME.

16  **Q.**    THANK YOU.

17          AND THEN FURTHER DOWN THAT SAME PAGE, SUBSECTION 4

18  IS ENTITLED "PLANNING PROCESS."  DO YOU SEE THAT, SIR?

19  **A.**    "PLANNING PHASE"?

20  **Q.**    I'M SORRY.  "PLANNING PHASE," YES.

21          AND WOULD YOU PLEASE READ THE SECTION THAT BEGINS

22  WITH -- READ THE SECTION THAT BEGINS "MEET" -- ACTUALLY, THE

23  WHOLE SECTION, PLEASE.

24  **A.**    "MEET WITH THE DPW DAC FOR EARLY PLANNING INPUT IN ORDER

25  TO IDENTIFY ACCESSIBILITY REQUIREMENTS THAT ARE CRITICAL TO THE

1   BUDGET AND SCHEDULE OF PLANNED PROJECTS.  ACCESS COMPLIANCE

2   OPTIONS MAY BE IDENTIFIED TO ESTABLISH A RANGE ESTIMATE FOR

3   BUDGET AND SCHEDULE-PLANNING PURPOSES.  COORDINATION WITH THE

4   CITY-WIDE A.D.A. TRANSITION PLAN AND THE PRIORITIES FOR MEETING

5   THE A.D.A. REQUIREMENTS SHOULD BE EVALUATED DURING THIS PHASE.

6           "THE DPW DAC CAN ADVISE ON FUNDING OPPORTUNITIES

7   THAT MAY BE AVAILABLE FOR IDENTIFIED ACCESSIBILITY BARRIER

8   REMOVAL AND PROGRAM ACCESSIBILITY OF A GIVEN FACILITY OR

9   DEPARTMENTAL FUNCTION."

10  Q.    AND DID YOU DRAFT THIS LANGUAGE, SIR?

11  A.    I DID.

12  Q.    AND WHAT'S THE SIGNIFICANCE OF THIS LANGUAGE?

13  A.    IT'S ESSENTIALLY MAKING SURE THAT PRIMARILY EARLY ON,

14  THAT -- THAT WE IDENTIFY THE ACCESSIBILITY ISSUES THAT WOULD BE

15  MOST CRITICAL -- WELL, THE FULL RANGE, ESSENTIALLY SO THAT WE

16  MAKE SURE WE GET IT IN THE -- THE COST ESTIMATE AND BUDGET FOR

17  THE PROJECT, NUMBER ONE, AND THEN FOLLOW ACCORDINGLY THROUGH

18  THE DESIGN OF THE PROJECT.

19  Q.    AND IF YOU COULD TURN TO ANOTHER DOCUMENT IN YOUR BINDER,

20  SIR, WHICH IS TRIAL EXHIBIT I41.

21          YOU MIGHT WANT TO KEEP THAT PAGE -- MAYBE I SHOULD

22  GIVE YOU A POST-IT 'CAUSE I'M GOING TO RETURN TO THIS

23  PROCEDURE.

24  A.    I GOT IT.

25          (EXHIBIT PUBLISHED.)

1   BY MS. O'NEIL:

2   Q.    DO YOU HAVE I41 BEFORE YOU, SIR?

3   A.    I DO.

4   Q.    AND COULD YOU IDENTIFY THIS DOCUMENT FOR THE RECORD?

5   A.    THIS IS A -- MEETING NOTES, MEETING MINUTES, FOR A -- A

6   DESIGN TEAM MEETING WITH ME REGARDING THE MINNIE AND LOVIE WARD

7   AND OCEANVIEW PARK PROJECT, WHICH WAS HELD ON MARCH 3RD, 2003.

8   Q.    AND ARE YOU FAMILIAR WITH THIS DOCUMENT?

9   A.    I AM.

10  Q.    ARE THESE NOTES THAT YOU RECEIVED IN THE COURSE OF YOUR

11  WORK AS DPW'S DISABILITY ACCESS COORDINATOR?

12  A.    YES.

13  Q.    WHAT TYPE OF WORK WAS CONTEMPLATED BY THE RECREATION AND

14  PARKS DEPARTMENT FOR THE MINNIE AND LOVIE WARD AND OCEANVIEW

15  PARK?

16  A.    IT WAS ANTICIPATED THAT THEY WOULD BE DEMOLISHING AND

17  TEARING DOWN THE EXISTING OLD FACILITY THERE.  IT WAS

18  DETERMINED THAT IT WAS NOT REALLY SALVAGEABLE OR COST EFFECTIVE

19  TO -- TO RENOVATE THAT BUILDING.  SO WE WERE EVALUATING THE

20  SITE AND THE CONCEPT OF BUILDING A NEW FACILITY DIRECTLY BEHIND

21  THE EXISTING ONE AND WHAT IT WOULD -- WHAT KINDS OF ISSUES MAY

22  BE INVOLVED IN -- GIVEN THAT SITE AND THOSE PARTICULAR EARLY

23  DESIGN IDEAS.

24  Q.    AND -- AND DID YOU MEET WITH RECREATION AND PARKS

25  DEPARTMENT STAFF ON OR -- ON MARCH 3RD, 2003, TO SCOPE OUT

1   ACCESS ISSUES THAT MIGHT BE RAISED BY THE –– IN CONNECTION WITH

2   THE PLANNED RECREATION CENTER REC PLAYGROUND?

3   **A.**    YES, LIST ATTENDEES INCLUDED REC AND PARK STAFF AS WELL

4   AS BUREAU OF ARCHITECTURE AND –– AND LANDSCAPE ARCHITECTURE

5   STAFF, PART OF THE BUREAU OF ENGINEERING.

6   **Q.**    AND WHAT WERE SOME OF THE ISSUES, JUST A FEW EXAMPLES,

7   THAT YOU FLAGGED FOR RECREATION AND PARK STAFF AT THIS MEETING

8   IN MARCH OF 2003 AS THEY RELATE TO DISABLED ACCESS?

9   **A.**    OH, THAT WE NEEDED TO LOOK AT, YOU KNOW, THE BIGGER

10  CONTEXT IN THE NEIGHBORHOOD, WHERE IS THE PUBLIC TRANSIT?  HOW

11  ARE PEOPLE GOING TO BE GETTING THERE FROM PUBLIC TRANSIT?  WE

12  NEEDED –– I NEEDED –– POINTED OUT IN HERE AT THIS POINT THAT

13  THEY NEEDED TO ANTICIPATE, YOU KNOW, REVIEWING THE SIDEWALK

14  CONDITIONS AND CURB RAMP CONDITIONS AND SEEING WHAT –– WHAT

15  WORK MAY BE DONE –– NEEDED FOR THIS PROJECT.

16          AND ALSO GIVEN THE TOPOGRAPHY OF THE SITE, THERE WAS

17  QUITE A BIT OF VERTICAL DROP FROM THE NORTH SIDE TO THE SOUTH

18  SIDE.  WE WERE ANTICIPATING THAT THERE WOULD BE A NEED FOR SOME

19  KIND OF MITIGATION OF –– OF THE PATHS OF TRAVEL DUE TO THE

20  TOPOGRAPHY.

21  **Q.**    AND IS THIS DOCUMENT REPRESENTATIVE OF THE ACCESS ISSUES

22  YOU TYPICALLY DISCUSS IN THE PLANNING PHASE OF A DPW–MANAGED

23  CITY CONSTRUCTION PROJECT?

24  **A.**    VERY MUCH SO.

25          **MR. JOHNSON:**  OBJECTION, VAGUE, COMPOUND.

```
 1              THE COURT:  WELL, HE'S ALREADY ANSWERED THE

 2   QUESTION.  OVERRULED.

 3              MS. O'NEIL:  YOUR HONOR, THE CITY MOVES TRIAL

 4   EXHIBIT I14 (SIC) INTO EVIDENCE.

 5              THE COURT:  ANY OBJECTION?

 6              MR. JOHNSON:  NO OBJECTION.

 7              THE COURT:  I14 WILL BE RECEIVED INTO EVIDENCE.

 8   BY MS. O'NEIL:

 9   Q.    OKAY.  AND, MR. JENSEN, IF YOU COULD RETURN NOW TO A14,

10   WHICH I HOPE YOU'VE HELD IN YOUR HAND THROUGHOUT THAT --

11   A.    I DID.

12   Q.    -- DETOUR.

13                      (EXHIBIT PUBLISHED.)

14   BY MS. O'NEIL:

15   Q.    AFTER THE PLANNING PHASE IN DPW PROCEDURE 9.8.24, THERE

16   IS A REFERENCE ON PAGE --

17              THE COURT:  OH, COUNSEL, YOU DID -- YOU SAID "I14."

18   YOU MEAN I41?

19              MS. O'NEIL:  YES, I DID.

20              THE COURT:  OKAY.  YOU MEAN I41?

21              MS. O'NEIL:  YES, I41.

22              THE COURT:  OKAY.

23              MS. O'NEIL:  THANK YOU VERY MUCH FOR CATCHING THAT.

24              ANY OBJECTION TO I41, COUNSEL?

25              MR. JOHNSON:  NO.
```

1          **MS. O'NEIL:**  OKAY.

2                    (DEFENDANTS' EXHIBIT I41

3                    RECEIVED IN EVIDENCE)

4    **BY MS. O'NEIL:**

5    **Q.**    RETURNING TO A14, THE DPW PROCEDURE 9.8.24, AND TURNING

6    TO PAGE 4 OF THE EXHIBIT, WHICH IS PAGE 3 OF THE PROCEDURE,

7    THERE ARE REFERENCES IN THIS DOCUMENT, SIR, TO A CONCEPTUAL

8    DESIGN PHASE AT SUBSECTION 5, A SCHEMATIC DESIGN AT SUBSECTION

9    6, DESIGN DEVELOPMENT REVIEWS AT SUBSECTION 7, AND CONSTRUCTION

10   DOCUMENT REVIEWS AT SUBSECTION 8.

11              DO THESE ENTRIES SIGNIFY DIFFERENT PHASES IN A

12   TYPICAL DPW CONSTRUCTION PROJECT?

13   **A.**    YES.

14   **Q.**    AND IS IT YOUR PRACTICE TO MEET WITH REPRESENTATIVES OF

15   THE ASSIGNED PROJECT TEAM AT EACH OF THESE PHASES?

16   **A.**    IT DEPENDS ON THE PROJECT.  AGAIN, AS I WAS EXPLAINING

17   EARLIER, IT'S TAILORED TO THE PROJECT.  FOR LARGER COMPLEX

18   PROJECTS SUCH AS THIS ONE, IT WOULD BE.

19   **Q.**    YOU SAID "SUCH AS THIS ONE," WHAT WERE YOU REFERRING TO?

20   **A.**    THE –– OH, THE MINNIE AND LOVIE WARD REC CENTER.  SMALLER

21   PROJECTS THAT ARE SIMPLER IN SCOPE AND SHORTER IN SCHEDULE

22   DON'T REQUIRE AS MANY REVIEWS DURING THE PHASES.

23   **Q.**    AND THEN WITH RESPECT TO SUBSECTION 8, CONSTRUCTION

24   DOCUMENT REVIEWS, THIS SECTION STATES "DPW DISABILITY ACCESS

25   COORDINATOR QUALITY INSURANCE REVIEW FORM IS REQUIRED TO BE

1    INCLUDED IN PLANS WITH PROJECT TITLE BLOCKS.

2             DO YOU SEE THAT LANGUAGE?

3    **A.**    YES.  UM-HMM.

4    **Q.**    AND WHAT DOES THIS TEXT REFER TO?

5    **A.**    IT REFERS TO A QUALITY ASSURANCE REVIEW FORM THAT IS

6    REQUIRED TO BE INTEGRAL TO THE SET OF DRAWINGS ON TITLE BLOCK

7    AND THOSE AS A STANDARD PLAN REVIEW APPROVAL FORM THAT IS --

8    THE RECORD OF -- OF MY REVIEW OF THOSE DOCUMENTS.

9    **Q.**    AND IS THERE ANY SIGNIFICANCE TO YOUR PLAN REVIEW --

10   STRIKE THAT.

11            WHAT IS THE SIGNIFICANCE OF YOUR PLAN REVIEW

12   APPROVAL FORM?

13   **A.**    WELL, FOREMOST IN THE MINDS OF THE PEOPLE PREPARING THE

14   DRAWINGS IS THAT THEY HAVE TO GET THAT APPROVAL AND HAVE MY WET

15   SIGNATURE ON THE PLANS BEFORE THE DEPARTMENT OF BUILDING

16   INSPECTION WILL ACCEPT IT FOR A BUILDING PERMIT REVIEW.

17   **Q.**    AND YOU JUST, I BELIEVE, SAID "WET SIGNATURE"?

18   **A.**    YES.

19   **Q.**    IS THAT RIGHT?  WHAT DOES THAT REFER TO?

20   **A.**    IT HAS TO BE IN MY HAND IN INK ON THE PAGE.

21   **Q.**    NOT A PHOTOCOPY?

22   **A.**    CORRECT.  JUST AS IS REQUIRED FOR THE ARCHITECT AND

23   ENGINEER OF RECORD WHO'S STAMPING THE DRAWINGS.

24   **Q.**    I SEE.

25            NOW, YOU TESTIFIED THAT OF THE OTHER REVIEWS THAT

1    ARE SET FORTH IN THIS PROCEDURE, REVIEWS OF THE CONCEPTUAL

2    DESIGN, THE CONCEPT DESIGN PHASE, OR THE SCHEMATIC DESIGN

3    PHASE, OR THE DESIGN DEVELOPMENT PHASE MAY BE A MATTER OF

4    DISCRETION DEPENDING UPON THE PROJECT; IS THAT CORRECT?

5    **A.**    YES.

6    **Q.**    IS THE REQUIREMENT OF A FINAL DISABILITY ACCESS QUALITY

7    ASSURANCE REVIEW OF THE CONSTRUCTION DRAWINGS BEFORE ISSUANCE

8    OF A BUILDING PERMIT SOMETHING THAT IS DISCRETIONARY?

9    **A.**    NO.

10    **Q.**    AND I'D LIKE TO DIRECT YOU TO TRIAL EXHIBIT J21.

11    **A.**    (REVIEWING DOCUMENT.)

12    **Q.**    DO YOU HAVE THAT BEFORE YOU, SIR?

13    **A.**    YES.

14                        (EXHIBIT PUBLISHED.)

15    **BY MS. O'NEIL:**

16    **Q.**    J21 IS A ONE-PAGE DOCUMENT.  COULD YOU DESCRIBE THIS OR

17    IDENTIFY IT FOR THE RECORD?

18    **A.**    YES.  THIS IS THE -- PROBABLY THE COVER DOCUMENT FOR THE

19    MINNIE AND LOVIE WARD REC CENTER CONTRACT DOCUMENTS.

20    **Q.**    AND DOES THIS -- DOES YOUR A.D.A. REVIEW FORM -- STRIKE

21    THAT.

22            IS YOUR A.D.A. REVIEW FORM CONTAINED ON THIS

23    DOCUMENT?

24    **A.**    IT IS.  IN THE BOX TITLED "A.D.A. REVIEW," AND YOU'LL SEE

25    THAT IT HAS MY SIGNATURE ON IT.

1  Q.    AND IS THIS THE FORM THAT IS REQUIRED ON EVERY DPW SET OF

2  CONSTRUCTION DOCUMENTS BEFORE A BUILDING PERMIT WILL BE ISSUED?

3  A.    YES.

4  Q.    AND WHAT IS SIGNIFIED BY THIS FORM?  I MEAN, THE -- THE

5  FACT THAT YOU HAVE SIGNED OFF ON THIS FORM, WHAT INFORMATION IS

6  COMMUNICATED?

7  A.    WELL, I'M -- I'M STATING THAT I'VE REVIEWED IT FOR

8  COMPLIANCE WITH APPLICABLE FEDERAL, STATE, AND LOCAL

9  REQUIREMENTS.

10 Q.    AND THAT YOU'VE APPROVED THE DRAWINGS?

11 A.    YES.

12 Q.    OKAY.  ALL RIGHT.  THANK YOU.

13        YOUR HONOR, AT THIS TIME, THE CITY MOVES TRIAL

14 EXHIBIT J21 INTO EVIDENCE.

15        THE COURT:  OKAY.  WHERE IS YOUR SIGNATURE,

16 MR. JENSEN?

17        THE WITNESS:  IT'S IN THE BOX THAT'S ENTITLED

18 "A.D.A. REVIEW."  YOU'LL SEE THAT IT'S A LETTER FORM, AND THAT

19 TOWARD THE BOTTOM --

20        THE COURT:  OH, I SEE IT.  OKAY.  THANK YOU.

21        ANY OBJECTION?

22        MR. JOHNSON:  NO OBJECTION, YOUR HONOR.

23        THE COURT:  OKAY.  THE REQUEST IS GRANTED.

24                (DEFENDANTS' EXHIBIT J21

25                 RECEIVED IN EVIDENCE)

1  BY MS. O'NEIL:

2  Q.    MR. JENSEN, DOES THIS -- DPW'S POLICY AS SET FORTH IN DPW

3  PROCEDURE 9.8.24, WHICH IS TRIAL EXHIBIT A14 --

4                        (EXHIBIT PUBLISHED.)

5  BY MS. O'NEIL:

6  Q.    -- REQUIRE ANY ACCESSIBILITY REVIEWS DURING CONSTRUCTION

7  PHASE OF A PROJECT AFTER THE BUILDING PERMIT IS ISSUED?

8  A.    IT DOES.

9  Q.    AND -- AND WHAT TYPE OF REVIEWS ARE REQUIRED DURING THE

10  CONSTRUCTION PHASE OF THE CITY PROJECT?

11  A.    WELL, FOR EXAMPLE, IN A -- IN A BUILDING PROJECT SUCH AS

12  THE MINNIE AND LOVE -- LOVIE WARD REC CENTER, THE INITIAL

13  INSPECTION IS USUALLY A FRAMING INSPECTION, SO WHEN THE -- THE

14  PLUMBING IS GOING INTO THE WALLS AND THE ELECTRICAL CONDUITS

15  AND JUNCTION BOXES, I LIKE TO REVIEW THOSE THINGS BEFORE THE

16  DRY WALL GOES ON THE WALLS.

17        LATER ON, WHEN DOORS ARE SET AND TOILET ACCESSORIES

18  AND PLUMBING FIXTURES ARE SET, BUILT-IN ELEMENTS ARE IN PLACE,

19  I'LL BE REVIEWING THOSE THINGS AND MORE FREQUENT INSPECTIONS AS

20  MORE OF THE FINISHES AND SIGNAGE GOES INTO THE PLACE, THE ROUGH

21  GRADING GOES INTO PLACE.

22        IN THIS CASE, THERE WAS A PLAYGROUND, AND SITE

23  DEVELOPMENTS, GATES, AND RAMPS AND SO FORTH, AND ULTIMATELY THE

24  SIDEWALKS AND CURB RAMPS.

25  Q.    AND IS THE NUMBER OF INSPECTIONS THAT YOU MAY CONDUCT

**RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530**

1    DURING THE CONSTRUCTION PHASE OF A CITY PROJECT DEPENDENT ON

2    THE TYPE OF PROJECT?

3    A.    YES, IT IS.    DEPENDING ON THE -- THE COMPLEXITY AND THE

4    DURATION AND THE -- THE NUMBER OF ELEMENTS INVOLVED AND ALSO

5    JUST THE CONSTRUCTION SCHEDULES.    WHEN THE PROJECT --

6    CONSTRUCTION MANAGER OR A -- PROJECT ARCHITECTS, PROJECT

7    MANAGER SEES THAT THINGS ARE MOVING ALONG AND THERE'S A POINT

8    AT WHICH THAT THEY CAN SEE THAT IT'S TIMELY, THEY'LL CONTACT

9    ME, AND I'LL GO OUT AND INSPECT IT.

10    Q.    AND, MR. JENSEN, TURNING YOUR ATTENTION TO TRIAL EXHIBIT

11    A14 AND THE SECTION 9, WHICH RELATES TO CONSTRUCTION, WHICH IS

12    ON PAGE 5 OF THE TRIAL EXHIBIT, IF YOU FLIP THE PAGE TO

13    SUBSECTION 9H, YOU'LL SEE A SEGMENT CALLED "FINAL PROJECT

14    REVIEW AND ACCEPTANCE."

15            DO YOU HAVE THAT IN MIND?

16    A.    YES.

17                (EXHIBIT PUBLISHED.)

18    BY MS. O'NEIL:

19    Q.    WOULD YOU PLEASE EXPLAIN THIS ASPECT OF THE DPW'S A.D.A.

20    REVIEW PROCEDURES.

21    A.    YES.    THIS REQUIREMENT STATES THAT I NEED TO BE INVOLVED

22    IN THE FINAL INSPECTIONS FOR THE PROJECT AND PRIOR TO A

23    TEMPORARY CERTIFICATE OF OCCUPANCY OR THE FINAL CERTIFICATE OF

24    OCCUPANCY ISSUANCE THAT I NEED TO SIGN OFF ON, THE -- WHAT'S

25    CALLED THE JOB CARD, THE DEPARTMENT OF BUILDING INSPECTION JOB

1   CARD WHICH HAS ALL THE INSPECTORS' SIGNATURES.

2   **Q.**   AND IF I COULD DIRECT YOUR ATTENTION TO K10, WHICH IS AN

3   EXHIBIT IN YOUR BINDER.

4   **A.**   (REVIEWING DOCUMENTS.)

5   **Q.**   PLEASE LET ME KNOW WHEN YOU HAVE THAT BEFORE YOU, SIR.

6   **A.**   I HAVE IT.

7            **THE COURT:**   YOU'RE SAYING J10?

8            **MS. O'NEIL:**   "K" AS IN "KITTEN."

9            **THE COURT:**   OH "K."

10   **BY MS. O'NEIL:**

11   **Q.**   MR. JENSEN, DO YOU RECOGNIZE THIS DOCUMENT?

12   **A.**   I DO.

13   **Q.**   AND WHAT IS IT?

14   **A.**   THIS IS THE CERTIFICATE OF FINAL COMPLETION AND OCCUPANCY

15   FOR THE MINNIE AND LOVIE WARD REC CENTER.

16   **Q.**   AND THIS EXHIBIT HAS THREE PAGES; IS THAT CORRECT?

17   **A.**   YES.

18                    (EXHIBIT PUBLISHED.)

19   **BY MS. O'NEIL:**

20   **Q.**   AND WOULD YOU PLEASE EXPLAIN THE INFORMATION CONTAINED IN

21   EACH OF THESE PAGES?

22   **A.**   THIS IS THE JOB CARD FOR THE PROJECT, THE DEPARTMENT OF

23   BUILDING INSPECTION JOB CARD.

24   **Q.**   IS THAT THE FIRST PAGE, SIR?

25   **A.**   THAT -- IT'S -- THE WHOLE THING IS.

1    Q.    THE WHOLE THING IS THE JOB CARD?

2    A.    YEAH, IT'S JUST THE –– THE ACTUAL JOB CARD IS TWO-SIDED

3    AND THERE'S MULTIPLE PAGES.

4    Q.    I SEE.

5    A.    YEAH.

6    Q.    AND IS THERE AN INSPECTION RECORD IN THE DOCUMENT?

7    A.    THERE IS.

8    Q.    AND IS YOUR SIGNATURE NOTED ON THE INSPECTION RECORD?

9    A.    YES, IT IS.

10   Q.    AND WHAT DOES THAT SIGNIFY?

11   A.    IT SIGNIFIES THAT ON JUNE 22ND, 2008, THAT I SIGNED OFF

12   ON THE INSPECTION RECORD AND WAS CERTIFYING THAT THE BUILDING

13   WAS READY FOR CERTIFICATE OF OCCUPANCY AS FAR AS DISABILITY

14   ACCESS ISSUES ARE CONCERNED.

15   Q.    AND IS THE DOCUMENT CONTAINED IN TRIAL EXHIBIT K10

16   REPRESENTATIVE OF THE FINAL DISABILITY ACCESS SIGN-OFF REQUIRED

17   UNDER CITY POLICY AS EXPRESSED IN MAYOR BROWN'S JUNE 22ND,

18   1998, DIRECTIVE AND DPW'S PROCEDURE 9.8.24?

19   A.    YES, IT IS.

20         MS. O'NEIL:  YOUR HONOR, THE CITY MOVES TRIAL

21   EXHIBIT K10 INTO EVIDENCE.

22         THE COURT:  ANY OBJECTION?

23         MR. JOHNSON:  NO OBJECTION, YOUR HONOR.

24         THE COURT:  REQUEST IS GRANTED.

25

```
1                    (DEFENDANTS' EXHIBIT K10

2                    RECEIVED IN EVIDENCE)

3    BY MS. O'NEIL:

4    Q.    MR. JENSEN, DOES THE CITY HAVE ANY POLICIES THAT REQUIRE

5    SIDEWALKS AND CURB RAMPS ADJACENT TO A NEWLY CONSTRUCTED OR

6    ALTERED BUILDING BE ACCESSIBLE TO PERSONS WITH DISABILITIES?

7    A.    YES, WE DO.

8    Q.    AND WHAT ARE THOSE POLICIES?

9    A.    THE POLICY IS THAT FOR PROJECTS SUCH AS THE MINNIE AND

10   LOVIE WARD REC CENTER, WE –– WE DO LOOK AT THE CONDITION OF THE

11   SIDEWALKS AROUND THE PERIMETER OF THE SITE, IDENTIFY AREAS THAT

12   NEED TO BE EITHER REPLACED OR REPAIRED, INCLUDING CURB RAMPS

13   THAT LEAD TOWARD THE NEAREST TRANSIT THAT WOULD BE CONSIDERED

14   TO SERVE THE SITE.

15   Q.    AND IS THIS POLICY SET FORTH IN DPW'S PROCEDURE 9.8.24

16   ITEM 6A RELATED TO SCHEMATIC DESIGN?

17   A.    YES.

18   Q.    AND WOULD YOU READ THAT INTO THE RECORD, PLEASE?

19   A.    FLIP BACK TO IT.

20              (REVIEWING DOCUMENT.)

21                 (EXHIBIT PUBLISHED.)

22         THE WITNESS:  DURING SCHEMATIC DESIGN, THE DPW DAC

23   WILL REVIEW THE PROJECT PROGRAM AND INTENDED USES, SITE

24   DEVELOPMENT NEEDS, EXISTING CONDITIONS, OVERALL CODE COMPLIANCE

25   ISSUES THAT MAY AFFECT ACCESS COMPLIANCE, PATH OF TRAVEL FROM
```

1   THE PROJECT TO THE PUBLIC RIGHT-OF-WAY, AND NEARBY PARKING AND

2   TRANSPORTATION.

3   **BY MS. O'NEIL:**

4   **Q.**   WOULD YOU DESCRIBE THE PROCESS THAT YOU USE TO IMPLEMENT

5   THIS POLICY SET FORTH IN ITEM 6A OF THE PROCEDURE 9.8.24?

6   **A.**   UM-HMM.  TYPICALLY, EITHER I OR SEPARATELY THE PROJECT

7   TEAM WILL WALK THE SITE AND REPORT BACK TO ME IF I DON'T GO OUT

8   MYSELF WHAT THE CONDITIONS OF THE SIDEWALK ARE, WHAT THE

9   CONDITIONS OF THE BOUNDING CURB RAMPS ARE, AND WHERE THE

10   TRANSIT STOPS ARE THAT ARE NEAREST TO THE SITE.

11   **Q.**   IF I COULD TURN YOUR ATTENTION TO TRIAL EXHIBIT I42.

12   **A.**   (REVIEWING DOCUMENTS.)

13           (EXHIBIT PUBLISHED.)

14   **BY MS. O'NEIL:**

15   **Q.**   DO YOU RECOGNIZE THAT DOCUMENT, SIR?

16   **A.**   YES, I DO.

17   **Q.**   WHAT IS THIS DOCUMENT?

18   **A.**   IT IS ALSO A MEETING MINUTES RECORD OF A MEETING DESIGN

19   REVIEW MEETING ON THE MINNIE AND LOVIE WARD AND OCEANVIEW PARK

20   PROJECT DATED APRIL 29TH, 2003.

21   **Q.**   DO THESE NOTES REFLECT CONVERSATIONS YOU HAD WITH THE

22   PROJECT TEAM REGARDING SIDEWALK AND CURB RAMP ISSUES AT THAT

23   SITE?

24   **A.**   YES.

25   **Q.**   WHERE IN THE NOTES IS THAT INFORMATION CONTAINED?

1    **A.**    OH, IT WOULD –– BEGINNING WITH ITEM 2, TITLED

2    "HANDICAPPED PARKING"; 3, "DROPOFF DELIVERY PARKING," 4,

3    "SIDEWALK REPAIR"; 6, "CURB RAMPS," AND THEN INDIRECTLY, NO. 7

4    WHICH IS TALKING ABOUT WHERE TO FIND MONEY.

5    **Q.**    AND WAS THE SIDEWALK REPAIRED IN CONNECTION WITH THAT

6    PROJECT?

7    **A.**    IT WAS.

8    **Q.**    AND WERE THE CURB RAMPS THAT YOU RECOMMENDED CONSTRUCTED

9    IN CONNECTION WITH THAT PROJECT?

10   **A.**    YES, WE CONSTRUCTED CURB RAMPS IN THREE OF THE BOUNDING

11   INTERSECTIONS ON THE WEST SIDE OF THE PROPERTY.

12            **MS. O'NEIL:**    YOUR HONOR, THE CITY MOVES TRIAL

13   EXHIBIT I42 INTO EVIDENCE.

14            **THE COURT:**    ANY OBJECTION?

15            **MR. JOHNSON:**    NO OBJECTION, YOUR HONOR.

16            **THE COURT:**    GRANTED.

17                    (DEFENDANT'S EXHIBIT I42

18                     RECEIVED IN EVIDENCE)

19   **BY MS. O'NEIL:**

20   **Q.**    MR. JENSEN, HAVE YOU HAD RESPONSIBILITY FOR REVIEWING

21   ANY OF THE LIBRARIES CONSTRUCTED OR RENOVATED UNDER THE

22   SAN FRANCISCO PUBLIC LIBRARIES BRANCH LIBRARY IMPROVEMENT

23   PROGRAM FOR COMPLIANCE WITH DISABILITY ACCESS LAWS?

24   **A.**    YES.

25   **Q.**    WHICH LIBRARIES HAVE YOU REVIEWED AND APPROVED FOR

1  COMPLIANCE WITH DISABILITY ACCESS LAWS?

2  **A.**    VIRTUALLY ALL OF THEM.  I HAVE A LIST HERE IF I COULD

3  READ FROM THAT.

4              **MS. O'NEIL:**  YOUR HONOR, IS THAT --

5              **THE COURT:**  JUST DO YOUR EXAMINATION.

6              **MS. O'NEIL:**  OKAY.

7              **THE COURT:**  IF THERE'S NO OBJECTION --

8              **MS. O'NEIL:**  YES.

9              **THE COURT:**  -- I HAVE NO OBJECTION.

10  **BY MS. O'NEIL:**

11  **Q.**    IF YOU NEED TO REFRESH YOUR RECOLLECTION WITH A LIST --

12  **A.**    YEAH, I CAN'T MEMORIZE --

13                  (SIMULTANEOUS COLLOQUY.)

14  **BY MS. O'NEIL:**

15  **Q.**    AND IF IT'S EASIER, YOU COULD STATE THE LIBRARIES YOU

16  DIDN'T REVIEW, IF THAT'S A SMALLER LIST?

17  **A.**    IT'S ALL OF THE LIBRARIES IN THE BLIP PROGRAM, THE BRANCH

18  LIBRARY IMPROVEMENT PROGRAM.  EARLIER LIBRARIES THAT WERE --

19  THAT WERE NOT PART OF THE BLIP BUT DID UNDERGO EITHER NEW

20  CONSTRUCTION OR REMODELING THAT I WAS NOT INVOLVED IN BECAUSE

21  THEY WERE PRIOR TO MY TIME AT DPW INCLUDE MISSION BAY, THE

22  MISSION BRANCH, CHINATOWN BRANCH, OCEANVIEW, AND I WOULD ADD

23  THE -- THE MAIN LIBRARY ITSELF WAS -- THE CONSTRUCTION OF THAT

24  WAS BEFORE MY TIME.

25  **Q.**    FOR ALL THE BRANCH LIBRARIES THAT YOU'VE REVIEWED FOR

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

1  COMPLIANCE WITH DISABILITY ACCESS LAWS, DID YOU FOLLOW THE

2  PROCESS SET FORTH IN TRIAL EXHIBIT A14, DPW'S PROCEDURE 9.8.24?

3  **A.**   YES.

4  **Q.**   WHAT ARCHITECTURAL ACCESS STANDARDS DID YOU USE IN

5  CONNECTION WITH YOUR APPROVALS OF THESE BRANCH LIBRARY

6  CONSTRUCTION PROJECTS?

7  **A.**   THE MOST NOTABLE ARE THE ADAAG AND THE CURRENT VERSION OF

8  THE CALIFORNIA BUILDING CODE.

9  **Q.**   AND DID YOU DEVELOP ANY CUSTOMIZED ACCESS STANDARDS FOR

10  THE LIBRARY TO USE IN CONNECTION WITH NEW CONSTRUCTION OR

11  ALTERATION PROJECTS FOR THE BRANCH LIBRARY IMPROVEMENT PROGRAM?

12  **A.**   YES.

13  **Q.**   AND WHAT STANDARDS WERE THOSE?

14  **A.**   WE DEVELOPED A SET OF STANDARDS FOR FURNITURE AND

15  EQUIPMENT.

16  **Q.**   WHY DID YOU DEVELOP THOSE STANDARDS?

17  **A.**   IT WAS PART OF OUR EFFORTS, CONSISTENT WITH OTHER --

18  OTHER PROJECTS, TO FOLLOW BEST PRACTICES IN ORDER TO ASSURE

19  THAT THE FACILITIES WERE USABLE BY PERSONS WITH DISABILITIES.

20         WE WANTED TO MAKE SURE THAT THE FURNITURE AND

21  EQUIPMENT THAT WERE BEING PROVIDED BY THE LIBRARY SEPARATELY

22  FROM US TYPICALLY, NOT ALWAYS, WAS GOING TO BE USABLE BY

23  PERSONS WITH DISABILITIES.

24  **Q.**   AND WHAT TYPE OF FURNITURE AND EQUIPMENT IS COVERED BY

25  THESE NEW STANDARDS?

1    A.    READING TABLES, COMPUTER TABLES, FOR -- FOR BOTH ADULTS

2    AND CHILDREN, SELF-CHECK BOOK-SCANNING STATIONS, PRINTING

3    STATIONS, SECURITY BARRIERS AT -- AT DOORS, THAT KIND OF THING.

4    Q.    AND ARE THESE STANDARDS NOW USED BY THE LIBRARY FOR ALL

5    OF ITS FURNITURE PURPOSES IN CONNECTION WITH THE BLIP PROGRAM?

6    A.    YES.

7    Q.    IF I COULD TURN YOUR ATTENTION, MR. JENSEN, TO THREE

8    EXHIBITS IN YOUR BINDER STARTING WITH EXHIBIT V28.

9    A.    (REVIEWING DOCUMENTS.)

10   Q.    DO YOU HAVE THAT IN HAND, SIR?

11   A.    YES.

12   Q.    IS THE CITY'S EXHIBIT V28 A COPY -- EXCUSE ME.  V26, I

13   MEANT TO SAY.

14          DID I SAY 28?

15          **THE COURT:**  YES, YOU DID.

16          **MS. O'NEIL:**  APOLOGIZE.  IF WE COULD START WITH

17   V261.

18          **THE WITNESS:**  (REVIEWING DOCUMENTS.)

19   **BY MS. O'NEIL:**

20   Q.    ACTUALLY, PERHAPS YOU COULD REVIEW V26, V27, AND V28.

21   A.    (REVIEWING DOCUMENTS.)

22          OKAY.

23   Q.    MR. JENSEN, ARE THESE COPIES OF STANDARDS THAT YOU

24   CREATED FOR THE LIBRARY RELATED TO PURCHASES OF ACCESSIBLE

25   FURNITURE AND EQUIPMENT?

1    A.    THEY ARE.

2    Q.    AND IN CONNECTION WITH THIS WORK, DID YOU CREATE ANY

3    STANDARDS FOR FURNITURE TO BE USED IN LIBRARY AREAS DEDICATED

4    TO CHILDREN'S PROGRAMMING?

5    A.    YES, THOSE ARE INCLUDED IN THIS STANDARD.

6    Q.    WHEN YOU SAY "THIS STANDARD," ARE YOU REFERRING TO A

7    PARTICULAR PAGE, OR ARE THEY INCORPORATED IN ALL THREE OF THE

8    STANDARDS?

9    A.    (REVIEWING DOCUMENTS.)

10          THEY'RE INCLUDED IN EXHIBIT V26 SPECIFICALLY, IN THE

11   LOWER RIGHT CORNER, YOU'LL SEE TABLE A TITLED "AGE-BASED

12   DIMENSIONS" WHICH GIVES A RANGE OF THREE DIFFERENT DIMENSIONS

13   BASED ON THREE DIFFERENT AGE GROUPS.  AND THEN ON VARIOUS

14   DRAWINGS, YOU'LL SEE THAT THERE ARE THREE DIMENSIONS GIVEN FOR

15   CERTAIN CLEARANCES.

16   Q.    AND WHY DID YOU DEVELOP THREE DIFFERENT DIMENSIONS, SIR?

17   A.    THIS WAS BASED ON THE DESIRES OF THE LIBRARY.  THEY

18   WANTED TO MAKE SURE THAT CHILDREN OF ALL AGES WERE ADEQUATELY

19   SERVED BY PROVIDING FURNITURE THAT WAS MOST AGE APPROPRIATE FOR

20   THEM.

21   Q.    AND WERE THE -- I'M SORRY.

22   A.    IT'S ALSO RECOGNIZED WITHIN THE -- THE FEDERAL STANDARDS.

23   THE ISSUE OF CHILDREN'S DIMENSIONS WERE ALSO ADOPTED INTO THE

24   FEDERAL ADAAG.

25          MS. O'NEIL:  YOUR HONOR, THE CITY MOVES TRIAL

1    EXHIBIT NOS. V26, V27, AND V28 INTO EVIDENCE.

2              **THE COURT:**  ANY OBJECTION?

3              **MR. JOHNSON:**  NO OBJECTION, YOUR HONOR.

4              **THE COURT:**  REQUEST IS GRANTED.

5                        (DEFENDANTS' EXHIBITS V26, V27, V28

6                        RECEIVED IN EVIDENCE)

7    **BY MS. O'NEIL:**

8    **Q.**    YOU PREVIOUSLY TESTIFIED THAT DPW'S POLICY IS TO REVIEW

9    THE PATH OF TRAVEL FROM A CITY PROJECT TO THE PUBLIC

10   RIGHT-OF-WAY AND NEARBY PUBLIC PARKING AND TRANSPORTATION; IS

11   THAT CORRECT?

12   **A.**    THAT'S CORRECT.

13   **Q.**    AND DID YOU IMPLEMENT THAT REQUIREMENT IN CONNECTION WITH

14   YOUR REVIEW OF THE BRANCH LIBRARY IMPROVEMENT PROJECTS?

15   **A.**    YES.

16   **Q.**    HOW DID YOU IMPLEMENT THAT REQUIREMENT?

17   **A.**    AS WITH OTHER PROJECTS, WE REVIEW THE SITE.  WE LOOK

18   AT -- WE BEING MYSELF AND THE PROJECT TEAM -- WHERE ARE THE

19   PUBLIC TRANSIT STOPS THAT ARE NEAREST TO EACH SITE.  HOW WOULD

20   ONE GET TO THAT LIBRARY FROM -- FROM THE TRANSIT.

21   **Q.**    DID YOU MAKE ANY RECOMMENDATIONS WITH RESPECT TO

22   PASSENGER LOADING ZONES?

23   **A.**    YES.  AS WELL -- ONE OF THE THINGS THAT WE'RE KEEN TO

24   PROVIDE NOT ONLY LIBRARIES BUT AT REC AND PARK FACILITIES IS

25   THE PASSENGER LOADING ZONES -- ON-STREET PASSENGER LOADING

1    ZONES, OFF-STREET IF WE HAVE TO IF THERE'S SPACE, AND ALSO

2    ON-STREET PARKING.

3    Q.    AND WAS IT ALSO DPW'S STANDARD PRACTICE WHEN APPROVING

4    BRANCH LIBRARY IMPROVEMENT PROGRAM CONSTRUCTION PROJECTS TO

5    REQUIRE ANY NECESSARY REPAIRS TO THE ADJACENT SIDEWALKS TO BE

6    COMPLETED IN CONNECTION WITH THE PROJECT?

7    A.    YES, EITHER REPLACED IN FULL OR REPAIRED.

8    Q.    WHO HAD RESPONSIBILITY FOR IDENTIFYING THE NECESSARY

9    SIDEWALK REPAIRS?

10   A.    THAT WOULD BE MYSELF AND THE SIDEWALK TEAM.  AND IN

11   ADDITION, OUR BUREAU OF STREET USE AND MAPPING ISSUES ALL

12   PERMITS FOR CONSTRUCTION IN THE PUBLIC RIGHT-OF-WAY.  AND THEY

13   ALSO MAKE A DETERMINATION AS TO WHETHER A SIDEWALK NEEDS TO BE

14   REPAIRED OR REPLACED.

15   Q.    WERE THERE EVER OCCASIONS WHEN THE ENTIRE SIDEWALK BLOCK

16   WAS REPLACED IN CONNECTION WITH A BRANCH LIBRARY IMPROVEMENT

17   CONSTRUCTION PROJECT?

18   A.    THE ENTIRE FRONTING SIDEWALK WAS REPLACED ON A NUMBER OF

19   THE LIBRARIES, YES.

20   Q.    AND WHAT WAS THE DETERMINING FACTOR AS TO WHETHER THE

21   ENTIRE SIDEWALK BLOCK WOULD BE REPLACED AS OPPOSED TO PORTIONS

22   OF THE SIDEWALK?

23   A.    IT HAD TO DO WITH EXISTING CONDITIONS AS WELL AS WHAT --

24   WHAT DAMAGE MAY HAVE OCCURRED DURING CONSTRUCTION.

25   Q.    AND WAS IT DPW'S PRACTICE DURING CONSTRUCTION OF BRANCH

1  LIBRARY IMPROVEMENT PROJECTS TO REQUIRE CURB RAMP INSTALLATION

2  AS NEEDED?

3  **A.**    YES.

4  **Q.**    AND HOW WAS IT DETERMINED WHETHER CURB RAMPS WERE

5  NECESSARY TO BE INSTALLED?

6  **A.**    WELL, AT THE ON-STREET PARKING AND PASSENGER LOADING

7  ZONES, WE MAKE SURE THAT THERE'S A CURB RAMP AT THOSE, AT THE

8  BACK TYPICALLY.  AND THEN DOWN BLOCK, IF IT'S A MID-BLOCK SITE,

9  OR IF IT'S A CORNER SITE, WE LOOK AT THOSE EXISTING CURB RAMPS

10 TO SEE WHAT CONDITION THEY'RE IN AND ARE ANY NEW ONES NEEDED.

11 **Q.**    AND HOW DO YOU DETERMINE THE APPROPRIATE BOUNDARIES FOR

12 THE IMPROVEMENT TO THE SIDEWALKS AND CURB RAMPS THAT WILL BE

13 REQUIRED IN CONNECTION WITH A NEWLY CONSTRUCTED OR RENOVATED

14 LIBRARY?

15 **A.**    WE'RE PRIMARILY CONCERNED WITH THE CITY BLOCK THAT THAT

16 FACILITY IS ON AND HOW ONE WOULD GET ON AND OFF THAT BLOCK IN

17 THE DIRECTION OF THE NEAREST TRANSIT.

18 **Q.**    MR. JENSEN, HAVE YOU HAD RESPONSIBILITY FOR REVIEWING ANY

19 OF THE RECREATION AND PARK DEPARTMENT FACILITIES CONSTRUCTED OR

20 RENOVATED UNDER THAT DEPARTMENT'S CAPITAL IMPROVEMENT PROGRAM

21 TO ASSESS THEIR COMPLIANCE WITH APPLICABLE DISABILITY ACCESS

22 LAWS?

23 **A.**    YES.

24 **Q.**    WHICH REC/PARK FACILITIES HAVE YOU REVIEWED AND APPROVED

25 FOR COMPLIANCE WITH APPLICABLE, INCLUDING FEDERAL, DISABILITY

1   ACCESS LAWS?

2   **A.**    AGAIN, THE NUMBER IS QUITE NUMEROUS, EVEN MORE THAN THE

3   BRANCH LIBRARY PROGRAM.  BUT I BROUGHT A REPRESENTATIVE LIST IF

4   I COULD READ FROM THAT.

5   **Q.**    YES, PLEASE DO.

6   **A.**    ARGON CLUBHOUSE AND PLAYGROUND, KAUFMAN POOL, EUREKA

7   VALLEY CLUBHOUSE AND PLAYGROUND, CONSERVATORY OF FLOWERS, THE

8   JOE LEE REC CENTER AND PLAYGROUND, MINNIE AND LOVIE WARD REC

9   CENTER AND PLAYGROUND, MISSION POOL, NORTH BEACH POOL, SALVA

10  POOL, ST. MARY'S PLAYGROUND, SUNNYSIDE CONSERVATORY, SUNSET REC

11  CENTER AND PLAYGROUND, AND SPORT FIELDS.  UPPER NOE PLAYGROUND,

12  REC CENTER AND SPORT FIELDS; SOMA PARK, OTHERWISE KNOWN AS

13  VICTORIA MANOLO GRAVES PARK; AND THE WEST PORTAL CLUBHOUSE AND

14  PLAYGROUND.

15  **Q.**    DID YOU FOLLOW THE CITY'S A.D.A. COMPLIANCE PROCESS SET

16  FORTH IN TRIAL EXHIBIT A14 WHICH IS THE DPW PROCEDURES THAT

17  WE'VE JUST BEEN TESTIFYING ABOUT --

18  **A.**    YES.

19  **Q.**    -- IN -- IN CONNECTION WITH YOUR REVIEW OF THESE

20  FACILITIES?

21  **A.**    YES.

22  **Q.**    AND WAS IT GENERALLY YOUR PRACTICE IN CONNECTION WITH

23  REVIEW OF ALL OF THE RECREATION AND PARK FACILITIES THAT WERE

24  BROUGHT TO YOUR ATTENTION FOR REVIEW AND APPROVAL TO FOLLOW THE

25  PROCESS SET FORTH IN TRIAL EXHIBIT A14?

1    A.    YES.

2    Q.    AND WHAT ARCHITECTURAL ACCESS STANDARDS DID YOU USE IN

3    CONNECTION WITH YOUR APPROVALS FOR THESE REC PARK CONSTRUCTION

4    PROJECTS?

5    A.    PREDOMINANTLY THE ADAAG AND THE CURRENT CALIFORNIA

6    BUILDING CODE.

7    Q.    AND DID YOU APPLY ANY PARTICULAR ACCESS STANDARDS FOR

8    PLAYGROUNDS AND RECREATIONAL USES IN CONNECTION WITH YOUR

9    REVIEW OF RECREATION AND PARK DEPARTMENT PROJECTS?

10   A.    YES, WE LOOKED AT THE -- AND USED THE PLAYGROUND

11   ACCESSIBILITY STANDARDS THAT HAD BEEN DEVELOPED BY THE U.S.

12   ACCESS BOARD.

13   Q.    WERE THESE ACCESS STANDARDS ADOPTED AT THE TIME BY THE

14   DEPARTMENT OF JUSTICE?

15   A.    THEY WERE NOT.  THEY WERE PUBLISHED IN -- AN UPDATED

16   VERSION OF THE ADAAG BUT HAD NOT YET BEEN ADOPTED FORMALLY BY

17   THE DEPARTMENT OF JUSTICE.

18   Q.    AND WHY DID YOU USE STANDARDS THAT HAD NOT YET BEEN

19   FORMALLY ADOPTED BY THE DEPARTMENT OF JUSTICE?

20   A.    BEST PRACTICE.

21   Q.    AND DID YOU REFER TO ANY PARTICULAR GUIDANCE DOCUMENTS IN

22   CONNECTION WITH YOUR REVIEW OF THE DEPARTMENT'S PLANS FOR NEWLY

23   CONSTRUCTED OR ALTERED SWIMMING POOLS?

24   A.    WE USED THE SAME RECREATION STANDARDS THAT HAD ALSO BEEN

25   DEVELOPED BY THE U.S. ACCESS BOARD AND WERE ADOPTED INTO ADAAG.

1  **Q.**   AND AT THE TIME YOU USED THESE STANDARDS, WERE THE -- HAD

2  THESE BEEN FORMALLY ADOPTED BY THE DEPARTMENT OF JUSTICE?

3  **A.**   NO, THEY HAD NOT.

4  **Q.**   AND, AGAIN, WHY DID YOU USE THESE DOCUMENTS -- THESE

5  STANDARDS EVEN IF THEY HADN'T BEEN FORMALLY ADOPTED?

6  **A.**   THEY ESTABLISHED BEST PRACTICE.

7  **Q.**   DID YOU IMPLEMENT THE CITY'S POLICY REQUIRING AN

8  EVALUATION OF POTENTIAL PATH OF TRAVEL FROM THE FACILITY TO THE

9  NEAREST PUBLIC TRANSPORTATION STOP WHEN REVIEWING RECREATION

10  AND PARKS DEPARTMENT CAPITAL IMPROVEMENT PROJECTS?

11  **A.**   YES.

12  **Q.**   AND WAS YOUR PROCESS FOR REVIEW SIMILAR TO THAT TO WHICH

13  YOU JUST TESTIFIED TO IN CONNECTION WITH THE BRANCH LIBRARY

14  IMPROVEMENT PROGRAM?

15  **A.**   YES.

16  **Q.**   WOULD YOU PROVIDE AN EXAMPLE OF A REC/PARK CAPITAL

17  IMPROVEMENT PROJECT WHERE THE CITY CONDUCTED THIS TYPE OF

18  EVALUATION?

19  **A.**   OH, IF I GO BACK TO THE LIST OF PROJECTS I JUST READ OUT,

20  FOR EXAMPLE, THE SUNSET REC CENTER.  IT'S A FULL CITY BLOCK

21  FACILITY.  I, ALONG WITH THE PROJECT TEAM REPRESENTATIVES,

22  WALKED THE SITE.  WE WALKED THE ENTIRE PERIMETER, AND WE NOTED

23  AREAS OF SIDEWALK THAT NEEDED REPAIR.  AND THOSE ARE CALLED OUT

24  VERY SPECIFICALLY ON THE CONTRACT DOCUMENTS.

25         THERE'S ALSO A SECTION THAT WE KNOW IS GOING TO GET

1    A.    YES, I DO KNOW HIM.

2    Q.    YOU WORKED ON WITH HIM IN DEVELOPING THE CERTIFIED ACCESS

3    SPECIALIST PROGRAM FOR STATE OF CALIFORNIA?

4    A.    WE WERE BOTH SUBJECT MATTER EXPERTS TO THE STATE

5    ARCHITECT'S OFFICE, YES.

6    Q.    OKAY.  AND YOU RESPECT MR. MARGEN'S WORK?

7    A.    YES.

8    Q.    YOU WERE INVOLVED IN THE PLAN -- THE DESIGN OR PLAN

9    REVIEW OF THE BOTANICAL GARDENS, IS THAT CORRECT, FOR THE

10   CITY -- CITY OF SAN FRANCISCO?

11   A.    THERE WAS A RECENT PROJECT THAT WAS -- THE PURPOSE OF

12   WHICH WAS TO UPGRADE CERTAIN OF THE PATHS TO PROVIDE

13   ACCESSIBILITY.

14   Q.    AND DO YOU APPLY THE CALIFORNIA BUILDING CODE AS THE

15   STANDARD FOR THOSE -- THE ACCESSIBILITY OF THOSE PATHS?

16   A.    ADAAG AND THE CALIFORNIA BUILDING CODE, YES.

17   Q.    AND THERE ISN'T ANY REASON WHY THOSE TWO STANDARDS DON'T

18   APPLY, IS THERE?

19   A.    NOT TO MY KNOWLEDGE.

20         MR. WALLACE:  YOUR HONOR, MAY I CONFER WITH COUNSEL?

21         THE COURT:  YOU MAY.

22              (PAUSE IN THE PROCEEDINGS.)

23         MR. JOHNSON:  NOTHING FURTHER, YOUR HONOR.

24         THE COURT:  OKAY.  REDIRECT?

25         MS. O'NEIL:  JUST A FEW QUESTIONS, YOUR HONOR.

CERTIFICATE OF REPORTER

WE, RAYNEE H. MERCADO, AND DIANE E. SKILLMAN, OFFICIAL REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN C07-03685SBA, KIROLA, ET AL. V. CITY AND COUNTY OF SAN FRANCISCO, ET AL., WERE REPORTED BY US, CERTIFIED SHORTHAND REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTERS' CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

_____

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

_____
/S/

DIANE E. SKILLMAN, CSR, RPR, FCRR

FRIDAY, APRIL 29, 2011