# EXHIBIT A

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

**ORIGINAL**

BEFORE THE HONORABLE SAUNDRA BROWN ARMSTRONG, JUDGE

IVANA KIROLA, ET AL.,          )
                               )          **COURT TRIAL**
          PLAINTIFFS,          )
                               )
  VS.                          )          NO. C 07-03685 SBA
                               )
CITY AND COUNTY OF             )
SAN FRANCISCO, ET AL.,         )          **PAGES 415 — 630**
                               )
          DEFENDANTS.          )          OAKLAND, CALIFORNIA
_____ )          THURSDAY, APRIL 7, 2011


**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

FOR PLAINTIFFS:          SCHNEIDER WALLACE COTTRELL BRAYTON &
                            KONECKY
                         180 MONTGOMERY STREET, SUITE 2000
                         SAN FRANCISCO, CALIFORNIA  94109
                  BY:    MARK T. JOHNSON,
                         ANDREW P. LEE,
                         KIRAN PRASAD,
                         GUY B. WALLACE, ATTORNEYS AT LAW

                         KAHN BROWN & POORE
                         THE WATERGATE TOWERS
                         2200 POWELL STREET, SUITE 745
                         EMERYVILLE, CALIFORNIA  94608
                  BY:    SCOTT A. BROWN, ATTORNEY AT LAW


FOR DEFENDANT:           OFFICE OF THE CITY ATTORNEY
                         SIXTH FLOOR — FOX PLAZA
                         1390 MARKET STREET
                         SAN FRANCISCO, CALIFORNIA  94102
                  BY:    ERIN BERNSTEIN,
                         JAMES M. EMERY,
                         ELAINE M. O'NEIL, ATTORNEYS AT LAW

REPORTED BY:             RAYNEE H. MERCADO, CSR NO. 8258
                         DIANE E. SKILLMAN, CSR NO. 4909

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530*

<u>**I N D E X**</u>

**<u>PLAINTIFFS' WITNESSES</u>**                                    <u>**PAGE**</u>      <u>VOL</u>

MARGEN, PETER

CROSS-EXAMINATION (RESUMED) BY MR. EMERY        420          3

REDIRECT EXAMINATION BY MR. WALLACE             439          3

RECROSS-EXAMINATION BY MR. EMERY                447          3


SEAMON, DAVID ERICH

DIRECT EXAMINATION BY MR. JOHNSON               454          3

CROSS-EXAMINATION BY MS. O'NEIL                 501          3


O'NEIL, ELIZABETH

DIRECT EXAMINATION BY MR. JOHNSON               536          3

CROSS-EXAMINATION BY MS. BERNSTEIN              591          3


STEINFELD, EDWARD

DIRECT EXAMINATION BY MR. WALLACE               597          3


--OOO--

### E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL |
|---|---|---|---|---|
| 0167A | | 460 | 461 | 3 |
| 4103A | | 468 | 492 | 3 |
| 4103B | | 474 | | 3 |
| 4103C | | 483 | 493 | 3 |
| 4103B, 4103D | | | 491 | 3 |
| 4103E | | 494 | 497 | 3 |
| 4103F | | 497 | 499 | 3 |
| 4107A | | 548 | 562 | 3 |

| DEFENDANTS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL |
|---|---|---|---|---|
| AA01 | | 420 | | 3 |

--oOo--

1    **THE COURT:**  OKAY, THANK YOU.

2    OKAY.  MR. JOHNSON?

3    **MR. JOHNSON:**  NO REDIRECT, YOUR HONOR.

4    **THE COURT:**  NO REDIRECT?

5    IS THERE ANY REASON THE WITNESS SHOULD NOT BE

6    EXCUSED FROM FURTHER TESTIMONY?

7    **MR. JOHNSON:**  NOT AS FAR AS PLAINTIFFS' ARE

8    CONCERNED, YOUR HONOR.

9    **MS. O'NEIL:**  NO, NOT AS FAR AS THE DEFENDANTS ARE

10   CONCERNED.  THANK YOU.

11   **THE COURT:**  THANK YOU, SIR.  YOU MAY BE EXCUSED.

12   HAVE A SAFE TRIP HOME.

13   **THE WITNESS:**  THANK YOU VERY MUCH, MA'AM.

14   **THE COURT:**  PLAINTIFFS MAY CALL THEIR NEXT WITNESS.

15   **MR. JOHNSON:**  PLAINTIFFS CALL ELIZABETH O'NEIL, YOUR

16   HONOR.  AND WE WILL HAVE TO GET HER FROM OUTSIDE THE COURTROOM.

17   SHE IS A CLASS MEMBER AND HAS BEEN EXCLUDED FROM THE TESTIMONY.

18   WE ALSO WILL NEED THE RAMP IN PLACE, YOUR HONOR.

19   SHE'S A WHEELCHAIR USER.

20   **THE COURT:**  YOU DON'T WANT MS. DREVON -- I THINK

21   IT'S HEAVY.  MAYBE THE GENTLEMAN CAN DO IT.

22   (PAUSE IN THE PROCEEDINGS.)

23   **THE WITNESS:**  GOOD MORNING.

24   **THE COURT:**  GOOD MORNING.

25   **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

1                    **ELIZABETH O'NEIL,**

2  CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY SWORN,

3  TESTIFIED AS FOLLOWS:

4            **THE WITNESS:**  I DO.

5            **THE CLERK:**  PLEASE STATE YOUR FULL NAME FOR THE

6  COURT AND SPELL YOUR LAST NAME.

7            **THE WITNESS:**  ELIZABETH O'NEIL.  O'NEIL IS SPELLED

8  O- APOSTROPHE –N-E-I-L.

9            **THE CLERK:**  THANK YOU.

10           I AM GOING TO PUT THE MIKE ON YOU, WHICH MAY BE

11  EASIER FOR YOU.

12           (PAUSE IN THE PROCEEDINGS.)

13           **THE CLERK:**  LET ME TEST IT.

14           **MR. JOHNSON:**  SHE HAS BEEN SWORN?

15           **THE CLERK:**  CAN YOU STATE YOUR NAME AGAIN?

16           **THE WITNESS:**  ELIZABETH O'NEIL.

17           **THE COURT:**  I CAN.

18           **THE WITNESS:**  IS IT WORKING?

19           **THE COURT:**  YES.

20           ARE YOU ABLE TO HEAR HER?

21           **THE REPORTER:**  YES.

22                  **DIRECT EXAMINATION**

23  **BY MR. JOHNSON:**

24  **Q.**   GOOD MORNING, MS. O'NEIL.

25           ARE YOU SETTLED IN?

1    A.   YES.

2    Q.   YOU MIGHT HAVE TO SPEAK UP A LITTLE BIT BECAUSE I THINK

3    THE DISTANCE FROM THE MIKE.  WE CAN HEAR YOU, BUT IT'S A

4    LITTLE --

5              THE COURT:  SHE'S PUT A MIKE ON HER BLOUSE, SO SHE

6    DOESN'T NEED TO GET THAT CLOSE TO THE MICROPHONE.

7              MR. JOHNSON:  OKAY.

8    BY MR. JOHNSON:

9    Q.   YOU MUST SPEAK TO YOUR RIGHT A LOT MORE THAN TO YOUR LEFT

10   APPARENTLY.

11   A.   OKAY.  I WILL TRY IT.  WE MAY GIVE UP.  I MAY JUST GRAB

12   THIS THING, I GUESS.

13   Q.   MS. O'NEIL, CAN YOU PLEASE TELL THE COURT WHERE YOU LIVE?

14   A.   I LIVE IN SAN FRANCISCO IN THE CIVIC CENTER DISTRICT OF

15   SAN FRANCISCO, 601 VAN NESS.

16   Q.   601 VAN NESS?

17   A.   AVENUE.

18   Q.   VAN NESS AVENUE?

19   A.   YES.

20   Q.   WHAT CROSS STREET IS THAT NEAR?

21   A.   GOLDEN GATE.

22   Q.   HOW LONG HAVE YOU LIVED AT THAT LOCATION?

23   A.   SINCE 2003.  SO I BELIEVE THIS OCTOBER WILL BE EIGHT

24   YEARS.

25   Q.   AND DOES ANYONE ELSE LIVE THERE WITH YOU?

O'NEIL – DIRECT / MR. JOHNSON

1    **A.**    YES.  MY HUSBAND.

2    **Q.**    AND HAVE YOU LIVED IN OTHERS PARTS OF THE CITY?

3    **A.**    YES, I HAVE.

4    **Q.**    ARE YOU A NATIVE SAN FRANCISCAN?

5    **A.**    I HAVE BEEN IN SAN FRANCISCO SINCE I WAS TEN.

6    **Q.**    WHAT OTHER PARTS OF THE CITY BESIDES THE CIVIC CENTER HAVE

7    YOU LIVED IN?

8    **A.**    THE RICHMOND DISTRICT, THE SUNSET DISTRICT, AND THE

9    MARINA, AND THEN CIVIC CENTER.

10   **Q.**    OKAY.

11   **A.**    YES.  I COVERED EVERYTHING.

12   **Q.**    AND WHERE DID YOU LIVE BEFORE MOVING TO THE CIVIC CENTER?

13   **A.**    I LIVED IN THE MARINA.

14   **Q.**    WHERE EXACTLY DID YOU LIVE?

15   **A.**    FILLMORE AT BEACH.

16   **Q.**    DID YOU LIVE WITH ANYONE THERE?

17   **A.**    YES.  I LIVED IN A HOUSE OWNED BY MY MOTHER AND STEP

18   FATHER, AND IT WAS A THREE-UNIT FLAT.  THEY LIVED UP TOP.  THEY

19   RENTED OUT THE MIDDLE AND MY HUSBAND, ALTHOUGH HE WASN'T MY

20   HUSBAND AT THE TIME, WE LIVED IN THE GARDEN APARTMENT ON THE

21   BOTTOM.

22   **Q.**    AND HOW LONG WAS THAT THAT YOU LIVED IN THE MARINA?

23   **A.**    MY MATH IS TERRIBLE.  '91 TO 2003.  MOST OF 2003.

24   **Q.**    AND DOES YOUR MOTHER STILL LIVE AT THAT LOCATION?

25   **A.**    YES, SHE DOES.

1    **Q.**   DO YOU VISIT YOUR MOTHER REGULARLY?

2    **A.**   I AM PROBABLY NOT THE BEST DAUGHTER, BUT I DO VISIT HER ON

3    A FAIRLY REGULAR BASIS, YES.

4    **Q.**   WHAT DO YOU DO FOR A LIVING, MS. O'NEIL?

5    **A.**   I WORK AT GOODWILL INDUSTRIES AT MISSION AND 11TH.  I WORK

6    IN ONE OF THE EMPLOYMENT PROGRAMS.  IT IS A WELFARE-TO-WORK

7    PROGRAM.  I AM A JOB SEARCH 101 INSTRUCTOR.

8    **Q.**   HOW DO YOU GET TO WORK?

9    **A.**   I TRAVEL BY THIS CHAIR.  I LIVE ABOUT TEN OR SO BLOCKS

10   AWAY.

11   **Q.**   AND YOU ARE REFERRING TO A POWER WHEELCHAIR THAT YOU USE

12   THAT YOU CAME HERE TODAY IN?

13   **A.**   YES.

14   **Q.**   DO YOU USE THAT CHAIR BECAUSE YOU HAVE A DISABILITY?

15   **A.**   YES.

16   **Q.**   CAN YOU DESCRIBE FOR THE COURT THE NATURE OF YOUR

17   DISABILITY?

18   **A.**   I HAVE CEREBRAL PALSY.  ALL --

19   **Q.**   I AM SORRY.

20   **A.**   ALL FOUR OF MY LIMBS ARE INVOLVED.  I -- AND SOME OF MY

21   FINE MOTOR SKILLS, SUCH AS WRITING ARE INVOLVED, AND I ALSO

22   HAVE SOME LEARNING DISABILITIES.

23   **Q.**   OKAY.  AND HOW DOES THAT AFFECT WHAT YOU CAN DO?  WHAT

24   LIMITATIONS DOES YOUR DISABILITY CAUSE FOR YOU?

25   **A.**   WELL, I USE FOREARM CRUTCHES TO WALK AROUND.  I CANNOT

1  WALK WITHOUT ASSISTANCE.  I USE A MANUAL CHAIR ALSO IN SOME

2  CASES.  AND IT EFFECTS, LIKE I SAY, I DO MOSTLY TYPING BECAUSE

3  MY WRITING IS AFFECTED, AND THINGS LIKE THAT.

4  Q.   SO, YOU NEED ONE OF THOSE THREE DEVICES THAT YOU DESCRIBED

5  IN ORDER TO GET AROUND?

6  A.   YES, I DO.

7  Q.   WHAT DETERMINES WHEN YOU USE THE FOREARM CRUTCHES VERSUS

8  THE MANUAL WHEELCHAIR VERSUS THE POWER CHAIR YOU ARE HERE IN

9  TODAY?

10  A.   I GUESS IT'S DISTANCE AND TERRAIN.  MY CRUTCHES I USE AT

11  WORK AS SOON AS I GET TO WORK.  I AM MOSTLY ON MY CRUTCHES ALL

12  DAY.  THAT IS BECAUSE I AM INDOORS.  I USE MY CRUTCHES FOR SOME

13  DISTANCE WALKING, BUT NOT VERY MUCH.

14        I LIKE TO, WHEN PEOPLE ASK ME, I SAY THAT I USE THE

15  POWER CHAIR WHEN THE DISTANCE IS TOO FAR FOR ME TO WALK, BUT

16  NOT REALLY FAR ENOUGH TO BOTHER TO TAKE THE BUS.

17        AND I USE THE POWER CHAIR FOR, IF I AM NOT SURE WHAT

18  THE TERRAIN IS GOING TO BE LIKE, IF I AM -- THE MANUAL CHAIR IF

19  I AM NOT SURE WHAT THE TERRAIN IS GOING TO BE LIKE OR IF I AM

20  TRAVELING WITH SOMEONE IN A CAR, THAT SORT OF THING.

21  Q.   OKAY.

22        NOW BESIDES TRAVELING FROM YOUR HOME TO WORK AND

23  BACK, AND GOING TO SEE YOUR MOTHER IN THE MARINA DISTRICT, DO

24  YOU VISIT OTHER PARTS OF THE CITY OF SAN FRANCISCO?

25  A.   OH, SURE.  I, OF COURSE, I GO ALL OVER THE CIVIC CENTER

1    AND BEYOND RUNNING ERRANDS, GOING OUT WITH FRIENDS, ALL KINDS

2    OF DIFFERENT THINGS.  VISITING DIFFERENT PLACES.  LIBRARY,

3    FARMERS MARKET, THAT SORT OF THING.

4    **Q.**   ANY PARTICULAR PARTS OF THE CITY THAT YOU GO TO ON A

5    FAIRLY REGULAR BASIS OR THAT YOU LIKE TO GO TO?

6    **A.**   BY MYSELF, I GO -- I MEAN, DOESN'T REALLY MATTER, I DO

7    WITH MY HUSBAND ALSO, BUT I GO ALL KINDS OF DIFFERENT PLACES.

8    IT JUST DEPENDS WHAT I AM DOING FOR THE DAY.

9    **Q.**   OKAY.

10           NOW, IN TRAVELING AROUND THE CITY, HAVE YOU HAD ANY

11   DIFFICULTIES MOVING ABOUT BECAUSE OF THE CONDITIONS OF THE

12   SIDEWALKS, CURB RAMPS OR CROSSWALKS?

13   **A.**   YES, I HAVE.

14   **Q.**   COULD YOU PLEASE DESCRIBE FOR THE COURT THE TYPES OF

15   CONDITIONS THAT YOU'VE ENCOUNTERED THAT HAVE CAUSED THOSE

16   PROBLEMS?

17   **A.**   WELL, I HAVE ENCOUNTERED MANY BAD CURB RAMPS, CRACKED

18   BLACKTOP, PIECES OF SIDEWALK BEING UP LIFTED BY TREE ROOTS,

19   POTHOLES, ALL KINDS OF THINGS.  THE LIST GETS PRETTY LONG.

20   **Q.**   WHAT ABOUT THE CURB RAMPS THEMSELVES; HAVE YOU ENCOUNTERED

21   ANY DIFFICULTIES WITH THE CURB RAMPS BECAUSE OF THE WAY THAT

22   THEY ARE CONSTRUCTED OR --

23   **A.**   OH, SURE, YES.

24   **Q.**   WHAT KINDS OF CONDITIONS HAVE CAUSED YOU PROBLEMS WITH

25   RESPECT TO THE CURB RAMPS?

1    **A.**    SOME ARE TERRIBLY STEEP.  SOME COME DOWN TO SUCH A POINT

2    THAT -- AND THEN I CAN GET STUCK.  AND THEN THERE'S USUALLY

3    EITHER A LIP ON THE CURB RAMP ITSELF OR FROM THE BLACKTOP BEING

4    ERODED AWAY THAT I NOT ONLY GET STUCK AND I HAVE TO BE PUSHED

5    UP AND OUT, SO TO SPEAK.

6    **Q.**    OKAY.

7    **A.**    ALL KINDS OF THINGS.

8    **Q.**    AND HAVE YOU ALSO ENCOUNTERED CORNERS WHERE THERE IS NO

9    CURB RAMP AT ALL?

10   **A.**    YES.

11   **Q.**    DOES THAT HAPPEN VERY OFTEN?

12   **A.**    YES.  UNFORTUNATELY, YES.

13   **Q.**    AND HOW DOES THAT AFFECT YOU?

14   **A.**    THAT MAKES ME VERY NERVOUS BECAUSE USUALLY THAT MEANS THAT

15   I AM COMING OFF THE ONE CURB RAMP AND I AM GETTING DUMPED

16   EITHER END OF MYSELF DEPENDING ON WHICH WAY I AM GOING.  I'M

17   GETTING DUMPED INTO TRAFFIC.  AND I DON'T LIKE TO BE DUMPED

18   INTO ONCOMING TRAFFIC, IF YOU UNDERSTAND.

19   **Q.**    I THINK YOU MIGHT HAVE MISUNDERSTOOD MY QUESTION,

20   MS. ELIZABETH (SIC).

21           I WAS ASKING YOU ABOUT A CORNER.  MAYBE I DIDN'T ASK

22   IT CLEARLY.

23           DO YOU ENCOUNTER CORNERS WHERE THERE'S NOT A CURB

24   RAMP ON EITHER SIDE OF THE CORNER?

25   **A.**    YOU MEAN IF THE CURB RAMP IS NOT BI-CUT?  IS THAT WHAT YOU

1    MEAN?

2    **Q.**   NO.  I MEAN IF THERE IS NO CURB RAMP AT ALL ON A CORNER,

3    DO YOU SOMETIMES COME ACROSS THOSE SITUATIONS?

4    **A.**   YES, I DO.

5    **Q.**   AND SO DOES THAT MEAN THAT YOU ARE NOT ABLE TO GET OFF THE

6    SIDEWALK AT THAT CORNER?

7    **A.**   NO.  I HAVE TO TRAVEL UNTIL I CAN FIND EITHER AN

8    ALTERNATIVE CURB RAMP OR A DRIVEWAY, OR SOMETHING LIKE THAT.

9    **Q.**   DOES THAT CAUSE YOU ANY CONCERN?

10   **A.**   WELL, IT TAKES ME OUT OF MY WAY.  USUALLY DRIVEWAYS AREN'T

11   IN VERY GOOD SHAPE.  IT IS GOING TO TAKE ME -- IT COULD VERY

12   WELL TAKE ME INTO ONCOMING TRAFFIC.  IT'S NOT SOMETHING I

13   ENJOY.

14   **Q.**   OKAY.

15         AND WHEN YOU DO NEED TO GO TO ANOTHER CORNER, ARE

16   YOU ABLE TO TELL FROM WHERE YOU'RE AT WHETHER, IN FACT, THERE'S

17   GOING TO BE A SAFE OR EVEN A CURB RAMP AT ALL AT THE NEXT

18   CORNER THAT YOU ARE TRAVELING TO?

19   **A.**   IF I KNOW THE NEIGHBORHOOD A LITTLE BIT, YES.  BUT IF IT'S

20   SOMEWHERE NEW, I HAVE NO IDEA UNTIL I GET RIGHT UP THERE, AND

21   THEN I COULD BE STUCK LOOKING FOR ANOTHER WAY UP.

22   **Q.**   YOU WERE TALKING A MOMENT AGO I THINK ABOUT A SITUATION

23   WHERE I THINK YOU SAID IT WAS WHERE IT'S NOT BI-CUT.

24         WHAT DO YOU MEAN BY THAT?

25   **A.**   THE SAME PIECE OF SIDEWALK HAS A CURB RAMP -- I AM

1    TERRIBLE AT DESCRIBING THINGS.

2            THE SIDEWALK –– THE CURB RAMP GOES THIS WAY

3    (INDICATING) IF YOU WANT TO CROSS THIS WAY.  LIKE IF IT WAS VAN

4    NESS, IF I WANTED TO GO ACROSS VAN NESS, OR IT GOES TO THE

5    OTHER SIDE SO I CAN CROSS THE STREET.  LIKE IF I WANTED TO

6    CROSS GOLDEN GATE, THERE WOULD BE ANOTHER CURB RAMP ON THAT

7    CORNER AS WELL.

8            **MR. JOHNSON:**  CAN I ASK MS. DREVON TO SHOW THE FIRST

9    PHOTOGRAPH OF EXHIBIT 4071?

10            (PHOTOGRAPH DISPLAYED ON SCREEN.)

11            **MS. BERNSTEIN:**  OBJECTION, YOUR HONOR.

12            **THE COURT:**  YES.

13            **MS. BERNSTEIN:**  I WILL IDENTIFY MYSELF FOR THE COURT

14    REPORTER.  I AM ERIN BERNSTEIN.

15            THIS, I BELIEVE, IS THE FIRST OF MANY ––

16            **THE COURT:**  WHAT'S THE LEGAL OBJECTION?

17            **MS. BERNSTEIN:**  LATE DISCLOSED EXHIBIT, ALSO LACKS

18    FOUNDATION.

19            **THE COURT:**  OKAY.  I DON'T KNOW ABOUT THE FOUNDATION

20    BECAUSE THERE HAS BEEN NO QUESTION ASKED.

21            **MS. BERNSTEIN:**  FOR NOW LATE DISCLOSED EXHIBIT.

22            **MR. JOHNSON:**  YOUR HONOR, THIS WAS –– DO YOU WANT ––

23            **THE COURT:**  LATE DISCLOSED.  THIS HAS BEEN MARKED

24    FOR IDENTIFICATION?

25            **MR. JOHNSON:**  IT HAS, YOUR HONOR, AS PART OF A

1    PACKET OF PHOTOGRAPHS, EXHIBIT 4071.

2              **THE COURT:**  WHEN YOU ARE OBJECTING THAT IT'S LATE

3    DISCLOSED, DOES THAT MEAN YOU RECEIVED IT, BUT YOU RECEIVED IT

4    LATE?

5              **MS. BERNSTEIN:**  YOUR HONOR, WE RECEIVED THIS

6    PHOTOGRAPH LESS THAN 48 HOURS AGO.

7              **THE COURT:**  OKAY.  AND SO WHAT IS -- YOUR OBJECTION

8    TO HIM SHOWING IT IS THAT YOU JUST RECEIVED IT 48 HOURS AGO?

9              **MS. BERNSTEIN:**  YOUR HONOR, THIS WAS THE SUBJECT OF

10   A MOTION THAT WE HAD ATTEMPTED TO FILE THAT WE HAVE SINCE MET

11   AND CONFERRED ON.  WE ATTEMPTED TO FILE A MOTION, I BELIEVE, ON

12   WEDNESDAY --

13             **THE COURT:**  THE LATE DISCLOSED EXHIBITS AND I TOLD

14   YOU THAT YOU RESERVED THE RIGHT TO MAKE THE OBJECTION WHEN THE

15   EXHIBIT IS OFFERED INTO EVIDENCE.

16             **MS. BERNSTEIN:**  OKAY.  I WILL RENEW IT AT THAT TIME,

17   YOUR HONOR.

18             **THE COURT:**  OKAY.

19             OKAY, COUNSEL, YOU MAY PROCEED.  IF IT IS OFFERED.

20   I DON'T KNOW WHETHER IT WILL BE OFFERED OR NOT.

21   **BY MR. JOHNSON:**

22   **Q.**   LET ME DIRECT YOUR ATTENTION, MS. O'NEIL, TO THE PICTURE

23   THAT'S UP ON THE PROJECTOR SCREEN THERE.

24             DO YOU SEE THAT?

25   **A.**   YES, I DO.

O'NEIL – DIRECT / MR. JOHNSON

1    **Q.**   DO YOU RECOGNIZE THIS LOCATION?

2    **A.**   YES, I DO.

3    **Q.**   CAN YOU TELL ME WHAT IT IS?

4    **A.**   THAT IS THE CORNER OF FILLMORE AND JEFFERSON IN THE

5    MARINA.

6    **Q.**   ARE YOU FAMILIAR WITH THIS PARTICULAR LOCATION?

7    **A.**   YES, I AM.

8    **Q.**   HOW ARE YOU FAMILIAR WITH IT?

9    **A.**   I LIVED IN THE NEIGHBORHOOD FOR MANY YEARS.

10   **Q.**   OKAY.

11   **A.**   AND THIS IS A PATH OF TRAVEL DOWN TO THE MARINA GREEN.

12   **Q.**   FROM WHERE?

13   **A.**   FROM MY MOTHER'S HOME, WHICH IS ABOUT -- USED TO BE MY

14   HOME -- ABOUT A BLOCK -- ABOUT A HALF A BLOCK BACK BEHIND US.

15   **Q.**   SO YOU MEAN AS WE ARE LOOKING AT THIS PICTURE -- IF YOU

16   ARE STANDING LOOKING AT THIS PICTURE AS IT IS DISPLAYED HERE,

17   YOUR MOTHER'S HOUSE AND WHERE YOU USED TO LIVE IS ABOUT A HALF

18   A BLOCK BEHIND YOU?

19   **A.**   YES.

20   **Q.**   I THINK YOU SAID THIS IS ON THE WAY DOWN TO MARINA GREEN.

21   IS THAT MARINA GREEN DOWN AT THE END OF THE BLOCK OR TWO?

22   **A.**   YES.

23   **Q.**   WHEN YOU VISIT YOUR MOTHER AT THAT LOCATION IN THE MARINA,

24   DO YOU GO DOWN TO MARINA GREEN?

25   **A.**   YES.

1    **Q.**    HOW DO YOU TRAVEL THERE?

2    **A.**    I USUALLY, NOW THAT I DON'T LIVE THERE, I USUALLY WALK ON

3    MY CRUTCHES, BUT SOMETIMES WE BRING -- WE HAVE MY MANUAL CHAIR

4    WITH ME.

5    **Q.**    OKAY.

6    **A.**    AND WE WALK THAT WAY, TOO.

7    **Q.**    AND ON YOUR ROUTE DOWN TO MARINA GREEN, DO YOU ENCOUNTER

8    THIS CURB, THIS PARTICULAR CROSSWALK CURB TRANSITION THERE?

9    **A.**    YEAH.  YES.  THERE IS NO WAY TO REALLY AVOID IT.

10   **Q.**    OKAY.

11           DOES THIS PARTICULAR LOCATION CAUSE YOU ANY PROBLEMS

12   IN TRAVERSING FROM THE STREET TO THE SIDEWALK AND THEN ON YOUR

13   RETURN BACK FROM THE SIDEWALK TO THE STREET?

14   **A.**    YES.

15   **Q.**    COULD YOU DESCRIBE WHAT THOSE PROBLEMS ARE?

16   **A.**    OKAY.

17           WELL, I DON'T KNOW IF YOUR HONOR CAN SEE.  I KNOW

18   THIS CORNER REALLY WELL.  IT DOESN'T REALLY -- THE PHOTOGRAPH

19   DOESN'T REALLY SHOW, BUT IT'S VERY STEEP.

20           AS YOU CAN SEE, THE SIGN -- THE STREET SIGN POST IS

21   PRACTICALLY AT THE TOP OF THE CURB RAMP.  AND SO IT IS VERY

22   DIFFICULT TO GET UP EVEN ON MY CRUTCHES BECAUSE I HAVE TO WORK

23   REALLY HARD TO GET UP THE GRADE OF THE RAMP, AND THEN I HAVE TO

24   SORT OF ANGLE MYSELF TO GET AROUND THE STREET SIGN.

25           **MR. JOHNSON:**  JUST SO WE ALL KNOW WHAT WE ARE

```
 1   TALKING ABOUT, I WOULD LIKE TO HAVE THE PHOTOGRAPH MARKED FOR

 2   IDENTIFICATION AS EXHIBIT 4071A.

 3            AND AS I INDICATED, IT ALSO APPEARS IN THE COURT'S

 4   BINDER AS THE -- I HOPE IT'S THE FIRST PHOTOGRAPH AFTER THE

 5   TAB.

 6            THE COURT:  OKAY.  4071A IS MARKED FOR

 7   IDENTIFICATION.

 8                  (PLAINTIFFS' EXHIBIT 4071A MARKED FOR

 9                   IDENTIFICATION)

10            MR. JOHNSON:  THIS IS THE PHOTOGRAPH THE WITNESS HAS

11   IDENTIFIED AS THE CORNER OF JEFFERSON AND FILLMORE.

12   BY MR. JOHNSON:

13   Q.   AND I GUESS WHAT IS THAT, LIKE THE NORTHEAST CORNER?

14   A.   I BELIEVE SO, YES.  I....

15   Q.   OKAY.

16            SO, MS. O'NEIL, DOES THE -- BESIDES THE LOCATION OF

17   THE SIGN AT THE TOP OF THAT CURB RAMP OVER TO THE LEFT OF THE

18   PICTURE --

19   A.   UH-HUH.

20   Q.   -- DOES THIS CURB RAMP OR THIS LOCATION CAUSE ANY OTHER

21   PROBLEMS FOR YOU?

22   A.   OH, YES.  THE SEWER AREA IS VERY, IS VERY SLOPED.  SO WHEN

23   YOU'RE COMING OFF THE CURB RAMP, IT'S VERY EASY TO GET PULLED

24   INTO THE -- CHAIRS WANT TO -- IF SOMETHING IS INCLINE, CHAIRS

25   JUST WANT TO GO.
```

| | |
|---|---|
| 1 | IF YOU ARE STUCK –– IF I AM STUCK THERE, IT JUST |
| 2 | SORT OF WANTS TO GO THAT WAY.  SO MY HUSBAND HAS TO WORK REALLY |
| 3 | HARD TO PUSH ME OUT OF THE AREA SO WE CAN CONTINUE ON ACROSS. |
| 4 | Q.   AND IF YOUR HUSBAND IS NOT WITH YOU, THEN WHAT HAPPENS? |
| 5 | A.   I TRY TO FIND A DRIVEWAY. |
| 6 | Q.   INSTEAD OF USING THIS LOCATION? |
| 7 | A.   YES. |
| 8 | Q.   DOES THAT MEAN YOU –– IT LOOKS LIKE THE NEXT DRIVEWAY IS |
| 9 | QUITE AWAYS DOWN THERE.  DOES THAT MEAN YOU HAVE TO TRAVEL OUT |
| 10 | IN THE STREET TO GET TO THAT DRIVEWAY? |
| 11 | A.   YES, IT DOES. |
| 12 | Q.   WHAT DOES THAT CAUSE YOU ANY CONCERN? |
| 13 | A.   YEAH.  I REALLY RATHER NOT GET –– TAKE A CHANCE ON GETTING |
| 14 | HIT BY A CAR. |
| 15 | Q.   IS THIS –– IF YOU SEE THERE IN THE PICTURE BEHIND THE |
| 16 | STREET SIGN, IT LOOKS LIKE THERE'S A BUS SIGN THERE, TOO. |
| 17 | IS THAT A BUS STOP RIGHT THERE WHERE THAT CAR ON THE |
| 18 | LEFT SIDE OF THE PHOTOGRAPH IS LOCATED? |
| 19 | A.   YES, IT IS. |
| 20 | Q.   IN THOSE CASES WHERE YOU NEED TO USE THE DRIVEWAY TO GET |
| 21 | BACK UP ON THE SIDEWALK, YOU HAVE TO TRAVEL IN THAT BUS LANE, |
| 22 | BUS STOP LANE? |
| 23 | A.   YES, I DO. |
| 24 | Q.   AND IN THOSE INSTANCES WHERE YOUR HUSBAND IS WITH YOU, DO |
| 25 | YOU STILL NEED TO GO OVER TO THE LEFT OF THE SIDEWALK THERE TO |

1    GET UP THAT CURB RAMP AND SO YOU ARE RIGHT BEHIND THE BUS LANE?

2    **A.**    YES.  YES, I AM.

3    **Q.**    DOES THAT CAUSE YOU ANY CONCERN?

4    **A.**    WELL, AS I SAID, I REALLY RATHER NOT GET HIT BY A BUS.  I

5    AM PRETTY LOW PROFILE, SO IT IS VERY DIFFICULT FOR ANY KIND OF

6    DRIVER TO SEE ME.

7    **Q.**    WHAT ABOUT THE SLOPE OF THIS CURB RAMP; DOES THAT -- IS

8    THE CURB RAMP STEEP?

9    **A.**    YES, VERY.

10    **Q.**    HOW DOES THAT AFFECT YOUR ABILITY TO NAVIGATE HERE?

11    **A.**    IT'S A -- IF I AM ON MY CRUTCHES, IT'S A MUSCLE BUILDER

12    FOR ANYBODY.  IF I AM USING MY MANUAL CHAIR, IT'S A MUSCLE

13    BUILDER FOR MY HUSBAND.  SO IT'S TOUGH, YEAH.  AND WE HAVE

14    TO -- GOING DOWN IT IS EQUALLY TOUGH.

15    **Q.**    IF YOU ARE USING YOUR MANUAL WHEELCHAIR, ARE YOU

16    PHYSICALLY ABLE TO GET UP ONTO THAT SIDEWALK FROM THAT CURB

17    RAMP -- AT THAT CURB RAMP ON YOUR OWN?

18    **A.**    NO.

19    **Q.**    MS. O'NEIL, IS IT, APART FROM TAKING THE DRIVEWAY GOING

20    THROUGH THE BUS LANE AND GOING INTO THE DRIVEWAY, IS THERE

21    ANOTHER ALTERNATIVE ROUTE THAT YOU COULD TAKE FROM YOUR

22    MOTHER'S HOUSE TO GET DOWN TO MARINA GREEN?

23    **A.**    NOT REALLY, NO.

24    **Q.**    WHY IS THAT?

25    **A.**    WELL, IT, I -- AS -- FOR ONE THING, IT WOULD TAKE ME WAY

1    OUT OF MY WAY.

2           AND AS I STATED EARLIER, I HAVE LEARNING

3    DISABILITIES.  AND PART OF THE WAY I'M AFFECTED BY THEM IS I

4    TRAVEL -- MY SENSE OF DIRECTION IS VERY POOR.  SO I TRAVEL

5    MOSTLY BY HABIT AND LANDMARKS.

6           AND I CAN GET -- IF I AM ON MY OWN, I CAN GET LOST

7    IN TWO MINUTES.  AND I -- IT'S NOT THAT I WON'T KNOW WHERE I

8    AM, JUST IT WOULD TAKE ME FOREVER TO GET BACK BECAUSE I CAN GET

9    MYSELF REALLY LOST.

10   **Q.**  OKAY.

11          AND MS. O'NEIL, WHY CAN'T YOU JUST GO ACROSS THE

12   STREET AND TRAVEL ON THE OTHER SIDE OF THE STREET BEFORE YOU

13   GET TO THIS CURB LOCATION?

14   **A.**  BECAUSE IT JUST ENDS UP BEING ROUND ABOUT AND PUTTING ME

15   IN TRAFFIC AT ONE POINT OR ANOTHER.  AND I AM NOT EVEN SURE, IS

16   THERE A CURB RAMP ON THE OTHER SIDE?  I DON'T, I DON'T

17   REMEMBER.

18          SO I DON'T KNOW.  THAT'S WHY I DON'T DO THAT.

19   **Q.**  SO YOU DON'T KNOW IF THERE'S A CORNER ON THE OTHER SIDE OF

20   THE STREET?

21   **A.**  NO.  AS I RECALL, I BELIEVE IT'S A DRIVEWAY ONLY, BUT I AM

22   NOT SURE.

23   **Q.**  SO YOU THINK THE SIDEWALK JUST CONTINUES ALONG THE OTHER

24   SIDE OF FILLMORE, THE SIDEWALK JUST CONTINUES DOWN?

25   **A.**  YEAH.  SO YEAH.

O'NEIL – DIRECT / MR. JOHNSON

1  Q.   SO THERE WOULDN'T BE ANY CORNER ON THE OTHER SIDE OF THE

2  STREET, AND THE ONLY WAY TO GET UP ON THE SIDEWALK ON THAT SIDE

3  WOULD BE TO USE ANOTHER DRIVEWAY?

4  A.   AS I RECALL, YES.

5  Q.   WHAT'S THE PROBLEM WITH USING DRIVEWAYS TO GET ON THE, UP

6  ON THE SIDEWALK?

7  A.   DRIVEWAYS TAKE ME OUT INTO THE STREETS.  SOMETIMES,

8  SOMETIMES THERE ARE CARS IN THE DRIVEWAYS, WHICH MAKE SENSE,

9  BUT THEN THAT'S BLOCKING MY PATH OF TRAVEL.  SOME DRIVEWAYS ARE

10  VERY STEEP.  THEY ARE JUST NOT MEANT TO BE USED AS A REGULAR

11  PATH OF TRAVEL.

12  Q.   OKAY.

13       NOW, IS THIS A -- YOU WERE REFERRING EARLIER TO WHAT

14  YOU CALLED A BI-CUT CURB RAMP OR BI-CUT CORNER, AND ALSO ONES

15  THAT DON'T -- THAT AREN'T BI-CUT?

16  A.   UH-HUH.

17  Q.   IS THIS AN EXAMPLE OF WHAT YOU MEANT BY IT'S NOT BI-CUT

18  BECAUSE THERE'S ONLY ONE CURB RAMP ON THE CORNER?

19  A.   YES.

20  Q.   IS THIS PARTICULAR CONFIGURATION WHERE YOU HAVE JUST THE

21  ONE CURB RAMP AND A SEWER GRATE THAT'S AT A LOWER LEVEL AT THE

22  BOTTOM OF A SLOPE ON THE CORNER, IS THAT COMMON IN YOUR

23  EXPERIENCE?

24  A.   OH, YES.

25  Q.   HOW OFTEN WOULD YOU SAY YOU ENCOUNTER THAT TYPE OF CURB

1    RAMP WITH THAT CONFIGURATION?

2    **A.**    EVERY DAY, ALL DAY, EVERYWHERE, ALL THE TIME.

3    **Q.**    AND IS THAT TRUE IN MOST OF THE AREAS OR ALL OF THE AREAS

4    THAT YOU TRAVELED IN THE CITY?

5    **A.**    YES.

6    **Q.**    DO YOU REMEMBER -- WERE YOU HERE FOR THE OPENING

7    STATEMENTS, MS. O'NEIL?

8    **A.**    YES, I WAS.

9    **Q.**    DO YOU REMEMBER WHEN THE CITY ATTORNEY SHOWED A

10    PHOTOGRAPH -- ACTUALLY I THINK IT WAS A COMPUTER-GENERATED

11    IMAGE OF A CURB -- A CORNER THAT HAD BI-CUT, AS YOU REFER TO

12    IT, A BI-CUT CURB RAMPS WHERE THERE WAS A CURB RAMP GOING ON

13    EITHER SIDE OF THE CORNER IN BOTH DIRECTIONS OF THE CROSSWALKS?

14    **A.**    YES, I SAW THAT.

15    **Q.**    HAVE YOU SEEN MANY OF THOSE TYPES OF BI-CUT CURB RAMPS AS

16    WAS DISPLAYED IN THE CITY'S OPENING STATEMENT IN YOUR TRAVELS

17    THROUGHOUT THE CITY?

18    **A.**    I'VE SEEN ONE OR TWO.

19    **Q.**    BUT THEY ARE NOT COMMON IN YOUR EXPERIENCE?

20    **A.**    NOT IN MY EXPERIENCE.

21    **Q.**    WHAT ABOUT THE SLOPE OF THE CURB RAMP; IN YOUR EXPERIENCE,

22    BESIDES THIS CORNER, HAVE YOU COMMONLY EXPERIENCED SITUATIONS

23    WHERE YOU FIND THE SLOPE IS TOO STEEP FOR YOU?

24    **A.**    YES.

25    **Q.**    AND WHAT KINDS OF PROBLEMS DOES THAT CAUSE FOR YOU?

1    **A.**    WELL, I HAVE A COUPLE IN MY NEIGHBORHOOD IN THE CIVIC

2    CENTER, AND LUCKILY I AM USUALLY IN MY POWER CHAIR.  AND MY

3    POWER CHAIR IS EQUIPPED WITH ANTI-TIP WHEELS IN THE BACK.

4                BUT IF I DIDN'T HAVE THEM, WHAT HAPPENS IS IN AN

5    EFFORT TO HAVE THE CHAIR TIP OVER, IT IS A SAFETY FEATURE, YOUR

6    HONOR, THE CHAIR DOES A WHEELIE.  AND I GO UP THE CURB AND IT

7    POPS ME UP, BUT IT KEEPS ME FROM GOING BACKWARD.  IF I DIDN'T

8    HAVE THOSE, I WOULD FALL OVER.

9    **Q.**    SO IS THAT UNNERVING FOR YOU EVEN THOUGH YOU DO HAVE THE,

10   I THINK YOU SAID ANTISLIP WHEELS?

11   **A.**    ANTI-TIP WHEELS, YES.  IT IS VERY UNNERVING.  SCARES ME TO

12   DEATH.

13               **MR. JOHNSON:**  YOUR HONOR, BEFORE I MOVE ON TOO FAR

14   AND FORGET, I WOULD LIKE TO MOVE EXHIBIT 4071A INTO EVIDENCE.

15               **MS. BERNSTEIN:**  OBJECTION, YOUR HONOR, LATE

16   DISCLOSED EXHIBIT AND LACK OF FOUNDATION.

17               **THE COURT:**  OKAY.  STARTING WITH THE FOUNDATION,

18   WHAT IS THE FOUNDATION OBJECTION THAT --

19               **MS. BERNSTEIN:**  I DON'T BELIEVE THE WITNESS HAS

20   TESTIFIED AS TO WHEN THIS PHOTO WAS TAKEN OR IF THIS IS INDEED

21   THE CURRENT CONDITION OF THE CORNER.

22               **THE COURT:**  SHE TESTIFIED CONCERNING -- YOU MEAN IN

23   TERMS OF WHETHER THIS ACCURATELY REFLECTS THE CORNER AS IT IS

24   PORTRAYED IN THIS PHOTOGRAPH?

25               **MS. BERNSTEIN:**  SHE HASN'T TESTIFIED AS TO WHEN THIS

1    PHOTOGRAPH WAS TAKEN AND I DON'T BELIEVE SHE TOOK THIS

2    PHOTOGRAPH.

3           **THE COURT:**  I DON'T KNOW THAT SHE NEEDS TO TAKE IT

4    HERSELF.

5           WHAT ABOUT HER OBJECTION THAT YOU ALL JUST PROVIDED

6    THIS PHOTOGRAPH 48 HOURS AGO AND NOT AT THE TIME PRETRIAL

7    DISCLOSURES ARE REQUIRED?

8           **MR. JOHNSON:**  THIS WAS ON OUR AMENDED EXHIBIT LIST,

9    YOUR HONOR.  AND IT WAS ALSO SPECIFICALLY IDENTIFIED AS

10   MS. BERNSTIEN REFERENCED A FEW MOMENTS AGO, IT WAS SPECIFICALLY

11   IDENTIFIED AS AN EXHIBIT THAT WOULD BE USED WITH MS. O'NEIL

12   TODAY.

13          **THE COURT:**  SO IT WASN'T JUST DISCLOSED 48 HOURS

14   AGO; IS THAT WHAT YOU ARE SAYING?

15          **MR. JOHNSON:**  THAT'S RIGHT.  IT WASN'T JUST

16   DISCLOSED 48 HOURS AGO.

17          **THE COURT:**  WHEN DID YOU DISCLOSE IT?

18          **MR. JOHNSON:**  IT WOULD HAVE BEEN ON OUR AMENDED

19   EXHIBIT LIST THAT THE COURT APPROVED, WHICH WAS NOT LONG AGO,

20   IN LATE MARCH.  BUT THESE DOCUMENTS, THESE PHOTOGRAPHS --

21          **THE COURT:**  THAT'S THE ONLY QUESTION I ASKED.

22          HE'S SAYING HE DISCLOSED IT BEFORE 48 HOURS AGO.

23          **MS. BERNSTEIN:**  YOUR HONOR, I BELIEVE THAT THAT'S

24   SLIGHTLY INCORRECT.  YOUR HONOR MAY RECALL THAT WHEN

25   PLAINTIFFS --

1       **THE COURT:**  SLIGHTLY INCORRECT?

2       **MS. BERNSTEIN:**  WHEN PLAINTIFFS ATTEMPTED TO AMEND

3    THEIR EXHIBIT LIST, THEY REQUESTED TO ADD AN EXHIBIT 4071 THAT

4    WOULD BE NEW PLAINTIFF CLASS MEMBER PHOTOGRAPHS.  YOUR HONOR

5    EXCLUDED THOSE PHOTOGRAPHS AND SAID THEY COULD NOT AMEND THEIR

6    EXHIBIT LIST TO ADD THEM.

7       WHAT THEY'VE ATTEMPTED TO DO HERE IS TO SWAP IN

8    OTHER PHOTOGRAPHS AND USE THAT SAME EXHIBIT NUMBER.  WE DID NOT

9    RECEIVE THE NEW PHOTOGRAPHS FOR THE EXHIBIT 4071 UNTIL LESS

10   THAN 48 HOURS AGO.

11      **THE COURT:**  OKAY.  I AM NOT SURE THAT I UNDERSTAND

12   WHAT YOU JUST SAID.

13      YOU ARE SAYING THAT THEY PROFFERED THIS PHOTOGRAPH

14   AND THE COURT EXCLUDED IT AND NOW THEY ARE BRINGING IT BACK OR

15   THEY'VE USED THIS NUMBER?

16      WHAT DOES THE NUMBER HAVE TO DO WITH THE PHOTOGRAPH?

17      **MS. BERNSTEIN:**  YOUR HONOR, THEY IDENTIFIED THE

18   EXHIBITS THAT WOULD BE USED IN MS. O'NEIL'S TESTIMONY AS

19   EXHIBIT 4071, AND THE COURT EXCLUDED THOSE PHOTOGRAPHS.

20      **THE COURT:**  AND THE PHOTOGRAPH THAT WAS EXCLUDED,

21   WAS IT THIS PHOTOGRAPH?

22      **MS. BERNSTEIN:**  IT WAS NOT THIS PHOTOGRAPH.  THIS

23   PHOTOGRAPH WE DID NOT FIND OUT THAT THIS PHOTOGRAPH WOULD BE

24   USED WITH MS. O'NEIL'S TESTIMONY UNTIL LESS THAN 48 HOURS AGO.

25      **THE COURT:**  SO THE COURT EXCLUDED YOUR REQUEST TO

1   AMEND YOUR EXHIBIT LIST TO INCLUDE ADDITIONAL EXHIBITS AT THAT

2   TIME.  WHY WOULD YOU JUST PROVIDE 48 HOURS AGO EXHIBITS WITHOUT

3   EVEN SEEKING LEAVE OF THE COURT?

4          **MR. JOHNSON:**  NO, WE DIDN'T DO THAT, YOUR HONOR.

5   THAT'S INCORRECT.

6          WHAT THE COURT EXCLUDED WAS PHOTOGRAPHS TAKEN BY THE

7   PLAINTIFFS, BY THE CLASS MEMBERS.  THIS DOCUMENT, THIS

8   PHOTOGRAPH IS A PHOTOGRAPH TAKEN BY THE DEFENDANTS THAT WAS NOT

9   PRODUCED UNTIL LATE IN THIS CASE --

10          **THE COURT:**  THIS IS A PHOTOGRAPH THAT YOU TOOK?  NOT

11   YOU PERSONALLY, BUT YOU, THE CITY?

12          **MS. BERNSTEIN:**  IT'S MY UNDERSTANDING THAT THIS

13   PHOTOGRAPH IS ONE OF OVER 25,000 PHOTOGRAPHS PRODUCED BY

14   DEFENDANTS IN THE COURSE OF THIS LITIGATION, BUT WAS NOT

15   IDENTIFIED SPECIFICALLY FOR USE AT TRIAL BY THIS WITNESS UNTIL

16   LESS THAN 48 HOURS AGO.

17          **THE COURT:**  OKAY.

18          **MR. JOHNSON:**  I CAN PROVIDE FURTHER EXPLANATION IF

19   THE COURT WANTS.

20          **THE COURT:**  YES, IT WOULD BE HELPFUL.

21          **MR. JOHNSON:**  YOUR HONOR, IN CONNECTION --

22          **THE COURT:**  I'M JUST AMAZED YOU ALL ARE CONSISTENTLY

23   WAITING SO LATE TO DISCLOSE THINGS TO ONE ANOTHER WHEN THIS

24   CASE HAS BEEN AROUND FOR FOUR YEARS.  AND THEN IT'S JUST NO

25   EXCUSE TO HAVE THINGS DISCLOSED FOR THE FIRST TIME 48 HOURS

1    BEFORE A TRIAL THAT HAS BEEN SCHEDULED -- ACTUALLY THE TRIAL

2    SHOULD HAVE COMMENCED IN SEPTEMBER AND HERE WE ARE IN APRIL,

3    AND 48 HOURS BEFOREHAND DISCLOSING THINGS.  I DON'T UNDERSTAND.

4            **MR. JOHNSON:**  YOUR HONOR, THIS DOCUMENT DID NOT COME

5    INTO OUR POSSESSION FROM DEFENDANTS UNTIL THE MIDDLE OF

6    FEBRUARY.

7            **THE COURT:**  WHY DID YOU WAIT UNTIL 48 HOURS AGO TO

8    DISCLOSE IT AS SOMETHING YOU WERE GOING TO USE?

9            **MR. JOHNSON:**  AS MS. BERNSTEIN HAS REPRESENTED, THAT

10   PRODUCTION INCLUDED OVER 25,000 PHOTOGRAPHS WHICH WERE NOT

11   INDIVIDUALLY BATES NUMBERED.

12           **THE COURT:**  IN FEBRUARY?

13           **MR. JOHNSON:**  IN MIDDLE OF FEBRUARY.  THEY WERE

14   PRODUCED -- WE TOOK A DEPOSITION PERTAINING TO THE CITY'S

15   SURVEY OF -- NEW SURVEY OF ITS CURB RAMPS.  THAT DEPOSITION WAS

16   NOTICED FOR AND TOOK PLACE ON THE 9TH.  AND THIS --

17           **THE COURT:**  I DON'T CARE ABOUT THE DEPOSITION.  I

18   WANT TO FOCUS ON WHAT WE ARE TALKING ABOUT BECAUSE I DON'T WANT

19   TO GO AROUND THE CORNER.  LET'S BE VERY DIRECT IN RESPONSE.

20           ARE YOU SAYING THAT IN FEBRUARY THEY PRODUCED TO YOU

21   2500 --

22           **MR. JOHNSON:**  25,000.

23           **THE COURT:**  -- PHOTOGRAPHS, AND THIS IS ONE OF THEM.

24           **MR. JOHNSON:**  THIS IS ONE OF THEM.  THEY WEREN'T

25   BATES NUMBERED.  IT TOOK SOME TIME TO MEET WITH THE WITNESSES

1    AND IDENTIFY THE PHOTOGRAPHS THAT PERTAINED TO THEIR PATH OF

2    TRAVEL AND THAT THEY COULD AUTHENTICATE, EVEN THOUGH THEY

3    DIDN'T TAKE THE PICTURE, BUT THIS IS DEFENDANTS' EXHIBIT --

4            **THE COURT:**  REFRESH MY RECOLLECTION.  WHEN YOU --

5    BECAUSE YOU ALL FILED SO MANY MOTIONS I DON'T REMEMBER THE

6    BASIS UPON WHICH YOU WERE REQUESTING, BUT I HAVE BEEN TOLD THAT

7    THE COURT HAS DENIED YOUR REQUEST TO AUGMENT YOUR EXHIBIT LIST

8    BY INCLUDING ADDITIONAL PHOTOGRAPHS.

9            SO WHAT WAS THE REASON GIVEN FOR THAT DECISION AT

10   THAT TIME?

11           **MR. JOHNSON:**  THAT THEY COULD HAVE BEEN PRODUCED

12   EARLIER AND DISCLOSED EARLIER, BUT THAT WAS WITH RESPECT TO

13   PHOTOGRAPHS THAT THE CLASS MEMBERS OR PLAINTIFFS HAD TAKEN

14   THEMSELVES.

15           **THE COURT:**  SO YOU ARE SAYING BECAUSE OF THE

16   VOLUMINOUS NATURE OF THE LATE DISCLOSURE -- THE FACT THAT THEY

17   GAVE YOU 25,000 PHOTOGRAPHS -- WHEN, IN FEBRUARY, EARLY

18   FEBRUARY OR LATE?

19           **MR. JOHNSON:**  I BELIEVE THE DATE WAS FEBRUARY 11TH.

20           **THE COURT:**  FEBRUARY 11TH AND IT TOOK TIME TO GO

21   THROUGH THEM.

22           COUNSEL?

23           **MS. BERNSTEIN:**  YOUR HONOR, I BELIEVE THAT THAT --

24           **THE COURT:**  FIRST OF ALL, IS THAT CORRECT THAT

25   AROUND, ON OR AROUND FEBRUARY 11 YOU ALL PROVIDED THEM WITH

 1   25,000 PHOTOGRAPHS?

 2        **MS. BERNSTEIN:**  THAT IS CORRECT, YOUR HONOR.

 3        **THE COURT:**  THEY WERE NOT BATES STAMPED OR

 4   IDENTIFIED IN ANY WAY?

 5        **MR. JOHNSON:**  THERE WAS A SINGLE BATES NUMBER FOR

 6   THE CD ON WHICH THEY WERE LOCATED, BUT THEY WEREN'T OTHERWISE

 7   BATES NUMBERED.

 8        **THE COURT:**  OKAY.

 9        **MS. BERNSTEIN:**  I BELIEVE THAT'S CORRECT, YOUR

10   HONOR.

11        WE HAVE BEEN ATTEMPTING TO GET -- TO MEET AND CONFER

12   ON THIS ISSUE AND GET AT LEAST A DESCRIPTION OF THE PHOTOGRAPHS

13   THAT THEY PLANNED ON USING WITH MS. O'NEIL EARLIER IN THE WEEK,

14   AND HAD BEEN TRYING TO GET COPIES OF THE PHOTOGRAPHS SO THAT WE

15   COULD RESOLVE THIS AND NOT HAVE THIS OBJECTION.

16        **THE COURT:**  YOU SAID YOU HAVE BEEN ATTEMPTING TO

17   MEET AND CONFER?  WHAT DOES THAT MEAN?

18        **MS. BERNSTEIN:**  WE WERE FINALLY ABLE TO VERBALLY

19   MEET AND CONFER JUST DURING THE PRIOR BREAK, YOUR HONOR.  WE

20   ARE STILL HOPING TO RESOLVE THIS ISSUE WITH CLASS MEMBERS THAT

21   MIGHT TESTIFY NEXT WEEK.

22        **THE COURT:**  NOT HOPING, YOU WILL.  YOU ALL WILL MEET

23   AND CONFER AND YOU WILL TELL THEM WHAT PHOTOGRAPHS YOU ARE

24   GOING TO BE USING OR THEY ARE NOT GOING TO BE ALLOWED.

25        **MR. JOHNSON:**  I UNDERSTAND, YOUR HONOR.

O'NEIL – DIRECT / MR. JOHNSON

1    **THE COURT:** JUST DO IT. BECAUSE THIS –– THE WAY YOU

2    ALL ARE PRACTICING IS QUITE UNUSUAL.

3          AND, YOU KNOW, THE WHOLE PURPOSE, AS I SAID BEFORE,

4    THE WHOLE PURPOSE OF TRIAL PREPARATION IS THAT YOU, YOU KNOW,

5    YOU DEVELOP A CASE AND YOU WINNOW IT TO A POINT WHERE WHEN YOU

6    HIT THE TRIAL DOOR, EVERYBODY KNOWS WHAT'S COMING IN AND WHAT'S

7    GOING OUT, AND NOBODY IS SURPRISED AND EVERYONE UNDERSTANDS

8    WHAT'S GOING TO BE USED AND EVERYONE IS ABLE TO ACCOMMODATE

9    THAT.

10          THIS LAST–MINUTE DISCLOSURE, THIS LAST MINUTE OR

11    FAILURE TO DISCLOSE AT ALL, IT'S NOT, YOU KNOW IT ISN'T

12    APPROPRIATE. AND IF IT HAPPENS BECAUSE YOU HAVEN'T HAD AN

13    ADEQUATE AMOUNT OF TIME TO REVIEW IT, THEN THAT'S WHAT MEET AND

14    CONFER COMES IN.

15          SIT DOWN AND MEET AND CONFER AND SAY, OKAY, THESE

16    ARE THE PHOTOGRAPHS I AM GOING TO USE WITH RESPECT TO THIS

17    WITNESS. AND THEN UNLESS THERE'S SOME SUBSTANTIVE, SOME REASON

18    THAT IS SUBSTANTIVE THAT YOU OBJECT –– YOU KNOW, YOU JUST

19    RECOGNIZE THIS IS A PHOTOGRAPH OF AN AREA THE WOMAN HAS

20    TESTIFIED THAT SHE TRAVERSES ON A REGULAR BASIS.

21          IT'S NOT THAT IT'S SOMETHING THAT'S NOT FAMILIAR

22    WITH HER. THIS IS JUST ONE EXAMPLE. SHE CAN TESTIFY

23    INDEPENDENTLY OF A PHOTOGRAPH AND TELL YOU WHAT THE PROBLEMS

24    ARE AND OBSTACLES AND BARRIERS THAT SHE HAS ENCOUNTERED, AND

25    THAT WOULDN'T BE A PROBLEM BECAUSE IT IS BASED ON HER PERSONAL

O'NEIL — DIRECT / MR. JOHNSON

1    EXPERIENCE.  THIS IS ONE GOOD EXAMPLE.

2           THE FACT IS, THEY STILL HAVE A RIGHT TO KNOW WHAT

3    PHOTOGRAPHS YOU ARE GOING TO BE USING.  AND YOU HAVE TO MAKE

4    THE TIME TO SIT AND MEET AND CONFER.  BECAUSE IT REALLY IS

5    EXTRAORDINARY THAT YOU ALL CAN'T AGREE ON EVEN SIMPLE THINGS

6    AND YOU HAVE TO GIVE EVERYTHING TO THE COURT FOR CONSIDERATION.

7    THAT'S NOT THE WAY WE PRACTICE IN THIS PROFESSION.  IT REALLY

8    ISN'T.

9           **MR. WALLACE:**  YOUR HONOR, WE HAVE NOW IDENTIFIED THE

10   PHOTOS, THEIR PHOTOS FOR SEVERAL OF THE CLASS MEMBERS, AND WE

11   WILL DO THE REST AS RAPIDLY AS WE POSSIBLY CAN.  WE WILL TAKE

12   THE COURT'S WORDS TO HEART.

13          **THE COURT:**  OKAY.  SO, BASED UPON THAT, THE

14   OBJECTION TO ADMITTING THIS IS OVERRULED.

15                   (PLAINTIFFS' EXHIBIT 4071A RECEIVED IN

16                   EVIDENCE)

17          **MS. BERNSTEIN:**  THANK YOU.

18          **MR. JOHNSON:**  THANK YOU, YOUR HONOR.

19          **THE COURT:**  I'M SORRY, WHAT DID YOU SAY YOUR NAME

20   IS?

21          HOW DO YOU SPELL YOUR LAST NAME?

22          **MS. BERNSTEIN:**  MY NAME IS ERIN BERNSTEIN, YOUR

23   HONOR.  B-E-R-N-S-T-E-I-N.

24          **THE COURT:**  E-R-I-N?

25          **MS. BERNSTEIN:**  ERIN, IS MY FIRST NAME AND LAST

1    NAME, B-E-R-N-S-T-E-I-N.

2              **THE COURT:**  ERIN.  THAT'S A PRETTY NAME.  THANK YOU.

3              **MS. BERNSTEIN:**  THANK YOU, YOUR HONOR.

4              OKAY.  YOU MAY CONTINUE.

5              **MR. JOHNSON:**  THANK YOU, YOUR HONOR.

6    **BY MR. JOHNSON:**

7    Q.  I'M AFRAID I LOST MY PLACE AFTER THAT --

8              **THE COURT:**  YOU JUST MOVED THIS INTO EVIDENCE, AND

9    IT HAS JUST BEEN ACCEPTED.

10             **MR. JOHNSON:**  THANK YOU.  I THINK I HAD MOVED ON,

11   THOUGH.

12             **THE COURT:**  DO YOU WANT HER TO READ THE LAST

13   QUESTION BACK?

14             **MR. JOHNSON:**  IF THAT'S OKAY.  THAT WOULD HELP.

15             (QUESTION AND ANSWER READ AS FOLLOWS:

16             SO IS THAT UNNERVING FOR YOU EVEN THOUGH YOU DO

17             HAVE THE, I THINK YOU SAID ANTI-SLIP WHEELS?

18             ANSWER:  ANTI-TIP WHEELS.  YES, IT'S VERY UNNERVING.

19             SCARES ME TO DEATH.)

20             **MR. JOHNSON:**  THANK YOU.  THAT HELPS.

21   **BY MR. JOHNSON:**

22   Q.  SO I THINK IN THAT CONTEXT, MS. O'NEIL, WE WERE DISCUSSING

23   CURB RAMPS THAT ARE STEEP FOR YOU.

24             HOW COMMON IS IT FOR YOU TO EXPERIENCE CURB RAMPS IN

25   THE CITY THAT YOU FIND TO BE STEEP AND CAUSE YOU THE SAME KIND

1    OF CONCERN?

2    **A.**    PRETTY COMMON, I WOULD SAY.  I CAN'T GIVE YOU AN EXACT

3    NUMBER OF TIMES THAT I RUN INTO IT, BUT FAIRLY COMMON, YES.

4                **THE COURT:**  WE CAN'T HEAR YOU.

5                **THE WITNESS:**  I AM SORRY.

6                **THE COURT:**  IS THE MICROPHONE --

7                **THE WITNESS:**  DID IT DIE?  I WILL START TO TURN THIS

8    WAY MORE.

9                FAIRLY COMMON.  I CAN'T GIVE YOU AN EXACT NUMBER,

10   BUT QUITE OFTEN.

11   **BY MR. JOHNSON:**

12   **Q.**    ARE THERE ANY OTHER PARTICULAR CONDITIONS ABOUT CURB RAMPS

13   THAT YOU HAVE ENCOUNTERED THAT CAUSE YOU PROBLEMS BESIDES THE

14   STEEPNESS OF THE CURB RAMPS?

15   **A.**    OH, YES.  I DON'T KNOW HOW TO DESCRIBE IT.

16               WHEN THE CURB RAMPS DIP DOWN AND THERE'S LIPS THAT

17   YOU HAVE TO GO OVER, AND JUST THERE'S MANY PROBLEMS WHERE I CAN

18   GET STUCK.  ALL KINDS OF THINGS.

19   **Q.**    HAS THAT HAPPENED TO YOU THAT YOU HAVE GOTTEN STUCK AT A

20   CURB RAMP?

21   **A.**    YES.

22   **Q.**    WHY IS THAT?  IS IT BECAUSE THE LIP THAT YOU MENTIONED OR

23   SOME OTHER PROBLEM?

24   **A.**    WELL, SOMETIMES IT'S THE LIPS THAT ARE CREATED BY BLACKTOP

25   ERODING AWAY AND DIFFERENT THINGS, AND SOMETIMES IT'S BECAUSE

O'NEIL – DIRECT / MR. JOHNSON

1    OF THE DRAIN AREA.  THE CURB RAMP IS RIGHT AROUND THE DRAIN

2    AREA, SO I GET SORT OF PULLED IN SORT OF LIKE THE WATER WOULD

3    IF IT IS RAINING.  I SORT OF GO WITH THE WATER.  IF THAT MAKES

4    SENSE.

5    Q.   YES.

6         YOU ALSO MENTIONED EROSION.  ARE YOU TALKING ABOUT

7    EROSION OF THE ASPHALT WHERE IT MEETS THE CURB, THE BOTTOM OF

8    THE CURB RAMP?

9    A.   YES.

10   Q.   HOW OFTEN DO YOU SEE THAT?

11   A.   OH, QUITE OFTEN.

12   Q.   AND EXACTLY HOW DOES THAT CAUSE A PROBLEM FOR YOU?  IS

13   THAT ONE OF THE SITUATIONS WHERE YOU CAN GET STUCK?

14   A.   YES.

15   Q.   WHY IS THAT?  WHAT ARE THE MECHANICS OF THAT EXACTLY?

16   A.   BECAUSE WHEN, PARTICULARLY WHEN I AM COMING OFF THE CURB

17   RAMP, THE FRONT OF MY CHAIR, THE LITTLER WHEELS HIT THE BOTTOM

18   OF THE TROUGH THAT'S CREATED, I GUESS YOU WOULD CALL IT.

19         AND THEN SOMETIMES MY CHAIR WILL COME TO A STOP.

20   AND I HAVE TO EITHER APPLY MORE POWER TO TRY AND PUSH MYSELF UP

21   AND OUT OR I SIT THERE WITH MY WHEELS SPINNING WITH MY BACK

22   WHEELS STILL ON THE CURB, AND I HAVE TO HAVE SOMEBODY COME

23   ALONG AND GIVE ME A PUSH WHILE I APPLY THE POWER TO GET OUT.

24   Q.   SO THAT'S HAPPENED TO YOU WHERE YOU HAVE HAD TO ASK A

25   STRANGER TO HELP YOU GET UNSTUCK FROM THE BOTTOM OF THE CURB

1    RAMP?

2    **A.**    YES.

3    **Q.**    WHAT OTHER PARTS OF THE CITY HAVE YOU HAD DIFFICULTIES

4    WITH CURB RAMPS BESIDES THE MARINA AREA?

5    **A.**    THE MARINA AREA, MANY OF THE STREETS THAT CROSS VAN NESS

6    AND CIVIC CENTER AREA, THE FINANCIAL DISTRICT AREA.  ALL KINDS

7    OF PLACES.  YOU NAME IT, IF I HAVE BEEN THERE, I HAVE PROBABLY

8    HAD A PROBLEM.

9    **Q.**    WHAT ABOUT SIDEWALKS?  I THINK YOU MENTIONED EARLIER THAT

10   YOU HAD PROBLEMS WITH SIDEWALKS.  CAN YOU DESCRIBE SOME OF

11   THOSE FOR THE COURT, PLEASE?

12   **A.**    YES.  I HAVE PROBLEMS WITH PIECES OF SIDEWALKS BEING

13   LIFTED UP BY TREE ROOTS MOSTLY.  SO I HAVE TO GO UP AND OVER

14   THEM OR HAVE TO ANGLE AROUND THEM.

15           I HAVE HAD A PROBLEM WITH A REALLY BADLY CRACKED

16   AREA IN MY NEIGHBORHOOD THAT'S KIND OF LIFTED UP A LITTLE WAYS

17   AND DIFFERENT THINGS WHERE MY FRONT WHEELS HAVE GOTTEN STUCK.

18           AS A MATTER OF FACT, I GOT STUCK ONCE.  I WAS ABLE

19   TO GET MYSELF OUT, BUT I HAD TO SWERVE AND I ALMOST HIT ANOTHER

20   PEDESTRIAN TRYING TO DO THAT.  SO ALL KINDS OF THINGS.

21   **Q.**    CAN YOU THINK OF A PARTICULAR EXAMPLE OF A BROKEN OR

22   RAISED SIDEWALK THAT HAS CAUSED YOU PROBLEMS?

23   **A.**    YES.  AS A MATTER OF FACT, THERE IS ONE RIGHT OUT IN FRONT

24   OF MY WORK WHERE I HAVE TO GO FIVE DAYS A WEEK TWICE A DAY.

25   **Q.**    AND CAN YOU DESCRIBE THE CONDITION THERE?

O'NEIL – DIRECT / MR. JOHNSON

1    **A.**    THE SIDEWALK THAT I MUST TRAVEL OVER TO GET TO THE FRONT

2    DOOR OF THE BUILDING IS BEING LIFTED UP BY A TREE ROOT RIGHT IN

3    FRONT.   AND AT THIS POINT I STILL CAN GO OVER IT IF I HAVE TO.

4    I PREFER NOT TO BECAUSE IT'S VERY UNCOMFORTABLE, MAKES ME VERY

5    NERVOUS BECAUSE MY CHAIR WANTS TO DO A WHEELIE.   AS I SAID, I

6    DON'T APPRECIATE THAT.

7         SO I TRY TO GO BACK BEHIND ON THE OTHER SIDE OF IT.

8    HOWEVER, THERE IS A BUS STOP THERE.   IT IS A VERY POPULAR BUS

9    STOP.   SO USUALLY THERE'S MANY PEOPLE STANDING THERE SO YOU

10   DON'T GET TO DO THAT ALL THAT OFTEN, SO I MUST GO OVER IT.

11   **Q.**    OKAY.

12        AND WHAT ABOUT CROSSWALKS, HAVE YOU HAD PROBLEMS IN

13   THE CROSSWALKS IN THE CITY STREETS AS WELL?

14   **A.**    SURE.   YEAH.   THERE'S LOTS.   THERE'S A LOT OF REALLY BADLY

15   CRACKED BLACKTOP WHERE I'VE -- MY NEIGHBORHOOD I KNOW IT SO

16   WELL, I CAN TRY TO AVOID MOST OF THEM BY GOING AROUND THEM.

17   THE BADLY CRACKED AREAS BECAUSE OTHERWISE MY FRONT WHEELS CAN

18   GET STUCK IN THERE.

19        I DON'T USUALLY HAVE TO RELY ON A STRANGER, BUT I

20   HAVE TO WORK HARD TO GET OUT OF THE PLACES I GET STUCK.   AND TO

21   AVOID THEM, I USUALLY HAVE TO STEP OUTSIDE THE CROSSWALK, WHICH

22   BEING THAT I LIVE OFF OF VAN NESS, IS -- I HATE TO BE REPEATING

23   MYSELF, BUT IT SCARES ME TO DEATH BECAUSE THOSE CARS BARREL

24   DOWN THOSE STREETS LIKE BATS OUT OF HELL.

25   **Q.**    MS. O'NEIL, HAVE YOU EVER COMPLAINED TO THE CITY ABOUT

1    THESE CONDITIONS THAT YOU'VE DESCRIBED TODAY?

2    **A.**    YES.

3    **Q.**    WHEN DID YOU FIRST MAKE A COMPLAINT TO THE CITY ABOUT ANY

4    OF THE CURB RAMP OR SIDEWALK OR CROSSWALK CONDITIONS?

5    **A.**    1991 WAS MY FIRST COMPLAINT.

6    **Q.**    AND WHAT WAS THE SUBSTANCE OF THAT COMPLAINT?

7    **A.**    IT WAS ABOUT A MONTH AFTER WE MOVED TO THE −− FAMILY, THE

8    FAMILY MOVED TO THE MARINA, AND IT WAS THE CURB RAMPS RIGHT IN

9    FRONT OF MY HOUSE.

10    **Q.**    ANY PARTICULAR CURB RAMP?

11    **A.**    YES, THE CURB RAMPS AT FILLMORE AND BEACH.

12    **Q.**    SO THAT'S CLOSE TO THE ONE THAT'S BEEN MARKED AND

13    INTRODUCED INTO EVIDENCE THAT'S ON THE SCREEN HERE,

14    EXHIBIT 4071A?

15    **A.**    YES.

16    **Q.**    AND WHO DID YOU MAKE THAT COMPLAINT TO?

17    **A.**    I MADE IT TO DPW, DEPARTMENT OF PUBLIC WORKS, I BELIEVE

18    THAT STANDS FOR.

19    **Q.**    DID YOU JUST −− WHAT DID YOU DO, GET A NUMBER FOR THEM AND

20    CALL THEM UP?

21    **A.**    YES.

22    **Q.**    AND WHAT DID THEY SAY WHEN YOU CALLED?

23    **A.**    I DIDN'T TALK TO ANYONE.  I LEFT A MESSAGE.

24    **Q.**    AND DID ANYONE GET BACK TO YOU?

25    **A.**    NO.

1  **Q.**   DID YOU FOLLOW UP AT ALL?

2  **A.**   YES, I DID.  I HAVE MADE SO MANY ATTEMPTS AT COMPLAINING,

3  IT IS HARD FOR ME TO KEEP TRACK.  BUT, YES, I DID.

4          I WAS -- I CALLED -- NO ONE GOT BACK TO ME.  SO I

5  CALLED THE SUPERVISOR'S OFFICE, MICHELA ALIOTO-PIER, AND THEN,

6  OF COURSE, ONE OF HER STAFFERS SAID, OH, WE'LL LOOK INTO IT

7  RIGHT AWAY.

8          SO THEN SHORTLY THEREAFTER, SOMEONE FROM DPW, I

9  NEVER GOT A NAME, I AM SORRY ABOUT THAT, THEY CALLED ME WANTING

10 TO KNOW WHY I DIDN'T -- WHY DID I CALL THE SUPERVISOR'S OFFICE

11 AND NOT THEM.

12 **Q.**   WHAT DID YOU SAY?

13 **A.**   AND I SAID THAT I DID.  I NEVER GOT A RESPONSE FROM YOUR

14 OFFICE.

15 **Q.**   AND WHAT WAS THE RESPONSE TO THAT?

16 **A.**   THE WOMAN SAID, SHE SAID, OH, WELL, I DON'T KNOW ANYTHING

17 ABOUT THAT.  I'M SURE SOMEONE WILL GET BACK TO YOU SOON.  THANK

18 YOU, GOODBYE.

19 **Q.**   DID THE CURB RAMP GET FIXED THEN?

20 **A.**   NO.

21 **Q.**   DID YOU FOLLOW UP AGAIN?

22 **A.**   YES.

23 **Q.**   WHAT DID YOU DO -- WHEN DID YOU NEXT FOLLOWUP?

24 **A.**   SOMEWHERE EITHER LATE '90S OR 2000.  I DON'T KNOW.  BUT I

25 GOT A NUMBER FROM A FRIEND OF MINE AT THE TIME.  SHE SAID, OH,

1   THIS IS THE PERSON YOU NEED TO CALL.  SHE WORKS AT DPW.  CALL

2   HER AND TELL HER WHAT'S GOING ON.

3           SO I DID.  AGAIN I LEFT A MESSAGE.  I WAITED ABOUT A

4   WEEK.  I CALLED HER BACK AND SHE WAS THERE.  SHE TOOK ALL THE

5   INFORMATION ABOUT WHERE IT WAS AND ALL THAT.  AND THEN SHE

6   SAID, WELL, WE HAVE TO LOOK INTO IT.  WE HAVE TO SEE WHAT KIND

7   OF CONDITION THE CURB RAMPS ARE IN, AND SO ON AND SO FORTH.

8   AND SHE SAID THAT SOMEONE WOULD BE CALLING ME BACK.

9   Q.   DID SOMEONE CALL YOU BACK?

10  A.   NO.  I CALLED HER BACK.

11  Q.   OKAY.  AND WHAT HAPPENED THEN?

12  A.   SHE SAID, YES, THE CURB RAMPS WERE TERRIBLE AND THEY WOULD

13  BE TAKEN CARE OF, BUT PROBABLY NOT THIS YEAR BECAUSE THEY

14  DIDN'T HAVE THE BUDGET FOR IT.

15  Q.   OKAY.  AND DID YOU WAIT SOME PERIOD OF TIME TO SEE IF IT

16  GOT FIXED?

17  A.   YES, I DID.

18  Q.   DID YOU FOLLOW UP AGAIN AT SOME POINT?

19  A.   YES, I DID.

20  Q.   WHEN DID YOU FOLLOW UP NEXT?

21  A.   THAT WAS IN 2006.  I REMEMBER DISTINCTLY BECAUSE I STARTED

22  WORKING AT THE MAYOR'S OFFICE ON DISABILITY.  AND THEY —— SUSAN

23  MIZNER AND JOHN PAUL SCOTT ENCOURAGED ME BOTH TO MAKE A

24  COMPLAINT.

25  Q.   THIS IS THE SAN FRANCISCO MAYOR'S OFFICE ON DISABILITY?

O'NEIL - DIRECT / MR. JOHNSON

1   **A.**   YES.

2   **Q.**   YOU WERE WORKING THERE AT THE TIME?

3   **A.**   YES.

4   **Q.**   IN WHAT CAPACITY?

5   **A.**   I WAS BEING AN AD MIN ASSISTANT, ANSWERING PHONES,

6   XEROXING, FILING, THAT SORT OF THING.

7   **Q.**   HOW LONG DID YOU WORK THERE?

8   **A.**   2006 TO 2009?  YEAH, NINE.

9   **Q.**   SO WAS IT IN 2006 THEN THAT MS. MIZNER AND MR. SCOTT

10  ADVISED YOU TO FOLLOW UP AGAIN?

11  **A.**   YES.

12  **Q.**   WHAT DID THEY TELL YOU EXACTLY?

13  **A.**   WELL, I REMEMBER SUSAN SAYING TO ME, SHE SAID, WE NEED TO

14  TAKE CARE OF THIS BECAUSE BAD CURB RAMPS IS WORSE THAN NONE AT

15  ALL.  BECAUSE, SHE SAID, THAT IF YOU -- IF THERE IS NO CURB

16  RAMP YOU ARE NOT GOING TO GO TO THE CORNER AND TRY TO USE IT.

17  BUT IF THERE IS A BAD ONE, YOU ARE GOING TO COME UP TO IT

18  THINKING YOU CAN USE IT, AND YOU MIGHT GET STUCK, YOU MIGHT BE

19  HURT, SOMETHING --

20  **Q.**   RIGHT.

21  **A.**   -- SOMETHING LIKE THAT.

22  **Q.**   DO YOU AGREE WITH THAT?

23  **A.**   OH, YES.

24  **Q.**   OKAY.  SO DID YOU THEN FOLLOWUP AFTER MS. MIZNER AND

25  MR. SCOTT ENCOURAGED YOU TO?

1   **A.**   YES.

2   **Q.**   WHAT DID YOU DO EXACTLY?

3   **A.**   WHILE I WAS THERE THAT PARTICULAR DAY, I DON'T REMEMBER

4   WHAT DAY IT WAS, I CALLED SOMEONE.  I AM SORRY, ONE THING I AM

5   BAD AT IS NAMES.  BUT I SPOKE WITH SOMEONE WHO THEY WORK WITH

6   SOME KIND OF LIAISON AT DPW.

7           AND SHE SAID THAT SHE HAD FOUND THE ORIGINAL

8   COMPLAINT.  AND THE REASON -- AND I SAID, WELL, NOTHING HAS

9   HAPPENED.  SHE SAID THE REASON NOTHING WAS DONE WAS BECAUSE IT

10  WAS NEVER GIVEN A PRIORITY BECAUSE IT WAS GIVEN, THE

11  INFORMATION WAS GIVEN ANONYMOUSLY.

12  **Q.**   WAS THAT TRUE?

13  **A.**   NO.  I WOULD NEVER DO THAT.

14  **Q.**   YOU WOULD ALWAYS GIVE YOUR NAME WHEN MAKING A COMPLAINT?

15  **A.**   YES, BECAUSE I WANT TO KNOW WHAT'S GOING TO HAPPEN.

16  **Q.**   AND THE PERSON YOU TALKED TO THEN, WAS SHE AT THE NUMBER

17  THAT -- HAD MS. MIZNER OR MR. SCOTT GIVEN YOU THAT NUMBER OR

18  TOLD YOU WHO TO CALL?

19  **A.**   I BELIEVE SO, YES.

20  **Q.**   SO, WHEN SHE TOLD YOU THAT IT WASN'T FOLLOWED UP ON

21  BECAUSE IT WAS ANONYMOUS AND YOU EXPLAINED TO HER THAT YOU

22  WOULD NEVER HAVE DONE THAT, DID YOU THEN GIVE HER YOUR NAME AND

23  THE DETAILS?

24  **A.**   YES.

25  **Q.**   AND WHAT DID SHE SAY ABOUT THAT?

 1   **A.**   SHE SAID, OH, WELL, NOW IT HAS A PRIORITY.  IT IS A

 2   PRIORITY.  WE WILL TAKE CARE OF IT.

 3   **Q.**   THAT WAS IN 2006?

 4   **A.**   YES.

 5   **Q.**   WAS THE CURB RAMP THAT WAS IN QUESTION, WAS IT FIXED THAT

 6   YEAR?

 7   **A.**   NO.

 8   **Q.**   WAS IT FIXED THE NEXT YEAR?

 9   **A.**   NO.

10   **Q.**   WHAT ABOUT THE YEAR AFTER THAT?

11   **A.**   NO.

12   **Q.**   DID YOU FOLLOW UP ANY MORE OR DID YOU JUST WAIT?

13   **A.**   I JUST WAITED.

14   **Q.**   MS. O'NEIL, DID YOU SUBMIT A DECLARATION IN THIS CASE

15   DISCUSSING YOUR PROBLEMS WITH THE CURB RAMPS AND SIDEWALKS AND

16   CROSSWALKS FOR THE PURPOSE OF THE MOTION FOR CLASS

17   CERTIFICATION?

18   **A.**   YES, I DID.

19   **Q.**   SO HAS THIS CURB RAMP THAT YOU HAVE BEEN TALKING ABOUT,

20   HAS IT EVER BEEN FIXED?

21   **A.**   YES.

22   **Q.**   WHEN WAS IT FIXED?

23   **A.**   I WENT TO VISIT MY MOTHER ON SATURDAY, APRIL 2ND.  I

24   REMEMBER DISTINCTLY BECAUSE THE DAY AFTER APRIL FOOL'S DAY, AND

25   THEY WERE -- THERE WERE WORKMEN POURING CONCRETE AS I WAS

1    STANDING THERE.

2             **THE COURT:**  YOU NEED TO ELICIT WHAT YEAR WE'RE

3    TALKING ABOUT.

4    **BY MR. JOHNSON:**

5    **Q.**    IS THAT APRIL 2ND OF THIS YEAR?

6    **A.**    OF THIS YEAR.

7    **Q.**    SO JUST LAST WEEK?

8    **A.**    RIGHT.

9    **Q.**    AND HAD ANYONE TOLD YOU THAT THE CURB RAMP WAS FINALLY

10   ABOUT TO BE FIXED AFTER ALL THESE YEARS?

11   **A.**    MY MOTHER.

12   **Q.**    BUT HAD ANYBODY FROM THE CITY CONTACTED YOU TO TELL YOU?

13   **A.**    NO.

14   **Q.**    HAS ANYBODY FROM THE CITY CONTACTED YOU TO THIS DATE TO

15   TELL YOU THAT YOUR COMPLAINT HAS BEEN ADDRESSED?

16   **A.**    NO.

17            **THE COURT:**  I WAS GOING TO TRY AND SEE IF YOU WERE

18   GOING TO FINISH YOUR DIRECT.  WE'RE BEYOND THE LUNCH HOUR --

19   LUNCH HALF AN HOUR.  SO IS THIS A GOOD POINT OR ARE YOU

20   ALMOST --

21            **MR. JOHNSON:**  I AM CLOSE, BUT I DON'T MIND BREAKING

22   AND PICKING UP, IF THAT IS OKAY WITH THE WITNESS.

23            IS THAT OKAY, MS. O'NEIL?

24            **THE WITNESS:**  THAT'S FINE.

25            **THE COURT:**  OKAY.  WE WILL BE IN RECESS UNTIL

O'NEIL – DIRECT / MR. JOHNSON

1    1:00 O'CLOCK FOR LUNCH.

2              (LUNCHEON RECESS WAS TAKEN AT 12:30 P.M.)

| | |
|---|---|
| 1 | **AFTERNOON SESSION**                                      **1:07 P.M.** |
| 2 | |
| 3 | **THE CLERK:**  ARE THE PARTIES READY? |
| 4 | **MR. JOHNSON:**  WE ARE, YOUR HONOR. |
| 5 | (PAUSE IN THE PROCEEDINGS.) |
| 6 | **THE CLERK:**  REMAIN SEATED AND COME TO ORDER. |
| 7 | BACK ON THE RECORD IN CIVIL 07-3685 KIROLA VERSUS |
| 8 | THE CITY AND COUNTY OF SAN FRANCISCO. |
| 9 | **THE COURT:**  THE RECORD SHOULD REFLECT THAT THE |
| 10 | ATTORNEYS FOR BOTH SIDES ARE PRESENT. |
| 11 | MR. JOHNSON, ARE YOU PREPARED TO RESUME YOUR DIRECT |
| 12 | EXAMINATION OF MS. O'NEIL? |
| 13 | **MR. JOHNSON:**  I AM, YOUR HONOR.  THANK YOU. |
| 14 | **THE COURT:**  YOU MAY. |
| 15 | **BY MR. JOHNSON:** |
| 16 | **Q.**  MS. O'NEIL, BEFORE WE TOOK THE LUNCH BREAK YOU WERE |
| 17 | TESTIFYING ABOUT THE CURB RAMP THAT YOU HAD COMPLAINED ABOUT |
| 18 | AND THAT WAS FINALLY FIXED LAST WEEK. |
| 19 | WHAT WAS THE CORNER WHERE THAT CURB RAMP WAS AGAIN? |
| 20 | **A.**  FILLMORE AT BEACH, CROSSING BEACH. |
| 21 | **Q.**  SO IS IT CLOSE TO THE CURB RAMP THAT'S STILL DISPLAYED ON |
| 22 | THE SCREEN HERE THAT WE IDENTIFIED AS EXHIBIT 4107A (SIC)? |
| 23 | **A.**  IT IS ABOUT A BLOCK AWAY, I BELIEVE.  I HAVE DIFFICULTY |
| 24 | JUDGING DISTANCE. |
| 25 | **Q.**  I AM SORRY, IT'S 4071A. |

O'NEIL – DIRECT / MR. JOHNSON

1  IT IS ABOUT A BLOCK AWAY FROM THIS CORNER?

2  **A.**  UH-HUH.

3  **Q.**  DID THE CITY FIX THIS CORNER AT THE SAME TIME AS THEY

4  FIXED THE OTHER CORNER?

5  **A.**  NO, THEY HAVE NOT.

6  **Q.**  AND SO IS IT ON THE SAME SIDE OF FILLMORE AS THE OTHER

7  CORNER?

8  **A.**  YES, IT IS.

9  **Q.**  SO YOU STILL HAVE THIS CORNER THAT YOU HAVE TO TRAVERSE

10  EVEN THOUGH THE OTHER ONE HAS BEEN FIXED?

11  **A.**  YES, I DO.

12  **THE COURT:**  "THIS ONE" MEANING JEFFERSON AND

13  FILLMORE?

14  **MR. JOHNSON:**  JEFFERSON AND FILLMORE, THE ONE THAT'S

15  DEPICTED IN 4071A.

16  **BY MR. JOHNSON:**

17  **Q.**  I WANT TO BE SURE THAT I DO SOMETHING THAT I DIDN'T DO

18  BEFORE, WHICH IS TO IDENTIFY THAT -- AUTHENTICATE AS TO THE

19  TIME WHEN THIS WAS.

20  WHEN WAS THE LAST TIME YOU SAW THE CORNER OF

21  JEFFERSON AND FILLMORE THAT'S DEPICTED IN EXHIBIT 4071A?

22  **A.**  THAT SAME SATURDAY, APRIL 2ND, 2011.

23  **Q.**  SO AS OF APRIL 2ND, 2011 THAT CORNER LOOKED THE WAY IT

24  DOES IN THE EXHIBIT 4071A THAT'S DISPLAYED ON THE SCREEN IN

25  FRONT OF YOU?

1    **A.**    ACTUALLY, IT LOOKED A LITTLE WORSE.  IT'S ALL CRACKED NOW

2    AROUND THE STREET SIGN.

3    **Q.**    OKAY.

4            NOW HAVE YOU MADE OTHER COMPLAINTS ABOUT OTHER CURB

5    RAMPS OR SIDEWALKS?

6    **A.**    YES, I HAVE.

7    **Q.**    WHEN WAS THE MOST RECENT COMPLAINT THAT YOU'VE MADE?

8    **A.**    THE MOST RECENT COMPLAINT WAS -- FUNNY, I GUESS IT'S

9    BECAUSE MY NAME IS O'NEIL, IT WAS ST. PATRICK'S DAY, MARCH 17TH

10   OF THIS YEAR, 2011.

11   **Q.**    OKAY.  WHAT WAS THE NATURE OF THE COMPLAINT?

12   **A.**    IT WAS A CURB RAMP AT VAN NESS AND HICKORY THAT I WANTED

13   TO BE REPLACED.

14   **Q.**    HOW DID YOU GO ABOUT MAKING -- CAN YOU FIRST TELL ME WHAT

15   WAS WRONG WITH THAT CURB RAMP THAT YOU WANTED TO GET FIXED?

16   **A.**    IT'S -- ACTUALLY THERE'S TWO.  THEY ARE BOTH VERY STEEP.

17   AND THE WAY IT IS, IT'S SIMILAR TO THIS ONE.  SO IT PUTS ME IN

18   AN EVEN MORE UNSAFE POSITION BECAUSE IT PUTS ME RIGHT INTO THE

19   BUS LANE.

20   **Q.**    AND ARE THOSE TWO CURB RAMPS ON YOUR ROUTE TO WORK ON VAN

21   NESS?

22   **A.**    YES.  AS A MATTER OF FACT, THOUGH, I HAVE STARTED GOING

23   ACROSS THE STREET TO AVOID THEM AND GO DOWN THE OTHER SIDE.

24   BUT, YES, IT IS.

25   **Q.**    ARE THERE ANY PROBLEMS ON THE OTHER SIDE OF THE STREET?

1    **A.**    YES.  NOT CURB RAMPS LIKE THAT, BUT THERE'S CRACKS IN THE

2    BLACKTOP, THE SIDEWALK.  THERE'S POTHOLES.  THERE'S UPLIFTED

3    TREE ROOTS, SIDEWALK PIECES BEING UPLIFTED BY TREE ROOTS.  ALL

4    KINDS OF THINGS.

5    **Q.**    SO HOW DID YOU GO ABOUT COMPLAINING ABOUT THE TWO CURB

6    RAMPS AT VAN NESS AND HICKORY?

7    **A.**    I USED THE COMPLAINT FORM ON THE MAYOR'S OFFICE ON

8    DISABILITY WEBSITE.

9    **Q.**    AND WHY DID YOU DO THAT AS OPPOSED TO COMPLAIN THE WAY YOU

10   HAD IN THE PAST?

11   **A.**    I WANTED TO SEE -- I HAD NEVER USED IT BEFORE, AND I

12   WANTED TO SEE IF IT GOT A FASTER RESPONSE.

13   **Q.**    OKAY.  DID YOU HAVE ANY DIFFICULTY FINDING THE COMPLAINT

14   FORM?

15   **A.**    YES, I DID.

16   **Q.**    CAN YOU DESCRIBE WHAT YOUR DIFFICULTY WAS, PLEASE?

17   **A.**    WELL, I GOT TO THE -- I GOT TO THE WEBSITE.  NO PROBLEM.

18   BUT THEN I -- THERE'S NOT REALLY AN OBVIOUS PLACE -- THEY DON'T

19   HAVE A TAB ON THEIR WEBSITE THAT SAYS "COMPLAINT FORM", BUT I

20   WENT TO CONTACT US, THE TAB CONTACT US GUESSING IT WOULD BE

21   THERE, AND IT WAS.

22           SO, I CLICKED IT, AND IT SAID "PAGE NOT FOUND".  SO,

23   I COULDN'T EVEN FIND THE FORM.

24   **Q.**    SO HOW WERE YOU ABLE TO USE THE FORM TO COMPLAIN IF YOU

25   COULDN'T FIND IT ON THE WEBSITE?

1    **A.**   WELL, I AM USED TO NOODLING AROUND ON THE INTERNET, SO I

2    THOUGHT I WOULD TRY ANOTHER APPROACH.

3            SO THERE'S ANOTHER TAB ON THE WEBSITE THAT SAYS, I

4    BELIEVE IT SAYS, "WHAT'S HAPPENING", "WHAT'S NEW", SOMETHING

5    LIKE THAT, AND I FOUND IT THERE.

6    **Q.**   YOU FOUND THE COMPLAINT FORM THERE?

7    **A.**   UH-HUH.

8    **Q.**   DID YOU FILL OUT THE FORM THEN AND SUBMIT IT?

9    **A.**   YES, I DID.

10   **Q.**   THIS WAS A COMPLAINT ABOUT THE TWO CURB RAMPS?

11   **A.**   YES.

12   **Q.**   OR CURB RAMP AT VAN NESS AND HICKORY?

13   **A.**   YES.

14   **Q.**   DID YOU RECEIVE ANY RESPONSE AFTER SUBMITTING THAT FORM?

15   **A.**   YES, I DID.

16           **MR. JOHNSON:**  I WOULD LIKE TO HAVE MARKED FOR

17   IDENTIFICATION AS EXHIBIT 4075, A TWO-PAGE DOCUMENT THAT THE

18   COURT SHOULD HAVE IN ITS BINDER UNDER THE TAB EXHIBIT 4075.

19           IF I MAY I APPROACH THE WITNESS WITH A COPY OF THE

20   DOCUMENT?

21           **THE COURT:**  YOU MAY AS LONG AS COUNSEL HAS SEEN OR

22   IS SHOWN WHAT YOU ARE GOING TO SHOW THIS WITNESS.

23           **MR. JOHNSON:**  DO YOU HAVE THIS DOCUMENT?

24           **MS. BERNSTEIN:**  WE DON'T HAVE IT IN THE WITNESS

25   BINDER.

1          **MR. JOHNSON:**  IT WAS GIVEN TO YOU A COUPLE OF DAYS

2   AGO --

3          **THE COURT:**  BEFORE YOU SHOW IT TO THE WITNESS, JUST

4   SHOW IT TO HER.

5          **MR. JOHNSON:**  I WILL.

6          (COUNSEL SHOWS DEFENSE COUNSEL EXHIBIT.)

7          **THE WITNESS:**  MAY I HELP YOU FIND SOMETHING, YOUR

8   HONOR?

9          **THE COURT:**  OH, NO, NO, NO.  THANK YOU.

10         LISA, DO WE HAVE 4075?

11         **THE CLERK:**  I AM SURE YOU DO.  I DON'T KNOW WHAT

12  BINDER IT IS OR WHAT TAB IT IS UNDER.  THEY NEED TO TELL YOU

13  THAT.

14         **MS. DREVON:**  BINDER FOUR, TAB 40 --

15         **MR. JOHNSON:**  TAB 4075.

16         **THE CLERK:**  IN BINDER FOUR?

17         **MR. JOHNSON:**  IT SHOULD BE A THIN BINDER.  THERE IS

18  NOT A LOT OF EXHIBITS FOR THIS WITNESS.

19         **THE WITNESS:**  THERE IS THIS SITTING HERE.  BINDER

20  FOUR?

21         **THE COURT:**  WHATEVER IS OVER THERE IS FOR THE

22  WITNESS.

23         **THE CLERK:**  IS IT ON YOUR DESK, JUDGE?

24         **THE WITNESS:**  IT SAYS BINDER FOUR.

25         (PAUSE IN THE PROCEEDINGS.)

```
1              THE COURT:  4075?

2              OKAY I HAVE IT.

3              MR. JOHNSON:  DOES THE COURT HAVE THE DOCUMENT?

4              THE COURT:  YES, I DO.  THANK YOU.

5              MR. JOHNSON:  THIS IS A TWO-PAGE DOCUMENT THAT'S

6    BEEN MARKED FOR IDENTIFICATION AS 4075, AND IT'S A COUPLE OF

7    E-MAILS.

8              MAY I APPROACH THE WITNESS, YOUR HONOR?

9              THE COURT:  YOU MAY.

10             (COUNSEL HANDS WITNESS EXHIBIT.)

11   BY MR. JOHNSON:

12   Q.   MS. O'NEIL, YOU HAVE IN FRONT OF YOU A DOCUMENT THAT THE

13   COURT HAS ACCEPTED FOR IDENTIFICATION AS EXHIBIT 4075.

14             AND LET ME ASK YOU TO LOOK AT THE SECOND PAGE, WHICH

15   ACTUALLY HAS THE EARLIER DATE OF MARCH 21ST, WHICH APPEARS TO

16   BE AN E-MAIL FROM KEN STEIN.

17             DO YOU SEE THAT?

18   A.   YES.

19   Q.   AND ITS "TO" HAS THE E-MAIL ADDRESS IN THE "TO" LINE

20   THERE, IS THAT YOUR E-MAIL ADDRESS?

21   A.   YES, IT IS.

22   Q.   AND IT'S DATED MARCH 21ST, 2011.

23             DO YOU RECOGNIZE THIS DOCUMENT?

24   A.   YES, I DO.

25   Q.   AND CAN YOU TELL THE COURT WHAT IT IS, TO YOUR KNOWLEDGE?
```

1   **A.**   IT IS THE REPLY E-MAIL TO MY COMPLAINT ABOUT THE CURB RAMP

2   AT VAN NESS AND HICKORY FROM KEN STEIN AT THE MAYOR'S OFFICE ON

3   DISABILITY.

4   **Q.**   DO YOU KNOW MR. STEIN FROM WHEN YOU WORKED AT THE MAYOR'S

5   OFFICE ON DISABILITY?

6   **A.**   YES, I DO.

7   **Q.**   DID YOU ACTUALLY RECEIVE THIS E-MAIL FROM MR. STEIN?

8   **A.**   YES, I DID.

9   **Q.**   CAN YOU READ INTO THE RECORD WHAT MR. STEIN HAD TO SAY TO

10  YOU?

11  **A.**   (READING)

12          "DEAR ELIZABETH:  THANKS VERY MUCH FOR YOUR

13          CONTACTING MOD ABOUT THE CURB RAMP AT" -- IT

14          TOOK ME A WHILE TO FIND THE STREET, YOUR HONOR,

15          SO I USED THE ADDRESS.  SO THIS IS RIGHT WHERE

16          IT IS -- "AT 25 VAN NESS.

17          I HAVE FORWARDED YOUR CONCERNS ALONG TO KEVIN

18          JENSEN, THE ADA COORDINATOR OF DPW FOR HIS

19          REVIEW.  IT IS MY UNDERSTANDING THAT THAT

20          PARTICULAR CURB RAMP IS OVER A SUBSIDEWALK

21          BASEMENT, AND THAT IS TECHNICALLY INFEASIBLE TO

22          PUT IN A STANDARD CURB RAMP AT THAT LOCATION,

23          AND THE CITY IS CURRENTLY EXPLORING OTHER

24          OPTIONS FOR THESE KINDS OF SITUATIONS.

25          SINCERELY YOURS, KEN STEIN."

O'NEIL – DIRECT / MR. JOHNSON

1   **Q.**   OKAY.  DID YOU THEN RECEIVE AN E-MAIL FROM MR. JENSEN?

2   **A.**   YES, I DID.

3   **Q.**   IF YOU WILL LOOK ON THE FIRST PAGE OF WHAT HAS BEEN MARKED

4   AS 4075, WHICH IS THE DOCUMENT THAT I HANDED YOU A MOMENT AGO?

5   **A.**   UH-HUH.

6   **Q.**   IS THAT THE E-MAIL THAT YOU RECEIVED FROM KEVIN JENSEN?

7   **A.**   YES, IT IS.

8   **Q.**   COULD YOU READ THE CONTENT OF HIS E-MAIL INTO THE RECORD?

9   **A.**   (READING)

10               "THE SAN FRANCISCO MUTUAL TRANSIT AGENCY, SFMTA,

11               IS CURRENTLY PLANNING TO PROVIDE IMPROVEMENTS

12               ALONG VAN NESS AVENUE FOR BUS RAPID TRANSIT,

13               BRT.  IT IS MY EXPECTATION THAT THE EXISTING

14               CURB RAMPS AT 25 -- AT THE 25 VAN NESS LOCATION

15               WILL BE REPLACED AS PART OF THE BRT PROJECT

16               SCOPE OF WORK.  THE PROJECT WILL REQUIRE THE

17               COORDINATION OF MANY FEATURES ALONG THE PUBLIC

18               RIGHT-OF-WAY, INCLUDING ACCESSIBILITY ITEMS.

19               BEST REGARDS, KEVIN."

20   **Q.**   DID YOU UNDERSTAND THIS E-MAIL TO BE DIRECTED TO YOU?

21   **A.**   IT'S RESPONDING TO THE COMPLAINT I MADE, BUT IT IS NOT

22   DIRECTED TOWARD ME.  IT IS NOT ADDRESSED BY NAME.

23   **Q.**   BUT IT HAS YOUR E-MAIL ADDRESS?

24   **A.**   YES, IT IS MINE.  IT IS.

25   **Q.**   ARE THESE THE ONLY TWO COMMUNICATIONS YOU'VE RECEIVED FROM

1    THE CITY ABOUT THE CURB RAMP -- CURB RAMPS AT 25 VAN NESS?

2    **A.**    YES.

3    **Q.**    AND ARE THE CURB RAMPS AT 25 VAN NESS AT THE SAME LOCATION

4    AS VAN NESS AND HICKORY THAT YOU REFERENCED EARLIER?

5    **A.**    YES.  AS I SAID TO HER HONOR, AT THE TIME I COULDN'T FIND

6    THE STREET SIGN SO I USED THAT AS THE REFERENCE WHEN I MADE THE

7    COMPLAINT.  SO THAT'S WHY IT IS IN THE E-MAILS.

8    **Q.**    OKAY.  WERE YOU SATISFIED WITH THESE RESPONSES FROM

9    MR. JENSEN AND MR. STEIN?

10   **A.**    NO, I WAS NOT.

11   **Q.**    WHY NOT?

12   **A.**    BECAUSE IT'S -- THEY ARE VAGUE.  IT DOESN'T GIVE ME ANY

13   TIME LINE FOR WHEN THE WORK WILL BE DONE.  I DON'T KNOW WHAT

14   THIS BRT PROJECT IS.  I HAVE NO IDEA.

15           SO ONCE AGAIN, IT'S ONE OF THESE THINGS THAT LEAVES

16   ME THINKING, WELL, IT'S NOT GOING TO GET FIXED.

17   **Q.**    OKAY.

18           HAVE YOU -- YOU MENTIONED THAT YOU HAD GONE ON MOD'S

19   WEBSITE TO LOOK FOR THE CURB RAMP FORM AND THEN SUBMITTED THE

20   COMPLAINT -- SORRY, THE COMPLAINT FORM AND THEN SUBMITTED THE

21   COMPLAINT FORM TO THE CITY, I GUESS BY JUST CLICKING A SUBMIT

22   BUTTON?

23   **A.**    YES.

24   **Q.**    HAVE YOU EVER LOOKED ON THE MAYOR'S OFFICE ON DISABILITY

25   WEBSITE OR ANY OTHER CITY WEBSITE TO SEE IF THERE ARE ANY MAPS

1    SHOWING ACCESSIBLE PATHS OF TRAVEL IN YOUR NEIGHBORHOOD OR

2    OTHER PARTS OF THE CITY THAT YOU GO TO?

3    **A.**   I HAVE LOOKED AT THE, I BELIEVE IT'S THE PARK AND REC

4    WEBSITE THAT SHOWS, SUPPOSED TO SHOW ACCESSIBLE PATHS FOR THE

5    PARKS AND DIFFERENT THINGS LIKE THAT.

6    **Q.**   AND DID YOU FIND ANY MAPS SHOWING ACCESSIBLE ROUTES?

7    **A.**   I FOUND MAPS, BUT I HAVE FOUND THEM VERY DIFFICULT TO

8    READ.  I FIND IT VERY DIFFICULT TO READ MAPS AND I DIDN'T FIND

9    THE ONES I FOUND ON THE WEBSITE HELPFUL AT ALL.

10    **Q.**   WERE THEY MAPS OF STREETS SHOWING ACCESSIBLE ROUTES OR

11    JUST MAPS OF WHERE THE PARKS ARE IN THE CITY?

12    **A.**   PRETTY MUCH JUST WHERE THE PARKS ARE, I GUESS.  IT

13    DIDN'T -- DOESN'T REALLY HAVE ANY NAMES.  IF IT DID, IT WAS SO

14    SMALL, I COULDN'T READ IT.

15             THEN I WAS SUPPOSED TO CLICK ON IT.  THEN I WAS --

16    SO I HAD TO MAKE A GUESS ABOUT WHERE THE PARK WAS.  AND THEN I

17    CLICK ON IT, AND I GET A BIGGER MAP, I GUESS.  I DON'T KNOW.

18    IT WAS VERY FRUSTRATING.

19    **Q.**   HAVE YOU SEEN ANY MAPS OF ACCESSIBLE ROUTES IN YOUR

20    NEIGHBORHOOD, IN THE CIVIC CENTER, ON THE MAYOR'S OFFICE ON

21    DISABILITY WEBSITE?

22    **A.**   NO, NOT THAT I RECALL.

23    **Q.**   HAS ANYONE FROM THE CITY EVER PROVIDED YOU WITH MAPS BY

24    MAIL OR OTHERWISE SHOWING ACCESSIBLE ROUTES ALONG THE SIDEWALKS

25    IN YOUR NEIGHBORHOOD OR ANYWHERE ELSE IN THE CITY?

1    **A.**   NO.

2    **Q.**   WHEN YOU ARE TRAVELING ON THIS STREET AND ENCOUNTERING

3    THESE DIFFICULTIES THAT YOU TALKED ABOUT IN YOUR TESTIMONY HERE

4    TODAY, HAVE YOU EVER SEEN ANY STREET SIGNS OR ANY SIGNS AT ALL

5    THAT INDICATE WHERE THE ACCESSIBLE PATH OF TRAVEL?  IN OTHER

6    WORDS, WHERE SAFE CURB RAMPS ARE LOCATED AND THERE'S NO OTHER

7    BARRIERS SO THAT YOU KNOW WHICH WAY TO GO?

8    **A.**   NO.  I HAVE NEVER SEEN THAT.  I AM STOPPING TO THINK

9    BECAUSE I -- I DID SEE ONE FAIRLY RECENTLY IN GOLDEN GATE PARK,

10   BUT MY HUSBAND AND I HAD ALREADY GONE THE NONACCESSIBLE WAY

11   BECAUSE IT WAS SO SMALL AND SO HIGH UP THAT WE MISSED IT.

12   SO --

13   **Q.**   WHERE WAS THAT?

14   **A.**   -- I ONLY SAW IT COMING BACK.

15   **Q.**   WHERE WAS THAT?

16   **A.**   I AM SORRY.  I AM KIND OF LAUGHING BECAUSE I AM

17   REMEMBERING MY EXPERIENCE.

18            WE WERE -- I AM SORRY, WHEN I SAW THE SIGN?  WE WERE

19   COMING BACK FROM A WEDDING CEREMONY.

20   **Q.**   WHERE WAS IT THAT YOU WERE -- WHAT LOCATION IN GOLDEN GATE

21   PARK?

22   **A.**   GOLDEN GATE PARK.  IT WAS AT STOW LAKE.  MY, ONE OF MY

23   BEST FRIENDS HAD JUST GOTTEN -- JUST HAD HER WEDDING CEREMONY

24   AT THE CHINESE PAGODA THAT'S OUT THERE AT STOW LAKE.

25   **Q.**   ARE YOU SAYING YOU HAD SOME DIFFICULTY THERE WITH

1   TRAVELING TO THE SITE OF THE WEDDING BECAUSE THE ACCESSIBLE

2   PATH OF TRAVEL SIGNAGE WAS NOT VISIBLE TO YOU?

3   **A.**   YES, THAT'S WHAT I AM SAYING.

4           MY GIRLFRIEND GAVE ME THE DIRECTIONS, BUT HER

5   DIRECTIONS ARE TERRIBLE, SO WE MISSED IT.

6           WE CAME WITH A FRIEND IN HIS CAR.  HE WAS INVITED TO

7   THE WEDDING ALSO.  AND SO WE MISSED IT.  SO WE -- I WAS IN

8   MY -- THIS IS ONE OF MY SITUATIONS WHERE I WOULD BE IN MY

9   MANUAL CHAIR BECAUSE WE DIDN'T KNOW HOW FAR WE WOULD BE WALKING

10  OR WHAT KIND OF TERRAIN OR DIFFERENT THINGS.

11          SO I WAS IN MY MANUAL CHAIR.  WE MISSED THE WHOLE

12  ACCESSIBLE ROUTE.  AND SO WE ENDED UP GOING OVER -- I DON'T

13  EVEN THINK YOU WOULD CALL THEM PAVERS.  THEY WERE THESE GIANT

14  SQUARE BLOCKS OF CONCRETE COVERING A SECTION OF THE LAKE THAT

15  YOU CAN GO OVER TO GET TO THE PAGODA.

16          AND IT WAS SOMETHING I NEVER WANT TO EXPERIENCE

17  AGAIN.  IT WAS NOT GOOD.  MY HUSBAND WAS PUSHING AND PULLING,

18  AND EVERY FEW MINUTES I THOUGHT MY CHAIR WOULD TIP IN BECAUSE

19  IT HAS SPACING WHERE THE WATER IS AND EVERYTHING.  SO, IT WAS

20  AN INTERESTING EXPERIENCE TO SAY THE VERY LEAST.

21  **Q.**   LET ME GO BACK TO YOUR TESTIMONY ABOUT COMPLAINTS ABOUT

22  THE SIDEWALKS AND CURB RAMPS AND CROSSWALKS.

23          WERE THERE OTHER OCCASIONS THAT YOU MADE COMPLAINTS

24  ABOUT CONDITIONS IN THOSE AREAS BESIDES THE TWO THAT YOU'VE

25  DESCRIBED?

1    **A.**   YES.

2    **Q.**   CAN YOU IDENTIFY ANOTHER EXAMPLE OF WHEN YOU COMPLAINED

3    ABOUT THE STREETS OR SIDEWALKS OR CURB RAMPS?

4    **A.**   I'VE -- I COMPLAINED ABOUT A CURB RAMP THAT -- AT VAN NESS

5    AND OLIVE THAT CROSSES OLIVE THAT WAS EXTREMELY STEEP.  I

6    COMPLAINED ABOUT IT WHILE I WAS AT MY -- DURING MY TIME AT THE

7    MAYOR'S OFFICE ON DISABILITY.

8    **Q.**   HOW DID YOU COMPLAIN THAT TIME?

9    **A.**   ON THE PHONE TO DPW.  I WAS WORKING THAT DAY AND I MADE A

10   PHONE CALL DURING THAT TIME.

11   **Q.**   OKAY.  AND DID THAT CURB RAMP EVER GET FIXED?

12   **A.**   YES, IT DID.

13            THE WOMAN I SPOKE TO SAID THAT -- I GAVE HER THE

14   INFORMATION.  SHE SAID THAT THEY WOULD BE CHECKING IT OUT.  AND

15   THEY SAID -- AND I ASKED IF THEY HAD ANY -- IF SHE HAD ANY IDEA

16   OF WHEN IT MIGHT BE LOOKED AT, FIXED, OR ANYTHING.  AND SHE

17   SAID, WELL, DEPENDING ON HOW MANY COMPLAINTS THERE ARE ABOUT

18   IT, IT WILL GET A HIGHER PRIORITY.

19   **Q.**   AND --

20   **A.**   AND --

21   **Q.**   HOW LONG WAS IT BETWEEN THE TIME YOU COMPLAINED ABOUT THAT

22   CURB RAMP AND THE TIME THAT IT WAS FIXED?

23   **A.**   I WOULD SAY ABOUT A YEAR MAYBE.

24   **Q.**   AND HOW RECENTLY WAS IT FIXED?

25   **A.**   IT WAS FIXED WHILE I WAS STILL WORKING FOR MOD.  SO IT WAS

1    FIXED SOMETIME BETWEEN '06 AND '09.  I WOULD SAY IT WAS LIKE

2    '07 OR '08, SOMEWHERE IN THERE.

3    **Q.**    IT TOOK A YEAR TO GET IT FIXED?

4    **A.**    UH-HUH.  YES.

5    **Q.**    CAN YOU DESCRIBE FOR THE COURT HOW YOUR EXPERIENCES IN

6    ENCOUNTERING BARRIERS THAT YOU'VE DESCRIBED IN THE CITY

7    SIDEWALKS AND CROSSWALKS AND CURBS HAS AFFECTED YOU OR AFFECTED

8    YOUR TRAVELS IN THE CITY?

9    **A.**    YES, I CAN.

10              WELL, IT MAKES IT VERY DIFFICULT AT TIMES BECAUSE I

11   HAVE TO -- IF I AM IN A SITUATION WHERE I MIGHT GET DUMPED INTO

12   TRAFFIC, THIS IS GOING ACROSS VAN NESS, IT'S VERY BUSY.  SO I

13   HAVE TO BE VERY WEARY OF CARS AND EVEN BICYCLISTS, AND

14   DIFFERENT THINGS LIKE THAT.

15              AND EVEN WHEN THERE ISN'T A PROBLEM, VAN NESS IS

16   JUST BUSY.  AND THEN THE CRACKS AND THE POTHOLES, AND THE HOLES

17   IN THE STREETS AND GETTING STUCK, AND ALL THESE THINGS.

18              I DON'T -- I PRIDE MYSELF ON BEING VERY INDEPENDENT.

19   AND WHEN I GET STUCK AND I NEED SOMEONE'S HELP TO GET ME OUT,

20   THAT'S GREAT.  I AM HAPPY VERY HAPPY A STRANGER WANTS TO HELP

21   ME, BUT I PREFER NOT TO -- I WANT TO DO IT MYSELF.

22              AND I DON'T WANT TO HAVE TO SLOW DOWN BECAUSE I HAVE

23   TO GET OVER A ROUGH SPOT IN THE SIDEWALK.  AND AFTER A FULL DAY

24   OF DOING THAT BACK AND FORTH, BACK AND FORTH, I JUST GET VERY

25   UNCOMFORTABLE.  AND IT GETS TO BE VERY PAINFUL AS WELL.

1   **Q.**   MS. O'NEIL, DO YOU FEEL LIKE YOU HAVE FULL AND EQUAL

2   ACCESS TO THE CITY'S PEDESTRIAN RIGHT-OF-WAY AS PEOPLE WITHOUT

3   DISABILITIES?

4   **A.**   NO, I DO NOT.

5   **Q.**   WHY DID YOU DECIDE TO COME HERE AND TESTIFY TODAY?

6   **A.**   WELL, I WANTED TO TELL YOUR HONOR THAT I AM TIRED OF

7   COMPLAINING, AND IT GOES EITHER UNSATISFACTORY ANSWERS OR NO

8   ANSWERS AT ALL.

9        I WOULD LIKE YOUR HONOR TO MAKE THE CITY HAVE A TIME

10  LINE AND MAKE SURE THAT THE WORK IS -- WHAT'S THE WORD, IS

11  MONITORED SO IT IS DONE WELL, SO IT IS NOT REPEATED AND

12  REPEATED AND REPEATED.

13       I CAME HERE BECAUSE I KNEW THAT IF I CAME TO THE

14  SETTING THAT I WOULD HAVE A BETTER CHANCE OF BEING HEARD.

15       **MR. JOHNSON:**   THANK YOU.  NO FURTHER QUESTIONS OF

16  THIS WITNESS, YOUR HONOR.

17       **THE COURT:**   OKAY.  THANK YOU, MR. JOHNSON.

18       CROSS-EXAMINATION.  IS THAT GOING TO BE

19  MS. BERNSTIEN?

20       OKAY.

21                    **CROSS-EXAMINATION**

22  **BY MS. BERNSTEIN:**

23  **Q.**   GOOD AFTERNOON, MS. O'NEIL.

24  **A.**   GOOD AFTERNOON.

25  **Q.**   YOU TESTIFIED YOU USED TO WORK AT THE SAN FRANCISCO

1    MAYOR'S OFFICE ON DISABILITY; IS THAT CORRECT?

2    **A.**    YES, I DID.

3    **Q.**    YOU STARTED WORKING THERE AS A VOLUNTEER?

4    **A.**    YES, I DID.

5    **Q.**    AND YOU BECAME A PAID EMPLOYEE SOMEWHERE AROUND NOVEMBER

6    OF 2006; IS THAT RIGHT?

7    **A.**    SOMETHING LIKE THAT.

8    **Q.**    AND YOU LEFT MOD EARLY 2009, MID-2009?

9    **A.**    IT WAS LATER 2009, BUT SOMEWHERE IN THERE, YES.

10    **Q.**    OKAY.  THANK YOU.

11              AND YOU BECAME FAMILIAR WHILE YOU WERE WORKING AT

12    THE MAYOR'S OFFICE ON DISABILITY THAT THERE WAS A PROCESS

13    THROUGH WHICH THE PUBLIC COULD COMPLAIN ABOUT THINGS THAT THEY

14    FELT WERE WRONG WITH THE PUBLIC RIGHT-OF-WAY; IS THAT RIGHT?

15    **A.**    YES.

16    **Q.**    AND WHILE YOU WERE THERE IN THE MIDDLE OF 2006, YOU IN

17    FACT MADE A COMPLAINT ABOUT A CURB RAMP ON VAN NESS AND ELLIS

18    NEAR THE BRITISH MOTORS DEALERSHIP?

19    **A.**    ACTUALLY THAT'S VAN NESS AND OLIVE.  BUT, YES, THAT'S THE

20    ONE.

21    **Q.**    OKAY.  AND THAT CURB RAMP WAS FIXED, CORRECT?

22    **A.**    YES.

23    **Q.**    AND YOU EXPRESSED TO VARIOUS MEMBERS OF THE STAFF AT THE

24    MAYOR'S OFFICE ON DISABILITY AT THAT TIME THAT YOU WERE REALLY

25    HAPPY ABOUT THAT RESULT; IS THAT RIGHT?

1    **A.**   YES, BECAUSE I STOPPED HAVING TO TAKE MY LIFE INTO MY OWN

2    HANDS.  THANK YOU.

3    **Q.**   YOU DIDN'T TELL ANYONE WHILE YOU WERE AT THE MAYOR'S

4    OFFICE ON DISABILITY FOR ROUGHLY THREE YEARS THAT YOU THOUGHT

5    THE COMPLAINT PROCESS AT THE CITY WAS INADEQUATE?

6    **A.**   I -- YES, I DID, BUT NOT FORMALLY.

7    **Q.**   MS. O'NEIL, YOU MADE ANOTHER COMPLAINT ABOUT A CURB RAMP

8    AT MC ALLISTER AND VAN NESS.  DO YOU RECALL THAT?

9    **A.**   I AM SORRY, I DON'T.

10   **Q.**   DO YOU RECALL THAT THERE -- ARE YOU AWARE THERE WAS A

11   BRAND NEW CURB RAMP CONSTRUCTED THERE LAST YEAR?

12   **A.**   OH, IS THAT WHY THERE'S A NEW ONE.  YES.  I SEE THAT

13   THERE'S ONE, YES.

14   **Q.**   SO THE COMPLAINT SYSTEM WORKED IN THAT CASE?

15   **A.**   YES.  IT TOOK A WHILE, BUT YES.

16   **Q.**   AND YOU MENTIONED -- MR. JOHNSON MENTIONED DURING HIS

17   EXAMINATION OF YOU HE TALKED ABOUT AN EXHIBIT THAT MY

18   COLLEAGUE, MR. EMERY, SHOWED DURING THE OPENING STATEMENT OF A

19   CURB RAMP WITH THE TWO THE BIDIRECTIONAL CURB RAMP WITH THE TWO

20   YELLOW LANDING STRIPS THERE?

21   **A.**   YES.

22   **Q.**   YOU SAID YOU DIDN'T RECALL SEEING VERY MANY OF THOSE IN

23   THE CITY?

24   **A.**   NO, I HAVE NOT.

25   **Q.**   YOU ARE NOT AWARE -- YOU SAID YOU ARE PRETTY FAMILIAR WITH

1    YOUR NEIGHBORHOOD; IS THAT RIGHT?

2    **A.**    YES.

3    **Q.**    SO, ARE YOU AWARE THAT THERE IS A BIDIRECTIONAL CURB RAMP

4    JUST LIKE WAS SHOWN IN THE OPENING STATEMENT AT GOLDEN GATE AND

5    VAN NESS?

6    **A.**    THERE MAY BE.  IT DOESN'T -- TO ME, IT DID NOT LOOK

7    LIKE -- IT DOES NOT LOOK THE SAME AT ALL AS THE PHOTOGRAPH.

8    **Q.**    OKAY.  HOW ABOUT AT MC ALLISTER AND VAN NESS?

9    **A.**    THERE IS THAT ONE, YES.

10   **Q.**    HOW ABOUT AT GROVE AND VAN NESS IN YOUR NEIGHBORHOOD?

11   **A.**    YES.  IT'S INTERESTING THAT IT'S ALL AROUND CITY HALL, THE

12   BIG FANCY BUILDINGS.

13   **Q.**    HOW ABOUT AT HAYES AND VAN NESS?

14   **A.**    AS I RECALL THAT ONE NEEDS SOME WORK.

15   **Q.**    WOULD IT SOUND CORRECT THAT THERE WERE MAYBE AROUND MORE

16   THAN 20 BRAND NEW CURB RAMPS ALONG THE VAN NESS CORRIDOR THAT

17   YOU TRAVEL ON IN YOUR NEIGHBORHOOD?

18   **A.**    MAYBE.  I'VE NEVER COUNTED, BUT YES.

19   **Q.**    AND YOU REFERENCED IN YOUR DIRECT EXAMINATION A CURB RAMP

20   AT FILLMORE AND JEFFERSON.  I BELIEVE THERE WAS A PHOTO OF IT

21   SHOWN UP ON THE SCREEN.

22           DO YOU REMEMBER THAT?

23   **A.**    OH, YES.

24   **Q.**    HAVE YOU CALLED MOD TO SEE WHETHER THEY HAD PLANS TO PUT A

25   NEW CURB RAMP IN THERE ANY TIME SOON?

O'NEIL – CROSS / MS. BERNSTEIN

```
 1   A.   NO, I HAVE NOT.

 2   Q.   YOU ARE NOT AWARE THAT THEY ARE PLANNING ON RECONSTRUCTING

 3   THAT CURB RAMP THIS YEAR?

 4   A.   NO, I WAS NOT.

 5              MR. JOHNSON:  OBJECTION, FOUNDATION.

 6              THE COURT:  FOUNDATION OBJECTION IS SUSTAINED.

 7              MS. BERNSTEIN:  I WILL WITHDRAW THE QUESTION, YOUR

 8   HONOR.

 9              NOTHING FURTHER.  THANK YOU.

10              THE COURT:  OKAY.  MR. JOHNSON, ANY REDIRECT OF THE

11   WITNESS?

12              MR. JOHNSON:  NO REDIRECT, YOUR HONOR.

13              THE COURT:  IS THERE ANY REASON WHY THE WITNESS

14   SHOULD NOT BE EXCUSED FROM FURTHER TESTIMONY?

15              MR. JOHNSON:  NO, YOUR HONOR, NOT FROM PLAINTIFFS'

16   PERSPECTIVE.

17              MS. BERNSTEIN:  NO, YOUR HONOR.

18              THE COURT:  THANK YOU, MS. O'NEIL FOR COMING.  YOU

19   ARE NOW EXCUSED.

20              LISA, WE NEED TO -- AND MAYBE SOMEONE SHOULD HELP

21   HER.

22              THE WITNESS:  THAT'S ALL RIGHT, YOUR HONOR.

23              THE COURT:  ARE YOU OKAY?

24              THE WITNESS:  NO, I ALWAYS MAKE AN ENTRANCE WHEREVER

25   I GO SOMEWHERE NEW.
```

1           THE COURT:  WE ARE MAKING AN EXIT THIS TIME.

2           THE WITNESS:  EXIT, YES.

3           THE COURT:  WE ARE GOING TO GIVE YOU THE HELP THAT

4   YOU NEED.

5           THE WITNESS:  HAVE A GOOD DAY.

6           THE COURT:  THANK YOU.  YOU TOO.

7           (PAUSE IN THE PROCEEDINGS.)

8           OKAY.  YOU MAY CALL YOUR NEXT WITNESS.

9           MR. WALLACE:  PLAINTIFFS CALL DR. EDWARD STEINFELD,

10  YOUR HONOR.

11          THE COURT:  OKAY.

12          THE CLERK:  PLEASE STAND AND RAISE YOUR RIGHT HAND.

13                  **EDWARD STEINFELD,**

14  CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY SWORN,

15  TESTIFIED AS FOLLOWS:

16          THE WITNESS:  I DO.

17          THE CLERK:  PLEASE BE SEATED.

18          THE WITNESS:  I NEED A CHAIR.

19          THE CLERK:  OH.

20          PLEASE STATE YOUR FULL NAME FOR THE COURT AND SPELL

21  YOUR LAST NAME.

22          THE WITNESS:  EDWARD STEINFELD.  S-T-E-I-N-F-E-L-D.

23          THE CLERK:  THANK YOU.

24  ///

25  ///

1

2

3                    CERTIFICATE OF REPORTER

4        WE, RAYNEE H. MERCADO, AND DIANE E. SKILLMAN, OFFICIAL

5   REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

6   CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN

7   C07-03685SBA, KIROLA, ET AL. V. CITY AND COUNTY OF SAN

8   FRANCISCO, ET AL., WERE REPORTED BY US, CERTIFIED SHORTHAND

9   REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION

10  INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

11  TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF

12  FILING.

13        THE VALIDITY OF THE REPORTERS' CERTIFICATION OF

14  SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL

15  FROM THE COURT FILE.

16

17      _____

18        RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

19

20

21      _____

22        DIANE E. SKILLMAN, CSR, RPR, FCRR

23

24             FRIDAY, APRIL 8, 2011

25