# EXHIBIT C

UNITED STATES DISTRICT COURT

**ORIGINAL**

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SAUNDRA BROWN ARMSTRONG, JUDGE

| | | |
|---|---|---|
| IVANA KIROLA, ET AL., | ) | COURT TRIAL |
| | ) | |
| PLAINTIFFS, | ) | VOLUME 5 |
| | ) | |
| VS. | ) | NO. C 07-03685 SBA |
| | ) | |
| CITY AND COUNTY OF | ) | |
| SAN FRANCISCO, ET AL., | ) | PAGES 857 - 1076 |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | MONDAY, APRIL 11, 2011 |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFFS:       SCHNEIDER WALLACE COTTRELL BRAYTON &
          KONECKY
      180 MONTGOMERY STREET, SUITE 2000
      SAN FRANCISCO, CALIFORNIA  94109
     BY:  MARK T. JOHNSON,
        ANDREW P. LEE,
        KIRAN PRASAD,
        GUY B. WALLACE, ATTORNEYS AT LAW
        BROWN POORE LLP
        THE WATERGATE TOWERS
        2200 POWELL STREET, SUITE 745
        EMERYVILLE, CALIFORNIA  94608
     BY:  SCOTT A. BROWN, ATTORNEY AT LAW

FOR DEFENDANT:     OFFICE OF THE CITY ATTORNEY
      SIXTH FLOOR - FOX PLAZA
      1390 MARKET STREET
      SAN FRANCISCO, CALIFORNIA  94102
     BY:  ERIN BERNSTEIN,
        JAMES M. EMERY,
        ELAINE M. O'NEIL,
        KRISTINE A. POPLAWSKI, ATTORNEYS AT LAW

REPORTED BY:      RAYNEE H. MERCADO, CSR NO. 8258
        DIANE E. SKILLMAN, CSR NO. 4909
    RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

I N D E X

PLAINTIFFS' WITNESSES                          PAGE        VOL

GRANT, TIMOTHY

DIRECT EXAMINATION BY MR. JOHNSON              862          5


MASTIN, JEFFREY SCOTT

DIRECT EXAMINATION BY MR. JOHNSON              899          5

DIRECT EXAMINATION (RESUMED) BY MR. JOHNSON   1053          5


DE CHADENEDES, AUDREY

DIRECT EXAMINATION BY MR. BROWN                997          5

CROSS-EXAMINATION BY MS. POPLAWSKI            1018          5

REDIRECT EXAMINATION BY MR. BROWN             1027          5


CHERRY, MARGIE

DIRECT EXAMINATION BY MR. WALLACE            1028          5

CROSS-EXAMINATION BY MS. BERNSTEIN           1027          5

--o0o--


RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL |
|---|---|---|---|---|
| 0173A | | 905 | 907 | 5 |
| 0173A | | | 946 | 5 |
| 2116A (29) | | 978 | 1052 | 5 |
| 2116A (38) | | 1062 | 1065 | 5 |
| 2119A (46) | | 989 | 1053 | 5 |
| 2131A (1) | | 1071 | | 5 |
| 4025A | | 1003 | 1003 | 5 |
| 4025B | | 1005 | 1007 | 5 |
| 4025C | | 1007 | 1008 | 5 |
| 4025D | | 1010 | 1010 | 5 |
| 4025E | | 1011 | 1012 | 5 |
| 4025F | | 1013 | 1015 | 5 |
| 4025G | | 1015 | 1016 | 5 |
| 4108A (26) | | | 1059 | 5 |
| 4108A (31) | | 1066 | 1070 | 5 |
| 4115A (15) | | 1059 | 1065 | 5 |
| 4142 | | | 990 | 5 |
| 4144 | | | 990 | 5 |
| 4146 | | 885 | 1052 | 5 |

--O0O--

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

860

| | |
|---|---|
| 1 | MONDAY, APRIL 11, 2011                              8:34 A.M. |

2                       P R O C E E D I N G S

3              THE CLERK:  CALLING CIVIL 07-3685, KIROLA VERSUS THE

4  CITY AND COUNTY OF SAN FRANCISCO.

5              COUNSEL, PLEASE STATE YOUR APPEARANCES FOR THE

6  COURT.

7              MR. WALLACE:  GOOD MORNING, YOUR HONOR.  GUY WALLACE

8  FOR PLAINTIFFS.

9              THE COURT:  GOOD MORNING, MR. WALLACE.  THE

10 MICROPHONES ARE NOT ON YET.

11             THE CLERK:  THEY SHOULD BE.

12             MR. JOHNSON:  GOOD MORNING, YOUR HONOR.  MARK

13 JOHNSON ALSO FOR PLAINTIFFS.

14             THE COURT:  GOOD MORNING, MR. JOHNSON.

15             MR. BROWN:  YOUR HONOR, SCOTT BROWN FOR PLAINTIFFS.

16             THE COURT:  MORNING, MR. SCOTT -- MR. BROWN.  EXCUSE

17 ME.

18             MR. LEE AND MS. DREVON.

19             MR. LEE:  MORNING, YOUR HONOR.

20             THE COURT:  AND I DON'T KNOW THE GENTLEMAN SEATED IN

21 THE WHEELCHAIR, BUT GOOD MORNING.

22             MR. JOHNSON:  HE'S OUR NEXT WITNESS, YOUR HONOR.

23             THE COURT:  MORNING, MR. EMERY.

24             MR. EMERY:  MORNING, YOUR HONOR.  JIM EMERY FOR THE

25 CITY AND COUNTY.

1           THE COURT:  AND THAT'S MS. POPLAWSKI?

2           MS. O'NEIL:  GOOD MORNING, YOUR HONOR.  ELAINE

3    O'NEIL -- SORRY, YOU CAN GO NEXT.

4           MS. POPLAWSKI:  CHRISTINE POPLAWSKI FOR THE CITY.

5    GOOD MORNING, YOUR HONOR.

6           MS. BERNSTEIN:  MORNING, YOUR HONOR.  ERIN BERNSTEIN

7    FOR THE CITY.

8           THE COURT:  BERNSTEIN.  OKAY.

9           MS. DIETTERLE:  GOOD MORNING.

10          MS. O'NEIL:  AND ELAINE O'NEIL FOR THE CITY.

11          THE COURT:  O'NEIL.  GOOD MORNING.

12          OKAY.  WHEN WE ADJOURNED, WE WERE STILL IN THE

13   PLAINTIFFS' CASE, AND I UNDERSTAND YOU'RE PREPARED TO CALL YOUR

14   NEXT WITNESS.

15          MR. JOHNSON:  YES, YOUR HONOR.  THE PLAINTIFFS CALL

16   TIM GRANT.

17          THE COURT:  THAT RAMP IS STILL THERE, RIGHT?

18          THE CLERK:  IT IS.

19          MR. JOHNSON:  IT IS.

20          THE CLERK:  COULD YOU TAKE THE CHAIR DOWN.

21               (PAUSE IN THE PROCEEDINGS.)

22               (OFF-THE-RECORD DISCUSSION.)

23          THE CLERK:  RAISE YOUR RIGHT HAND.

24

25

862

1                        TIMOTHY GRANT,

2  CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY SWORN,

3  TESTIFIED AS FOLLOWS:

4            THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE

5  COURT AND TELL YOUR LAST NAME.

6            THE WITNESS:  TIMOTHY GRANT, G-R-A-N-T.

7            THE CLERK:  THANK YOU.

8                      DIRECT EXAMINATION

9  BY MR. JOHNSON:

10 Q.    GOOD MORNING, MR. GRANT.

11 A.    GOOD MORNING.

12 Q.    COULD YOU START BY TELLING THE COURT WHERE YOU LIVE.

13 A.    I LIVE IN ALBANY.

14 Q.    HOW LONG HAVE YOU LIVED THERE?

15 A.    I'VE LIVED THERE FOR ABOUT TWO YEARS.

16 Q.    WHO DO YOU LIVE WITH?

17 A.    I LIVE WITH MY WIFE.

18 Q.    MR. GRANT, ARE YOU EMPLOYED?

19 A.    I'M NOT.  I'M ON DISABILITY.

20           THE COURT:  WAIT.  I'M SORRY.  WHO DID YOU SAY YOU

21 LIVE WITH?

22           THE WITNESS:  MY WIFE.

23           THE COURT:  WIFE, OKAY.

24 BY MR. JOHNSON:

25 Q.    WHAT'S THE NATURE OF YOUR DISABILITY?

863

```
 1   A.    I HAVE MULTIPLE SCLEROSIS.

 2   Q.    AND CAN YOU DESCRIBE HOW THAT AFFECTS YOUR ABILITIES?

 3   A.    THE RIGHT SIDE OF MY BODY IS STIFF.  I CAN'T MOVE IT AS

 4   WELL.  I HAVE SPASMS.  I'M TIRED.  I -- I HAVE FATIGUE SO I

 5   TIRE EASILY.  I HAVE NYSTAGMUS, WHICH MY LEFT EYE WIGGLES.

 6   THAT'S THE BEST DESCRIPTION I CAN GIVE.  AND SO THE WORLD ON

 7   THE LEFT SIDE KIND OF SHAKES SOME.  AND IT'S HARD FOR ME TO --

 8   WELL, I CAN'T WALK, AND -- THAT'S ABOUT IT.

 9   Q.    WHEN WERE YOU DIAGNOSED WITH MS?

10   A.    I WAS DIAGNOSED ABOUT FIVE YEARS AGO.

11   Q.    OKAY.  AND YOU'RE USING A POWER WHEELCHAIR TODAY.  IS

12   THAT YOUR NORMAL MODE OF TRANSPORTATION?

13   A.    IT DEPENDS.  IF I'M BY MYSELF, THEN YEAH, I NEED TO USE

14   THE POWER WHEELCHAIR.  BUT IF I'VE -- WITH MY WIFE, MY FAMILY

15   AND MY FRIENDS WITH ME, THEN I PREFER TO USE THE MANUAL

16   WHEELCHAIR.

17   Q.    OKAY.  AND SO YOU HAVE A POWER WHEELCHAIR AND A MANUAL

18   WHEELCHAIR?

19   A.    YES, I DO.

20   Q.    DO YOU USE ANY OTHER DEVICES FOR MOBILITY?

21   A.    NO.

22   Q.    OKAY.  HAVE YOU USED A WHEELCHAIR SINCE YOU WERE

23   DIAGNOSED WITH MS FIVE YEARS AGO?

24   A.    NO.  WHEN I WAS FIRST DIAGNOSED, I WAS WALKING WITH A

25   CANE, AND SO I HAD A CANE FOR ABOUT TWO TO THREE YEARS.  I BEEN
```

864

1   IN A WHEELCHAIR FOR TWO YEARS.

2   Q.    WHAT DETERMINES WHEN YOU USE YOUR MANUAL WHEELCHAIR

3   VERSUS YOUR POWER WHEELCHAIR?

4   A.    DETERMINES -- ACTUALLY IF I HAVE FRIENDS WITH ME, FAMILY

5   WITH ME.  WHEN I'M USING -- BECAUSE I NEED HELP WITH THE MANUAL

6   CHAIR.  IF I ENCOUNTER AN OBSTACLE, I NEED SOMEONE TO HELP ME

7   GET UP A RAMP OR -- OR GET DOWN A CURB THAT THERE ISN'T A RAMP

8   IN.

9           IF I DON'T KNOW IF -- THAT'S NOT THERE, THEN I USE

10  THE POWER CHAIR.  SO WHEN I'M MOSTLY GOING OUT BY MYSELF, I'LL

11  USE A POWER CHAIR 'CAUSE I DON'T KNOW HOW THE SITUATION WILL

12  BE.

13  Q.    DO YOU HAVE A PREFERENCE FOR USING THE ONE CHAIR OVER THE

14  OTHER?

15  A.    I -- I DEFINITELY PREFER THE POWER -- I MEAN, THE MANUAL

16  CHAIR OVER THE POWER CHAIR.

17  Q.    WHY IS THAT?

18  A.    'CAUSE PHYSICALLY IT'S BETTER FOR ME.  USING MY ARMS,

19  MORE OF A PHYSICAL ACTIVITY, I PLAY SPORTS, I PLAY POWER -- I

20  MEAN, I PLAYER WHEELCHAIR BASKETBALL, QUAD RUGBY, AND I NEED

21  TO -- I NEED TO USE THE MANUAL CHAIR AS MUCH AS POSSIBLE SO I

22  CAN BE STRONG SO I CAN PLAY THOSE GAMES.  IF I -- IF MY ARMS

23  ARE WEAK, THEN I WON'T BE ABLE TO PLAY THE GAMES WITH THE OTHER

24  ATHLETES.

25  Q.    HOW DO YOU -- HOW DO YOU KNOW THAT THE MANUAL WHEELCHAIR

1  IS BETTER FOR YOU IN TERMS OF YOUR HEALTH AND STRENGTH?

2  A.    JUST PERSONALLY I FEEL BETTER.  I KNOW THAT JUST USING

3  THE MANUAL CHAIR, BUT FROM EXPERIENCES OF SEEING PEOPLE WHO

4  DON'T USE -- WHO DON'T USE AS MUCH PHYSICAL ACTIVITY AS

5  POSSIBLE -- I GO TO A YOGA CLASS IN BERKELEY, AND A LOT OF

6  THOSE PEOPLE HAVE MS.  AND THOSE PEOPLE -- A LOT OF THOSE

7  PEOPLE ARE FAR DOWN THE LINE THAN ME, MORE DISABLED.

8          THERE'S ONE GUY WHO -- HE CAN'T RAISE HIS ARMS ABOVE

9  HIS HEAD.  AND I ASKED HIM WHY AND HE SAID 'CAUSE I STOPPED

10 DOING IT.  SO THAT'S MY PERSONAL MANTRA, IS IF YOU DON'T DO IT,

11 OR IF YOU DON'T USE IT, YOU'RE GOING TO LOSE IT.  SO IF I STOP

12 USING THE MANUAL CHAIR, THEN MY -- THE STRENGTH IN MY ARMS ARE

13 GOING TO GO BECAUSE I'M NOT GOING TO BE USING IT AS MUCH.

14 Q.    HAVE YOU BEEN ADVISED BY ANY PHYSICIANS OR DOCTORS OF

15 YOURS THAT IT'S BETTER FOR YOU TO USE THE MANUAL CHAIR?

16 A.    YEAH.  ACTUALLY, EVERY PHYSICIAN, EVERY PHYSICAL

17 THERAPIST HAS ALWAYS ENCOURAGED ME TO DO AS MUCH AS POSSIBLE.

18 WHEN I TELL THEM I PLAY POWER -- I MEAN, WHEN I TELL THEM I

19 PLAY THE QUAD RUGBY OR IT'S CALLED MURDER BALL -- MURDER BALL

20 ALSO, A LOT OF PEOPLE CALL IT -- THAT'S ANOTHER NAME FOR QUAD

21 RUGBY.

22          THEY'RE ALWAYS SURPRISED THAT I DO THAT, AND THEY

23 WANT ME TO DO -- EVERYBODY ENCOURAGES ME TO DO MORE AS

24 POSSIBLE -- AS MUCH AS POSSIBLE.

25 Q.    MR. GRANT, DO YOU TRAVEL TO THE CITY OF SAN FRANCISCO ON

1  OCCASION?

2  A.    I DO -- I TRAVEL TO SAN FRANCISCO REGULARLY.  I DO A

3  PROGRAM AT THE EMBARCADERO YMCA.  IT'S CALL EMPOWER.  AND I

4  WORK OUT TWO TIMES A WEEK, TUESDAYS AND THURSDAYS.  AND I ALSO

5  PLAY QUAD RUGBY ON SATURDAYS.

6  Q.    WHY DO YOU COME ALL THE WAY FROM ALBANY TO SAN FRANCISCO

7  TO WORK OUT AND PLAY RUGBY?

8  A.    THE PROGRAM THAT THE EMBARCADERO Y IS -- IS PHENOMENAL.

9  IF I EXPLAIN IT TO -- IF I DESCRIBE IT TO ANYBODY WHO'S IN A

10 WHEELCHAIR, THEY'RE SURPRISED.  THE EQUIPMENT IS ACCESSIBLE,

11 WHICH IS THE BIGGEST THING.

12        I CAN GO WORK OUT.  I CAN LIFT WEIGHTS, AND I CAN --

13 THE SEATS JUST SWING OUT, AND I CAN JUST BRING IN THE

14 WHEELCHAIR AND ACTUALLY LIFT THE WEIGHTS, SO THAT'S A REALLY

15 BIG DEAL.  YOU DON'T REALLY FIND THAT THAT MUCH.  I ACTUALLY

16 HAVEN'T SEEN IT -- I HAVEN'T FOUND IT ANYWHERE ELSE AROUND

17 HERE.

18 Q.    WHEN YOU GO TO SAN FRANCISCO TO GO TO THE EMBARCADERO

19 YMCA, HOW DO YOU GET THERE?

20 A.    I TAKE BART.  I USE THE POWER CHAIR, AND I GO TO THE

21 EMBARCADERO BART STATION AND GET TO -- AND THEN GO TO THE

22 ACTUAL Y.

23 Q.    SO THEN YOU TAKE YOUR POWER CHAIR AND TRAVEL ON THE

24 STREETS TO THE EMBARCADERO Y?

25 A.    YES, I DO.

1  Q.    WHY -- WHY DO YOU USE THE POWER CHAIR TO MAKE THAT TRIP

2  INSTEAD OF THE MANUAL CHAIR WHEN YOU PREFER THE MANUAL CHAIR?

3  A.    'CAUSE THERE'S OBSTACLES.  I WOULDN'T BE ABLE TO MAKE IT

4  IN THE MANUAL CHAIR.  SO I HAVE TO USE THE POWER CHAIR.

5  Q.    WHAT DO YOU MEAN BY "OBSTACLES"?

6  A.    CURB RAMPS ARE TOO STEEP, THERE'S LIPS, THERE'S A

7  CROSS-SLOPE, AND ALL THOSE DIFFERENT THINGS HAPPEN, I CAN'T DO

8  IT MYSELF SO THEN I NEED HELP, WHICH IS WHY IF I GO OUT IN THE

9  MANUAL CHAIR, I NEED MY FRIENDS AND FAMILY.

10         SO IF I WERE TO GO OUT BY MYSELF, I WOULD HAVE TO

11  ASK FOR HELP, AND I WOULD HAVE TO HOPE THAT SOMEONE WOULD --

12  WOULD HELP ME.  MOST -- MOST PEOPLE DO, BUT THERE IS THE CHANCE

13  THAT I DON'T HAVE HELP AND I'M STUCK AND I CAN'T MOVE.

14  Q.    HAVE YOU MADE THAT TRIP BEFORE FROM THE EMBARCADERO BART

15  STATION TO THE EMBARCADERO YMCA IN YOUR MANUAL CHAIR?

16  A.    I HAVE.  I'VE GONE WITH HELP.  I'VE GONE WITH MY -- MY

17  SISTER'S GONE WITH ME, AND MY WIFE HAS COME WITH ME TO THE --

18  TO THE Y AND HELPED ME GET THERE.

19  Q.    AND SO WHAT'S BEEN YOUR EXPERIENCE WHEN YOU'VE TAKEN THE

20  TRIP IN YOUR MANUAL CHAIR?

21  A.    I ENCOUNTER THE PROBLEMS.  I ENCOUNTER LIPS, AND I HAVE

22  TO ASK MY WIFE FOR -- OR WHEN I WENT WITH MY SISTER, MY SISTER

23  HELPED TO GET UP THE RAMPS, TO GET OVER THE LITTLE LIPS AND

24  STUFF LIKE THAT.

25  Q.    SO IS IT YOUR BELIEF THAT YOU WOULD NOT BE ABLE TO MAKE

868

1   THAT TRIP IN YOUR MANUAL CHAIR BY YOURSELF?

2   A.    I -- YEAH, I KNOW I WOULDN'T BE ABLE TO.

3   Q.    HOW FAR IS IT FROM THE EMBARCADERO Y -- FROM THE

4   EMBARCADERO BART STATION TO THE EMBARCADERO Y?

5   A.    IT'S ABOUT A HALF MILE, PROBABLY OVER -- A LITTLE OVER A

6   HALF MILE.

7   Q.    HAVE YOU ATTEMPTED TO -- TO TRAVEL IN YOUR MANUAL CHAIR

8   IN DIFFERENT ROUTES BETWEEN THE BART STATION AND THE YMCA?

9   A.    YEAH, I WAS REFERENCING MY SISTER -- I WENT WITH MY

10  SISTER, AND WE DID GO TO THE -- WE DID TAKE THE OTHER ROUTES,

11  THE OTHER BLOCKS.  THE OBSTACLES WERE HARDER.  I HAVE -- I

12  FOUND MORE STEEP CURB RAMPS, AND -- AND IT WAS LONGER, A

13  LONGER -- LONGER DISTANCE, SO THEN I HAD MORE OPPORTUNITIES TO

14  FIND MORE OBSTACLES.

15          SO THE ONE -- THE ROUTE I TAKE NOW IS THE CLOSEST

16  WITH THE LEAST AMOUNT OF THE OBSTACLES AS THERE IS.

17  Q.    BUT ARE YOU -- ARE YOU STILL CONFIDENT THAT YOU COULDN'T

18  MAKE THAT TRIP -- THE CURRENT ROUTE THAT YOU'RE USING NOW IN

19  YOUR POWER CHAIR, YOU COULDN'T MAKE THAT TRIP IN YOUR MANUAL

20  CHAIR?

21  A.    RIGHT.  RIGHT.  OH, NO.  I WAS SAYING THAT THE ALTERNATE

22  ROUTES ARE WORSE, SO I CAN'T -- I CAN'T DO IT AT ALL.

23  Q.    NOW, YOU DESCRIBED THE -- THE RISK OF BEING STUCK.  CAN

24  YOU DESCRIBE FOR THE COURT WHAT YOU MEAN BY THAT, EXACTLY HOW

25  WOULD YOU GET STUCK IN YOUR MANUAL CHAIR IF YOU WERE MAKING

1  THAT TRIP?

2  A.    BEING STUCK -- WELL, DEPENDS ON THE -- ON THE OBSTACLE IF

3  THE RAMP WAS TOO HIGH -- OR TOO STEEP, OR IF THERE WAS A CURB

4  LIP -- STUCK AS IN I WOULDN'T BE ABLE TO DO IT, AND I WOULD --

5  DEPENDS ON WHAT SIDE I'M ON.  I MIGHT BE IN THE STREET AND

6  THERE WOULD BE CARS COMING AROUND.  AND HOPEFULLY I WON'T GET

7  HIT.  AND I WOULD BE WAITING THERE FOR -- HOPEFULLY FOR SOMEONE

8  TO HELP ME GET UP.

9  Q.    BESIDES STEEP CURB RAMPS, WHAT OTHER OBSTACLES HAVE YOU

10  ENCOUNTERED WHEN IN SAN FRANCISCO ON THIS ROUTE?

11  A.    I'VE ENCOUNTERED THE LIPS ALSO.  SO NOT ONLY IS THE RAMP

12  STEEP, BUT THERE'S A -- THERE'S ELEVATION FROM THE BOTTOM OF

13  THE RAMP TO -- TO THE STREET.  SO I WOULD HAVE TO -- I NEED TO

14  HOPEFULLY POP A WHEELIE AND GET OVER IF I CAN.

15        ALSO THERE'S A CROSS -- CROSS-SLOPE.  SO THE

16  SIDEWALK IS SLOPED, AND MY WHEELCHAIR IS PULLED TO THE STREET

17  'CAUSE MOST OF THE TIME THE CROSS-SLOPES ARE -- ARE DOWN

18  TOWARDS THE STREET.  AND SO I HAVE TO DO EXTRA WORK ON ONE ARM

19  TO MAINTAIN ON THE SIDEWALK INSTEAD OF JUST ROLLING OUT INTO

20  THE STREET.

21  Q.    DO THOSE CONDITIONS THAT YOU DESCRIBE, THE -- THE STEEP

22  CURB RAMP, THE LIP, AND THE CROSS-SLOPE ON THE SIDEWALK, DO

23  THEY AFFECT YOU IN YOUR POWER WHEELCHAIR AS WELL?

24  A.    THEY DO.  FOR -- FOR THE POWER WHEELCHAIR, IT WILL THROW

25  ME OFF BALANCE.  IF I'M NOT PAYING ATTENTION AND I'M GOING DOWN

1  THE SIDEWALK, AND THERE IS A CROSS-SLOPE OR THERE IS SOME

2  ELEVATION CHANGE, IF I DON'T WATCH IT, THEN I WILL GET THROWN

3  OUT OF MY CHAIR.  I HAVEN'T FULLY BEEN THROWN OUT OF MY CHAIR.

4  I HAVE -- FORTUNATELY, I CATCH MYSELF.

5           I'VE BEEN IN -- I KNOW TO WATCH ABOUT THIS, BUT I

6  HAVE GRABBED ONTO THE -- ON THE POWER CHAIR ON THE ARMS AND

7  HOPEFULLY NOT FALLEN OUT, FLIPPED OUT.

8           WHEN I GO DOWN STEEP RAMPS, THERE'S -- I HAVE --

9  THERE'S CASTERS.  THERE'S ALSO WHEELS ON THE FRONT OF MY POWER

10 CHAIR THAT PREVENT ME FROM TIPPING OVER.  AND IF IT'S STEEP

11 ENOUGH, I'M GOING DOWN ALL ON THE CASTERS, WHICH ARE REALLY

12 LITTLE WHEELS.  THEY'RE JUST THERE FOR SAFETY, NOT TO USE ALL

13 THE TIME.  SO THAT -- THAT'S -- THAT'S A FEAR.

14           I MEAN, THAT'S A POSSIBILITY OF FLIPPING OVER OR

15 FALLING OUT OF THE CHAIR.

16 Q.   AND WHY IS THAT EXACTLY, 'CAUSE THE CASTERS CAN CATCH

17 ON -- ON A LIP, OR --

18 A.   I HAVEN'T HAD THE CASTERS REALLY CATCH ON A LIP, BUT

19 THERE -- IT'S MORE OF A SAFETY FEATURE.  AND IF I'M GOING DOWN

20 A STEEP RAMP, I'M USING THE CASTERS NOT AS A SAFETY FEATURE BUT

21 AS A PRIMARY USE OF THE CHAIR.

22 Q.   AND DO YOU HAVE CONTROL OVER THE CASTERS IN YOUR

23 WHEELCHAIR?

24 A.   NO, NO, THEY'RE JUST -- THEY'RE -- THEY'RE JUST THERE

25 JUST TO STOP THE CHAIR FROM FLIPPING OVER.

1  Q.    AND -- AND SO YOU CAN'T -- YOU CAN'T DIRECT THE CASTERS

2  TO TURN ONE WAY OR ANOTHER.  THEY JUST -- THEY CAN TURN

3  SIDEWAYS WHEN YOU DON'T WANT THEM TO?

4  A.    NO, NO, THEY'RE JUST FIXED.  THEY'RE RIGHT THERE.

5  Q.    OKAY.

6  A.    IT'S JUST A FIXED.

7  Q.    DO YOU -- MR. GRANT, DO YOU GO TO OTHER PLACES IN THE

8  CITY BESIDES THE EMBARCADERO YMCA?

9  A.    YEAH, I LIKE TO -- I LIKE TO GO OUT AND SOCIALLY BE

10 INVOLVED IN THINGS.  I'VE GONE TO VARIOUS TRADE SHOWS.  JUST

11 RECENTLY I WENT TO MACWORLD AND WEB 2.0 IN THE MOSCONE CENTER.

12 LAST WEEKEND, I WENT TO WUNDERKIND, I THINK IT WAS, THE COMIC

13 BOOK CONVENTION.  I DON'T KNOW ANYTHING ABOUT COMIC BOOKS, BUT

14 I WENT WITH A FRIEND.  THAT WAS FUN.

15        I GO TO DEPOSIT -- I'LL GO DEPOSIT MY CHECK.

16            (INTERRUPTION IN THE PROCEEDINGS.)

17        MR. JOHNSON:  I'M VERY SORRY, YOUR HONOR.

18        THE WITNESS:  OH, SO I'LL GO TO THE BANK, ACTUALLY,

19 IN SAN FRANCISCO, TOO, AND COFFEE SHOPS AND STUFF LIKE THAT.

20 BY MR. JOHNSON:

21 Q.    OKAY.  CAN'T YOU DO THOSE KINDS OF THINGS IN ALBANY OR IN

22 THE EAST BAY?

23 A.    SAN FRANCISCO IS MORE OF A SOCIAL MECCA FOR ME.  IT --

24 THERE ARE MORE THINGS TO DO IN SAN FRANCISCO.  I CAN CHECK -- I

25 MEAN, I CHECK VARIOUS WEBSITES AND I CAN SEE WHAT'S GOING ON,

1  AND IT'S ALWAYS -- THERE'S ALWAYS SOMETHING GOING ON IN

2  SAN FRANCISCO.  AND ALBANY, NOT SO MUCH.  I DON'T REALLY KNOW

3  OF ANYTHING EXCEPT FOR ONE FESTIVAL IN ALBANY ONCE A YEAR.

4  Q.    WHY IS IT IMPORTANT FOR YOU TO GET OUT TO SAN FRANCISCO

5  AND SOCIALIZE, AS YOU PUT IT?

6  A.    I DON'T WANT TO BE STUCK IN MY HOUSE ALL DAY.  I MEAN, I

7  DON'T WANT TO BE A RECLUSE AND -- AND NOT GO OUT.  I NEED TO GO

8  OUT AND BE SOCIALLY INVOLVED WITH PEOPLE.  I WAS TALKING ABOUT

9  HOW I WAS -- I WAS WALKING WITH A CANE FOR A COUPLE YEARS, BUT

10 THERE IS THAT -- THERE'S THE HAZY TRANSITION PERIOD BETWEEN THE

11 CANE AND THE WHEELCHAIR -- I THINK MOST PEOPLE HAVE -- DO WHEN

12 THEY -- WHEN THEY BECOME DISABLED -- WHERE I DIDN'T WANT TO GET

13 IN THE WHEELCHAIR, BUT USING THE CANE WAS VERY DIFFICULT.

14        SO THERE WAS THIS PERIOD WHERE I WAS AT HOME A LOT

15 BECAUSE I WOULDN'T GET IN THE WHEELCHAIR AND I WASN'T ABLE TO

16 GO OUT AND WALK WITH -- JUST WALK EVERYWHERE WITH MY CANE.  SO

17 IT'S KIND OF DEPRESSING JUST TO BE IN THE SAME HOUSE -- THE

18 SAME ROOM ALL DAY LONG AND STUFF LIKE THAT.

19        I JUST -- I NEED -- I NEED TO GET OUT AND TALK TO

20 PEOPLE, BE INVOLVED.  I MEAN, WHEN YOU WORK, YOU TALK TO PEOPLE

21 ALL THE TIME.  WHEN YOU GO TO SCHOOL, YOU HAVE AN INTERACTION

22 WITH PEOPLE ALL THE TIME.  BUT IF I WASN'T ABLE TO DO THAT,

23 THEN I WOULD -- IT WOULD BE A LOT HARDER EMOTIONALLY.

24 Q.    AND DO YOU FIND IT EASIER TO -- TO SOCIALIZE AND INTERACT

25 WITH PEOPLE WHEN YOU'RE AMONG THE -- WHEN YOU'RE IN A CITY LIKE

1  SAN FRANCISCO WHERE THERE'S A LOT OF ACTIVITY?

2  A.    RIGHT.  WELL, THERE'S MORE OPPORTUNITIES TO SOCIALIZE.

3  LIKE I WAS SAYING EARLIER, ALBANY, THEY DON'T HAVE THAT --

4  DOESN'T HAVE THAT MUCH STUFF GOING ON.  SO I DON'T HAVE THE

5  OPPORTUNITIES TO SOCIALIZE WITH PEOPLE.  WHEN I WENT TO MAC

6  WORLD, WHEN I WENT TO WEB 2.0, I WAS -- I COULD TALK TO PEOPLE.

7  I DID SEE PEOPLE AND INTERACT.

8  Q.    SO HOW OFTEN OVERALL DO YOU GO TO SAN FRANCISCO, THEN,

9  BETWEEN YOUR TRIPS TO THE EMBARCADERO YMCA AND OTHER TRIPS

10 THERE TO SOCIALIZE OR GO WITH FAMILY?

11 A.    SO -- WELL, MINIMUM THREE TIMES A WEEK.  I MEAN,

12 THAT'S -- 'CAUSE THAT'S TWO TIMES WORK OUT, ONE TIME TO PLAY

13 RUGBY.  BUT MOST OF THE TIME -- I GO TO SAN FRANCISCO ABOUT

14 FOUR OR FIVE TIMES TO GO TO THE DIFFERENT SHOWS AND GO TO THE

15 CONCERTS AND PARKS AND STUFF LIKE THAT.

16 Q.    ARE THERE ANY OTHER REASONS TO GO SAN FRANCISCO BESIDES

17 WHAT YOU DESCRIBED?

18 A.    IF I'M WITH -- IF I HAVE FAMILY VISITING, WE ALWAYS HAVE

19 TO GO TO SAN FRANCISCO.  THAT'S -- THAT'S THE TOURIST PLACE TO

20 GO TO, SO I'LL GO TO MUSEUMS.  ACTUALLY, I'LL GO TO MUSEUMS BY

21 MYSELF.  I LIKE DOING THAT, TOO.  YEAH.

22 Q.    AND WHEN YOU GO WITH -- WITH FAMILY, DO YOU TAKE YOUR

23 MANUAL WHEELCHAIR SOMETIMES?

24 A.    FAMILY?  FAMILY AND FRIENDS?  DEPENDS.  DEPENDS ON HOW

25 MUCH HELP I CAN ASK FOR.  I HAVE TO GAUGE IT.  YOU CAN ONLY ASK

1  FOR HELP SO MANY TIMES.  EVEN THOUGH THE PERSON WILL TELL YOU,

2  OH, I'M -- I'M TOTALLY OKAY WITH HELPING YOU AND HOW -- AND

3  THEY WILL BE FOR THE FIRST COUPLE TIMES OF HELP -- OF ASKING

4  FOR HELP.  BUT I KNOW THAT THERE'S A LIMIT.  AND IF I ASK FOR

5  HELP TOO MANY TIMES, I'LL SEE -- THEY WON'T SAY SOMETHING TO

6  ME, BUT I'LL SEE EYES ROLLED.  I'LL SEE -- I'LL HEAR A HEAVY

7  SIGH.  AND I KNOW IT'S -- THEY'RE ANNOYING THEM, AND I'M

8  ANNOYING THEM, AND I DON'T REALLY WANT TO OVERUSE MY WELCOME OR

9  OVERUSE THE HELP, SO DEPENDS.  I GAUGE IT.

10        MOST OF THE TIME, I TRY TO GO WITH MY MANUAL CHAIR

11  WITH MY FAMILY.  SOMETIMES WITH FRIENDS, I KNOW I CAN'T REALLY

12  ASK FOR HELP THAT MANY TIMES SO I'LL TAKE THE POWER CHAIR.  BUT

13  I HAVEN'T REALLY TAKEN THE POWER CHAIR WITH FRIENDS AND FAMILY

14  MUCH.

15  Q.    IN THESE -- IN THE OTHER PARTS OF THE CITY YOU GO TO

16  BESIDES THE AREA BETWEEN THE EMBARCADERO BART STATION AND THE

17  EMBARCADERO Y, DO YOU EXPERIENCE SIMILAR KINDS OF OBSTACLES OR

18  PROBLEMS AS YOU DESCRIBE FOR YOUR TRIP BETWEEN THE Y AND THE

19  BART STATION?

20  A.    YES, THESE -- THE PROBLEMS THAT I'VE EXPLAINED ARE --

21  IT'S NOT JUST -- ATYPICAL -- I MEAN, IT'S THE TYPICAL -- IT'S

22  NOT JUST CONFINED TO THE ROUTE THAT I TAKE TO THE Y.  I FIND IT

23  EVERYWHERE.  LACK OF CURB RAMPS, STEEP RAMPS, EVERYTHING THAT

24  WE'VE BEEN DESCRIBING EARLIER.

25  Q.    DO YOU ALSO EXPERIENCE SITUATIONS WHERE THERE'S NO RAMP

1    AT ALL ON A CORNER?

2    A.    YEAH.  ALL -- ALL TOGETHER NO RAMP OR MAYBE A RAMP ON ONE

3    SIDE, ONE CROSSWALK, WHEN THERE'S TWO CROSSWALKS?  AND SO

4    THAT'S -- THAT'S LIKE THE QUESTION I SAY, LIKE, IF THERE'S ONLY

5    ONE RAMP, IS IT SAFER FOR ME TO STAY UP ON THE CURB AND WAIT

6    TILL THE LIGHT TURNS GREEN SO I CAN GO OUT DOWN WRONG SIDE RAMP

7    AND GO OUT INTO THE STREET AND GO THROUGH MY CROSSWALK?  OR IS

8    IT SAFER FOR ME TO GO DOWN AND WAIT IN THE STREET AND WAIT TILL

9    IT CHANGES?

10          SO I HAVE THIS HUGE DILEMMA.  I DON'T KNOW IF I'M

11   EXPLAINING IT --

12          THE COURT:  NO, I DON'T -- I'M NOT UNDERSTANDING

13   WHAT -- WHAT THE DILEMMA IS.

14          THE WITNESS:  IF THERE'S A INTERSECTION -- AND IN

15   SAN FRANCISCO, SOMETIMES THERE'S ONLY A RAMP ON ONE SIDE.  SO

16   IF I WANT TO GO STRAIGHT -- I WANT TO GO STRAIGHT AND THERE

17   ISN'T A CURB RAMP, THEN I HAVE TO GO DOWN THE RAMP ON THE LEFT

18   ON THE SIDE AND THEN GO OUT INTO THE INTERSECTION TO GO ACROSS

19   THE INTERSECTION -- I MEAN, INTERSECTION TO GO ACROSS THE

20   CROSSWALK.

21          SO BECAUSE THERE AREN'T TWO -- THERE AREN'T -- THERE

22   ISN'T ONE FOR GOING STRAIGHT, THEN EITHER I HAVE TO WAIT UP

23   THERE, WHEN THE LIGHT TURNS GREEN, I GO OUT INTO TRAFFIC AND GO

24   TO MY CROSSWALK.  OR BEFORE THE LIGHT TURNS GREENS, I JUST GO

25   OUT AND I WAIT IN THE CROSSWALK, WAIT TILL THE CROSSWALK (SIC)

1  TURNS GREEN.

2           THE COURT:  OH.

3  BY MR. JOHNSON:

4  Q.    SO -- SO ARE YOU TALKING ABOUT A SITUATION WHERE

5  THERE'S -- ON A CORNER, THERE'S ONLY ONE CURB RAMP THAT ONLY

6  SERVES ONE CROSSWALK, SO TO USE THE OTHER CROSSWALK, YOU NEED

7  TO GO OUT INTO TRAFFIC AND THEN COME AROUND THE CORNER TO USE

8  THAT OTHER CROSSWALK THAT YOU WANT TO USE?

9  A.    RIGHT.

10  Q.    ARE -- ARE THERE OTHER PROBLEMS WITH THAT SITUATION

11  BESIDES JUST GOING OUT INTO THE STREET?

12  A.    WELL, BECAUSE I'M ACTUALLY GOING OUT -- YEAH, IF THERE --

13  A LOT OF TIMES THERE'LL BE SEWER GRATES, STUFF THAT I HAVE TO

14  GO OVER, AND THEN WITH THOSE EROSION HAPPENS AROUND THAT AND I

15  HAVE TO WORRY ABOUT GETTING CAUGHT -- THE CASTERS GETTING

16  CAUGHT.  OR IF EVEN THE SEWER GRATE IS TOO WIDE, I HAVE TO

17  WORRY ABOUT THE FRONT CASTERS OF MY CHAIR GETTING CAUGHT IN

18  THAT AND LITERALLY GETTING STUCK, NOT JUST LIKE METAPHORICALLY

19  GETTING STUCK NOT HAVING -- NEEDING HELP, BUT LITERALLY THE

20  WHEEL COULD GET STUCK AND I'D HAVE TO GET TO PULLED OUT.

21  Q.    AND ARE THOSE -- WHERE THOSE SEWER GRATES ARE OR WHERE

22  THEY -- IN THE GUTTER IN THOSE CORNERS WHERE THERE IS ONLY ONE

23  CROSSWALK, IS IT THE CASE THAT GUTTER IS OFTEN SLOPED, TOO, SO

24  THAT YOU HAVE A CROSS-SLOPE TO DEAL WITH?

25  A.    RIGHT.  YEAH, SO SOMETIMES -- THANKS FOR REMINDING ME.

877

1           SOMETIMES THE SLOPE GOES DOWN INTO THE -- THE RAMP,

2    SO NOT ONLY DO YOU HAVE A RAMP COMING OFF THE SIDEWALK, BUT

3    THEN YOU HAVE A RAMP COMING INTO THE INTERSECTION, WHICH

4    COMPLICATES AND MAKES IT -- IT MORE DIFFICULT.

5           SO NOT ONLY AM I -- SO I'M GOING DOWN -- LIKE SAY

6    I'M IN THE CROSSWALK.  I'M GOING ONTO THE RAMP.  THERE'S A

7    SLOPE THAT GOES DOWN, SO MY CHAIR IS A LITTLE BIT FASTER.  IF

8    THERE'S A LIP, IT CATCHES, AND I HAVE TO DO A LITTLE WHEELIE,

9    BUT IT MAKES THE WHEELIE MORE DIFFICULT.  IT MAKES IT A LOT

10   HARDER BECAUSE I'M ACTUALLY AT A DOWN ANGLE ALSO.

11   Q.    MR. GRANT, HAVE YOU EVER BEEN CONCERNED FOR YOUR SAFETY

12   BECAUSE OF ANY OF THESE CONDITIONS?

13   A.    YEAH, I HAVE.  WHEN I'VE HAD TO GO OUT INTO THE STREET

14   AND GO AROUND THE OBSTACLES, THAT'S BEEN -- THAT'S BEEN A BIG

15   CONCERN.  IF THE RAMP IS TOO STEEP, I HAVE A CONCERN OF -- IF I

16   PUSH TOO HARD, THE WHEELCHAIR WILL FLIP BACKWARDS, AND -- I

17   HAVEN'T HAD THAT HAPPEN, BUT -- I MEAN, ACTUALLY, I HAVE -- I

18   HAVEN'T HAD THAT HAPPEN IN SAN FRANCISCO, BUT I MEAN, I'VE HAD

19   MY CHAIR FLIP ON ME BEFORE ON RAMPS AND STUFF LIKE, THAT --

20   CURBS.  STEEP RAMPS, I MEAN.

21   Q.    MR. GRANT, HOW HAVE THESE OBSTACLES OR DIFFICULTIES WITH

22   THE PEDESTRIAN RIGHT-OF-WAY THAT YOU'VE EXPERIENCED AFFECTED

23   YOU OVERALL?

24   A.    WELL, I MEAN, FOR -- MAINLY IT'S FRUSTRATING -- I'M

25   FRUSTRATED 'CAUSE I CAN'T DO THE THINGS THAT I WANT TO DO.  I

1  CAN'T GO TO THE PLACES THAT I WOULD LIKE TO GO TO IN THE MANUAL

2  CHAIR, WHICH I -- I WOULD LIKE TO DO BECAUSE -- TO KEEP MY ARM

3  STRENGTH.  I DON'T WANT -- I REALLY DON'T WANT TO LOSE MY ARMS.

4          SO -- SAD.  FRUSTRATED IS THE BIGGEST ONE.

5          IF I HAVE TO ASK FOR HELP SO MANY TIMES, IT -- I

6  MEAN, IT PUTS ME -- MAKES ME FEEL LIKE I HAVE A LOWER -- LIKE A

7  LOWER-CLASSED CITIZEN ALMOST.  PEOPLE TALK DOWN TO YOU.

8  THEY'RE PATRONIZING 'CAUSE THEY'RE HELPING YOU.

9          A LOT OF TIMES PEOPLE TREAT ME LIKE I'M A LITTLE

10  KID, WHICH I KIND OF REALIZE -- I UNDERSTAND NOW WHY

11  SOMETIMES -- THERE'S ALWAYS THAT WHOLE -- THE WHOLE THOUGHT OF,

12  LIKE, OH, PEOPLE IN WHEELCHAIRS HAVE ATTITUDES.  AND IT'S MORE

13  LIKE YOU KIND OF NEED TO DO THAT OR YOU'RE -- YOU'RE TREATED

14  LIKE YOU'RE IMMATURE, YOU'RE LIKE A LITTLE KID, AND THAT'S

15  HARD.

16  Q.    DO YOU FEEL LIKE BECAUSE OF THESE OBSTACLES THAT YOU HAVE

17  FULL AND EQUAL ACCESS TO THE CITY'S PEDESTRIAN RIGHTS-OF-WAY,

18  THE SIDEWALKS AND CROSSWALKS?

19  A.    NO.

20          THE COURT:  DO YOU HAVE ANY -- I MEAN, ALL THESE

21  EXHIBITS, DO YOU HAVE ANY PHOTOGRAPHS OF ANY OF THE OBSTACLES

22  HE'S TESTIFYING ABOUT OR DO I KNOW WHERE ANY OF THESE ARE?  I

23  MEAN, IT WOULD BE HELPFUL, 'CAUSE I -- I THINK I CAN VISUALIZE

24  BASED ON WHAT HE'S SAID, BUT IT WOULD CERTAINLY -- ALL THE

25  PHOTOGRAPHS WE'VE BEEN LOOKING AT, IT WOULD HAVE BEEN USEFUL IF

879

1   YOU HAD TAKEN PHOTOGRAPHS OF SOME OF THE AREAS SO THAT WHEN HE

2   TESTIFIES, IT'S EASIER TO FOLLOW HIM, AND ALSO TO KNOW

3   SPECIFICALLY WHERE IN THE SAN FRANCISCO THE OBSTACLE THAT HE'S

4   TESTIFYING CONCERNING IS LOCATED.

5        DO YOU HAVE ANY?

6        MR. JOHNSON:  WE DID HAVE SOME PHOTOGRAPHS, YOUR

7   HONOR, BUT THEY WERE TAKEN AFTER THE CLOSE OF DISCOVERY AND THE

8   COURT EXCLUDED THEM ON A RECENT MOTION SUBMITTED BY THE

9   DEFENDANTS.

10        THE COURT:  SO YOU DIDN'T KNOW BACK IN 2007 BETWEEN

11   2007 AND 2011 YOU WERE GOING TO CALL HIM AS A WITNESS?

12        MR. JOHNSON:  WELL, WE HAVE KNOWN -- MR. GRANT IS

13   ONE OF THE INDIVIDUALS THAT SUBMITTED DECLARATION BUT WE --

14             (SIMULTANEOUS COLLOQUY.)

15        MR. JOHNSON:  -- DID NOT ASK HIM TO TAKE ANY -- IN

16   CONNECTION WITH THE MOTION FOR CLASS CERTIFICATION, BUT WE DID

17   NOT ASK HIM AT THAT TIME OR AFTERWARDS TO TAKE PHOTOGRAPHS OF

18   THE --

19        THE COURT:  WELL, SO DO I KNOW WHERE ANY OF THESE

20   LOCATIONS ARE?  OR WE'RE JUST -- ARE THESE JUST GENERALIZED

21   OBSERVATIONS THAT SOMEWHERE IN THE CITY OF SAN FRANCISCO THESE

22   THINGS ARE OCCURRING?

23        MR. JOHNSON:  NO, I CAN ASK THE WITNESS THAT, YOUR

24   HONOR.

25   Q.   CAN YOU IDENTIFY ANY SPECIFIC LOCATIONS WHERE YOU HAVE

ENCOUNTERED THESE BARRIERS THAT YOU HAVE DESCRIBED?

A.    WELL, WHEN I GO TO THE EMBARCADERO, I GO TO -- I TAKE

BART AND I GET OFF AT THE EMBARCADERO YMCA (SIC), AND I GO DOWN

MARKET STREET, AND I TURN AND GO DOWN STEUART STREET.  AND

EMBARCADERO Y IS A COUPLE -- COUPLE BLOCKS DOWN STEUART, SO

THE -- THE RAMPS WOULD BE -- I THINK MARKET AND -- FIRST ONE,

MARKET AND DRUMM, I THINK, THE -- THE INITIAL CURB RAMP THAT I

GO DOWN FROM BART.  THAT ONE'S STEEP.

          WHEN I'M GOING ALONG THE STEUART -- STEUART STREET,

THE -- THERE'S ACTUALLY TRACKS GOING FROM THE CABLE CARS

TRACKS.  THOSE ONES ARE PRETTY DIFFICULT INTERSECTIONS.  I HAVE

TROUBLE -- I WOULD HAVE TROUBLE WITH THOSE, THE CASTERS GETTING

STUCK.

          THERE'S A CROSS-SLOPE ON -- ON STEUART STREET ALSO

THAT'S -- THAT'S A PRETTY BIG ONE ALSO, TOO.

          AND SO OTHER PLACES, GOING TO THE MOSCONE CENTER --

          THE COURT:  STEUART AND WHAT?

          THE WITNESS:  STEUART FROM MARKET STREET.  SO COMING

FROM MARKET STREET AND GOING ON STEUART TO THE EMBARCADERO Y.

I DON'T KNOW WHAT THE OTHER CROSS -- THE CLOSEST CROSS STREET

IS.

          THEN THE OTHER PLACES WOULD BE WHEN I'VE -- I'VE

BEEN TO THE NORTH BEACH, WHICH IS PRETTY -- PRETTY COMPLICATED.

THERE'S A LOT OF OBSTACLES IN THERE.  I WENT TO -- I MEAN, I

SPECIFICALLY REMEMBER GOING TO THE COBB'S COMEDY CENTER, AND I

881

1   HAD FRIENDS, BUT THERE WAS NO WAY I COULD HAVE DONE IT WITHOUT

2   FRIENDS.  THE STEEP -- THE RAMPS WERE TOO STEEP THAT I ACTUALLY

3   WOULD HAVE TO GO DOWN BACKWARDS 'CAUSE I WAS AFRAID I WAS GOING

4   TO -- EVEN WITH SOMEBODY HOLDING ONTO ME, I WAS GOING TO FALL

5   OUT OF THE CHAIR.

6           OTHER PLACES, GOING TO GOLDEN GATE PARK; GOING TO

7   THE ACADEMY OF SCIENCES; THE DE YOUNG MUSEUM.  I'VE EXPERIENCED

8   THOSE THERE, TOO.

9           THE COURT:  THANK YOU.

10  BY MR. JOHNSON:

11  Q.   HAVE YOU BEEN TO THE FINANCIAL DISTRICT IN SAN FRANCISCO?

12  A.   YEAH, I HAVE.

13  Q.   HAVE YOU EXPERIENCED STEEP RAMPS OR OTHER PROBLEMS IN THE

14  FINANCIAL DISTRICT?

15  A.   I HAVE, BUT I'M -- HONESTLY, I CAN'T SAY -- I CAN'T

16  IDENTIFY THE EXACT INTERSECTION 'CAUSE I DON'T KNOW THE STREET

17  NAMES, BUT YEAH, I HAVE ALSO.

18  Q.   DO YOU GO TO SAN FRANCISCO TO TRANSACT ANY BUSINESS,

19  BANKING OR ANYTHING LIKE THAT?

20  A.   SO I DEPOSIT MY CHECKS.  I DEPOSIT MY -- I GET TWO

21  DISABILITY CHECKS, AND I DO -- I DO THAT TWICE A MONTH, SO --

22  YEAH, I DO.  I GO TO THE BANK EVERY -- AT LEAST TWICE A MONTH

23  IN SAN FRANCISCO.

24  Q.   ARE THERE -- WHERE EXACTLY IS YOUR BANK THAT YOU GO TO IN

25  SAN FRANCISCO?

882

1  A.    SO I GO TO THE U.S. BANK AND -- RIGHT OFF OF THE

2  EMBARCADERO BART, THE -- THE BANK IS RIGHT THERE, RIGHT ACROSS

3  THE STREET FROM THE ELEVATOR.

4  Q.    WHY DO YOU GO TO A BANK IN SAN FRANCISCO RATHER THAN

5  ALBANY?

6  A.    FUNNY ENOUGH, IT'S EASIER FOR ME TO GO TO THE

7  SAN FRANCISCO BANK THAN IT IS -- THERE ISN'T ONE IN ALBANY, BUT

8  THE CLOSEST WOULD BE RICHMOND, EL CERRITO, AND I HAVE TO TAKE A

9  COUPLE BUSES, SO -- AS OPPOSED TO JUST JUMPING ON BART.  THE

10 TRIP WOULD BE LONGER.  AND --

11        YEAH, IT WOULD BE A LOT HARDER SO FOR ME, IT'S EASY

12 FOR ME TO JUMP ON BART AND GET OFF BART AT EMBARCADERO Y AND

13 JUST GO ACROSS THE STREET AND GO TO THE BANK.

14 Q.    ARE THERE -- DO YOU EXPERIENCE ANY OBSTACLES IN THE

15 PEDESTRIAN RIGHT-OF-WAY FROM -- WHEN YOU GET OFF THE BART

16 STATION TO GETTING TO THE BANK?

17 A.    YES.  IT'S A REALLY SHORT -- IT'S A REALLY SHORT DISTANCE

18 FROM EMBARCADERO BART TO THE -- TO MY BANK.  I MEAN, IT'S

19 ACROSS THE STREET.  IT'S LITERALLY ACROSS THE STREET, BUT THE

20 INTERSECTION IS TOO DIFFICULT FOR ME.  THERE'S A PRETTY DEFINED

21 LIP ON TO THE -- THE CURB CUT THAT I'M GOING ON TO THAT I

22 WOULDN'T BE ABLE TO GO -- I WOULDN'T BE ABLE TO DO IT IN MY

23 MANUAL CHAIR.

24        AND THERE'S ALSO ELEVATION CHANGES, CRACKS -- TRYING

25 TO -- THE BEST DESCRIPTION WOULD BE, YOU KNOW, CRACKS IN THE

883

1    SIDEWALK, ELEVATION CHANGES WHERE I DO HAVE PROBLEMS GETTING

2    ACROSS.

3    Q.    AND WHAT INTERSECTION IS THAT, AGAIN?

4    A.    IT'S NOT -- SORRY.  IT'S NOT DRUMM, BUT IT'S THE OTHER --

5    IT'S THE STREET FARTHER AWAY FROM THE FERRY BUILDING, SO WHEN I

6    GET OUT OF EMBARCADERO BART, ONE SIDE IS DRUMM STREET BUT THE

7    OTHER SIDE, I CAN'T REMEMBER WHAT THE INTERSECTION'S CALLED.

8    Q.    AND YOU ALSO MENTIONED THAT YOU HAD PROBLEMS IN GOLDEN

9    GATE PARK.  CAN YOU DESCRIBE FOR THE COURT THE NATURE OF THOSE

10   PROBLEMS?

11             THE COURT:  YOU CAN'T CORRECT HIM TO ANYTHING TO

12   REFRESH HIS RECOLLECTION AS TO WHAT THE OTHER STREET IS; YOU'RE

13   JUST GOING TO MOVE ON?

14             MR. JOHNSON:  I'M AFRAID WE DON'T HAVE

15   PHOTOGRAPHS --

16             THE COURT:  PHOTOGRAPHS OR MAPS OR DIAGRAMS, OR -- I

17   MEAN -- GO ON.  IT CERTAINLY WOULD BE HELPFUL TO KNOW WHAT YOU

18   ALL ARE TALKING ABOUT AS YOU GO THROUGH THIS.

19             NOBODY EVEN HAS A MAP OF THE CITY?  OF THE -- OF THE

20   AREAS THAT YOU'RE TALKING ABOUT?

21             MR. JOHNSON:  I THINK WE DO HAVE A MAP, YOUR HONOR,

22   IF I CAN CONFER --

23             THE COURT:  I'M INTERESTED IN BEING ABLE TO FOLLOW

24   HIM AND KNOW WHAT STREETS HE'S TALKING ABOUT.  AND HE SAYS IT'S

25   NOT DRUMM, IT'S THE OTHER ONE, SO THERE SHOULD BE SOMETHING --

1   SOME MAP OR SOME DIAGRAM OR SOMETHING THAT YOU ALL HAVE IN

2   THESE THOUSANDS PAGES OF --

3                     (SIMULTANEOUS COLLOQUY.)

4           THE COURT:  OKAY.

5                  (OFF-THE-RECORD DISCUSSION.)

6           THE COURT:  YOU KNOW, EVEN IF YOU JUST PULL UP A

7   GENERIC MAP.

8           MR. JOHNSON:  THAT'S WHAT WE'RE DOING, YOUR HONOR.

9           THE COURT:  OH, OKAY.

10                 (OFF-THE-RECORD DISCUSSION.)

11                    (EXHIBIT PUBLISHED.)

12          MR. JOHNSON:  YOUR HONOR, MAY I APPROACH THE WITNESS

13  TO PROVIDE A LASER POINTER?

14              THE COURT:  YOU MAY.

15          MR. JOHNSON:  CAN YOU SEE THAT ANGLE?  DO YOU NEED

16  IT TURNED A LITTLE BIT?

17          MR. WALLACE:  YEAH, I THINK THE ANGLE'S GOING TO

18  HAVE TO BE CHANGED --

19                   (PAUSE IN THE PROCEEDINGS.)

20          MR. WALLACE:  -- JUST A LITTLE BIT.

21          THE WITNESS:  YEAH, THAT'S FINE.

22  BY MR. JOHNSON:

23  Q.   CAN YOU SEE?

24  A.   I CAN SEE.

25  Q.   YOU CAN DISREGARD THE RED AND YELLOW MARKINGS ON THERE.

885

1   CAN YOU ORIENT YOURSELF THERE?

2   A.    YEAH, I THINK THE RED AND YELLOW MARKINGS ARE

3   MARKET STREET, RIGHT?

4           THE COURT:  THIS MAP WILL BE IDENTIFIED AS

5   PLAINTIFFS' EXHIBIT NEXT IN LINE, OR HAVE YOU MARKED IT

6   ALREADY?

7           MR. JOHNSON:  DO WE HAVE A NUMBER FOR THIS?

8               (OFF-THE-RECORD DISCUSSION.)

9           MR. WALLACE:  JUST MAKE IT NEXT IN ORDER, YOUR

10  HONOR, I THINK.

11          THE COURT:  OKAY.

12          MR. JOHNSON:  YOUR HONOR, I THINK ACTUALLY, WE HAVE

13  OTHERS THAT ARE MARKED IN ORDER, SO WE NEED TO PROBABLY SKIP

14  OVER --

15          MS. DREVON:  I BELIEVE THE NEXT WOULD BE 4146.

16          MR. JOHNSON:  4146 WOULD BE WHAT WE'D WANT TO MARK

17  THIS TO AVOID DUPLICATION WITH OTHER EXHIBITS THAT HAVE ALREADY

18  BEEN MARKED.

19          THE COURT:  OKAY.  4146.

20                  (PLAINTIFFS' EXHIBIT 4146

21                  MARKED FOR IDENTIFICATION)

22          THE WITNESS:  SO TO ORIENT MYSELF, THERE'S THE FERRY

23  BUILDING, SO I'M ASSUMING THAT'S MARKET, SO THERE'S STEUART.

24          MR. JOHNSON:  THE YMCA IS ON STEUART?

25          THE WITNESS:  YES.  AND IT'S -- IT WOULD BE ABOUT

886

1   RIGHT THERE (INDICATING).

2           THE COURT:  THAT'S WHERE THE Y IS?

3           THE WITNESS:  YES, IT IS.

4           THE COURT:  OKAY.

5   BY MR. JOHNSON:

6   Q.    AND WERE YOU TRYING TO POINT TO THE PARTICULAR CURB RAMP

7   THAT YOU HAD DIFFICULTIES WITH?

8   A.    RIGHT.  RIGHT.  OH, NO, I WAS JUST TRYING TO ORIENT

9   MYSELF ON THE MAP.

10  Q.    HOW MANY BLOCKS SOUTH OF MARKET IS THE YMCA?  ON STEUART?

11  A.    THREE, TWO.

12  Q.    OKAY.

13  A.    I CROSS -- I CROSS TWO INTERSECTIONS.

14  Q.    OKAY.  AND DO YOU HAVE DIFFICULTY WITH THE INTERSECTIONS

15  ON STEUART GETTING TO THE YMCA?

16  A.    YEAH.  THE FIRST INTERSECTION IS -- IT HAS THE -- THE

17  TRAIN TRACKS OR THE -- THE CABLE CAR TRACKS THAT I HAVE TO

18  CROSS, AND THOSE ARE PRETTY DIFFICULT FOR ME.

19          AND THEN -- SO THEN IF WE'RE GOING FROM -- JUST

20  TRYING TO ORIENT MYSELF.  LET'S SEE.

21          EMBARCADERO BART IS ABOUT RIGHT THERE, I BELIEVE --

22  WELL, THERE'S DRUMM.  SO I GO DOWN, I COME RIGHT HERE FROM

23  EMBARCADERO BART, AND THEN I GO DOWN MARKET, AND THEN I COME

24  DOWN STEUART.  BUT THE BANK THAT WE WERE TALKING ABOUT WOULD BE

25  THIS STREET RIGHT HERE.  I DON'T SEE A NAME ON IT.  IT'S GOT

887

1    THE -- I THINK -- IS THAT A "C"?

2    Q.    WELL, THAT -- YOU CAN DISREGARD THAT BECAUSE THAT

3    REFERENCES SOMETHING ELSE, BUT IS THAT CALIFORNIA?  IS IT

4    CALIFORNIA -- IF YOU SEE WAY TO THE LEFT THERE, THERE'S A --

5           THE COURT:  WHY DON'T YOU A TAKE A POINTER AND GO

6    OVER THERE AND POINT TO WHAT YOU'RE TALKING ABOUT SO HE'LL KNOW

7    WHAT YOU'RE ASKING HIM 'CAUSE -- I DON'T --

8                   (SIMULTANEOUS COLLOQUY.)

9           THE WITNESS:  THIS IS WHAT I'M TALKING ABOUT.  THIS

10   ONE RIGHT HERE.

11                  (OFF-THE-RECORD DISCUSSION.)

12          THE WITNESS:  AN ARCHAIC POINTER.

13   BY MR. JOHNSON:

14   Q.    MR. GRANT, I WAS JUST TRYING TO IDENTIFY THE STREET YOU

15   WERE REFERRING TO.  THOUGHT YOU WERE REFERRING TO THAT, AND IF

16   YOU GO DOWN ALL THE WAY, IT SAYS "CALIFORNIA."

17          IS IT CALIFORNIA?

18   A.    NO, THE STREET PERPENDICULAR TO THAT, THE ONE YOU WERE

19   JUST POINTING AT.

20                  (SIMULTANEOUS COLLOQUY.)

21   BY MR. JOHNSON:

22   Q.    IS THIS WHERE THE BANK IS?

23   A.    YES.  AND IT'S A -- IT'S A INTERSECTION -- ACTUALLY,

24   THERE'S INTERSECTION OF THREE STREETS, SO CALIFORNIA, THAT

25   OTHER ONE, THAT -- THE ONE YOU HAVE YOUR POINTER ON, AND THEN

888

1   MARKET.

2   Q.    AND MARKET?

3   A.    AND THE BANK IS ON THE CORNER OF CALIFORNIA AND THE ONE

4   WE HAVEN'T NAMED YET.

5                   (OFF-THE-RECORD DISCUSSION.)

6               THE WITNESS:  DAVIS?

7               THE COURT:  DAVIS?

8               THE WITNESS:  SO U.S. BANK IS ON THE CORNER OF DAVIS

9   AND CALIFORNIA.  AND SO THE RAMP THAT I'M TALKING ABOUT IS THAT

10  RAMP THERE IN THAT CORNER.  YEAH, IT'S THE CORNER THERE OF

11  THOSE TWO STREETS, AND THERE'S -- THERE'S A -- A LIP

12  APPROXIMATELY 2 INCHES, 3 INCHES?  AND ALSO EROSION IN THE

13  STREET AROUND THAT AREA, TOO.

14  BY MR. JOHNSON:

15  Q.    AND THE KINDS OF EXPERIENCES THAT YOU -- SORRY.

16          THE KINDS OF EXPERIENCES THAT YOU HAVE WITH THAT

17  CURB RAMP, ARE THEY -- WOULD YOU CONSIDER THEM TO BE TYPICAL OF

18  OTHER EXPERIENCES YOU HAVE IN OTHER PARTS OF THE CITY THAT

19  YOU'VE GONE TO?

20  A.    YEAH, TYPICAL.  YEAH, IT'S -- BUT I MEAN, NOT EVERY CURB

21  RAMP IN SAN FRANCISCO IS HORRIBLE.  BUT IT ONLY TAKES ONE

22  HORRIBLE CURB RAMP TO RUIN MY DAY.  JUST TAKES ONE RAMP FOR ME

23  TO NOT BE ABLE TO DO WHAT I'M SUPPOSED TO DO.

24  Q.    OKAY.  HOW OFTEN -- DO YOU ENCOUNTER CURB RAMPS THAT --

25  THAT WOULD BE A PROBLEM FOR YOU IN YOUR MANUAL CHAIR AS YOU'RE

889

1  TRAVELING IN THE PARTS OF SAN FRANCISCO THAT YOU GO TO?

2  A.    DAILY.  I -- I MEAN -- I TRY NOT TO GET DEPRESSED AND

3  THINK ABOUT HOW BAD THINGS ARE, BUT EVERY DAY I'LL FIND A RAMP

4  THAT WILL BE TOO HARD OR NOT EVEN JUST A RAMP, THE CUT, OR THE

5  GAP, THE -- THE LIP -- THAT'S A BIG ONE -- IS THE LIP, TOO.

6  Q.    OKAY.

7         AND SO YOU'VE IDENTIFIED THIS AREA HERE SOUTH OF

8  DOWNTOWN OR SOUTH OF THE FINANCIAL DIRECT, RATHER, BETWEEN

9  EMBARCADERO BART STATION AND THE YMCA AND WHERE YOU GO TO BANK.

10  YOU'VE ALSO MENTIONED GOLDEN GATE PARK WHICH I'LL ASK YOU ABOUT

11  IN JUST A MOMENT.

12         THE COURT:  THE BANK WAS WHAT -- WHAT WAS THAT,

13  CALIFORNIA AND DAVIS STREET, YOU SAID?

14         THE WITNESS:  YES.

15         THE COURT:  OKAY.

16  BY MR. JOHNSON:

17  Q.    AND I'M SORRY, I'VE FORGOTTEN SOME OF THE OTHER AREAS.

18  THE MOSCONE CENTER, AND THAT AREA, YOU GO TO AROUND THERE AS

19  WELL?

20  A.    BY THE POWELL STREET BART.  EVERYTHING'S BY BART FOR ME.

21  SO I TAKE BART -- I'M ALMOST LIMITED TO GOING TO PLACES WHERE

22  BART GOES.  I'VE TAKEN THE BUS TO -- TO THE GOLDEN GATE PARK

23  AND EVERYTHING.  BUT YEAH, THE POWELL STREET AREA ALSO.

24  Q.    AND HAVE YOU EXPERIENCED SIMILAR KINDS OF DIFFICULTIES

25  WITH STEEP CURB RAMPS AND CURB RAMPS WITH LIP IN THE AREA OF

1  MOSCONE CENTER?

2  A.     YEAH, I HAVE.

3           SORRY ABOUT NOT KNOWING THE STREET NAMES, BUT --

4           THE COURT:  THAT'S OKAY.

5           THE WITNESS:  -- THE CORNER WHERE --

6           THE COURT:  WE HAVE A MAP.  WE HAVE A MAP --

7  HOPEFULLY A MAP THAT WILL HELP YOU IF YOU NEED IT.

8           THE WITNESS:  THE SAN FRANCISCO CHRONICLE, THAT

9  CORNER, WHERE THE -- THE CHRONICLE BUILDING IS, THE MINT'S

10 BUILDING --

11          THE COURT:  SO HE'S POINTING TO THE MOSCONE CENTER.

12 IS THAT THE AREA YOU'RE TALKING ABOUT?

13          THE WITNESS:  YEAH, YEAH.  I DIDN'T REALIZE -- YEAH,

14 I SEE.  NO, NO, NO.  YEAH.

15          THOSE AREAS I'VE -- I'VE ENCOUNTERED THE RAMPS,

16 AND -- THERE'S A PRETTY BAD CROSS-SLOPE BY THE YERBA BUENA

17 GARDENS ALSO, WHICH IS RIGHT BY MOSCONE CENTER.

18 BY MR. JOHNSON:

19 Q.     CROSS-SLOPE ON THE SIDEWALK?

20 A.     UH-HUH.

21 Q.     AND HOW DOES THAT AFFECT YOU EXACTLY, THE CROSS-SLOPE?

22 YOU MAY HAVE ALREADY DESCRIBED THAT, BUT --

23 A.     DEPENDS WHAT I'M IN.  IF I'M IN THE MANUAL CHAIR, THE

24 CROSS-SLOPE -- I'M PULLED OUT INTO THE STREET, SO THEN I'M

25 FORCED TO USE THE -- THE DOWN SIDE ARM TO PUSH HARDER.  THAT

1  PUTS A LOT MORE WEAR AND TEAR ON MY SHOULDERS.  I HURT MY

2  SHOULDER -- MY LEFT SHOULDER A YEAR AGO -- NO, ABOUT A YEAR AND

3  A HALF AGO.

4            AND FOR ME TO HURT A SHOULDER WAS -- IT WAS

5  ALMOST -- PRETTY MUCH GAME OVER.  I WASN'T -- I WASN'T ABLE TO

6  DO ANYTHING FOR -- FOR SIX MONTHS.  I COULDN'T GO TO

7  BASKETBALL.  I COULDN'T DO ANYTHING -- ANYTHING ELSE LIKE THAT,

8  SO IT'S A BIG DEAL FOR ME TO HURT -- TO HURT MY SHOULDER

9  'CAUSE -- IT'S THE EQUIVALENT OF HURTING YOUR LEGS, AND --

10 BUT -- AND, YOU KNOW, SOMEONE HURTS THEIR LEG AND THEY HAVE TO

11 USE CRUTCHES.  WELL, FOR ME, IF I HURT A SHOULDER, I DON'T HAVE

12 ANYTHING ELSE OTHER THAN THE WHEELCHAIR TO MOVE AROUND IN, SO

13 THAT'S HARD FOR ME.

14 Q.    AND YOU BELIEVE THAT THE -- HAVING TO TRAVEL ON A

15 CROSS-SLOPE CAN INJURE YOUR SHOULDER?

16 A.    WELL, I FEEL -- I MEAN, WHEN I'M IN THE MANUAL CHAIR, I

17 WILL FEEL A STRAIN ON MY SHOULDER, AND I WILL STOP AND WAIT.

18 BUT ALSO WHEN I'M -- A CROSS-SLOPE IN THE POWER CHAIR, MY

19 CENTER OF BALANCE IS OFF.  AND I -- IF I HIT A BUMP OR

20 SOMETHING -- ALSO, 'CAUSE, I MEAN, NOT ONLY IS THERE A

21 CROSS-SLOPE, BUT THERE MIGHT BE LITTLE BUMPS, BREAKS, WITH

22 TREES AND STUFF, AND IF I'M -- IF I DON'T SEE IT, I CAN

23 POTENTIALLY GET THROWN OUT OF MY CHAIR, WHICH -- WHICH WOULDN'T

24 BE A GOOD DAY EITHER.

25 Q.    AND DO YOU -- I THINK YOU SAID YOU ALSO GET OFF AT THE

1  POWELL STREET STATION.  DO YOU DO OTHER THINGS AROUND THERE

2  BESIDES GO TO THE MOSCONE CENTER?

3  A.    WELL, LIKE I SAID, IF -- WHERE -- SOMETHING'S GOING ON, I

4  GO UP TO UNION SQUARE ALSO.

5  Q.    AND DO YOU HAVE DIFFICULTIES WITH STEEP CURB RAMPS AND

6  CROSS-SLOPES ON THE SIDEWALK AND LIPS ON THE CURB RAMPS THERE

7  AS WELL?

8  A.    I DO.  YEAH.  WHICH -- I WAS EXPLAINING EARLIER, EVEN BY

9  THE MINT'S BUILDING, AND RIGHT BY THE POWELL BART, I LIKE TO GO

10 TO A COFFEE SHOP OVER THERE.  AND I DO FIND THE -- THE LIPS AND

11 THE -- THE RAMP -- THE CROSS-SLOPE AND THE RAMPS, EVERYTHING

12 THAT WE'VE BEEN TALKING ABOUT.

13 Q.    OKAY.

14       LET ME ASK YOU, THEN, YOU'D MENTIONED GOLDEN GATE

15 PARK.  WHAT KIND OF DIFFICULTIES HAVE YOU HAD IN GOLDEN GATE

16 PARK WITH THE WALKWAYS OR PATHS OF TRAVEL?

17 A.    SO THE FIRST THING I THINK OF -- IT'S KIND OF A JOKE,

18 KIND OF -- WE KIND OF -- MY FAMILY KIND OF LAUGHS AT IT OR MY

19 WIFE AND I -- SOME REASON, THE SIDEWALK -- WE'LL BE GOING ON

20 THE SIDEWALK AND FOR SOME REASON -- I DON'T KNOW WHY -- IT

21 CHANGES.  IT STOPS.  AND SO THE PAVEMENT STOPS, AND IT'S NOT

22 FOR LONG, HUGE TIME -- I MEAN, HUGE DISTANCE.  MAYBE 20,

23 30 FEET, I DON'T KNOW EXACTLY, BUT -- AND IT'S JUST DIRT, AND

24 THEN THE SIDEWALK STARTS AGAIN.  IT'S ALWAYS A JOKE.  IT'S,

25 LIKE, WELL, WHY DID THEY STOP PAVING THE SIDEWALK AT THIS SPOT?

 1          SO THAT'S A BIG PROBLEM FOR ME.  HOPEFULLY, THE

 2    DIRT'S PACKED DOWN, PEOPLE HAVE BEEN WALKING ON IT.  IF IT'S

 3    RAINING -- IF IT'S RAINING, DEFINITELY I WILL GET MY HANDS

 4    DIRTY, GET -- REALLY BAD.  I HAVE TO WASH MY HANDS A LOT.

 5          BUT OTHER THAN THAT, I MEAN -- BUT JUST PUTTING THAT

 6    ASIDE, POTENTIALLY -- I DON'T KNOW IF -- IF THE DIRT IS

 7    PACKED -- IF IT'S RAINY, IT COULD BE MUD, AND I COULD GET

 8    STUCK.  AND GETTING STUCK IN A WHEELCHAIR IN THE MIDDLE OF MUD

 9    WOULDN'T BE ALL THAT FUN EITHER.

10          SO WHEN I DO FIND STUFF LIKE THAT, I HAVE TO GO

11    AROUND.  I DON'T WANT TO RISK IT.  I DON'T WANT TO -- I -- I

12    MEAN, I DON'T WANT MY WHEELS TO FALL INTO THE MUD AND JUST GET

13    STUCK, SO I FIND THAT, AND THEN I FIND -- I'VE FOUND BATHROOMS

14    ARE, I GUESS, NOT UP TO CODE, YOU KNOW, FULLY ACCESSIBLE.

15    AND -- AND CURB RAMPS ALSO.

16    Q.   YOU HAVE A PROBLEM FINDING A BATHROOM IN GOLDEN GATE

17    PARK?

18    A.   I DO.  I USUALLY -- ACTUALLY, I TRY TO ABSTAIN FROM

19    DRINKING SO I DON'T HAVE TO GO TO THE BATHROOM.  JUST --

20    ACTUALLY, JUST YESTERDAY WE WENT TO -- TO THE GOLDEN GATE PARK

21    TO THE BALLPARK AREAS, AND THE BATHROOM WAS ACCESSIBLE, BUT IT

22    WASN'T -- I MEAN, IT HAD ONE BAR AND THAT'S ABOUT IT.  SUPPOSED

23    TO HAVE MORE BARS AND BIGGER AND EVERYTHING.

24          SO WHEN I WAS HANGING OUT WITH FRIENDS, I KIND OF --

25    I DID -- DIDN'T DRINK AS MUCH AS THEY DID JUST 'CAUSE I DIDN'T

1  WANT TO HAVE TO GO TO THE BATHROOM, AND WE WERE JUST -- IT WAS

2  JUST A PICNIC WE HAD YESTERDAY.  WE WERE JUST SITTING ON THE

3  LAWN.

4  Q.    AND I THINK YOU SAID THE BATHROOM HAD ONE -- ONE BAR

5  INSTEAD OF TWO.  CAN YOU EXPLAIN THAT A LITTLE MORE, PLEASE.

6  A.    RIGHT.  SO WHEN YOU'RE -- IF YOU GO INTO THE HANDICAP

7  STALL, THERE'S TWO BARS.  THERE'S USUALLY ONE IN THE BACK OR

8  ACTUALLY IT IS IN THE BACK, AND THEN DEPENDING ON WHAT SIDE THE

9  WALL IS ON THE RIGHT SIDE OR THE LEFT SIDE SO YOU CAN GRAB ON

10 BOTH BARS WHILE YOU'RE TRANSFERRING, MOVING AROUND.  BUT THIS

11 ONE DIDN'T HAVE THAT.

12 Q.    SO WHY -- HOW DOES IT MAKE IT MORE DIFFICULT IF THERE'S

13 ONLY -- WAS THERE ONLY A BACK BAR OR ONLY A SIDEBAR?

14 A.    IT WAS A SIDEBAR.

15 Q.    OKAY.  SO HOW DOES THAT MAKE IT MORE DIFFICULT FOR YOU TO

16 TRANSFER FROM YOUR CHAIR TO THE TOILET?

17 A.    SO THEN I DON'T HAVE AS MUCH STUFF TO GRAB ON TO TO

18 BALANCE, WHICH MAKES IT HARDER FOR ME.  SO WITH THAT, IT'S MORE

19 LIKE -- IT'S ALMOST LIKE A LEAP OF FAITH.  THERE'S A MOMENT

20 WHERE I HAVE TO PULL, AND -- 'CAUSE I CAN TRANSFER OUT OF THE

21 CHAIR.  SOME PEOPLE HAVE A REALLY HARD TIME.  BUT I'LL ACTUALLY

22 PULL -- IT'S LIKE A LEAP OF FAITH -- AND MOVE FROM THE CHAIR TO

23 THE TOILET SEAT, SO THAT MAKES IT MORE DIFFICULT.

24         BUT THEN IF THERE WAS TWO BARS TO GRAB ONTO, IT

25 WOULDN'T BE AS HARD.  I WOULD HAVE MORE STABILITY INSTEAD OF

```
 1   JUST GRABBING ON TO ONE AND LIFTING UP AND KIND OF SWING

 2   AROUND, 'CAUSE I CAN STILL STAND ON MY LEGS, AND THAT'S ANOTHER

 3   IF YOU DON'T USE IT, YOU LOSE IT, SO FOR ME, I ALWAYS TRY TO

 4   STAND AS MUCH AS POSSIBLE.

 5   Q.    SO IS THERE A GREATER RISK FOR YOU IN FALLING WHEN YOU'RE

 6   MAKING THE TRANSFER IF THERE'S ONLY ONE BAR?

 7   A.    YEAH.  WELL, YEAH, THERE IS.  I MEAN, I'LL HAVE TO GRAB

 8   ON TO THE WALLS.  I MEAN, IDEALLY, HOPEFULLY, NO.  HOPEFULLY,

 9   NOTHING HAPPENS.  BUT IF I CAN'T STAND AS WELL, IF I'M OFF

10   BALANCE AND I NEED TO GRAB ON TO SOMETHING ELSE, THEN, YEAH,

11   THERE IS A BIGGER RISK.

12         IF THERE ISN'T ANOTHER BAR FOR ME TO GRAB ON TO,

13   HOPEFULLY THERE'S THE TOILET SEAT COVERS, I CAN GRAB ON TO

14   THAT.  IT'S NOT REALLY GRABBING ON TO THAT, BUT THAT'S JUST

15   PUTTING A HAND ON TO HELP ME STEADY A LITTLE BIT MORE.

16   Q.    MR. GRANT, HAVE YOU EVER COMPLAINED TO THE CITY OF

17   SAN FRANCISCO ABOUT ANY OF THESE PROBLEMS WHEN VISITING THERE?

18   A.    NO, I HAVEN'T.

19   Q.    WHY NOT?

20   A.    IT'S FINE.  I MEAN, I GUESS -- FROM THIS TRIAL, I MEAN,

21   WE'RE JUST TALKING ABOUT IT, I HONESTLY HAVE NOT FELT LIKE -- I

22   DIDN'T FEEL LIKE I COULD.  I -- I'M NOT A RESIDENT OF

23   SAN FRANCISCO.  SO I -- I FELT LIKE THAT IF MY -- I HONESTLY

24   THOUGHT THAT IF I COMPLAINED, IT PROBABLY WOULD BE LOOKED OVER,

25   'CAUSE I'M NOT -- I DON'T LIVE IN SAN FRANCISCO.  I DIDN'T KNOW
```

1   HOW IT WOULD BE HANDLED.

2           I SHOULD HAVE -- I SHOULD HAVE LOOKED INTO IT AND

3   SAW, BUT I REALLY DIDN'T FEEL LIKE I COULD COMPLAIN.

4   Q.   NOW, BEFORE GOING OVER TO SAN FRANCISCO, EITHER FOR THE

5   YM -- TO GO TO THE YMCA OR ONE OF THE OTHER REASONS THAT YOU'VE

6   DESCRIBED FOR THE COURT, HAVE YOU EVER CONSIDERED GOING ON

7   THE -- THE CITY'S WEBSITES AND SEEING -- SEEING IF THERE'S

8   SOMETHING POSTED THERE THAT PROVIDES YOU WITH INFORMATION ABOUT

9   AN ACCESSIBLE PATH OF TRAVEL SO YOU WOULD BE ABLE TO AVOID SOME

10  OF THESE OBSTACLES?

11  A.   YEAH.  YEAH, ACTUALLY I HAVE.  ACTUALLY, JUST RECENTLY I

12  DID A TRIP TO EUROPE AND BERLIN AND PARIS, AND I HAD TO

13  RESEARCH FOR THOSE.  AND SINCE THEN, I'VE RESEARCHED

14  SAN FRANCISCO.

15          I MEAN, AT FIRST, I DIDN'T REALLY THINK ABOUT IT.  I

16  WAS LIKE, OH, WELL, I SHOULD.  AND SO I HAVE LOOKED FOR

17  DIFFERENT ACCESSIBLE WEBSITES OR WEBSITES THAT POST ACCESSIBLE

18  PLACES.  I MEAN, I COULD -- I FOUND IT PRETTY GOOD IN, LIKE,

19  BERLIN -- WAS -- BERLIN WAS PRETTY -- WAS EXCELLENT.  I COULD

20  TELL THEM MY DISABILITY -- MY DEGREE OF DISABILITY, AND THEN I

21  WOULD BE GIVEN A MODE OF -- ROUTE TO MAKE IT TO MY DESTINATION.

22          SO SINCE THEN, I'VE GONE TO THE SAN FRANCISCO

23  WEBSITES.  I'VE LOOKED AT THE MAYOR'S OFFICE ON DISABILITIES

24  WEBSITE, AND THEN ALSO THE -- THE PARK AND REC WEBSITE, THE

25  PARK AND REC SAN FRANCISCO WEBSITE, AND I'VE TRIED TO LOOK UP

1  STUFF.

2          IT -- IT'S A LITTLE BIT HARDER.  I'M NOT NEW AT THE

3  INTERNET THING.  I BEEN ON IT BEFORE.  THERE'S THE LACK OF

4  DEFINITIONS -- THAT WAS THE HARDEST ONE FOR ME, WAS THE LACK OF

5  DEFINITIONS ON THE -- ON THE PARK AND REC WEBSITE.

6  Q.    WHAT ARE YOU REFERRING TO SPECIFICALLY?  DEFINITIONS OF

7  WHAT?

8  A.    DEFINITIONS OF ACCESSIBILITY.  YOU KNOW, I MEAN, A GOOD

9  EXAMPLE IS FOR COMPARISON, IT WAS LIKE IN BERLIN, THEY WOULD

10  SAY, OH, IF THERE'S LIMITED ACCESS, THEN -- THEN THESE KINDS OF

11  OBSTACLES YOU WOULD FIND.  AND IF THERE WAS FULL ACCESS, THERE

12  WOULDN'T BE ANY OBSTACLES.

13          WELL, ON THE SAN FRANCISCO PARK AND REC WEBSITE,

14  THERE WAS A LIMITED ACCESS DESIGNATION AND THEN A FULL ACCESS

15  DESIGNATION.  AND THERE WAS A DEFINITION FOR THE FULL ACCESS.

16  AND THEN I THINK IT SAID SOMETHING LIKE IT'S ACCESSIBLE, YOU

17  CAN GO IN AND YOU CAN DO ONE ACTIVITY.  BUT I DIDN'T FIND ANY

18  DEFINITIONS FOR WHAT A LIMITED ACCESS FACILITY WAS.

19          AND SO ALL THE FACILITIES WERE -- WERE DESIGNATED

20  EITHER FULL ACCESS OR LIMITED WHEELCHAIR ACCESSIBILITY, BUT I

21  DIDN'T KNOW WHAT LIMITED WHEELCHAIR ACCESSIBILITY MEANT.

22  Q.    DID YOU FIND ON ANY CITY WEBSITE, MAYOR'S OFFICE ON

23  DISABILITY WEBSITE, OR ANOTHER WEBSITE, ANY MAPS THAT SHOWED

24  ACCESSIBLE ROUTES AROUND THE CITY'S STREETS SO THAT YOU COULD

25  PLAN YOUR TRIP BEFOREHAND AND TRY AND AVOID OBSTACLES THAT WERE

1  FORMED BY THE -- THE LACK OF CURB RAMPS OR BAD CURB RAMPS?

2  A.    EXCUSE ME.  NO, I MEAN I DIDN'T FIND MAPS OF ROUTES.  I

3  DID FIND MAPS OF THE -- OF THE CENTERS, AND THE PARKS.  AND

4  THAT'S WHERE I WAS TALKING ABOUT THE -- THE DESIGNATION OF

5  ACCESSIBILITIES, BUT I DIDN'T ACTUALLY FIND A -- A ROUTE MAP.

6  Q.    WHEN YOU HAVE BEEN TRAVELING ON THE STREETS -- ON THE

7  SIDEWALKS IN THE CITY, AND THE CROSSWALKS, WHEN YOU'VE

8  EXPERIENCED THESE SITUATIONS WHERE THERE'S BEEN A MISSING CURB

9  RAMP OR A -- A STEEP CURB RAMP, CURB RAMPS WITH LIPS, SO ON --

10  HAVE YOU EVER SEEN ANY SIGNAGE THAT INDICATES THAT THAT'S NOT

11  THE ACCESSIBLE ROUTE AND YOU NEED TO GO IN SOME OTHER DIRECTION

12  TO -- TO AVOID OBSTACLES LIKE THAT?

13  A.    NO, I DIDN'T EVER -- NO, I HAVEN'T SEEN ANY DESIGNATION

14  LIKE THAT, OR SIGNS.

15          MR. JOHNSON:  THANK YOU, MR. GRANT.

16          NOTHING FURTHER OF THIS WITNESS, YOUR HONOR.

17          THE COURT:  THANK YOU, MR. JOHNSON.

18          CROSS-EXAMINATION?

19          MS. POPLAWSKI:  NO CROSS-EXAMINATION, YOUR HONOR.

20          THE COURT:  OKAY.  ANY REASON THE WITNESS SHOULD NOT

21  BE EXCUSED FROM ANY FURTHER TESTIMONY?

22          MR. JOHNSON:  NO REASON HE CAN'T BE RELEASED, YOUR

23  HONOR.

24          THE COURT:  OKAY.  THANK YOU, MR. GRANT.  YOU MAY BE

25  EXCUSED.

997

1          OKAY.  YOU MAY CALL YOUR NEXT WITNESS.

2          MR. BROWN:  PLAINTIFFS CALL AUDREY DECHADENEDES.

3          THE COURT:  AUDREY?

4          MR. BROWN:  DECHADENEDES.

5          THE CLERK:  PLEASE COME FORWARD AND TAKE THE WITNESS

6  STAND.

7          (PAUSE IN THE PROCEEDINGS.)

8          THE CLERK:  WILL YOU STAND AND RAISE YOUR RIGHT

9  HAND?

10          THE COURT:  IT'S FINE.  GOOD.

11                    AUDREY DECHADENEDES,

12  CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY SWORN,

13  TESTIFIED AS FOLLOWS:

14          THE WITNESS:  YES, I DO.

15          THE CLERK:  PLEASE BE SEATED STATE YOUR FULL NAME

16  FOR THE COURT AND SPELL YOUR LAST NAME.

17          MR. BARRY:  MY NAME IS AUDREY DECHADENEDES.  MY LAST

18  NAME IS SPELLED D-E-C-H-A-D-E-N-E-D-E-S.

19          THE CLERK:  THANK YOU.

20                    DIRECT EXAMINATION

21  BY MR. BROWN:

22  Q.   GOOD AFTERNOON, MS. DECHADENEDES.

23  A.   GOOD AFTERNOON.

24  Q.   WHERE DO YOU LIVE?

25  A.   I LIVE IN THE SOUTHWESTERN END OF SAN FRANCISCO NEAR LAKE

998

1  MERCED.

2  Q.    HOW LONG HAVE YOU LIVED THERE?

3  A.    FOUR OR FIVE YEARS.

4  Q.    BEFORE THAT WHERE DID YOU LIVE?

5  A.    BEFORE THAT WE LIVED IN THE OUTER SUNSET, 20 -- 45TH

6  AVENUE AND RIVERA.

7  Q.    IS THAT ALSO IN SAN FRANCISCO?

8  A.    YES.

9  Q.    HOW LONG HAVE YOU LIVED IN SAN FRANCISCO CONTINUOUSLY?

10  A.    ABOUT 18 YEARS.

11  Q.    HAVE YOU PAID TAXES WHILE YOU LIVED THERE?

12  A.    ABSOLUTELY.

13  Q.    WITH WHOM DO YOU LIVE?

14  A.    I LIVE WITH MY DAUGHTER VALERIE.

15  Q.    IS VALERIE WITH US IN COURT TODAY?

16  A.    SHE IS.

17  Q.    WOULD YOU POINT HER OUT, PLEASE?

18  A.    SHE IS THE SMALL YOUNG LADY IN THE WHEELCHAIR.

19  Q.    THANK YOU.

20        VALERIE HAS A DISABILITY?

21  A.    SHE DOES.

22  Q.    CAN YOU DESCRIBE THAT FOR THE COURT, PLEASE?

23  A.    SHE HAS A DISABILITY CALLED RETT SYNDROME WHICH PRESENTS

24  DIFFERENTLY WITH DIFFERENT PEOPLE WHO HAVE IT.

25        FOR HER, SHE'S UNABLE TO CONTROL HER MUSCLES VERY

1  WELL.  SO SHE CAN'T WALK OR TALK OR USE HER HANDS.  SHE HAS A

2  SEIZURE DISORDER.  SHE HAS SCOLIOSIS, A PRETTY BIG CURVE IN HER

3  SPINE.  AND SHE IS NOT ABLE TO EAT, SO SHE USES A G TUBE FOR

4  FEEDING.

5  Q.   WHAT PHYSICAL LIMITATIONS DOES SHE HAVE?

6  A.   NOT BEING ABLE TO WALK, TALK, USE HER HANDS.  SHE NEEDS

7  HELP WITH JUST ABOUT EVERYTHING.

8  Q.   HOW DO YOU COMMUNICATE WITH HER?

9  A.   SHE -- HER RECEPTIVE SKILLS ARE FAR BETTER THAN HER

10 EXPRESSIVE SKILLS.  SO HER UNDERSTANDING IS QUITE GOOD.  SO I

11 SPEAK TO HER AS I SPEAK TO ANYBODY ELSE AND SHE'S ABLE TO

12 ANSWER ME WITH YES AND NO, WITH HER EYE GAZE.

13            AND WITHIN THE LAST -- UNDER A YEAR WE HAVE HAD A

14 COMMUNICATION DEVICE THAT WE ARE WORKING WITH THAT USES EYE

15 GAZE AS WELL.  AS SHE LEARNS TO USE IT BETTER AND I LEARN TO

16 PROGRAM IT BETTER AND MORE TO HER NEEDS, IT'S BECOMING MORE AND

17 MORE OF A USEFUL TOOL FOR HER TO COMMUNICATE, BUT IT'S STILL A

18 WORK IN PROCESS.

19 Q.   IS THAT A COMPUTER DEVICE THAT'S ATTACHED TO HER CHAIR?

20 A.   YES.

21 Q.   WHEN DID YOU FIRST NOTICE THE SYMPTOMS YOU DESCRIBED WITH

22 VALERIE?

23 A.   WE NOTICED THAT SHE WASN'T REACHING MILESTONES SOMEWHERE

24 BETWEEN ONE AND TWO YEARS.

25 Q.   AT WHAT AGE WAS SHE FORMALLY DIAGNOSED?

1   A.   NOT UNTIL SHE WAS ABOUT FOUR.

2   Q.   HAS SHE EVER ATTENDED SCHOOL?

3   A.   SHE HAS.  ALWAYS.

4   Q.   AT WHAT LEVELS?

5   A.   SHE ATTENDED PRESCHOOL, EARLY START PROGRAM, UNTIL SHE WAS

6   FOUR.  AND THEN SHE WENT INTO KINDERGARTEN AND SHE HAS BEEN IN

7   PUBLIC SCHOOL EVER SINCE.  UNTIL SHE TURNED 22.  SHE'S 25 NOW.

8   Q.   WHERE DID SHE ATTEND MIDDLE SCHOOL?

9   A.   A.P. GIANNINI.

10  Q.   ALL THESE SCHOOLS ARE IN SAN FRANCISCO?

11  A.   YES.  WE WERE IN NEW MEXICO UNTIL SHE WAS ABOUT FOUR.  SO

12  HER EARLY DAYS WERE THERE, BUT WE GOT HERE WHEN SHE WAS IN THE

13  BEGINNING OF ELEMENTARY SCHOOL.

14  Q.   WHAT ABOUT HIGH SCHOOL?

15  A.   SHE WENT TO LINCOLN FOR THE FULL 12 YEARS.  AND THEN SHE

16  DID HER TRANSITION PROGRAM AT MISSION HIGH SCHOOL.

17  Q.   DID SHE COMPLETE HIGH SCHOOL?

18  A.   SHE HAS A CERTIFICATE OF COMPLETION.

19  Q.   HAS SHE TAKEN ANY CLASSES SINCE HIGH SCHOOL?

20  A.   SHE TAKES A FEW CLASSES THROUGH CITY COLLEGE DISABILITIES

21  PROGRAM.

22  Q.   AND WHAT ARE SOME OF HER FAVORITE CLASSES?

23  A.   SHE HAS A CLASS SHE REALLY ENJOYS CALLED DANCE AND DRAMA,

24  AND IT'S JUST -- SHE LOVES IT.

25  Q.   HAVE YOU HAD A CHANCE TO OBSERVE HER IN THE CLASS?

1   A.   I HAVE.

2   Q.   CAN YOU DESCRIBE THE CLASS AND HER ROLE IN IT?

3   A.   IT HAS ABOUT 38 YOUNG PEOPLE OF QUITE A VARIETY OF

4   DISABILITIES.  SOME OF THEM CAN MOVE THEMSELVES AROUND AND SOME

5   OF THEM ARE IN WHEELCHAIRS THAT THEY CAN OPERATE THEMSELVES.

6   THERE ARE A COUPLE OF OTHERS WHO, LIKE VAL, NEED FULL CARE SO

7   THEY HAVE AIDES WORKING WITH THEM.

8         AND THE CLASS IS MOSTLY IMPROVISATIONAL, SO THE

9   TEACHER WHO IS VERY SKILLED IN WORKING WITH DIFFERENT LEVELS OF

10  DISABILITIES COMES UP WITH PROJECTS FOR THEM TO DO.  MUSIC HE

11  PLAYS AND LITTLE SKITS THAT THEY PUT ON.

12  Q.   YOU SEE SHE SITS IN A CHAIR.  WHAT MOBILITY AIDES DOES

13  VALERIE USES?

14  A.   WELL, SHE ALWAYS NEEDS HER WHEELCHAIR.

15  Q.   SHE HAS A MANUAL WHEELCHAIR?

16  A.   YES.  SHE ALSO ALWAYS NEEDS SOMEBODY TO PUSH THE

17  WHEELCHAIR.

18  Q.   CAN SHE OPERATE IT BY HERSELF?

19  A.   NO.

20  Q.   DO YOU TRAVEL AROUND YOUR NEIGHBORHOOD WITH VALERIE?

21  A.   YES.

22  Q.   WHERE DO YOU GO IN YOUR NEIGHBORHOOD WITH VALERIE?

23  A.   WELL, IN OUR NEIGHBORHOOD REALLY THERE'S JUST THE LAKE.

24  SO WE WALK AROUND THE LAKE QUITE A BIT, BUT WE MOSTLY HAVE TO

25  GET IN THE VAN AND GO SOMEPLACE ELSE IF WE WANT TO REALLY DO

1002

1  ANYTHING BY ANYTHING.

2  Q.   WHAT OTHER AREAS IN THE CITY HAVE YOU VISITED WITH

3  VALERIE?

4  A.   WE GO ALL OVER THE PLACE.  WE SPEND A LOT OF TIME IN THE

5  OUTER SUNSET BECAUSE WE LIVED THERE A LOT AND WE HAVE FRIENDS

6  THERE, SO WE LIKE TO GO THERE.

7         SHE GOES TO UC FOR SOME OF HER DOCTORS.  SHE GOES TO

8  PARNASSUS.  SHE GOES TO MT. ZION FOR OTHER DOCTORS.  WE DO A

9  LOT OF THINGS IN THE WEST PORTAL AREA.  SO SHE'S PRETTY MUCH

10 ALL OVER THE PLACE.

11 Q.   WHILE YOU HAVE BEEN OUT WITH VALERIE IN THE CITY, HAVE YOU

12 ENCOUNTERED ANY PHYSICAL BARRIERS OR OBSTACLES?

13 A.   YES, I HAVE.

14 Q.   WHAT TYPES?

15 A.   WELL, RANGING FROM PROBLEMS WITH RAMPS, CURB RAMPS THAT

16 AREN'T THERE ON CORNERS, CORNERS WHERE THERE ARE OFTEN RAMPS IN

17 ONE DIRECTION BUT NOT THE OTHER.  RAMPS THAT ARE IN BAD REPAIR,

18 THAT ARE BROKEN OR THAT HAVE LIPS ON THE BOTTOM SO WE MIGHT

19 FALL.  RAMPS THAT ARE TOO STEEP.  TREES THAT ARE CRACKED IN BAD

20 REPAIR.  THE SIDEWALKS, SIDEWALKS THAT SLANT A LITTLE BIT SO

21 THAT MAKES IT HARD TO CONTROL, AND CROSSWALKS THAT ARE NOT IN

22 GOOD REPAIR EITHER SO THEY ARE BUMPY AND CRACKED.

23 Q.   LET ME TURN YOUR ATTENTION TO EXHIBIT 4025 IN PLAINTIFFS'

24 DOCUMENTS.

25         YOU SHOULD HAVE A HARD COPY IN FRONT OF YOU AS WELL

1003

1   AS DEFENSE AND HOPEFULLY THE COURT.

2           WE WILL MARK THIS AS 4025A OR SUBDIVISION A.

3                   (PLAINTIFFS' EXHIBIT 4025A MARKED FOR

4                   IDENTIFICATION)

5           (EXHIBIT DISPLAYED ON SCREEN.)

6   BY MR. BROWN:

7   Q.   DO YOU KNOW WHAT THIS PHOTOGRAPH SHOWS?

8   A.   YEAH.  THIS IS THE AREA NEAR MT. ZION HOSPITAL.  THIS IS

9   DIVISADERO CORNER OF POST STREET.

10  Q.   HOW DO YOU KNOW THAT?

11  A.   I KNOW THAT BECAUSE WE GO THERE SEVERAL TIMES A MONTH.

12  Q.   WHEN IS THE LAST TIME YOU VISITED THIS CORNER?

13  A.   NOT MORE THAN A WEEK AGO.

14  Q.   AND DOES THIS PHOTOGRAPH TRULY AND ACCURATELY REPRESENT

15  THE CONDITIONS THE LAST TIME YOU SAW IT?

16  A.   YES.

17          MR. BROWN:  PLAINTIFFS' MOVE 4025A INTO EVIDENCE,

18  YOUR HONOR.

19          THE COURT:  ANY OBJECTION?

20          MS. POPLAWSKI:  NO OBJECTION, YOUR HONOR.

21          THE COURT:  REQUEST IS GRANTED.

22                  (PLAINTIFFS' EXHIBIT 4025A RECEIVED IN

23                  EVIDENCE)

24          MR. BROWN:  THANK YOU, YOUR HONOR.

25  ///

1004

BY MR. BROWN:

Q.   DO YOU OBSERVE OR HAVE YOU ENCOUNTERED ANY BARRIERS THAT
ARE DEPICTED IN THIS PHOTOGRAPH?

A.   YES.

     WELL, THIS IS THE SIDE OF THE STREET THAT THE
PARKING GARAGE IS ON.  THE HOSPITAL IS ON THE OTHER SIDE OF
DIVISADERO.  SO IT'S NECESSARY TO CROSS DIVISADERO.

     AS YOU CAN SEE ON THIS PICTURE, THERE IS NO CURB
RAMP TO CROSS DIVISADERO.  IT'S ONLY ON THE OTHER SIDE.  YOU
CAN CROSS POST WITH THE RAMP, BUT YOU CAN'T GET DOWN THE
DIVISADERO SIDE, SO YOU HAVE TO DO A TRICKY THING TO GET INTO
THE STREET, WHICH IS NOT MY FAVORITE.

Q.   YOU MENTIONED THE HOSPITAL.  WHY DO YOU GO TO THE HOSPITAL
THERE?

A.   SHE SEES SEVERAL DOCTORS THERE ON A REGULAR BASIS.

Q.   WHAT TYPES OF PHYSICALS?

A.   AT MT. ZION SHE SEES THE PULMONARY SPECIALIST AND
GYNECOLOGIST.

Q.   AND HOW DO YOU PHYSICALLY GET YOU AND VALERIE UP AND DOWN
THIS CURB RAMP?

A.   WELL, THE WAY WE HAVE TO DO IT IF WE WANT TO CROSS THE
STREET THIS WAY (INDICATING) IS --

     THE COURT:  WHY DON'T YOU USE THE POINTER BECAUSE I
AM NOT SURE WHAT YOU ARE REFERRING TO.

     THE WITNESS:  OKAY.

1005

1    MR. BROWN:  YOU CAN STEP DOWN.

2    THE COURT:  HAND HER THE MICROPHONE.

3    (WITNESS STEPS DOWN TO SCREEN.)

4    THE WITNESS:  SO, IF WE WANT TO CROSS THE STREET

5    THIS WAY, BUT THERE'S NO RAMP HERE (INDICATING), WHAT WE HAVE

6    TO DO IS EITHER GO INTO THE LINE OF TRAFFIC WHEN IT'S GREEN IN

7    THIS DIRECTION (INDICATING), GO DOWN THIS RAMP AND BE IN THE

8    TRAFFIC THAT'S COMING THIS WAY, OR IF I WANT TO SET UP EARLY, I

9    CAN GET INTO THE ROAD WHEN THE LIGHT IS RED IN THIS DIRECTION

10   AND GREEN IN THIS DIRECTION (INDICATING) AND POSITION OURSELVES

11   OVER HERE (INDICATING) SO WE ARE READY TO GO RIGHT AWAY WHEN

12   THE LIGHT TURNS GREEN.  THAT DOESN'T FEEL SAFE EITHER BECAUSE

13   THERE ARE CARS COMING IN THIS DIRECTION WHEN WE DO THAT.  SO

14   THOSE ARE MY TWO OPTIONS IN ANY SITUATION LIKE THAT.

15   MR. BROWN:  TURN TO THE NEXT PHOTOGRAPH, 4125B, WE

16   WILL CALL IT.  WE WILL MARK IT.

17   (PLAINTIFFS' EXHIBIT 4125B MARKED FOR

18   IDENTIFICATION)

19   (EXHIBIT DISPLAYED ON SCREEN.)

20   BY MR. BROWN:

21   Q.   DO YOU KNOW WHAT THIS PHOTOGRAPH SHOWS?

22   A.   THAT'S THE OPPOSITE SIDE OF DIVISADERO.

23   Q.   HOW DO YOU KNOW THAT?

24   A.   SAME REASON, WE ARE THERE A LOT.

25   Q.   IS THIS AN ACCURATE REFLECTION OF THE CONDITIONS THAT YOU

1006

1  SEE?

2  A.   THE STREET IS -- ACTUALLY THE LAST TIME I WAS THERE, THEY

3  WERE DOING SOME CONSTRUCTION AROUND HERE (INDICATING), SO I

4  THINK THAT THIS SIGN IS TEMPORARILY DOWN.  BUT OTHER THAN THAT,

5  YES.

6  Q.   OTHER THAN THE SIGN BEING MOVED OR BLOCKED, IS THIS AN

7  ACCURATE REPRESENTATION OF IT?

8  A.   YES, IT IS.

9          MR. BROWN:  PLAINTIFFS MOVE 4025B INTO EVIDENCE,

10 YOUR HONOR.

11         THE COURT:  ANY OBJECTION?

12         MS. POPLAWSKI:  WE WOULD OBJECT, YOUR HONOR, BECAUSE

13 THE PLAINTIFF HAS NOT ESTABLISHED A TIME THAT SHE WAS LAST AT

14 THE SITE, AND WHETHER THIS PHOTOGRAPH ACCURATELY DEPICTS THE

15 SITE AS IT STANDS TODAY.

16         THE COURT:  SHE DID SAY IT ACCURATELY REFLECTS THE

17 TIME, THE LAST TIME SHE SAW IT, BUT YOU CAN ELICIT -- WHEN SHE

18 SAID SHE WAS ACROSS THE STREET A WEEK AGO, SO, BUT SINCE THERE

19 IS AN OBJECTION, ESTABLISH FOR THE RECORD --

20         MR. BROWN:  THAT'S FINE, YOUR HONOR.

21 BY MR. BROWN:

22 Q.   WITH WHAT FREQUENCY DO YOU VISIT THIS INTERSECTION OR

23 CORNER?

24 A.   I VISIT THIS THREE TO FOUR TIMES A MONTH.

25 Q.   WHEN IS THE LAST TIME YOU VISITED THIS SITE?

1007

1   A.   LAST WEEK.

2           MR. BROWN:  PLAINTIFFS MOVE 4025B INTO EVIDENCE.

3           THE COURT:  THE REQUEST IS GRANTED.

4                   (PLAINTIFFS' EXHIBIT 4025B RECEIVED IN

5                   EVIDENCE)

6   BY MR. BROWN:

7   Q.   ARE THERE ANY BARRIERS YOU SEE AS DEPICTED IN THIS

8   PHOTOGRAPH?

9   A.   IT'S THE SAME PROBLEM.  THE RAMP GOES IN THIS DIRECTION,

10  BUT NOT THIS DIRECTION, (INDICATING).  SO, AGAIN, YOU HAVE TO

11  MOVE YOURSELF OUT INTO TRAFFIC ONE WAY OR ANOTHER TO GET ACROSS

12  THE STREET.

13  Q.   ARE THERE ANY ALTERNATIVE PATHS YOU CAN TAKE TO EITHER GET

14  AROUND THAT CORNER AND STILL GET TO THE HOSPITAL?

15  A.   IF I GO TO THE NEXT CORNER, THE SAME SITUATION EXISTS.  SO

16  THERE REALLY ISN'T A GOOD WAY AROUND IT.

17  Q.   LET'S TURN TO PLAINTIFFS' NEXT IN ORDER, WHICH WE'LL MARK

18  AS 4025C.

19                   (PLAINTIFFS' EXHIBIT 4025C MARKED FOR

20                   IDENTIFICATION)

21           (EXHIBIT DISPLAYED ON SCREEN.)

22  BY MR. BROWN:

23  Q.   ARE YOU FAMILIAR WITH WHAT IS SHOWN IN THIS PARAGRAPH?

24  A.   YES.  THAT'S SUNSET BOULEVARD IN THE OUTER SUNSET, AND THE

25  CORNER IS KIRKHAM.

1  Q.   WITH WHAT FREQUENCY DO YOU VISIT THIS INTERSECTION?

2  A.   WE ARE PROBABLY IN THAT NEIGHBORHOOD, I WOULD SAY, THREE

3  TIMES A MONTH.  SO ALMOST EVERY WEEK.

4  Q.   WHEN IS THE LAST TIME YOU VISITED THIS CORNER?

5  A.   WE WERE THERE THE WEEK BEFORE LAST.

6  Q.   IS THIS A TRUE AND ACCURATE REPRESENTATION OF THE

7  CONDITIONS AT THE SITE WHEN YOU LAST VISITED IT?

8  A.   YES, IT IS.

9        MR. BROWN:  PLAINTIFFS MOVE 4025C INTO EVIDENCE,

10 YOUR HONOR.

11        THE COURT:  ANY OBJECTION?

12        MS. POPLAWSKI:  NO OBJECTION, YOUR HONOR.

13        THE COURT:  REQUEST IS GRANTED.

14              (PLAINTIFFS' EXHIBIT 4025C RECEIVED IN

15              EVIDENCE)

16 BY MR. BROWN:

17 Q.   ANY BARRIERS YOU HAVE ENCOUNTERED THAT YOU SEE IN THIS

18 PHOTOGRAPH?

19 A.   I SIMILARLY CAN'T CROSS THE STREET HERE OR GET DOWN THE

20 CURB SO THAT YOU CAN CROSS THE STREET GOING ACROSS SUNSET.

21 ALMOST, MOST OF THE WAY DOWN FROM IRVING ALL THE WAY TO

22 VICENTE, THERE ARE ONLY I THINK TWO STREETS THAT ACTUALLY GIVE

23 YOU CURB RAMPS OPPOSITE EACH OTHER CROSSING SUNSET AND MOST OF

24 THE WAYS HAVE NONE AT ALL.

25 Q.   SO CAN YOU AVOID THIS CORNER BY GOING UP A BLOCK OR TWO OR

1009

1  DOWN A BLOCK OR TWO?

2  A.   THEY ARE ALL LIKE THAT.  YOU CAN GO A FEW AND YOU MIGHT

3  FIND ONE, BUT YOU WOULD HAVE TO GO QUITE A FEW BLOCKS TO FIND

4  ONE THAT WORK BECAUSE THERE REALLY ARE ONLY A COUPLE.

5  Q.   HOW MUCH DOES VALERIE'S CHAIR WEIGH?

6  A.   VALERIE'S CHAIR WEIGHS 93 POUNDS.

7  Q.   WITH HER IN IT?

8  A.   175 POUNDS.

9  Q.   HOW MUCH DO YOU WEIGH?

10  A.   I WEIGH 110.

11  Q.   HOW DO YOU NEGOTIATE THE CHAIR UP OR DOWN THE CURB RAMP

12  FROM THIS PHOTO OR OTHER CURB RAMPS?

13  A.   WHEN THERE'S NO CURB RAMP AND I REALLY HAVE TO BE

14  SOMEWHERE, THE WAYS I CAN DO IT ARE TO TIP HER BACK AND PULL

15  HER -- PULL IT BACK AND CONTROL THE WHOLE WEIGHT OF THE THING

16  AS IT GOES DOWN ON THE BACK WHEELS OR LEAN IT FORWARD AND

17  CONTROL IT THAT WAY (INDICATING).

18  Q.   HOW IS THAT A PROBLEM?

19  A.   IT MEANS IT TAKES ALL OF MY STRENGTH AND ALL OF MY

20  CONTROL, AND I AM NOT THAT BIG.  SO -- IT HAS NEVER HAPPENED

21  THAT SHE'S FALLEN, BUT IT HAS HAPPENED SHE'S ALMOST FALLEN AND

22  I HAVE HAD TO GRAB HER SUDDENLY.

23          MR. BROWN:  LET'S TURN TO PLAINTIFFS' NEXT IN ORDER,

24  WHICH WE WILL MARK AS 4025D, YOUR HONOR.

25          THE COURT:  OKAY.

1010

1   (PLAINTIFFS' EXHIBIT 4025D MARKED FOR

2   IDENTIFICATION)

3   (EXHIBIT DISPLAYED ON SCREEN.)

4  BY MR. BROWN:

5  Q.   DO YOU KNOW WHAT'S IN THIS PHOTOGRAPH?

6  A.   THAT'S ANOTHER SIDE OF THE SAME STREET, THE SAME

7  INTERSECTION SHOWING, AGAIN, THERE'S NO CURB RAMP GOING THAT

8  WAY OR THAT WAY (INDICATING).

9  Q.   HOW OFTEN DO YOU FREQUENT THIS INTERSECTION OR CORNER?

10  A.   THE SAME FREQUENCY.  WE LIKE TO TAKE A WALK THERE.  IT'S A

11  BEAUTIFUL STREET AS YOU CAN SEE WITH THE TREES DOWN.  WE VISIT

12  FRIENDS NEARBY AND WE LIKE TO WALK THERE SEVERAL TIMES A MONTH.

13  Q.   WHEN IS THE LAST TIME YOU TRAVELED HERE?

14  A.   AGAIN ABOUT THE WEEK BEFORE LAST.

15  Q.   DOES THIS PHOTOGRAPH REFLECT THE SAME CONDITIONS WHEN YOU

16  LAST SAW THIS CORNER?

17  A.   ABSOLUTELY.  YES.

18        MR. BROWN:  PLAINTIFFS MOVE INTO EVIDENCE 4025D,

19  YOUR HONOR.

20        THE COURT:  ANY OBJECTION?

21        MS. POPLAWSKI:  NO OBJECTION, YOUR HONOR.

22        THE COURT:  GRANTED.

23        (PLAINTIFFS' EXHIBIT 4025D RECEIVED IN

24        EVIDENCE)

25  ///

1011

BY MR. BROWN:

Q.   DO YOU SEE ANY PHYSICAL BARRIERS THAT YOU HAVE ENCOUNTERED

WITH VALERIE HERE?

A.   ALSO NO CURB RAMP.

Q.   IS THIS AS YOU DESCRIBED IN THE PREVIOUS EXHIBIT?

A.   UH-HUH.

Q.   YES?

A.   YES.

Q.   HAVE YOU HAD OCCASION TO USE THE DIRT PATH THAT'S SHOWN IN

THIS EXHIBIT?

A.   USUALLY WE WALK ON THE OTHER SIDE OF THE STREET IF WE CAN

BECAUSE THAT'S USUALLY WHERE WE PARK.  THIS IS THE SIDE WE

DON'T GET TOO MUCH BECAUSE THAT SIDE IS PAVED.  BUT THE BACK

SIDE OF THIS IS PAVED ALSO CLOSER TO THE HOUSES, SO I WOULDN'T

MIND WALKING ON THIS SIDE AS WELL.  THIS IS HARD TO GET TO.

Q.   IF THIS PATH WAS PAVED, WOULD YOU AND VALERIE USE IT?

A.   YEAH.  IT'S VERY PRETTY.

          MR. BROWN:  PLAINTIFFS TURN TO NEXT IN ORDER, 4025E.

                    (PLAINTIFFS' EXHIBIT 4025E MARKED FOR

                    IDENTIFICATION)

          (EXHIBIT DISPLAYED ON SCREEN.)

BY MR. BROWN:

Q.   ARE YOU FAMILIAR WITH WHAT'S SHOWN IN THIS PHOTOGRAPH?

A.   YES.  THAT'S ANOTHER INTERSECTION ON SUNSET.  THIS ONE IS

IRVING.

1012

```
 1  Q.   AND HOW OFTEN DO YOU VISIT THIS INTERSECTION?

 2  A.   IT'S PART OF THAT WALK THAT WE TAKE.

 3  Q.   WHERE IS THIS INTERSECTION IN RELATION TO THE PREVIOUS

 4  PHOTOS WE JUST SAW?

 5  A.   IT'S TWO BLOCKS AWAY.

 6  Q.   WHEN IS THE LAST TIME YOU VISITED?

 7  A.   ABOUT TWO WEEKS.

 8           MR. BROWN:  PLAINTIFFS MOVE IN EVIDENCE 4025E, YOUR

 9  HONOR.

10  BY MR. BROWN:

11  Q.   ACTUALLY, LET ME ASK YOU ONE MORE QUESTION.

12           IS THIS AN ACCURATE REFLECTION OF THE CONDITIONS

13  WHEN YOU LAST SAW THIS VISIT?

14  A.   YES.

15           MR. BROWN:  PLAINTIFFS MOVE INTO EVIDENCE 4025E,

16  YOUR HONOR.

17           THE COURT:  ANY OBJECTION?

18           MS. POPLAWSKI:  NO OBJECTION, YOUR HONOR.

19           THE COURT:  REQUEST IS GRANTED.

20                 (PLAINTIFFS' EXHIBIT 4025E RECEIVED IN

21                 EVIDENCE)

22  BY MR. BROWN:

23  Q.   ARE THERE ANY OBSTACLES YOU HAVE ENCOUNTERED WITH VALERIE

24  IN THIS EXHIBIT?

25  A.   WELL, YEAH.  YOU CAN GET HER OFF THE CURB ON THIS SIDE.  I
```

1013

1  KNOW THERE'S A RAMP THE SIDE THAT I WOULD BE ON IF I WERE

2  FACING THIS ON IRVING.  BUT THEN TO GET HER ALL THE WAY ACROSS

3  THE STREET, YOU HAVE TO BRING HER OUT INTO TRAFFIC BECAUSE WE

4  CAN'T GET OVER THAT ISLAND, NOR CAN WE GET UP THE RAMP

5  OPPOSITE, THE CURB ON THE OPPOSITE SIDE.

6  Q.    WHAT'S THE PROBLEM WITH GOING AROUND THAT ISLAND?

7  A.    THE TRAFFIC IS COMING IN THE SAME DIRECTION YOU ARE.  YOU

8  HAVE TO BE SURE THEY SEE YOU.

9  Q.    ARE THERE ANY OPTIONS OTHER THAN HOPPING OVER THE CURB OR

10 GOING AROUND THE ISLAND ITSELF?

11 A.    NO.

12            MR. BROWN:  TURN TO PLAINTIFFS NEXT IN ORDER 4025F,

13 WE WILL MARK.

14                 (PLAINTIFFS' EXHIBIT 4025F MARKED FOR

15                  IDENTIFICATION)

16            (EXHIBIT DISPLAYED ON SCREEN.)

17 BY MR. BROWN:

18 Q.    ARE YOU FAMILIAR WITH WHAT IS IN THIS PHOTOGRAPH?

19 A.    THIS IS THE CORNER OF FRANKLIN AND GROVE.

20 Q.    HOW DO YOU KNOW THAT?

21 A.    I KNOW THAT BECAUSE OF THE LANDMARKS AND WE PARK THERE

22 QUITE OFTEN, USUALLY WHEN I GO TO THE CIVIC CENTER AREA.  GROVE

23 IS WHERE I AM ABLE TO FIND PARKING.

24 Q.    ARE YOU ABLE TO IDENTIFY THE BUILDINGS ON THE RIGHT AND

25 LEFT OF THIS PHOTOGRAPH?

1014

1    A.   THIS IS THE SYMPHONY HALL AND THIS IS THE OPERA HOUSE,

2    (INDICATING).

3    Q.   YOU'RE POINTING TO THE RIGHT FOR THE SYMPHONY HALL AND THE

4    LEFT TO THE OPERA HOUSE; IS THAT RIGHT?

5    A.   CORRECT.

6    Q.   WHEN IS THE LAST TIME YOU VISITED THIS CORNER?

7    A.   IT WOULD HAVE BEEN SEVERAL DAYS AGO.

8    Q.   DOES THIS ACCURATELY SHOW THE CONDITIONS WHEN YOU VISITED?

9    A.   I DON'T THINK THIS WAS HERE ANYMORE, BUT OTHER THAN THAT,

10   YES.

11             THE COURT:  REFERRING TO THE COVERING --

12             THE WITNESS:  YES.

13             THE COURT:  -- BLUE COVERING ON PARTS OF THE

14   SHRUBBERY OR BUILDING?

15             THE WITNESS:  RIGHT.

16   BY MR. BROWN:

17   Q.   THE BLUE COVERING OR TARP ASIDE, DOES THIS ACCURATELY SHOW

18   THE CONDITIONS WHEN YOU WERE LAST THERE?

19   A.   YES.

20             MR. BROWN:  PLAINTIFFS MOVE IN EVIDENCE 4025F, YOUR

21   HONOR.

22             THE COURT:  ANY OBJECTION?

23             MR. EMERY:  NO OBJECTION.

24             THE COURT:  THE REQUEST IS GRANTED.

25   ///

1015

1    (PLAINTIFFS' EXHIBIT 4025F RECEIVED IN

2        EVIDENCE)

3  BY MR. BROWN:

4  Q.   MS. DECHADENEDES, DO YOU SEE ANY OBSTACLES OR BARRIERS

5  YOU'VE ENCOUNTERED HERE?

6  A.   THIS IS ANOTHER CORNER THAT DOESN'T HAVE A RAMP GOING IN

7  THIS DIRECTION.

8        IN ADDITION TO THE USUAL PROBLEMS, I HAVE TO GO OUT

9  INTO TRAFFIC TO GET FROM THAT RAMP TO HERE (INDICATING), I ALSO

10 RUN INTO THIS GRATING WHICH DIPS A LITTLE BIT AND IS LIABLE TO

11 CATCH THE WHEELS, THE SMALLER WHEELS.

12       THERE'S A LIP OVER HERE (INDICATING) WHERE THE

13 PAVING, NEW PAVING I GUESS MET THE OLD PAVING.  SO THERE'S A

14 BIG LUMP IN THE CONCRETE AND I KNOW THAT CROSSING THE STREET

15 SOMETIMES FEELS TREACHEROUS.

16       MR. BROWN:  LET'S TURN TO THE NEXT PHOTOGRAPH MARKED

17 PLAINTIFFS' 4025G.

18              (PLAINTIFFS' EXHIBIT 4025G MARKED FOR

19              IDENTIFICATION)

20       (EXHIBIT DISPLAYED ON SCREEN.)

21 BY MR. BROWN:

22 Q.   DO YOU KNOW WHAT THIS SHOWS?

23 A.   THAT'S THE OPPOSITE CORNER.

24 Q.   HOW ARE YOU AWARE OF THAT?

25 A.   BECAUSE I AM USUALLY PARKED UP THERE.

1016

```
1   Q.   YOU SAY "THERE", WHAT DO YOU MEAN?

2   A.   UP GROVE STREET IS USUALLY WHERE I AM ABLE TO FIND PARKING

3   WHEN I GO TO THE CIVIC CENTER AREA.

4   Q.   THANK YOU.

5           WHEN WAS THE LAST TIME YOU WERE HERE?

6   A.   IT WAS JUST A FEW DAYS AGO.

7   Q.   AND IS THIS AN ACCURATE REFLECTION OF THE CONDITIONS WHEN

8   YOU WERE THERE?

9   A.   YES.

10          MR. BROWN:  PLAINTIFFS MOVE INTO EVIDENCE 4025G,

11  YOUR HONOR.

12          THE COURT:  ANY OBJECTION?

13          MS. POPLAWSKI:  NO OBJECTION.

14          THE COURT:  REQUEST IS GRANTED.

15              (PLAINTIFFS' EXHIBIT 4025G RECEIVED IN

16              EVIDENCE)

17  BY MR. BROWN:

18  Q.   DO YOU SEE ANY BARRIERS OR PROBLEMS THAT YOU HAVE

19  ENCOUNTERED WITH VALERIE HERE?

20  A.   YES.  AGAIN, THE CURB RAMP ISSUE.  SO WHEN I WANT TO CROSS

21  THIS WAY (INDICATING), I HAVE TO GO LIKE THAT (INDICATING).

22  THIS PARTICULAR RAMP HAS A BIG LUMP OF CONCRETE ON THE BOTTOM

23  OF IT, WHICH IS EASY TO CATCH AND FALL IF YOU ARE NOT CAREFUL.

24          AND, AGAIN, THE PRETTY BAD CRACKS IN THE SIDEWALK, I

25  MEAN THE CROSSWALK MAKE IT DIFFICULT TO MOVE.
```

1017

1  Q.   I THINK THAT IS GOOD FOR NOW WE CAN FINISH UP IN THE

2  CHAIR.

3            (WITNESS RESUMES WITNESS STAND.)

4            WE MENTIONED A FEW SPECIFIC SITES.  ARE THERE ANY

5  OTHER PLACES IN SAN FRANCISCO WHERE YOU'VE ENCOUNTERED

6  OBSTACLES WITH VALERIE?

7  A.   WE HAVE SOME PROBLEMS IN THE WEST PORTAL AREA, A

8  NEIGHBORHOOD WE GO TO A LOT.  THERE ARE ACTUALLY BEAUTIFULLY

9  BUILT RAMPS BUT SOME OF THEM DO HAVE THAT LIP AT THE BOTTOM OF

10  THEM AND THE CROSSWALKS ARE IN VERY BAD REPAIR.  THE STREET

11  SLANTS SIDEWAYS IN A LOT OF PLACES AS WELL.

12  Q.   HOW DO THESE BARRIERS IMPACT YOU AND VALERIE ON A DAILY

13  BASIS?

14  A.   WELL, THEY MAKE ME HAVE TO PAY A HUNDRED AND FIVE PERCENT

15  ATTENTION ALL THE TIME AND THEY MAKE ME HAVE TO STAY STRONG.  I

16  HAVE TO WORK OUT SO THAT I CAN TAKE CARE OF HER.  AND THEY MAKE

17  ME HAVE TO THINK REALLY HARD BEFORE I TAKE HER ANY PLACE

18  BECAUSE I HAVE TO PLAN OUT WHETHER I CAN ACTUALLY PARK, WHETHER

19  I CAN GET HER FROM WHERE I CAN PARK TO WHERE WE NEED TO BE IT

20  AND IT MEANS SOMETIMES WE DON'T GO PLACES.

21  Q.   WHY IS THAT IMPORTANT OR NOT IMPORTANT?

22  A.   I THINK IT'S VERY IMPORTANT THAT MY DAUGHTER BE PART OF

23  THE COMMUNITY, THAT SHE HAVE ACCESS TO THE SAME ACTIVITIES AND

24  SITES THAT EVERYBODY ELSE DOES, AND I FEEL BAD WHEN I LEAVE HER

25  AT HOME.

1018

1  Q.   HAVE YOU OBSERVED VALERIE'S REACTIONS DURING ONE OF THE

2  SCARIER MOMENTS WHEN YOU'RE CROSSING OR NAVIGATING A CURVE?

3  A.   WHEN WE CATCH ON SOMETHING AND IT SEEMS LIKE IT'S ALMOST

4  GOING TO TIP, SHE GETS VERY FRIGHTENED AND SHE THROWS HER ARMS

5  UP A LITTLE BIT LIKE A STARTLED REFLEX AND SOMETIMES SHE'LL

6  SHOUT OR CRY.

7  Q.   DO YOU BELIEVE YOU HAVE -- YOU AND VALERIE HAVE FULL AND

8  EQUAL ACCESS TO THE CITY'S PROGRAMS?

9  A.   IN THEORY WE DO, BUT IN ACTUALITY WE CAN'T GET EVERYWHERE.

10  WE CAN'T GET EVERYWHERE SAFELY.

11  Q.   WHY DID YOU AGREE TO TESTIFY TODAY?

12  A.   BECAUSE I WOULD LIKE TO SEE THAT CHANGED.  I WOULD LIKE TO

13  SEE THE CITY'S ATTRACTIONS MADE AVAILABLE TO EVERYBODY.  I

14  WOULD LIKE TO SEE THE STREETS MORE SAFE AND I WOULD LIKE TO SEE

15  IT DONE IN A TIMELY FASHION.

16          MR. BROWN:  THANK YOU, MA'AM.

17          THAT'S ALL, YOUR HONOR.

18          THE COURT:  OKAY.  THANK YOU.

19          CROSS-EXAMINATION?

20          MS. POPLAWSKI:  YES, YOUR HONOR.

21                  CROSS-EXAMINATION

22          (EXHIBIT DISPLAYED ON SCREEN.)

23  BY MS. POPLAWSKI:

24  Q.   GOOD AFTERNOON, MS. DECHADENEDES.

25          AM I SAYING THAT CORRECTLY?

1019

```
 1   A.    UH-HUH.
 2   Q.    MY NAME IS KRISTINE POPLAWSKI, AN EQUALLY HARD NAME.
 3             I BELIEVE YOU TESTIFIED ON DIRECT WITH RESPECT TO --
 4             THE COURT:  WHAT IS THIS?
 5             MS. POPLAWSKI:  THIS WE ARE GOING TO IDENTIFY AS A
 6   DEMONSTRATIVE EXHIBIT F3, DEFENDANTS' F3.  IT IS ACTUALLY A
 7   BLOWUP OF A PORTION OF F3.
 8             THE COURT:  IT IS F3 OR IT'S A BLOWUP OF A
 9   PORTION -- OKAY.
10             MS. POPLAWSKI:  IT IS A BLOWUP OF A PORTION OF F3.
11             THE COURT:  THAT IS F3 THEN?
12             MS. POPLAWSKI:  YES.
13             THE COURT:  OKAY.
14   BY MS. POPLAWSKI:
15   Q.    I BELIEVE YOU TESTIFIED ON DIRECT REGARDING A COUPLE OF
16   PHOTOGRAPHS OF INTERSECTIONS ALONG SUNSET BOULEVARD?
17   A.    YES.
18   Q.    AND IN PARTICULAR, YOU TESTIFIED ABOUT SUNSET AND KIRKHAM?
19   A.    UH-HUH.
20   Q.    AND SUNSET AND IRVING?
21             THE COURT:  YOU HAVE TO SAY YES OR NO.
22             THE WITNESS:  YES.
23   BY MS. POPLAWSKI:
24   Q.    CAN YOU SEE ON THE SCREEN HERE THE VERY FIRST INTERSECTION
25   IS SUNSET BOULEVARD AND IRVING STREET, CORRECT?
```

1020

1  A.   CORRECT.

2        MR. BROWN:  OBJECTION, YOUR HONOR, NONDISCLOSURE.

3  WE HAVE NEVER SEEN THIS PORTION OF THE MAP OR CHART, WHATEVER

4  IT IS, BEFORE.

5        THE COURT:  RESPONSE?

6        MS. POPLAWSKI:  YOUR HONOR, THE DEMONSTRATIVE, THE

7  AGREEMENT ABOUT EXCHANGE OF DEMONSTRATIVES IN ADVANCE IS WITH

8  RESPECT TO THE PARTY PRESENTING THE WITNESS SINCE THE CROSS

9  EXAMINER HAS NO WAY OF KNOWING, ESPECIALLY FOR THE CLASS MEMBER

10 WITNESSES, WHAT THEY ARE GOING TO TESTIFY ABOUT PRIOR TO THE

11 TIME THEY COME TO COURT.

12       THE COURT:  SO THAT WAS THE AGREEMENT YOU ALL HAD?

13       MS. POPLAWSKI:  YES.

14       THE COURT:  IT RELATED TO THE PERSON WHO WAS

15 PRESENTING THE WITNESS AND THE DEMONSTRATIVES YOU INTEND TO USE

16 IN THE CASE, IN YOUR CASE-IN-CHIEF WITH THE WITNESS?

17       MS. POPLAWSKI:  YES, YOUR HONOR.

18       MR. BROWN:  I AM SIMPLY NOT AWARE OF THAT AGREEMENT,

19 YOUR HONOR.  I JUST KNOW WE HAVEN'T SEEN THIS BEFORE.

20       THE COURT:  ARE YOU ALL TALKING TO EACH OTHER AT

21 ALL?  HOW IS SHE SAYING YOU HAVE AN AGREEMENT AND YOU'RE NOT

22 AWARE OF IT.  YOU DIDN'T HAVE ANY SUCH DISCUSSIONS IS THAT WHAT

23 YOU'RE SAYING?

24       MR. BROWN:  THAT IS WHAT I AM SAYING.

25       THE COURT:  OR DON'T REMEMBER?  ARE YOU SAYING THERE

1  WAS NO SUCH DISCUSSION?

2          MR. BROWN:  I AM NOT AWARE OF ANY AGREEMENT TO

3  EXCHANGE THIS.  WE HAVEN'T SEEN IT BEFORE.

4          THE COURT:  I'M SORRY.  YOU NEED TO STAND UP AND

5  RAISE YOUR VOICE BECAUSE I CAN'T HEAR YOU.

6          MR. BROWN:  I AM NOT AWARE OF ANY AGREEMENT.  WE

7  HAVE NEVER SEEN THIS BEFORE.  IT'S LATE DISCLOSURE.

8          THE COURT:  YOU DIDN'T HAVE ANY AGREEMENT IN TERMS

9  OF WHEN YOU ALL WOULD PROVIDE ONE ANOTHER WITH DEMONSTRATIVES

10 THAT WERE TO BE USED WITH THE WITNESSES?

11         MR. JOHNSON:  IF I MAY, WE DO HAVE AN AGREEMENT --

12         THE COURT:  I AM ASKING YOU.  YOU ARE THE ONE THAT'S

13 MAKING THE OBJECTION.

14         MR. BROWN:  CORRECT, YOUR HONOR.

15         THE COURT:  YOU SHOULD KNOW WHAT YOU ARE AWARE OF

16 AND WHAT YOU ARE NOT AWARE OF.

17         MR. BROWN:  LIKE I SAID, I AM NOT AWARE OF ANY

18 AGREEMENT TO EXCHANGE DEMONSTRATIVES FOR CROSS-EXAMINE OR

19 OTHERWISE, WHATEVER THE TIME LIMIT WAS.

20         THE COURT:  YOU ARE JUST NOT AWARE ONE WAY OR THE

21 OTHER?

22         MR. BROWN:  CORRECT.

23         THE COURT:  YOU ARE SAYING THAT THERE WAS AN

24 AGREEMENT?

25         MS. POPLAWSKI:  IT'S MY UNDERSTANDING, NOT THAT I

1   HAD THE DISCUSSION PERSONALLY, I BELIEVE IT WAS BETWEEN

2   MR. EMERY AND ONE OF PLAINTIFFS' COUNSEL THAT DEMONSTRATIVES

3   FOR WITNESSES WHO ARE BEING PRESENTED ON DIRECT WOULD BE

4   EXCHANGED 48 HOURS IN ADVANCE.

5            HOWEVER, BECAUSE WE HAVE NO WAY OF KNOWING WHAT A

6   WITNESS, PARTICULARLY A CLASS MEMBER WITNESS IS GOING TO

7   TESTIFY TO, THERE'S NO WAY FOR US TO DISCLOSE IN ADVANCE WHICH

8   DEMONSTRATIVES WE WILL BE USING.

9            THE COURT:  WHAT SHE'S SAYING MAKES SENSE, REALLY.

10  I MEAN, I DON'T KNOW WHETHER YOU ALL HAD AN AGREEMENT.  I CAN

11  ONLY -- I WOULD ASSUME -- MR. EMERY, DID YOU HAVE A DISCUSSION

12  WITH MR. WALLACE OR WITH WHO?

13           MR. EMERY:  I HAVE A LETTER FROM OPPOSING COUNSEL

14  FROM JANUARY BEFORE THE PREVIOUS TRIAL DATE IN WHICH WE SAY

15  THAT THERE WILL BE A 48-HOUR PREVIOUS EXCHANGE OF

16  DEMONSTRATIVES EXCEPT FOR IMPEACHMENT.

17           THE COURT:  OH.

18           MR. BROWN:  IF HE REPRESENTS THAT, I WILL DEFER TO

19  HIM.  I AM NOT IN A POSITION TO CONTRADICT IT.

20           THE COURT:  SINCE HE IS AFFIRMATIVELY REPRESENTING

21  THAT AS AN OFFICER OF THE COURT AND YOU DON'T REMEMBER ONE WAY

22  OR THE OTHER, I WILL ACCEPT HIS REPRESENTATION.

23           MR. BROWN:  FAIR ENOUGH.

24           THE COURT:  YOU MAY CONTINUE.

25           MS. POPLAWSKI:  THANK YOU, YOUR HONOR.

1023

```
 1  BY MS. POPLAWSKI:

 2  Q.   MS. DECHADENEDES, I BELIEVE YOU TESTIFIED EARLIER ABOUT A

 3  PHOTOGRAPH, I BELIEVE IT WAS EXHIBIT 4025E.

 4            THAT WAS A PHOTOGRAPH OF AN INTERSECTION AT SUNSET

 5  AND IRVING, CORRECT?

 6  A.   UH-HUH.

 7            THE COURT:  YOU HAVE TO SAY YES OR NO.

 8            THE WITNESS:  YES.

 9            THE COURT:  YOU CAN'T SAY UH-HUH OR HUH-UH.

10            THE WITNESS:  I AM SORRY.  YES.

11  BY MS. POPLAWSKI:

12  Q.   DO YOU SEE SUNSET AND IRVING HERE ON THE MAP?

13  A.   YES.

14  Q.   SHALL I USE THE POINTER?

15  A.   I SEE WHERE THEY ARE.

16  Q.   YOU SEE THAT?  OKAY.

17            THE VERY NEXT INTERSECTION DOWN IS JUDAH AND SUNSET?

18  A.   YES.

19  Q.   DO YOU KNOW WHETHER THERE ARE CROSSWALKS THAT GO ALL THE

20  WAY ACROSS SUNSET BOULEVARD AT THE JUDAH STREET INTERSECTIONS?

21  A.   I KNOW THAT THERE ARE CROSSWALKS AT JUDAH BECAUSE THERE'S

22  A MUNI THERE.  HOWEVER, THERE IS ONE ON THE -- I AM NOT SURE IF

23  IT IS NORTHWEST AND SOUTHEAST OR NORTHEAST AND SOUTHWEST, BUT

24  THEY ARE NOT OPPOSITE EACH OTHER.  IT'S STILL HARD TO GET

25  ACROSS.
```

1024

Q.   WHEN YOU SAY "THEY ARE NOT OPPOSITE EACH OTHER", DO YOU

MEAN THEY ARE NOT ON THE SAME SIDE OF THE STREET?

A.   THERE ARE FOUR CORNERS.  SO HERE AND HERE RATHER THAN HERE

AND HERE (INDICATING).

Q.   OKAY.  AND --

            THE COURT:  IT'S HARD TO KNOW WHAT THAT MEANS.  WE

DO HAVE AN EXHIBIT UP THERE.  MAYBE YOU WANT TO USE IT.

            THE WITNESS:  I JUST KNOW THAT THEY ARE NOT STRAIGHT

ACROSS JUDAH.  I KNOW THERE'S ONE ON THE WEST SIDE OF SUNSET

AND JUDAH AND I KNOW THERE'S ONE ON THE EAST SIDE OF SUNSET AND

JUDAH, BUT THEY ARE NOT DIRECTLY OPPOSITE EACH OTHER.

BY MS. POPLAWSKI:

Q.   SO IF I UNDERSTAND YOU CORRECTLY YOU'RE SAYING THAT THERE

MIGHT BE ONE, FOR EXAMPLE, ON THE NORTHWEST CORNER AND A CURB

RAMP ON THE SOUTHEAST CORNER, BUT THERE WOULD NOT BE ONE ON THE

NORTHEAST CORNER?

A.   THAT'S WHAT I OBSERVED AT JUDAH, YES.

Q.   WOULD YOU BE SURPRISED IF I TOLD YOU THERE WERE IN FACT

CURB RAMPS ON EACH OF THE FOUR CORNERS AT EVERY POINT OF

CROSSING ACROSS SUNSET BOULEVARD?

A.   AT JUDAH.

Q.   AT JUDAH?

A.   I WOULD BE SURPRISED BECAUSE I DIDN'T SEE THAT.

Q.   OKAY.

            THEN I BELIEVE YOU TESTIFIED ABOUT ANOTHER

1025

PHOTOGRAPH, A COUPLE OF PHOTOGRAPHS, 4025C, WHICH WAS AT SUNSET

AND KIRKHAM?

A.   YES.

Q.   AND 4025D AT SUNSET AND KIRKHAM?

A.   YES.

Q.   THAT IS JUST THE NEXT INTERSECTION DOWN FROM JUDAH,

CORRECT, ALONG SUNSET?

A.   YES.

Q.   YOU ALSO TESTIFIED ABOUT A PHOTOGRAPH 4025A, WHICH YOU

IDENTIFIED AS BEING THE INTERSECTION OF DIVISADERO AND POST?

A.   YES.

Q.   I BELIEVE YOU TESTIFIED THAT BECAUSE THE CURB RAMP CAME

OUT IN ONLY ONE DIRECTION, I BELIEVE IT IS ACROSS POST AT THAT

CORNER THAT YOU DESCRIBED, THAT IT WAS DANGEROUS BECAUSE YOU

THEN HAD TO COME OUT AND WHEN YOU WERE ON THE SIDE OF THE

CORNER WITHOUT THE CURB RAMP, YOU WERE IN THE LINE OF TRAFFIC.

          IS THAT WHAT YOU TESTIFIED EARLIER?

A.   YES.

Q.   ISN'T THERE, IN FACT, A PARKING LANE ALONG DIVISADERO AT

THAT INTERSECTION?

A.   THERE IS A PARKING LANE, BUT I STILL DON'T THINK THAT WE

SHOULD BE -- WELL, FIRST OF ALL, PEOPLE ARE TURNING.  PEOPLE

ARE COMING CLOSE, AND IT JUST FEELS UNSAFE TO BE IN THE ROAD.

          MS. POPLAWSKI:  YOUR HONOR, MAY I MOVE TO STRIKE --

          THE COURT:  EVERYTHING OTHER THAN "THERE IS A

1  PARKING LANE" YOU WANT TO STRIKE THE REST, EVERYTHING AFTER

2  THAT --

3          MS. POPLAWSKI:  YES.

4          THE COURT:  -- AS NONRESPONSIVE?

5          MS. POPLAWSKI:  YES, YOUR HONOR.

6          THE COURT:  THE OBJECTION IS SUSTAINED AND THE

7  REQUEST TO STRIKE IS GRANTED.

8  BY MS. POPLAWSKI:

9  Q.   AND WITH RESPECT TO THE OTHER SIDE OF THE INTERSECTION,

10  WHICH WAS, I BELIEVE, EXHIBIT 4025B, DO YOU HAVE THOSE PHOTOS

11  UP THERE WITH YOU BY ANY CHANCE?

12  A.   I DO.

13  Q.   AGAIN, WHEN YOU STEP OFF THE CURB WITH THE -- THROUGH THE

14  CURB RAMP ONTO POST, I BELIEVE AT THAT POINT, THERE IS A

15  PARKING LANE THERE, CORRECT?

16  A.   THERE IS A PARKING LANE ON POST.

17  Q.   OKAY.  THERE IS ALSO A PARKING LANE ON DIVISADERO?

18  A.   I DON'T KNOW.

19  Q.   YOU DON'T KNOW?

20  A.   NO.

21  Q.   OKAY.

22          MS. POPLAWSKI:  THAT'S ALL, YOUR HONOR.

23          THE COURT:  OKAY.  THANK YOU.

24          MS. POPLAWSKI:  THANK YOU.

25          THE COURT:  MR. BROWN, REDIRECT?

1027

```
1              MR. BROWN:  JUST BRIEFLY, YOUR HONOR.

2              THE COURT:  OKAY.

3                    REDIRECT EXAMINATION

4    BY MR. BROWN:

5    Q.   WITH RESPECT TO THE INTERSECTION DISCUSSED WITH DEFENSE

6    COUNSEL AT DIVISADERO AND POST, I BELIEVE IT WAS EXHIBIT A OF

7    4025, ARE YOU AWARE OF ANY PROBLEM WITH TRAVELING IN THE PATH

8    THAT WAS SUGGESTED, THE PARKING LANE?

9    A.   I STILL DON'T FEEL SAFE HAVING MY DAUGHTER AND MYSELF BE

10   IN THE INTERSECTION IN THE STREET WHEN CARS ARE COMING.  AND

11   WHEN CARS MAKE TURNS AROUND THAT LANE, SOMETIMES THEY CAN'T SEE

12   YOU WITH THE PARKING LANE, SO IT STILL FEELS TREACHEROUS TO ME.

13             MR. BROWN:  THAT'S ALL.

14             THANK YOU, YOUR HONOR.

15             THE COURT:  OKAY.  RECROSS?

16             MS. POPLAWSKI:  NO RECROSS.

17             THE COURT:  IS THERE ANY REASON THE WITNESS SHOULD

18   NOT BE EXCUSED FROM FURTHER TESTIMONY?

19             MR. BROWN:  THERE IS NONE, YOUR HONOR.

20             MS. POPLAWSKI:  NO.

21             THE COURT:  OKAY.  THANK YOU.  YOU MAY BE EXCUSED.

22             YOU MAY CALL YOUR NEXT WITNESS, MR. BROWN?

23             MR. WALLACE:  PLAINTIFFS CALL MARGIE CHERRY, YOUR

24   HONOR.

25             THE COURT:  OH, MR. WALLACE.  OKAY.
```

1    IS SHE IN THE COURTROOM?

2    MR. WALLACE:  SHE MIGHT BE OUTSIDE.

3    THE COURT:  MR. LEE IS GOING TO GET HER?

4    THE CLERK:  MS. CHERRY, WILL YOU COME FORWARD AND

5  TAKE THE WITNESS STAND?

6    RIGHT HERE.

7    STAND AND RAISE YOUR RIGHT HAND.

8                    MARGIE CHERRY,

9  CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY SWORN,

10 TESTIFIED AS FOLLOWS:

11    THE WITNESS:  I DO.

12    THE CLERK:  PLEASE BE SEATED.

13    PLEASE STATE YOUR FULL NAME FOR THE COURT AND SPELL

14 YOUR LAST NAME.

15    THE WITNESS:  MARGIE CHERRY, LIKE THE FRUIT.

16 C-H-E-R-R-Y.

17    THE CLERK:  THANK YOU.

18                    DIRECT EXAMINATION

19 BY MR. WALLACE:

20 Q.   GOOD AFTERNOON, MRS. CHERRY.

21 A.   GOOD AFTERNOON.

22 Q.   WHERE DO YOU LIVE?

23 A.   I LIVE IN SAN FRANCISCO.  IN THE BAYVIEW HUNTER'S POINT

24 DISTRICT.

25 Q.   HOW LONG HAVE YOU LIVED THERE?

1  A.   EIGHTEEN YEARS.

2  Q.   WHO DO YOU LIVE WITH?

3  A.   MY HUSBAND AND MY DAUGHTER.

4  Q.   OKAY.  WHAT IS YOUR HUSBAND'S NAME?

5  A.   JOHNNY CHERRY.

6  Q.   OKAY.  AND WHAT IS YOUR DAUGHTER'S NAME?

7  A.   ESTORIA CHERRY.

8  Q.   HAVE YOU LIVED IN OTHER PARTS OF SAN FRANCISCO?

9  A.   BAYVIEW HUNTER'S POINT.

10 Q.   IS THERE A STREET THAT YOU LIVE ON?

11 A.   I LIVE ON PROGRESS STREET.

12 Q.   OKAY.  WHAT DO YOU DO FOR A LIVING?

13 A.   I AM RETIRED, BUT MY PROFESSION IS COMMUNITY HEALTH

14 WORKER.

15 Q.   ARE YOU STILL DOING THAT?

16 A.   I'M RETIRED, BUT I AM A COMMUNITY ACTIVIST.

17 Q.   DO YOU HAVE A DISABILITY?

18 A.   I DO.  I HAVE CHRONIC ARTHRITIS.

19 Q.   HOW LONG HAVE YOU HAD THAT?

20 A.   CHRONIC STATE ABOUT 11 YEARS.

21 Q.   AND COULD YOU DESCRIBE THAT CONDITION FOR THE COURT,

22 PLEASE?

23 A.   IT'S VERY PAINFUL.  ALL I CAN TELL YOU.  SWELLING AND

24 PAIN.

25 Q.   DOES IT LIMIT YOUR MOBILITY?

1030

1  A.    IT DOES.

2  Q.    OKAY.  COULD YOU TELL US HOW IT LIMITS YOUR MOBILITY?

3  A.    MY ABILITY TO LIKE CLIMB STAIRS, SLOPES, ANYTHING THAT

4  WILL CAUSE MY KNEES TO HAVE TO FLEX.

5  Q.    HOW FAR CAN YOU WALK?

6  A.    IF IT IS A STRAIGHT PATH, MAYBE A HALF BLOCK WITHOUT A LOT

7  OF TROUBLE.

8  Q.    WHAT HAPPENS AFTER HALF A BLOCK?

9  A.    ARTHRITIS IS VERY PAINFUL AND IT LIMITS YOUR ABILITY TO

10  WALK FAR.  IT'S NOT ONLY MY KNEES, I HAVE CHRONIC ARTHRITIS ALL

11  OVER.

12  Q.    IS THAT THROUGHOUT YOUR BODY?

13  A.    YES.

14  Q.    AFTER YOU GO HALF A BLOCK, DO YOU HAVE TO REST?

15  A.    I USUALLY STOP SO THAT I CAN CONTINUE WITHOUT AS MUCH

16  PAIN.

17  Q.    HOW LONG DO YOU STOP FOR?

18  A.    IT DEPENDS ON THE DEGREE OF PAIN.

19  Q.    OKAY.

20  A.    MAYBE 15 MINUTES OR MORE.  IT DEPENDS.

21  Q.    IS THERE SOMETHING THAT YOU USE TO HELP WITH YOUR

22  MOBILITY?

23  A.    I USE A CANE.

24  Q.    DO YOU HAVE A BLUE PLACARD FOR YOUR CAR FROM THE STATE OF

25  CALIFORNIA?

1031

1   A.   YES, I DO.

2   Q.   HOW OLD ARE YOU, MRS. CHERRY?

3   A.   I AM 68.

4   Q.   DO YOU HAVE ANYONE ELSE IN YOUR FAMILY WHO HAS A

5   DISABILITY?

6   A.   MY HUSBAND AND MY DAUGHTER.

7   Q.   HOW ABOUT YOUR HUSBAND, WHAT IS HIS DISABILITY?

8   A.   HE HAS A SPINE DETERIORATION.

9   Q.   OKAY.  AND HOW ABOUT ESTORIA?

10  A.   CEREBRAL PALSY.

11  Q.   DOES SHE USE A MOBILITY AID?

12  A.   SHE CAN ONLY WALK WITH THE WALKER.

13  Q.   WITH RESPECT TO THE SIDEWALKS ON PROGRESS STREET, ARE

14  THERE ANY PROBLEMS WITH THOSE THAT YOU EXPERIENCE?

15  A.   ON PROGRESS STREET ITSELF, WE ARE ALL RIGHT, BUT IT'S IN A

16  CUL-DE-SAC.

17  Q.   OKAY.

18  A.   SO TO GET OUT, I -- OUR PATH OF TRAVEL WOULD BE TO WHITNEY

19  YOUNG AND PROGRESS, WHICH IS FROM MY DOOR ABOUT A HALF A BLOCK.

20  Q.   ARE THERE ANY PROBLEMS AT THE CORNER OF PROGRESS AND

21  WHITNEY YOUNG?

22  A.   THAT'S WHERE THEY START FOR US LEAVING HOME.

23       THE CURB, THERE'S A CURB RAMP THERE BUT ALSO THERE'S

24  A MULTITUDE OF PROBLEMS.  WE HAVE THE UNEVEN SIDEWALKS.  WE

25  HAVE CRACKS IN THE SIDEWALK.  WE HAVE TREE ROOTS GROWING UP OUT

1032

OF THE GROUND.

Q.    WHEN YOU ARE GOING DOWN THE -- OR UP THE CURB RAMP AT
PROGRESS AND WHITNEY YOUNG, IS THERE ANY LIP THAT CAUSES YOU A
PROBLEM THERE?

A.    WELL, YOU HAVE TO WATCH BECAUSE THE CURB RAMP IS NOT
FLUSH, IT'S TILTED.  AND IT HAS LIKE A LIP ON IT THAT YOU HAVE
TO MAKE SURE YOUR SHOES DON'T CATCH ON AND MAKE YOU FALL.

Q.    ABOUT HOW TALL IS THAT LIP?

A.    WELL, I DON'T KNOW HOW TO DESCRIBE IT AS HOW TALL IT IS.
I SEE IT AS HOW DANGEROUS IT IS FOR ME.

Q.    UH-HUH.

A.    IT'S ENOUGH TO CAUSE ME A PROBLEM.

Q.    UH-HUH.  AND WHAT PROBLEM DOES IT CAUSE YOU WHEN YOU TRY
TO GO OVER THAT?

A.    WELL, I MOST CERTAINLY HAVE TO BEND MY LEGS, YOU KNOW, TO
GET ACROSS SAFELY.  THAT'S A PROBLEM FOR ME.  AND JUST THAT
UNCERTAINTY BECAUSE IT IS OFF BALANCE.

Q.    WHEN YOU TALK ABOUT THE SIDEWALK BEING UNEVEN, WHAT DO YOU
MEAN BY THAT?

A.    IT'S CRACKED AND IT'S UNEVEN.

Q.    DOES IT HAVE A GRADIENT TO IT?  IS IT TILTED TO ONE SIDE?

A.    IT IS TILTED IN SOME AREAS.  IT IS VERY TILTED.

Q.    IS IT TILTED TOWARD THE STREET?

A.    IT'S ON THE STREET SIDE.  SO WHERE IT IS, IF YOU'RE A
PERSON WITH A DISABILITY AND YOUR BALANCE IS NOT SURE, IT'S

1  ENOUGH AT THAT CORNER WHERE YOU COULD BE IN THE STREET ON THE

2  PROGRESS SIDE OR THE WHITNEY YOUNG SIDE.  IT'S A PROBLEM.

3  Q.  OKAY.  AND WHEN YOU TALK ABOUT CRACKS IN THE SIDEWALK,

4  COULD YOU DESCRIBE FOR US HOW BIG THOSE ARE?

5  A.  WELL, IN CERTAIN AREAS TO ME THEY ARE VERY LARGE.  I'M NOT

6  SURE ABOUT, LIKE I SAID, THE DISTANCE, BUT IT'S VERY VISIBLE

7  BECAUSE IN SOME OF THE AREAS, THERE -- TREES ARE PLANTED INSIDE

8  OF IT.  SO THE ROOTS ARE ACTUALLY COMING UP AND HAS CAUSED THE

9  SIDEWALKS TO BUCKLE IN PLACES.

10 Q.  AND DO THOSE CREATE PARTS OF THE SIDEWALK WHERE IT'S NOT

11 SMOOTH ANYMORE?

12 A.  YES.

13 Q.  OKAY.  AND ABOUT HOW TALL ARE SOME OF THE BUMPS THAT YOU

14 COME ACROSS?

15 A.  IT'S RAISED ENOUGH WHERE YOU HAVE TO RAISE YOUR FEET.  YOU

16 HAVE TO PAY ATTENTION TO WHAT YOU ARE DOING AND WHERE YOU ARE

17 OR YOU WILL FALL.

18 Q.  WHEN YOU HAVE TO PICK YOUR FEET UP LIKE THAT, HOW DOES

19 THAT IMPACT YOUR DISABILITY?

20 A.  IT'S PAINFUL.

21 Q.  IS THERE ANY SORT OF CUMULATIVE IMPACT OF THAT OVER THE

22 COURSE OF A DAY?

23 A.  WELL, WALKING WITH ARTHRITIS IS BAD ENOUGH, BUT DEPENDING

24 ON YOUR PATH OF WHERE YOU ARE GOING THAT WAY WALKING, YES.

25 Q.  DOES IT MAKE YOUR DISABILITY WORSE?

1034

1   A.   IT MAKES THE PAIN WORSE, YES.

2   Q.   ARE THERE ANY OTHER SPECIFIC LOCATIONS YOU CAN TELL US

3   ABOUT THAT YOU GO TO IN YOUR NEIGHBORHOOD THAT CAUSE THE SAME

4   PROBLEMS FOR YOU AS DEALING WITH PROGRESS AND WHITNEY YOUNG?

5   A.   BAYVIEW HUNTER'S POINT HAS A VARIETY OF THE SAME PROBLEMS.

6   Q.   OKAY.

7   A.   CRACKED SIDEWALKS, UNEVEN SPACES AROUND THE CURB RAMP.

8           I HAVE LIVED THERE A LONG TIME, SO JUST SAYING BEING

9   IN THAT AREA, THERE'S A LOT OF THINGS.  CRACKED SIDEWALKS, TREE

10  ROOTS COMING UP OUT OF THE GROUND, DURING YOUR WALK, YOUR

11  PATHWAY FOR WALKING, IT'S A DEFINITE PROBLEM.

12  Q.   OKAY.  WHEN YOU TALK ABOUT UNEVEN AREAS AROUND THE CURB

13  RAMP, WHAT ARE YOU REFERRING TO?

14  A.   I AM TALKING TO -- ABOUT IT'S NOT FLUSH HOW IT IS WHEN

15  THEY FINISH THE CURB.  THERE'S GAPS, RAISED AREAS.  IF YOU HAVE

16  A DISABILITY AND YOU ARE WALKING WITH A CANE, THE MORE YOU HAVE

17  TO HAVE THE RIGHT SHOES ON.  I AM A YOUNG LADY, SO NOW I KNOW

18  TO WEAR SHOES THAT I CAN KIND OF GET AROUND IN WITHOUT FALLING,

19  AND EVEN THEN IT'S A PROBLEM.

20  Q.   OKAY.  DO YOU EVER GO TO THE CORNER OF NEWCOMB AND THIRD?

21  A.   YES, I DO.  AND THAT'S A VERY DIFFICULT PATH FOR ME, BUT I

22  NEED TO BE IN THAT AREA, SO I KNOW TO WATCH.

23          AT THE CORNER OF NEWCOMB AND THIRD WHERE THE CURB

24  RAMP IS, IT'S UNEVEN.  IT HAS A PRETTY LARGE GAP BETWEEN THE

25  CEMENT AND THE STREET (INDICATING).

1  Q.    OKAY.  MRS. CHERRY, ARE YOU TRYING TO SHOW US THERE ABOUT

2  HOW TALL THAT GAP IS?

3  A.    YES.

4  Q.    IS THAT ABOUT TWO INCHES?

5  A.    WHATEVER.  IT'S ABOUT LIKE THIS, (INDICATING).

6  Q.    OKAY.

7  A.    ONCE YOU PASS THAT --

8            THE COURT:  DID YOU WANT TO INCORPORATE IN THE

9  RECORD WHAT SHE JUST DID AND YOUR OWN ESTIMATE AND SEE IF

10 COUNSEL OBJECTS?

11 BY MR. WALLACE:

12 Q.    MRS. CHERRY WERE YOU TRYING TO DEMONSTRATE FOR US WITH

13 YOUR HANDS THE HEIGHT OF THAT GAP THAT YOU ENCOUNTER AT NEWCOMB

14 AND THIRD?

15 A.    JUST A SPACE, YOU KNOW, JUST LOOKING AT IT THIS IS WHAT I

16 WOULD SAY (INDICATING).  THE GAP IS LIKE THAT.  AND IT'S NOT

17 ONLY --

18            MR. WALLACE:  THE WITNESS APPEARS TO BE HOLDING HER

19 FINGERS ABOUT TWO INCHES APART, MAYBE A LITTLE MORE, BUT LET'S

20 SAY TWO INCHES.

21            THE COURT:  OKAY.

22            THE WITNESS:  BUT EVEN AT THAT, ONCE YOU GET PASSED

23 THAT LITTLE PART AND YOU GET HALFWAY, THE T TRAIN TRACKS IS

24 THERE.  THAT'S ANOTHER PROBLEM.  YOU HAVEN'T EVEN CROSSED THE

25 STREET YET.  YOU ARE SORT OF IN THE MIDDLE.  AND THE LIGHT WILL

1  CHANGE FOR A PERSON LIKE ME TWICE.  I KNOW NOT TO EVEN THINK

2  ABOUT GOING ACROSS ON THE FIRST CHANGE.  I AM NOT GOING TO MAKE

3  IT.  SO, IT'S -- THAT'S A DEFINITE PROBLEM SPOT FOR ME.

4  BY MR. WALLACE:

5  Q.   DID THE BIG GAP YOU WERE TALKING ABOUT A MOMENT AGO, IS

6  THAT RIGHT WHERE THE T TRAIN TRACKS ARE OR IS THAT BEFORE YOU

7  GET THERE?

8  A.   NO, THAT'S BEFORE YOU GET TO WHERE THE T TRAIN TRACKS ARE.

9  Q.   WHAT HAPPENS WHEN YOU GET TO THE T TRAIN TRACKS?

10  A.   WELL, YOU KNOW, IT'S THE SAME PROBLEM WITH THE SIDEWALK

11  AND THE TRACK.  IT'S NOT EVEN.  YOU KNOW, WHERE YOU CAN JUST GO

12  ACROSS IT EASILY, NO.

13       THE COURT:  I AM SORRY.  YOU SAID THE LIGHT WILL

14  CHANGE FOR A PERSON LIKE YOU TWICE AND YOU KNOW NOT TO EVEN TRY

15  TO MAKE IT ACROSS THE STREET.  I DIDN'T UNDERSTAND.  WHAT DID

16  YOU MEAN BY THAT?

17       THE WITNESS:  NEWCOMB AND THIRD IS A VERY ACTIVE

18  CORNER.  SO, TRYING TO GET OFF THE SIDEWALK AND MAKE IT ACROSS

19  JUST HALFWAY, THAT'S WHEN YOU ARE GOING TO ENCOUNTER THE TRAIN

20  TRACKS AT THE T TRAIN LEVEL WHERE THEY GET ON.

21       AND YOU'RE GOING TO HAVE TO GO SLOW TO MAKE SURE YOU

22  DON'T FALL BECAUSE THAT, LIKE I SAID, THAT INTERSECTION IS REAL

23  ACTIVE.

24       THE COURT:  SO YOU WAIT FOR THE LIGHT TO CHANGE

25  TWICE?

1037

```
 1          THE WITNESS:  NOT INTENTIONALLY.  I AM TRYING TO --
 2   I HAVE BAD KNEES.
 3          THE COURT:  I AM HAVING A HARD TIME UNDERSTANDING.
 4   SO THE LIGHT CHANGES TO GREEN --
 5          MR. BARRY:  SO MY LIGHT IS GREEN TO GO ACROSS.
 6          THE COURT:  RIGHT.
 7          THE WITNESS:  I HAVE TO BE CAREFUL NOT TO GET CAUGHT
 8   IN THE -- IN THAT GAP AS SOON AS I COME OFF THE CURB.  BY THE
 9   TIME I GET HALFWAY, I AM ENCOUNTERING THE T TRAIN TRACK AND THE
10   UNLEVELNESS.  I HAVEN'T MADE IT ALL THE WAY ACROSS THE STREET
11   YET.  SO THEN I AM GOING TO HAVE TO WAIT THERE FOR THE LIGHT
12   USUALLY TO CHANGE AGAIN.
13          THE COURT:  IN THE T TRACKS AREA?
14          THE WITNESS:  YES.
15   BY MR. WALLACE:
16   Q.   THE TRACKS ARE HALFWAY ACROSS THE STREET, MRS. CHERRY,
17   THAT YOU ARE TRYING TO CROSS?
18   A.   YES.
19          THE COURT:  THANK YOU.
20          THE WITNESS:  SO YOU ARE GOING TO ENCOUNTER, YOU
21   KNOW, SOME CHANGES IN YOUR FOOTING TWICE.  I KNOW THAT BECAUSE
22   I CROSS THAT ALMOST EVERY DAY.
23          THE COURT:  OKAY.  THANK YOU.
24          THE WITNESS:  FOR ME TO BE SAFE AND NOT BE A VICTIM
25   OF HIT AND RUN AT THAT CORNER BECAUSE IT'S AN ACTIVE CORNER.
```

1    THE COURT:  THANK YOU.  THAT CLARIFIES IT.

2  BY MR. WALLACE:

3  Q.   WHAT LEADS YOU TO BE CROSSING THE STREET THERE?

4  A.   I GO TO A CENTER THAT'S RIGHT ACROSS THE STREET.  IT'S

5  EASIER TO PARK ON THE SIDE THAT I DO PARK, AND THAT SIDE HAS

6  THE MOST DAMAGE THOUGH.  THERE'S NO PARKING ON THE OTHER SIDE.

7  Q.   OKAY.  IS THERE A CHURCH THAT YOU GO TO IN YOUR

8  NEIGHBORHOOD?

9  A.   I GO TO TRUE HOPE CHURCH.

10  Q.   ARE THERE ANY PROBLEMS ON THE SIDEWALKS LEADING TO YOUR

11  CHURCH?

12  A.   THERE ARE A LOT OF CRACKS BECAUSE OF THE TREES THAT

13  HAVEN'T BEEN PROPERLY -- WELL, I WOULD SAY THEY DON'T TAKE CARE

14  OF IT BECAUSE THE TREE ROOTS ARE UP OUT OF THE GROUND.  IT'S

15  THE SQUARE CONCRETE, BUT THE -- WITH THE HOLE CUT IN THE MIDDLE

16  FOR THE TREES.  BUT THE TREES ARE GETTING LARGER.  AND THE

17  ROOTS ARE COMING UP, BUSTING UP THE SIDEWALK EVEN MORE.

18    SO NOT ONLY WHERE THE TREE IS IMPLANTED, BUT IT

19  AFFECTS THE SIDEWALK -- THE OTHER SIDE OF THE SQUARE.  SO

20  THERE'S A LOT OF THAT THERE.

21  Q.   AND WHAT KIND OF PROBLEM DOES THAT CAUSE FOR YOU?

22  A.   YOU HAVE TO BE VERY CAREFUL TO WATCH.  I MEAN TO STEP OVER

23  IT.  IT DOESN'T REALLY MATTER BECAUSE ON THE OTHER SIDE THERE'S

24  NO SIDEWALK AT ALL, JUST TREE ROOTS COMING UP.  SO IT'S A

25  PROBLEM.

1039

1  Q.   OKAY.  WHERE IS YOUR CHURCH, MRS. CHERRY?

2  A.   ON GILMAN STREET.

3  Q.   OKAY.  IS THERE A CROSS STREET?

4  A.   I BELIEVE IT IS WALKER DRIVE.

5  Q.   AND IS THAT RIGHT WHERE YOU ARE DESCRIBING THE SIDEWALK

6  AND TREE ROOT PROBLEMS?

7  A.   YEAH, PRETTY CLOSE TO THAT, YES.

8  Q.   DO YOU HAVE A NEIGHBORHOOD PARK IN YOUR NEIGHBORHOOD?

9  A.   WE DO.

10 Q.   WHAT DO YOU CALL IT?

11 A.   I AM NOT SURE OF THE PROPER NAME, BUT WE CALL IT THE SUN

12 DIAL PARK BECAUSE IT HAS THE BIG SUN DIAL THERE IN THE PARK,

13 THE ONLY ONE IN THE CITY.

14 Q.   OKAY.  AND DO YOU ENCOUNTER ANY PROBLEMS TRYING TO USE THE

15 SUN DIAL PARK?

16 A.   WELL, MY MAIN PROBLEMS ARE SINCE THE BIG STORM, IT BLEW

17 ALL OF THE TREES DOWN, TWO BLOCKS WORTH I WOULD SAY, AND IT

18 TORE THE SIDEWALKS UP.

19      THE TREE ROOTS, EVEN THOUGH THEY REMOVED THE BLOWN

20 DOWN TREES, THEY REPLACED IT WITH NEW TREES AND THEY DIDN'T

21 REMOVE ALL THOSE -- THE TREE ROOTS OUT, SO WE HAVE TREE ROOTS

22 COMING UP OUT OF THE GROUND, BROKEN SIDEWALKS, UNEVEN

23 SIDEWALKS.  SO ON THAT SIDE OF THE STREET WHERE THE PARK IS, I

24 DON'T GO ON THAT SIDE.

25 Q.   OKAY.  IS THERE A BARBECUE AREA OVER THERE?

1040

```
1   A.   IT IS.  IT IS A MINI PARK WITH BARBECUE AREA PITS AND
2   TABLES AND WHATEVER.  BUT THE WAY THE PARK IS -- THE WAY IT IS
3   CONSTRUCTED WITH ALL THOSE BROKEN SIDEWALKS AND TREE ROOTS, AND
4   WHATEVER, IT IS NOT SAFE FOR ME AND MY DAUGHTER TO USE IT.
5   Q.   OKAY.  HAVE YOU EVER COMPLAINED TO THE CITY ABOUT THAT
6   SIDEWALK LEADING TO SUN DIAL PARK?
7   A.   I NEVER COMPLAINED TO THE CITY BECAUSE TO ME THEY COME OUT
8   THERE AND DO DIFFERENT THINGS, THEY CAN SEE IT.  THEY HAVE TO
9   STEP OVER THE SAME THING THAT I HAVE TO STEP OVER.
10          SO, WITH THE DIFFERENT ACTIVITIES AND THINGS THAT
11  HAPPEN IN THAT PARTICULAR AREA, I WOULD THINK THAT THEY KNOW
12  ALREADY.
13  Q.   HOW LONG HAS THE SIDEWALK BEEN BROKEN UP OVER ON THAT SIDE
14  OF THE STREET?
15  A.   AS LONG AS I CAN REMEMBER, BUT EVEN WORSE AFTER THE STORM.
16  THEY NEVER FIXED IT.
17  Q.   IS THERE A REST ROOM IN THE SUN DIAL PARK?
18  A.   IT IS, BUT IT'S NOT A PATH THAT MAKES IT ACCESSIBLE OR TO
19  REALLY BE SAFE FOR ANYBODY WITH A DISABILITY USING A CANE,
20  WALKER, OR WHATEVER, IT'S NOT SAFE.
21  Q.   WHY NOT?
22  A.   THE SIDEWALKS, ONCE AGAIN, ARE BROKEN, AND THE TREE ROOTS
23  ARE LITERALLY UP, UP BIG ROOTS.  I AM NOT TALKING ABOUT A
24  LITTLE BREAK, I AM TALKING ABOUT WHERE YOU CAN SEE HOW THE
25  ROOTS SPREAD OUT.  SO IT'S ALL OVER.  IT NEEDS TO BE FIXED.
```

1041

1  Q.   OKAY.  IS THERE ANOTHER PARK IN YOUR NEIGHBORHOOD, MAYBE

2  ANOTHER PARK THAT IS MORE ACCESSIBLE THAN SUN DIAL PARK?

3  A.   TO TELL THE TRUTH, ALL OF THE PARKS IN THE AREA BASICALLY

4  THEY NEED HELP.  THEY HAVEN'T BEEN MAINTAINED THE WAY THEY

5  SHOULD, THEY SHOULD.

6        FOR PEOPLE WITH DISABILITIES, IT'S DIFFERENT FROM

7  PEOPLE WHO CAN MOVE ABOUT FLUIDLY AND RUN, JUMP, HOP.  I AM NOT

8  GOING TO BE ABLE TO DO THAT.  MY DAUGHTER WON'T BE ABLE TO DO

9  THAT, NOR MY HUSBAND.

10  Q.   OKAY.  HAVE YOU EVER GONE TO GOLDEN GATE PARK?

11  A.   I USED TO GO TO GOLDEN GATE PARK A LOT.  I LOVE THAT PARK,

12  BUT THERE ARE JUST CHALLENGES IN THE PARK THAT I CAN'T MEET.

13  Q.   WHAT KIND OF CHALLENGES?

14  A.   THE BATHROOM ACCESSIBILITY IN THE PART THAT I LIKE TO GO

15  TO IS DIFFICULT.  MY DAUGHTER, USUALLY WHEN I AM AT THE PARK, I

16  AM GOING BECAUSE I AM TAKING MY DAUGHTER.  I TRY TO GO

17  SOMEWHERE THAT I CAN ENJOY ALSO AND RELAX.

18        AND ONE OF THE PROBLEMS WITH THE AREA THAT I GO TO,

19  THE BATHROOM -- THE PATHWAY TO THE BATHROOMS, THE BATHROOM

20  ITSELF AS FAR AS THE DISABLED STALLS IS JUST -- IT'S NOT UP TO

21  PAR TO BE EASILY ACCESSED.

22  Q.   ARE YOU ABLE TO TELL US WHAT AREA OF THE PARK WE ARE IN

23  HERE?

24  A.   OVER BY THE MUSEUM.

25  Q.   OVER BY THE -- OKAY, DE YOUNG AND ACADEMY OF SCIENCES,

1042

1   THAT AREA?

2   A.   YES.

3   Q.   OKAY.  AND WHAT TROUBLE HAVE YOU AND ESTORIA HAD TRYING TO

4   USE THE REST ROOMS THERE?

5   A.   WELL, THE ONLY WAY THAT ESTORIA CAN MOVE ABOUT IS WITH THE

6   WALKER.  THE WIDTH -- THE SPACE THAT WE HAVE TO TRAVEL TO GO IN

7   AND OUT OF THE BATHROOMS DOES NOT PROPERLY GIVE ROOM FOR

8   MOVEMENT, YOU KNOW.  SOMETIMES WE HAVE MADE IT TO THE BATHROOM

9   BUT KIND OF LATE, SO WE HAD TO LEAVE THE PARK ANYWAY SO I CAN

10  TAKE HER HOME TO CHANGE HER.

11          IT IS JUST DIFFICULT.  I MEAN, SOMEONE ELSE MAYBE

12  WITHOUT A DISABILITY MAY NOT PAY ATTENTION, BUT IF YOU ARE

13  DISABLED AND YOU HAVE TO STEP OVER THINGS OR YOU USE A WALKER

14  OR CANE, CRUTCHES, IT'S JUST HARD.

15  Q.   OKAY.  WITH RESPECT TO THIS EXPERIENCE WITH THE REST ROOMS

16  THERE THAT YOU ARE TALKING ABOUT, WHAT MADE THE REST ROOM

17  ITSELF HARD TO USE?

18  A.   WHERE THE STALLS ARE, TO GET TO THE STALL, TO EVEN GET IN

19  THE BATHROOM, THE PATHWAYS, THEY ARE TOO NARROW.  YOU KNOW, I

20  AM TRYING TO HELP HER BALANCE WITH THE WALKER BECAUSE IF THE

21  WHEELS GO OVER, SHE'S GOING TO FALL.

22          I AM NOT THAT -- IT'S JUST DIFFICULT.  IT'S KIND OF

23  HARD TO EXPLAIN.  BUT IF IT'S DIFFICULT, IT'S JUST DIFFICULT.

24  WHAT CAN I SAY.

25  Q.   WAS SHE ABLE TO MANEUVER HER WALKER INTO THE STALL OR WAS

1  IT TOO SMALL?

2  A.   USUALLY THEY PUT THE HANDICAP ACCESSIBLE BATHROOMS IN THE

3  BACK.  I THINK THAT SHOULD BE CHANGED TO THE FRONT.  AND IT

4  SHOULD BE ENOUGH SPACE SO THAT YOU CAN TURN.  THAT -- THAT'S A

5  PROBLEM.  IT'S NOT ENOUGH SPACE.

6  Q.   OKAY.

7  A.   TO GET THROUGH IN THE FIRST PLACE.  AND THEN YOU ARE GOING

8  PASSED ALL THE REGULAR BATHROOMS TO TRY TO GET IN THE HANDICAP

9  ACCESSIBLE.

10  Q.   HAVE YOU BEEN BACK TO GOLDEN GATE PARK SINCE YOU HAD THAT

11  EXPERIENCE?

12  A.   OH, SURE I GO, BUT I DON'T GET OUT.  I JUST DRIVE THROUGH.

13  IT'S A BEAUTIFUL PARK AND IT WORKS IF YOU ARE IN YOUR CAR AND

14  YOU KEEP MOVING.

15  Q.   HAVE YOU EVER HAD AN OCCASION TO USE THE MARTIN LUTHER

16  KING POOL, MRS. CHERRY?

17  A.   I TRIED TO GO TO MARTIN LUTHER KING PARK TO TAKE A CLASS

18  SO THAT I CAN TRY AND BE MORE MOBILE BECAUSE MY DISABILITY IS

19  GETTING WORSE.  AND I WASN'T ABLE TO CONTINUE.  I WAS LIKE

20  TRYING TO GET IN THE POOL ITSELF.

21  Q.   WHAT WAS THE PROBLEM?

22  A.   I COULDN'T GET IN BECAUSE THE LIFT WAS BROKEN.  I HAD PAID

23  MY MONEY FOR THE SCRIPS, BUT I STILL TRIED.  AND IT JUST DIDN'T

24  WORK FOR ME.  BECAUSE IF YOU ARE IN PAIN AND YOU GOT THIS

25  GORGEOUS HEATED POOL AND ALL THIS, BUT YOU CAN'T GET IN THE

1  POOL BECAUSE THE LIFT IS BROKEN, THERE ARE NO GRAB BARS ENOUGH

2  FOR DISABLED PEOPLE BECAUSE I HAVE LIMITED MOVEMENT ALL OVER MY

3  BODY.  AND THEN THE GAPS, TRYING TO GET IN THE POOL WHERE YOU

4  PUT YOUR FEET, THEY WAS SO FAR APART THAT IT DIDN'T WORK FOR

5  ME.  I AM SHORT.  I HAVE SHORT LEGS.  AND I AM ARTHRITIC.

6         SO GETTING IN AND OUT OF THE POOL BECAME DANGEROUS

7  AS FAR AS I WAS CONCERNED.  SO I STOPPED GOING.

8  Q.   OKAY.  HOW OFTEN DID YOU TRY TO USE THE MARTIN LUTHER KING

9  POOL AND FOUND THAT THE POOL LIFT WAS NOT WORKING THAT DAY?

10 A.   THE WHOLE TIME THAT I WENT.  AND I TRIED TO GO THREE TIMES

11 A WEEK.  AND IT BECAME MORE OF A BURDEN TO GO THAN NOT.

12 Q.   HOW LONG DID YOU TRY TO TAKE THAT CLASS?

13 A.   I DID TRY IT FOR A MONTH.

14 Q.   AND THE POOL LIFT WAS OUT OF OPERATION THAT WHOLE TIME?

15 A.   YES.

16 Q.   WOULD YOU USE THE MARTIN LUTHER KING POOL IF THE LIFT WAS

17 OPERATIONAL?

18 A.   YES BECAUSE I COULD GET IN AND OUT OF THE POOL.

19 Q.   OKAY.

20         MRS. CHERRY, HAVE YOU EVER HAD OCCASION FOR YOU AND

21 YOUR FAMILY TO USE THE PARATRANSIT SERVICE IN SAN FRANCISCO?

22 A.   YES.

23 Q.   AND FOR HOW MANY YEARS DID YOU DO THAT?

24 A.   OFF AND ON BECAUSE OF ESTORIA'S DISABILITY.

25 Q.   DID YOU EVER EXPERIENCE PROBLEMS WITH PARATRANSIT SERVICE?

1045

1  A.   DEFINITE PROBLEMS.

2  Q.   COULD YOU DESCRIBE SOME OF THOSE FOR US, PLEASE?

3  A.   EITHER THE VAN DID NOT COME AT ALL, THEY WERE LATE.

4  THE -- I HAD TWO TIMES THAT THE VAN PUT MY DAUGHTER OFF ON THE

5  CORNER AND LEFT HER THERE BY HERSELF.  AND IT JUST SO HAPPENED

6  THAT ONE OF THE TEACHERS CAME OUT AND SAW HER THERE.  AND I

7  DON'T KNOW HOW LONG SHE HAD BEEN OUT THERE, BUT AT ANY RATE I

8  HAD TO GO AND PICK HER UP.

9        ANOTHER TIME THEY LEFT HER IN THE GOLDEN GATE PARK

10  BY HERSELF.  AND JUST NUMEROUS TIMES WHERE THEY DIDN'T COME.

11  Q.   DID THERE COME A TIME WHEN YOUR FAMILY STOPPED USING

12  PARATRANSIT BECAUSE IT WAS UNRELIABLE?

13  A.   AFTER THEY LEFT HER IN THE GOLDEN GATE PARK ALL THE WAY

14  ACROSS TOWN IN THE EVENING, IT WAS AFTER 3:00 O'CLOCK, ESTORIA

15  DIDN'T GET HOME UNTIL 5:00 O'CLOCK.  THEY -- ONCE THEY

16  DISCOVERED THAT SHE HAD BEEN LEFT.  AND IT WAS AFTER THAT THAT

17  I SAID, NO, I WON'T HAVE ANY MORE OF THIS, AND I STARTED

18  TRANSPORTING HER MYSELF.

19  Q.   OKAY.  MRS. CHERRY, AT YOUR CHURCH HAVE YOU HAD THE

20  OPPORTUNITY TO OBSERVE PARATRANSIT SERVICE FOR SOME OF YOUR

21  PARISHIONERS?

22  A.   YES.  THIS PAST -- SUNDAY BEFORE LAST, THE SAME THING.  I

23  SAID, OH, THEY HAVEN'T CHANGED YET.

24        ONE OF THE MEMBERS HER WINDOW WAS -- NOW THEY DO A

25  WINDOW THING.  AND HER PICK UP TIME WAS 2:00 O'CLOCK.  BUT THE

Raynee H. Mercado, CSR, CRR, FCRR & Diane E. Skillman, CSR, RPR, FCRR

1046

WINDOW SPACE FOR THEM GETTING TO WHEREVER IS A HALF HOUR.

1    SO, AT 2:30 THEY STILL HADN'T CAME.  SO SHE CALLED.

2  I HAD TO WAIT THERE WITH HER BECAUSE EVERYBODY HAD WENT HOME.

3  AND WHEN SHE CALLED THEM, THE ANSWERING MACHINE CAME ON AND IT

4  SAID THERE ARE FIVE CALLS AHEAD OF YOU.  I COULD HEAR IT.

5  PLEASE DO NOT HANG UP.

6    AND SHE WAS SAYING, OH, THEY DO THIS ALL THE TIME.

7  I SAID, YEAH, I KNOW ALL ABOUT IT.

8    BUT, ANYWAY, SHE HELD ON THE PHONE AND WHEN THE

9  OPERATOR CAME ON, THE OPERATOR TOLD HER THAT THE BUS WAS THERE.

10    AND SHE SAID WHERE?  WHERE I AM SITTING YOU COULD

11  SEE CLEARLY EITHER WAY THAT THERE WAS NO VAN.

12    AND THE OPERATOR TOLD HER, OH, YEAH, THE VAN IS

13  THERE.

14    SO WE SAID WE DON'T SEE IT IF IT IS THERE.  BECAUSE

15  I COULD -- SHE HAD IT ON SPEAKER.  SO THAT'S WHY I SAID, WE

16  DON'T SEE IT.  AND I GUESS SHE WAS SOMEWHERE ELSE, OR WHATEVER.

17  AT ANY RATE, SHE WASN'T AT THE CHURCH.  IT'S A BIG CHURCH RIGHT

18  AT THE CORNER OF GILMAN AND ARELIOUS WALKER.  YOU CAN'T MISS

19  IT.

20    AND WE WERE ON THE FRONT.  BECAUSE IF YOU ARE NOT

21  OUT, THEN THEY WILL LEAVE YOU AND THEY WON'T COME BACK TO PICK

22  YOU UP.  SO, I SAID THEY HAVEN'T CHANGED.

23  Q.   HOW LONG WAS IT BEFORE PARATRANSIT FINALLY ARRIVED?

24  A.   THEY DIDN'T GET THERE UNTIL AFTER 3:00 O'CLOCK.  SO THEIR

1047

1  30-MINUTE WINDOW WAS OVER AND THEY WERE ON SOMEBODY ELSE'S

2  TIME.

3  Q.   WHEN WERE THEY SUPPOSED TO BE THERE?

4  A.   2:00 O'CLOCK.  IT WAS AFTER THREE.

5  Q.   IN YOUR EXPERIENCE, IS PARATRANSIT A SERVICE THAT A PERSON

6  WITH A DISABILITY HAS TO PAY MONEY TO USE IN SAN FRANCISCO?

7  A.   WE HAD TO PAY FOR IT.  I DON'T KNOW HOW IT WORKS FOR

8  EVERYBODY, BUT, YES, WE HAD TO PAY.

9  Q.   OKAY.  ABOUT HOW MUCH?

10  A.   IT WASN'T HOW MUCH IT WAS, IT WAS THAT -- FOR ME, I THINK

11  IT WAS SOMETHING LIKE $15 AT THAT TIME.  I AM NOT SURE.  BUT AT

12  ANY RATE, WE DID PAY.  BUT I DON'T KNOW.

13        AND THE CAB IS THE SAME PROBLEM BECAUSE THEN I OPTED

14  TO TRY THE CAB, BUT IT WAS THE SAME THING.

15  Q.   THE TYPES OF BARRIERS THAT YOU'VE DESCRIBED FOR US THIS

16  AFTERNOON, HOW HAVE THEY IMPACTED YOUR LIFE?

17  A.   WELL, I CAN'T MAKE THE CITY FIX THE BATHROOMS, TAKE OUT

18  THE CRACKS, DO THE JOB THAT THEY ARE SUPPOSED TO DO.  YOU GET

19  VERY FRUSTRATED BECAUSE YOU LIVE THIS EVERY DAY.  EVERY DAY

20  WHEN YOU GET READY TO COME OUT AND GO SOMEWHERE FOR PERSONS

21  WITH LIMITED MOBILITY, FOR THE CAREGIVERS, IT'S A HEADACHE

22  EVERY DAY.

23        NO MATTER WHERE YOU GO WHERE THINGS THAT ARE

24  SUPPOSED TO BE IN PLACE ARE NOT REALLY IN PLACE THE WAY THEY

25  SHOULD BE.  FOR A NORMAL PERSON THEY MIGHT SAY, WELL, IT'S

1048

HANDICAP ACCESSIBLE.

2          I CAN'T TELL YOU HOW MANY BROKEN DOORS I HAVE BEEN
3 TO TO TRY TO GET IN.  HOW MANY RAMPS ARE SO STEEP, EVEN THOUGH
4 I HAVE A CANE AND IT IS SUPPOSED TO BE AN ACCESSIBLE RAMP, THAT
5 YOU HAVE PROBLEMS GOING TO.

6          ARTHRITIS IS THE KIND OF THING IF IT IS COLD OR
7 WHATEVER, IT AFFECTS YOU MORE.  I HAVE BEEN TO A LOT OF
8 DIFFERENT BUILDINGS, BUT I WAS SO FRUSTRATED BY THE TIME I GOT
9 IN OR WHATEVER, THE IMPACT OF IT IS GREAT FOR A DISABLED
10 PERSON, A DISABLED PERSON'S CAREGIVER.

11 Q.   HOW HAVE YOU SEEN IT AFFECT YOUR DAUGHTER'S LIFE?

12 A.   IT'S DIFFICULT.

13 Q.   OKAY.  WHAT WOULD YOU LIKE HER HONOR TO DO ABOUT THIS?

14 A.   YOUR HONOR, IF ANYTHING YOU COULD DO IS TO REALLY TRY AND
15 TAKE A GOOD LOOK AT THESE THINGS THAT ARE SUPPOSED TO BE
16 HANDICAP ACCESSIBLE THAT SOMEBODY COULD GET TO, DESIGNERS, AND
17 REALLY GO OUT AND CHECK THESE THINGS BECAUSE THEY ARE NOT ALL
18 THAT THEY ARE SUPPOSED TO BE.

19          IF I AM DISABLED AND I WANT TO ENTER THAT DOOR OVER
20 THERE, BUT THEY SWITCH THAT OPENS THE DOOR IS OUTSIDE SOMEWHERE
21 OVER HERE (INDICATING), WHERE I CAN'T EVEN GET TO IT, OR IF IT
22 IS BROKEN, I DON'T KNOW IF YOU ALL KNOW, BUT A HANDICAP
23 ACCESSIBLE DOOR, IF IT IS BROKEN AND YOU HAVE TO OPEN IT, IT'S
24 HEAVIER THAN A NORMAL DOOR.

25          THEY PUT UP SIGNS WHERE IT'S MORE -- MORE SPACES FOR

1049

PEOPLE WITHOUT DISABILITIES, YOU GOT THE AGED THAT'S BECOMING

DISABLED MORE THAN WE HAVE THE BODY BREAKDOWN AND YOU HAVE

DISABLED PEOPLE FOR WHATEVER REASONS HAVE CERTAIN MOBILITY

PROBLEMS.  IT IS A PROBLEM WHEN YOU CAN'T GET TO WHERE YOU NEED

TO GO.

           IT'S A PROBLEM WHEN YOU CAN'T GET IN THE THEATER OR

TO GO AND TRY AND ENJOY THINGS LIKE OTHER PEOPLE.  IT'S A

PROBLEM, AND IF YOU ARE A CAREGIVER, IT IS REALLY A PROBLEM.

           I CAN'T TELL YOU HOW MANY DAYS AND NIGHTS I HAVE

CRIED BECAUSE MY DAUGHTER WANTED TO GO SOMEWHERE, MY HUSBAND

COULDN'T HELP HER BECAUSE HE'S CRIPPLED, I AM GETTING WORSE

EVERY DAY, AND SHE'S ALREADY CRIPPLE.  WHEN YOU LIVE THIS 24/7,

IT'S A HARD THING.

           AND ANYTHING THAT YOU COULD DO THAT WOULD MAKE

PEOPLE AWARE THAT WHAT THEY ARE PUTTING IN PLACE CALLING

ACCESSIBLE IS REALLY DIFFICULT, BUT NOT AS ACCESSIBLE AS IT

COULD BE OR SHOULD BE.

           THAT'S ALL I HAVE TO SAY.

           MR. WALLACE:  NO FURTHER QUESTIONS FOR THIS WITNESS

AT THIS TIME.

           THE COURT:  OKAY.  THANK YOU.

           CROSS-EXAMINATION?

                       CROSS-EXAMINATION

BY MS. BERNSTEIN:

Q.   GOOD AFTERNOON, MRS. CHERRY.

1  A.   GOOD AFTERNOON.

2  Q.   JUST A FEW QUESTIONS.

3       FIRST, YOU WERE DESCRIBING AN INTERSECTION AT, I

4  THINK, NEWCOMB AND THIRD; IS THAT RIGHT?

5  A.   CORRECT.

6  Q.   JUST SO OUR DESCRIPTION CAN BE CLEAR, THERE'S A MEDIAN

7  ABOUT HALFWAY ACROSS THAT INTERSECTION WITH A LITTLE PLACE FOR

8  PEDESTRIANS TO SIT?

9  A.   YES, A SAFETY SPOT FOR WHEN THE LIGHT CHANGES AGAIN.

10 Q.   EXACTLY.  THANK YOU.

11      NOW, WOULD YOU AGREE THAT AS A -- SOMEBODY INVOLVED

12 IN COMMUNITY HEALTH AND AS A COMMUNITY ACTIVIST, IT WOULD BE

13 IMPORTANT IF YOU SAW A SAFETY ISSUE TO TELL SOMEBODY ABOUT IT

14 SO THEY CAN FIX IT?

15 A.   YES.

16 Q.   BUT YOU HAVEN'T COMPLAINED ABOUT THESE CONDITIONS TO THE

17 CITY?

18 A.   NOT TO THE CITY.  BECAUSE LIKE I SAID BEFORE, THE CITY

19 SHOULD KNOW BECAUSE THEY GET PAID TO COME OUT AND FIX THINGS

20 AND BE THERE AND KNOW WHERE THINGS ARE NOT RIGHT.

21      WHEN THEY CAME OUT AND PUT THAT TWO BLOCKS OF TREES

22 BACK, WHY DIDN'T THEY SEE THAT THE SIDEWALKS WERE TORE UP

23 STILL?  THEY HAD TO REPLACE THE TREES.  AND THEY DIDN'T FIX THE

24 AREA THAT WAS TORN DOWN AROUND IT.

25 Q.   HAVE YOU COMPLAINED TO THE CITY ABOUT ANY OF THE CURB RAMP

1051

1   ISSUES THAT YOU MENTIONED?

2   A.   NO, I REALLY HAVEN'T COMPLAINED TO THE CITY ABOUT THAT

3   EITHER BECAUSE THESE ARE THE EXPERTS.  THEY ARE THE ONES WHO

4   CUT OUT AND BUILD AND PUT THINGS IN PLACE.  I DON'T UNDERSTAND

5   WHY THEY WEREN'T PUT THERE CORRECTLY IN THE FIRST PLACE.

6            MS. BERNSTEIN:  NO FURTHER QUESTIONS, YOUR HONOR.

7            THE COURT:  OKAY.  THANK YOU.

8            ANY REDIRECT, MR. WALLACE?

9            MR. WALLACE:  NO, YOUR HONOR.

10           THE COURT:  ANY REASON MRS. CHERRY SHOULD NOT BE

11  EXCUSED FROM FURTHER TESTIMONY?

12           MR. WALLACE:  NONE THAT I CAN THINK OF.

13           MS. BERNSTEIN:  NONE, YOUR HONOR.

14           THE COURT:  THANK YOU, MRS. CHERRY.  YOU MAY BE

15  EXCUSED.

16           THE WITNESS:  THANK YOU.

17           THE COURT:  YOU MAY CALL YOUR NEXT WITNESS.

18           MR. JOHNSON:  WE RECALL MR. MASTIN TO THE STAND,

19  YOUR HONOR.

20           THE COURT:  OKAY.

21           MR. JOHNSON:  YOUR HONOR, BEFORE WE RESUME WITH

22  MR. MASTIN'S EXAM, I WOULD LIKE TO MOVE INTO EVIDENCE SOME OF

23  THE EXHIBITS THAT WERE PREVIOUSLY MARKED BUT NOT MOVED INTO

24  EVIDENCE.

25           THE FIRST ONE BEING EXHIBIT 4146, WHICH WAS THE MAP

1

2

3                    CERTIFICATE OF REPORTER

4          WE, RAYNEE H. MERCADO, AND DIANE E. SKILLMAN, OFFICIAL

5   REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

6   CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN

7   C07-03685SBA, KIROLA, ET AL. V. CITY AND COUNTY OF SAN

8   FRANCISCO, ET AL., WERE REPORTED BY US, CERTIFIED SHORTHAND

9   REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION

10  INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

11  TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF

12  FILING.

13          THE VALIDITY OF THE REPORTERS' CERTIFICATION OF

14  SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL

15  FROM THE COURT FILE.

16

17  _____

18          RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

19

20

21  _____

22          DIANE E. SKILLMAN, CSR, RPR, FCRR

23

24              TUESDAY, APRIL 12, 2011

25