# EXHIBIT D

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SAUNDRA BROWN ARMSTRONG, JUDGE

**_ORIGINAL_**

| | | |
|---|---|---|
| IVANA KIROLA, ET AL., | ) | COURT TRIAL |
| | ) | |
| PLAINTIFFS, | ) | VOLUME 6 |
| | ) | |
| VS. | ) | NO. C 07-03685 SBA |
| | ) | |
| CITY AND COUNTY OF | ) | |
| SAN FRANCISCO, ET AL., | ) | PAGES 1077 - 1295 |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | MONDAY, APRIL 18, 2011 |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFFS:             SCHNEIDER WALLACE COTTRELL BRAYTON &
                                KONECKY
                            180 MONTGOMERY STREET, SUITE 2000
                            SAN FRANCISCO, CALIFORNIA  94109
                      BY:  MARK T. JOHNSON,
                           ANDREW P. LEE,
                           KIRAN PRASAD,
                           GUY B. WALLACE, ATTORNEYS AT LAW
                           BROWN POORE LLP
                           THE WATERGATE TOWERS
                           2200 POWELL STREET, SUITE 745
                           EMERYVILLE, CALIFORNIA  94608
                      BY:  SCOTT A. BROWN, ATTORNEY AT LAW
FOR DEFENDANT:             OFFICE OF THE CITY ATTORNEY
                           SIXTH FLOOR - FOX PLAZA
                           1390 MARKET STREET
                           SAN FRANCISCO, CALIFORNIA  94102
                      BY:  JAMES M. EMERY,
                           ELAINE M. O'NEIL,
                           KRISTINE A. POPLAWSKI, ATTORNEYS AT LAW


REPORTED BY:            RAYNEE H. MERCADO, CSR NO. 8258
                        DIANE E. SKILLMAN, CSR NO. 4909
        RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

I N D E X

| PLAINTIFFS' WITNESSES | PAGE | VOL |
|---|---|---|
| MCKENNA, DANIEL J. | | |
| DIRECT EXAMINATION BY MR. BROWN | 1099 | 6 |
| | | |
| MASTIN, JEFFREY | | |
| DIRECT EXAMINATION (RESUMED) BY MR. JOHNSON | 1111 | 6 |
| CROSS-EXAMINATION BY MR. EMERY | 1250 | 6 |
| | | |
| MONASTERIO, ERICA | | |
| DIRECT EXAMINATION BY MS. PRASAD | 1225 | 6 |
| CROSS-EXAMINATION BY MS. POPLAWSKI | 1241 | 6 |

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 0173B | | 1112 | 1113 | 6 |
| 2104A | | | 1177 | 6 |
| 2104A(7) | | | 1184 | 6 |
| 2104A(7A) | | 1180 | 1184 | 6 |
| 2124A(90) | | | 1196 | 6 |
| 2125A(30) | | | 1198 | 6 |
| 2138A(7) | | | 1206 | 6 |
| 2138A(8) | | | 1208 | 6 |
| 2142A, SEQUENCE 4 | | | 1136 | 6 |
| 2142A, SEQUENCE 8 | | | 1139 | 6 |
| 2143A, SEQUENCE 30 | | | 1150 | 6 |
| 2144A, SEQUENCE 6 | | 1151 | | 6 |
| 2144A, SEQUENCE 6 | | | 1152 | 6 |
| 2145A, SEQUENCE 11 | | 1158 | 1159 | 6 |
| 2147A-1 | | 1189 | 1193 | 6 |
| 2148A, SEQUENCE 2 | | 1161 | 1164 | 6 |
| 2148A, SEQUENCE 8 | | | 1166 | 6 |
| 2148A, SEQUENCE 10 | | 1166 | | 6 |
| 2148A, SEQUENCE 10 | | | 1167 | 6 |
| 2148A, SEQUENCE 14 | | | 1169 | 6 |
| 2148A, SEQUENCE 15 | | | 1170 | 6 |
| 4063A(3) | | | 1212 | 6 |

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

E X H I B I T S (CONT'D.)

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL. |
|---|---|---|---|---|
| 4147 | | 1115 | 1119 | 6 |
| 4148 | | 1215 | 1219 | 6 |

| DEFENDANTS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL |
|---|---|---|---|---|
| AA03 | | 1253 | | 6 |
| AA04 | | 1260 | | 6 |
| AA05 | | 1277 | | 6 |
| AA06 | | 1283 | | 6 |

--oOo--

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

1225

1  BEFORE MR. EMERY BEGINS HIS CROSS OF MR. MASTIN, IF THAT'S OKAY

2  WITH THE COURT.

3            THE COURT:  IF MR. EMERY HAS AGREED TO THAT --

4            MR. EMERY:  THAT'S CORRECT.

5            THE COURT:  I'LL SAY I COMMEND YOU ALL FOR MEETING

6  AND CONFERRING AND AGREEING TO SOMETHING, AND TO THE EXTENT YOU

7  AGREE, THE COURT IS HAPPY TO ACCOMMODATE.

8            MR. JOHNSON:  THANK YOU VERY MUCH, YOUR HONOR.

9            MS. PRASAD:  PLAINTIFFS CALL MS. ERICA MONASTERIO TO

10 THE STAND.

11           THE CLERK:  PLEASE COME TAKE THE WITNESS STAND.

12 STAND AND RAISE YOUR RIGHT HAND.

13                      KIRAN PRASAD,

14 CALLED AS A WITNESS FOR THE PLAINTIFFS, HAVING BEEN DULY SWORN,

15 TESTIFIED AS FOLLOWS:

16           THE WITNESS:  YES.

17           THE CLERK:  PLEASE BE SEATED.

18           THE WITNESS:  THANK YOU.

19           THE CLERK:  PLEASE STATE YOUR FULL NAME FOR THE

20 COURT AND SPELL YOUR LAST NAME.

21           THE WITNESS:  ERICA MONASTERIO M-O-N-A-S-T-E-R-I-O.

22           THE CLERK:  THANK YOU.

23                   DIRECT EXAMINATION

24 BY MS. PRASAD:

25 Q.   GOOD AFTERNOON, MS. MONASTERIO.

```
 1            WHAT DO YOU DO FOR A LIVING, MS. MONASTERIO?
 2   A.   I AM A NURSE PRACTITIONER AND I WORK -- I TEACH AT UCSF.
 3   Q.   WHAT CITY DO YOU LIVE IN?
 4   A.   I LIVE IN SAN FRANCISCO.
 5   Q.   HOW LONG HAVE YOU LIVED IN SAN FRANCISCO?
 6   A.   TWENTY-SEVEN YEARS.
 7   Q.   AND WHAT NEIGHBORHOOD DO YOU SPECIFICALLY LIVE IN?
 8   A.   I LIVE IN BERNAL HEIGHTS.
 9   Q.   AND HOW LONG HAVE YOU LIVED IN BERNAL HEIGHTS?
10   A.   TWELVE OR 13 YEARS.
11   Q.   AND CAN YOU TELL THE COURT WHO YOU LIVE WITH?
12   A.   I LIVE WITH MY PARTNER AND OUR 13-YEAR-OLD DAUGHTER, AND
13   ON AND OFF OUR 22-YEAR-OLD SON.
14   Q.   DOES ANYONE IN YOUR FAMILY HAVE A DISABILITY?
15   A.   OUR DAUGHTER DOES, MAIRA.
16   Q.   AND IS YOUR DAUGHTER, MAIRA, HERE WITH US TODAY?
17   A.   YES.  SHE'S SITTING OVER THERE WITH MY PARTNER MARISA.
18   Q.   CAN YOU DESCRIBE MAIRA'S DISABILITY FOR THE COURT?
19   A.   MAIRA HAS CEREBRAL PALSY AND SHE HAS WHAT'S CALLED A
20   TRI-PARESIS, SO THAT MEANS BOTH LEGS AND HER LEFT ARM ARE
21   AFFECTED.  SO SHE ESSENTIALLY HAS HER RIGHT ARM TO WORK WITH.
22   Q.   IS SHE ABLE TO GET AROUND ON HER OWN?
23   A.   SHE USES A WHEELCHAIR FOR MOBILITY.  SHE CAN'T WALK
24   INDEPENDENTLY AT ALL.
25   Q.   WHAT MADE YOU DECIDE TO LIVE IN BERNAL HEIGHTS?
```

1227

1    A.    WELL, WHEN MAIRA WAS A BABY, WE WERE LIVING IN THE LOWER

2    HAIGHT, WHICH IS PRETTY URBAN AND GRITTY.  WE WANTED TO LIVE

3    SOMEPLACE THAT HAD MORE OF A NEIGHBORHOOD FEEL THAT WAS

4    SMALLER, HAD MORE OF A SENSE OF COMMUNITY.

5    Q.    HOW IS MAIRA'S RELATIONSHIP WITH HER COMMUNITY?

6    A.    MAIRA -- A LOT OF PEOPLE KNOW MAIRA.  SHE'S GROWN UP

7    THERE.  THE MERCHANTS ON CORTLAND, WHICH IS THE MAIN BUSINESS

8    STREET MOSTLY KNOW HER.  PEOPLE ON THE STREET INTERACT WITH

9    HER.  IT'S A PRETTY FRIENDLY NEIGHBORHOOD.  WE KNOW FOLKS ON

10   OUR BLOCK AND HAVE FRIENDS AND FAMILY IN THE NEIGHBORHOOD.

11   Q.    AND IS MAIRA ABLE TO TRAVEL YOUR NEIGHBORHOOD STREETS?

12   A.    THERE ARE PLACES THAT SHE CAN GO BY HERSELF AND THERE ARE

13   PLACES THAT SHE CAN ONLY GO WITH US IN THE NEIGHBORHOOD.

14   Q.    WHERE CAN SHE GO TO ON HER OWN, IF YOU CAN TELL THE COURT?

15   A.    SHE CAN GO UP TO CORTLAND, WHICH IS THE MAIN BUSINESS

16   STREET.  SO THAT'S ABOUT FIVE BLOCKS UP FROM OUR HOUSE.  THAT'S

17   WHERE THE GROCERY AND THE VIDEO STORE, THE LIBRARY ARE.

18   Q.    WHY IS THAT THAT YOU ALLOW HER TO GO DOWN CORTLAND STREET

19   ON HER OWN?

20   A.    SHE CAN GO FROM OUR HOUSE TO CORTLAND AND DOWN CORTLAND

21   BECAUSE SHE HAS SAFE ACCESS ON THE SIDEWALK ALL THE WAY UP TO

22   CORTLAND AND ALL THE WAY THROUGH THE SHOPPING AREA.

23   Q.    CAN YOU TELL THE COURT WHAT YOU MEAN BY "SAFE ACCESS"?

24   A.    THERE'S CURB CUTS ON EVERY CORNER AND SHE CAN TRAVEL ON

25   THE SIDEWALK, NOT IN THE STREET.

1  Q.   AND WHY DO YOU NEED TO ACCOMPANY MAIRA TO OTHER PLACES IN

2  YOUR NEIGHBORHOOD?

3  A.   WELL, THERE'S A LOT OF PLACES WHERE THERE AREN'T

4  CONTINUOUS CURB CUTS, SO SHE WOULD HAVE TO BE IN THE STREET IN

5  ORDER TO GET WHERE SHE WAS GOING.

6       SHE ALSO GETS STUCK BECAUSE THE SIDEWALKS ARE PRETTY

7  BEATEN UP, CRACKED AND LIFTED.

8  Q.   WHAT PURPOSE DOES YOUR PRESENCE SERVE WHEN MAIRA IS

9  TRAVELING?

10 A.   BASICALLY TO KEEP HER SAFE, TO HELP HER PROBLEM SOLVE, HOW

11 TO GET AROUND THE BARRIER.  AND WHEN SHE IS TRAVELING IN THE

12 STREET, I LIKE TO STAND ON THE OUTSIDE OF HER BECAUSE PEOPLE

13 REALLY, THEY DON'T SEE PEOPLE IN WHEELCHAIRS, AND SO THEY COME

14 TOO CLOSE.  AND SHE CAN'T LIKE JUMP UP ON THE CURB IF SOMEONE

15 GETS TOO CLOSE.  SO I JUST FEEL SAFER IF I'M STANDING ON THE

16 OUTSIDE AND I CAN KIND OF WAVE, GET THEIR ATTENTION, AND MAKE

17 SURE THAT SHE'S AS SAFE AS POSSIBLE.

18 Q.   YOU MENTIONED THERE'S CONTINUOUS CURB CUTS ALONG CORTLAND.

19 WERE THOSE CURB CUTS IN PLACE WHEN YOU MOVED TO BERNAL HEIGHTS?

20 A.   NO.

21 Q.   DO YOU KNOW WHAT PROMPTED THE INSTALLATION OF THOSE CURB

22 CUTS?

23 A.   THE CURB CUTS ON CORTLAND, I AM NOT SURE, BUT THE CURB

24 CUTS BETWEEN WHERE WE LIVE AND CORTLAND WAS IN RESPONSE TO US

25 APPROACHING OUR SUPERVISOR.  HE LIVES IN BERNAL HEIGHTS,

1229

1  MR. AMMIANO, HE'S OUR FORMER SUPERVISOR, AND WE RAN INTO HIM IN

2  THE VIDEO STORE.  AND MAIRA INSISTED THAT I TALK TO HIM ABOUT

3  ACCESS.

4         SO WE TALKED TO HIM AND HE SAID TO SEND HIM AN

5  E-MAIL.  AND THEN HIS OFFICE HELPED US SORT OF GO THROUGH THE

6  PROCESS OF GETTING AS NEEDED CURB CUTS INSTALLED.

7  Q.   AND DO YOU REMEMBER WHEN YOU MADE THIS COMPLAINT?

8  A.   I THINK MAIRA WAS IN SECOND GRADE.  SO I THINK LATE 2006

9  OR THE BEGINNING OF 2007.

10  Q.   CAN YOU TELL THE COURT WHICH ROUTES YOU MAPPED OUT FOR THE

11  SUPERVISORS' OFFICE?

12  A.   WE MAPPED OUT THE ROUTE FROM OUR HOUSE UP TO CORTLAND, THE

13  SHOPPING DISTRICT.  FROM OUR HOUSE TO HOLLY PARK WHICH IS

14  THE -- ONE OF THE PARKS IN OUR COMMUNITY.  AND FROM OUR HOUSE

15  TO THE DIFFERENT BUS LINES.  SO THERE'S ONE BUS THAT RUNS ON

16  CORTLAND AND TWO BUSES THAT RUN ON CRESCENT.  AND THEN THE

17  ROUTE DOWN TO THE FARMER'S MARKET, ALEMANY FARMER'S MARKET,

18  WHICH IS ABOUT SIX OR SEVEN BLOCKS DOWN THE HILL FROM US.

19         THE COURT:  YOU MIGHT HAVE ALREADY SAID, BUT HOW OLD

20  IS YOUR DAUGHTER?

21         THE WITNESS:  SHE'S 13.  SHE'S SITTING RIGHT THERE.

22         THE COURT:  OKAY.  I SAW HER, BUT I DIDN'T REMEMBER

23  IF YOU SAID HER AGE.

24         GO ON.

25  ///

1230

BY MS. PRASAD:

Q.    HAVE THEY REPAIRED ALL THE ROUTES YOU COMPLAINED ABOUT?

A.    NO.

Q.    WHICH ROUTES HAVE THEY NOT FIXED?

A.    THEY HAVEN'T FIXED THE CURB CUTS ON CRESCENT, SO THAT'S
ACCESS TO THE 23 AND 67 LINE, AND TO THE FARMER'S MARKET.

        AND THEN IN TERMS OF THE SIDEWALKS, THEY HAD US MARK
BOTH CURB CUTS AND SIDEWALKS WHERE THE SLAB IS LIFTED SO THAT
HER CHAIR GETS STUCK, AND THEY HAVEN'T DONE ANYTHING WITH THE
SIDEWALKS.

Q.    WHY IS HAVING ACCESS TO THE BUS ROUTES IMPORTANT, IF YOU
CAN TELL THE COURT?

A.    WELL, MAIRA, SHE HAS A SIGNIFICANT PHYSICAL DISABILITY,
BUT SHE'S VERY PUT TOGETHER FOR A 13-YEAR-OLD GIRL.  SO WE
ANTICIPATE THAT SHE'LL BE LIVING INDEPENDENTLY AND -- BUT WILL
PROBABLY BE USING THE BUSES TO GET AROUND.

        SO WHAT WE ARE TRYING TO DO RIGHT NOW IS REALLY
TEACH HER HOW TO RIDE THE BUS.  THE BUS THAT GOES TO BART IS ON
CRESCENT, THAT'S THE 23 LINE, SO THAT SHE'LL BE ABLE TO MOVE
AROUND THE CITY, GET TO CITY COLLEGE WHEN SHE FINISHES HIGH
SCHOOL AND FUNCTION INDEPENDENTLY.

Q.    WHY IS THAT IMPORTANT FOR HER TO HAVE ACCESS, SAFE ACCESS
TO THE FARMER'S MARKET?

A.    WELL, IT'S FRESH FOOD, IT'S LESS EXPENSIVE FOOD, GOOD
QUALITY FOOD.  THE NEIGHBORHOOD THAT WE LIVE IN HAS A VERY NICE

1231

1  GROCERY STORE, BUT IT'S VERY EXPENSIVE.  AND IT'S JUST A

2  HEALTHY ALTERNATIVE.

3  Q.   IS THERE ANYTHING SPECIAL ABOUT THE FARMER'S MARKET?

4  A.   WELL, IT'S EVERY SATURDAY.  IT'S DOWN THE HILL FROM US.

5  IT'S THE OLDEST FARMER'S MARKET IN SAN FRANCISCO.  AND SO IT'S

6  NOT GOING ANYWHERE I DON'T THINK.  IT'S A VERY LARGE ONE.

7  Q.   IS THERE ANOTHER FARMER'S MARKET THAT'S ACCESSIBLE TO HER?

8  A.   NOT NEAR US.

9  Q.   HAVE THEY DONE ANY RECENT IMPROVEMENTS IN YOUR

10  NEIGHBORHOOD IN THE LAST FEW MONTHS?

11  A.   THE LAST CURB CUT BETWEEN OUR HOUSE AND HOLLY PARK, WHICH

12  IS THE MIDDLE OF THE BLOCK CURB CUT BECAUSE THE STREET IS ONLY

13  ON THE OTHER SIDE, THEY JUST DID THAT PROBABLY, I THINK, MAYBE

14  FOUR MONTHS AGO IT WAS FINISHED.  ONE OF THE CURB CUTS ON

15  CORTLAND WAS FINISHED IN THE LAST YEAR.

16  Q.   AND YOU MENTIONED PROBLEMS WITH THE SIDEWALKS.  WHAT TYPE

17  OF ISSUES DOES MAIRA EXPERIENCE?

18  A.   A LOT OF THE SIDEWALKS ARE CRACKED UP FROM, I GUESS FROM

19  TREE ROOTS.  SO THERE'S BOTH A LOT OF CRACKING AND WHERE

20  THERE'S CRACKING THERE'S LOOSE DIRT AND PEBBLES.  SO HER WHEELS

21  SPIN IN IT.  AND THEN THERE ARE PLACES WHERE THE WHOLE SLAB IS

22  LIFTED.  SO IF THE WHOLE SLAB IS LIFTED, THEN YOU HAVE TO

23  BASICALLY GO IN THE STREET TO GET AROUND IT BECAUSE THE

24  WHEELCHAIR WILL CATCH ON IT.

25  Q.   HAS SHE EVER LOST CONTROL OF HER WHEELCHAIR?

1  A.   THE BACK HAS FISHTAILED OUT.  THERE'S ACTUALLY PLACES --

2  ROUTES THAT SHE WON'T TAKE BECAUSE THE BACK HAS FISHTAILED ON

3  HER.

4  Q.   OKAY.  SO YOU'VE TOLD US ABOUT PLACES THAT SHE CAN GO ON

5  HER OWN AND WITH YOUR SUPERVISION.  ARE THERE PLACES THAT SHE

6  CANNOT GO AT ALL BECAUSE THE CONDITIONS OF THE CURB RAMPS AND

7  SIDEWALKS ARE SO BAD?

8  A.   IN MY NEIGHBORHOOD?

9  Q.   IN YOUR NEIGHBORHOOD.

10  A.   THERE'S A BEAUTIFUL SPACE AT THE TOP OF BERNAL HILL THAT'S

11  ACTUALLY GOT TO WALK ALL THE WAY AROUND IT.  IT HAS CURB CUTS

12  ALL THE WAY AROUND IT AND THE STREET IS CLOSED AT THE TOP.  SO

13  IT'S VERY BEAUTIFUL VIEWS.  IT'S AN OPEN SPACE AND IT'S AN

14  OFF-LEASH SPACE.  AND MAIRA HAS A SERVICE DOG, SO THAT'S A

15  PLACE WE WOULD LIKE TO GO TO BUT WE CAN'T GO WALKING BECAUSE

16  THE SIDEWALKS, THE CROSS SLOPE OF THE SIDEWALKS IS PRETTY

17  DANGEROUS AND IT GETS -- THEY ARE VERY DEEP DIPS DOWN AND UP IN

18  THE DRIVEWAYS.

19  Q.   CAN YOU TELL THE COURT WHAT WOULD HAPPEN IF MAIRA WERE TO

20  TRAVEL THOSE SIDEWALKS?

21  A.   WHEN WE TRIED TO GO WALKING, WE'VE HAD TO WALK UP THE

22  MIDDLE OF THE STREET.  AND IT IS -- YOU KNOW, THE STREETS ARE

23  SMALL, THEY ARE NARROW, BUT PEOPLE DRIVE PRETTY FAST.  AND

24  BECAUSE OF THE PITCH OF THE HILL, THEY CAN'T SEE YOU UNTIL THEY

25  COME OVER THE TOP OF THE HILL.  SO SHE CAN'T GO BY HERSELF.

1233

1  IT'S JUST NOT SAFE FOR HER.

2  Q.   OKAY.  AND IF THE SIDEWALKS AND CURB RAMPS WERE REPAIRED,

3  WOULD SHE BE ABLE TO ACCESS THE PARK?

4  A.   YES.

5  Q.   IS THERE ANOTHER OFF-LEASH PARK WHERE MAIRA CAN BRING HER

6  DOG IN YOUR NEIGHBORHOOD?

7  A.   NO.

8  Q.   HOW HAVE THE SIDEWALK AND CURB RAMP CONDITIONS IN YOUR

9  NEIGHBORHOOD AFFECTED YOU AND YOUR FAMILY?

10 A.   WELL, FOR ME, I GET FRUSTRATED AND IMPATIENT.  FOR MAIRA,

11 IT MAKES IT -- SHE GETS ALSO WILL SAY THAT SHE GETS FRUSTRATED.

12 SHE SOMETIMES GETS REALLY SCARED.

13       SHE GOT A CELL PHONE FOR HER 13TH BIRTHDAY SO NOW

14 SHE FEELS MORE CONFIDENT, BUT JUST SINCE SHE TURNED 13 IN THE

15 MIDDLE OF MARCH, AND TWICE SHE'S HAD TO CALL ME WHEN SHE'S BEEN

16 GOING TO THE LIBRARY BY HERSELF BECAUSE SHE GOT STUCK, HER

17 CHAIR GOT STUCK.

18 Q.   AND WHAT IS THE NAME OF YOUR NEIGHBORHOOD POOL?

19 A.   GARFIELD IS THE CLOSEST.  THAT'S IN OUR END OF THE

20 MISSION.

21 Q.   AND HAS MAIRA HAD ANY ACCESS PROBLEMS AT GARFIELD POOL?

22 A.   WE HAVE GONE TO GARFIELD POOL, BUT THERE'S NOT A SAFE

23 SPACE FOR HER TO SIT AND SHOWER.  SINCE SHE CAN'T STAND

24 INDEPENDENTLY, IT JUST DOESN'T WORK FOR US.

25 Q.   IS -- HOW FAR AWAY IS THE ALTERNATIVE ACCESSIBLE POOL?

1  A.   WELL, I THINK THE NEXT -- THERE'S ANOTHER POOL IN THE

2  MISSION, MISSION POOL, BUT THAT'S AN OUTDOOR POOL.  AND

3  ACTUALLY I THINK IT IS CLOSED RIGHT NOW.

4          AND THEN WE HAVE GONE -- THE ONE NEXT TO -- NEAR

5  CITY COLLEGE, BALBOA, WE HAVE GONE THERE, TOO, WITH SIMILAR

6  PROBLEMS.

7  Q.   AND HAVE YOU LOOKED AT THE CITY'S WEBSITE TO FIND

8  ACCESSIBLE POOLS IN YOUR AREA?

9  A.   YES.  ACTUALLY PRETTY RECENTLY.

10  Q.   AND WHAT ARE THE ACCESSIBLE POOLS THAT ARE LISTED FOR YOUR

11  AREA?

12  A.   GARFIELD IS LISTED.

13  Q.   IS THAT THE ONLY ACCESSIBLE POOL IN YOUR NEIGHBORHOOD?

14  A.   YES.  WELL, IT'S THE CLOSEST TO US.  WE DON'T ACTUALLY

15  HAVE A POOL IN OUR NEIGHBORHOOD.

16  Q.   OKAY.  AND HAVE YOU VISITED GLEN CANYON PARK?

17  A.   YES.  WE GO TO GLEN CANYON PARK A LOT.  WE WENT YESTERDAY.

18  Q.   AND DO YOU HAVE TROUBLE ACCESSING GLEN CANYON PARK WITH

19  MAIRA?

20  A.   YES.  SHE DOESN'T LIKE TO GO THERE.  IT'S NOT A

21  COMFORTABLE PARK FOR HER TO BE IN.

22  Q.   CAN YOU EXPLAIN TO THE COURT WHY THAT IS?

23  A.   THERE'S A LOT OF PROBLEMS THERE.  IT'S A BEAUTIFUL PARK.

24  IT'S KIND OF A WILDERNESS AREA.  IT'S A CANYON THAT GOES IN

25  PRETTY DEEP.

1235

```
1        AND THE ENTRANCE -- THERE ARE AREAS THAT ARE PAVED
2   ALTHOUGH THE PAVEMENT IS PRETTY BROKEN UP, BUT THEN THEY JUST
3   KIND OF PETER OUT TO A DIRT TRACK, AND THEN IT BECOMES A TRAIL.
4        SO SHE CAN'T -- IT'S PRETTY ROUGH.  AND THE GRADE IN
5   ONE AREA IS VERY STEEP AND IT'S PEBBLY, SO HER CHAIR HAS
6   SLIPPED ON IT, SO SHE JUST DOESN'T LIKE TO GO THERE.
7   Q.   ARE THERE ACCESSIBLE BATHROOMS THERE?
8   A.   OH, NO, THERE'S NO ACCESSIBLE BATHROOM THERE.  I HAVE TO
9   PIGGYBACK HER DOWN THE STAIRS TO USE THE BATHROOM.
10  Q.   WHAT SPECIAL -- IS THERE ANYTHING SPECIAL ABOUT GLEN
11  CANYON PARK?
12  A.   IT'S A VERY WILD PARK.  IT'S VERY BEAUTIFUL.  THEY HAVE
13  DONE A LOT OF RENEWAL OF LIKE NATIVE PLANTS.  IT'S AN
14  EUCALYPTUS FOREST.  IT IS A VERY PEACEFUL OUTDOOR AREA, AND
15  MAIRA IS AN URBAN KID AND SHE DOESN'T GET TO BE IN SPACES LIKE
16  THAT TOO MUCH.
17  Q.   IS SHE ABLE TO ACCESS ANY AREAS WHERE THERE IS MORE OF
18  THIS WILD ENVIRONMENT?
19  A.   IN THE CITY?
20  Q.   IN GLEN CANYON.
21  A.   OH, IN GLEN CANYON.  NO, YOU CAN'T GET -- YOU CAN GET
22  PASSED LIKE WHERE THE REC CENTER IS.  THERE IS A PLAYGROUND FOR
23  LITTLE KIDS THERE.  AND YOU -- BUT YOU CAN'T -- YOU CAN'T EVEN
24  GET TO THE BASEBALL DIAMOND ACTUALLY BECAUSE IT'S ALL GRASS.
25  AND THEN AFTER YOU GO AROUND THE REC CENTER, THE TRAIL JUST
```

1236

1  PETERS OUT TO DIRT.

2  Q.    YOU MENTIONED THERE'S A FACILITY.  ARE THERE ANY DAY CAMPS

3  OR ANY SORT OF ACTIVITIES THAT ARE HELD AT GLEN CANYON PARK?

4  A.    YEAH.  DEEP IN THE CANYON THERE'S A PRESCHOOL AND THE CITY

5  RUNS A SUMMER CAMP.

6  Q.    HAS MAIRA EVER ATTENDED THAT SUMMER CAMP?

7  A.    NO.  SHE CAN'T GET TO IT.  WE LOOKED AT IT BECAUSE IT'S

8  CLOSE TO HOME.  BUT THE DROP-OFF PLACE FOR THE CHILDREN WAS UP

9  AT SORT OF OFF OF DIAMOND, GOING UP INTO DIAMOND HEIGHTS.  SO

10  IT'S ACTUALLY A LITTLE TRAIL THAT THEY GATHER THE KIDS UP THERE

11  AND THEN COME DOWN A LITTLE TRAIL TO GO TO CAMP.

12  Q.    WAS THERE A PROBLEM WITH THE TRAIL?

13  A.    IT'S NOT ACCESSIBLE.  YOU CAN'T GET INTO THE SAME AREA

14  FROM THE OTHER SIDE, SHE JUST COULDN'T GO WITH A WHEELCHAIR.

15  Q.    AND HOW CLOSE IS GLEN CANYON PARK TO YOUR HOME?

16  A.    IT'S ABOUT FIVE MINUTES FROM WHERE WE LIVE.

17  Q.    DID YOU ENROLL MAIRA IN AN ALTERNATIVE PROGRAM?

18  A.    SHE.  SHE ENDED UP GOING TO PINE LAKE, WHICH WAS -- AT

19  THAT TIME, I DON'T KNOW WHAT THE CITY IS DOING NOW.  THIS IS

20  WHEN SHE WAS YOUNGER.  AT THAT TIME THAT WAS ONE OF THE

21  DESIGNATED CAMPS THAT WAS ACCESSIBLE.

22  Q.    AND HOW FAR AWAY WAS THAT FROM YOUR HOME?

23  A.    OFF OF SLOAT.  IT'S ABOUT 20 MINUTES.

24  Q.    WAS IT A BURDEN FOR YOU TO HAVE TO TRAVEL THAT FAR?

25  A.    YEAH.  I MEAN, IT'S PRETTY INCONVENIENT TO HAVE TO CROSS

1  THE CITY FOR HER TO GO TO CAMP WHEN THERE'S A CAMP, YOU KNOW,

2  IN THE NEXT NEIGHBORHOOD OVER.

3  Q.    HAVE YOU BEEN TO THE CONSERVATORY OF FLOWERS?

4  A.    YES.

5  Q.    AND HAVE YOU -- HAS MAIRA HAD ANY ACCESS PROBLEMS THERE?

6  A.    SHE CAN GET IN, NO PROBLEM, BUT SHE CAN'T GET THROUGH.  SO

7  YOU CAN GET INTO THE FIRST PART OF THE CONSERVATORY OF FLOWERS,

8  BUT YOU CAN'T GO ALL THE WAY THROUGH IT.  IT'S NARROW AND

9  THERE'S A LOT OF PLANTS AND POTS THAT ARE SORT OF ON THE

10  WALKING AREA.

11  Q.    IS THERE --

12  A.    WHERE THE LITTLE BRIDGES, SHE CAN'T GO IN THERE.

13  Q.    SHE CAN'T CROSS THE BRIDGE; IS THAT CORRECT?

14  A.    NO, SHE CAN'T CROSS THE BRIDGE.

15  Q.    AND HAS MAIRA VISITED THE CONSERVATORY OF FLOWERS WITH HER

16  SCHOOL?

17  A.    YES.  SHE'S GONE WITH US AND SHE ALSO WENT WITH HER

18  SCHOOL.  WHEN SHE WENT WITH HER SCHOOL, SHE HAD TO WAIT ON THE

19  OTHER SIDE OF THE BRIDGE WHILE THE OTHER CHILDREN WENT THROUGH

20  THE CONSERVATORY.

21  Q.    HAS SHE HAD ACCESS PROBLEMS WITH OTHER -- GOING ON FIELD

22  TRIPS WITH HER CLASSMATES TO OTHER CITY PLACES?

23  A.    THEY WENT TO THE JAPANESE TEA GARDEN AND SHE ACTUALLY HAD

24  TO STAY IN THE BAND SHELL AREA WITH A PARAPROFESSIONAL BECAUSE

25  SHE COULDN'T GO ON THE WALK WITH THE OTHER KIDS IN THE TEA

GARDEN.

Q.    DID SHE MISS OUT ON ANY EDUCATIONAL PROGRAMS THAT DAY?

A.    WELL, THEY WERE STUDYING JAPAN, SO I THINK IT WAS -- THE

IDEA WAS TO SORT OF SEE SOMETHING OF JAPANESE CULTURE AND ART.

AND THEY WERE LEARNING ABOUT BONSAI AND SHE COULDN'T SEE THE

PLANTS THAT HAD BEEN -- I DON'T KNOW WHAT THEY DO WITH THEM,

TRIM.  THEY ARE CONTAINED.

Q.    AND HOW HAS THAT AFFECTED MAIRA NOT BEING ABLE TO

PARTICIPATE ABOUT HER CLASSMATES?

A.    WELL, THAT WAS THE DAY SHE CAME HOME IN TEARS, BUT MOSTLY

I WOULD SAY SHE GETS, AT THIS POINT, EITHER PRETTY ANGRY OR

REALLY FRUSTRATED.  SOMETIMES CRIES ABOUT IT, BUT SHE'S GETTING

OLDER SO NOW SHE'S MORE ANGRY ABOUT IT.

Q.    AND WHAT IS YOUR OPINION OF THE CITY'S APPROACH TO

ENSURING THAT PEOPLE WITH DISABILITIES HAVE FULL ACCESS TO ITS

PROGRAMS WHY SIDEWALKS, AND OTHER FACILITIES?

A.    WELL, SO, HONESTLY, I AM GRATEFUL FOR THE THINGS THAT HAVE

BEEN DONE.  IT HAS MADE A BIG DIFFERENCE IN OUR LIVES AND IN MY

DAUGHTER'S ABILITY TO MOVE AROUND THE CITY, BUT IT IS VERY

INCONSISTENT AND UNPREDICTABLE.  SO YOU JUST -- YOU CAN'T COUNT

ON IT.

        YOU HAVE TO GO SCOUT OUT AN AREA, MAKE SURE IT'S

ACCESSIBLE BEFORE I WILL TAKE MAIRA WITH ME TO GO SOMEPLACE.

Q.    IN YOUR OPINION, DO YOU GET THE SAME ACCESS TO PUBLIC

SERVICE AS NONDISABLED FOLKS?

1   A.   WELL, MAIRA DOESN'T.

2   Q.   OKAY.  AND WHAT MAKES YOU THINK THAT?

3   A.   BECAUSE WE ENCOUNTER BARRIERS ALL THE TIME IN TERMS OF

4   GETTING AROUND THE CITY WHERE WE HAVE TO GO OUT OF OUR WAY,

5   SOMETIMES BLOCKS -- LIKE IN MY NEIGHBORHOOD GOING DOWN TOWARDS

6   THE FARMER'S MARKET, THERE'S A STREET THAT THERE'S NO CURB CUT

7   AND THERE'S ACTUALLY NO DRIVEWAYS OR ANYTHING.  WE USUALLY USE

8   THE DRIVEWAYS IF THERE'S NO CURB CUTS, SO YOU ACTUALLY HAVE TO

9   GO A COUPLE OF BLOCKS OUT OF THE WAY.  SO THERE'S A LOT OF

10  DETOURING.

11           AND, AGAIN, I DON'T FEEL CONFIDENT THAT SHE, AT THIS

12  POINT, CAN NEGOTIATE THOSE THINGS BY HERSELF.  SHE NEEDS TO

13  HAVE AN ADULT WITH HER TO SORT OF RUN INTERFERENCE.

14  Q.   IF THE CITY WERE TO REPAIR ALL ITS SIDEWALKS AND CURB

15  RAMPS, DO YOU FEEL THAT MAIRA CAN BE INDEPENDENT?

16  A.   ABSOLUTELY.

17  Q.   CAN YOU PLEASE --

18  A.   NOT NOW.  SHE'S 13, BUT YEAH, IN THE FUTURE.

19  Q.   WHEN SHE IS OF AGE?

20  A.   ABSOLUTELY.

21  Q.   WOULD YOU TELL YOUR HONOR WHAT YOU WOULD LIKE FOR HER TO

22  DO ABOUT THE PROBLEMS YOU HAVE DESCRIBED TODAY?

23  A.   OKAY.  YOUR HONOR, I -- WHAT WOULD BE IDEAL FROM MY

24  PERSPECTIVE IS THAT THERE BE A PLAN, THAT IT IS PREDICTABLE,

25  THAT IT'S VISIBLE, AND THAT IT HAS SOME TIME LIMITS ON IT

1   BECAUSE IT JUST SEEMS TO -- IT TAKES A REALLY LONG TIME.  IT'S

2   BEEN A VERY PROTRACTED PROCESS.

3           SO, THAT WOULD BE ONE THING.  IT'S JUST THAT THERE

4   WAS -- THAT IT WAS PREDICTABLE WHEN THINGS WOULD BE DONE.  AND

5   ALSO THAT IT WOULD BE POSSIBLE TO ACTUALLY FIGURE OUT WHERE IT

6   IS ACCESSIBLE AND WHERE IT ISN'T.  NOT JUST LIKE FROM THE

7   PARKING LOT TO THE BUILDING, BECAUSE WE ARE TRYING TO DO MOST

8   THINGS WITH HER ON PUBLIC TRANSPORTATION BECAUSE THAT'S WHAT

9   SHE'LL BE GETTING AROUND ON, SO TO BE ABLE TO KNOW ACTUAL

10  ACCESS INSTEAD OF THAT THERE'S A RAMP TO THE FRONT DOOR.

11  Q.   AND WHAT IS YOUR OPINION OF THINGS THAT THE CITY

12  FACILITIES THAT HAVE BEEN CHARACTERIZED AS ACCESSIBLE?

13  A.   SOMETIMES THEY ARE NOT ALL THE WAY ACCESSIBLE.  I THINK IT

14  SEEMS LIKE ACCESSIBLE MEANS YOU CAN GET INSIDE.  SO, THAT'S NOT

15  ALWAYS ENOUGH TO JUST GET INSIDE.

16           MS. PRASAD:  YOUR HONOR, THAT'S ALL THE QUESTIONS I

17  HAVE FOR THIS WITNESS.

18           ERICA MONASTERIO.

19           THE COURT:  EXCUSE ME?

20           MS. PRASAD:  I WAS TELLING YOU HER NAME.

21           THE COURT:  YOU HEARD ME?  I AM SORRY, HOW DO YOU

22  SPELL IT?

23           MS. PRASAD:  GO AHEAD.

24           THE WITNESS:  M-O-N-A-S-T-E-R-I-O.

25           THE COURT:  THANK YOU.  I DIDN'T MEAN TO INTERRUPT

1241

1    YOUR ASKING HER.

2         MS. PRASAD:  I WAS TELLING YOU THAT I HAVE NO MORE

3    QUESTIONS.

4         THE COURT:  OKAY.  THANK YOU, MS. PRASAD.

5         CROSS-EXAMINATION OF MS. MONASTERIO?

6                    CROSS-EXAMINATION

7    BY MS. POPLAWSKI:

8    Q.    GOOD AFTERNOON, MS. MONASTERIO.

9    A.    HELLO.

10   Q.    MY NAME IS KRISTINE POPLAWSKI AND I AM REPRESENTING THE

11   CITY HERE TODAY.

12        YOU TESTIFIED THAT YOU HAD GONE ON THE CITY'S REC

13   PARK WEBSITE AND YOU HAD LOOKED THERE TO SEE IF THE GARFIELD

14   POOL WAS ACCESSIBLE?

15        AND I BELIEVE YOU STATED THAT IT WAS LISTED AS AN

16   ACCESSIBLE POOL?

17   A.    I BELIEVE IT IS LISTED AS AN ACCESSIBLE POOL.  THERE WAS A

18   BIG THING ON THE WEBSITE ABOUT HOW THEY -- IT HAD JUST

19   REOPENED, HAD ITS GRAND RE-OPENING AND HAD BEEN REDONE.

20   Q.    WHEN WAS THIS THAT YOU LOOKED AT THE WEBSITE?

21   A.    I LOOKED A COUPLE -- WE WERE LOOKING FOR A PLACE FOR MAIRA

22   TO SWIM THIS WINTER, SO IT'S BEEN MAYBE, I DON'T KNOW, FOUR

23   MONTHS.

24   Q.    AND YOU ARE SURE THAT THEY LISTED THE GARFIELD POOL?

25   A.    I BELIEVE THEY LISTED IT AS ACCESSIBLE, BUT I WOULDN'T

1  SWEAR TO IT.  IT'S A POOL THAT WE KNOW BECAUSE WE HAD BEEN TO

2  IT IN THE PAST.  SO WHAT I WAS LOOKING FOR WAS TO SEE IF THEY

3  HAD DONE ANYTHING IN THE BATHROOMS, BUT I COULDN'T -- THEY HAD

4  LITTLE VIDEOS OF THE IMPROVEMENTS, BUT I COULDN'T TELL.

5  Q.   WHEN YOU SAY YOU COULDN'T SWEAR THAT GARFIELD POOL WAS

6  LISTED ON THE WEBSITE, YOUR TESTIMONY IS THAT YOU ARE NOT SURE

7  OF GARFIELD POOL?

8  A.   I AM NOT POSITIVE THAT IT'S LISTED ON THE WEBSITE AS

9  ACCESSIBLE.

10 Q.   JUST AS A CAUTION, I WILL TRY NOT TO SPEAK OVER YOU AND IF

11 YOU LET ME FINISH MY QUESTION THAT WOULD BE GOOD BECAUSE THE

12 COURT REPORTER HAS TROUBLE TAKING US DOWN WHEN WE ARE BOTH

13 SPEAKING AT THE SAME TIME.

14 A.   SURE.

15 Q.   OKAY.  HAVE YOU COMPLAINED TO THE CITY ABOUT ACCESS

16 PROBLEMS AT GLEN CANYON PARK?

17 A.   NO.

18 Q.   WHY NOT?

19 A.   WELL, HAVING A CHILD WITH SPECIAL HEALTH CARE NEEDS IS A

20 BIG JOB.  I ALSO WORK FULL TIME AS DOES MY PARTNER.  SO YOU

21 PRIORITIZE -- I PRIORITIZE.  AND MOSTLY WE HAVE BEEN WORKING ON

22 THINGS AROUND SCHOOL AND NOT SO MUCH THINGS IN THE COMMUNITY.

23 Q.   HAVE YOU COMPLAINED TO THE CITY ABOUT ACCESS TO THE

24 CONSERVATORY OF FLOWERS?

25 A.   I COMPLAINED AT THE TIME THAT WE WERE THERE, AND ACTUALLY

1  THEY GAVE US OUR MONEY BACK.  BECAUSE THE PERSON, JUST THE

2  PERSON AT THE KIOSK, I SAID, YOU KNOW, IT'S VERY LOVELY WE

3  COULD GET IN BUT WE REALLY COULDN'T GET THROUGH AND WE DIDN'T

4  GET TO REALLY VISIT, AND THEY GAVE US OUR MONEY BACK.

5  Q.   DID YOU COMPLAIN TO ANYONE REGARDING THE JAPANESE TEA

6  GARDEN?

7  A.   NO.  JUST GAVE UP.

8  Q.   DID YOU CONSIDER CALLING THE MAYOR'S OFFICE ON DISABILITY

9  FOR ANY ASSISTANCE WITH RESPECT TO ACCESSIBILITY?

10 A.   WELL, AS I EXPLAINED IN TERMS OF TRYING TO INCREASE ACCESS

11 IN OUR OWN COMMUNITY SO THAT MAIRA CAN LEARN HOW TO TAKE CARE

12 OF HER BUSINESS IN THE NEIGHBORHOOD, YES.  ALTHOUGH IT WAS

13 THROUGH SUPERVISOR AMMIANO'S OFFICE, THAT'S THE OFFICE THAT

14 THEY WORKED WITH.

15 Q.   I BELIEVE YOU TESTIFIED THAT YOU BELIEVE YOU CONTACTED

16 MR. AMMIANO'S OFFICE IN LATE 2006 OR LATE 2007?

17 A.   UH-HUH.

18         THE COURT:  YOU HAVE TO SAY YES OR NO.

19         THE WITNESS:  SORRY.  YES.

20 BY MS. POPLAWSKI:

21 Q.   AND DIDN'T YOU, WITHIN DAYS OF SENDING THAT E-MAIL TO

22 MR. AMMIANO'S OFFICE, RECEIVE A COMMUNICATION BACK FROM SUSAN

23 MIZNER, THE DIRECTOR OF THE MAYOR'S OFFICE ON DISABILITY?

24 A.   THAT I REMEMBER?  ALL OF THE COMMUNICATION I HAD WAS WITH

25 A WOMAN IN MR. AMMIANO'S OFFICE, AND THEY HAD THE CONTACT WITH

1   THE MAYOR'S OFFICE.

2   Q.   SO YOU DO NOT REMEMBER RECEIVING E-MAILS DIRECTLY FROM THE

3   DIRECTOR OF THE MAYOR'S OFFICE ON DISABILITY SUSAN MIZNER IN

4   RESPONSE TO YOUR CONCERNS ABOUT CURB RAMPS AND SIDEWALK

5   CONDITIONS IN YOUR NEIGHBORHOOD?

6   A.   WHAT I REMEMBER IS GETTING AN E-MAIL BACK THAT WAS FROM

7   MR. AMMIANO'S OFFICE THAT HAD -- THAT WAS OF AN E-MAIL TRAIL

8   FROM THE MAYOR'S OFFICE.  I DON'T REMEMBER WHO SIGNED IT

9   THOUGH.

10  Q.   DO YOU REMEMBER GETTING AN E-MAIL FROM KEVIN JENSEN WHO IS

11  THE DISABILITY ACCESS COORDINATOR WITH, I BELIEVE, DEPARTMENT

12  OF PUBLIC WORKS?

13  A.   NO.

14  Q.   DO YOU RECALL BEING VISITED BY A GENTLEMAN FROM THE

15  DEPARTMENT OF PUBLIC WORKS WHO CAME TO TALK TO YOU ABOUT THE

16  PATHS OF TRAVEL THAT YOUR DAUGHTER REGULARLY USES?

17  A.   I WAS NEVER VISITED BY ANYONE.

18  Q.   YOU DON'T RECALL THAT?

19  A.   I WAS NOT VISITED BY ANYONE.

20  Q.   DO YOU RECALL SENDING A MAP TO MS. MIZNER THAT IDENTIFIED

21  PARTICULAR INTERSECTIONS AND A ROUTE -- AND THE ROUTE OF TRAVEL

22  REGULARLY USED BY YOUR DAUGHTER?

23  A.   YES, I REMEMBER SENDING A MAP.  IT WAS REQUESTED.  I GOT

24  AN E-MAIL ASKING FOR A MAP.  AND MAIRA AND I WALKED AROUND THE

25  NEIGHBORHOOD AND MAPPED OUT WHERE THE SIDEWALK WAS BROKEN AND

1245

1  WHERE THERE WERE NO CURB CUTS.

2  Q.   YOU REMEMBER SENDING THAT MAP TO MS. MIZNER, CORRECT?

3  A.   I REMEMBER SENDING THE MAP -- I DON'T REMEMBER WHO I SENT

4  IT TO.  IT WAS A NUMBER OF YEARS AGO AND I DON'T REMEMBER THE

5  PEOPLE'S NAMES.

6  Q.   OKAY.  I BELIEVE AT THAT TIME, IN LATE 2006, EARLY 2007 AS

7  YOU'VE TESTIFIED, YOU IDENTIFIED CERTAIN INTERSECTIONS AS ON

8  MAIRA'S ROUTE OF TRAVEL THAT YOU WISHED HAD EITHER MORE CURB

9  RAMPS OR SIMPLY CURB RAMPS, CORRECT?

10  A.   YES.

11  Q.   ONE OF THOSE INTERSECTIONS WAS THE INTERSECTION OF OGDEN

12  AVENUE AND MOULTRIE STREET.  YOU LIVE ON MOULTRIE, CORRECT?

13  A.   YES.

14  Q.   SO YOU IDENTIFIED OGDEN AVENUE AND MOULTRIE STREET

15  INTERSECTION AS ONE THAT YOU ASKED TO HAVE CURB RAMPS

16  INSTALLED, CORRECT?

17  A.   YES.

18  Q.   AND ISN'T IT TRUE THAT IN LESS THAN A YEAR CURB RAMPS WERE

19  IN FACT INSTALLED ON ALL FOUR CORNERS OF THAT INTERSECTION,

20  LESS THAN A YEAR AFTER YOUR COMPLAINT?

21  A.   THAT INTERSECTION WAS PROBABLY I THINK THE FIRST ONE THAT

22  WAS DONE.  AND, YES, AS I MENTIONED, THE RESPONSE WHERE WE HAVE

23  ASKED FOR HELP, THEY HAVE -- THEY INITIATED A RESPONSE.  IT

24  SEEMED LIKE IT WAS MORE LIKE A YEAR AND A HALF, BUT PERHAPS IT

25  WAS A YEAR.  IN TERMS OF THE CURB CUTS.  SO SHE HAS ACCESS FROM

1246

1 OUR HOUSE UP TO CORTLAND AND OVER TO HOLLY PARK.

2 Q.    AND GIVEN THAT RESPONSE THAT YOU RECEIVED FROM THE MAYOR'S

3 OFFICE ON DISABILITY, WHETHER IT WAS DIRECTLY THROUGH COMPLAINT

4 FROM YOU TO THEM, OR BY WAY OF YOUR COMPLAINT BEING FORWARDED

5 TO THEM BY MR. AMMIANO'S OFFICE, WHY WOULDN'T YOU THEN CONSIDER

6 CALLING THE MAYOR'S OFFICE ON DISABILITY NOW FOR FURTHER

7 ASSISTANCE IN EITHER GETTING ADDITIONAL CURB CUTS, ADDITIONAL

8 ACCESSIBILITY, OR BEING ABLE TO PLAN OUTINGS?

9 A.    WELL, THE FIRST JOB ISN'T DONE YET.  AT THE END OF OUR

10 BLOCK, WE LIVE ONE HOUSE OFF THE CORNER ON MOULTRIE, THAT'S THE

11 CORNER OF MOULTRIE AND CRESCENT.  THERE ARE NO CURB CUTS AT OUR

12 CORNER ON EITHER SIDE OF CRESCENT.

13         THERE ARE FOUR STREETS GOING DOWN CRESCENT THAT

14 DON'T HAVE CURB CUTS.  I HAVEN'T GONE ON TO THE NEXT THING

15 BECAUSE THIS THING ISN'T DONE.  THERE ALSO HASN'T BEEN ANYTHING

16 DONE WITH THE SIDEWALKS, AND THE SIDEWALK CONDITION IS PRETTY

17 POOR.

18 Q.    HAVE YOU CONVEYED THAT INFORMATION TO THE MAYOR'S OFFICE

19 ON DISABILITY?

20 A.    NO.  AS I MENTIONED, ALL THE INTERSECTIONS THAT I HAVE HAD

21 THAT I REMEMBER HAVE BEEN WITH THE SUPERVISOR'S OFFICE.  AND I

22 DID -- IT WAS OVER ABOUT THREE YEARS PROBABLY THAT THE

23 COMMUNICATION BETWEEN MYSELF AND I CANNOT REMEMBER THE WOMAN'S

24 NAME IN MR. AMMIANO'S OFFICE.  I DON'T KNOW I CAN'T SAY.

25 Q.    ANGELA CAVIOLO (PHONETIC)?

1247

```
 1  A.   YES.  THERE YOU GO.  YES.  THAT WE CONTINUED -- THE

 2  COMMUNICATION CONTINUED BETWEEN MYSELF AND HER.  AND -- BUT

 3  IT'S JUST IT'S NOT DONE.  IT'S NOT FINISHED.

 4  Q.   IS THERE ANY REASON THAT YOU HAVEN'T COMMUNICATED TO THE

 5  MAYOR'S OFFICE ON DISABILITY TO TELL THEM THAT YOU FEEL THE JOB

 6  IS NOT DONE?

 7  A.   FRUSTRATION.  I DID COMMUNICATE THAT I FELT THE JOB WASN'T

 8  DONE AND RAISED THE ISSUE ABOUT THE CURB CUTS ON MOULTRIE

 9  AGAIN, AND THEN JUST, YOU KNOW, WENT ON TO THE NEXT BIG THING.

10  THERE'S JUST MANY COMPETING PRIORITIES.

11  Q.   ISN'T IT TRUE --

12          THE COURT:  WERE YOU TRYING TO SAY SOMETHING,

13  MS. PRASAD?

14          MS. PRASAD:  I TRYING TO OBJECT.  I WAS TOO SLOW.

15          THE COURT:  YOUR VOICE IS REALLY SOFT, TOO.  IF YOU

16  STAND UP SOMETIMES I CAN SEE YOU BEFORE I CAN HEAR YOU.

17          MS. PRASAD:  I WILL.

18          THE COURT:  YOU ARE NOT MAKING AN OBJECTION?

19          MS. PRASAD:  NO.  I AM SORRY.

20          THE COURT:  YOU MAY CONTINUE.

21  BY MS. POPLAWSKI:

22  Q.   ISN'T IT TRUE, MS. MONASTERIO, THAT AFTER YOUR COMPLAINT

23  TO MR. AMMIANO'S OFFICE IN LATE 2006 AND EARLY 2007 THAT THERE

24  WERE IN EXCESS OF 20 NEW CURB RAMPS THAT WERE INSTALLED IN YOUR

25  NEIGHBORHOOD ALONG THE PATH OF TRAVEL YOUR DAUGHTER REGULARLY
```

1248

1  USES WITHIN A YEAR OF YOUR COMPLAINT?

2           MS. PRASAD:  OBJECTION.

3           THE COURT:  WHAT'S THE OBJECTION?

4           MS. PRASAD:  LACKS FOUNDATION.

5           THE COURT:  SUSTAINED.  YOU NEED TO ESTABLISH

6  FOUNDATION.

7  BY MS. POPLAWSKI:

8  Q.   MS. MONASTERIO, AFTER YOUR COMPLAINT TO MR. AMMIANO'S

9  OFFICE, I BELIEVE YOU TESTIFIED THAT THERE WERE NEW CURB RAMPS

10 PUT IN IN THE INTERSECTION AT OGDEN AND MOULTRIE.

11          WEREN'T THERE ALSO CURB RAMPS PUT IN ON ALL FOUR

12 CORNERS OF THE INTERSECTION OF MOULTRIE AND TOMPKINS AVENUE

13 WITHIN A YEAR OF YOUR COMPLAINT?

14 A.   I COULD NOT SAY WHETHER IT WAS WITHIN A YEAR, BUT THERE

15 ARE NOW CURB CUTS ON ALL FOUR CORNERS.

16 Q.   WEREN'T THERE ALSO NEW CURB CUTS ADDED AT THE CORNER OF --

17 TWO OF THE CORNERS OF TOMPKINS?  I BELIEVE TOMPKINS DEAD-ENDS

18 INTO ANDOVER; IS THAT CORRECT?

19          THE COURT:  IS WHICH CORRECT?  WHETHER TOMPKINS

20 DEAD-ENDS INTO THE OTHER STREET OR WHETHER THE NEW CURB RAMPS

21 WERE ADDED TO THE CORNERS?

22          MS. POPLAWSKI:  LET ME REPHRASE.

23          THE COURT:  OKAY.

24 BY MS. POPLAWSKI:

25 Q.   IS IT TRUE THAT TOMPKINS AVENUE DEAD-ENDS INTO ANDOVER

1249

1   STREET?

2   A.   YES.

3   Q.   AND WITH RESPECT TO THE TWO CORNERS OF TOMPKINS, AT THAT

4   INTERSECTION WITH ANDOVER, ISN'T IT TRUE THAT NEW CURB RAMPS

5   WERE PUT IN AT THAT INTERSECTION AS WELL WITHIN A YEAR AFTER

6   YOUR COMPLAINT?

7   A.   AS I MENTIONED, I DON'T THINK IT WAS WITHIN A YEAR, BUT

8   THEY WERE PUT IN.

9   Q.   AND YOUR TESTIMONY NOW IS THAT YOUR DAUGHTER NOW CAN

10  TRAVEL, HAS AN ACCESSIBLE PATH OF TRAVEL BECAUSE OF NEW CURB

11  CUTS FROM YOUR HOUSE UP TO HOLLY PARK; IS THAT CORRECT?

12  A.   YES.  SHE CAN NOW TRAVEL TO HOLLY PARK WITH CURB CUTS.

13  Q.   AND UP TO CORTLAND AVENUE?

14  A.   AND UP TO CORTLAND AS WELL.

15  Q.   AND TO THE LIBRARY AT CORTLAND AVENUE?

16  A.   YES.  THAT IS ON CORTLAND.

17           MS. POPLAWSKI:  THANK YOU.

18           THE COURT:  ARE YOU COMPLETELY THROUGH?

19           MS. PRASAD:  NO MORE QUESTIONS.

20           THE COURT:  ANY REASON THE WITNESS SHOULD NOT BE

21  EXCUSED FROM FURTHER TESTIMONY?

22           MS. PRASAD:  NO.

23           MS. POPLAWSKI:  NO, YOUR HONOR.

24           THE COURT:  THANK YOU, MS. MONASTERIO.  YOU MAY BE

25  EXCUSED.

1251

1   LET ME KNOW WHEN YOU ARE THERE.

2   A.   OKAY.

3   Q.   DO YOU REMEMBER, MR. MASTIN, LAST YEAR ON APRIL 2ND, 2010

4   I ASKED YOU A QUESTION.

5        "IN ADDITION TO THE CASP CERTIFICATION, WHAT

6        QUALIFICATIONS WOULD YOU NEED TO SEE BEFORE YOU

7        WOULD CONSIDER A COLLEAGUE TO BE AN EXPERT IN

8        DISABILITY ACCESS STANDARDS?"

9        AND DO YOU REMEMBER, MR. MASTIN, YOU ANSWERED ME AT

10  THAT TIME THAT YOU WOULD GENERALLY VIEW SOMEONE WHO IS LICENSED

11  AS AN ARCHITECT IN CALIFORNIA FOR SOME TIME IN PRACTICE TO BE

12  MORE KNOWLEDGEABLE IN ADDITION TO BEING CAST CERTIFIED; IS THAT

13  RIGHT?

14  A.   YES.

15  Q.   SO I ASKED YOU:

16       "WHAT QUALIFICATIONS YOU WOULD REQUIRE IN AN

17  EXPERT?"

18       AND YOU SAID, "A LICENSED ARCHITECT", CORRECT?

19  A.   YES.

20  Q.   ARE YOU AWARE THAT YOUR COLLEAGUE, MR. MARGEN, DOES NOT

21  FULFILL THAT REQUIREMENT THAT YOU SET OUT FOR ME LAST YEAR?

22  A.   I AM AWARE OF THAT.

23  Q.   I WOULD LIKE TO ASK YOU SOME QUESTIONS ABOUT SOME OF THE

24  FACILITIES THAT YOU DISCUSSED EARLIER TODAY AND ON MONDAY.

25       AND WE WILL START FIRST WITH THE PANHANDLE

1295

1

2

CERTIFICATE OF REPORTER

WE, RAYNEE H. MERCADO, AND DIANE E. SKILLMAN, OFFICIAL
REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF
CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN
C07-03685SBA, KIROLA, ET AL. V. CITY AND COUNTY OF SAN
FRANCISCO, ET AL., WERE REPORTED BY US, CERTIFIED SHORTHAND
REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION
INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND
TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF
FILING.

THE VALIDITY OF THE REPORTERS' CERTIFICATION OF
SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL
FROM THE COURT FILE.

_____

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

_____

DIANE E. SKILLMAN, CSR, RPR, FCRR

TUESDAY, APRIL 19, 2011