# EXHIBIT K

ORIGINAL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SAUNDRA BROWN ARMSTRONG, JUDGE

| | | |
|---|---|---|
| IVANA KIROLA, ET AL., | ) | COURT TRIAL |
| | ) | |
| PLAINTIFFS, | ) | VOLUME 9 |
| | ) | |
| VS. | ) | NO. C 07-03685 SBA |
| | ) | |
| CITY AND COUNTY OF | ) | |
| SAN FRANCISCO, ET AL., | ) | PAGES 1661 - 1887 |
| | ) | |
| DEFENDANTS. | ) | OAKLAND, CALIFORNIA |
| _____ | ) | FRIDAY, APRIL 22, 2011 |

TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFFS:     SCHNEIDER WALLACE COTTRELL BRAYTON &
                         KONECKY
                    180 MONTGOMERY STREET, SUITE 2000
                    SAN FRANCISCO, CALIFORNIA  94109
               BY:  MARK T. JOHNSON,
                    ANDREW P. LEE,
                    KIRAN PRASAD,
                    GUY B. WALLACE, ATTORNEYS AT LAW
                    BROWN POORE LLP
                    THE WATERGATE TOWERS
                    2200 POWELL STREET, SUITE 745
                    EMERYVILLE, CALIFORNIA  94608
               BY:  SCOTT A. BROWN, ATTORNEY AT LAW
FOR DEFENDANT:      OFFICE OF THE CITY ATTORNEY
                    SIXTH FLOOR - FOX PLAZA
                    1390 MARKET STREET
                    SAN FRANCISCO, CALIFORNIA  94102
               BY:  ERIN BERNSTEIN,
                    JAMES M. EMERY,
                    ELAINE M. O'NEIL,
                    KRISTINE A. POPLAWSKI, ATTORNEYS AT LAW

REPORTED BY:        RAYNEE H. MERCADO, CSR NO. 8258
                    DIANE E. SKILLMAN, CSR NO. 4909
     RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

I N D E X

DEFENDANTS' WITNESSES                          PAGE      VOL.

MIZNER, SUSAN

CROSS-EXAMINATION (RESUMED) BY MR. JOHNSON     1665        9

CROSS-EXAMINATION (RESUMED) BY MR. JOHNSON     1756        9

REDIRECT EXAMINATION BY MS. O'NEIL             1766        9

RECROSS-EXAMINATION BY MR. JOHNSON             1768        9


JOHNSON, CARLA J.

DIRECT EXAMINATION BY MR. EMERY                1740        9

CROSS-EXAMINATION BY MR. BROWN                 1752        9


SCOTT, JOHN PAUL

DIRECT EXAMINATION BY MR. EMERY                1770        9

CROSS-EXAMINATION BY MR. WALLACE               1828        9


FRAGULI, JOANNA

DIRECT EXAMINATION BY MS. O'NEIL               1839        9

CROSS-EXAMINATION BY MR. BROWN                 1871        9

REDIRECT EXAMINATION BY MS. O'NEIL             1884        9

--O0O--


RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

E X H I B I T S

| PLAINTIFFS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL |
|---|---|---|---|---|
| 2785 | | | 1877 | 9 |
| 3911 | | | 1886 | 9 |
| 4150 | | 1712 | 1756 | 9 |

| DEFENDANTS' EXHIBITS | W/DRAWN | IDEN | EVID | VOL |
|---|---|---|---|---|
| B07 | | | 1785 | 9 |
| B39 | | | 1804 | 9 |
| E27 | | | 1866 | 9 |
| E45 | | | 1854 | 9 |
| F16 | | | 1815 | 9 |
| F17 | | | 1832 | 9 |
| F26 | | | 1830 | 9 |
| F27 | | | 1833 | 9 |
| F34 | | | 1818 | 9 |
| F37 | | | 1825 | 9 |
| F38 | | | 1835 | 9 |
| F39 | | | 1836 | 9 |
| F40 | | | 1817 | 9 |
| I32 | | | 1813 | 9 |

--O0O--

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

1846

1   ADA.

2   Q.   AND PRIOR TO THAT POSITION, WERE YOU EMPLOYED?

3   A.   YES, I WERE.  MY EMPLOYMENT INVOLVED MORE SERVICE

4   PROVIDING TO THE DISABILITY COMMUNITY.

5        I WORKED IN AN OUTREACH ADOLESCENT PROGRAM FOR

6   GIRLS, HIGH RISK GIRLS WITH DISABILITIES FOR SUBSTANCE ABUSE.

7   AND I ALSO, AS PART OF MY TRAINING AS A CLINICAL PSYCHOLOGIST,

8   I PROVIDED SERVICES IN MENTAL HEALTH.  I WORKED WITH PUBLIC

9   MENTAL HEALTH CLINICS IN THE AREAS OF DOMESTIC VIOLENCE AND

10  ALSO PROVIDING SERVICES FOR PEOPLE WITH SIGNIFICANT MENTAL

11  HEALTH DISABILITIES.

12  Q.   YOU MENTIONED SOME TRAINING THAT YOU HAD.

13       COULD YOU BRIEFLY STATE YOUR EDUCATIONAL EXPERIENCE?

14  A.   I HAVE A BACHELOR'S DEGREE FROM UC BERKELEY IN PSYCHOLOGY

15  AND SOCIOLOGY, AND I HAVE MY MASTER'S IN CLINICAL PSYCHOLOGY

16  FROM THE CALIFORNIA SCHOOL OF PROFESSIONAL PSYCHOLOGY.

17  Q.   HOW MANY YEARS HAVE YOU BEEN WORKING IN THE AREA OF

18  DISABILITY ACCESS?

19  A.   DISABILITY ACCESS OR DISABILITY ISSUES?

20  Q.   DISABILITIES ISSUES.

21  A.   TOTAL OF ABOUT 17 YEARS.

22  Q.   ARE YOU A PERSON WITH A DISABILITY?

23  A.   I AM.  I HAVE SPINAL MUSCULAR ATROPHY, WHICH IS A

24  NEUROMUSCULAR CONGENITAL MILDLY PROGRESSIVE NEUROMUSCULAR

25  DISORDER.  IT RESULTS IN AN OVERALL GENERALIZED WEAKNESS

```
1   THROUGHOUT MY BODY, AND IT NECESSITATES THAT I USE AN ELECTRIC

2   WHEELCHAIR AND ALSO PERSONAL ASSISTANT SERVICES ON A DAILY

3   BASIS.

4   Q.   NOW, MS. FRAGULI, YOU TESTIFIED THAT YOUR JOB

5   RESPONSIBILITIES FOR THE MAYOR'S OFFICE ON DISABILITY INCLUDE

6   THE CREATION AND IMPLEMENTATION OF TRAINING PROGRAMS FOR CITY

7   STAFF.  IS THAT CORRECT?

8   A.   YES, IT IS.

9   Q.   AND I WOULD LIKE TO DIRECT YOUR ATTENTION TO A DOCUMENT

10  THAT HAS BEEN IDENTIFIED AND MOVED INTO EVIDENCE AS -- IT'S

11  TRIAL EXHIBIT E47.

12          MS. O'NEIL:  YOUR HONOR, WE ARE GOING TO, WITH

13  MS. FRAGULI, JUST DISPLAY THE DOCUMENTS ON THE SCREEN FOR HER.

14          THE COURT:  OKAY.

15          THE WITNESS:  MAY I?

16          THE COURT:  SURE, BUT CAN SHE READ THAT?

17          MR. EMERY:  I CAN HAVE SOMEONE HOLD THE BINDER.

18          THE COURT:  ARE YOU ABLE TO READ THAT --

19          THE WITNESS:  YES.  I KNOW THE DOCUMENT.

20          THE COURT:  I KNOW YOU PROBABLY KNOW IT, BUT CAN YOU

21  READ IT?

22          ARE YOU GOING TO BE DIRECTING HER TO DIFFERENT

23  PORTIONS OF IT?

24          MS. O'NEIL:  YES.

25          THE COURT:  ARE YOU ABLE TO READ THAT?
```

1848

1    THE WITNESS:  YES, I AM.

2    THE COURT:  YOU ARE?

3    OKAY.  THEN THAT'S FINE.

4    (EXHIBIT DISPLAYED ON SCREEN.)

5  BY MS. O'NEIL:

6  Q.  ARE YOU FAMILIAR WITH THE DOCUMENT THAT HAS BEEN DISPLAYED

7  ON THE SCREEN MARKED AS DEFENDANTS' TRIAL EXHIBIT E47 MS.

8  FRAGULI?

9  A.  YES, I AM.

10   MR. BROWN:  YOUR HONOR, I DON'T BELIEVE I HAVE THIS

11  EXHIBIT.  IF I CAN CONFER WITH COUNSEL?

12   (COUNSEL CONFER.)

13   MS. O'NEIL:  THE FIRST DOCUMENT IN THE COURT'S

14  BINDER.

15   MR. BROWN:  THANK YOU.

16  BY MS. O'NEIL:

17  Q.  ARE YOU FAMILIAR WITH THIS DOCUMENT --

18  A.  YES, I AM.

19  Q.  I NEED TO FINISH THE QUESTION FOR THE COURT REPORTER.

20   WHAT IS THIS DOCUMENT, MS. FRAGULI?

21  A.  THIS IS A LETTER THAT WENT OUT ON BEHALF OF MAYOR GAVIN

22  NEWSOME AND THE THEN HEAD OF THE CITY ATTORNEY'S OFFICE DENNIS

23  HERRERA, URGING DEPARTMENT HEADS, CITY DEPARTMENT HEADS TO

24  ATTEND AND MANDATE THAT THEIR UPPER LEVEL MANAGEMENT OF THEIR

25  DEPARTMENTS ATTEND A SPECIAL TRAINING BASED ON ADA PROGRAMMATIC

1849

1  ACCESS ISSUES.

2         AND IT BASICALLY RAISES THIS AS AN IMPORTANT

3  RESPONSIBILITY AND PRIORITY FOR CITY DEPARTMENTS.

4  Q.   AND WERE YOU INVOLVED IN THOSE TRAINING SESSIONS?

5  A.   I WAS THE PRIMARY PERSON IN OUR OFFICE THAT BOTH DEVELOPED

6  AND CONDUCTED THE TRAINING SESSIONS.

7  Q.   WERE YOU ASSISTED IN THESE TRAINING SESSIONS BY ANY OTHER

8  PERSON?

9  A.   YES.  THEY WERE DONE IN COLLABORATION WITH THE CITY

10 ATTORNEY'S OFFICE, AND MORE SPECIFICALLY MARIAM MORLEY, WHO IS

11 A DEPUTY CITY ATTORNEY.

12 Q.   HOW MANY TRAINING SESSIONS DID SAN FRANCISCO CONDUCT AS

13 PART OF THIS EFFORT?

14 A.   OVER THE COURSE OF ABOUT A YEAR AND A HALF TO TWO YEARS,

15 WE CONDUCTED ABOUT 22, 22 TRAINING SESSIONS THAT INVOLVED

16 PRETTY MUCH ALL OF THE DEPARTMENTS IN THE CITY OR THE MAJORITY

17 OF THE DEPARTMENTS IN THE CITY.

18        MANY OF THOSE TRAININGS HAD A COMBINATION OF SMALLER

19 DEPARTMENTS THAT HAD SIMILAR FUNCTIONS AND SOME OF THEM,

20 BECAUSE THERE WERE LARGER DEPARTMENTS, THEY RECEIVED THEIR OWN

21 CUSTOM DESIGN TRAINING.

22 Q.   AND APPROXIMATELY HOW LONG DID IT TAKE TO COMPLETE THESE

23 TRAINING SESSIONS?

24 A.   APPROXIMATELY TWO YEARS, BASED ON SCHEDULING IT WAS A YEAR

25 AND A HALF.

1850

1  Q.    HOW MANY CITY DEPARTMENT HEADS AND TOP MANAGERS RECEIVED

2  THIS TRAINING?

3  A.    IN TERMS OF TOTAL PEOPLE?

4  Q.    YES.

5  A.    TRAINED?  CLOSE TO 350, 350 PEOPLE.

6  Q.    DID REPRESENTATIVES OF THE CITY'S RECREATION AND PARKS

7  DEPARTMENT ATTEND THE TRAINING?

8  A.    ACTUALLY THAT WAS ONE OF THE TRAINING SESSIONS THAT WE HAD

9  A CUSTOM DESIGNED PROGRAM BECAUSE IT'S SUCH A LARGE DEPARTMENT

10  WITH SUCH MULTIPLE FACETS, BOTH ARCHITECTURAL AND PROGRAMMATIC.

11  THAT WAS -- YES, THERE WAS A TRAINING.

12  Q.    AND DID REPRESENTATIVES OF THE CITY'S PUBLIC LIBRARY

13  ATTEND THE TRAINING SESSIONS?

14  A.    YES, WE DID ALSO A CUSTOM DESIGN TRAINING FOR THE LIBRARY.

15  Q.    DID REPRESENTATIVES OF THE CITY'S DEPARTMENT OF PUBLIC

16  WORKS ATTEND THE TRAINING SESSIONS?

17  A.    YES.  AND IN ADDITION TO THAT, AFTER THE TRAINING OF TOP

18  MANAGERS HAPPENED, I WAS INVITED BY THE HEAD OF PUBLIC WORKS TO

19  COME BACK AND PROVIDE ANOTHER -- AN ADDITIONAL TRAINING SIMILAR

20  FOR THEIR FRONT LINE STAFF.

21          THE COURT:  FOR THE FRONT LINE?  YOU SAID FRONT

22  LINE?

23          THE WITNESS:  YES.

24  BY MS. O'NEIL:

25  Q.    MS. FRAGULI, I WOULD LIKE TO DIRECT YOUR ATTENTION TO

1851

1    DEFENDANTS' TRIAL EXHIBIT E45, WHICH COLLEEN WILL DISPLAY ON

2    THE SCREEN.

3              (EXHIBIT DISPLAYED ON SCREEN.)

4              ARE YOU FAMILIAR WITH THIS DOCUMENT?

5    A.    YES, I AM.

6    Q.    WHAT IS IT?

7    A.    IT IS THE CUSTOM DESIGN TRAINING THAT WAS DONE FOR THE

8    DEPARTMENT OF PUBLIC WORKS.

9    Q.    AND IS THIS AN EXAMPLE OF THE TYPE OF TRAINING

10   MATERIALS -- AND WE WILL SHOW SOME -- WE WILL LOOK AT SOME

11   ADDITIONAL SLIDES, BUT AS A PREDICATE QUESTION, IS THIS AN

12   EXAMPLE OF THE TYPE OF TRAINING MATERIALS THAT YOU USE WHEN

13   TRAINING CITY EMPLOYEES?

14   A.    WELL, IT IS A SAMPLE, BUT IT IS DEFINITELY NOT THE EXACT

15   SAME TRAINING.

16             AS I MENTIONED EARLIER, WE INTENDED TO CUSTOM DESIGN

17   THE TRAINING -- I TENDED TO CUSTOM -- I'M SORRY, IT'S MY ACCENT

18   ALSO -- TO CUSTOM DESIGN THE TRAINING SESSIONS TO THE

19   DEPARTMENTS THAT WE WERE WORKING WITH.  SO THERE ARE -- THERE'S

20   AN OVERALL REPETITION TO THE TYPES OF ISSUES THAT WERE RAISED

21   FOR EVERY DEPARTMENT, BUT THEY WERE SPECIFIC EXAMPLES AND

22   PERTINENT BASED ON THE WORK THAT EACH DEPARTMENT DOES.

23   Q.    NOW I WOULD LIKE TO DIRECT YOUR ATTENTION TO A SLIDE -- IS

24   THIS A POWER POINT PRESENTATION?

25   A.    IT IS, YES.

1852

1  Q.    I WOULD LIKE TO DIRECT YOU TO A SLIDE IN YOUR POWER POINT

2  PRESENTATION THAT IS NUMBERED 22.  THEN THAT'S THE NUMBER ON

3  THE BOTTOM RIGHT-HAND CORNER NOT TO BE CONFUSED WITH YOUR

4  NUMBER 20.

5          THIS SLIDE IS ENTITLED "MAINTENANCE OF ACCESSIBLE

6  FEATURES".

7          WHAT DOES THE TERM "MAINTENANCE OF ACCESSIBLE

8  FEATURES" REFER TO?

9  A.    PERSONALLY AND ALSO IT IS THE POLICY OF OUR OFFICE AND THE

10 WAY I TEACH WHEN I DO MY TRAINING SESSIONS, IT'S THE

11 CORNERSTONE OF PHYSICAL ACCESS.

12          HAVING A FACILITY BEING ACCESSIBLE DOESN'T DO MUCH

13 UNLESS THE ELEMENTS THAT MAKE THE VERY SAME FACILITY ACCESSIBLE

14 TO PEOPLE WITH DISABILITIES IS MAINTAINED PROPERLY.  IT IS A

15 VERY IMPORTANT CITYWIDE POLICY THAT WE WANTED TO DRAW EMPHASIS

16 ON FOR ALL DEPARTMENTS BECAUSE IT AFFECTS EQUALLY BOTH

17 DEPARTMENTS THAT BUILD -- THAT DEAL WITH A BUILT ENVIRONMENT

18 LIKE THE DEPARTMENT OF PUBLIC WORKS OR PLANNING, BUT ALSO

19 DEPARTMENTS THAT HAVE TO DO WITH OVER-THE-COUNTER, PROVIDING

20 OVER-THE-COUNTER SERVICE.  BECAUSE IT EQUALLY APPLIES TO INDOOR

21 OFFICES AND OUTDOOR FACILITIES.

22 Q.    AND WHAT ARE SOME EXAMPLES OF MAINTENANCE OF ACCESSIBLE

23 FEATURES AS THAT ISSUE RELATES TO THE CITY'S DEPARTMENT OF

24 PUBLIC WORKS?

25 A.    IF YOU ACTUALLY LOOK AT THE NEXT SLIDE, I CAN OUTLINE SOME

1853

1   EXAMPLES IN THAT TRAINING.

2              (DISPLAYED ON SCREEN.)

3   Q.   AND --

4   A.   SO --  I'M SORRY.

5   Q.   GO AHEAD.

6   A.   SO, LET'S TAKE A LOOK.

7              SO, SOME OF THE EXAMPLES THAT I OUTLINE THERE WERE

8   AS SIMPLE AS BOXES AND CHAIRS LEFT IN A HALLWAY OR IN FRONT OF

9   A DOOR.  SOME OF THE MOST BASIC THINGS.

10             FOR THE PUBLIC RIGHT-OF-WAY, IT COULD BE A NEW CURB

11  RAMP CONSTRUCTION THAT WHILE WE ARE BUILDING IT, IT BLOCKS THE

12  PATH OF TRAVEL WITHOUT AN APPROPRIATE WAY OF CREATING AN

13  ALTERNATE ROUTE, OR IT COULD BE SOMETHING AS SIMPLE AS BUSHES

14  OR TREE BRANCHES OVERGROWN AND NEEDING TO BE TRIMMED DOWN SO

15  THAT THE PATH OF TRAVEL CONTINUES TO BE WIDE FOR SOMEONE IN A

16  WHEELCHAIR TO GET THROUGH, OR THE BRANCHES ARE TRIMMED BACK

17  ENOUGH SO SOMEONE WHO IS BLIND DOESN'T WALK AND BUMP THEIR HEAD

18  OVER IT.

19  Q.   DO YOU ALWAYS INCLUDE MAINTENANCE OF ACCESSIBLE FEATURES

20  IN YOUR TRAININGS FOR CITY EMPLOYEES?

21  A.   AS I SAID EARLIER, MAINTENANCE OF ACCESSIBLE FEATURES IS

22  ONE OF THE TOP ISSUES THAT WE WANT TO TRAIN ALL DEPARTMENTS ON.

23  IT WAS IDENTIFIED EARLY ON AS A RESPONSIBILITY.

24             IT'S ALSO VERY IMPORTANT PART OF PHYSICAL ACCESS

25  THAT IS OFTEN OVERLOOKED.  AND WE WANTED TO REALLY BRING IT IN

1854

1 THE FOREFRONT.

2          IT WAS ALSO PART OF MY EXPERIENCE HAVING THE

3 OVERSIGHT OF COMPLAINTS AND THE ADA GRIEVANCE PROCEDURE THAT A

4 LOT OF MAINTENANCE ISSUES WERE BEING BROUGHT ON.

5          SO, WE JUST WANTED TO MAKE SURE THAT WE ARE

6 PROACTIVE IN TRAINING OUR STAFF AND OUR DEPARTMENTS TO LOOK FOR

7 THOSE ISSUES BEFORE THEY BECAME PROBLEMS.

8          MS. O'NEIL:  YOUR HONOR, THE CITY AT THIS TIME WOULD

9 MOVE TRIAL EXHIBIT E45 INTO EVIDENCE.

10          THE COURT:  ANY OBJECTION?

11          MR. BROWN:  NO OBJECTION, YOUR HONOR.

12          THE COURT:  REQUEST IS GRANTED.

13                   (DEFENDANTS' EXHIBIT E45 RECEIVED IN

14                   EVIDENCE)

15 BY MS. O'NEIL:

16 Q.  NOW, MS. FRAGULI, YOU TESTIFIED ALSO THAT YOUR JOB

17 RESPONSIBILITIES INCLUDE THE TRAINING AND COORDINATION OF THE

18 CITY'S ADA COORDINATORS; IS THAT CORRECT?

19 A.  YES, IT IS.

20          MS. O'NEIL:  YOU CAN TAKE THAT DOWN.

21 BY MS. O'NEIL:

22 Q.  COULD YOU PLEASE DESCRIBE THIS WORK IN SOME GREATER

23 DETAIL?

24 A.  YES.  THE ADA -- EVERY CITY DEPARTMENT THAT HAS MORE THAN

25 50 EMPLOYEES HAS AN ASSIGNED -- OR HAS A DESIGNATED ADA

1855

1  COORDINATOR.  THAT IS THE PERSON WHO'S PRIMARILY RESPONSIBLE

2  FOR INVESTIGATING DISABILITY ACCESS COMPLAINTS AS WELL AS BEING

3  THE RESOURCE PERSON FOR THE DEPARTMENT ON ADA ISSUES.

4          UNFORTUNATELY, THIS POSITION IS NOT THE ONLY JOB

5  THAT A PARTICULAR ADA COORDINATOR DOES.  SO DEPENDING ON WHO IS

6  ASSIGNED TO A PARTICULAR DEPARTMENT, AND WHETHER EXPERIENCE

7  LEVEL WITH ADA OR DISABILITY RIGHTS LAWS IS, THEY MAY HAVE NOT

8  HAD GREAT BACKGROUND.  SO A LOT OF MY WORK IS DOING ONE-ON-ONE

9  TRAINING AND TECHNICAL ASSISTANCE WITH THESE INDIVIDUALS.

10          AND THERE ARE ABOUT 60 IN THE CITY, ONE FOR EACH

11  DEPARTMENT, PRETTY MUCH.  AND WORKING WITH THEM VERY CLOSELY

12  WHEN THERE ARE COMPLAINTS AND THERE NEEDS TO BE AN

13  INVESTIGATION.

14  Q.   SO HAVE YOU CONDUCTED TRAINING SESSIONS FOR THE ADA

15  COORDINATORS SIMILAR TO THE TRAINING SESSIONS THAT YOU LED FOR

16  DEPARTMENT HEADS AND MANAGERS?

17  A.   YES, I HAVE.  IN APRIL OR MAY OF LAST YEAR, 2010, I

18  CONDUCTED A HALF-DAY TRAINING -- ACTUALLY IN SO MANY -- SO MUCH

19  MORE IN DEPTH OF WHAT I USUALLY DO FOR CITY DEPARTMENTS.  AND

20  IT WAS A TRAINING THAT WAS PRIMARILY COORDINATED AND

21  IMPLEMENTED BY ME, BUT ALSO WITH THE ASSISTANCE OF SOME OF OUR

22  MORE EXPERIENCED ADA COORDINATORS AND WITH JOHN PAUL SCOTT.

23  BECAUSE WE WANTED TO PROVIDE A PRIMER, A COMMON BASE FOR ALL OF

24  OUR ADA COORDINATOR STAFF.

25          THE CITY HAS UNDERGONE THROUGH HUGE BUDGETARY

1856

1  DIFFICULTIES, SO A LOT OF PEOPLE HAVE MOVED IN AND OUT OF THAT

2  POSITION.  SO LAST YEAR IT WAS AN OPPORTUNITY TO GET EVERYBODY

3  ON THE SAME PAGE.

4  Q.   AND I WOULD LIKE TO DIRECT YOUR ATTENTION TO THE CITY'S

5  TRIAL EXHIBIT E27, WHICH IS A POWER POINT SLIDE ENTITLED

6  "DISABILITY ACCESS TO CITY'S PROGRAMS, SERVICES AND ACTIVITIES

7  A PRIMER FOR CITY DEPARTMENTS' ADA COORDINATORS".

8           ARE YOU FAMILIAR WITH THIS DOCUMENT, MS. FRAGULI?

9           (EXHIBIT DISPLAYED ON SCREEN.)

10  A.   YES.  I WROTE THIS DOCUMENT.

11  Q.   WHEN DID YOU PREPARE THIS DOCUMENT?

12  A.   AS I SAID, THE TRAINING OCCURRED IN EITHER MAY OR MARCH OF

13  LAST YEAR.  I AM SORRY I CAN'T REMEMBER EXACTLY.  AND SO I

14  PREPARED IT DURING THAT TIME.

15  Q.   IS THIS A POWER POINT TRAINING PACKET THAT YOU PREPARED

16  FOR PURPOSES OF THAT TRAINING SESSION FOR THE ADA COORDINATORS

17  LAST YEAR?

18  A.   YES, IT IS.

19  Q.   AND ROUGHLY HOW MANY PEOPLE ATTENDED THIS TRAINING?

20  A.   ABOUT 45 PEOPLE.  AND THAT REPRESENTED OVER 80 PERCENT OF

21  ALL THE DEPARTMENTS IN THE CITY.

22  Q.   AND I WOULD LIKE TO DIRECT YOUR ATTENTION TO PAGE 10 OF

23  THE CITY'S TRIAL EXHIBIT E27.

24           MS. FRAGULI, DID YOU PREPARE THAT SLIDE?

25  A.   YES, I DID.  IT'S ESSENTIALLY THE JOB DESCRIPTION FOR OUR

1857

1   ADA COORDINATORS.  IT PROVIDES AN OUTLINE OF WHAT THEY ARE

2   EXPECTED TO DO.

3   Q.   NOW, TURNING TO THE NEXT PAGE OF THIS POWER POINT, THERE

4   IS A GRAPHIC IMAGE.

5            DID YOU PREPARE THAT GRAPHIC?

6   A.   I DID.  IT WAS MY VERY QUICK AND POIGNANT WAY OF TELLING

7   FOLKS THAT MOD, MAYOR'S OFFICE ON DISABILITY IS A TINY LITTLE

8   CENTER.  WE HOLD ALL OF THE INFORMATION.  WE ARE THE

9   CLEARINGHOUSE FOR INFORMATION FOR POLICIES, FOR THE CONNECTIONS

10  TO DISABILITY ACCESS, BUT THESE GUYS, THOSE ADA -- THE

11  DEPARTMENT ADA COORDINATORS ARE ACTUALLY OUR LIAISONS.  WE ALL

12  WORK TOGETHER TO SORT OF GET THE DISABILITY WHEEL OF ACCESS

13  GOING.

14           AND I KNOW IT'S KIND OF A CORNY GRAPHIC, BUT IT

15  REALLY -- IT REALLY BRINGS TO HEART, I THINK, THE FACT THAT

16  COLLABORATIVE STYLE THAT OUR OFFICE HAS BEEN SO GOOD AT WORKING

17  WITH FOLKS WITHIN THEIR DEPARTMENTS TO CREATE CULTURE, TO GO

18  BEYOND WHAT IS REQUIRED TO GO TO WHAT IS REALLY NECESSARY TO

19  NOT JUST GET US IN THE DOOR, BUT ACTUALLY GETTING PEOPLE ACCESS

20  TO THE PROGRAM.

21  Q.   WHO IS THE ADA COORDINATOR FOR THE DEPARTMENT OF PUBLIC

22  WORKS?

23  A.   KEVIN JENSEN.

24  Q.   DO YOU COLLABORATE WITH MR. JENSEN ON PROJECTS RELATING TO

25  DISABLED ACCESS?

1  A.   QUITE FREQUENTLY.  BOTH IN TERMS OF COMPLAINTS AND CURB

2  RAMP REQUESTS BECAUSE AS I SAID, I OVERSEE AND I CONDUCT A BIG

3  PORTION OF THE ADA GRIEVANCE PROCEDURE.  I COMMUNICATE WITH

4  MR. JENSEN QUITE FREQUENTLY IN REGARD TO THOSE COMPLAINTS.

5            I OFTEN HAVE THE OPTION OF SINCE I'M A WHEELCHAIR

6  USER MYSELF, TO KIND OF CALL HIM UP OR SEND HIM A QUICK E-MAIL

7  AND SAY, HEY, YOU KNOW, I NOTICED THIS.  AND SO THAT COULD LEAD

8  TO INTERACTION.

9            I ALSO WORK WITH MR. JENSEN OR I HAVE BEEN IN GROUPS

10 AND ADVISORY COMMITTEES, TECHNICAL ADVISORY GROUPS ABOUT

11 POLICIES THAT PERTAIN TO ACCESSIBILITY IN THE PUBLIC

12 RIGHT-OF-WAY.

13 Q.   AND WHO IS THE ADA COORDINATOR FOR THE DEPARTMENT OF

14 RECREATION AND PARKS?

15 A.   THERE'S ACTUALLY TWO PEOPLE WITH DIFFERENT

16 RESPONSIBILITIES.  PAULINA ARAICA IS THE PHYSICAL ACCESS

17 COORDINATOR, ADA COORDINATOR AND LUCAS TOBIN IS PRIMARILY THE

18 INDIVIDUAL RESPONSIBLE FOR PROGRAMMATIC ACCESS ISSUES, SUCH AS

19 REASONABLE ACCOMMODATIONS IN RECREATIONAL PROGRAMS FOR PEOPLE

20 WITH DISABILITIES AND ALSO PROJECT INSIGHT, WHICH IS AN

21 ADAPTIVE RECREATION PROGRAM.

22 Q.   HAVE YOU PROVIDED TRAINING OR OTHER ASSISTANCE TO EITHER

23 MS. ARAICA OR MR. TOBIN?

24 A.   I HAVE WORKED WITH MS. ARAICA PERTAINING TO A FEW PHYSICAL

25 ACCESS COMPLAINTS IN THE RECREATION AND PARK FACILITIES, BUT I

1  MOSTLY HAVE BEEN WORKING WITH MR. TOBIN RELATED TO PROGRAMMATIC

2  ACCESS ISSUES.

3         ONE OF THE MOST -- ONE OF THE MOST IMPORTANT ONE WAS

4  ACCESSIBILITY TO CITIES -- TO TEMPORARY EVENTS TAKING PLACE IN

5  REC AND PARK OPEN SPACES, LIKE FESTIVALS AND PARADES AND THOSE

6  KINDS OF THINGS THAT HAPPEN IN CITY PARKS.

7         THE COURT:  COUNSEL, JUST A SECOND.

8         (PAUSE IN THE PROCEEDINGS.)

9         THE COURT:  IT'S TIME TO RECESS.  DID YOU -- WERE

10  ALL TRYING TO SEE IF YOU COULD COMPLETE THE WITNESS TODAY?

11         MS. O'NEIL:  I PROBABLY HAVE ABOUT MAYBE TEN MINUTES

12  OF QUESTIONS FOR MS. FRAGULI.  IF WE COULD COMPLETE HER TODAY,

13  I THINK SHE WOULD APPRECIATE THAT.  SHE'S BEEN HERE ALL DAY.

14         THE COURT:  MY COURTROOM DEPUTY AND STAFF ARE

15  BEING -- THEY ARE HAVING AN AWARD CEREMONY FOR THE COURT TO

16  START AT 2:30, SO I AM GOING TO LET HER GO.  AND THEN WE CAN

17  JUST -- WE CAN CONTINUE IF THAT'S WHAT YOU ALL WANT TO DO.

18         MAYBE WE CAN JUST -- ASK KEITH TO COME IN UNLESS --

19  IF HE'S GOING TO GO TO THE AWARD CEREMONY, THAT'S OKAY.  WE

20  WILL JUST GO ON WITHOUT IT.

21         WAS HE GOING?  DO YOU KNOW?

22         MR. JOHNSON:  YOUR HONOR, IF I MAY, BEFORE WE BREAK

23  FOR THE DAY AND BEFORE MS. CLARK LEAVES, AND I APOLOGIZE FOR

24  THE INTERRUPTION, BUT I REALIZE WE DIDN'T INTRODUCE OR MOVE

25  INTO EVIDENCE EXHIBIT 3911, WHICH IS THE 12 MAPS.

1860

```
 1              CAN WE MOVE THOSE IN?
 2              THE COURT:  3911?
 3              MR. JOHNSON:  3911.
 4              THE COURT:  WHO IS YOUR COUNTERPART?
 5              MS. O'NEIL:  I APOLOGIZE, YOUR HONOR.  I WAS
 6  DISCUSSING WITH MR. BROWN ABOUT HIS EXPECTED CROSS-EXAMINATION
 7  OF MS. FRAGULI.
 8              THE COURT:  I AM GOING TO ACCOMMODATE HER.  I JUST
 9  DON'T WANT TO -- BECAUSE THIS AWARD CEREMONY -- SHE'S BEEN HERE
10  15 YEARS.  MY SECRETARY HAS BEEN HERE FOR 20.
11              YOU HAVE BEEN HERE 20 ALSO.
12              EXCUSE ME.  I AM SORRY.  I AM SORRY.  THEY ARE
13  HAVING A BIG CEREMONY, SO I'M GOING TO LET HER GO.  WE CAN STAY
14  AS LONG AS YOU ALL NEED TO SO WE CAN FINISH THE WITNESS SO SHE
15  WON'T HAVE TO COME BACK ON MONDAY.
16              THE WITNESS:  I AM PLANNING FOR ANOTHER TRAINING
17  NEXT WEEK.
18              THE COURT:  WE CAN STAY.
19              LISA, TELL THEM WHY I AM NOT THERE, OKAY?  YOU CAN
20  GO.
21              THE COURT:  HE ASKED THAT --
22              MS. O'NEIL:  WE THOUGHT WE COULD TALK ABOUT IT AFTER
23  WE WERE DONE WITH MS. FRAGULI.
24              THE COURT:  THAT'S FINE.
25              MR. JOHNSON:  THAT'S FINE.
```

1861

BY MS. O'NEIL:

Q.    WHAT IS THE NATURE OF THE PROJECT THAT YOU WERE WORKING ON

WITH MR. TOBIN RELATED TO TEMPORARY EVENTS AT RECREATION AND

PARK FACILITIES?

A.    SO ONE OF OUR CITYWIDE POLICIES, AND, AGAIN, ONE OF THE

LESSER KNOWN THINGS ABOUT -- THAT I TRIED TO OUTLINE OR

HIGHLIGHT IN MY TRAINING SESSIONS WAS THE ACCESSIBLE EVENTS

CHECKLIST, WHICH IS A DOCUMENT PREPARED BY OUR OFFICE LONG

BEFORE I CAME INTO THE PICTURE, BUT IT PROVIDES STEP-BY-STEP

GUIDANCE ON HOW PUBLIC EVENTS SHOULD BE CREATED TO BE

ACCESSIBLE, BOTH PROGRAMMATICALLY AND PHYSICALLY TO PEOPLE WITH

DISABILITIES.    ANYTHING FROM A PARADE TO A FESTIVAL, THE WHOLE

COMMUNITY PARTICIPATES.    SO THAT PEOPLE WITH DISABILITIES GET

TO PARTICIPATE.

        ONE OF THE THINGS THAT WAS NOT QUITE AS CLEAR WAS

THE FACT THAT FOR EVENTS THAT WERE PUT ON BY PRIVATE ENTITIES,

SUCH AS THE AIDES FOUNDATION, OR OPERA IN THE PARK, WHERE THOSE

EVENTS ARE BEING CONDUCTED IN CITY PARKS, WE FELT THAT IT WAS

OUR RESPONSIBILITY TO ALSO TRAIN THOSE ENTITIES ON HOW TO DO

BUSINESS IN OUR HOUSE IN A VERY COMPLIANT WAY, AN INCLUSIVE

WAY.

        SO, PART OF WHAT I DID WITH MR. TOBIN WAS TO REALLY

GET ON MAKING THAT PROGRAM ACCESSIBLE, AND REVAMP THE CHECKLIST

IN A WAY THAT MADE SENSE FOR THE PERMITS DEPARTMENT AT REC AND

PARK TO WORK WITH THEIR ESSENTIALLY THEIR LESSEES.

1862

1   Q.   WHO IS THE LIBRARY'S ADA COORDINATOR?

2   A.   MARTI GODDARD.

3   Q.   HAVE YOU PROVIDED TRAINING OR OTHER ASSISTANCE TO MS.

4   GODDARD?

5   A.   IT IS MORE THE OTHER WAY AROUND.  MARTI GODDARD IS ONE OF

6   OUR, WHAT I CALL, STAR ADA COORDINATORS.  SHE HAS DONE AN

7   INCREDIBLE JOB IN BRINGING THE PUBLIC LIBRARY INTO A NATION --

8   NATIONAL MODEL OF ACCESSIBILITY BY INCLUDING HIGH-TECH

9   ASSISTIVE TECHNOLOGY, FREE ASSISTIVE TECHNOLOGY ACCESS TO THE

10  PUBLIC LIBRARIES FOR PEOPLE WITH DISABILITIES, PEOPLE WITH BOTH

11  MOBILITY --

12          THE COURT:  SLOW DOWN.  SLOW DOWN.  I HAVE THE SAME

13  PROBLEM.  SO JUST BE CONSCIOUS --

14          THE WITNESS:  I'M ITALIAN --

15          THE COURT:  JUST BE CONSCIOUS.  IF YOU SEE HER

16  GRIMACING THAT MEANS THAT SHE'S HAVING A HARD TIME.

17          THE WITNESS:  I'M SORRY.

18          THE COURT:  SLOW DOWN.

19          MS. O'NEIL:  IT'S NOTHING TO DO WITH THE CONTENT OF

20  WHAT SHE SAYS.

21          THE COURT:  NO, NO.  IT'S JUST THAT SHE'S TRYING HER

22  BEST TO DISCERN WHAT YOU'RE SAYING, SO THAT SHE CAN WRITE IT

23  DOWN ACCURATELY.  JUST SLOW IT DOWN.

24          THE WITNESS:  SO SHE HAS ARE CREATED OR BROUGHT INTO

25  THE PUBLIC LIBRARY A LOT OF FREE ASSISTIVE TECHNOLOGY FOR

1863

1   PEOPLE WITH MOBILITY DISABILITIES, LEARNING DISABILITIES AND

2   VISUAL DISABILITIES, PEOPLE WHO ARE BLIND.

3            AND IN ADDITION TO THAT, SHE HAS CREATED AN

4   EXEMPLARY DEAF AND HARD OF HEARING SECTION IN THE PUBLIC

5   LIBRARY THAT INCLUDES ALSO WAYS OF CREATING COMMUNICATION

6   ACCESS.

7   BY MS. O'NEIL:

8   Q.   THANK YOU.

9            NOW I WOULD LIKE TO DIRECT YOUR ATTENTION TO PAGE 33

10  OF YOUR POWER POINT TRAINING MARKED AS EXHIBIT E27.

11           DID YOUR TRAINING TO THE ADA COORDINATORS INCLUDE

12  TRAINING ON ARCHITECTURAL ACCESS ISSUES?

13           (PAGE DISPLAYED ON SCREEN.)

14  A.   SORRY.  WE ARE DOING A WHEELCHAIR DANCE HERE.

15           YES, I DID.  AND THAT WAS -- THAT WAS A TRAINING

16  THAT WAS ASSISTED BY BOTH OF OUR ARCHITECTURAL ACCESS FOLKS,

17  JOHN PAUL SCOTT, DEPUTY DIRECTOR OF PHYSICAL ACCESS, AND KEVIN

18  JENSEN, WHO IS THE ADA COORDINATOR FOR THE DEPARTMENT OF PUBLIC

19  WORKS.

20  Q.   AND THEN TURNING YOUR ATTENTION TO PAGE 47 OF YOUR

21  TRAINING MATERIALS.

22           (PAGE DISPLAYED ON SCREEN.)

23           THERE IS A SLIDE ON THE SUBJECT OF MAINTENANCE OF

24  ACCESSIBLE FEATURES; IS THAT CORRECT?

25  A.   YES.  YOU WILL SEE A RECURRING THEME HERE.

1864

1        AS A MATTER OF FACT, FOR THE -- OUR ADA

2   COORDINATORS, THE CONCEPT OF MAINTENANCE OF ACCESSIBLE FEATURES

3   WAS AN ENTIRE SECTION.  SO IF YOU WERE TO FLIP ON SOME OF THE

4   SUBSEQUENT SLIDES, YOU WOULD SEE WHAT I MEAN.

5        MS. O'NEIL:  WOULD YOU LIKE TO PUT UP THE NEXT

6   COUPLE OF SLIDES, COLLEEN.

7        (PAGES DISPLAYED ON SCREEN.)

8        AND THE NEXT ONE?

9        (PAGE DISPLAYED ON SCREEN.)

10  BY MS. O'NEIL:

11  Q.   DID YOU, IN THIS TRAINING, DID YOU PROVIDE EXAMPLES TO THE

12  ADA COORDINATORS OF ITEMS THAT NEED TO BE MAINTAINED TO

13  PRESERVE THE ACCESSIBILITY OF MAINTENANCE FEATURES -- EXCUSE

14  ME -- TO PRESERVE THE ACCESSIBILITY OF FEATURES IN THE CITY'S

15  BUILDINGS?

16       THAT'S NOT VERY ARTFULLY STATED.

17  A.   I THINK THAT SLIDE IS EXACTLY WHAT THIS IS ABOUT.  THERE

18  THE SLIDE IS AN EXAMPLE.  I THINK THE ITEMS ON THE SLIDES ARE

19  AN EXAMPLE OF WHAT THIS IS ABOUT.

20       I AM TRYING TO REMEMBER WHAT I SAID.  YOU WOULD SEE

21  THERE SORT OF A DEPICTION OF SEVERAL ITEMS THAT CAN GO OUT OF

22  MAINTENANCE.

23  Q.   AND DOES MOD EXPECT THE CITY'S ADA COORDINATORS TO ASSIST

24  WITH MAINTAINING THE CITY'S ACCESSIBLE FEATURES?

25  A.   AGAIN, THIS IS SOMETHING THAT WE ARE TRYING TO DRILL INTO

1865

1  EVERYBODY'S HEAD.  IT'S ABOUT IF YOU SEE SOMETHING IS BROKEN,

2  YOU NEED TO THINK OF IT AS A DISABILITY RIGHTS ISSUE AND AS A

3  DISABILITY ACCESS VIOLATION.

4            SO IF YOU FLIP TO THE NEXT SLIDE AGAIN....

5            (PAGE DISPLAYED ON SCREEN.)

6  Q.   THAT, FOR THE RECORD, IS SLIDE MARKED AS NUMBER 50.

7  A.   SO AS YOU WILL SEE ON THAT SLIDE, ONE OF THE ITEMS THAT WE

8  TRIED TO EMPHASIZE TO THE ADA COORDINATORS IS THAT REGARDLESS

9  OF THEIR TRAINING AS A PHYSICAL ACCESS EXPERT, RIGHT,

10 REGARDLESS OF THEIR TRAINING ON THAT, EVERYBODY CAN SEE THAT

11 ACCESSIBILITY IS A PRIORITY THAT THE MOD OR THE DPW DISABILITY

12 ACCESS COORDINATOR HAVE HAD A FULL ACCESSIBILITY REVIEW --

13            THE REPORTER:  I'M SORRY.

14            THE COURT:  SHE CAN'T UNDERSTAND WHAT YOU'RE SAYING

15 BECAUSE YOU ARE SPEAKING TOO QUICKLY.

16            TELL HER WHERE YOU STOPPED.

17            THE REPORTER:

18            (RECORD READ AS FOLLOWS:

19            "...ACCESS COORDINATOR HAVE HAD A FULL

20            ACCESSIBILITY REVIEW.")

21            THE WITNESS:  HAVE HAD AN OPPORTUNITY TO FULLY

22 REVIEW THE PLANS.

23            AND -- I AM SORRY, I LOST MY TRAIN OF THOUGHT.

24 BY MS. O'NEIL:

25 Q.   WELL, IS THE INFORMATION STATED ON THE SLIDE SIMILAR TO

1866

1  WHAT YOU TELL AND HAVE TOLD THE ADA COORDINATORS?

2  A.    EXACTLY.

3          MS. O'NEIL:  THE CITY MOVES EXHIBIT E27 INTO

4  EVIDENCE AT THIS TIME.

5          THE COURT:  ANY OBJECTION?

6          MR. BROWN:  NO OBJECTION, YOUR HONOR.

7          THE COURT:  THE REQUEST IS GRANTED.

8                  (DEFENDANTS' EXHIBIT E27 RECEIVED IN

9                  EVIDENCE)

10 BY MS. O'NEIL:

11 Q.    MS. FRAGULI, YOU TESTIFIED THAT YOU ALSO HAVE

12 RESPONSIBILITIES RELATED TO THE CITY'S GRIEVANCE PROCEDURE; IS

13 THAT CORRECT?

14 A.    YES, I DO.  NOT ONLY I HAVE THE OVERSIGHT RESPONSIBILITY,

15 BUT, AGAIN, DUE TO THE OVERALL CITY'S BUDGETARY SITUATION AND

16 THE STAFFING REDUCTIONS, I ACTUALLY END UP CONDUCTING A BIG

17 PORTION OF THE ACTUAL INTERVIEWING AND RELATING TO THE

18 COMPLAINTS.

19 Q.    AND ARE THE DEPARTMENT ADA COORDINATORS RESPONSIBLE FOR

20 ACTUALLY INVESTIGATING THE COMPLAINT?

21 A.    YES, WITH HELP.  I, AS I SAID, AGAIN, DEPENDING ON THE

22 LEVEL OF EXPERTISE AND EXPERIENCE THAT OUR ADA COORDINATORS

23 HAVE IN VARIOUS DEPARTMENTS, I GET TO BE, IN SOME CASES, MUCH

24 MORE INTIMATELY INVOLVED WITH THE ACTUAL RESOLUTION OF THE

25 COMPLAINT THAN OTHERS.

1867

1  Q.   DOES THE CITY HAVE A TIME LINE FOR RESPONDING TO

2  GRIEVANCES?

3  A.   YES.   THE COMPLAINANT IS ENTITLED TO A RESPONSE FROM THE

4  DEPARTMENT WITHIN 30 CALENDAR DAYS.   AND IF A SOLUTION OR A

5  RESOLUTION, OR THE INVESTIGATION EVEN, TAKES LONGER THAN THAT,

6  THE COMPLAINANT STILL RECEIVES A RESPONSE WITHIN 30 DAYS

7  INFORMING THEM OF THE STEPS TAKEN AND WHAT THE TIME LINE -- THE

8  EXPECTED TIME LINE TO BE.

9  Q.   AND DO YOU PROVIDE TRAINING TO THE CITY'S ADA COORDINATORS

10 ON THEIR RESPONSIBILITIES HELPING TO IMPLEMENT THE CITY'S

11 GRIEVANCE PROCEDURE?

12 A.   WELL, THIS IS ONE OF THE TOP REASONS THAT WE WANTED TO

13 TRAIN THE ADA COORDINATORS.   WE TAKE THE ADA GRIEVANCE

14 PROCEDURE VERY, VERY SERIOUSLY.   AND WE SEE OUR ADA

15 COORDINATORS AS VERY KEY PEOPLE IN BEING ABLE TO IMPLEMENT THAT

16 POLICY AND GET BACK TO OUR CITIZENS AS SOON AS POSSIBLE.

17          SO, YES.   IF YOU, AGAIN, FLIP THROUGH SEVERAL

18 SLIDES, WE HAD AN ENTIRE SECTION ON THE ADA GRIEVANCE PROCEDURE

19 AND INVESTIGATION.

20          (PAGE DISPLAYED ON SCREEN.)

21 Q.   DOES THAT BEGIN ON THE SLIDE THAT'S SHOWN HERE AS

22 SLIDE 58?

23 A.   THAT'S CORRECT.

24 Q.   ARE THERE ADDITIONAL SLIDES AFTER THIS RELATED TO YOUR

25 TRAINING ON THE SUBJECT?

1868

1   A.   AS I SAID, THERE'S A WHOLE SECTION OF SLIDES.

2         ONE OF THE THINGS THAT I WANTED TO EMPHASIZE IN THIS

3   SLIDE IS A -- AND ONE OF THE ITEMS THAT WE TEND TO HIGHLIGHT

4   FOR OUR ADA COORDINATORS IS THAT THIS IS A WAY OF THE CITY

5   MONITORING AND BEING PROACTIVE AS TO WHERE THE GLITCHES OR SOME

6   OF THE PROBLEMS MAY BE.

7         SO RATHER THAN SEEING THIS IS A PUNITIVE PROCESS, IT

8   IS REALLY A PROACTIVE PROCESS FOR QUALITY MANAGEMENT.

9   Q.   AND DOES YOUR OFFICE MONITOR THE TYPES OF GRIEVANCES THAT

10  IT RECEIVES?

11         YOU CAN TURN BACK AROUND.  SORRY.  WE ARE DONE.

12         LET ME REPHRASE THAT.

13         DOES MOD KEEP ANY STATISTICS OR RECORDS ABOUT THE

14  TYPES OF GRIEVANCES IT RECEIVES?

15  A.   I, IN PREPARATION FOR THIS CASE, HAVE DONE A QUICK

16  ESTIMATION OF THE COMPLAINTS THAT WE HAVE RECEIVED ON -- IN THE

17  PAST THREE YEARS.

18         I WOULD SAY THAT ABOUT 40 PERCENT ARE RELATED TO

19  HOUSING, AND FAIR HOUSING ACT -- FAIR HOUSING AMENDMENT ACT

20  ISSUES IN CITY-FUNDED PROGRAMS.

21         ABOUT 30 PERCENT, 25 TO 30 PERCENT ARE RELATED TO

22  MUNI.  THAT IS THE CITY'S PUBLIC TRANSPORTATION AND

23  PARATRANSIT.

24         AND ONLY ABOUT 20 PERCENT OF OUR COMPLAINTS ARE

25  RELATED TO PHYSICAL ACCESS.

1869

1    WITH MOST OF THEM, WE CALL THEM COMPLAINTS, BUT THEY

2   ARE REALLY REQUESTS FOR CURB RAMPS.

3    AND THEN THE REMAINDER IS JUST MISCELLANEOUS

4   DEPARTMENTS.  MOST OF OUR COMPLAINTS ARE PRIMARILY PROGRAMMATIC

5   ACCESS ISSUES.

6   Q.   DO YOU HAVE ANY REGULAR PROCESS OF REPORTING TO THE

7   DIRECTOR OF THE MAYOR'S OFFICE ON DISABILITY REGARDING THE

8   TYPES OF GRIEVANCES THAT YOUR OFFICE HAS RECEIVED?

9   A.   YES.

10    GENERALLY MY DIRECTOR, SUSAN MIZNER, RECEIVES A

11  MONTHLY SUMMARY REPORT THAT OUTLINES SOME OF THE DEPARTMENTS

12  THAT HAVE BEEN SLOW PERHAPS IN GETTING A RESPONSE OR WHAT SOME

13  OF THE MAIN THEMES OF THE COMPLAINTS ARE.

14    THIS IS ALSO WHAT PROVIDES US AT THE MAYOR'S OFFICE

15  ON DISABILITY WITH A ROAD MAP OF HOW WE WANT TO ACHIEVE BETTER

16  ACCESS THROUGHOUT THE CITY.  WE CREATE A PROCESS WHERE WE

17  IDENTIFY TRENDS.

18    SO, FOR EXAMPLE, THE ACCESSIBLE EVENTS CHECKLIST,

19  AND DOING MUCH MORE INTENSE EFFORTS ON THE CHECKLIST FOR

20  TEMPORARY EVENTS WAS AN OUTCOME OF THOSE TYPES OF DISCUSSIONS

21  AND THAT TYPE OF MONITORING.

22  Q.   AND IN YOUR TIME WORKING FOR MOD, HAVE YOU EVER RECEIVED

23  ANY COMPLAINTS ABOUT THE PUBLIC LIBRARY?

24  A.   ONLY ONE, AND IT WAS RELATED TO ASSISTIVE TECHNOLOGY.

25  Q.   AND DURING THE SAME PERIOD OF TIME THAT YOU WORKED FOR MOD

```
1   HAVE YOU EVER RECEIVED ANY COMPLAINTS ABOUT THE DEPARTMENT OF

2   RECREATION AND PARKS?

3   A.   A FEW PHYSICAL ACCESS COMPLAINTS RELATING PRIMARILY TO A

4   GATE AT A BASEBALL FIELD BEING LOCKED AND WITHOUT APPROPRIATE

5   SIGNAGE, OR SOMETHING LIKE THAT.  SO A LOT OF THEM WERE SORT OF

6   PROCESS, PROGRAMMATIC ACCESS ISSUES.

7   Q.   AND DID THE RECREATION AND PARKS DEPARTMENT RESOLVE THE

8   ISSUE RELATED TO THE LOCKED GATE?

9   A.   YES, FAIRLY QUICKLY.

10           ACTUALLY, THE PEOPLE INVOLVED HAVE BEEN -- HAD BEEN

11  IN TOUCH AND PHONE CALLS WITH THE COMPLAINANT, AND EVERYBODY

12  KIND OF CREATED A RESOLUTION TOGETHER.  IT WAS A CREATIVE

13  PROCESS.

14  Q.   AND DURING THE TIME THAT YOU WORKED AT THE MAYOR'S OFFICE

15  ON DISABILITY, HAVE YOU EVER RECEIVED ANY COMPLAINTS FROM IVANA

16  KIROLA?

17  A.   NO.  AND I WAS SURPRISED BECAUSE I KNOW MS. KIROLA

18  SOCIALLY.

19  Q.   HAVE YOU RECEIVED ANY COMPLAINTS FROM ELIZABETH O'NEIL?

20  A.   ONCE AGAIN, I'M SURPRISED TO SAY NO, BECAUSE MS. O'NEIL

21  WORKED IN OUR OFFICE FOR ABOUT THREE YEARS.  SO, SHE KNEW

22  EXACTLY WHAT I DID.

23  Q.   HAVE YOU EVER RECEIVED ANY COMPLAINTS FROM JILL KIMBROUGH?

24  A.   I DON'T KNOW THE NAME.

25  Q.   HAVE YOU EVER RECEIVED ANY COMPLAINTS FROM TIM GRANT?
```

1  A.    NEVER HEARD OF THAT NAME BEFORE THIS CASE.

2  Q.    HAVE YOU EVER RECEIVED ANY COMPLAINTS FROM AUDREY

3  DECHADENEDES?  I'M SORRY, I --

4  A.    DECHADENEDES.  IT'S A GREEK NAME.

5  Q.    THANK YOU.

6  A.    NO.  ONCE AGAIN, BEFORE THIS CASE, NOT BEFORE THIS CASE.

7  Q.    AND WHAT ABOUT ERICA MONASTERIO, HAVE YOU EVER RECEIVED

8  ANY COMPLAINTS FROM HER?

9  A.    THOSE NAMES HAVE NOT GONE THROUGH ME.

10             MS. O'NEIL:  I HAVE NO FURTHER QUESTIONS.  THANK

11  YOU.

12             THE COURT:  OKAY.  THANK YOU, MS. O'NEIL.

13             MR. BROWN?

14             MR. BROWN:  THANK YOU, YOUR HONOR.

15                     CROSS-EXAMINATION

16  BY MR. BROWN:

17  Q.    GOOD AFTERNOON, MS. FRAGULI.

18  A.    HELLO, MR. BROWN.

19  Q.    JUST GIVE ME ONE MINUTE HERE.

20             (PAUSE IN THE PROCEEDINGS.)

21             THE WITNESS:  THANK YOU EVERYONE FOR TRYING TO

22  ACCOMMODATE MY SCHEDULE.

23             THE COURT:  THAT'S NO PROBLEM.  GLAD WE CAN DO IT.

24  BY MR. BROWN:

25  Q.    MS. FRAGULI, WE HEARD EARLIER FROM MS. MIZNER, WHO IS

1872

1  SITTING NEXT TO YOU, SHE'S YOUR DIRECT SUPERVISOR; IS THAT

2  RIGHT?

3  A.   SHE IS.

4  Q.   THERE ISN'T ANY PORTION OF YOUR JOB SCOPE THAT IS BEYOND

5  MS. MIZNER'S KNOWLEDGE, IS THERE?

6  A.   ANY -- I AM SORRY.  CAN YOU REPHRASE THE QUESTION?

7  Q.   SURE.  THERE ISN'T ANY PORTION OF YOUR JOB SCOPE THAT IS

8  BEYOND MS. MIZNER'S KNOWLEDGE, IS THERE?

9           MS. O'NEIL:  OBJECTION, CALLS FOR SPECULATION.

10          THE WITNESS:  AGAIN, ANY PORTION --

11          THE COURT:  EXCUSE ME.  THERE'S AN OBJECTION.  SO

12  JUST --

13          THE WITNESS:  SORRY.

14          THE COURT:  THE QUESTION IS WHETHER THERE IS ANY

15  PORTION OF THE SCOPE OF HER JOB, HER DUTIES THAT IS BEYOND HER

16  SUPERVISOR'S UNDERSTANDING; IS THAT THE QUESTION?

17          MR. BROWN:  I CAN REPHRASE.

18          THE COURT:  OKAY.

19  BY MR. BROWN:

20  Q.   ARE YOU AWARE OF ANY PORTION OF YOUR JOB SCOPE THAT YOU

21  BELIEVE IS BEYOND MS. MIZNER'S KNOWLEDGE?

22  A.   JOB SCOPE THAT MS. MIZNER DOESN'T KNOW ABOUT?

23          IS THAT THE QUESTION YOU ARE ASKING?

24  Q.   THAT'S CORRECT.

25  A.   NO.

1

2

3                    CERTIFICATE OF REPORTER

4          WE, RAYNEE H. MERCADO, AND DIANE E. SKILLMAN, OFFICIAL

5    REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF

6    CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN

7    C07-03685SBA, KIROLA, ET AL. V. CITY AND COUNTY OF SAN

8    FRANCISCO, ET AL., WERE REPORTED BY US, CERTIFIED SHORTHAND

9    REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION

10   INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND

11   TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF

12   FILING.

13          THE VALIDITY OF THE REPORTERS' CERTIFICATION OF

14   SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL

15   FROM THE COURT FILE.

16

17   _____

18        RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR

19

20

21   _____

22        DIANE E. SKILLMAN, CSR, RPR, FCRR

23

24             SATURDAY, APRIL 23, 2011

25

Raynee H. Mercado, CSR, CRR, FCRR & Diane E. Skillman, CSR, RPR, FCRR