# EXHIBIT M

Case No. 14-17521

# UNITED STATES COURT OF APPEALS

*for the*

# NINTH CIRCUIT

---

### IVANA KIROLA, ET AL.,

*Plaintiffs and Appellants,*

*vs.*

### THE CITY AND COUNTY OF SAN FRANCISCO, ET AL.,

*Defendants and Respondents.*

---

Appeal from the United States District Court,

Northern District of California

Case No. 07-cv-03685-SBA,

Hon. Saundra Brown Armstrong

---

**APPELLANTS' OPENING BRIEF**

---

Guy B. Wallace (SBN 176151)
gwallace@schneiderwallace.com
Mark T. Johnson (SBN 076904)
mjohnson@schneiderwallace.com
Jennifer A. Uhrowczik (SBN 302212)
juhrowczik@schneiderwallace.com
SCHNEIDER WALLACE
COTTRELL KONECKY
WOTKYNS LLP
2000 Powell Street, Suite 1400
Emeryville, CA 94608
Tel: (415) 421-7100
Fax: (415) 421-7105

Barry Goldstein, Of Counsel (SBN 141868)
bgoldstein@gbdhlegal.com
Linda M. Dardarian (SBN 131001)
ldardarian@gbdhlegal.com
Ray A. Wendell (SBN 298333)
rwendell@gbdhlegal.com
GOLDSTEIN BORGEN DARDARIAN & HO
300 Lakeside Drive, Suite 1000
Oakland, CA 94612
Tel: (510) 763-9800
Fax: (510) 835-1417

Monique Olivier (SBN 190385)
monique@dplo.com
DUCKWORTH PETERS
LEBOWITZ OLIVIER LLP
100 Bush Street, Suite 1800
San Francisco, CA 94104
Tel: (415) 433-0333
Fax: (415) 449-6556

José R. Allen (SBN 122742)
jrallen@skadden.com
525 University Avenue
Palo Alto, CA 94301-1908
Tel: (650) 470-4520
Fax: (650) 798-6507

James C. Sturdevant (SBN 94551)
jsturdevant@sturdevantlaw.com
THE STURDEVANT LAW FIRM
A Professional Corporation
354 Pine Street, Fourth Floor
San Francisco, CA 94104
Tel: (415) 477-2410
Fax: (415) 477-2420

*Attorneys for Plaintiffs and Appellants*

# **TABLE OF CONTENTS**

I.    REQUEST FOR ORAL ARGUMENT ............................................. 1

II.   JURISDICTIONAL STATEMENT .................................................. 3

III.  STATEMENT OF ISSUES ................................................................ 4

IV.  STATEMENT OF THE CASE ......................................................... 5

V.   STATEMENT OF FACTS ................................................................. 7

     A.    The City's Newly Constructed and Altered Facilities Do Not Comply with ADAAG ........................................................ 7

          1.   Pedestrian Right of Way .......................................... 8

          2.   Parks ....................................................................... 9

          3.   Swimming Pools ...................................................... 10

          4.   Libraries ................................................................. 11

          5.   Plaintiffs' Experts' Qualifications, Methodologies and Conclusions ............................................................ 12

     B.    The City's Pedestrian Right of Way and Parks Programs Are Inaccessible to Persons with Mobility Disabilities Due to Thousands of Access Barriers ............................................... 15

          1.   Pedestrian Right of Way .......................................... 15

          2.   Parks ....................................................................... 25

VI.  SUMMARY OF THE ARGUMENT ............................................... 30

VII.  STANDARD OF REVIEW ............................................................. 35

VIII. LEGAL ANALYSIS ....................................................................... 37

     A.    The District Court Erred in Holding That Ms. Kirola Lacks Standing ......................................................................... 37

          1.   Ms. Kirola Satisfied All of the Constitutional Elements of Standing .............................................................. 37

              a.    Ms. Kirola Suffered Injury-in-Fact ................ 38

              b.    Ms. Kirola's Injuries Are Traceable to the City's Failure to Remove Access Barriers ...... 42

              c.    Ms. Kirola's Injuries Can Be Redressed by a Favorable Decision from the Court ................ 43

              d.    Ms. Kirola is Likely to Suffer Future Injury ... 44

i

2. The District Court's Reasons for Concluding That Ms. Kirola Lacks Standing Are Fatally Flawed ................ 46

    a. The District Court Incorrectly Concluded That Ms. Kirola Failed to Demonstrate Injury-In-Fact ............................................................................. 46

    b. The District Court's Imposition of a Novel "Nexus" Requirement to Establish Redressability Is Without Legal Support ........ 53

    c. The District Court Incorrectly Concluded That Ms. Kirola Failed to Demonstrate the Likelihood of Future Harm ............................. 54

3. The District Court Could Not Enter Judgment Against the Class if Ms. Kirola Lacked Standing ................... 56

B. The City Violated Title II of the ADA by Failing to Perform New Construction and Alterations in Compliance with ADAAG ............................................................................. 57

1. The District Court Erred in Holding that ADAAG Does Not Apply to the Pedestrian Right of Way, Parks and Playground Facilities .......................................... 58

2. The District Court Erred by Failing to Find the City Liable for Performing New Construction and Alterations in Violation of ADAAG ......................... 61

3. The District Court's Reasons for Excusing the City's Non-Compliance with ADAAG Are Contrary to Settled Law ............................................................... 77

C. The District Court Erred in Finding That the City Has Complied with Its Program Access Obligations with Respect to Its Pedestrian Right of Way and Parks ............................. 86

1. The District Court Held Plaintiffs to an Incorrect Legal Standard by Requiring Them to Show That the City's Pedestrian Right of Way and Parks are Inaccessible in Their Entirety ............................................................................. 86

2. The City's Pedestrian Right of Way Is Not Readily Accessible to Persons with Mobility Disabilities ...... 88

    a. The Evidence at Trial Demonstrated that the City Has Not Provided Persons with Mobility Disabilities Meaningful and Equal Access to the Benefits of its Pedestrian Right of Way .......... 88

b.     The District Court's Reasons for Its Non-
       Liability Finding Regarding the City's
       Pedestrian Right of Way are Contrary to Law 93

3.    The City Has Not Provided Persons with Mobility
      Disabilities with Meaningful and Equal Access to the
      Benefits of Its Parks ....................................................97

      a.     The District Court Erred by Failing to Analyze
             Whether Persons with Mobility Disabilities
             Have Meaningful Access to All of the Program
             Benefits of the City's Parks ............................97

      b.     The City's Parks Are Not Readily Accessible
             When Viewed in Their Entirety ......................98

      c.     The City Cannot Provide Program Access to the
             Benefits of the City's Parks Through Non-Park
             Facilities That Provide Different Benefits ....104

IX.   IF THE COURT REMANDS THIS CASE FOR FURTHER
      PROCEEDINGS, IT SHOULD REASSIGN THE CASE TO A
      DIFFERENT JUDGE..................................................................107

X.    CONCLUSION ...........................................................................109

# TABLE OF AUTHORITIES

## Federal Cases

*Ability Ctr. of Greater Toledo v. City of Sandusky*

    133 F. Supp. 2d 589 (N.D. Ohio 2001) ........................................... 63

*Antoninetti v. Chipotle Mexican Grill, Inc.*

    643 F.3d 1165 (9th Cir. 2010) ......................................................... 77

*Arizona v. Harkins Amusement Enters., Inc.*

    603 F.3d 674 (9th Cir. 2010) ........................................................... 59

*Armstrong v. Davis*

    275 F.3d 849 (9th Cir. 2001) .................................................... passim

*Arreola v. Godinez*

    546 F.3d 788 (7th Cir. 2008) ........................................................... 48

*Barden v. City of Sacramento*

    292 F.3d 1073 (9th Cir. 2002) ......................................................... 89

*Barrios v. Diamond Contract Servs., Inc.*

    461 Fed. App'x 571 (9th Cir. 2011) .............................................. 108

*Bates v. UPS*

    511 F.3d 974 (9th Cir. 2007) ........................................................... 48

*Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*

    179 F.3d 725 (9th Cir. 1999) ........................................................... 63

*Bird v. Lewis & Clark Coll.*

    303 F.3d 1015 (9th Cir. 2002) ......................................................... 94

*Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*

  No. C 06-5125, 2009 WL 8595755 (N.D. Cal. Sept. 14, 2009) ..... 83

*Chapman v. Pier 1 Imports (U.S.), Inc.*

  631 F.3d 939 (9th Cir. 2011) ................................................... passim

*Chapman v. Pier 1 Imports (U.S.), Inc.*

  779 F.3d 1001 (9th Cir. 2015) ......................................................... 41

*Chaudhry v. City of Los Angeles*

  751 F.3d 1096 (9th Cir. 2014) ....................................................... 48

*City of Los Angeles v. Lyons*

  461 U.S. 95 (1983) ......................................................................... 44

*Cohen v. City of Culver City*

  754 F.3d 690 (9th Cir. 2014) ................................................... passim

*Disabled in Action v. Bd. of Elections in the City of N.Y.*

  752 F.3d 189 (2d Cir. 2014) ......................................... 2, 33, 87, 101

*Doran v. 7-Eleven, Inc.*

  524 F.3d 1034 (9th Cir. 2008) ................................................ 39, 50

*Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*

  753 F.3d 862 (9th Cir. 2014) ......................................................... 55

*Fortyune v. City of Lomita*

  766 F.3d 1098 (9th Cir. 2014) ................................................. passim

*Haines v. Liggett Grp. Inc.*

  975 F.2d 81 (3d Cir. 1992) ........................................................... 108

*Harris v. Bd. of Supervisors, L.A. Cnty.*

   366 F.3d 754 (9th Cir. 2004) ........................................................... 49

*Hawkins v. Comparet-Cassani*

   251 F.3d 1230 (9th Cir. 2001) ......................................................... 45

*Huezo v. L.A. Cmty. Coll. Dist.*

   672 F. Supp. 2d 1045 (C.D. Cal. 2008) .................................... 96, 101

*Inwood Labs., Inc. v. Ives Labs., Inc.*

   456 U.S. 844 (1982) ........................................................................ 36

*Kinney v. Yerusalim*

   9 F.3d 1067 (3d Cir. 1993) ................................................. 63, 89, 91

*Kirola v. City & Cnty. of San Francisco*

   74 F. Supp. 3d 1187 (N.D. Cal. 2014) .................................... passim

*Kohler v. Presidio Int'l, Inc.*

   782 F.3d 1064 (9th Cir. 2015) ......................................................... 82

*Kohler v. Staples the Office Superstore, LLC*

   291 F.R.D. 464 (S.D. Cal. 2013) .................................................... 83

*Krechman v. Cnty. of Riverside*

   723 F.3d 1104 (9th Cir. 2013) ....................................................... 107

*Lewis v. Casey*

   518 U.S. 343 (1996) ........................................................................ 38

*Lierboe v. State Farm Mut. Auto. Ins. Co.*

   350 F.3d 1018 (9th Cir. 2003) ......................................................... 56

*Lim v. City of Long Beach*

  217 F.3d 1050 (9th Cir. 2000) ........................................................ 36

*Lonberg v. City of Riverside*

  571 F.3d 846 (9th Cir. 2009) ..................................................... 3, 78

*Lonberg v. City of Riverside*, No. EDCV970237SGLAJWX,

2007 WL 2005177, (C.D. Cal. May 16, 2007) .................................. 77

*Long v. Coast Resorts, Inc.*

  267 F.3d 918 (9th Cir. 2001) ................................................... 62, 77

*Lopez v. S.F. Unified Sch. Dist.*

  No. C 99-3260, 2004 WL 6061306 (N.D. Cal. April 20, 2004) ..... 77

*Los Angeles Cnty. v. Davis*

  440 U.S. 625 (1979) ....................................................................... 95

*Lujan v. Defenders of Wildlife*

  504 U.S. 555 (1992) .................................................................. 37, 43

*Massachusetts v. EPA*

  549 U.S. 497 (2007) .................................................................. 43, 53

*Maya v. Centex Corp.*

  658 F.3d 1060 (9th Cir. 2011) ....................................................... 42

*Melendres v. Arpaio*

  784 F.3d 1254 (9th Cir. 2015) ....................................................... 38

*Moeller v. Taco Bell Corp.*

  816 F. Supp. 2d 831 (N.D. Cal. 2011) ........................................... 55

*Monsanto Co. v. Geertson Seed Farms*

  561 U.S. 139 (2010) ........................................................... 48

*OneBeacon Ins. Co. v. Haas Indus., Inc.*

  634 F.3d 1092 (9th Cir. 2011) ........................................... 36

*Pascuiti v. N.Y. Yankees*

  87 F. Supp. 2d 221 (S.D.N.Y. 1999) ................................. 15

*PGA Tour, Inc. v. Martin*

  532 U.S. 661 (2001) ........................................................... 51

*Pickern v. Holiday Quality Foods Inc.*

  293 F.3d 1133 (9th Cir. 2002) ........................................... 49

*Pierce v. Cnty. of Orange*

  526 F.3d 1190 (9th Cir. 2008) .................................... passim

*Pierce v. Cnty. of Orange*

  761 F. Supp. 2d 915 (C.D. Cal. 2011) ........................ 15, 54

*Putnam v. Oakland Unified Sch. Dist.*

  No. C-93-3772CW, 1995 WL 873734 (N.D. Cal. June 9, 1995) .... 96

*Salve Regina Coll. v. Russell*

  499 U.S. 225 (1991) ........................................................... 36

*Schonfeld v. City of Carlsbad*

  978 F. Supp. 1329 (S.D. Cal. 1997) .................................. 94

*Shell Offshore, Inc. v. Greenpeace, Inc.*

  709 F.3d 1281 (9th Cir. 2013) ........................................... 35

*Shotz v. Cates*

256 F.3d 1077 (11th Cir. 2001) ........................................... 3, 40, 101

*Silver v. Exec. Car Leasing Long-Term Disability Plan*

466 F.3d 727 (9th Cir. 2006) ........................................................ 36

*Simon v. E. Ky. Welfare Rights Org.*

426 U.S. 26 (1976) ....................................................................... 38

*Spalding Labs., Inc. v. Ariz. Biological Control, Inc.*

345 Fed. App'x 270 (9th Cir. 2009) ............................................. 109

*Taylor v. Westly*

488 F.3d 1197 (9th Cir. 2007) ...................................................... 54

*U.S. ex rel. Little v. Shell Exploration, Prod. Co.*

602 Fed. App'x 959 (5th Cir. 2015) ............................................. 108

*United States v. AMC Entm't, Inc.*

245 F. Supp. 2d 1094 (C.D. Cal. 2003) .................................... 77, 83

*United States v. Larios*

640 F.2d 938 (9th Cir. 1981) ...................................................... 108

*Vasquez v. Los Angeles ("LA") Cnty.*

487 F.3d 1246 (9th Cir. 2007) ...................................................... 39

*Warth v. Seldin*

422 U.S. 490 (1975) ..................................................................... 48

*Whitmore v. Arkansas*

495 U.S. 149 (1990) ..................................................................... 48

**State Cases**

*Californians for Disability Rights v. Mervyn's LLC*

    165 Cal. App. 4th 571 (Cal. Ct. App. 2008) ................................... 61

**Federal Statutes**

28 U.S.C. § 476 ........................................................................ 108

28 U.S.C. § 1291 ............................................................................ 4

28 U.S.C. § 1331 ............................................................................ 4

28 U.S.C. § 1343(a)(3)-(4) ............................................................. 4

28 U.S.C. § 1367 ............................................................................ 4

29 U.S.C. § 794 .............................................................................. 3

42 U.S.C. §§ 12131 *et seq.* ........................................................... 3

42 U.S.C. § 12132 ......................................................................... 87

42 U.S.C. § 12201(b) .................................................................... 75

42 U.S.C. § 1983 ............................................................................ 3

**State Statutes**

Cal. Civ. Code § 51 ......................................................................... 3

Cal. Civ. Code § 54.1 ...................................................................... 3

Cal. Govt. Code § 4450(c) ............................................................ 75

Cal. Gov't. Code §§ 4459.5 *et seq.* .............................................. 84

Cal. Gov't Code § 11135 ................................................................. 3

Cal. Govt. Code § 11135(a) .......................................................... 97

## Rules and Regulations

Cal. Bldg. Code § 1115B.3.1.4(4.5) ..................................................... 66

Cal. Bldg.Code § 1133B.7.1 .............................................................. 72

21 C.C.R. §§ 111, *et seq.* ................................................................ 84

28 C.F.R. § 35.103 .......................................................................... 75

28 C.F.R. § 35.130(b)(1)(ii)-(iii) ...................................................... 97

28 C.F.R. § 35.133 .......................................................................... 73

28 C.F.R. § 35.163(b) ..................................................................... 103

28 C.F.R. § 35.150 ................................................................... passim

28 C.F.R. § 35.150(b)(1) ................................................................. 105

28 C.F.R. § 35.150(c) ....................................................................... 94

28 C.F.R. § 35.151 ................................................................... passim

28 C.F.R. § 35.151(a)(1) ............................................................. 75, 78

28 C.F.R. § 35.151(b) ................................................................. 63, 72

28 C.F.R. § 35.151(b)(1) ............................................................. 75, 78

28 C.F.R. § 35.151(c)(1) .................................................................. 61

28 C.F.R. § 36.211(b) ...................................................................... 42

28 C.F.R. part 35, App. A, § 35.150.................................... 98, 99, 105

28 C.F.R. part 36, App. A, § 4.1.2...................................................... 60

28 C.F.R. part 36, App. A, § 4.1.2(7)(c) ............................................ 74

28 C.F.R. part 36, App. A, § 4.1.3...................................................... 60

28 C.F.R. part 36, App. A, § 4.1.6................................................. 60, 75

28 C.F.R. part 36, App. A, §  4.1.6(1)(b) ........................................... 75

28 C.F.R. part 36, App. A, § 4.1.6(2) .................................................. 64

28 C.F.R. part 36, App. A, § 4.1.6(3)(a)(ii)....................................... 76

28 C.F.R. part 36, App. A, § 4.2.4.1.................................................. 65

28 C.F.R. part 36, App. A, § 4.3.3..................................................... 72

28 C.F.R. part 36, App. A, § 4.3.7......................................... 68, 70, 73

28 C.F.R. part 36, App. A, § 4.3.8..................................................... 68

28 C.F.R. part 36, App. A, § 4.5.1..................................................... 69

28 C.F.R. part 36, App. A, § 4.7.2.......................................... 8, 18, 75

28 C.F.R. part 36, App. A, § 4.8.2............................. 17, 18, 67, 68, 74

28 C.F.R. part 36, App. A, § 4.8.4.............................................. 67, 71

28 C.F.R. part 36, App. A, § 4.8.5..................................................... 67

28 C.F.R. part 36, App. A, § 4.8.6..................................................... 67

28 C.F.R. part 36, App. A, § 4.13.5................................................... 65

28 C.F.R. part 36, App. A, § 4.13.6................................................... 69

28 C.F.R. part 36, App. A, § 4.13.8................................................... 69

28 C.F.R. part 36, App. A, § 4.13.9................................................... 74

28 C.F.R. part 36, App. A, § 4.19.4....................................... 66, 70, 74

28 C.F.R. part 36, App. A, § 4.23.3................................................... 66

28 C.F.R. part 36, App. A, § 4.33.3................................................... 65

28 C.F.R. part 36, App. A, § A4.5.1.................................................. 71

28 C.F.R. part 36, App. A, § A4.8.2.................................................. 68

28 C.F.R. part 36, App. A, § A4.8.4.................................................. 71

28 C.F.R. part 36, App. A, § A4.13.8................................................ 69

Fed. R. Civ. P. 23(b)(2) ...................................................................... 6

Fed. R. Civ. P. 52(a) ...................................................................... 35

## Other Authorities

Access Board/DOT, Accessible Rights-of-Way: Sidewalks, Street

    Crossings, Other Pedestrian Facilities.  A Design Guide, November

    1999 .................................................................... 9, 60

DOJ ADA Toolkit, Introduction to Appendices 1 and 2, ADA

    Accessibility Survey Forms and Instructions .................................. 82

U.S. Dep't of Justice ADA Title II Technical Assistance Manual § II-

    6.1000 .................................................................... 62

U.S. Dep't of Justice ADA Title II Technical Assistance Manual § II-

    6.3100 .................................................................... 64

## I.   REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34, Plaintiff and Appellant Ivana Kirola and the certified class exceeding 20,000 persons with mobility disabilities respectfully request that this Court hear oral argument of this appeal.  In its decision, the District Court made sweeping and unprecedented legal rulings regarding a plaintiff's standing under Article III, and regarding a city's obligations to provide access to its pedestrian right of way, parks, pools and libraries as required by Title II of the Americans with Disabilities Act of 1990 ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and parallel California laws.

The District Court erroneously held that Ms. Kirola, a wheelchair user with cerebral palsy, failed to prove that she had suffered an injury-in-fact for purposes of Article III standing, even though it was undisputed that she has encountered numerous disability access barriers in the City and County of San Francisco's ("the City") pedestrian right of way, parks, pools and libraries.  *Kirola v. City & Cnty. of San Francisco*, 74 F. Supp. 3d 1187, 1198, 1242 (N.D. Cal. 2014) ("*Kirola*").  Ms. Kirola has encountered steep ramps and paths of travel, inaccessible restrooms, missing curb ramps, broken and uneven sidewalks, and other similar access barriers.  This Court has held that encountering barriers that deny, limit or interfere with a plaintiff's ability to access public facilities or programs, such as those

1

encountered by Ms. Kirola, is sufficient to establish standing. *See, e.g.*, *Chapman v. Pier 1 Imports (U.S.), Inc.*, 631 F.3d 939, 944-53 (9th Cir. 2011) (en banc).

In addition, the District Court held that it was permissible for the City to construct new facilities, and alter existing facilities, without complying with the Americans with Disabilities Act Accessibility Guidelines ("ADAAG"). *Kirola*, 74 F. Supp. 3d at 1258-59. This Court, however, has held that public entities must perform new construction and alterations in compliance with ADAAG. *See, e.g.*, *Fortyune v. City of Lomita*, 766 F.3d 1098, 1103 (9th Cir. 2014), *cert denied*, 135 S.Ct. 2888 (2015); *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1216 (9th Cir. 2008).

Finally, the District Court erroneously concluded that a class that had demonstrated widespread barriers that either limit or deny access to a public entity's facilities and programs failed to demonstrate violations of the ADA and California law. This Court and other circuits have repeatedly held that persons with mobility disabilities are entitled to meaningful and equal access to the benefits of public programs such as a city's pedestrian right of way, parks, pools and libraries, and that physical barriers that limit or deny such access violate the ADA. *See, e.g.*, *Cohen v. City of Culver City*, 754 F.3d 690, 694-95 (9th Cir. 2014); *Disabled in Action v. Bd. of Elections in the City of N.Y.*, 752 F.3d 189, 197-200 (2d Cir. 2014);

*Lonberg v. City of Riverside*, 571 F.3d 846, 851 (9th Cir. 2009); *Shotz v. Cates*, 256 F.3d 1077, 1080 (11th Cir. 2001). Ignoring controlling precedent, the District Court constructed a new and draconian legal standard, finding that the class must establish that the City's pedestrian right of way, parks, pools and libraries were "inaccessible in their entirety." *Kirola*, 74 F. Supp. 3d at 1237, 1250, 1256.

The District Court's rulings stand in stark contradiction to the plain language of the ADA, its implementing regulations, and the rich body of case law from this Court construing the ADA. Oral argument will assist the Court in reviewing the multiple and sweeping rulings by the District Court which, if left standing, risk deprivation of the civil rights of not only the Plaintiff class in this case, but of all people with disabilities seeking equal access to public programs and facilities.

## II.   JURISDICTIONAL STATEMENT

Plaintiffs and Appellees are persons with mobility disabilities alleging violations of Title II of the ADA (42 U.S.C. §§ 12131-12165), Section 504 (29 U.S.C. § 794), the Civil Rights Act of 1871 (42 U.S.C. § 1983), the California Unruh Civil Rights Act (Cal. Civ. Code § 51), the California Disabled Persons Act (Cal. Civ. Code § 54.1) ("DPA"), and California Government Code § 11135 (Cal. Gov't Code § 11135) ("§ 11135"). Defendants are the City and

County of San Francisco, the Mayor, and the members of the Board of Supervisors, all in their official capacities ("the City").

The District Court had jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4), and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

This Court has jurisdiction over this matter under 28 U.S.C. § 1291 to review the judgment of the District Court, which entered final judgment on all claims in favor of Defendants on November 26, 2014.

Plaintiffs filed a timely Notice of Appeal on December 23, 2014.

## III.   STATEMENT OF ISSUES

1) Did the District Court err in holding that Ms. Kirola lacked standing under Article III of the United States Constitution?

2) Did the District Court err in holding that the City did not violate the ADA despite the Court's finding that the City had performed new construction and alterations to its pedestrian right of way, parks, pools and libraries that did not comply with ADAAG?

3)  Did the District Court err in concluding that the City's
    pedestrian right of way provides meaningful and equal
    access to the Plaintiff class as required by the ADA even
    though over half of the City's pedestrian right of way is
    admittedly inaccessible?

4)  Did the District Court err in concluding that the City's parks
    provide meaningful and equal access to the Plaintiff class as
    required by the ADA even though three quarters of the
    City's parks are inaccessible, and numerous inaccessible
    parks provide particular features and benefits that are not
    available at other City parks?

## IV.  <u>STATEMENT OF THE CASE</u>

Plaintiffs' Complaint was filed on July 17, 2007.  (EOR.3547-
68).  Plaintiffs alleged that the City's sidewalks, parks, pools and
public buildings were characterized by multiple, pervasive access
barriers to persons with mobility disabilities.  (EOR.3548, 3551-60
¶¶ 1, 15, 22-49).  Plaintiffs further alleged that the City had failed to
adopt and implement effective policies to ensure that its public
facilities and programs are readily accessible to and usable by persons
with mobility disabilities, and that it had performed new construction
and alterations to its facilities without complying with ADAAG and
the California Building Code ("CBC").  (EOR.3548, 3553 ¶¶ 2, 16).

5

As a result of such conduct, the City was in violation of the ADA,

Section 504 and California access laws.  (EOR.3562-64 ¶¶ 60-70).

Plaintiffs sought declaratory and injunctive relief requiring the

City to remedy the effects of its past and ongoing violations of the

law, including a plan for the removal of barriers and the

implementation of measures to ensure that new construction and

alterations to City facilities comply with ADAAG.  (EOR.3537-38

¶¶ 2, 3).

On June 7, 2010, pursuant to Federal Rule of Civil Procedure

23(b)(2), the District Court certified the following class:

> All persons with mobility disabilities who are
> allegedly being denied access under Title II of the
> Americans with Disabilities Act of 1990, Section 504
> of the Rehabilitation Act of 1973, California
> Government Code Section 11135, et seq., California
> Civil Code § 51 et seq., and California Civil Code
> § 54 et seq. due to disability access barriers to the
> following programs, services, activities and facilities
> owned, operated and/or maintained by the City and
> County of San Francisco: parks, libraries, swimming
> pools, and curb ramps, sidewalks, cross-walks, and
> any other outdoor designated pedestrian walkways in
> the City and County of San Francisco.  (EOR.3545).

A bench trial was conducted over 14 days between April 4,

2011 and May 5, 2011.  On February 24, 2014, almost three years

after the trial, the Court issued an Order re Supplemental Briefing

directing the parties to specify any new material facts or changes of

law occurring after the time of trial.  (EOR.258).  On November 26,

2014, the Court issued its Findings of Fact and Conclusions of Law
and entered judgment in favor of the City on all claims. (EOR.1-2).

This appeal followed.

## V.   STATEMENT OF FACTS

### A.   The City's Newly Constructed and Altered Facilities Do Not Comply with ADAAG

The ADA requires that facilities that are newly constructed or
altered after January 26, 1992 must comply with the applicable
requirements of ADAAG.  28 C.F.R. § 35.151.  The record below
demonstrates that the City has constructed new facilities and altered
existing facilities in a manner that violates ADAAG.  The
pervasiveness of the violations was established by the testimony of
Plaintiffs' experts, the class members, and the City's own records.

Plaintiffs presented testimony from four disability access
experts, Dr. Edward Steinfeld, Gary Waters, Jeff Mastin, and Peter
Margen.  All were qualified as experts by the Court.  *Kirola*, 74 F.
Supp. 3d at 1221; (EOR.1926-30, 2413-17, 3021-22, 3384-85).
Plaintiffs' experts inspected a wide variety of the City's newly
constructed and altered curb ramps, parks, recreational facilities, pools
and libraries, including many of the City's "blue dot" facilities that
have undergone construction since 2000.  *Kirola*, 74 F. Supp. 3d at
1211.  Their inspection data showed that virtually none of these
facilities complied with the applicable provisions of ADAAG, even

though ADAAG is the City's chosen access standard.  *Id.* at 1212.
The City did not rebut this evidence. The District Court made no
findings that any of the City's facilities complied with ADAAG.

## 1.  **Pedestrian Right of Way**

The undisputed evidence at trial established that the City
deliberately installed, and has not corrected, curb ramps with 1/2 inch
lips at the base where the ramp meets the crosswalk.  The City
designed and installed thousands of curb ramps with such lips
throughout the City between 1994 and 2004, even though ADAAG
has always required a flush transition between the curb ramp and the
crosswalk surface.  ADAAG § 4.7.2.  It is undisputed that class
members regularly encounter curb ramps with concrete lips that
prevent them from accessing City sidewalks, or cause them to struggle
with using the City's curb ramps.  (EOR.2353-55, 2368, 2374, 2503,
2518, 2956-57).

Although a half-inch lip may seem inconsequential to a non-
wheelchair user, it poses a serious safety hazard to wheelchair users.
The U.S. Architectural and Transportation Barriers Compliance Board
("ATBCB") and the Federal Highway Administration ("FHWA")
described the hazards posed by curb ramp lips as follows:

> It is particularly important that the transition from the ramp
> to the street be flush, without a lip or other difference in
> level … Some pedestrians who use wheelchairs will take a
> run at the upslope of a curb ramp to take advantage of
> forward momentum. Even a small lip at the gutter edge will
> interrupt this progress. A substantial lip will cause many
> wheelchairs to stop abruptly enough to dislodge the user. On
> a downslope, a lip can … pitch[] the pedestrian forward and
> into the street.

ATBCB/DOT, Accessible Rights-of-Way Design Guide, dated

November 1999. (EOR.325-27).

The District Court acknowledged this clear violation of the

City's new construction obligations, but excused it on the basis that

the City "endeavors to remove them where possible." *Kirola*, 74

F. Supp. 3d at 1206 n.4. The Court ordered no relief.

### 2. Parks

Plaintiffs' experts inspected a sample of parks and recreation

centers across the City that were identified by the City as having been

newly constructed or altered since January 26, 1992. Plaintiffs'

experts found similar patterns of access barriers in every newly

constructed or altered park and recreational facility that they

inspected. The ADAAG violations typically included, among others:

ramps and pathways with excessive running slopes or cross slopes,

making the inclines too steep for accessible entry and travel within

parts of a facility; inaccessible restrooms with stalls that are too small

or lacking accessible grab bars; and a lack of accessible signage

9

directing persons with mobility disabilities to accessible routes and entrances.  A detailed discussion of some of the ADAAG violations observed by Plaintiffs' experts is provided *infra* at 67-75.

Class members testified to numerous barriers they encountered at the City's newly constructed or altered parks.  For example, Jill Kimbrough testified that St. Mary's Playground was not accessible to her daughter, Millie, who uses a wheelchair, due to its steep entrance path.  (EOR.2778-79).  Erica Monasterio testified regarding a field trip that her daughter, Maira, a wheelchair user, took to the Japanese Tea Garden with her classmates.  Despite being labeled by the City as "accessible," Maira had to "stay in the band shell area with a paraprofessional because she couldn't go on the walk with the other kids in the Tea Garden."  As a result, Maira was segregated from her classmates, missed out on educational opportunities and "came home in tears."  (EOR.2269-70).  Ms. Kimbrough also testified to barriers that Millie experienced at the Tea Garden, explaining that "she couldn't get into the Tea House … They have stepping stones that go over the water.  There isn't enough room for me to help [Millie] cross on those stepping stones [*i.e.*, the stone bridges]."  (EOR.2774-75).

### 3.  Swimming Pools

At trial the City identified six of its nine public pools as "blue dot" pools, meaning that they had undergone new construction or alterations after 2000.  (EOR.457, 1598, 1673).  Plaintiffs' experts

found that two of these "blue dot" pools were not compliant with

ADAAG.  (EOR.2669-70). The barriers at these pools included non-

compliant restrooms and locker rooms at Coffman pool, and

inaccessible restroom stalls and sinks at Martin Luther King pool.

(EOR.2671-72, 2677-80, 2804-05).

### 4.    Libraries

Plaintiffs' experts inspected the Main Library and twelve

branch libraries. (EOR.2594-96, 3237-38, 3446-49).  All of these

"blue dot" facilities were newly constructed or altered by the City

after 2000.  Plaintiffs' experts testified to multiple barriers to access

that violate ADAAG throughout these libraries, including but not

limited to, accessories in the restrooms that are mounted too high

[Eureka Valley, Marina, Mission, Mission Bay, Sunset and West

Portal branch libraries (EOR.3161-63)]; inaccessible paths of travel to

the books [Visitation Valley Branch Library (EOR.2672-75, 2802-

03)]; and an entry ramp that far exceeds the maximum running slope

of 8.33% [Richmond Branch Library (EOR.2681-82, 2760-62)].

The Main Library was newly constructed after January 26, 1992

and is a "blue dot" facility.  Nonetheless, it has numerous access

barriers, including but not limited to, the lack of companion seating

adjacent to the wheelchair seating spaces in the Koret Auditorium

(EOR.3219); inaccessible seating (EOR.3221); and multiple other

ADAAG violations in its restrooms (EOR.3157-59, 3226-27, 3231).

### 5.    Plaintiffs' Experts' Qualifications, Methodologies and Conclusions

Plaintiffs' experts, Peter Margen, Dr. Edward Steinfeld, Jeff Mastin, and Gary Waters, conducted or oversaw site inspections of the City's pedestrian right of way, and of many of the City's parks, pools and libraries.  Each of Plaintiffs' experts is highly qualified in the field of disability access.

Peter Margen has been working as an expert consultant in the disability access field since 1982.  He helped establish California's Certified Access Specialist Program ("CASp") through which, pursuant to state law, the California Division of the State Architect qualifies, certifies and regulates specialists who are authorized to review facility plans, investigate facilities for compliance with state and federal disability access codes, conduct site inspections and research and prepare accessibility reports.  (EOR.3357-58, 3362-63).  He has also served on the California Building Standards Commission and worked on access projects for the California Attorney General's Office and the Division of the State Architect, including a project to align state access standards with those of ADAAG.  (EOR.3358-62).

Mr. Margen has served as the ADA Coordinator for the City of Oakland, has trained over 1,000 city employees on the requirements of the ADA, and has prepared ADA transition plans for the Cities of Oakland, Ukiah, Piedmont and Belvedere, the Counties of Santa Cruz

12

and Sonoma and the University of California at Berkeley. (EOR.3268-
71, 3363-65).

Dr. Edward Steinfeld is a licensed architect and a professor of
architecture at the State University of New York at Buffalo.  He is an
adjunct professor in the University's Rehabilitation Sciences
Department, which conducts research on accessibility.  (EOR.3012,
3014-15).  Dr. Steinfeld has designed many access improvement
projects for public entities. (EOR.3015-16).  He has prepared ADA
transition plans for several universities and school districts, including
the entire 22-campus California State University system. (EOR.3016-
17).  As a researcher and expert in the area of anthropometry and
accessible design, Dr. Steinfeld conducted research involving human
subjects that became the foundation for the 1991 ADAAG.
(EOR.2808-29, 3017-18).

Jeff Mastin is a licensed architect in California, and is the
founder and president of Facility Access Consulting, a consulting firm
specializing in disability access services.  (EOR.2392-94).  Mr.
Mastin has served as a plan checker for the California Division of the
State Architect, reviewing the design plans of California schools to
ensure compliance with the CBC and ADAAG.  (EOR.2397-98). He
is a Certified Access Specialist.  (EOR.2397, 2563-65).  Mr. Mastin
has been employed by several public entities, including the State of
California, Orange County, Alameda County and Santa Rosa Junior

College, to perform site inspections, prepare ADA transition plans and recommend barrier removal for hundreds of facilities.  (EOR.2399-2401, 2406-09).

Gary Waters has been a licensed architect in California since 1989, and is a Certified Access Specialist.  (EOR.1921, 1925-26).  He specializes in accessible design.  (EOR.1922).  He has provided disability access consulting services to public entities since 2001, including facility surveys, ADA transition planning and barrier removal.  His clients for such services have included Napa Valley College, Santa Rosa Junior College, Alameda and Sonoma Counties, the City of Sonoma and City College of San Francisco.  (EOR.1924-25).  He has also reviewed public school facility design plans for the California Division of the State Architect to ensure compliance with the CBC and ADAAG.  (EOR.1926, 2097-2100).

Plaintiffs' experts followed the U.S. Department of Justice ("DOJ") standards for assessing the accessibility of the City's pedestrian right of way, parks, pools and libraries.  As to new construction and alterations performed since January 26, 1992, they applied ADAAG, the federal access standard selected by the City. *Kirola*, 74 F. Supp. 3d at 1212.  As to "existing" facilities (those constructed prior to January 26, 1992 and not altered since), Plaintiffs' experts properly used ADAAG as a guideline for identifying barriers that may limit or deny the participation of persons with mobility

14

disabilities in programs offered at an existing facility. *See, e.g.*,
*Pierce v. Cnty. of Orange*, 761 F. Supp. 2d 915, 946 (C.D. Cal. 2011)
("the Court may look to UFAS or ADAAG guidelines to decide
whether barriers to access exist"). The DOJ considers any condition
that does not meet the minimum standards of ADAAG to be a
"barrier" to persons with mobility disabilities regardless of the age of
the facility at issue. *See, e.g.*, *Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d
221, 225 (S.D.N.Y. 1999).

> **B.** **The City's Pedestrian Right of Way and Parks
> Programs Are Inaccessible to Persons with Mobility
> Disabilities Due to Thousands of Access Barriers**

The City's "existing" pedestrian right of way and parks (*i.e.*,
facilities constructed prior to January 26, 1992 and not altered since)
are characterized by multiple, pervasive barriers that limit or deny
access to persons with mobility disabilities.

> **1.** **Pedestrian Right of Way**

The City's pedestrian right of way encompasses over 2,000
miles of sidewalks, approximately 5,000 blocks, 7,200 intersections
and 27,585 total street corners. *Kirola*, 74 F. Supp. 3d at 1205;
(EOR.972). The evidence at trial overwhelmingly showed that the
pedestrian right of way contains pervasive barriers to access with
regard to curb ramps, sidewalks, and crosswalks across all areas of the
City.

**Curb Ramps.**  Over fifty percent of the City's corners lack an accessible curb ramp according to the City's own standards.  The City does not evaluate or track the condition of curb ramps based upon the accessibility standards set forth in ADAAG.  Instead, it uses its own "condition score," based upon a scale of 1 to 100, deducting points for certain conditions.  *Kirola*, 74 F. Supp. 3d at 1207-08; (EOR.2029-30, 2088).  Under this scoring system, the City considers a curb ramp "good" and "usable" if it has a condition score of greater than 75 (EOR.1825), even though such curb ramps typically have multiple ADAAG violations.[1]  A curb ramp with a score of "69" or below is not considered to be "good and usable," and is considered by the City to be in need of replacement.  (EOR.1825, 2041).

The City's curb ramp program project manager, Ken Spielman, testified that the City has 22,778 corners at which a pedestrian crossing exists, and at which a curb ramp can be constructed.  Of those 22,778 corners, more than half have no curb ramp at all, or only have a curb ramp that the City considers to be in need of replacement because it does not score high enough on the City's own rating for

---

[1] Deductions are made for certain conditions affecting accessibility, including a 5 point deduction for lips greater than 1/2 inch; 12 points for a running slope between 8.33% and 10%; and 25 points for a running slope greater than 10%. (EOR.1816-18, 1820-21, 2088); *see also* (EOR.2029).

accessibility.  (EOR.2039-41).  Specifically, Mr. Spielman testified,
based on the City's Curb Ramp Information System ("CRIS")
database, that, as of January 14, 2011 (three months before trial), there
were a total of 11,736 corners with no curb ramp at all, or that only
had a curb ramp with a "condition score" of 69 or below.  Thus, the
total number of corners that lack a curb ramp, or that have a curb
ramp that needs to be replaced, represent more than 51% of all corners
at which the City admits a curb ramp could be built to serve an
existing pedestrian crossing.  (EOR.2039-41, 2107).  Of the 22,778
corners with pedestrian crossings in the City, only 9,616, or 42% of
the corners, have a curb ramp that meets the City's "good and usable"
standard. (EOR.2107).

Mr. Spielman's testimony also established that 5,675 of the
City's curb ramps had running slopes greater than 10%, which far
exceeds the ADAAG maximum of 8.3%.  ADAAG § 4.8.2;
(EOR.2887, 3047).  The City's own Director for Physical Access,
John Paul Scott, admitted at trial that such slopes are too steep for
persons with mobility disabilities.  (EOR.1700-01).  Accordingly, the
5,675 curb ramps that are too steep are not accessible to persons with
mobility disabilities.

The City's CRIS database also indicates that 2,635 of the City's
curb ramps have a lip at the base that is higher than 1/2 inch, far
greater than the "flush" transition to the street mandated by ADAAG

17

§ 4.7.2. (EOR.2031, 2092). Thousands more curb ramps have lips of 1/2 inch, since the City designed and built its curb ramps with such lips until 2004. (EOR.1330-37, 1425-45).

Plaintiffs' expert, Jeff Mastin, inspected a total of 1,432 curb ramps in various parts of the City and found that 1,358, or 94%, were inaccessible. Out of Mr. Mastin's sample, 175 curb ramps had running slopes greater than 10%, and 178 had running slopes greater than 12.5%, in violation of ADAAG § 4.8.2, which requires an 8.3% maximum running slope; 503 had lips at the bottom of the ramp greater than 1/4 inch high; and 494 had lips at the bottom of the ramp greater than 1/2 inch high, in violation of ADAAG § 4.7.2 which requires a flush transition. (EOR.2247-50, 2342, 2566-68, 2572).

Every class member who testified at trial stated that they routinely encounter barriers to access in the City's pedestrian right of way. Audrey DeChadenedes described the frequent struggles with barriers that she and her daughter, Valerie, encounter navigating the City's sidewalks. Valerie has Rett syndrome and requires the use of a wheelchair. Valerie is unable to operate her chair on her own, so Ms. DeChadenedes has to accompany Valerie on trips throughout the City. (EOR.2487, 2495). Ms. DeChadenedes testified about nonexistent or inaccessible curb ramps at the intersection of Sunset Boulevard and Irving Street, an intersection that she and Valerie encounter on walks several times a month. (EOR.2496-98, 2571). To cross the

18

intersection, she has to "bring [Valerie] out into traffic because [they] can't get over [the] island, nor can [they] get up the ramp … on the opposite side." There is no option other than going over the curb, or around the island and into vehicular traffic, to get across the street. This causes Ms. DeChadenedes to feel unsafe. (EOR.2498-99, 2513).

Ms. DeChadenedes also testified about curb ramp barriers at five other specific intersections. Near Mt. Zion Hospital, on the corner of Divisadero and Post Street, where she and Valerie go several times a month for Valerie's medical appointments, there are two corners with missing curb ramps that force Ms. DeChadenedes and Valerie into the street with vehicular traffic. (EOR.2489-93). Ms. DeChadenedes testified to similar experiences at Sunset Boulevard and Kirkham Street and the intersections along Sunset Boulevard between Irving Street and Vicente Street. (EOR.2493-99, 2569-71). She also testified to struggling with missing curb ramps, curb ramp lips, and cracked sidewalks in the Civic Center area at the intersection of Franklin Street and Grove Street that require her to travel in traffic with Valerie and make "crossing the street sometimes feel[] treacherous." (EOR.2499-2502). In the West Portal neighborhood, she encounters curb ramp lips, crosswalks that are in disrepair, and steep cross slopes. (EOR.2503). While Valerie has not yet fallen out of her wheelchair while navigating the pedestrian right of way, she has come close and "gets very frightened." (EOR.2495, 2504).

19

Tim Grant testified about his struggles with barriers in the pedestrian right of way in the Financial District, North Beach, Union Square and near the Moscone Center.  Mr. Grant has multiple sclerosis and uses a manual or power wheelchair for mobility, depending on whether he is by himself or has someone with him to assist him if he encounters a barrier.  (EOR.2349).  Mr. Grant lives in Albany, but travels to San Francisco several times a week to play quad rugby at the Embarcadero YMCA or to engage in other activities around the City.  (EOR.2351-52, 2359).

When Mr. Grant goes to the YMCA, he takes BART to the Embarcadero station and then travels by sidewalk for half a mile, crossing two intersections along Steuart Street.  Due to the obstacles he encounters, he is unable to make the trip in his manual chair by himself.  On this route, Mr. Grant has encountered steep curb ramps, and curb ramps with lips at the bottom of the ramp so that he has to "hopefully pop a wheelie and get over it if [he] can."  (EOR.2352-56, 2366).

Mr. Grant attempted to find a route from BART to the YMCA with fewer obstacles, but "[t]he obstacles were harder" on other routes and "it was [a] longer … distance, so then I had more opportunities to find more obstacles."  He could not traverse the alternate routes at all.  "So the … route I take now is the closest with the least amount of [] obstacles as there is."  (EOR.2354). Though Mr. Grant testified about

a specific stretch of sidewalk, "the problems that I've explained are …

typical – it's not just confined to the route that I take to the Y. I find it

everywhere. Lack of curb ramps, steep ramps, everything."

(EOR.2360, 2374-75).

Every class member testified that they routinely encounter

access barriers in the City's pedestrian right of way, including missing

curb ramps, steep curb ramps, and curb ramps with high lips. Class

members identified numerous specific locations throughout the City

where they regularly encounter such barriers, and they described how

the barriers affect them. (EOR.2260-62, 2278, 2353-57, 2360-64,

2366-68, 2371-76, 2378, 2488, 2503, 2517-18, 2520-21, 2768-73,

2806-07, 2956-58, 2960-69, 2978-89, 2991-3000, 3003-06, 3046).

**Sidewalks.** It is undisputed that the City's sidewalks have

numerous access barriers. In 2005, the City surveyed a random

sample of 450 blocks distributed across the City for the purpose of

identifying barriers to access for persons with mobility disabilities.

(EOR.3488-91). This survey identified 7,102 access barriers along

the 450 blocks, almost 16 barriers per block, including sidewalk

damage or depressions, missing tree grates, sidewalk upheaval, curb

ramp damage, empty tree pits, and excessive slopes. *Id*. At trial, the

City made no claim that it had repaired any of these sidewalk barriers,

nor did the Court find that it had done so.

In 2010 Plaintiffs' experts inspected more than one hundred blocks of City sidewalks.  Their inspections identified hundreds of mid-block barriers rendering the sidewalks inaccessible, including the same types of barriers identified in the City's survey. (EOR.2108, 2174-75, 2341-42, 2419-20, 2573, 2652-56, 2658-59, 2700, 2800-01, 3177-78, 3198-3200, 3272-78, 3488-91).  Again, the City offered no rebuttal evidence.

Class members also testified to numerous, pervasive access barriers that they encounter in the City's sidewalks.  Ms. Kimbrough, and her daughter, Millie, live in the Excelsior neighborhood of San Francisco.  (EOR.2764-66).  Ms. Kimbrough testified about their almost daily struggles to get to the market from their house.  She described a specific section of sidewalk on Excelsior Avenue across from Paris Street that is "lifted from a tree root.  We have tripped on that same crack so many times."  Ms. Kimbrough has actually fallen on top of Millie while trying to help her navigate that section of sidewalk.  (EOR.2773).

Erica Monasterio and her daughter Maira live in the Bernal Heights neighborhood.  (EOR.2258).  Ms. Monasterio testified that, in less than a two month span, Maira's wheelchair got stuck on barriers in the sidewalks on two separate trips to the library so that she had to call her mother for help.  (EOR.2265).  She gets stuck on the sidewalks regularly because they are "pretty beaten up, cracked and

lifted." (EOR.2260). Also, due to the lack of accessible curb ramps
in her neighborhood, Maira is often forced to travel in the street with
vehicular traffic. Ms. Monasterio testified that the curb ramp and
sidewalk barriers in their neighborhood make Maira "frustrated" and
"scared." (EOR.2260, 2263-65).

Ms. Monasterio also testified that while Maira "has a
significant disability, [] she's very put together for a 13-year-old girl.
So [they] anticipate that she'll be living independently and … will
probably be using the buses to get around. [W]hat [they] are trying to
do right now is really teach her how to ride the bus … so that she'll be
able to move around the City, get to City College when she finishes
high school and function independently." The Monasterios' efforts to
teach Maira how to use public transportation, however, are hampered
by the fact that the bus stops closest to their home are inaccessible to
Maira due to missing curb ramps or sidewalks in disrepair.
(EOR.2261-62).

Margie Cherry testified regarding specific locations where she
regularly encounters cracked sidewalks, sidewalks uplifted by tree
roots, and curb ramps with lips. Ms. Cherry suffers from chronic
arthritis and uses a cane for mobility. Her daughter, Estoria, has
cerebral palsy and uses a walker for mobility. The Cherrys live in the
Bayview Hunter's Point neighborhood. (EOR.2514-16). To leave
their house, they must pass through the intersection of Progress Street

and Whitney Young Circle.  At that corner, however, there are
uneven, cracked sidewalks and a curb ramp with a lip.  Ms. Cherry
finds it "dangerous," and having to traverse such barriers "makes [her
arthritis] pain worse."  "Bayview Hunter's Point has a variety of the
same problems."  (EOR.2516-20).  Ms. Cherry attends True Hope
Church on Gilman Street and Walker Drive.  To get to church, Ms.
Cherry must struggle with cracked and uprooted sidewalks.
(EOR.2524-25).

　　　All of the class members testified about similar access barriers
that they regularly encounter on sidewalks throughout the City that
deny them equal access to the pedestrian right of way, including but
not limited to: lifted sidewalk sections in the Civic Center District,
sidewalks broken by tree roots at Mission and 11th Street in the
Mission District, cracks and erosion in the pavement at the
intersection of Davis Street and California Street in the Financial
District, broken and cracked sidewalk sections, including sections
made uneven by tree roots, in Bernal Heights, Bay View/Hunter's
Point, West Portal, and the Western Addition, as well as lifted
sidewalks with severe cross slopes along Excelsior Avenue in the
Excelsior neighborhood.  (EOR.2001-02, 2260, 2263-65, 2355-57,
2366, 2368-69, 2374, 2376-79, 2487-88, 2520, 2525-26, 2764, 2773-
74, 2952, 2981-82, 2993-94).

**Crosswalks.** Plaintiffs' experts identified numerous access barriers in the City's crosswalks, including potholes, cracks, and abrupt changes in level of more than 1/2 inch, and excessive cross slopes. (EOR.2342, 2471-75, 2566, 3087-89, 3094-95, 3112-13, 3115-19, 3183-84, 3279-81, 3427). Consistent with these findings, Ms. Kirola and several class members described their own encounters with such barriers in crosswalks at various locations throughout the City. (EOR.2368-69, 2374, 2488, 2499-2503, 2520-24, 2982).

The City offered no testimony from any person with a mobility disability that the City's pedestrian right of way is accessible.

## 2. Parks

The City's parks are overwhelmingly inaccessible to persons with mobility disabilities. The Recreation and Parks Department ("RPD") maintains a website that provides information to the public about disability access to the City's parks. (EOR.869-71). The website includes a map that designates parks and recreation facilities as either "accessible" or "limited wheelchair accessibility." (EOR.1871-1915). The RPD website defines an "accessible" park as one that has an accessible entrance and "at least one accessible recreational opportunity." (EOR.854, 1686-87, 1872).

The City has identified only 60 out of its 220 parks (27%) as being "accessible." (EOR.1901-11). In other words, the City recognizes that the other 164 parks, or 73% of its parks, have barriers

to access such that they are inaccessible to persons with mobility disabilities. The City does not contend that the 164 parks designated as "limited wheelchair accessibility" provide program access. (EOR.1872).

The City's own documents show that the 73% of the City's parks that are concededly inaccessible provide particular program features and benefits that are not available at the City's "accessible" parks. For example, the following parks that the City admits are inaccessible all provide program benefits that are not available at other City parks: Buena Vista Park (a natural area with one of the City's few remaining coast live oak groves); India Basin Shoreline Park (a wetland that is the only natural area within the parks system that borders the Bay, with "fantastic bird watching" and access for kayakers); Lake Merced (paved trail around the lake, boathouse and fishing pier); Lincoln Park (views of the Golden Gate Bridge and Marin Headlands, Lands End trails, 18 hole public golf course); Mt. Davidson Park (highest point in the City, habitat for a wide range of migratory birds, rainforest-like natural area); and Sharp Park (the City's only archery range, and which is nationally recognized). (EOR.1871-1915).

Other unique parks that the City considers to be special destination parks, and which it admits are inaccessible include: McLaren Park, Glen Canyon Park, Alamo Square Park, and the

26

Sigmund Stern Recreation Grove.  McLaren Park is the City's second largest park, and contains the park system's only outdoor Greek-style theatre, a venue for special music and entertainment events. According to the City, Glen Canyon Park provides a large urban canyon with wildflower displays, dramatic rock formations, and Islais Creek, one of the few remaining free flowing creeks in San Francisco, all of which are particular program features that are not duplicated at any other designated "accessible" park.  Alamo Square Park offers quintessential scenes of the City, including views of the "painted ladies" nearby, and provides a unique and world-famous experience. Sigmund Stern Recreation Grove provides symphony, opera, dance, world music and more in an outdoor setting, and hosts the Stern Grove festival.  (EOR.1871-1915).  All of these unique features of the City's parks are off limits to persons with mobility disabilities.

Further, the City admits that Golden Gate Park is inaccessible to persons with mobility disabilities in many important respects.  The City's own witness, Dawn Kamalanathan, the RPD's Director of Planning and Capital Management, described Golden Gate Park as world famous and a "gem" of the City's park system.  (EOR.1214-15).  However, according to the City's map of Golden Gate Park, many unique aspects of the Park are inaccessible.  These include the Sharon Arts Studio, Anglers Lodge, Bercut Equestrian Area, Bowling Greens & Clubhouse, Model Yacht Clubhouse, Rose Garden and

27

Shakespeare Garden.  (EOR.1676, 2101 [lack of accessible paths to the roses at the Rose Garden]).

Class members identified numerous access barriers that they encountered when attempting to use the City's "limited wheelchair accessibility" parks.  Ms. Monasterio testified that she and Maira encountered barriers in Glen Canyon Park.  Specifically, the pavement at the entrance is "pretty broken up," very steep and then "becomes a trail."  There are no accessible restrooms.  In addition, Maira cannot access the natural areas of the park or the baseball diamond because of the lack of accessible paths.  And, Maira could not attend the City-run summer camp at Glen Canyon Park because it is located in an inaccessible part of the park.  (EOR.2106, 2266-69).

With respect to the "limited wheelchair accessibility" portions of Golden Gate Park, Ms. Monasterio testified that when Maira's class went to the Conservatory of Flowers, "she had to wait on the other side of the bridge while the other children went through the conservatory" because the bridge was too narrow for Maira to cross in her wheelchair. (EOR.2269).  Ms. Kimbrough testified that the Children's Playground is inaccessible to Millie, despite having been recently modernized, because of a steep entrance and inaccessible play structures.  (EOR.2275-76).

Class members also testified to struggling with accessibility barriers at John McLaren Park (EOR.2777-78 [lack of accessible

28

paths and signage]), Balboa Park (EOR.2779-80 [lack of accessible path to playground]), Gilman Playground (EOR.2525-27 [lack of accessible paths, restroom and barbecue area]), and avoiding visiting certain parks altogether because of similar issues. (EOR.2266-69, 2527-29, 3002-03).

Moreover, even the 27% of parks that the City claims are "accessible" do not purport to be fully accessible, but only provide access to "at least one accessible recreational opportunity." (EOR.1872). Indeed, as discussed below at § VIII(B)(2), the City's "accessible" parks and facilities contain myriad access barriers that limit the participation and enjoyment of mobility disabled persons.

The City's own witnesses admitted that a substantial number of the barriers in the park facilities that were identified by Plaintiffs' experts were "maintenance issues," which required intervention from the Director of the Mayor's Office on Disability ("MOD"). In this respect, MOD identified approximately 400 items from Plaintiffs' expert reports that it determined needed to be addressed because they impacted disabled access adversely. (EOR.846-49, 1862-63). At the time of trial, only 60 of those 400 items had been remediated. *Id.*

The City did not present any testimony from any class member that any of the City's parks are accessible.

## VI. SUMMARY OF THE ARGUMENT

The District Court's judgment must be reversed because it is contrary to the plain language of the ADA, its implementing regulations, and controlling precedents. The District Court erred in three fundamental respects.

*1. The District Court Erred in Holding that Plaintiff Ivana Kirola Lacked Standing Under Article III of the Constitution.* This Court has ruled that the plaintiff in an ADA access case has suffered injury-in-fact if she has encountered access barriers that limit, obstruct or interfere with her ability to use a public facility or program. *Chapman*, 631 F.3d at 944. Ms. Kirola proved that she met this standard. As discussed below, Ms. Kirola has encountered numerous access barriers that limit or obstruct her ability to use the City's pedestrian right of way, parks, pools and libraries. For example, Ms. Kirola has struggled with the lack of accessible curb ramps in the City's pedestrian right of way, and has been forced to roll in the street with vehicular traffic because she could not get onto the sidewalks. She has encountered a restroom at a modernized pool that was inaccessible to her. She has been forced to struggle with steep entrances and paths of travel at her neighborhood park, and been unable to access its newly constructed playground. She has often been unable to access and browse the book stacks in City libraries because she cannot get past obstacles in the aisles. All of the

30

foregoing experiences are sufficient to establish injury-in-fact. *See* discussion and authorities *infra* at § VIII(A)(1)(a).

The District Court did not follow governing law. Instead, the Court applied an unprecedented requirement that in order to demonstrate injury-in-fact an ADA plaintiff must show that she was completely excluded from a city's sidewalk system or facilities "in their entirety." The Court held that because Ms. Kirola did not meet this threshold of showing that the City's pedestrian right of way, parks, pools and libraries were "inaccessible and unusable in their entirety," Ms. Kirola did not suffer injury-in-fact for purposes of Article III standing. *Kirola*, 74 F. Supp. 3d at 1237, 1239-42.

Ms. Kirola also satisfied each of the other elements of standing. Ms. Kirola proved causation as her injuries are the result of the City's failure to remove those access barriers, and to make its programs and facilities accessible. With respect to redressability, the District Court could have entered injunctive relief that would have relieved or lessened her injuries. Finally, Ms. Kirola demonstrated a likelihood of future injury because the City has not removed many of the access barriers that she and the other class members testified to at trial. Ms. Kirola lives in San Francisco, and continues to encounter barriers in the City's pedestrian right of way, parks, pools and libraries on a daily or monthly basis. Nothing more is required to show a likelihood of future harm. *See, e.g.*, *Chapman*, 631 F.3d at

948.  Accordingly, the Court's decision that Ms. Kirola lacks standing must be reversed.

2. *The District Court Erred in Holding that the City Did Not Violate the ADA When it Performed New Construction and Alterations that Did Not Comply with ADAAG.*  This Court has held that 28 C.F.R. § 35.151 mandates that new construction, or alterations to existing facilities, must be performed in full compliance with ADAAG.  *See, e.g.*, *Fortyune*, 766 F.3d at 1103.  The District Court found that Plaintiffs had established instances in which the City newly constructed or altered facilities, but failed to perform that work in compliance with ADAAG.  *Kirola*, 74 F. Supp. 3d at 1258-59.  Indeed, the record is replete with examples of ADAAG violations in the City's newly constructed or altered pedestrian right of way, parks, pools and libraries. The City did not rebut these violations.

Despite this evidence and its own factual conclusion, the District Court found that the City's new construction and alterations did not violate the ADA.  In doing so, the District Court did not apply the stringent standard for new construction and alterations under § 35.151, but instead applied the more lenient standard for program access under 28 C.F.R. § 35.150.  This was plain error, and must be reversed.

32

3. *The District Court Erred in Holding that the City Has Provided Program Access to its Pedestrian Right of Way and Parks.* The ADA requires a city to make each of its programs, when viewed in its entirety, "readily accessible" to persons with disabilities so that they have meaningful and equal access to all of the benefits thereof. *See, e.g., Cohen*, 754 F.3d at 695 ("a public entity's programs and services, viewed in their entirety, must be equally accessible to disabled persons"); *Armstrong v. Davis*, 275 F.3d 849, 869 (9th Cir. 2001) (the ADA requires that persons with disabilities receive the "full benefit" of public programs).

The District Court failed to apply this well-established standard. Instead, it held that Plaintiffs had not established a violation of Title II because they had not shown that the City's pedestrian right of way and parks were "inaccessible in [their] entirety." *Kirola*, 74 F. Supp. 3d at 1250, 1256. This was plain error. It is well-settled that the plaintiffs in a Title II case are not required to show that they were entirely shut out of a program in order to establish liability. Rather, they need only show that access barriers limited or obstructed their ability to have meaningful and equal access to the program(s) at issue. *See, e.g.*, *Cohen*, 754 F.3d at 694-95; *Disabled in Action*, 752 F.3d at 198-200; *see also*, discussion and authorities *infra* at 101-02.

The record contains substantial, unrebutted evidence that the City has not provided persons with mobility disabilities with

33

meaningful and equal access to its pedestrian right of way when viewed in its entirety. More than half of the City's corners lack an accessible curb ramp. At the time of trial, only 16% of the City's sidewalk blocks had been inspected for access barriers and repaired. Class members testified that because of the City's pervasive access barriers, they are often unable to get on and off the sidewalks and are forced to travel in the street with vehicular traffic, or must struggle with traversing cracked or uplifted concrete in the sidewalks. In short, most of the City's pedestrian right of way remains inaccessible, and this denies class members the ability to travel safely and freely on and between the streets. The District Court itself noted that the City has not yet achieved program access with regard to its pedestrian right of way. *Kirola*, 74 F. Supp. 3d at 1253. Notwithstanding the foregoing, the District Court held that the City did not violate the ADA's program access mandate.

The undisputed evidence similarly demonstrated the inaccessibility of the City's parks, but this, too, was ignored by the District Court because it erroneously required Plaintiffs to show the inaccessibility of the City's parks program "in its entirety." By the City's own admission, 73% of its 220 parks are inaccessible, including Golden Gate Park and many other unique special destination parks. The remaining 27% (60 parks) have only limited access, and do not provide many of the significant program features

34

and benefits offered by the City's inaccessible parks. Ms. Kirola and the class members testified that the City's parks contain barriers that limit access to entrances, paths of travel, and restrooms, all of which this Court has recognized "'interfere with disabled individuals' full and equal enjoyment' of public places and accommodations." *Cohen*, 754 F.3d at 694 (quoting *Chapman*, 631 F.3d at 945). Because the vast majority of the City's parks are inaccessible, class members are denied meaningful access to their benefits in violation of the ADA.

In summary, the District Court's opinion is in direct conflict with the ADA. If the opinion is permitted to stand, Congress' core purposes in enacting the ADA will be frustrated: ensuring the accessibility of public programs and services, mandating the removal of physical access barriers from public facilities, and promoting the independence, equality and dignity of persons with disabilities. Accordingly, the District Court's judgment must be reversed, and judgment should be entered in favor of the Plaintiff class.

## VII.  <u>STANDARD OF REVIEW</u>

The district court's conclusions of law, including its determination of whether a party has standing, are reviewed *de novo*. *See, e.g.*, *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1286 (9th Cir. 2013).

The district court's findings of fact are reviewed for clear error. *See, e.g.*, Fed. R. Civ. P. 52(a); *OneBeacon Ins. Co. v. Haas Indus.*,

*Inc.*, 634 F.3d 1092, 1096 (9th Cir. 2011).  This Court reviews the district court's factual findings with "special scrutiny" where, as here, they were adopted wholesale or verbatim from proposed findings drafted by the prevailing party.  *See, e.g.*, *Silver v. Exec. Car Leasing Long-Term Disability Plan*, 466 F.3d 727, 733 (9th Cir. 2006).

Mixed questions of law and fact are also reviewed *de novo*. *See, e.g.*, *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir. 2000).  "A mixed question of law and fact exists when there is no dispute as to the facts, the rule of law is undisputed, and the question is whether the facts satisfy the legal rule." *Id*.  "When *de novo* review is compelled, no form of appellate deference is acceptable." *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991).  "[I]f the trial court bases its [fact] findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 855 n.15 (1982).

## VIII. LEGAL ANALYSIS

### A. The District Court Erred in Holding That Ms. Kirola Lacks Standing

The District Court ruled that, Ms. "Kirola lacks constitutional standing to pursue any claims on behalf of the class." *Kirola*, 74 F. Supp. 3d at 1198, 1242. The evidence at trial unequivocally demonstrates that Ms. Kirola satisfied the Article III requirements for standing. Therefore, the District Court's judgment must be reversed.

#### 1. Ms. Kirola Satisfied All of the Constitutional Elements of Standing

In *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the Supreme Court set forth the three-part test for Article III standing:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) "actual or imminent, not 'conjectural' or 'hypothetical'." Second, there must be a causal connection between the injury and the conduct complained of … Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* at 560-61.

A plaintiff seeking injunctive relief must additionally demonstrate a sufficient likelihood that she will again be wronged in a similar way. That is, she must establish a "real and immediate threat of repeated injury." *Chapman,* 631 F.3d at 948 (citations omitted).

The standing requirements are exactly the same for the named plaintiff in a class action as for a plaintiff in a single party suit. *See, e.g.*, *Lewis v. Casey*, 518 U.S. 343, 357 (1996); *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 40 n.20 (1976) ("That a suit may be a class action, however, adds nothing to the question of standing…"); *Melendres v. Arpaio,* 784 F.3d 1254, 1262 (9th Cir. 2015) (once a class representative plaintiff establishes his own individual standing to bring a claim, the question whether he "may be allowed to present claims on behalf of others who have similar, but not identical, interests depends not on standing, but on an assessment of typicality and adequacy" [citation omitted]).

### a.    Ms. Kirola Suffered Injury-in-Fact

In the context of ADA access cases, the plaintiff establishes an injury-in-fact in at least two situations: (1) where the plaintiff has encountered at least one barrier related to her disability that limits her access to the facility or program, or (2) where the plaintiff has personal knowledge of at least one barrier related to her disability at a facility or program and, because of that barrier, has been deterred from accessing the facility or program. *Chapman*, 631 F.3d at 944. In either case, if the plaintiff is aware that an entity has barriers that render a facility inaccessible, the plaintiff has already suffered an injury-in-fact and is not required to engage in the "futile gesture" of trying to use the inaccessible facility. *Id*. at 951.

Ms. Kirola testified that she has personally encountered numerous access barriers that denied, limited or interfered with her ability to access the City's pedestrian right of way, parks, pools and libraries.  Given that Ms. Kirola has had to, and will continue to have to, frequently encounter such barriers just to carry out the activities of her daily life, she clearly has a "sufficient personal concern to effectively litigate the matter."  *Vasquez v. Los Angeles ("LA") Cnty.*, 487 F.3d 1246, 1250 (9th Cir. 2007); *see also Doran v. 7-Eleven, Inc.*, 524 F.3d 1034, 1042-44 (9th Cir. 2008).

**Pedestrian Right of Way.**  Ms. Kirola testified that she regularly encounters barriers such as sidewalks upheaved by tree roots, as well as uneven and bumpy sidewalk surfaces that cause her power wheelchair to stop or go more slowly.  (EOR.2005 ["path of travel along Geary from Fillmore"], 2011-12 [west side of Fulton between Fillmore and Steiner]).  She testified to encountering sidewalks that are so uneven that she is unable to navigate them at all.  (EOR.2002 [east side of Fulton on path of travel to Alamo Square Park]; 2007 [19th Street]).  Further, she has encountered drop offs in the City's sidewalks such as tree wells in which she has become stuck, requiring the assistance of a passerby to extricate her, resulting in damage to her wheelchair.  (EOR.2003 [McAllister and Fillmore]). In addition, Ms. Kirola described curb ramps that were too steep, and

corners without curb ramps that forced her to travel in the street with
vehicular traffic.  (EOR.2003-05).

**Alamo Square Park.**  Ms. Kirola also testified that she has
encountered access barriers at Alamo Square Park, one of the City's
unique special destination parks.  Ms. Kirola testified that the
designated "accessible" entrance to the park is too steep, and causes
her power chair to slip backward when she attempts to climb the path
at the entrance.  She is unable to access the playground at all, which is
a "blue dot" facility constructed by the City post-2000.  (EOR.1674).
Further, the paths within the park are steep and difficult to navigate.
(EOR.2005).  In addition to accessibility issues in Alamo Square Park
itself, Ms. Kirola testified that in attempting to travel to and from the
park, she encounters bumps and uneven surfaces on the sidewalks that
prevent her from using certain sidewalks altogether, or that cause her
difficulty in moving forward.  (EOR.2002); *see Shotz*, 256 F.3d at
1080-81 (struggles with steep ramps state claim under ADA even if
plaintiff is able to access the program).

**Pools.**  Ms. Kirola also testified that she has encountered
numerous barriers that limited or interfered with her ability to use the
City's pools.  Ms. Kirola testified to sidewalk disrepair that limited
her ability to approach the entrance to Sava Pool ("the sidewalk was
really cracked up on the east side of 19[th]"), and to a "narrow women's

40

locker room and no accessible restroom and no accessible shower."
(EOR.2006-07).  Sava Pool is a "blue dot" facility modernized by the
City post-2000.  (EOR.1673).  She further testified that Balboa Pool
has "a steep front entrance," and "you can't get in the entrance
comfortably at Balboa."  Balboa pool has "no accessible locker
rooms." (EOR.2008). She stated that Garfield pool has "narrow locker
rooms and no accessible restrooms," because the restroom stall lacks
"sufficient room to close the door."  *Id*.  Ms. Kirola also testified that
she was deterred from visiting Rossi Pool because she was aware that
it was not accessible to people with mobility disabilities. (EOR.2006).

**Libraries.**  Ms. Kirola testified that she personally struggled
with barriers related to her disability on multiple occasions at three of
the City's libraries that she regularly uses: the Western Addition
Branch Library, the Parkside Branch Library and the Main Library.
She testified that during "about forty percent" of her visits to those
libraries she encountered barriers such as stools in the aisles so that
she is unable to access the book stack aisles in her wheelchair.
(EOR.2005-06).

In *Chapman v. Pier 1 Imports (U.S.), Inc.*, 779 F.3d 1001 (9th
Cir. 2015), this Court held that repeated instances of aisles being
blocked or obstructed by movable objects such as furniture constitutes
a violation of the ADA, thus rejecting the proposition that only fixed

41

"architectural" features are barriers under the ADA. *Id.* at 1007-08.
Further, this Court held that encountering obstructed or blocked aisles
on eleven separate visits to a store over two years was not a
permissible "'isolated or temporary interruption[] in … access' under
28 C.F.R. § 36.211(b)." *Id.* ("the presence of items in aisles is not
'temporary' … just because the obstructing items in the aisles were
placed there by customers and would have been moved on request or
eventually"). Furthermore, with respect to the Western Addition
branch, Ms. Kirola testified that she encounters bumpy and uneven
sidewalks on the path of travel approaching the library. (EOR.2005).

In summary, the record below compels the conclusion that
Ms. Kirola suffered an injury-in-fact sufficient to give her standing to
seek relief on her own behalf.

### b.    Ms. Kirola's Injuries Are Traceable to the City's Failure to Remove Access Barriers

To show causation, "plaintiffs must establish a 'line of
causation' between defendants' action and their alleged harm that is
more than 'attenuated.'" *Maya v. Centex Corp.*, 658 F.3d 1060, 1070
(9th Cir. 2011) (citation omitted). Ms. Kirola easily meets this
standard. Her injuries are directly traceable to the City's failure to
remove access barriers. The City owns, operates and has authority
over all of the programs and facilities at issue. The City decides

whether, how and when an access barrier will be removed. Therefore, the causal link between the City's failure to remove access barriers and Ms. Kirola's encounters with such barriers is incontestable.

### c. Ms. Kirola's Injuries Can Be Redressed by a Favorable Decision from the Court

The "redressability" prong of the standing inquiry requires the plaintiff to show that it is "likely" (not certain) that the court could order any relief that would address her injuries in part, and that promises a modest reduction in the risk of future injury to the plaintiff. *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 525 (2007); *Lujan*, 504 U.S. at 561.

Ms. Kirola unquestionably meets this standard because an injunction would require the City to remove barriers which currently serve to limit, impede or deny her meaningful and equal access to the City's programs and facilities. An order requiring the City to make its sidewalks accessible to wheelchair users, install missing curb ramps or repair existing ones, remove access barriers from Alamo Square Park, remove access barriers at Sava Pool, and/or regularly check the aisles at the libraries to ensure that they are free from stools would allow Ms. Kirola to access and enjoy each of these facilities to the same extent as persons without mobility disabilities. Further, with regard to barriers the City has represented it intends to remove at some point in the future, a judicially enforceable order setting

43

deadlines for the City to complete such work by a date certain would

give Ms. Kirola the assurance that access conditions will improve

according to an enforceable timetable.

In short, a favorable decision on Ms. Kirola's claims would

confer a direct, tangible benefit on her.  Accordingly, she meets the

standard for redressability.

### d.      Ms. Kirola is Likely to Suffer Future Injury

Where a plaintiff seeks prospective injunctive relief she must

show "a sufficient likelihood that [s]he will again be wronged in a

*similar* way," not the exact same way.  *City of Los Angeles v. Lyons*,

461 U.S. 95, 111 (1983) (emphasis added).  In other words, she must

demonstrate that she "faces a 'real and immediate threat of repeated

injury.'"  *Chapman*, 631 F.3d at 948 (citation omitted).

This Court has held that a plaintiff who is threatened with harm

in the future because of existing noncompliance with the ADA suffers

imminent injury.  *See, e.g., Chapman*, 631 F.3d at 952-53; *Armstrong*,

275 F.3d at 863-64.  This Court has also recognized that an "ADA

plaintiff demonstrates a sufficient likelihood of future harm to

establish standing to sue for an injunction when he intends to return to

a noncompliant place of public accommodation where he will likely

suffer repeated injury."  *Chapman*, 631 F.3d at 948.

Further, in evaluating the likelihood of future harm in a class action, the testimony of the class members and the record as a whole must be considered.  As this Court has explained, "When a named plaintiff asserts injuries that have been inflicted upon a class of plaintiffs, we may consider those injuries in the context of the harm asserted by the class as a whole, to determine whether a credible threat that the named plaintiff's injury will recur has been established."  *Armstrong*, 275 F.3d at 861; *see also Hawkins v. Comparet-Cassani*, 251 F.3d 1230, 1237 (9th Cir. 2001).

The trial record contains substantial evidence that Ms. Kirola is virtually certain to suffer future harm.  The City's pedestrian right of way, parks, pools and libraries are plagued with numerous access barriers and will continue to be so for years to come.  Ms. Kirola has cerebral palsy and uses a wheelchair.  She is a long time resident of San Francisco who uses, and will continue to use, the challenged programs and facilities on a daily, monthly, and regular basis.  The class member testimony confirms that Ms. Kirola's experience of encountering barriers in the City's pedestrian right of way, parks, pools, and libraries is not unique.  Rather, it is a frequent occurrence in their lives.  *See* discussion *supra* at §§ V(A)(2), V(B).

The City's admissions demonstrate that more often than not, when an ADA plaintiff encounters a street corner, there will not be an accessible curb ramp.  (EOR.2039-41, 2107).  The City's own survey

45

shows that, on average, there are almost 16 barriers to access per block of sidewalk in any given area of the City.  (EOR.3488-91).  The City admits that 164, or 73%, of its parks are inaccessible to persons with mobility disabilities.  Of the 27% that are "accessible," the City does not claim they are fully accessible, but merely that they offer one wheelchair accessible entrance and "at least one recreational opportunity."  (EOR.854, 1686-87, 1872).  Thus, even if Ms. Kirola has not yet encountered the particular barriers referred to in the City's admissions, those encountered by class members, or inspected by Plaintiffs' access experts, each time she enters the public commons she is imminently threatened with doing so and has suffered an injury-in-fact.

### 2. The District Court's Reasons for Concluding That Ms. Kirola Lacks Standing Are Fatally Flawed

#### a. The District Court Incorrectly Concluded That Ms. Kirola Failed to Demonstrate Injury-In-Fact

The District Court held that Ms. Kirola failed to show that she personally suffered an injury-in-fact because she did not "establish that she was personally denied meaningful access to the challenged programs, services and activities **in their entirety**."  *Kirola*, 74 F. Supp. 3d at 1239 (emphasis added); *see also* 1237 ("She must instead prove that she was denied access to the foregoing in their entirety.").

46

No court has previously ruled that in order to have standing to sue a public entity under the ADA, a plaintiff with a mobility disability must show that the public entity's programs and facilities are inaccessible **in their entirety** to that plaintiff, both as to the facilities that the plaintiff has personally used and as to those she has not yet sought to use.  The District Court cited this Court's decisions in *Armstrong*, 275 F.3d at 861, and *Fortyune,* 766 F.3d at 1102, as support for this unprecedented proposition.  However, the passages cited by the District Court in those cases do not address injury-in-fact, and do not even hint that this Circuit would endorse the extreme standard the lower court applied below.

By imposing the requirement that as a precondition to demonstrating injury-in-fact Ms. Kirola must show that the City's programs, services and activities are inaccessible in their entirety, the District Court erroneously conflated the Constitutional inquiry regarding Ms. Kirola's Article III standing with the analysis of the merits of her claim under the ADA (and even on the merits, this is an incorrect standard, *see* § VIII(C)(1) *infra*).  In essence, the Court ruled that because Ms. Kirola did not meet her burden of showing that the City had violated federal and state disability access laws, she did not have standing to pursue her claims in the first instance.

As discussed above, in the context of the ADA, the relevant question for purposes of determining whether Ms. Kirola suffered

47

constitutional injury-in-fact is whether she encountered access barriers that function to limit, interfere with or deny her access to the City's programs, services, or activities. Ms. Kirola met this threshold. The separate question of whether the City's programs, when viewed in their entirety, are readily accessible to individuals with disabilities, goes to the merits of whether the City has complied with its statutory obligations under the ADA.

Courts have repeatedly emphasized this pivotal distinction. *See, e.g., Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 151 & n.1 (2010); *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("standing 'in no way depends on the merits of the [petitioner's] contention that particular conduct is illegal'") (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)); *Chaudhry v. City of Los Angeles,* 751 F.3d 1096, 1109 (9th Cir. 2014); *Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) (even after a class action trial, the named plaintiff's standing, including injury-in-fact, remains a threshold jurisdictional issue that is to be analyzed separately from considering the ultimate merits of the statutory claims). As stated by the Court in *Arreola v. Godinez*, 546 F.3d 788, 795 (7th Cir. 2008), "the law does not preclude a plaintiff from filing suit simply because some forms of relief may be unavailable, or indeed because in the end he cannot prove that he is entitled to any relief."

The District Court's test for standing is also fatally flawed because it imposes an impossible burden for a plaintiff to meet. Under the District Court's test, for Ms. Kirola to demonstrate an injury sufficient to give her standing to challenge the inaccessibility of the City's pedestrian right of way, she would have to prove, via her own testimony and personal experience, that all 2,000 miles of sidewalks, 27,585 street corners, and 7,200 intersections in the City were inaccessible in their entirety, and that all or almost all of the City's parks, pools and libraries were inaccessible. To meet this test Ms. Kirola would have had to spend virtually every waking hour of her life visiting every facility in the City to demonstrate that they are inaccessible. No court has ever imposed such a staggering burden on a plaintiff just to show injury-in-fact.

On the contrary, this Court has recognized that a plaintiff need not "engage in [the] futile gesture" of attempting to use an inaccessible facility in order to have standing to sue to remove access barriers. *Chapman*, 631 F.3d at 951; *see also Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1138 (9th Cir. 2002). In other words, the injury required for standing need not be actualized. "The Supreme Court has consistently recognized that threatened rather than actual injury can satisfy Article III requirements." *Harris v. Bd. of Supervisors, L.A. Cnty.*, 366 F.3d 754, 761 (9th Cir. 2004).

49

The District Court also erred by failing to accept this Court's decision in *Chapman* as controlling authority on the issue of Ms. Kirola's standing. In *Chapman,* this Court reaffirmed the proposition it articulated in *Doran*, 524 F.3d at 1042 n.5, that, "Once a disabled individual has encountered or become aware of alleged ADA violations that deter his patronage of or otherwise interfere with his access to a place of public accommodation, he has already suffered an injury in fact traceable to the defendant's conduct and capable of being redressed by the courts, and so he possesses standing under Article III…." *Chapman*, 631 F.3d at 947.

The District Court attempted to distinguish *Chapman* on the ground that it "was an individual lawsuit and thus did not address the standards for evaluating standing in a class action." *Kirola*, 74 F. Supp. 3d at 1236. The lower court also asserted that the claims in *Chapman* "were premised on Title III of the ADA, unlike Title II which does not require that each individual site at which a public service is offered be accessible." *Id*. Neither rationale holds water.

First, as discussed above, this Court has held that the requirements for standing, and therefore for injury-in-fact, are the same for the named plaintiff in a class action as they are for an individual case. *See* discussion and authorities cited *supra* at 38.

Second, that *Chapman* involved claims under Title III of the ADA instead of Title II also has no bearing on the standing analysis.

50

Nothing in the *Chapman* decision suggests that its holding on standing was limited to the context of cases brought under Title III.  Rather, the standing discussion was grounded on an analysis of Article III's jurisdictional limitation on a federal court's power to hear "cases or controversies."

Moreover, the distinction the District Court attempts to draw between Title II and Title III of the ADA is illusory and is of no practical consequence in the standing analysis.  Both Title II and Title III provide a "comprehensive," "broad mandate" to eliminate discrimination against disabled persons, including both "out-right intentional exclusion" as well as the "failure to make modifications to existing facilities and practices."  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 675 (2001) (internal quotation marks and citations omitted).

Title II of the ADA differs from Title III only in the obligations imposed on public entities versus private entities to achieve these key Congressional objectives.  It would certainly be perverse if, solely because the entity in control of a challenged program or facility was a public entity versus a private entity, the burden to show standing would increase exponentially as the District Court held by attempting to distinguish *Chapman* on this ground.

Finally, in attempting to draw a distinction between Title II and Title III of the ADA with respect to standing, the District Court asserted that Title II of the ADA, unlike Title III, does not impose

51

site-specific access requirements. *Kirola*, 74 F. Supp. 3d at 1236.

While the foregoing is irrelevant for standing purposes, it is also

incorrect regarding the substantive duties imposed by Title II and Title

III of the ADA. Title II of the ADA, like Title III, imposes facility

specific duties. As this Court has held, under Title II, "each" newly

constructed facility, and "each" altered part of a facility, must comply

with ADAAG. *Pierce*, 526 F.3d at 1216. Thus, the District Court's

bright line distinction between access to "programs and services" and

access to "sites" or "facilities" is incorrect in its statement of the

duties created by Title II.

Similarly, with respect to the program access duty under Title

II, the facilities at which a public entity provides its programs to

persons with disabilities must be "readily accessible" even if such

facilities have not undergone construction or alterations since January

26, 1992. *See* discussion and authorities *infra* at 97-98. Accordingly,

the Court's attempt to draw an inaccurate distinction between the

statutory duties under Title II and Title III, and then use this

distinction to manufacture a heightened standard for injury-in-fact

under Title II, is in error.

### b. The District Court's Imposition of a Novel "Nexus" Requirement to Establish Redressability Is Without Legal Support

The District Court also erred in ruling that Ms. Kirola failed to show that her injuries are redressable because "the nexus between Kirola's injury and the relief sought is lacking." *Kirola*, 74 F. Supp. 3d at 1243.

The District Court erred by adopting an overly narrow view of redressability. The Court myopically focused on whether the specific terms of the injunctive relief Ms. Kirola sought would redress her specific injuries. However, the redressability inquiry is far broader, and simply asks whether the court is capable of granting *any* relief that would redress, *in whole or in part*, the injuries a plaintiff has suffered. *See, e.g.*, *EPA*, 549 U.S. at 525. Once the court finds that it is capable of granting any form of relief that would redress a plaintiff's injury, in whole or in part, the Article III redressability requirement is satisfied. *Id.*

Here, of course, the District Court was fully capable of granting the injunctive relief sought by Ms. Kirola, and that relief would have benefitted both Ms. Kirola and the absent class members. In fact, the Court's repeated reliance on the City's intention to remove barriers from the pedestrian right of way, parks, pools and libraries to support its conclusion that Ms. Kirola's injuries are not redressable, is itself evidence that her injuries *are* redressable: at the very least the District

53

Court could have crafted an injunction that converted the City's promises into a judicially enforceable order.  Moreover, it is well-settled that courts are able to order the removal of access barriers, and there is no reason that a similar injunction could not have been entered here.  *See, e.g., Armstrong*, 275 F.3d at 881-84; *Pierce*, 761 F. Supp. 2d at 954-57.

### c. The District Court Incorrectly Concluded That Ms. Kirola Failed to Demonstrate the Likelihood of Future Harm

The District Court held that Ms. Kirola lacked standing to pursue prospective injunctive relief because she did not establish that her injury was likely to recur.  The Court held that "to show a likelihood of recurrence, Kirola ***must*** demonstrate an injury that 'stems from' each [of the City's] polic[ies]."  *Kirola*, 74 F. Supp. 3d at 1245 (emphasis added).  The Court then looked at each of the City's written policies to determine if Ms. Kirola had suffered an injury as a direct result of that specific policy.

The District Court's reliance on *Taylor v. Westly*, 488 F.3d 1197 (9th Cir. 2007), as support for its approach is misplaced.  While *Taylor* states that the likelihood of recurrence can be established by showing that the plaintiff's injury stems from a written policy that was in effect at the time of the injury, that is not the exclusive way that a plaintiff can establish the likelihood of future injury.  Rather, a plaintiff can establish a threat of future harm in at least one of four

54

different ways. *Moeller v. Taco Bell Corp.*, 816 F. Supp. 2d 831, 850
(N.D. Cal. 2011) ("In *Armstrong,* the Ninth Circuit described two
ways in which a plaintiff can show an injury is likely to occur…
Later, in *Chapman*, the Ninth Circuit identified [two] additional ways
in which a plaintiff can show a likelihood of future injury.").

First, "a plaintiff may show that the defendant had, at the time
of the injury, a written policy, and that the injury 'stems from' that
policy.'" *Armstrong*, 275 F.3d at 861. Second, "the plaintiff may
demonstrate that the harm is part of a 'pattern of officially sanctioned
… behavior, violative of the plaintiffs' [federal] rights.'" *Id.* (internal
citation omitted). Third, "an ADA plaintiff demonstrates a sufficient
likelihood of future harm … when he intends to return to a
noncompliant place of public accommodation where he will likely
suffer repeated injury." *Chapman*, 631 F.3d at 948. Fourth, "a
plaintiff who 'has visited a public accommodation on a prior
occasion' demonstrates a real and immediate threat if he 'is currently
deterred from visiting that accommodation by accessibility barriers.'"
*Ervine v. Desert View Reg'l Med. Ctr. Holdings, LLC*, 753 F.3d 862,
867 (9th Cir. 2014) (citation omitted).

As discussed above, wholly apart from showing injury
stemming from the City's written policies, Ms. Kirola demonstrated
future injury by showing that the barriers that she and class members
have encountered are commonplace. Class members and Plaintiffs'

experts confirmed the existence of access barriers in the pedestrian
right of way, parks, pools and libraries at numerous locations
throughout the City, *see* discussions *supra* at § V, VIII(B)(2).

Further, Ms. Kirola demonstrated that she and other class
members intend to return to facilities that are noncompliant with the
ADA, that they have been deterred from visiting facilities plagued
with access barriers, and that their harm stems from a pattern of
officially sanctioned conduct violative of their rights under the ADA.
*See* discussions at §§ V(B), VIII(A)(1)(a), VIII(A)(1)(d), VIII(B)(2).
Moreover, the record establishes that policies and practices challenged
by Ms. Kirola will, in fact, cause future injury to both Ms. Kirola and
class members. *See* discussion *infra* at §§ VIII(A)(1)(d), VIII(B)(2),
VIII(C)(2)(a), VIII(C)(3)(b).  The District Court therefore incorrectly
concluded that Ms. Kirola failed to show that she would suffer future
injury.

### 3. The District Court Could Not Enter Judgment Against the Class if Ms. Kirola Lacked Standing

Having erroneously ruled that Ms. Kirola never had standing,
the District Court lacked jurisdiction over this matter and could not
enter judgment in favor of the City and against absent class members.
*See Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1023
(9th Cir. 2003).  In holding that Ms. Kirola lacked standing, the
District Court found that it never had jurisdiction over this matter.

56

Nevertheless, the Court then made numerous "findings of fact" regarding the merits of the class claims, opined on numerous legal issues regarding the merits, and then entered judgment in the City's favor and against the class. This result is contrary to governing precedent, violates due process, and alone warrants vacatur of the District Court's judgment.

> **B.** **The City Violated Title II of the ADA by Failing to Perform New Construction and Alterations in Compliance with ADAAG**

This Court has held that new construction or alteration of existing facilities performed by public entities after January 26, 1992 must be done in compliance with ADAAG. *See, e.g.*, *Fortyune*, 766 F.3d at 1103; *Pierce*, 526 F.3d at 1216. The District Court failed to follow governing law and assess whether each of the City's newly constructed or altered facilities that were the subject of testimony at trial were constructed or altered in conformance with ADAAG.

Instead, the District Court erroneously applied the program access standard to these facilities, and found the City to be in compliance with the ADA because "the few variations from ADAAG or the California Building Code with respect to new construction or alterations are insufficient to show that Plaintiff or class members were denied meaningful access to the City's programs, services or activities or that they are entitled to relief on a class-wide basis."

*Kirola*, 74 F. Supp. 3d at 1259.  However, the "meaningful access" standard has no application to new construction and alterations.  This Court has held that if a public entity elects to makes its programs accessible by constructing new facilities, or by altering existing facilities, any such construction must comply with ADAAG.  *Pierce*, 526 F.3d at 1216.  By applying the program access standard to new construction and alterations, the District Court committed reversible error.

1.     **The District Court Erred in Holding that ADAAG Does Not Apply to the Pedestrian Right of Way, Parks and Playground Facilities**

The District Court held that ADAAG does not apply to the City's pedestrian right of way, parks and playground facilities, and therefore the City was not obligated to comply with ADAAG in constructing or altering such facilities.  The Court reached this conclusion on the basis that ADAAG does not contain technical requirements that are specific to the pedestrian right of way or parks, and that such standards are still in the process of being developed by the federal government.  *Kirola*, 74 F. Supp. 3d at 1223, 1227-28.  In so doing, the District Court disregarded Ninth Circuit precedent.

In *Fortyune*, 766 F.3d 1098, this Court held that where ADAAG does not contain specific design standards for a particular type of facility, cities must comply with ADAAG standards to the extent practicable.  The Court explained:

58

> [N]othing in 28 C.F.R. § 35.151 suggests that when
> technical specifications do not exist for a particular
> type of facility, public entities have no accessibility
> obligations. In fact, such an interpretation of the
> regulation cannot be reconciled with subsections
> (a)(1) and (b)(1), which mandate that "each" newly
> constructed or altered facility be readily accessible ….

*Id.* at 1103-04.

Further, this Court expressly rejected the argument that the development of more specific design standards regarding the pedestrian right of way, in particular the Proposed Accessibility Guidelines for Pedestrian Facilities in the Public Right-of-Way ("PROWAG"), meant that current ADAAG standards for particular features should not be followed. *Id.* at 1105 & n.12.[2]

Interpretive guidance materials issued by the U.S. DOJ and the U.S. Access Board have taken the same position as this Court did in *Fortyune*, *i.e.*, that pending the issuance of more detailed standards, public entities should apply the basic access standards set forth in ADAAG. *Fortyune*, 766 F.3d at 1103-04. The Access Board and the U.S. Department of Transportation have issued a joint "Design Guide" which states, "Although no Federal scoping or technical

---

[2] This Court has held that *proposed* access guidelines that have not been formally adopted by the DOJ may not be considered. *See, e.g.*, *Arizona v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 674 (9th Cir. 2010).

requirements have been established that apply specifically to public rights-of-way, both ADAAG and UFAS contain technical requirements for the construction of accessible exterior pedestrian routes that may be applied to the construction of public rights-of-way …." ATBCB/DOT, Accessible Rights-of-Way Design Guide, dated November 1999.  (EOR.269-70).

In the Design Guide, the Access Board and the DOT also explain that ADAAG applies to pedestrian routes in city parks and recreation areas.  "ADAAG (or UFAS) is also the design standard for public entities constructing individual or multiple facilities on sites bounded by property lines or rights-of-way.  The design of a … municipal park … must comply with Title II site development and building standards.  Scoping and technical provisions that govern such construction can be found at: ADAAG § 4.1.2 Accessible Sites and Exterior Facilities, ADAAG § 4.1.3 New Construction, and ADAAG § 4.1.6 Alterations." (EOR.276-77).[3]

Inexplicably, the District Court disregarded governing law and the explicit language of the controlling regulation, Section 35.151, and reached the contrary conclusion that ADAAG has no application to

_____

[3]  Plaintiffs drew the District Court's attention to the U.S. Access Board/DOT Design Guide by way of a Request for Judicial Notice, but the Court denied that Request on the legally erroneous basis that it was not "germane to the Court's decision."  *Kirola*, 74 F. Supp. 3d at 1202 n.3; (EOR.395-402).

the pedestrian right of way, parks or playgrounds.  Further, the Court severely criticized Plaintiffs' experts for using ADAAG as their standard for evaluating the accessibility of newly constructed or altered parks and playgrounds, including the paved pathways therein, and discounted their findings and testimony on that basis.  *Kirola*, 74 F. Supp. 3d at 1223, 1227-28.  In so doing, the District Court erred.

> **2.      The District Court Erred by Failing to Find the City Liable for Performing New Construction and Alterations in Violation of ADAAG**

The Title II regulations provide that "If physical construction or alterations commence after July 26, 1992 … then new construction and alterations subject to this section must comply with either UFAS or the 1991 Standards … Departures from particular requirements of either standard by the use of other methods shall be permitted when it is clearly evident that equivalent access to the facility or part of the facility is thereby provided."  28 C.F.R. § 35.151(c)(1).  The District Court found that the City selected ADAAG (the "1991 Standards") as its access standard for new construction and alterations.  *Kirola*, 74 F. Supp. 3d at 1212.[4]

---

[4] California law also requires that new construction and alterations to public facilities be accessible.  The Disabled Persons Act requires that facilities constructed or altered after December 1981 conform to the disability access design standards contained in Title 24 of the California Building Code ("CBC").  *Californians for Disability Rights v. Mervyn's LLC*, 165 Cal. App. 4th 571, 585-86 (Cal. Ct. App. 2008).

This Court has repeatedly held that new construction and alterations must be performed in full compliance with ADAAG, and that even so-called minor deviations from those standards are impermissible and must be remediated. *See, e.g.*, *Fortyune*, 766 F.3d at 1103; *Chapman*, 631 F.3d 945-46 ("We have held that 'obedience to the spirit of the ADA' does not excuse noncompliance with the ADAAG's requirements. The ADAAG's requirements are as precise as they are thorough, and the difference between compliance and noncompliance with the standard of full and equal enjoyment established by the ADA is often a matter of inches."); *Long v. Coast Resorts, Inc.*, 267 F.3d 918, 923 (9th Cir. 2001) (ordering defendant to remedy its ADAAG non-compliant door widths, and reversing district court's refusal to order such relief based on "substantial compliance" and defendant's "demonstrated obedience to the spirit of the ADA").

In its Title II Technical Assistance Manual, the DOJ has stated that with respect to new construction and alterations "readily accessible and usable" means that "the facility must be designed, constructed, or altered in **strict compliance with a design standard**," specifically the ADAAG or UFAS. U.S. Dep't of Justice, The Americans with Disabilities Act: Title II Technical Assistance Manual (last visited Sept. 15, 2015), www.ada.gov/taman2.html at § II-6.1000 (emphasis added) ("Title II TAM"). The Title II Technical Assistance Manual is entitled to substantial deference. *See, e.g.*, *Fortyune*, 766

F.3d at 1104; *Bay Area Addiction Research & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 n.11 (9th Cir. 1999).

The legal standards applicable to new construction and alterations covered by 28 C.F.R. § 35.151 are more stringent than those that apply to the program access regulation codified at 28 C.F.R. § 35.150.  *See, e.g.*, *Ability Ctr. of Greater Toledo v. City of Sandusky,* 133 F. Supp. 2d 589, 592 (N.D. Ohio 2001), *aff'd*, *Ability Ctr. of Greater Toledo*, 385 F.3d 901 (6th Cir. 2004) ("While the regulations for existing facilities allow compliance 'when viewed in their entirety', the standard for new or altered streets is more stringent."). With respect to new construction and alterations, public entities are required to perform construction in such a manner that all elements of the facility to which ADAAG applies are in compliance with its accessibility standards.  This analysis requires an element-by-element evaluation of a facility's compliance with ADAAG.

Altered facilities, such as the City's "blue dot" facilities, are *not* existing facilities, and the lower program access standard does not apply to them.  Instead, they are subject to the alterations standard codified at 28 C.F.R. § 35.151(b).  *See, e.g.*, *Pierce*, 526 F.3d at 1216; *Kinney v. Yerusalim*, 9 F.3d 1067, 1075 (3d Cir. 1993) ("[O]nce the City undertakes to resurface a street, the accompanying curbs are no longer to be considered as existing facilities … They are, now … incorporated with a facility under alteration, pursuant to

63

§ 35.151 …").

The District Court failed to undertake this mandated element-by-element, barrier-by-barrier analysis of the City's newly constructed and altered facilities and their compliance with ADAAG. *Kirola*, 74 F. Supp. 3d at 1258-59. The Court therefore committed reversible error.

At trial, Plaintiffs established that many of the City's new construction and modernization projects performed after January 26, 1992 are characterized by numerous access barriers that are in clear non-compliance with ADAAG. The District Court found that each of the "blue dot" facilities discussed below was either constructed or modernized after the year 2000. *Kirola*, 74 F. Supp. 3d at 1211, 1258. For facilities that are newly constructed, those facilities ought to be fully compliant with ADAAG in all areas. For facilities that were altered after January 26, 1992, the areas of alteration should be in full compliance with ADAAG. In addition, as explained in the DOJ's Technical Assistance Manual, "Alterations to primary function areas (where major activities take place) trigger a 'path of travel' requirement, that is, a requirement to make the path of travel from the entrance to the altered area –and telephones, restrooms, and drinking fountains serving the altered area—accessible [*i.e.*, ADAAG compliant]." Title II TAM at § II-6.3100; ADAAG § 4.1.6(2).

64

The record shows that the following facilities or sites were not constructed or altered in compliance with ADAAG:

<u>The Main Library</u>.  The Main Library was constructed after January 26, 1992.  *Kirola*, 74 F. Supp. 3d at 1254.  Plaintiffs' expert, Peter Margen, testified that he conducted a site inspection of the Main Library, and that his data showed that the following elements, among others, violate ADAAG:

- In the Koret Auditorium, there are four accessible seating spaces, but no adjacent companion seating for nondisabled persons as required by ADAAG § 4.33.3 ("At least one companion fixed seat shall be provided next to each wheelchair seating area.").  (EOR.3219).

- At the video phone booth the clear opening width of the door is only 29 inches, 3 inches less than the 32 inch minimum width required by ADAAG § 4.13.5. (EOR.3220).

- The landing space for the video phone booth is 31 inches deep, not 48 inches deep as required by ADAAG § 4.2.4.1, a 17 inch disparity.  As a result, a person who uses a wheelchair cannot approach the video phone booth.  (EOR.3220-21).

- There is no insulation on the lavatory pipes at multiple locations in the Library's restrooms, including the First and Third Floor restrooms. (EOR.3158, 3231). This violates ADAAG § 4.19.4, which requires insulation of "hot water and drain pipes under lavatories," and which requires that there be "no sharp or abrasive surfaces under lavatories." Because the City has failed to install insulation on the lavatory pipes, wheelchair users risk exposure to either hot, sharp or abrasive surfaces that have not been "*configured to protect against contact*." *Id.* (emphasis in original).

- In the lower level restrooms, there is no pull handle on the outside of the compartment door, in violation of CBC § 1115B.3.1.4(4.5). As a result, persons who use wheelchairs, who often have limited manual dexterity, would be unable to open the doors without assistance. (EOR.3226).

- There is no knee space for clearance under the sink in the Latino/Hispanic meeting room as required by ADAAG § 4.23.3, thus precluding a wheelchair user from approaching and using the sink. (EOR.3220).

Minnie and Lovie Ward Recreation Center.  The Minnie and Lovie Ward Recreation Center is a "blue dot" facility that was newly constructed in 2008, and was inspected by Plaintiffs' expert Jeff Mastin.  (EOR.1274-75, 1675, 2337, 2339-40).  His data showed that the following elements, among others, violate ADAAG:

- The ramp to the newly installed ball fields has a 9.8% cross slope, almost five times the maximum 2.0% cross-slope permitted by ADAAG § 4.8.6. ("The cross slope of ramp surfaces shall be no greater than 1:50." [*i.e.*, 2%]).  (EOR.2194, 2200).

- The newly constructed east entrance ramp to the Recreation Center has a running slope of 9.8% in violation of ADAAG § 4.8.2 ("The maximum slope of a ramp in new construction shall be 1:12." [*i.e.*, 8.3%]). Also, the ramp landing is not level, and has slopes of 3.4% in violation of ADAAG § 4.8.4, which requires that ramps have level landings.  (EOR.2197, 2338).

- The lower section of the ramp to the facility's east entrance is missing a handrail in violation of ADAAG § 4.8.5.  (EOR.2197, 2338).

St. Mary's Playground.  St. Mary's Playground is a "blue dot"
facility that was newly constructed in 2009, and was inspected by Mr.
Margen.  (EOR.1674, 2779, 3138).  Mr. Margen's data showed that
the following elements, among others, violate ADAAG:

- There is a vertical lip 1.5 inches high at the entrance to
  the play equipment, in violation of ADAAG § 4.3.8.
  Many persons with mobility disabilities are unable to
  overcome such a lip without assistance.  (EOR.3132-33,
  3139-40, 3283).

- The path of travel to the entrance to the playground has
  a running slope of 11-15%.  (EOR.3139).  This far
  exceeds ADAAG's maximum permissible running slope
  of 5% for an accessible route, or 8.3 % maximum for a
  ramp.  ADAAG §§ 4.3.7, 4.8.2.  The Appendix to
  ADAAG explains that gradients steeper than 8.33% are
  too steep for many wheelchair users to use.
  ADAAG § A4.8.2.

- The alternative route to the playground is a service road
  that has a running slope of 13-15% in violation of
  ADAAG § 4.3.7.  (EOR.3141-42).

- The running slope on the bridge way is 13.7%, far in
  excess of the 5.0% maximum slope permitted by
  ADAAG § 4.3.7.  (EOR.3142-44, 3284).

68

Bernal Heights Recreation Center.  The Bernal Heights Recreation Center is a designated "blue dot" accessible facility that the City altered post-2000.  (EOR.1675).  Mr. Mastin inspected this facility, and his data showed that the following elements, among others, violate ADAAG:

- The newly installed playground is located on sand, and there is no accessible route to the playground equipment in violation of ADAAG § 4.5.1 which requires that "surfaces along accessible routes … be stable, firm, slip-resistant."  (EOR.2153-55).

- The paved surface at the entrance gate to the facility has a cross-slope of 8.9%, over four times the maximum 2% cross-slope permitted by ADAAG § 4.13.6.  (EOR.2155-56).

- The restrooms have one inch high thresholds at the entrance doors.  (EOR.2171-73). ADAAG § 4.13.8 requires that such thresholds be no greater than 1/2 inch.  The Appendix explains that "Thresholds and surface height changes in doorways are particularly inconvenient for wheelchair users who also have low stamina or restrictions in arm movement because complex maneuvering is required to get over the level change while operating the door."  ADAAG § A4.13.8.

- The restrooms lack insulation on the lavatory pipes in violation of ADAAG § 4.19.4. (EOR.2172).

Botanical Gardens. The Botanical Gardens were altered by the City during the period between 2008 and 2011. (EOR.1676, 2207-08). Mr. Mastin testified that the data from his inspection showed that the following elements, among others, violate ADAAG:

- The Botanical Gardens have no restrooms that comply with ADAAG. The designated accessible men's room has cross-slopes of 5.0% in the floor surface leading to the accessible stall. (EOR.2215-16). This is more than double the maximum cross slope of 2.0% permitted by ADAAG § 4.3.7. The City concedes that the other set of restrooms in the Botanical Gardens is inaccessible. (EOR.1057).

- The designated "accessible" paths in the Gardens have excessive running slopes and cross slopes, including running slopes of up to 15.4%, three times the maximum running slope of 5.0% permitted by ADAAG § 4.3.7. (EOR.2217-19).

The City did not present any evidence at trial disputing the existence of any of these barriers in the foregoing facilities. Furthermore, the District Court made no findings of fact or conclusions of law about any of the foregoing access barriers, and

70

provided no explanation regarding why it believed that these facilities
complied with 28 C.F.R. § 35.151 or ADAAG.

Japanese Tea Garden. The City identifies the Japanese Tea
Garden as an accessible "blue dot" facility that it altered post-2000.
(EOR.1676). Plaintiffs' expert Gary Waters testified that the data
from his site inspection showed that the following elements, among
others, violate ADAAG:

- The entrance ramp to the Tea Garden has an uneven
  landing with a cross-slope of 4.0%, double the
  maximum cross-slope of 2.0% permitted by ADAAG
  § 4.8.4. The Appendix to ADAAG explains that "Cross
  slopes on walks and ground or floor surfaces can cause
  considerable difficulty in propelling a wheelchair in a
  straight line." ADAAG § A4.5.1. "A ramp landing that
  is not level causes individuals using wheelchairs to tip
  backward or bottom out when the ramp is approached."
  ADAAG § A4.8.4. This is the only designated
  "accessible" entrance ramp to the Tea Garden.
  (EOR.1945).

- The stone bridges linking the lower part of the Tea
  Garden to the upper areas where alterations were
  performed, such as installing accessible restrooms, are
  too narrow. The stone bridges are 33 inches wide, 3

71

inches narrower than the 36 inch minimum width permitted by ADAAG § 4.3.3, and 15 inches narrower than the minimum 48 inch width required by CBC § 1133B.7.1. Because these bridges are the only route that leads from the lower Tea Garden to the upper Tea Garden, the restrooms, the Tea House, the bookstore and the upper portion of the Tea Garden where the cherry trees flower, are all off limits to persons with mobility disabilities. (EOR.1936-40).

The City did not present any evidence at trial disputing the existence of any of the foregoing barriers or data, and the District Court made no findings of fact or conclusions of law regarding the entrance ramp to the Tea Garden, or the stone bridges. The Court's only analysis was that making the Tea Garden accessible would require a "fundamental alteration." *Kirola*, 74 F. Supp. 3d at 1257. However, "fundamental alteration" is an affirmative defense for *existing* facilities under 28 C.F.R. § 35.150. This defense is not available with respect to *altered* facilities covered by 28 C.F.R. § 35.151(b).

In addition, the Court excused the Tea Garden's current inaccessibility on the basis that "additional improvements for the Japanese Tea Garden were scheduled to be completed shortly after trial, and will further enhance access to the Tea House." *Kirola*, 74 F.

Supp. 3d at 1257. This is also contrary to law. Future access improvements do not excuse non-compliance with the alterations requirements of 28 C.F.R. § 35.151. Persons with mobility disabilities were entitled to ADAAG-compliant access to the areas of alteration, and the path of travel leading to them, at the time prior to 2011 when the City made alterations to the Tea Garden, not at some indefinite point in the future. *See, e.g.*, *Pierce*, 526 F.3d at 1222-23.

Plaintiffs' experts' site inspections identified numerous other "blue dot" facilities that were not altered in compliance with ADAAG. Mr. Mastin inspected ten recreation centers, including the Bernal Heights, Eureka Valley, St. Mary's, Upper Noe, Tenderloin, Woh Hei Yuen, Minnie and Lovie Ward, Gene Friend, Joseph Lee, and Richmond Recreation Centers. He observed elements at each facility that violate ADAAG. (EOR.2147-48, 2202-03).

ADAAG violations at the City's altered facilities, include but are not limited to, the following: Tenderloin Recreation Center (the girls' restroom on the first floor has a 4% cross slope in the floor, double the cross slope permitted by ADAAG § 4.3.7, and the elevator has not functioned since 1992 in violation of 28 C.F.R. § 35.133 [EOR.1677, 2183-84, 2188-89, 2335])[5]; Woh Hei Yuen Recreation

---

[5] Mr. Mastin also observed inaccessible restrooms at the Bernal Heights Recreation Center (EOR.2154, 2171-73), Upper Noe Recreation Center (EOR.2173-74), Tenderloin Recreation Center (EOR.2182-84, 2187-89, 2335), and Woh Hei Yuen Recreation

Center (no signage directing persons with mobility disabilities to the accessible features of the facility in violation of ADAAG § 4.1.2(7)(c) [EOR.1677, 2189-90, 2192]) [6]; Martin Luther King Jr. Swimming Pool (no insulation of the lavatory pipes in the restrooms in violation of ADAAG § 4.19.4; door hardware on the "accessible" stall in the restroom does not comply with ADAAG § 4.13.9 because it requires tight pinching and grasping to open, thus causing a barrier for many persons with mobility disabilities who have limited manual dexterity [EOR.1673, 2677-80, 2805]); Richmond Branch Library (one of the newly constructed entrance ramps has a running slope of 10.6%, far in excess of the 8.3% maximum slope permitted by ADAAG § 4.8.2 [EOR.1227, 2681-82]).

The City did not present any evidence at trial disputing the existence of any of the foregoing barriers or data. The uncontroverted evidence showed that the foregoing facilities were not altered in compliance with ADAAG. The District Court made no findings of fact or conclusions of law regarding the specific barriers at any of these facilities. Nor did the Court provide any discussion about why it believed that they met ADAAG standards for altered facilities, with

---

Center (EOR.2190-92, 2336).

[6] Mr. Mastin also observed a lack of accessible signage at Upper Noe Recreation Center (EOR.2173) and Minnie and Lovie Ward Recreation Center (EOR.2194-95).

the sole exceptions of the Tea Garden and Richmond Branch Library.[7]
This was clear error.

Curb ramps with lips. The District Court found that during the
period between 1994 and 2004, the City designed and constructed all
of its non-federally funded curb ramps with 1/2 inch lips at the base of
the ramp, and that this did not comply with federal law which
"specified flush or smooth transitions." *Kirola*, 74 F. Supp. 3d at
1206; ADAAG § 4.7.2 ("Transitions from ramps to walks, gutters, or
streets shall be flush and free of abrupt changes.").  During that
decade, the City built thousands of curb ramps that do not comply
with federal access standards or with California law, which both
mandate that ADAAG sets the floor for accessibility.  *See, e.g.*,
42 U.S.C. § 12201(b); 28 C.F.R. § 35.103; Cal. Govt. Code § 4450(c).
Despite these findings, the District Court failed to find liability.

---

[7]  The City did not dispute the Richmond Branch Library ramp
measurement at trial.  Rather, the City argued, and the District Court
agreed, that this newly constructed and non-compliant ramp was
permissible because a *different* ramp at the same facility complied
with ADAAG.  *Kirola*, 74 F. Supp. 3d at 1228.  This conclusion of
law was in error.  The regulations expressly provide that "Each
facility **or part of a facility** constructed by … a public entity shall be
designed and constructed in such manner that the facility **or part of
the facility** is readily accessible to and usable by individuals with
disabilities, if the construction was commenced after January 26,
1992."  28 C.F.R. § 35.151(a)(1); 28 C.F.R. § 35.151(b)(1); ADAAG
§ 4.1.6(1)(b) ("each" altered element must comply).

Further, while the Court found that "some legacy curb ramp lips still exist," it did not order any relief. *Kirola*, 74 F. Supp. 3d at 1206 n.4.

    <u>Curb ramps with running slopes greater than 12.5%</u>. Mr. Mastin inspected 178 curb ramps that had running slopes greater than 12.5%. (EOR.2247-49, 2342). ADAAG § 4.1.6(3)(a)(ii) permits an absolute maximum slope of 12.5% (1:8) for a maximum rise of three inches where space limitations prohibit the use of an 8.3% slope (1:12). No disability access standard, whether federal or state, has ever permitted a curb ramp running slope greater than 12.5%. Thus, the City should never have constructed any ramps with running slopes that exceed 12.5%.

    The City presented no evidence at trial disputing the existence of these extremely steep curb ramps. The District Court did not even address these curb ramps in its opinion.

    In summary, Plaintiffs' experts identified multiple violations of ADAAG standards for newly constructed or altered facilities at twenty-four of the City's "blue dot" facilities, including nine libraries, ten recreation centers, two modernized swimming pools, St. Mary's Playground, the Japanese Tea Garden, and the Botanical Gardens. These are exactly the type of access barriers in newly constructed or altered facilities that courts have held violate the ADA and require injunctive relief. *See, e.g.*, *Lonberg v. City of Riverside*, No. EDCV970237SGLAJWX, 2007 WL 2005177, at *5-8 (C.D. Cal. May

16, 2007); *Lopez v. S.F. Unified Sch. Dist.*, No. C 99-3260, 2004 WL

6061306, at \*2-3 (N.D. Cal. April 20, 2004); *United States v. AMC

Entm't, Inc.*, 245 F. Supp. 2d 1094, 1096-97, 1100 (C.D. Cal. 2003).

Accordingly, the District Court's judgment that the City did not

violate the ADA's new construction and alterations provisions must

be reversed, and this case should be remanded for the entry of

injunctive relief. *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d

1165, 1175 (9th Cir. 2010); *Pierce*, 526 F.3d at 1223; *Long*, 267 F.3d

at 923.

### 3.  The District Court's Reasons for Excusing the City's Non-Compliance with ADAAG Are Contrary to Settled Law

The District Court acknowledged that Plaintiffs had proven at

least some violations of the ADA's new construction and alterations

requirements, yet failed to hold the City liable for its failure to comply

with ADAAG. *Kirola*, 74 F. Supp. 3d at 1258-59. The Court stated

that the City had not violated the ADA for two reasons. First, the

Court concluded that "the few variations from ADAAG" were

"insufficient to show that Plaintiff or class members were denied

meaningful access to the City's programs, services or activities." *Id*.

Second, the Court found that Plaintiffs had established only "a few"

violations of ADAAG, although it did not quantify how many non-

compliant access barriers had been established in the City's newly

77

constructed or altered facilities.  *Id.*  Both of the Court's reasons are contrary to applicable law.

First, "meaningful access" is the legal standard for program access claims regarding existing facilities under 28 C.F.R. § 35.150. *Lonberg*, 571 F.3d at 851.  The Court's use of this standard to evaluate Plaintiffs' new construction and alterations claims is plainly wrong.  The correct legal standard for new construction and alterations requires ADAAG compliance with respect to each newly constructed or altered part of facilities.  28 C.F.R. § 35.151(a)(1); 28 C.F.R. § 35.151(b)(1).

Moreover, the District Court criticized Plaintiffs' experts' testimony as flawed because of their citation to barriers "that, in fact, did not impede meaningful access," and because "[i]nstead of focusing on overall accessibility, Kirola's experts dwelled on minor variations that were no longer required, [sic] while overlooking 'obvious features of a significant expense' undertaken to make the facility accessible."  *Kirola*, 74 F. Supp. 3d at 1228, 1258-59.  In discounting Plaintiffs' experts on this basis, the Court utilized the lower program access standard for existing facilities, which permits access "when viewed in its entirety", instead of the new construction and alterations standard which mandates ADAAG compliance.  This is plain legal error, and reversal is warranted on this basis alone.

Second, the District Court's contention that "a few" violations of ADAAG do not establish liability is contrary to both the language of 28 C.F.R. § 35.151 and Ninth Circuit precedent.  As discussed above, when a public entity builds new facilities, or alters existing facilities, any such construction must be performed in full compliance with applicable design standards.  The ADA, its regulations, and the case law do not permit public entities to create any barriers while performing new construction or alterations on the basis that only "a few" such barriers are at issue.

Indeed, the presence of only "a few" barriers, such as the type of entrance, path of travel, and restroom barriers that Plaintiffs established at trial and that are described above, can render an entire facility inaccessible, or make the use of a facility needlessly difficult for persons with mobility disabilities.  For this reason, whether a newly constructed or altered facility is compliant with the applicable provisions of ADAAG is vital to whether a facility is "readily accessible" to persons with mobility disabilities.  Compliance with ADAAG's minimum standards for accessibility is *not* a question of whether a "facility or building is perfect," as the Court mistakenly puts it (*Kirola*, 74 F. Supp. 3d at 1259), but rather of whether disabled persons can access a public facility on an equal basis with nondisabled persons.  The District Court's attempt to manufacture a new defense if only "a few" access barriers are proven at trial must be rejected.

79

Further, the District Court's assertion that Plaintiffs established only "a few" non-compliant conditions is clearly erroneous.  The uncontroverted evidence demonstrated that the City performed a significant amount of ADAAG non-compliant construction in its pedestrian right of way, parks, recreation centers, pools and libraries.  While the Court asserts that the foregoing pattern of non-compliant new construction and alterations did not demonstrate any systemic deficiency, the record shows the contrary.  The Court simply ignored Plaintiffs' experts' substantial unrebutted evidence of the City's multiple failures to newly construct and alter facilities in compliance with the ADA.

The District Court's other criticisms of Plaintiffs' experts also rest on legal error.  The District Court criticized Plaintiffs' experts as being "unreliable" and "unpersuasive" because they used ADAAG to assess the accessibility of the City's pedestrian right of way, parks and playgrounds.  *Kirola*, 74 F. Supp. 3d at 1222, 1223, 1227-28.  As discussed above, however, ADAAG *does* apply to those types of facilities, and the lower court's conclusion to the contrary is erroneous as a matter of law.  *See* authorities *supra* at § VIII(B)(1).

Further, the District Court's assertion that Plaintiffs' experts should have used proposed federal access guidelines for outdoor facilities, which "set different and more forgiving slope requirements" than ADAAG (*id.* at 1227-28), is wrong given that this Court has

80

repeatedly held that such *proposed* guidelines lack the force of law, and therefore cannot be used as a legally cognizable federal access standard. *See* discussion and authorities *supra* at 58-60 & n.2. Accordingly, the District Court's finding that Plaintiffs' experts were "unreliable," which was in large part predicated on its misapprehension of these principles, is incorrect as a matter of law.

The District Court also discounted Plaintiffs' experts' testimony about the barriers in the City's new and altered facilities because they allegedly "applied faulty and inconsistent methodologies." This is incorrect. With respect to methodology, the only specific item that the Court identified in its opinion was the manner in which Plaintiffs' experts measured the slope of ramps and curb ramps.[8] The Court criticized Plaintiffs' experts for measuring the slope of ramps and curb ramps at the steepest point instead of using the "rise over run" method of determining ramp slopes. *Kirola*, 74 F. Supp. 3d at 1223, 1227.

Plaintiffs' experts, however, followed the methods that have been approved by the DOJ. According to the DOJ ADA Toolkit, "The ADA Standards set requirements for maximum running slope and cross slopes, so surveyors can generally check compliance with the Standards by measuring where the running slopes appear steepest

---

[8]  The Court made no finding that Plaintiffs' experts used any incorrect methodology with respect to measuring the elements of facilities with their tape measures, or that they had mis-measured any such items.

and where the cross slopes appear steepest." DOJ ADA Toolkit,

Introduction to Appendices 1 and 2, ADA Accessibility Survey Forms

and Instructions at EOR.1224. The DOJ specifically rejected the "rise

over run" method of measuring ramp slopes:

> Some architects use a 'rise over run' formula to calculate the slope of a surface. This formula … is not useful when assessing the accessibility of a feature that has already been constructed. <u>This formula does not reliably provide the actual slope because it does not take into account factors such as the existing topography of a site and because it assumes that the slope over the length of the run is consistent, which is often an inaccurate assumption.</u>

(EOR.1225) (emphasis added). This Court has repeatedly held that

the DOJ's interpretive guidance materials regarding the ADA, its

regulations and ADAAG are entitled to deference. *See, e.g.*, *Kohler v.*

*Presidio Int'l, Inc.*, 782 F.3d 1064, 1069 (9th Cir. 2015); *Fortyune*,

766 F.3d at 1104.

Plaintiffs' experts followed the inspection methods approved by

the DOJ Toolkit, which are the accepted methods in their field.

(EOR.2714, 3171-3172). Thus, the District Court, and not Plaintiffs'

experts, was mistaken regarding the correct method for measuring

ramp slopes.

The District Court also criticized Plaintiffs' experts for failing

to take into account dimensional tolerances and "minor construction

variations." *Kirola*, 74 F. Supp. 3d at 1227, 1258-59. As an initial

matter, dimensional tolerances do not apply to many of the access barriers that Plaintiffs' experts identified.  For example, tolerances do not apply to whether the Koret auditorium has companion seating, whether lavatories have insulated pipes, or whether a restroom stall door has hardware that can be used by wheelchair users.  With respect to many of the barriers established at trial, the City facility at issue simply did not have the access feature mandated by ADAAG.  For this reason, the Court's decision to discount the testimony of Plaintiffs' experts based on dimensional tolerances is in error.

In addition, dimensional tolerances are an affirmative defense. The entity seeking to depart from ADAAG's minimum standards has the burden to show that any specific non-compliant items in new construction and alterations fall within acceptable tolerances.  *See, e.g., Kohler v. Staples the Office Superstore, LLC,* 291 F.R.D. 464, 473 (S.D. Cal. 2013); *AMC*, 245 F. Supp. 2d at 1100.  In fact, the District Court herein previously held that "minor deviations" from ADAAG were an affirmative defense, and that a public entity could only justify departures from ADAAG through an item-by-item showing of "site infeasibility considerations."  *Californians for Disability Rights, Inc. v. Cal. Dep't of Transp.*, No. C 06-5125, 2009 WL 8595755, at *2 (N.D. Cal. Sept. 14, 2009).

At trial, the City presented no evidence regarding specific dimensional tolerances that it used for any of the newly constructed or

83

altered facilities discussed above.  Moreover, the District Court did
not identify a single specific barrier or type of barrier discussed by
Plaintiffs' experts as being one that would fall within tolerances.
Indeed, such tolerances apply only to minimal deviations, and not the
types of grossly non-compliant conditions described above.

The District Court also found Plaintiffs' experts to be
"unreliable" because they "relied on unqualified individuals to
conduct their inspections."  *Kirola*, 74 F. Supp. 3d at 1258.  This
finding is clearly erroneous.  The Court qualified all of Plaintiffs'
experts in the field of disability access.  *Id.* at 1221.  Mr. Mastin and
Mr. Waters are licensed architects in California.  Mr. Mastin
conducted all of his own site inspections in this case.  Mr. Waters also
conducted his own site inspections, with the exception of some
inspections that were performed by licensed California architects
within his firm.  (EOR.1921, 2386).

Mr. Margen is a "CASp," a California certified accessibility
specialist who has passed the State's examination on disability access
standards, and is thereby qualified to inspect public facilities for
compliance with access laws, including the ADA.  *See* Cal. Gov't
Code §§ 4459.5 *et seq.*; 21 C.C.R. §§ 111, *et seq.*[9]  Mr. Margen

---

[9] The Court faulted Mr. Margen for using a one-foot level to measure
slopes at one site, the Kimball Playground.  *Kirola*, 74 F. Supp. 3d at
1227.  This isolated use of a one-foot level did not result in any
inaccurate slope measurements.

conducted his own site inspections in this case, with the exception of some inspections that he conducted jointly with Patricia Maruya, who holds a Masters of Architecture degree.  (EOR.3454).

Dr. Steinfeld is a licensed architect.  Dr. Steinfeld did not conduct his own site inspections, but relied on the data collected by his team.  None of his team were "students" as the District Court incorrectly states.  *Kirola*, 74 F. Supp. 3d at 1222.  In fact, Dr. Steinfeld's inspectors were architectural interns, who all held Masters of Architecture degrees, and who did their inspections under the supervision of a licensed architect, Danise Levine.  (EOR.2595). The Court did not identify any inaccurate measurements taken by Dr. Steinfeld's architectural interns.  In short, Plaintiffs' experts did not use any "unqualified individuals" to perform their access inspections in this case.

Finally, the District Court's opinion does not identify a single measurement taken by Plaintiffs' experts at any facility or site that the Court found to be inaccurate.  While the Court refers to "inconsistent" methodologies used by Plaintiffs' experts, the Court identifies no item for which such methodologies resulted in any inaccurate measurements or data regarding field conditions.  In short, the Court's entire discussion of inconsistent methodologies is a red herring.

C. **The District Court Erred in Finding That the City Has Complied with Its Program Access Obligations with Respect to Its Pedestrian Right of Way and Parks**

1. **The District Court Held Plaintiffs to an Incorrect Legal Standard by Requiring Them to Show That the City's Pedestrian Right of Way and Parks are Inaccessible in Their Entirety**

The District Court's ruling that the City did not violate its program access obligations rests on an erroneous legal standard. The District Court held that Plaintiffs were required to show that the City's pedestrian right of way was "inaccessible in its entirety" in order to establish a program access violation under the ADA. *Kirola*, 74 F. Supp. 3d at 1240 ("Starting first with the City's system of sidewalks and pedestrian walkways, the Court finds that Kirola has failed to show that it is inaccessible and unusable in its entirety."). The District Court applied this same erroneous standard to the City's parks. *Id.* at 1250 ("The Court therefore considers whether Kirola has shown that each of these services or programs is inaccessible in its entirety.").

In other words, for Plaintiffs to prevail on their program access claims with respect to the pedestrian right of way, the Court required Plaintiffs to establish that no part of the City's pedestrian right of way is accessible. Similarly, the Court required Plaintiffs to show that they were excluded from the City's parks in their entirety. This standard finds no support in the language of the statute, the regulations or the case law.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Plaintiffs alleging a denial of program access under Title II are not required to show that they were completely excluded from or denied access to the program at issue. *See, e.g.*, *Cohen*, 754 F.3d at 694-95; *Disabled in Action*, 752 F.3d at 198 ("Plaintiffs need not, however, prove that they have been … 'completely prevented from enjoying a service, program, or activity' to establish discrimination under Section 504 or Title II." [citation omitted]).  The District Court simply disregarded governing law, and thus discounted the testimony of class members describing their daily struggles with barriers that limit, interfere with or otherwise deny them meaningful access to the City's pedestrian right of way and parks.

Indeed, the District Court's standard for program access would allow a city to satisfy its program access obligations by, for example, installing curb ramps and maintaining accessible sidewalks in only one neighborhood, or on a small percentage of a city's streets.  Such limited accessibility does not provide meaningful access to persons with disabilities who live or work in other parts of the city where the sidewalks are not accessible, or who desire to travel to those areas to

87

shop, visit friends, and use other city programs. For example, an individual with a mobility disability who lives in and engages in most of their activities in the Western Addition does not have meaningful access to the City's pedestrian right of way if only the Pacific Heights neighborhood has accessible sidewalks and curb ramps. Similarly, an individual with a mobility disability does not have meaningful access to the City's parks if special destination parks such as Alamo Square Park and Mission Dolores Park are not accessible so that she can enjoy their unique landscapes and particular program features. The District Court's application of an erroneous legal standard regarding program access requires that the Court's judgment be reversed.

### 2. The City's Pedestrian Right of Way Is Not Readily Accessible to Persons with Mobility Disabilities

#### a. The Evidence at Trial Demonstrated that the City Has Not Provided Persons with Mobility Disabilities Meaningful and Equal Access to the Benefits of its Pedestrian Right of Way

Courts have repeatedly held that the protections of the ADA would be rendered meaningless if persons with disabilities were denied meaningful and equal access to a city's pedestrian right of way because of the lack of accessible sidewalks, curb ramps and crosswalks. *See, e.g.*, *Cohen*, 754 F.3d at 694-95; *Barden v. City of*

*Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002); *Kinney*, 9 F.3d at 1071.

Plaintiffs presented overwhelming evidence at trial showing that the City has failed to make its pedestrian right of way, when viewed in its entirety, readily accessible to and usable by persons with mobility disabilities. The record shows that the City's pedestrian right of way has pervasive access barriers, including but not limited to missing curb ramps, steep curb ramps, curb ramps with concrete lips, cracked and uplifted sidewalks, and crosswalks with cracked and uneven surfaces and potholes creating a falling hazard. Every testifying class member described how she or he routinely encounters such barriers at various specific locations throughout the City. The testimony of the class members described an obstacle course, the exact opposite of a "readily accessible" pedestrian right of way. *See* discussion *supra* at § V(B)(1).

Indeed, these barriers are often severe enough that persons with mobility disabilities are forced to roll their wheelchairs in the street with vehicular traffic because they cannot access the sidewalks. This is an obvious safety hazard that denies persons with disabilities meaningful access to the key program benefit of travelling safely, freely and independently on and between the City's streets. In contrast, nondisabled persons are able to use the City's pedestrian right of way safely without being forced to walk in the street with

89

vehicular traffic, and can use it to travel wherever and whenever they wish to within San Francisco.

The City's own testimony and documents confirmed that the City's pedestrian right of way is not readily accessible when viewed in its entirety. First, the evidence at trial showed that the majority of corners in the City lack accessible curb ramps. More than 51% of the City's 22,778 corners at which a pedestrian crossing exists and at which a curb ramp can be constructed have no curb ramp at all, or only have a curb ramp that the City itself considers in need of replacement because it is not accessible. (EOR.2039-41, 2107). Furthermore, 5,675 of the City's existing curb ramps are too steep, and at least 2,635 of its curb ramps have concrete lips at their base which the federal government considers to be a safety hazard to persons with mobility disabilities. *See* discussion *supra* at §§ V(A)(1), V(B)(1).

Second, the City's sidewalks and crosswalks are also not readily accessible when viewed in their entirety. The City's 2005 survey of 450 blocks evenly distributed throughout the City identified 7,102 sidewalk access barriers across the 450 blocks, almost 16 barriers per block. (EOR.3488-91); *see* discussion *supra* at § V(B)(1). The City made no contention at trial that it has removed any of the access barriers identified in its own sidewalk survey, nor did the Court find that it had done so.

With respect to crosswalks, Plaintiffs' experts and the class members identified numerous access barriers therein, including potholes, cracked and uplifted pavement, and others. In the fall of 2010, the City developed a "pilot study" and "checklist" regarding access to its crosswalks. *Kirola*, 74 F. Supp. 3d at 1209; (EOR.955-56, 1008). Thus, at the time of trial, the City had only just begun to repair the crosswalks in its 7,200 intersections. *See* discussion *supra* at § V(B)(1).

Moreover, even though the City has made only a fraction of its pedestrian right of way accessible, the City has not identified to persons with mobility disabilities any specific accessible routes that actually exist within its 2,000 mile sidewalk and crosswalk system. This is highly problematic as the pedestrian right of way is comprised of three "interdependent" components: the sidewalk, the curb ramp and the crosswalk. *Kinney*, 9 F.3d at 1073. If any one of those three components along a route is inaccessible, a mobility disabled person will be unable to reach her destination, or be impeded in doing so. Notwithstanding the foregoing, the City does not publicly identify the locations where an accessible corner is linked to an accessible sidewalk and crosswalk.

As a consequence, class members are left to fend for themselves to find accessible routes through an arduous and hazardous process of trial and error. In this way, the City has shifted

91

the burden of finding accessible routes onto the class members.  This
conflicts squarely with the program access mandate of the ADA,
which requires that programs be "readily accessible."

 Finally, the City's policies are wholly inadequate to deal with
the general inaccessibility of the City's pedestrian right of way.  The
City's policy on this subject is its Sidewalk Inspection and Repair
Program ("SIRP").  Under the SIRP, the City plans to complete the
inspection and repair of its sidewalks over a 25 year period up through
2033.  (EOR.972-73, 2132, 1312-14, 3497).

 The District Court found that the SIRP only inspects 200 City
blocks per year out of the City's 5,000 blocks (or 4%).  *Kirola,* 74 F.
Supp. 3d at 1253; (EOR.972).  As of 2011, the SIRP had only
inspected 800 City blocks, or 16% of the City's sidewalks.  Moreover,
the SIRP contains no deadlines for the completion of repairs with
respect to the barriers that it identifies.  (EOR.975-76, 1009-10, 2132-
34, 3497-99).  Thus, inspection and repair pursuant to the SIRP will
not be completed until 2033 at the earliest.  As a result, the types of
access barriers identified by the City's own sidewalk survey will not
be removed for another 18 years.

 In short, the SIRP is of little utility to persons with mobility
disabilities who are trying to use the City's pedestrian right of way
now.  Similarly, as discussed below, the City's "goal" to achieve

92

"curb ramp saturation" by 2026 does not make the City's corners
readily accessible at the present time as required by the ADA.

> **b.  The District Court's Reasons for Its Non-Liability Finding Regarding the City's Pedestrian Right of Way are Contrary to Law**

The District Court found that the City was not in violation of its
program access obligations as to the pedestrian right of way because
(1) the City is not required to install a curb ramp at every street
corner, (2) the City installs 1,200 curb ramps each year and follows
the DOJ priorities for their installation with the ultimate goal of
achieving "curb ramp saturation" by 2026, (3) the SIRP inspects 200
blocks per year, which "in view of the City's financial and staffing
constraints" is not an "objectively unreasonable" approach to sidewalk
access,[10] (4) class members may request barrier removal, and (5) the
City offers "paratransit services and public transportation." *Kirola*, 74
F. Supp. 3d at 1252-53. The Court's bases for finding the City in
compliance with the ADA conflict with governing law.

First, while it is true that the City is not required to install a
curb ramp at every corner, the ADA does require that the City install
enough accessible curb ramps to make its pedestrian right of way

---

[10] The inadequacies of the City's SIRP are addressed *supra*. The
District Court made no fact findings whatsoever regarding the City's
"financial and staffing constraints," which are not specified.

"readily accessible" when "viewed in its entirety." And it has not done so. Most of the City's corners are *not* served by an accessible curb ramp. As a result, class members struggle to find accessible routes in the City's pedestrian right of way. On these facts, cases such as *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1021 (9th Cir. 2002), and *Schonfeld v. City of Carlsbad*, 978 F. Supp. 1329, 1341 (S.D. Cal. 1997), *aff'd*, 172 F.3d 876 (9th Cir. 1999), cited by the District Court, lend no support to its conclusions. To the contrary, they support Plaintiffs. In those cases, the covered entity had already completed almost all of its access work. That is not this case.

Second, as part of its determination that the City was currently in compliance with the ADA, the District Court credited access work that the City had not yet completed, but planned to complete during the coming decades. *Kirola*, 74 F. Supp. 3d at 1207-09, 1211, 1214-17. This was reversible error. Compliance with the ADA hinges on the current accessibility of a defendant's programs and facilities. This Court has held that the deadline for completing the structural changes necessary for program access was January 26, 1995. "[N]either the fact that [a defendant] might move toward compliance nor [a] district court's belief that it w[ill] do so eventually constitute[s] a proper basis for denying plaintiffs relief." *Pierce*, 526 F.3d at 1223; *see also Cohen*, 754 F.3d at 696; 28 C.F.R. § 35.150(c).

Indeed, it is generally improper for a court to consider future actions in determining current liability. A defendant cannot moot a current controversy by promising future conduct. *See, e.g.*, *Los Angeles Cnty. v. Davis*, 440 U.S. 625, 631 (1979). The reasons are straightforward. For one, a court cannot necessarily trust a party's representations regarding its future conduct.[11] Also, the promised actions will not necessarily provide complete relief to the plaintiffs. *See, e.g.*, *Pierce*, 526 F.3d at 1222-23. Thus, the District Court should not have considered the City's plans for future work.

The District Court's reliance on the City's policies that permit persons with mobility disabilities to make complaints or requests for barrier removal is equally misplaced. *Kirola*, 74 F. Supp. 3d at 1203-05, 1209-10, 1253, 1260. Courts have uniformly rejected the notion that a public entity can satisfy its program access obligation through policies and practices that put the burden on persons with disabilities to make complaints or requests for barrier removal. As the court held in *Putnam v. Oakland Unified School District*, such an "approach imposes the discriminatory requirement that a disabled [person]

---

[11] The Court relied on the City's representations that it will perform access work in the future even though City officials testified that the timeframes for the completion of such work were indefinite. City representatives testified that curb ramp saturation was the City's "goal" (*Kirola,* 74 F. Supp. 3d at 1207; EOR.915), and made loose estimates as to the timeframe for installing the tens of thousands of curb ramps needed to achieve this "goal" (EOR.935-39).

ascertain which barriers deny her access and brave possible
disapproval to point them out and request that they be remedied.
Furthermore, it imposes the further discrimination of forcing the
[person] to wait for the barriers to be remedied, and in the meantime
either be excluded or be subjected to the perils attendant to the
barriers." *Putnam v. Oakland Unified Sch. Dist.,* No. C-93-3772CW,
1995 WL 873734, at *10 (N.D. Cal. June 9, 1995); *Huezo v. L.A.
Cmty. Coll. Dist.,* 672 F. Supp. 2d 1045, 1061-64 (C.D. Cal. 2008).

    In addition, the record shows that the City typically takes
anywhere from one to three years to remove barriers after a request
for removal has been made, thus resulting in class members being
denied access for a protracted period of time. *Kirola*, 74 F. Supp. 3d
at 1220, 1243, 1261; (EOR.1498-99, 2003-04, 2260-62, 2854-56,
2982-89, 2991-3000, 3003-05). City officials, including the Director
of the Mayor's Office on Disability, testified that backlogs have led to
delays of up to two years or more in addressing complaints and
requests for barrier removal. (EOR.1498-99, 1771, 1838-40).

    The City's approach of taking a year or more to remove access
barriers simply does not make the City's pedestrian right of way or
parks "readily accessible." To the contrary, courts have held that
delays of six months pending barrier removal violate the ADA
because persons with mobility disabilities are denied access in the
interim. *See, e.g., Huezo*, 672 F. Supp. 2d at 1067.

### 3. The City Has Not Provided Persons with Mobility Disabilities with Meaningful and Equal Access to the Benefits of Its Parks

#### a. The District Court Erred by Failing to Analyze Whether Persons with Mobility Disabilities Have Meaningful Access to All of the Program Benefits of the City's Parks

The District Court erred by failing to analyze whether persons with mobility disabilities have meaningful and equal access to the full range of benefits and program features provided by the City's parks. Instead, the District Court focused exclusively on whether persons with mobility disabilities have access to a subset of recreation centers and other different types of facilities that provide different program benefits. *Kirola*, 74 F. Supp. 3d at 1255-58.

The ADA and California law mandate that public entities must provide persons with disabilities with meaningful and equal access to *all* of the benefits of their programs, services and activities, including parks. *See, e.g.*, *Cohen*, 754 F.3d at 695; *Armstrong*, 275 F.3d at 869; 28 C.F.R. § 35.130(b)(1)(ii)-(iii); Cal. Govt. Code § 11135(a).

Moreover, the DOJ has stated in its interpretive guidance to 28 C.F.R. § 35.150 that where a public identity offers the *same* programs, services and activities at multiple sites, it must make a reasonable number of such sites "readily accessible" to persons with mobility disabilities. In determining whether a public entity has made a

97

reasonable number of such sites readily accessible, the following factors should be considered: the size of the public entity; the particular program features offered at each site; the geographical distance between sites; the travel times to the sites; the number of sites; and the availability of public transportation to the sites. 28 C.F.R. pt. 35, app. A, § 35.150.

The District Court conducted no analysis of whether the City had made a reasonable number of parks accessible, nor did it conduct any analysis of whether the full range of benefits and particular program features provided by the City's parks were accessible. In short, the District Court failed to apply the correct legal standards for evaluating program access to the City's parks. Accordingly, the District Court's decision must be reversed.

<blockquote>

**b.    The City's Parks Are Not Readily Accessible When Viewed in Their Entirety**

</blockquote>

The undisputed evidence at trial showed that the City identifies only 27% (60 out of 220) of its parks as "accessible." (EOR.1901-11). The remaining 73% are "limited wheelchair access" sites which, according to the City's own definition, lack even one accessible entrance or one accessible recreational opportunity. (EOR.1872). The City stated at trial that it does *not* rely upon the "limited access" parks to provide program access. (EOR.1674-75, 3328-36).

Under applicable law, to determine whether the City had
provided access to a reasonable number of its 220 parks, the District
Court was required to analyze the specific benefits and "particular
program features" provided at the City's small subset of designated
"accessible" parks, and determine whether those sites offer all of the
"particular program features" offered by the City's parks as a whole.
*Cohen*, 754 F.3d at 695; 28 C.F.R. pt. 35, app. A, § 35.150. The
District Court performed no such analysis whatsoever, and therefore
committed reversible error.

Using the correct legal analysis, the evidence at trial showed
that the City does not provide persons with mobility disabilities with
meaningful, let alone equal, access to all of the benefits of the City's
parks. The City did not offer any evidence that the 27% of its parks
that it considers to be "accessible" provide class members with access
to all of the benefits of the programs, services and activities that are
offered at the other 73% of parks that are admittedly inaccessible.
(EOR.462-64, 490-02, 1548-50, 1871-1915, 1968-69, 2204-06, 3043-
44, 3180-82). In fact, Mr. Kern, the Director of Operations of the
Department of Recreation and Parks, testified that the City has never
analyzed that issue. (EOR.855).

Moreover, a review of the record shows that the minority of
parks that the City considers to be "accessible" do not provide all of
the benefits and "particular program features" offered at the City's

99

parks when viewed in their entirety.  The evidence at trial showed that the City's special destination parks do not provide meaningful access to their benefits to persons with mobility disabilities.

For example, the City admitted that Golden Gate Park is unique and that no other City park provides the same programs or benefits as Golden Gate Park.  (EOR.1214-15).  Numerous special purpose facilities at Golden Gate Park that provide program benefits that are not duplicated elsewhere are inaccessible according to the City's own access map of Golden Gate Park, including the Sharon Arts Studio, Anglers Lodge, Bercut Equestrian Area, Bowling Greens & Clubhouse, Model Yacht Clubhouse, Rose Garden, and Shakespeare Garden.  (EOR.1676).

The District Court disregarded the City's map of inaccessible special purpose facilities and programs offered at Golden Gate Park. (EOR.1676).  Instead, the Court found that the Park complied with the program access standard because the following limited subset of the Park's program features are accessible: (1) some paths, parking and restrooms, and (2) "the popular destinations … namely, the Conservatory of Flowers, the Arboretum and the Japanese Tea Garden." *Kirola*, 74 F. Supp. 3d at 1257.  However, the foregoing three items are only a few of the program features available to the public at Golden Gate Park.  By taking this approach, the Court failed to analyze the particular program features provided by the wide

variety of other inaccessible facilities at Golden Gate Park. Applying the correct legal standard, Golden Gate Park does not provide persons with mobility disabilities with meaningful access to the full range of benefits offered therein.

Similarly, a review of the trial testimony and the City's documents confirms that numerous other City parks that are concededly inaccessible contain "program features" that are not available at other "accessible" parks. *See* discussion *supra* at § V(B)(2). By failing to make such unique parks and their particular program benefits accessible, the City has denied Plaintiffs the full benefits of its parks program and violated the ADA.

Moreover, even the limited subset of parks designated by the City as being "accessible" do not satisfy the program access standard because they do not provide meaningful access. A public entity's program access obligations are not met by merely providing "limited access" or participation, or if a disabled person is only able to enter the facility or site. Barriers that limit access to entrance ways, paths of travel, or restrooms may alone amount to a program access violation because such barriers necessarily limit a mobility disabled person's ability to have meaningful and equal access to the program(s) offered at that location. *See, e.g., Cohen*, 754 F.3d at 694; *Disabled in Action*, 752 F.3d at 199-200; *Shotz*, 256 F.3d at 1080; *Huezo*, 672 F.

Supp. 2d at 1061 (program access requires a "high degree of convenient accessibility").

The City's definition of what constitutes an "accessible" park does not ensure meaningful access. The City vaguely defines "accessible" as an outdoor area or park with an accessible entry that provides "at least one accessible recreational opportunity." (EOR.1872). Mr. Scott, the City's Director of Physical Access, testified that the City's definition of an "accessible" park is not based on compliance with any disability access standard. (EOR.1684-85, 1687). This definition of an "accessible" park is inherently unequal: while non-disabled persons are able to enjoy the full range of recreational opportunities offered at each park, persons with mobility disabilities are restricted to a few such opportunities or none at all.

In addition, the City's definition does not work in the real world because it does not ensure access to vital parts of a designated "accessible" park. For example, in determining which parks meet the City's definition of "accessible," City officials performed no analysis of the accessibility of parking, restrooms or paths of travel to the entrance. (EOR.1872). The City presented no evidence at trial that its "accessible" parks provide accessible entrances, parking or restrooms. Nor did the District Court make any such finding. Further, the City's definition of an "accessible" park does not include accessible paths of travel within the park. Without an accessible path of travel within the

park, a person with a mobility disability cannot access its varied
landscapes and natural settings, key program benefits that are
conferred on nondisabled persons, but which are largely denied to
mobility disabled persons. Further, without accessible paths of travel,
a disabled person cannot travel to the accessible picnic area, tennis
court, or whatever portion of the park might be accessible.

Compounding the problem of the lack of accessible paths in the
City's parks, there is a lack of signage at the parks themselves
directing disabled persons to the accessible area(s) of any park at
which any accessible recreational opportunities are provided.
*See* 28 C.F.R. § 35.150; 28 C.F.R. § 35.163(b); (EOR.2775, 2777-78,
3002-03).

As discussed above, class member testimony confirms the
presence of myriad barriers in the City's parks that function to either
limit or deny program access to the benefits thereof. Class members
encounter such barriers at both the designated "accessible" parks and
the "limited access" parks. *See* discussion *supra* at §§ V(A)(2),
V(B)(2).

Finally, none of the City's parks comply with ADAAG,
including parks and other recreation facilities that have been newly
constructed or altered. As shown above, the City's designated "blue
dot" park facilities do not comply with ADAAG as required by 28
C.F.R. § 35.151. The District Court made no findings that any park,

or even any part of a park, was in compliance with ADAAG. Nor did
the City make any such contention at trial. *See* discussion and
authorities *supra* at §§ V(A)(2), VIII(B)(1). Given that even the
City's most "accessible" blue dot parks and facilities suffer from
numerous barriers that limit or deny access to class members, it is
plain that the City's parks are not readily accessible when viewed in
their entirety.

### c.   The City Cannot Provide Program Access to the Benefits of the City's Parks Through Non-Park Facilities That Provide Different Benefits

The District Court relied heavily on its conclusion that the City
provides an "equitable distribution" of "blue dot" accessible facilities,
including twenty accessible athletic fields, forty-three accessible
recreation centers, and an unspecified number of children's play areas,
as support for its holding that the City was in compliance with its
program access obligations under the ADA with respect to its parks.
*Kirola*, 74 F. Supp. 3d at 1256-57. The Court stated, "The athletic
fields, play areas and recreation centers (along with open space that is
provided at virtually every park), represent core features that together
provide the range of services, programs and activities available at the
City's parks." *Id.* at 1256.

Under applicable law, public entities must provide meaningful and equal access to all of the benefits provided by a multi-facility program such as the City's parks. Pursuant to 28 C.F.R. § 35.150(b)(1), a public entity may provide program access through "alternate accessible sites." In its interpretation of the program access regulation, the DOJ has stated that when a program is offered at multiple sites, a "reasonable number" of sites must be accessible to persons with disabilities, taking into account the "particular program features at each site" and the other factors set forth in the DOJ's interpretive guidance. 28 C.F.R. pt. 35, app. A, § 35.150. The DOJ's interpretation is entitled to substantial deference. *See, e.g.*, *Fortyune*, 766 F.3d at 1104.

The District Court wholly failed to perform the analysis required by Title II and its implementing regulations. First, the Court performed no analysis of "the particular program features offered at each" of the City's parks. The Court made no analysis of whether the City's recreation centers, athletic fields and play areas provide access to the "particular program features" provided by its parks. It is plain that they do not. For example, the indoor activities provided by the City's recreation centers, such as weightlifting or chess, are not a substitute for the very different program benefit of being able to walk or roll through the wetland habitat provided by India Basin Shoreline Park. Similarly, being in a recreation center cannot replace the nature

path at Glen Canyon Park, which provides the experience of native butterflies and one of the few remaining free flowing creeks in San Francisco, or being able to smell the fragrance of the roses in the Rose Garden at Golden Gate Park. Further, for those persons with mobility disabilities who do not play sports, or have no interest in being a spectator, accessible athletic fields are no substitute for accessible parks. In short, the program benefits provided by the City's recreation centers, clubhouses, athletic fields and children's play areas differ in fundamental ways from those provided by the City's parks.

Second, the District Court conducted no analysis of the number of accessible parks, the geographical distance between them, the travel times to such sites, or the difficulty of travelling to any such accessible parks. The City did not present any "blue dot" map of "accessible" parks at trial, nor did its expert, Mr. Hecker, proffer any opinion about the relative accessibility of the City's parks, or their geographic distribution within the City. The City proffered no evidence regarding the distances between accessible parks, or the amount of time necessary to travel to them. Similarly, the Court performed no such analysis with respect to the City's accessible recreation centers, athletic fields and children's play areas.

Finally, the Court relied upon access work that the City allegedly plans to do in the future at the Japanese Tea Garden, Mission Dolores Park and Glen Canyon Park as a basis for concluding

106

that the City is currently in compliance with the ADA. *Kirola*, 74 F.

Supp. 3d at 1257. Doing so is contrary to Ninth Circuit precedent.

*Pierce*, 526 F.3d at 1222-23.

## IX. IF THE COURT REMANDS THIS CASE FOR FURTHER PROCEEDINGS, IT SHOULD REASSIGN THE CASE TO A DIFFERENT JUDGE

Should this Court reverse and remand this case for further

proceedings, Appellants respectfully request that it assign the case to a

different judge. When considering whether a case should be

reassigned on remand, this Court considers three factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected,

> (2) whether reassignment is advisable to preserve the appearance of justice, and

> (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Krechman v. Cnty. of Riverside*, 723 F.3d 1104, 1111-12 (9th Cir.

2013) (citation omitted). The first two factors are of equal

importance, and either is sufficient to support reassignment. *Id.*

A case fulfills the first factor for reassignment if the district

judge was so "adamant" about the outcome of the case that she

disregarded clear legal standards or a substantial portion of one

party's evidence.  *United States v. Larios*, 640 F.2d 938, 943 (9th Cir. 1981).  Here, the District Court focused on the City's efforts and intentions, almost entirely to the exclusion of analyzing actual compliance with the governing legal standards set forth in Ninth Circuit precedents construing the requirements of the ADA.  *See* discussion and authorities *supra* at § VIII(A)-(C).

The second factor for reassignment is satisfied if a member of the public reading the opinion would be likely to conclude that one party was treated unfairly.  *See, e.g.*, *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 97-98 (3d Cir. 1992).  Here, the District Court's long delay in reaching a decision following the trial in this case supports reassignment on remand.  *See, e.g.*, *U.S. ex rel. Little v. Shell Exploration, Prod. Co.*, 602 Fed. App'x 959, 976 (5th Cir. 2015) (citing delay as one factor leading to appearance of injustice).  Despite the fact that this action seeks injunctive relief to redress ongoing civil rights violations, more than three and a half years passed between the close of trial and the Court's decision.  The Civil Justice Reform Act of 1990 indicates that Congress expects most bench trials to be pending for no longer than six months.  28 U.S.C. § 476.

Finally, reassignment would not cause undue waste or duplication of efforts.  *Barrios v. Diamond Contract Servs., Inc.*, 461 Fed. App'x 571, 573 (9th Cir. 2011).  Here, due to the long delay between trial and judgment, and the fact that injunctive relief is

sought, any further proceedings will require the presentation of new evidence. Thus, reassignment will not lead to significant duplication of efforts in comparison with remand to the original judge. *Spalding Labs., Inc. v. Ariz. Biological Control, Inc.*, 345 Fed. App'x 270, 271 (9th Cir. 2009).

## X.   CONCLUSION

For the reasons stated herein, Appellants respectfully request that this Court:

(1) reverse and vacate the District Court's opinion and judgment;

(2) enter judgment in favor of the Plaintiff class with respect to the City's violations of the ADA's new construction and alterations duties;

 (3) enter judgment in favor of the Plaintiff class with respect to the City's failure to make its pedestrian right of way and its parks readily accessible to and usable by persons with mobility disabilities in accordance with 28 C.F.R. § 35.150; and,

(4) remand this matter for the entry of appropriate injunctive relief, with such proceedings to be reassigned to a new judge.

Respectfully submitted,

Dated: November 2, 2015          SCHNEIDER WALLACE
                                 COTTRELL KONECKY
                                 WOTKYNS, LLP

By:  __/s/ Guy B. Wallace__

    Guy B. Wallace
    Attorneys for Plaintiffs
    and Appellants

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Circuit Rule 28-2.6, Plaintiffs-Appellants Ivana

Kirola, *et al.*, are not aware of any cases that are related to this matter.


Dated:  November 2, 2015                 Respectfully submitted,

                                         Schneider Wallace
                                         Cottrell Konecky
                                         Wotkyns LLP


                                          _/s/ Guy B. Wallace_
                                         Guy B. Wallace
                                         Attorneys for Plaintiffs
                                         and Appellants

## CERTIFICATE OF COMPLIANCE

This brief contains approximately 23,846 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in a 14-point proportionally spaced typeface using Microsoft Word.

Dated: November 2, 2015      Respectfully submitted,

Schneider Wallace
Cottrell Konecky
Wotkyns LLP

*/s/ Guy B. Wallace*
Guy B. Wallace
Attorneys for Plaintiffs
and Appellants

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2015, I electronically filed the foregoing and all attachments with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all the participants in the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

Dated:  November 2, 2015   Respectfully submitted,

          Schneider Wallace
          Cottrell Konecky
          Wotkyns LLP


          */s/ Guy B. Wallace*
          Guy B. Wallace
          Attorneys for Plaintiffs
          and Appellants