# EXHIBIT 4

631

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SAUNDRA BROWN ARMSTRONG, JUDGE

IVANA KIROLA, ET AL.,          )          COURT TRIAL
                               )
            PLAINTIFFS,        )          VOLUME 4
                               )
     VS.                       )          NO. C 07-03685 SBA
                               )
CITY AND COUNTY OF             )
SAN FRANCISCO, ET AL.,         )          PAGES 631 - 856
                               )
            DEFENDANTS.        )          OAKLAND, CALIFORNIA
_____)          FRIDAY, APRIL 8, 2011

                    TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

FOR PLAINTIFFS:          SCHNEIDER WALLACE COTTRELL BRAYTON &
                            KONECKY
                        180 MONTGOMERY STREET, SUITE 2000
                        SAN FRANCISCO, CALIFORNIA  94109
                   BY:  MARK T. JOHNSON,
                        ANDREW P. LEE,
                        KIRAN PRASAD,
                        GUY B. WALLACE, ATTORNEYS AT LAW

                        BROWN POORE LLP
                        THE WATERGATE TOWERS
                        2200 POWELL STREET, SUITE 745
                        EMERYVILLE, CALIFORNIA  94608
                   BY:  SCOTT A. BROWN, ATTORNEY AT LAW

FOR DEFENDANT:          OFFICE OF THE CITY ATTORNEY
                        SIXTH FLOOR - FOX PLAZA
                        1390 MARKET STREET
                        SAN FRANCISCO, CALIFORNIA  94102
                   BY:  ERIN BERNSTEIN,
                        JAMES M. EMERY,
                        ELAINE M. O'NEIL,
                        KRISTINE A. POPLAWSKI, ATTORNEYS AT LAW

REPORTED BY:          RAYNEE H. MERCADO, CSR NO. 8258
                      DIANE E. SKILLMAN, CSR NO. 4909

        RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

671

STEINFELD - DIRECT (RESUMED)/ WALLACE

Q.    OKAY.

A.    GIVES -- GIVES PEOPLE A CHANCE TO REST AND RECOVER THEIR -- THEIR ENERGY.

Q.    DO YOU HAVE ANY OPINIONS ABOUT WHETHER A RAMP OF -- OF THIS TYPE CAUSES ANY SAFETY CONCERNS?

A.    YES, THIS RAMP COULD CAUSE SIGNIFICANT SAFETY CONCERNS BECAUSE SOMEONE COULD START UP THE RAMP, START ROLLING BACKWARDS BECAUSE IT'S CURVED, THEY COULD BUMP INTO THE RAILING GOING BACKWARDS, GET TANGLED UP.  THE -- THEY COULD ALSO -- IF IT WERE REPEATED USE, IT COULD CAUSE PAIN -- EVEN WITH ONE USE, IT COULD CAUSE PAIN IF THEY HAVE CHRONIC PROBLEMS WITH THEIR SHOULDERS.

Q.    OKAY.  BASED ON YOUR EXPERIENCE AND RESEARCH OVER THE PAST 40 YEARS, IS THERE A PARTICULAR GRADIENT AT WHICH A RAMP STARTS TO CAUSE SAFETY CONCERNS FOR PERSONS WITH MOBILITY DISABILITIES TRYING TO USE IT?

A.    WELL, FIRST OF ALL, LIKE TO ANSWER THAT A LITTLE DIFFERENT WAY.  WE FOUND IN OUR RESEARCH IN THE '70'S THAT ONLY ABOUT HALF OF OUR RESEARCH PARTICIPANTS COULD MANAGE A SLOPE OF 1 TO 12 FOR MORE THAN ABOUT 20 FEET.  AND THIS IS WELL BEYOND 20 FEET, SO JUST BEING ABLE TO USE THE RAMP IS ONE CONCERN.

                    (SIMULTANEOUS COLLOQUY.)

BY MR. WALLACE:

Q.    WHAT GRADIENT IS 1 IN 12, DR. STEINFELD?

A.    8.33 PERCENT, SO THIS ONE IS ALMOST TWICE THE -- THE

            RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

                    Kirola Trial Day 04, 110408

702

STEINFELD - DIRECT (RESUMED)/ WALLACE

STOPS.  AND IN THIS CASE, THIS IS RIGHT OUTSIDE THE RICHMOND LIBRARY.  AND THIS HAS SLOPE -- A CROSS SLOPE OF 14 PERCENT. AND THE ALLOWABLE CROSS SLOPE IS 2 PERCENT.

BY MR. WALLACE:

Q.    OKAY.  DR. STEINFELD, WHAT'S THE DIFFERENCE BETWEEN RUNNING SLOPE AND CROSS-SLOPE?

A.    RUNNING SLOPE IS THE SLOPE GOING ALONG THE RAMP IN THE DIRECTION OF THE RAMP.  AND CROSS-SLOPE IS THE SLOPE MEASURED IN RIGHT -- AT RIGHT ANGLES AS YOU'RE GOING FORWARD DOWN THE RAMP.  IT WOULD BE FROM YOUR LEFT TO YOUR RIGHT OR RIGHT TO LEFT.

Q.    OKAY.  DOES THIS CROSS-SLOPE CAUSE YOU CONCERN?

A.    YES, CROSS -- SIGNIFICANT CROSS-SLOPE LIKE THIS CAN BE A SERIOUS PROBLEM FOR MANY PEOPLE WITH MOBILITY IMPAIRMENTS.

Q.    WHY IS THAT?

A.    FOR WHEELCHAIR USERS, IT CAUSES A WHEELCHAIR TO TRACK TOWARDS THE DOWNHILL SIDE SO IT MAKES IT MORE DIFFICULT TO MANEUVER, TO HOLD IT IN -- KEEP IT IN A STRAIGHT LINE.  AND WHAT IT ALSO DOES IS INCREASES THE FORCE ON THE -- ON THE SHOULDER ON THE DOWNHILL SIDE.  SHOULDER INJURIES ARE ONE OF THE MAJOR INJURIES THAT WHEELCHAIR USERS FACE.  THE --

IT ALSO AFFECTS PEOPLE WHO HAVE OTHER KINDS OF DISABILITIES LIKE LOWER LEG PROSTHESES, HIP PROBLEMS, THE -- BECAUSE -- BECAUSE IT PUTS MORE PRESSURE ON THE FORCE ON THE DOWNHILL SIDE AND, THEREFORE, CAN CAUSE PAIN OR -- OR CHRONIC

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

STEINFELD - DIRECT (RESUMED)/ WALLACE

PROBLEMS IF ENCOUNTERED A LOT.

Q.    OKAY.

WHAT IS THE -- WOULD YOU -- IN YOUR OPINION, WOULD YOU CONSIDER THIS CURB RAMP TO BE ACCESSIBLE?

A.    NO.

Q.    OKAY.

THE -- WHY NOT?

A.    BECAUSE OF THE EXCESSIVE CROSS-SLOPE.

Q.    WHAT IMPACT DOES THE INACCESSIBILITY OF THIS CURB RAMP HAVE ON THE ACCESSIBILITY OF THE RICHMOND LIBRARY?

A.    IT MEANS THAT PEOPLE WHO ARE DROPPED OFF AT THE LIBRARY MAY HAVE DIFFICULTY GETTING IN -- GETTING UP TO THE -- YOU KNOW, JUST EVEN GETTING TO THE SIDEWALK.  BUT I -- YOU KNOW, I THINK IN THIS CASE, IT'S MORE OF A -- IT'S MORE OF A -- AN ISSUE OF PAIN AND CONTRIBUTING TO CHRONIC -- CHRONIC HEALTH PROBLEMS.

Q.    OKAY.  DID IDEA CENTER OBSERVE OTHER CONDITIONS IN THIS CASE WITH AN EXCESSIVE CROSS-SLOPE?

A.    YES, WE DID.

Q.    HOW MANY?

A.    WELL, WE FOUND -- LET'S SEE NOW HERE.  THERE WERE 14 SITES.  13 OF THE 14 -- OF 14 SITES THAT HAD CURB RAMPS HAD EXCESSIVE CROSS-SLOPES.

Q.    WHICH SITES HAD THAT PROBLEM?

A.    I HAVE TO FIND THAT.

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

Kirola Trial Day 04, 110408

705

STEINFELD - DIRECT (RESUMED)/ WALLACE

A.    WELL, THE CALIFORNIA CODE REQUIRES A 48-INCH WIDTH.  THE ADAAG REQUIRES A 36-INCH WIDTH.  IN SOME CASES, WE FOUND THAT THE 48-INCH WIDTH WASN'T MET.

Q.    OKAY.

LET'S GO TO THE NEXT PHOTO, PLEASE.

(EXHIBIT PUBLISHED.)

BY MR. WALLACE:

Q.    WHAT ARE WE LOOKING AT HERE, DR. STEINFELD?

A.    THIS IS A ABRUPT EDGE ON THE BOTTOM OF A CURB RAMP.

THE COURT:  569G?

(PLAINTIFFS' EXHIBIT 569G

MARKED FOR IDENTIFICATION)

MR. WALLACE:  OKAY.

THE COURT:  YOU SHOULD ALWAYS IDENTIFY FOR THE RECORD WHAT IT IS YOU'RE -- WHEN YOU CHANGE, SO THE RECORD IS ALWAYS CLEAR AS TO WHAT YOU'RE REFERRING TO WHEN YOU SAY, WHAT ARE WE LOOKING AT HERE?

MR. WALLACE:  OKAY.

I'M SORRY, YOUR HONOR.

Q.    DOES THIS KIND OF CONDITION POSE A PROBLEM FOR WHEELCHAIR USERS?

A.    YES, THIS IS A VERY SIGNIFICANT PROBLEM.  WHEN YOU -- CROSSING A STREET AND HAVE TO GO UP A RAMP, YOU HAVE TO PUSH HARD ON A WHEELCHAIR.  SO YOU WANT TO BUILD UP SPEED TO GET UP THAT RAMP.  AND IF YOU ENCOUNTER A LIP LIKE THIS, IT CAN JUST

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

Kirola Trial Day 04, 110408

STEINFELD - DIRECT (RESUMED)/ WALLACE

STOP A PERSON RIGHT IN THEIR TRACKS AND CREATE A LOT OF VIBRATION.

ASIDE FROM SHOULDER INJURIES, THE OTHER MAJOR PROBLEM THAT WHEELED MOBILITY USERS HAVE IS LOWER BACK INJURIES.  AND VIBRATION CAUSED BY IRREGULAR PAVEMENT AND CONDITIONS LIKE THIS IS -- IT CONTRIBUTES SIGNIFICANTLY TO LOWER BACK PROBLEMS.  SO BY -- WHOLE BODY VIBRATION IS A REALLY SIGNIFICANT PROBLEM FOR WHEELED MOBILITY USERS.  IT'S BEEN IDENTIFIED IN THE LITERATURE.

Q.    IS THERE A PARTICULAR REASON THAT THE ADAAG REQUIRES THAT A CURB RAMP BE FLUSH WITH THE STREET?

A.    YEAH, THERE'S ANOTHER -- THAT -- THAT IS NOT THE ONLY REASON, BUT THE OTHER PROBLEM IS COMING DOWN THE CURB RAMP, BECAUSE WHEN SOMEONE COMES DOWN THE CURB RAMP AND THE CASTER -- THE FRONT CASTERS GO OVER THAT LIP, THEN THEY TEND TO SLIDE OUT OF THEIR CHAIR UNLESS THEY HAVE A SEAT BELT.  AND MOST PEOPLE DON'T USE LAP BELTS.

AND SO IT'S A -- IT CAN STOP THEM AS THEY'RE GOING DOWN, AND THEN THEY COULD SLIDE OFF THE CHAIR AND HAVE AN ACCIDENT.

AND, YOU KNOW, IT'S -- ACCIDENTS IN WHEELED MOBILITY DEVICES ARE NOT UNCOMMON.  THEY'RE A PRETTY SIGNIFICANT HEALTH PROBLEM FOR PEOPLE WITH -- WHO USE WHEELED MOBILITY DEVICES.

Q.    UM-HMM.

A.    SO THE ADAAG IN 1991, AND BEFORE THAT, THE NC STANDARD OF

RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR (510) 451-7530

749

STEINFELD - DIRECT / MR. WALLACE

DESIGNATED AS ACCESSIBLE LOCKERS, BUT THEY ARE -- THE ONES THAT ARE HARDER TO REACH AND AREN'T FULLY ACCESSIBLE BECAUSE THE COAT HOOKS WOULD BE WAY OUT OF REACH.  THE CLOTHING HOOKS THAT USUALLY ARE INSIDE LOCKERS ON THE SHELF.

AND THE HARDWARE ALSO REQUIRES TIGHT GRASPING TO OPEN.  AND IT'S CLEAR FROM THIS PHOTO THAT THEY COULD HAVE ADJUSTED THE LOCKER ROOM TO PROVIDE MORE -- TO PROVIDE ACCESSIBLE LOCKERS.

Q.   HOW DOES THAT LIMIT ACCESS TO THE LOCKER ROOM?

A.   IT MEANS PEOPLE WOULD NEED ASSISTANCE TO STORE THEIR CLOTHES AND RETRIEVE THEM.  THEY WOULDN'T BE ABLE TO DO IT INDEPENDENTLY.

Q.   OKAY.

DR. STEINFELD, AS PART OF YOUR WORK ON THIS MATTER, DID YOU REACH ANY OPINIONS AS TO WHETHER THE LIBRARIES WERE ACCESSIBLE TO PERSONS WITH MOBILITY DISABILITIES?

A.   THE LIBRARIES WE SAW HAD MANY BARRIERS IN THEM, EVEN THE NEW ONES.  SO I DON'T THINK YOU COULD SAY THAT THEY WERE ACCESSIBLE USING THE STANDARD OF THE ADA GUIDELINES.

Q.   AND BASED ON YOUR WORK IN THIS CASE, DID YOU REACH ANY CONCLUSION AS TO WHETHER THE CITY'S POLICIES HAD BEEN EFFECTIVE IN PROVIDING ACCESS TO PERSONS WITH MOBILITY DISABILITIES?

A.   I THINK THIS COLLECTION OF PHOTOGRAPHS DEMONSTRATES THAT THE POLICIES ARE NOT EFFECTIVE; THAT THERE ARE FACILITIES THAT THEY DESIGNATED ACCESSIBLE FACILITIES THAT AREN'T FULLY

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

750

STEINFELD - DIRECT / MR. WALLACE

ACCESSIBLE.

THERE ARE CONTINUING PROBLEMS WITH THE MANAGEMENT OF THE FACILITIES.  SO PEOPLE WHO OPERATE THE FACILITIES ARE NOT AWARE OF WHAT THEY NEED TO DO TO KEEP THEM ACCESSIBLE -- KEEP THOSE PLACES ACCESSIBLE THAT THEY NEED TO.

AND THE PRESENCE OF BARRIERS IN THE NEW CONSTRUCTION INDICATES THAT THERE ISN'T A GOOD QUALITY CONTROL ON APPROVING THE -- EITHER THE DESIGN OR THE CONSTRUCTION OR BOTH.  IT'S HARD TO SAY SOMETIMES WHERE THIS -- WHERE THE PROBLEM LIES.

Q.   OKAY.

BASED ON YOUR WORK ON THIS CASE AND YOUR INVESTIGATION AND YOUR EXPERIENCE, DID YOU REACH ANY OPINIONS AS TO WHETHER THE CITY HAS A PROPER UNDERSTANDING AND DEFINITION OF WHAT IS ACCESSIBLE TO PERSONS WITH MOBILITY DISABILITIES?

A.   I THINK THE ACCEPTED DEFINITION IS THAT ACCESSIBLE FACILITIES AT -- IN TERMS OF PROGRAM, THOSE PARTS OF THE BUILDINGS WHERE PROGRAMS ARE OFFERED SHOULD BE -- WHICH ARE NEEDED FOR PROGRAM ACCESSIBILITY, NEED TO COMPLY WITH THE ADA GUIDELINES.  AND IN CALIFORNIA, THAT WOULD INCLUDE THE CBC CODE AS WELL.

AND I DON'T THINK THE CITY HAS REALLY EXPLICITLY STATED THAT THAT'S WHAT THEY ARE SHOOTING FOR.  AND I THINK THAT IS A PROBLEM.  IN THE TESTIMONY FROM CITY OFFICIALS, IT APPEARS THAT WHEN THEY INSPECT BUILDINGS, THAT THEY DON'T DO IT

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930

Kirola Trial Day 04, 110408

751

STEINFELD - DIRECT / MR. WALLACE

IN A SYSTEMATIC WAY, THEY DON'T HAVE A DETAILED CHECKLIST, THEY DON'T PROVIDE NOTES TO THE ARCHITECTS AND TO THE CONTRACTORS, AND THINGS DON'T -- THINGS GET BY, THINGS SLIP BY AND NOT CORRECTED IN TIME.

THERE ALSO MAY BE A DISCONNECT BETWEEN VARIOUS DIVISIONS WITHIN EACH AGENCY.  SO, FOR EXAMPLE, HOW DO YOU EXPLAIN THE SECURITY GATES?  MAYBE THERE'S A PURCHASING AGENT THAT BUYS THOSE SECURITY GATES.  THE ARCHITECT NEVER SEES THE DRAWINGS TO REVIEW THEM IN TERMS OF COMPLIANCE WITH THE ADA, AND SO THE BUILDING HAS AN ACCESSIBLE ENTRANCE AND THEN THE SECURITY GATES ARE PUT IN AND THEY ARE TOO NARROW.  THE -- SO THAT THEY MAY BE -- APPEARS TO BE A LACK OF COORDINATION BETWEEN THE VARIOUS PEOPLE INVOLVED.

AND I THINK THERE NEEDS TO BE MORE RIGOR AND MORE CAREFUL AND THOROUGH QUALITY CONTROL.

Q.   AND WHAT HAS THE OUTCOME OF THOSE PROBLEMS BEEN FOR PERSONS WITH MOBILITY DISABILITIES?

A.    THE OUTCOME GOES BACK TO WHAT ACCESSIBILITY TO -- OF -- AND FULL PARTICIPATION MEAN.  PEOPLE DON'T HAVE FULL ACCESSIBILITY TO THE PROGRAMS.  THEY DO NOT HAVE -- THEY ARE EXPOSED TO SAFETY RISKS IN SOME -- IN MANY CASES.  AND THEY DON'T HAVE FULL AND EQUAL PARTICIPATION, AND THEY DON'T REAP THE BENEFITS IN AN EQUAL WAY OF THE PROGRAMS THE CITY PROVIDES.

MR.  WALLACE:  PLAINTIFFS HAVE NO FURTHER QUESTIONS FOR DR. STEINFELD AT THIS TIME.

DIANE E. SKILLMAN, OFFICIAL COURT REPORTER, USDC (510) 451-2930